# EXHIBIT 6

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF**

**ENGLAND AND WALES**

**BUSINESS LIST (ChD)**


**B E T W E E N:**


**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**<u>Claimant</u>**

**-and-**


**FARHAD AZIMA**

**<u>Defendant</u>**

_____

**DEFENDANT'S SKELETON ARGUMENT**

**FOR TRIAL**

_____


_**Suggested judicial pre-reading**_: (2 days)

- Skeleton Arguments

- Pleadings: Bundle volume [**A**]

- Witness Statements:

  - Claimant's statements: Bundle volume [**B**]

  - Defendant's statements: Bundle volume [**E**]

- Expert Reports (Defendant: [**F/1**]; Claimant: [**F/13**]) and Joint Expert Statement [**F/27**]

- Emails regarding the "targeting" of Mr Azima: 4-6 April 2015 [**H7/267**]-[**H7/274**], and 20 July 2015 [**H7/463**]**, [H7/464**]

- Internal reports on Mr Azima of March 2015 [**H7/298**], [**H7/299**] and December 2015 [**H9/106**]

- Websites attacking Mr Azima: [**F/10**], [**F/11**], [**H10/360**]

1

EXHIBIT 6

## I. INTRODUCTION AND OVERVIEW

1. The Defendant, Mr Azima, is a US citizen. He is a businessman with a long and successful career in the aviation sector, including having owned three airlines and assisting the government of Tatarstan in establishing its own airline. Mr Azima and his companies had been in business in a range of countries including in Ras Al Khaimah ('**RAK'**), which is an Emirate in the United Arab Emirates, including with the national carrier, RAK Airways.

2. The Claimant, the Ras Al Khaimah Investment Authority ('**RAKIA**'), is a state entity of RAK. The Claimant has indicated that in around July 2015, its affairs began to be wound up and that responsibility for managing its assets and this litigation was run through another RAK State-owned entity, RAK Development LLC (1st Ward, para 8 [**G/8/3**]). As set out below, a range of other RAK-government individuals and bodies feature in this litigation, including RAK Petroleum and RAKIA Georgia, and His Highness Sheikh Saud Bin Saqr Al Qasmi, the Ruler of RAK ('**the Ruler'**). References in this skeleton argument to "RAKIA" should be understood in the broader sense of including other RAK-government bodies and institutions, save where the context indicates otherwise.

3. RAKIA presents itself as bringing a conventional commercial claim against Mr Azima for: (1) breach of warranty in a settlement agreement signed by the parties in March 2016 ('**Settlement Agreement**'); (2) misrepresentations inducing it to enter that Settlement Agreement; and (3) a conspiracy inducing it to pay Mr Azima a commission on a false basis. It contends that it is pursuing a series of alleged frauds perpetrated by its former CEO, Dr Khater Massaad, and that it has discovered evidence against Mr Azima in connection with its investigations into Dr Massaad.

4. In reality, RAKIA's conduct is highly <u>un</u>conventional, for two reasons. First, the litigation is the result of a targeted attack on Mr Azima, pursued because of his refusal to take RAKIA's side in a bitter fight with a former senior government official that arose following a change of regime in RAK. Second, at the heart of these proceedings is a prolonged illegal computer hacking attack on Mr Azima's emails and data occurring until immediately prior to the issuing of RAKIA's claim in September 2016. There is no dispute that in bringing this case RAKIA seeks to rely on a huge quantity of confidential (and in many instances privileged) documents and data that was stolen

from Mr Azima. Mr Azima contends that it was stolen by RAKIA. RAKIA claims to have no knowledge of the hacking and to have obtained the data from various websites (described as "BitTorrent" websites) created in August and September 2016; indeed, it admits to holding in excess of 30GB of Mr Azima's data.

5. As set out below and as will be developed at trial, there is a compelling case establishing RAKIA's responsibility for the hacking of Mr Azima's emails and data. RAKIA and the Ruler of RAK sought to "target" Mr Azima shortly before his emails and data were hacked, hired a third party investigator who has been tied to hacking in the past, threatened that he would become "collateral damage" shortly before his hacked data was published on the internet, and is the only party that has used the data in any proceedings against Mr Azima, whose financial accounts and online identity have remained untouched.

6. Mr Azima strongly denies RAKIA's allegations on their merits and has addressed RAKIA's case in witness evidence from himself and others. He contends, in particular, that transactions and matters now complained of by RAKIA were endorsed at the time by the Ruler of RAK or by RAKIA itself. As set out in detail below, RAKIA's claims of dishonesty are unsustainable on the evidence.

7. Moreover, Mr Azima's case is that RAKIA's hacking of his emails, its deployment of his stolen documents in these proceedings, and its dishonest denials of any responsibility for the hacking are so egregious and outrageous that RAKIA's claim should be regarded as an affront to the administration of justice and struck out as an abuse of process. It should do so irrespective of its merits (which Mr Azima denies). He also and alternatively contends that the evidence on which RAKIA relies should be ruled inadmissible and RAKIA's claims accordingly dismissed as unfounded.

8. Mr Azima has also brought a counterclaim against RAKIA arising from the hacking seeking significant damages; that counterclaim has been stayed for case management reasons until after the trial of RAKIA's claims against Mr Azima. Mr Azima does also rely in this trial on his complaint of hacking and his claim for damages to set off RAKIA's claim.

9. The detailed basis for Mr Azima's complaint of hacking against RAKIA is set out below. In overview, the overarching connection between the hacking and RAKIA's pursuit of these proceedings is as follows.

3

10. RAKIA has over the last three years deployed documents stolen from Mr Azima, including privileged material. It has presented itself as uncovering new evidence from the data it claims to have discovered on the BitTorrent sites. In reality, it is clear from the disclosed documents that from early 2015 the RAK government and the Ruler of RAK had marked Mr Azima as complicit in what it described as Dr Massad's 'frauds' against it, well before it entered the Settlement Agreement and before proceedings commenced in September 2016. Those 'frauds' included, in RAK's mind, Mr Azima's involvement in investigating arbitrary detention and other human rights abuses in RAK.

11. As developed below, the evidence points clearly to RAKIA having decided in early 2015 that Mr Azima was an adversary connected with its bitter dispute with Dr Massaad. RAKIA accordingly began investigating and monitoring Mr Azima, using various shadowy agents, including Stuart Page, who has been linked in other proceedings with the unlawful gathering of evidence. The actions of these agents were directed by Mr Buchanan and by RAKIA's solicitor Mr Neil Gerrard of Dechert LLP, who faces serious allegations of wrongdoing in other proceedings. RAKIA also appointed other agents, including the disgraced PR firm Bell Pottinger, in readiness for an "*offensive*" online campaign that would disseminate RAKIA's attacks on Mr Azima. In parallel, RAKIA drew Mr Azima into entering into the contractual duties of good faith and the jurisdiction clause in the Settlement Agreement on which it now relies in these proceedings.

12. Having put these building blocks in place, RAKIA then unleashed a campaign against Mr Azima through the issuing of this claim, accompanied by the hacking attack and a storm of critical publicity. The trigger for RAKIA acting was laid bare at a meeting between Mr Azima and RAKIA's representatives in July 2016. At that stage, Mr Azima had been engaged for some time in assisting to broker a resolution of the dispute between RAKIA and Dr Massaad. The July 2016 meeting took an acrimonious turn, with Mr Gerrard telling Mr Azima that if Dr Massaad could not be made to agree to a settlement, then RAKIA would pursue Dr Massaad, and Mr Azima would be rendered "collateral damage".

13. The dispute with Dr Massaad was not resolved. RAKIA admits to creating websites attacking Dr Massaad a few days after the July 2016 meeting, and very shortly after those sites were created, in early August 2016, websites began appearing denigrating

Mr Azima as a "fraud" and a "scammer", connecting him to Dr Massaad, and linking to BitTorrent websites containing Mr Azima's stolen data that appeared in parallel at around the same time. The following month, RAKIA issued this claim invoking the contractual duty of good faith and the English jurisdiction clause to which Mr Azima had agreed months earlier. RAKIA's pursuit of Mr Azima in this case is the only instance in which any person has made use of any of Mr Azima's stolen data in any proceedings anywhere in the world.

14. RAKIA has also used improper methods to pursue other parties whom it associates with Dr Massaad, including the former head of RAKIA in the Republic of Georgia, Mr Gela Mikadze. Internal RAKIA documents apparently leaked to a Georgian TV news website show RAKIA seeking to influence the Georgian judicial process against Mr Mikadze and other adversaries of RAKIA in that country. Despite its status as a government body, RAKIA is evidently willing to use illegitimate means of attacking those whom it regards as its opponents.

15. The case against RAKIA is fortified by its highly suspicious approach to the documentary evidence in this case. At the disclosure stage throughout 2017 and 2018, RAKIA repeatedly presented its central witness, Mr Buchanan, as the conduit for relevant communications on RAKIA's side, and informed the Court that Mr Buchanan's emails had been fully preserved and imaged for searching. Only after the disclosure process was completed in April 2019, did RAKIA inform Mr Azima that significant numbers of Mr Buchanan's emails had been deleted and could not be restored. RAKIA has since provided several further contradictory accounts of the deletion of those emails. Negligible disclosure was obtained from the key agents and consultants engaged by RAKIA. It has transpired that various consultants had policies of destroying documents (in some instances, within 24 hours of creation), and of deliberately avoiding creating any documents referring to Mr Azima in the first place.

16. The evidence all suggests that RAKIA has sought to kick over the traces of its misconduct. As with many miscreants, however, those attempts at concealment were not fully successful.

17. The evidence and the chain of events indicates that RAKIA has maliciously pursued Mr Azima. It cynically entered into the Settlement Agreement as a device, insisting on the inclusion of a duty of good faith binding Mr Azima (and an English jurisdiction

clause), while at the same time harbouring a conviction informed by surveillance and other covert sources that he was <u>not</u> acting in good faith.   In doing so, it sought to use Mr Azima in its dispute with Dr Massaad: it believed the Settlement Agreement gave it leverage over Mr Azima, insurance to recover the funds paid (which were modest compared to the $2 billion it was seeking to obtain), and possibly the means of turning Mr Azima against Dr Massaad.   These proceedings, the hacking, and the online campaign, are ultimately aimed at ruining Mr Azima's reputation, as retribution for his refusal to join RAKIA's side and to punish him for his involvement in investigating human rights abuses in RAK.

Case 1:20-cv-00954-WO-JLW    Document 22-6    Filed 11/12/20    Page 7 of 128

## II.   ISSUES AND SOURCES OF EVIDENCE

18.   RAKIA brings several claims, most of which are based on an allegation that Mr Azima acted contrary to clause 3.2 of the March 2016 Settlement Agreement, which states as follows:

> *"Mr Azima and HeavyLift each expressly and separately warrants and confirms to RAKIA that he/it (respectively) has at all times acted in good faith and with the utmost professional integrity and will continue in the future to act in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK Entity.*
>
> *"The payment made to HeavyLift pursuant to this Settlement Agreement is made in reliance on this express warranty and confirmation.*
>
> *"For the purposes of this Sub-clause, "acted in good faith" and "act in good faith" each means (1) participating in conduct which meets the standard expected of reasonable business persons in the context and includes acting in ways which were or are, or are likely to be, non-detrimental to the interests of RAKIA or any other RAK Entity, and (2) not encouraging others to participate in conduct which fails to meet the standard expected of reasonable business persons in the context or acting in ways which were or are likely to be detrimental to the interests of RAKIA or any other RAK Entity and (3) not participating in any illegal activity.*
>
> *"In this Agreement "RAK Entity" shall mean any entity in which RAKIA or the Government of RAK has a shareholding interest (irrespective of where that entity may be incorporated)."*

19.   RAKIA alleges acts of so-called "misconduct" contrary to clause 3.2 in four categories. These four acts of misconduct are said: (1) to constitute a breach of contract, and/or (2) to establish that by warranting that he had acted consistently with the standards of conduct described by the clause, Mr Azima made a misrepresentation, which induced RAKIA to enter the Settlement Agreement.  Other related allegations are also made. These allegations are addressed in detail below, but the following high level summary is provided for the Court's reference at this stage:

20. **Training Academy Allegation**  It is said by RAKIA that Mr Azima made fraudulent misrepresentations exaggerating the amounts invested by HeavyLift, a company at one time owned by Mr Azima, in a joint venture between HeavyLift and RAK Airways establishing and operating a flight training academy in RAK from 2007-2010.  Mr Azima strongly denies dishonesty. HeavyLift's claim for compensation was justified and fully consistent with the accounts for the training academy prepared and audited contemporaneously, years before the claim was made.  He contends that RAKIA has selectively cherry-picked certain aspects of the work done to create the training academy, while ignoring the bulk of the very substantial other contributions made and services provided by HeavyLift.

21. **Hotel Allegation**  RAKIA contends that Mr Azima committed acts of misconduct in relation to the proposed sale of a hotel in Tblisi owned by RAKIA Georgia.  It is alleged that Mr Azima concealed the interest he was to obtain in the hotel following sale, misrepresented his role in introducing RAKIA to the buyers, and then created a sham contract to justify the referral fee he was paid by RAKIA.  These allegations are flatly contradicted by the contemporaneous documents, including from RAKIA's own lawyers.  RAKIA contends also that Mr Azima bribed Dr Massaad to secure his referral fee; this, too, is baseless, resting on the flawed premise that Mr Azima had no entitlement to any referral fee, and at odds with the documented fact that the so-called bribe related to the purchase of aircraft and was repaid.

22. **ISR Allegation**  RAKIA alleges that Mr Azima committed acts of misconduct in presenting proposals in 2015-2016 for RAKIA to enter into a joint venture to establish an intelligence, surveillance and reconnaissance operation ('ISR') using aircraft.  Mr Azima denies that there was any misconduct in the presentation of those proposals, which were an ordinary commercial exchange between sophisticated parties, each represented by lawyers.  The proposals ultimately were not pursued and RAKIA's complaints are hollow.

23. **Human Rights Campaign Allegation**  It is alleged that from 2014, Mr Azima participated in a media campaign against RAK and RAKIA, in particular by seeking to publicise media stories of abuses by the RAK government authorities, which RAKIA alleges were false.  It is said that this 'campaign' constitutes misconduct prohibited by clause 3.2 of the Settlement Agreement.  However, Mr Azima's activities in

investigating human rights abuses were justified and do not constitute misconduct. Moreover, the evidence shows that the RAK authorities are in fact implicated in very serious human rights abuses. In any event, it is clear that RAKIA was well aware (through some form or other of surveillance) of Mr Azima's activities in this regard well before it entered the Settlement Agreement. Its claim to have suffered loss does not hold water, especially as no publicity actually resulted.

24. Mr Azima denies RAKIA's allegations of wrongdoing and disputes RAKIA's claims of having relied on any representations, given that RAKIA was privately convinced that Mr Azima was engaged in wrongdoing. He contends that in any event, RAKIA seeks to prove its case by relying on materials stolen from him, and has lied to the Court about the means by which it came to hold those materials.

25. Mr Azima's case in a nutshell is that (contrary to its denials) RAKIA is responsible for a hacking attack that entailed the theft of his data and culminated in August 2016 with the placing of those data on a series of BitTorrent websites. Other websites were also published by RAKIA at the same time, denigrating him and linking to the BitTorrent websites. Mr Azima infers that RAKIA had assistance from at least some of its agents that it had engaged in connection with this dispute.

26. He submits that RAKIA's claims should therefore be dismissed as an abuse of process, and/or that the stolen documents should be excluded from evidence. Further or alternatively, the damages recoverable by Mr Azima under his counterclaim for RAKIA's hacking fall to extinguish or diminish RAKIA's own claims, by way of a separate defence of set-off.

27. Both parties rely on factual witness evidence and expert reports.

### A.     Mr Azima's witnesses

28. Mr Azima has provided two witness statements and also relies on witness statements from Mr Ray Adams and Mr Donald Fowler:

   a. Mr Adams is the President and CFO of ALG, a company owned by Mr Azima. Mr Adams was formerly the CFO of HeavyLift. He was involved in a number of the transactions the subject of RAKIA's claim.

b. Mr Fowler is a senior US political figure, and was formerly the Chairman of the Democratic National Committee. He offered assistance to Mr Azima and HH Sheikh Saud Bin Saqr Al Qasimi (now the Ruler of RAK) in the mid-2000s by meeting with US congressional leaders in support of Sheikh Saud's claim to be heir to the position of Ruler. RAKIA does not challenge his evidence. His evidence corroborates Mr Azima's account that Mr Azima provided much valued assistance to the Ruler, laying the foundation for their close relationship.

29. Mr Azima has also served a witness statement from Mr David Sun and applied for permission to rely on that statement, while also offering Mr Sun for cross-examination. Mr Sun is an IT analyst who attempted to download Mr Azima's data from the BitTorrent websites in 2016, and whose contemporaneous report on that work (the 'Sunblock Report') is referred to by the Defendant's forensic IT expert, Mr Tarbell. Mr Sun's statement essentially confirmed that he had carried out the attempted download described in the Sunblock Report. RAKIA opposed the admission of the statement. At the pre-trial review, RAKIA indicated that it did not contest the facts recorded in the Sunblock Report. On that basis, the Court did not make a ruling on Mr Azima's application to admit Mr Sun's witness statement.

### B. RAKIA's witnesses

30. RAKIA has served witness statements from twelve witnesses, but has offered only eleven of these for cross-examination.

31. **The Ruler** The Ruler of RAK has provided a witness statement purporting to respond to and rebut various aspects of Mr Azima's case [**D/17**]. RAKIA has refused to offer the Ruler for cross-examination, asserting that this would be incompatible with his position.

32. Had the Ruler been offered for cross-examination, Mr Azima would have strongly challenged him on each aspect of his evidence with clear evidence contradicting his account, and would have put to the Ruler matters that are avoided in his witness statement. Mr Azima would have sought to cross-examine the Ruler on points at the heart of RAKIA's claim and Mr Azima's defences, including on:

a. RAKIA's case that Mr Azima sought to arrange the publication of "*false*" stories reporting on the arbitrary detention of individuals in RAK. There is a

10

mass of evidence from independent NGOs and international bodies on human rights abuses in RAK, including the prolonged and illegal detention of dissidents and others at the Ruler's Palace: see eg [**G/26.3/18, 19**]. As RAKIA has put in issue its practices on detention and its human rights records, this would have been put to the Ruler.

b. The instructions given by the Ruler in April and July 2015 to Mr Buchanan, Mr Bustami and Mr Handjani to "target" Mr Azima, to bring criminal charges against him, and to use "other channels", which are recorded in emails: [**H7/269**], [**H7/274**], [**H7/464**].

c. The Ruler's denial of having asked Mr Azima to assist in the sale of the Georgian hotel owned by RAKIA, or of having approved payments to Mr Azima (1st Saud, paras 15-20 [**D/17/5-7**]).

d. The reason for the Ruler's interest in including a duty of "good faith" in the Settlement Agreement. A contemporaneous briefing to the Ruler alluded to his reasons for insisting on including this duty: *"It is on this basis that we have been able to successfully negotiate the inclusion of Clause 3.2 referred to below which we believe is the key clause in this agreement bearing in mind your wider objectives"* [**H9/417/1**].

33. Other relevant points would have been challenged had the Ruler submitted to cross-examination. For example, the Ruler also denies that Mr Azima introduced him to foreign political leaders (para 11) or that Mr Azima offered assistance in relation to various business dealings, denying in particular that Mr Azima accompanied him in a delegation to Kurdistan (para 12(2)) [**D/17/4**]. As to this:

a. The documents show that Mr Azima acted as a conduit for exchanges and invitations passing between the Ruler and the Prime Minister of Tatarstan in Russia: see [**H1/109**], [**H1/190**].

b. Contemporaneous emails and photographs show that Mr Azima sponsored the Ruler's invitation to attend the Clinton Global Initiative in 2011: [**H3/445**], [**H3/446**], [**H3/450**]. This led the Ruler to become a member and then meet former President Bill Clinton and former Secretary of State Hillary Clinton: 1st Azima, para 15 [**E/3/4**].

11

c.  In contemporaneous emails, Mr Azima indicated that he was to accompany the Ruler on a visit to Erbil, in Kurdistan: [**H3/360**].

34.  The Ruler also denies Mr Azima's case that the two enjoyed a close relationship and generally presents the relationship as being limited in scope.  He also denies knowledge or involvement in the running of RAKIA, or having approved any of the transactions or payments at issue.  As to this:

a.  Mr Azima has presented evidence showing how this relationship was forged: Mr Azima (through his contacts with Mr Fowler and others) had offered valuable political assistance to the Ruler in a power struggle following the death of his late father: see 1st Fowler, para 6-7 [**E/12**] (unchallenged by RAKIA).

b.  Other documents confirm that the Ruler invited Mr Azima to visit the Palace in RAK, indicating that he would be "delighted" to see him: [**H8/167**].

35.  One aspect of Mr Azima's case concerns an article published by a news website, *The Smoking Gun*, about the Ruler.  The article concerns an alleged sexual assault committed by the Ruler in the United States [**H10/357**], and includes a full police report of the incident, recording an interview in which the Ruler made certain admissions and the police officer's critical observations of his truthfulness [**H1/6.1**].  This article was among Mr Azima's data and so was available to the persons that conducted the hacking, but it was omitted from the materials published on the BitTorrent websites (2nd Azima, paras 41-42 [**E/4/10**]).

36.  The publishers of *The Smoking Gun* reported that a cyber-attack was made on this story on their website following demands by the Ruler's representatives for the story to be taken down [**H10/358**]:

> *"Beginning yesterday afternoon, TSG has been the target of a massive denial-of-service attack intended to drive the site offline. Launched from numerous international locales, the attack has swamped our servers with more than 300 million requests (and counting).*
>
> *The attack's specific target is a story we published in October 2009. That piece revealed the arrest of a United Arab Emirates sheikh for the sexual assault of a housekeeper at a Minnesota hotel adjacent to the Mayo Clinic.*

12

*Intermediaries for Sheikh Saud bin Saqr Al Qasimi, the 62-year-old ruler of Ras al-Khaimah, one of the seven emirates comprising the UAE, have previously asked TSG to delete the story. Those requests were denied.*

*So we've republished the story here: bit.ly/2M67Epq It would be terrible if the piece (and the sheikh's mug shot) got retweeted/recirculated."*

37. The Ruler denies (in extremely brief terms) directing any cyber-attack on the *Smoking Gun* website: 1st Saud, para 29 [**D/17/9**]. This is obviously a matter on which Mr Azima would have challenged his evidence given the information provided by the publishers of the website, and the central issue of cyber-warfare by RAK in these proceedings.

38. The Ruler's refusal to submit to cross-examination is highly unsatisfactory. RAKIA, a State entity, has chosen to use the English Court to resolve its dispute and it has willingly brought proceedings in this jurisdiction. The key figure behind its activities purports to give evidence but without allowing himself to be challenged on any of its contents. The purported reason given is a general assertion that it would be "*incompatible with his constitutional role and status as the sovereign ruler*" of RAK [**G/42**].

39. This is not sufficient justification for the Ruler's refusal to give evidence:

    a. The government of RAK, through RAKIA and supported by other RAK government entities, has voluntarily pursued these proceedings and the Ruler has voluntarily provided a witness statement. He could submit to cross-examination. He is not a head of State (and even heads of State can give evidence, even if they cannot be compelled to do so).

    b. The Ruler is clearly a key figure in the matters at issue in these proceedings, given in particular his instructions to RAKIA's agents to "target", to bring "criminal charges", to "go after" and to use "other channels" against Mr Azima. These orders cannot be reconciled with RAKIA's claims to the Ruler acting in a "*constitutional role*" and in any event, even senior government officials can and do give evidence in civil courts.

40. It is submitted that the Court should give no weight to the Ruler's evidence. It should rather infer that the Ruler's refusal to submit to cross-examination is motivated by a desire to avoid scrutiny, and so should accept Mr Azima's account of transactions and

13

discussions involving between him and the Ruler, and other matters concerning the Ruler.

41. **RAKIA's remaining witnesses**  RAKIA has also served witness statements from the following persons:

   a. Mr James Buchanan.  From November 2014, Mr Buchanan was the CEO of RAK Development LLC, albeit Mr Azima understands that he ceased working for any RAK entity in late 2019.  Mr Buchanan is said by RAKIA to have been responsible for the conduct of this litigation.  Mr Buchanan is RAKIA's central witness but has no first-hand knowledge of certain key events and transactions.  As discussed further below, significant deficiencies arose in the preservation and disclosure of Mr Buchanan's documents.

   b. Mr Neil Gerrard is a solicitor at the London office of Dechert LLP.  Mr Gerrard is an important figure in the case, being a key counsel at the highest levels of the government of RAK.  He provided instructions to various of RAKIA's agents engaged to conduct investigations and internet monitoring and publications in relation to this dispute.  It is Mr Azima's case that Mr Gerrard threatened him at a meeting on 16 July 2016.

   c. Mr Amir Handjani is a member of the board of RAK Petroleum and a senior adviser at Karv Communications, a firm engaged by RAKIA in connection with this dispute.  He was party to a number of communications in which the Ruler's instructions to target and go after Mr Azima were discussed.

   d. Mr Stuart Page is the principal of a corporate investigations firm engaged by RAKIA.  He is said by RAKIA to have informed Mr Buchanan and Mr Gerrard of the existence of the BitTorrent websites containing Mr Azima's data.  Mr Page has been connected with unlawful evidence-gathering, including through hacking, in other cases. Mr Page's role is very opaque, compounded by the absence of any documents at all concerning his role.

   e. Mr Naser Bustami is a director of Stevin Rock, a RAK State-owned company in the quarrying business, and a director of RAK Development LLC.  He is also party to a number of communications in which the Ruler's instructions to target and go after Mr Azima were discussed.

14

f.  Mr Majdi Al Halabi is an Israeli journalist and lawyer.  Mr Halabi is said to have discovered various BitTorrent websites containing Mr Azima's data, and to have informed Mr Page of this.  Mr Al Halabi is an important part of RAKIA's story as to how it innocently discovered by Mr Azima's data, but he has provided no documents for use in these proceedings.

g.  Mr Stuart Leach was employed in a senior role at Bell Pottinger, one of the agents engaged by RAKIA in connection with the dispute.  He was the principal recipient of instructions at Bell Pottinger and also provided instructions to another consultancy firm, Digitalis Reputation.  Despite being requested, Mr Leach has provided no documents for use in these proceedings.

h.  Mr David King is the CEO of Digitalis Reputation ('**Digitalis'**).  Digitalis was engaged by RAKIA to conduct an "*offensive and defensive*" online operation in connection with the dispute.  Its mandate included "*website establishment*".  It admits to having created websites making allegations against Dr Massaad at the same time as the websites denigrating Mr Azima and the BitTorrent websites containing his data appeared.  Digitalis provided no documents when requested by RAKIA pursuant to the Court's orders on disclosure.  Following a third party disclosure application, Digitalis produced a single irrelevant document.  Digitalis claims to have a practice of keeping emails for 2 years, and it was instructed by RAKIA's solicitors to preserve documents on 1 November 2016, yet no useful documents have been disclosed.  It transpires that Digitalis destroyed any hard copy documents within 24 hours of creation.  Digitalis enforced standing instructions internally to avoid creating documents mentioning Mr Azima.

i.  Mr Nicholas del Rosso is employed by Vital Management Services ('**Vital'**).  Vital is said to have engaged another firm, NTi, to download Mr Azima's personal data from the BitTorrent websites in August and September 2016.

j.  Mr Richard Garcia and Ms Jessica Gray are employed by NTi.  Their evidence is that they carried out a download of Mr Azima's data from the BitTorrent websites in August and September 2016, on RAKIA's instructions.

42.  A recurrent theme of RAKIA's case is that it relies on the evidence of several important witnesses without those witnesses having produced any documents at all to substantiate

15

their account of events. By contrast, RAKIA has had access to an enormous volume of Mr Azima's documents, given the hacking. The absence, destruction and/or loss of documents on RAKIA's side is highly suspicious (to say the least) and Mr Azima will invite the Court to infer that RAKIA and its agents adopted these practices to avoid scrutiny of wrongdoing. RAKIA admits that large quantities of documents were deleted after litigation was contemplated against Mr Azima. Whatever the reason for the absence of documents, it should lead to inferences being drawn against RAKIA.

43. Moreover, RAKIA's main witness Mr Buchanan has no personal knowledge of certain material events and transactions. The only witness on RAKIA's side who does have knowledge of those events is the Ruler, who has provided a self-serving witness statement but who refuses to give oral evidence.

### C. Dr Massaad and others said to be his associates

44. RAKIA makes very serious allegations regarding Dr Massaad, and in so doing aims to tar Mr Azima with the same brush. RAKIA also contends that others, such as Mr Al Sadeq and Mr Mikadze, were also engaged in fraud with Dr Massaad, such that RAKIA is not fixed with their actions or knowledge. It should be noted that RAKIA has not attempted to prove the various wide-ranging allegations against Dr Massaad, which are expressed in very high level terms (see 1st Buchanan, paras 13-19 [**D/9/4, 5**]). Rather, it relies on the convictions recorded by the courts of the UAE against Dr Massaad following trial *in absentia*: 1st Buchanan, para 17 [**D/9/5**]. As against Mr Al Sadeq and Mr Mikadze, it offers bare assertion from the Ruler: 1st Saud, para 23 [**D/17/7**] and reference to unspecified "convictions": RRARep, para 11.2 [**A/4/17**].

45. This Court should not assume that the convictions recorded against Dr Massaad establish his guilt for those matters, and there is simply insufficient information before the Court in any event to understand the specific wrongs alleged by RAK and RAKIA against him. Trial *in absentia* cannot be regarded as a reliable judicial mechanism without the Court also seeing at least some of the underlying evidence and details of the allegations, particularly where such serious allegations are involved. This is *a fortiori* given that the legal system which has produced these verdicts is that of the UAE. The UAE is heavily criticised for human rights abuses, in particular arbitrary detention, as discussed in detail below under the "Human Rights Campaign" allegation, Section VII.B.1, paras 364*ff*.

46.     In the circumstances, it is submitted that the appropriate approach is for the Court to note that RAKIA makes various allegations against Dr Massaad and others but to find that it is not in a position to determine whether those allegations are well-founded.  For the same reason, the Court cannot simply accept that the individuals working for RAKIA at the time lacked authority.  The starting point is that the acts and knowledge of those individuals is attributable to RAKIA, unless RAKIA can establish otherwise.

### D.      Expert reports

47.     Both parties have relied on expert reports from forensic IT specialists: Mr Azima has adduced a report from Mr Tarbell, and RAKIA a report from Mr Krone.  The reports focus on the hacking issue.  The experts have conferred and produced a joint statement [**F/27**].

### III. MR AZIMA'S COMPLAINT OF HACKING

#### A. *Legal principles*

48. **Strike out** This Court has power to strike out a claim as an abuse of process where its process is being used in a manner that would bring the administration of justice into disrepute or would be unfair. In *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529, Lord Diplock held (at p.536):

    *"This is a case about abuse of the process of the High Court. It concerns the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied. ... It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power."*

49. More recent authority has confirmed that the Court has power to strike out a claim which would be an abuse of the Court's process. CPR 3.4.2(b) provides that:

    *"The court may strike out a statement of case if it appears to the court–*

    *(b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings."*

50. In *Summers v Fairclough Homes* [2012] 1 WLR 2004, Lord Clarke (giving the judgment of the Supreme Court) stated:

    a. Paras 41, 42:

    *"The language of the CPR supports the existence of a jurisdiction to strike a claim out for abuse of process even where to do so would defeat a substantive claim. The express words of CPR r 3.4(2)(b) give the court power to strike out a statement of case on the ground that it is an abuse of the court's process. It is common ground that deliberately to make a false claim and to adduce false evidence is an abuse of process…*

18

> *"Under the CPR the court has a wide discretion as to how its powers should be exercised: see eg Biguzzi v Rank Leisure plc [1999] 1 WLR 1926 . So the position is that the court has the power to strike out a statement of case for abuse of process but at the same time has a wide discretion as to which of its many powers to exercise. The position is the same under the inherent jurisdiction of the court…"*

b. Paras 48, 49:

> *"It is in the public interest that there should be a power to strike out a statement of case for abuse of process, both under the inherent jurisdiction of the court and under the CPR , but the court accepts the submission that in deciding whether or not to exercise the power the court must examine the circumstances of the case scrupulously in order to ensure that to strike out the claim is a proportionate means of achieving the aim of controlling the process of the court and deciding cases justly.*

> ***"The exercise of the power***
> *"49. As noted at para 42 above, the court has a wide discretion as to how to exercise its case management powers. These include the power to strike out the whole or any part of a statement of case at whatever stage it is made, even if it is made at the end of the trial."*

51. **Exclusion of evidence** CPR 32.1 provides:

> *"(1)  The court may control the evidence by giving directions as to–*
>
> *(a)  the issues on which it requires evidence;*
>
> *(b)  the nature of the evidence which it requires to decide those issues; and*
>
> *(c)  the way in which the evidence is to be placed before the court.*
>
> *"(2)  The court may use its power under this rule to exclude evidence that would otherwise be admissible."*

52. This power thus confers a discretion on the Court to exclude evidence.  The discretion is to be exercised in light of the overriding objective.  CPR 1.1 provides:

> *"(1) These Rules are a new procedural code with the overriding objective of enabling the court to deal with cases justly and at proportionate cost.*
> *(2) Dealing with a case justly and at proportionate cost includes, so far as is practicable –*
> *(a) ensuring that the parties are on an equal footing;*
> *...*
> *(d) ensuring that it is dealt with expeditiously and fairly;*
> *...*
> *(f) enforcing compliance with rules, practice directions and orders."*

53. The exercise of the discretion involves having regard to the gravity of breach of the law entailed in the collection of the evidence, and to the other circumstances. As the Court of Appeal explained in *Jones v University of Warwick*, in which evidence had been obtained unlawfully and in breach of the claimant's right to privacy (para 28):

> *"That leaves the issue as to how the court should exercise its discretion in the difficult situation confronting the district judge and Judge Harris. The court must try to give effect to what are here the two conflicting public interests. The weight to be attached to each will vary according to the circumstances. The significance of the evidence will differ as will the gravity of the breach of article 8, according to the facts of the particular case. The decision will depend on all the circumstances."*

### B.  RAKIA's responsibility for the hacking

54. There is no dispute that RAKIA's case against Mr Azima is based on data that was stolen from Mr Azima. Mr Azima contends that this data was stolen by RAKIA. RAKIA claims to have no knowledge of the hacking and to have obtained the data from the BitTorrent websites. The circumstances, however, paint a compelling picture of RAKIA's culpability.

1.  Timeline of events

*RAKIA's agents*

55. In 2012, a dispute arose between RAKIA and Dr Massaad, who had been CEO of RAKIA and had held other roles in RAK entities since the 1990s. RAKIA contends that Dr Massaad had, with various other parties, engaged in various frauds while in his role (see 1st Buchanan, para 15 [**D/9/4**]). Its case is that, notwithstanding what it says

was the serious nature of Dr Massaad's alleged wrongdoing, it sought to engage with Dr Massaad to reach a negotiated resolution of this dispute (1st Buchanan, para 28 [**D/9/8**]).

56. Mr Azima became involved in seeking to broker a resolution to this dispute, as RAKIA acknowledges (1st Buchanan, paras 27-28 [**D/9/8**]). However, RAKIA admits that it regarded Mr Azima as "being on Dr Massaad's side" (1st Buchanan, para 27 [**D/9/8**]).

57. RAKIA also admits that in connection with this dispute, it engaged various "*investigators and public relations consultants*", including the PR firm Bell Pottinger (RRARep, para 7H.4 [**A/4/11**]). The role of those agents included monitoring the press and internet for information regarding individuals involved in the dispute. RAKIA accepts that Mr Azima was one of the individuals in respect of whom this "monitoring" occurred: RAKIA's Part 18 Response, para 8(a) [**A/7/21**].

58. The tasks given to RAKIA's agents were not limited, however, to monitoring media reports. In 2018, RAKIA was ordered to answer a Part 18 request which, among other things, sought information on the investigations and public relations consultants it had appointed and on the tasks given to them. RAKIA indicated that (RAKIA's Part 18 Response, para 8 [**A/7/21-22**]):

   a. It appointed Bell Pottinger in November 2014 to provide "*strategic advice, global media monitoring, and devising and implementing plans for communication response*";

   b. It appointed Stuart Page (and/or one of his firms, identified as Stuart Page ME FZ) in March or April 2015 to conduct "*commercial investigations and security*"; and

   c. It appointed Digitalis in March 2016 to conduct "*Strategic media and reputation management advice, including data research, analysis and planning, search engine optimisation and website establishment and management*."

59. The involvement of these agents and the purposes for which they were retained indicates that RAKIA was assembling a team: (1) with a view to conducting an aggressive internet and media campaign, and (2) with the capability of obtaining material through hacking. Key agents also adopted a secretive approach, creating and retaining very few, if any, documents of their activities. The activities undertaken by

21

these agents will be explored in cross-examination, but the following matters are noted now for context.

60. **Stuart Page**   Mr Page has on other occasions seemingly been implicated in or connected with the illegal collection of evidence, including through computer hacking, which is highly suspicious in the context of this case:

   a. In 1998, Mr Page's firm, Page Associates, was engaged to obtain information about a Mr Alawi in connection with a dispute with Dubai Aliminium Co.  The judgment of the High Court records that a sub-agent engaged by Mr Page's firm had made "*what Mr. Page of that firm called "pretext calls" to the banks concerned*", who provided detailed information of Mr Alawi's financial records.  Rix J held that he was not in a position to assess Mr Page's precise knowledge, but said, *"nevertheless I believe that I can find there to be a **strong prima facie case of criminal or fraudulent conduct in the obtaining of such information** concerning Mr. Al Alawi's accounts, and indeed in the light of Mr. Pelling's approach to his submissions I think I can proceed for present purposes on the assumption that such conduct has occurred."*: *Dubai Aluminium Co Ltd v Al Alawi* [1998] EWHC 1202 (Comm) (emphasis added).

   b. In 2015, Mr Page's firm (Page Protective Services) was engaged by the Board of Control for Cricket in India, and paid fees of around $900,000.  The press reported that Mr Page's firm had conducted surveillance; confidential emails passing between individuals who were the subject of an inquiry by the BCCI were somehow obtained and passed to the media.  Page Protective Services was accused of having carried out these activities, including obtaining unauthorised access to emails [**G/26.15/1-2**].

   c. In 2018, Mr Page again was associated with a hacking attack used to obtain information used in litigation, conducted by Israeli hackers.  As Sir Andrew Smith explained in *JSC BTA Bank v Ablyazov* [**H10/353/24**] (emphasis added):

   "*The evidence in support of the application was a statement made by Mr Tucker and dated 14 June 2016. He said that the Bank had "recently discovered that Mr Ablyazov and Mr Khrapunov [had] been working [with] Mr Aggarwal". He explained that the Bank was contacted in early 2016 by a **Mr Stuart Page, who***

> *had claimed to act for unnamed Israeli "hackers" who had extracted information from Mr Aggarwal's computer. At a meeting with Mr Hardman and a Mr Nurlan Nurgabylov, a senior official of the Bank, on 17 February 2016 Mr Page showed documents indicating that Mr Aggarwal was involved with a number of named companies."* [2018] EWHC 259 (Comm) (para 129).

61. As discussed further below, Mr Page and his companies have disclosed no records at all of their activities in this case.

62. **Bell Pottinger** appears to have been pulling strings to arrange press coverage and *"digital activity"* promoting RAKIA's position and critical of its adversaries, including Mr Azima, to bolster its position in the litigation. The "*plan of attack*" was to be coordinated with RAKIA's lawyers and other consultants, and approved by the Ruler. A proposal letter signed by Mr Buchanan and Mr Leach explains [**H7/286/3**]:

> *"A plan of attack around the litigation will be developed by Bell Pottinger working with Andrew Frank for presentation to the rest of the team (Dechert/RAK Development/HHSS* [ie, His Highness Sheikh Saud]*) for further input and approval, at which point the plan will be put into action.*
>
> *As with all these matters we need to be fully prepared throughout for the 'unknowns' that we know will arise. Planning for a defensive approach behind the proactive one is important and will be an integral part of our preparation.*
>
> *We should look at the role of and need for digital activity and how this can strengthen our approach. We can advise on how best to access this."*

63. The "proactive" approach was not intended to involve fair reporting. In this case, no disclosure was given by RAKIA from Bell Pottinger (its liquidators having refused to provide any documents to Stewarts). A data protection / Subject Access Request made by Mr Azima obtained a substantial number (125) of heavily redacted documents from the liquidators mentioning Mr Azima: these are available in [**H11**]. In those documents, an unknown individual at Bell Pottinger proposes attacking Mr Azima through the media: "*we also may want to push out a story attacking FA.*" [**H11/9/2**].

23

64. Bell Pottinger collapsed in September 2017 following revelations of unethical conduct that it initially denied:

    *a.* In March 2017, Bell Pottinger was reported to have conducted an unethical public relations campaign in South Africa, which was alleged to have included playing on racial tensions (under the guise of an "economic emancipation campaign" directed against white South African individuals) and the use of fake social media profiles. Bell Pottinger denied the allegations.

    *b.* Herbert Smith Freehills conducted an audit, which found that Bell Pottinger had created an artificial social media campaign, including a blog. It found that the Bell Pottinger team, "*was primarily responsible for devising the strategy behind the economic emancipation campaign and for creating and commissioning content for the social media and press aspects of that campaign. Certain material that we have seen that was created for the campaign was negative or targeted towards wealthy white South African individuals or corporates and/or was potentially racially divisive and/or potentially offensive and was created in breach of relevant ethical principles.*" [**G/26.41/1-3**]

    *c.* Bell Pottinger was expelled from its trade body, lost many key clients and staff, and then entered administration in September 2017.

65. **Digitalis** was engaged in March 2016, shortly before a critical stage in the negotiations between RAKIA and Dr Massaad. The Digitalis engagement letter described the detailed work to be carried out in terms that, while elliptical, now resonate with the facts that then unfolded [**H10/39**] (emphasis added).

    a. The letter first set out the "Background" [**H10/39/1**]:

        *"Karv and Bell Pottinger are engaged on one side of a significant dispute which to date has managed to avoid significant media coverage or scrutiny. The other side is made up of multiple parties from multiple territories and there are active civil and criminal proceedings against them individually and collectively. At an imminent meeting (the Event) it is hoped that settlement might be achieved and it remains in all parties' interests to maintain and protect the media silence on the matter.*

24

*In the event that settlement is not achieved imminently, it is assumed that the other side will publish an inevitably biased portrayal of the issues at stake and that they may engage with the media as well as creating assets online to achieve reputational damage. As such, the client (Client) is keen to prepare a strategy which will facilitate a <u>primarily defensive</u> campaign online.*

*…*

*Karv and Bell Pottinger have requested Digitalis to consider the strategic work required in advance of the Event <u>to enable rapid activation of an offensive and/or defensive campaign online</u>.*

b. The letter thus identifies Dr Massaad <u>and other</u> associated with him as adversaries. It foreshadows an offensive and escalating campaign, across a core website and blogs. The letter explained the methodology to be used by Digitalis in more detail [**H10/39/2**]:

*"It is proposed that in advance of the Event, time permitting, the following steps are taken by way of preparation, in order to create a turnkey plan with readymade assets which can be activated to maximum impact with minimum time. At this stage it is assumed that all activation activity (post the Event) is outside the scope of this proposal.*
*1. Data Trawl, Analysis & Planning*
*2. Lock Down*
*3. Build"*

c. Under the heading "Build", the letter refers to [**H10/39/2-3**]:

*"The Planning phase will create a brief for an inevitably complex infrastructure of sites and social media assets across a range of geographies, some of which will be linked together and others which will stand alone.*
*…*
*While the exact platforms will be driven by the Planning outputs, for the purpose of guidance only, it is envisaged at this stage that such a content infrastructure will comprise the likes of:*
* *A core, overt site ("theTruthAboutTheHyattAffair.com"), potentially anonymously registered*

25

- *Multiple covert sites which are apparently more balanced; such as those by third parties who take an active interest in and comments on cases of this nature not limited to the Hyatt case*

- *Multiple blogs, Facebook pages, Twitter handles and other social media assets each designed to provide either content which will rank for a specific name, search engine, language and country combination or to provide highly-targeted link equity into another asset which is in turn designed to rank somewhere specific*

*...*

*Many of these assets can be designed and populated in advance of the Event without being published online, so that go-live can be immediate post-Event if required."*

66. RAKIA clearly engaged Digitalis with an online campaign comprised of "defensive" and "offensive" elements in mind, to be launched if the attempt at settlement failed. RAKIA admits that Digitalis on its instructions created a "core" site or sites regarding Dr Massaad, but claims not to have created the blog sites that appeared at a similar time, featuring links to Mr Azima's data.

67. **Neil Gerrard** A partner in the London office of Dechert LLP, Mr Gerrard represented RAKIA in its dispute with Dr Massaad and had an acrimonious meeting with Mr Azima at which he foreshadowed "*collateral damage*" if Dr Massaad could not be made to settle on terms acceptable to RAKIA. He is a trusted adviser at high levels of the RAK government. RAKIA has indicated that Mr Gerrard also provided instructions to its other agents.

68. Mr Gerrard's conduct at the meeting with Mr Azima and his other activities will be the subject of cross-examination. It should for present purposes be noted that Mr Gerrard's former client, Eurasian Natural Resources Corporation ('**ENRC**'), is suing the Serious Fraud Office (the '**SFO'**) in relation to Mr Gerrard. In its pleading, ENRC alleges that Mr Gerrard leaked information covered by ENRC's confidentiality and privilege to journalists and to the SFO, in breach of his fiduciary duties and his retainer with ENRC: particulars in High Court Claim No 2019-000613, para 29 [**G/26.27/39-42**]. ENRC further alleges that Mr Gerrard set out to overcharge ENRC, having told other

consultants retained by ENRC, "*right boys, I'm in rape mode*", and that he planned to "*screw these fuckers*" (namely, ENRC): ENRC claim, para 11.12 [**G/26.27/12**].

69. It is RAKIA's case also that Mr Azima was involved in investigating and promoting allegations that Mr Gerrard and Dechert were involved in human rights abuses in RAK; allegations which RAKIA says are false. This will be explored further at trial.

70. **Other agents: Karv and Vital** Following RAKIA's service of that Part 18 Response (on 6 November 2018 [**A/7/24**]), it became apparent from the disclosure that RAKIA had in fact appointed at least two other investigators or PR consultants, whom it did not identify in that Part 18 Response. These were:

    a. Karv Communications ('**Karv**'); and

    b. Vital Management Services ('**Vital**').

71. RAKIA's position now is that Vital was appointed to conduct "*investigations*", in August 2014 (1st del Rosso, para 4 [**D/5/2**]). The reason for and timing of the appointment of Karv has not been explained by RAKIA. RAKIA has refused to explain why it failed to identify these entities as among its agents when answering Mr Azima's Part 18 Request: [**G/40/1-5**]. RAKIA has also not provided witness evidence from Mr Andrew Frank of Karv, despite him being party to a number of the key communications.

*RAKIA identifies Mr Azima as an enemy*

72. In the course of investigating and monitoring Dr Massaad, RAKIA formed the view by March 2015 that Mr Azima was aligned against it. A report entitled "RAK Project Update" and dated 26 March 2015 states as follows [**H7/299/2**]:

> "In the US, KM's hired a team of advisors managed by Farhad Azima (FA) in order to spread allegations against our client. The main allegations against the client are on human rights issues and in particular the allegation that RAK uses a dedicated facility in RAK where it imprisons and torture political opponents. FA, who might also be responsible for paying the US team, handles all KM's activities in the US."

73. Much of the rest of the document was redacted by RAKIA before being disclosed, but it otherwise continues in a similar vein, setting out information from 'sources' as to Mr

Azima's activities in connection with Dr Massaad, and foreshadows gathering "*intelligence*". It states, for example:

> "*In continuation to our previous report, we were informed by several new sources that FA is managing KM's efforts in the US and perhaps even paying their bills.*" [**H7/299/3**]

> "*As we reported above, KM's US team has a certain plan to smear RAK and its ruler with human right allegations. As far as we know, at this point, they do not have any evidence to back up these allegations, but they started gathering information for a campaign, based on hearsay and testimonies, and started searching for a platform to make it public. The campaign is not public yet, so we will be able to gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans.*" [**H7/299/16**]

74. The "Project Update" was attached to an email sent to Mr Buchanan [**H7/298**]. Very shortly after 26 March 2015 (the date of the "Project Update" document), the Ruler of RAK gave instructions to Mr Buchanan to "target" Mr Azima. On 4 April 2015, Mr Buchanan informed Mr Handjani that [**H7/267**]:

> "*HHSS had wanted us to target FA – on what basis would we do this?*"

75. This instruction was discussed between Mr Buchanan, Mr Handjani and Mr Bustami. Mr Bustami wrote to Mr Buchanan [**H7/272**]:

> "*I think next week Amir is in town so we can both hook up with him and brain storm it.*"

76. On the same day, Mr Bustami wrote to Mr Handjani and Mr Buchanan, explaining the wish of the Ruler (or the "Boss" as he is referred to) for Mr Azima to be charged, alluding to "*another channel*", and proposing that the three meet to "*coordinate*" their "*attack*" [**H7/273**]:

> "*I have had few discussions with boss about FA and he is adamant that we bring charges against him. ...*
> *He wants me to get you on the case to file some sort of charges against Farhad. He also told me today that you have another channel that you are using with khater.*

*When are you next in town so that me you and Jamie could hook up and coordinate our attack."*

77. RAKIA says that, notwithstanding the Ruler's instructions, no further action was taken, and no "other channels" were utilised, against Mr Azima at that time. This will be explored with RAKIA's witnesses in cross-examination (and would have been raised with the Ruler, had he submitted to cross-examination).

78. In any event, it is then clear from the documents that in July 2015, the Ruler was again directing action against Mr Azima. On 19 July 2015, Mr Buchanan wrote to Mr Handjani that [**H7/464**]:

> *"NB* [Naser Bustami] *says the Boss wants criminal stuff taken out of letter and to go after FA subject to guidance from AF."*

*The spear-phishing attack on Mr Azima*

79. Cyber-warfare is inherently based on deception and so, unsurprisingly, it has not been possible for Mr Azima to identify with complete certainty through forensic IT anaylsis the precise manner by which his emails and data were hacked. However, forensic IT analysis has identified a series of suspicious 'spear-phishing' emails sent to Mr Azima in October 2015. A 'phishing' email is an email that seeks to trick the recipient into clicking on a hyperlink taking the user to a webpage that the criminal controls, or into downloading malicious software (malware) (see 1st Tarbell, paras 39-40 [**F/1/12-13**]; 1st Krone, para 21 [**F/13/11**]).

80. A 'spear phishing' email is a more targeted and sophisticated form of a 'phishing' email. As Mr Tarbell explains (para 42 [**F/1/13-14**]):

> *"As I explain above, it is not uncommon for any email account to receive a quantity of generic deceptive phishing emails. This in itself would not indicate that the individual recipient had been specifically targeted (although together with other facts it may be relevant to show this). It appears that Azima's email accounts received a quantity of such generic phishing emails over time. Spear-phishing emails are in a different category, however, for two reasons. First, they indicate that the cyber criminal has purposely targeted the deception at that individual (as shown by the fact that the email has been constructed to include*

29

*material pertinent to the recipient, or otherwise to be of more interest to them). Second, the fact that the spear-phishing email contains material of particular interest to the targeted recipient makes it more likely to be effective, in that the recipient is more likely to open the deceptive email and any further links it may contain."*

81. The parties' forensic IT experts agree that at least four such 'spear-phishing' emails were sent to Mr Azima (or otherwise targeting him) in October and November 2015: see Joint Expert Statement, para 2(c) [**F/27/4**]; there is disagreement as to whether one email (sent on 14 October 2015) is properly regarded as a fifth 'spear-phishing' email or simply as a 'phishing' email. Each of the emails contained links which would have taken the recipient to a website that was not the reported link given in the email.

82. The spear-phishing emails (described in detail in 1st Tarbell, paras 44-63 [**F/1/14**]) were sophisticated in the means used to trick Mr Azima into finding them of interest and opening the links in them. For example, the first of these emails was sent on 12 October 2015 to Mr Azima's associate, Ms Azadeh, who forwarded it to him. The email contained a fake story from the Huffington Post website about Mr Azima, under the title, "Multi-billionaire Iranian Azima may be in trouble as links against him are getting stronger" [**F/1/14-16**].

83. Another of the spear-phishing emails, sent on 23 October 2015 to Mr Azima, purported to originate from Ms Cynthia Beudjekian [**F/1/20-22**]. Ms Beudjekian is the personal assistant to Dr Massaad.

84. Significant time (some 9 months) had passed between the time at which these emails were sent, and the point at which Mr Azima fully realised that he had been the victim of a hacking attack (which was not until August 2016). This affected the ability of the experts to investigate the source or results of the spear-phishing emails. As the Joint Statement explains (para 2(a) [**F/27/4**]):

*"The Experts agree that the passage of time between the receipt of spear-phishing emails, the realisation of a victim that its data has been compromised, and the initiation of a forensic investigation can affect the ability to obtain evidence of the source or results of the spear-phishing attack."*

30

85. In addition to the passage of time, the nature of the attack makes identifying the attacker difficult even through expert forensic examination of the emails. The experts could not identify the sender of the emails or which (if any) of these spear-phishing emails Mr Azima may have opened, and to what effect. As Mr Tarbell explains (para 23 [**F/1/8-9**]):

> *"It is not possible for me to identify the persons who sent any of these spear-phishing emails. This is not surprising, as there are various effective means by which cybercriminals using the Internet can conceal their identity or location. It is also not possible to say whether my analysis has in fact identified all of the spear-phishing emails that were sent, or indeed detected other methods of gaining unauthorized access. There are several other (often more effective) methods by which unauthorized access can be obtained. Cyber criminal activity is obviously covert."*

86. While it is not possible to say precisely how Mr Azima's emails were accessed without his authorisation, the indications are that it began at around the time these spear-phishing emails were received. Mr Tarbell examined the records of instances when Mr Azima's email account, "fa@fa1.us" was accessed, in October 2015. That examination indicated that there were multiple instances between 13 and 15 October 2015 during which time the account was accessed from IP addresses that are unfamiliar to Mr Azima: 1st Tarbell, paras 65-70 [**F/1/27-28**]. Mr Krone agrees that the access on these dates appears to be suspicious: Joint Expert Statement, Summary of Conclusions, para 5 [**F/27/2**].

87. Mr Tarbell also found that the emails stored in the "fa@fa1.us" account also included a number of emails in which Mr Azima had recorded passwords for other email accounts: 1st Tarbell, para 71 [**F/1/28**]. The person who had covertly accessed the "fa@fa1.us" account could therefore have obtained the means of accessing other email accounts used by Mr Azima.

88. The "authorised connection record" for another of Mr Azima's email addresses, "fa@farhadazima.com", indicates that this address was accessed from several countries with which Mr Azima had no connection: 1st Tarbell, paras 73-74 [**F/1/28-29**]. Mr Krone accepts that this access appears to be suspicious: Joint Expert Statement, para 4(e) [**F/27/6**].

31

89. It also appears that attempts to gain unauthorised access to Mr Azima's emails had been made in March 2015 and July 2015. On 2 March 2015, 2 July 2015 and 22 July 2015, Mr Adams received emails from Yahoo alerting him to attempts being made from unrecognized devices to access the Yahoo account "farhad2": [**H7/243**], [**H7/414**], [**H7/470**]. It is not clear whether those attempts succeeded. They were, however, made at around the same time as RAKIA was internally identifying Mr Azima as an enemy, and the Ruler of RAK was giving instructions to Mr Buchanan and others to "*target*" and "*go after*" Mr Azima.

90. Despite the difficulties that arise in investigating covert cyber-attacks and hacking, Mr Azima submits that the following conclusions should be drawn from the IT evidence and from the experts' analyses:

    a. A sophisticated and highly targeted spear phishing attack was made on Mr Azima in October and November 2015.

    b. The author of that attack was familiar with aspects of Mr Azima's affairs: he or she was aware that Ms Azadeh worked with him.

    c. The author of the attack also believed that Mr Azima would be likely to open an email sent to him by Dr Massaad's personal assistant, Ms Beudjekian. This point is especially significant given that RAKIA had by this point formed the view that Mr Azima and Dr Massaad were aligned and working together.

    d. Very shortly after these spear-phishing emails were sent, unauthorised access was obtained by the hacker to Mr Azima's email accounts, in October and November 2015.

    e. There are indications that attempts had already been made to gain unauthorised access to Mr Azima's emails in March and July 2015.

*Events following the spear-phishing emails*

91. 2-3 months after the spear-phishing emails were sent and unauthorised access was obtained to Mr Azima's emails, a document was prepared on RAKIA's side which described a "*series of investigations*" and labelled Mr Azima as a participant in "*fraudulent activities*" [**H9/106**]. The metadata for the document, which appears to be

a draft, indicate that it was prepared on 29 December 2015.  It was sent to Mr Gerrard on 4 January 2016 by Andrew Frank, a senior individual at Karv (one of the agents that RAKIA failed to identify in its Part 18 Response) [**H9/105**]:

> *"View from the window*
>
> *"The window has opened on Ras Al Khaimah through a series of investigations that have unearthed a massive fraud that has taken place in the Emirate, the UAE, and several other countries including the Republic of Georgia, India, Congo and others.*
>
> *...*
>
> *"Others committed crimes inside RAK, including the Ruler's Chief legal advisor and the legal advisor to RAKIA (they also happen to be cousins(?))*
>
> *o There have been accusations that these prisoners have been ill treated. This is very far from the truth. When they were first arrested, HH put them in a prison or similar that had more freedoms and more open space than the normal UAE prisons. He did this because they were close to him and he didn't want to see them suffer various indignations of ordinary prisoners*
>
> *o Other points*
>
> *FA, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities.*
>
> *...*
>
> *"Companies were set up with Iranian nationals*
>
> *o Individual names and companies."*

92.  The reference to companies being set up with Iranian nationals is of particular significance, given that this was a feature of the Georgian hotel transaction in respect of which RAKIA now sues Mr Azima.  Equally significant is the reference to the suggestion that false accusations had been made of the ill-treatment of prisoners; those accusations now feature in this litigation.

93.  Shortly after this draft report was prepared and circulated among RAKIA's advisers, RAKIA entered into the Settlement Agreement with Mr Azima, on 2 March 2016.  On its face, the purpose of the Settlement Agreement was to resolve a claim by HeavyLift against RAKIA, under which RAKIA paid US$2.6 million to settle that claim.  RAKIA had taken several months to consider the HeavyLift claim, but no internal documents

are available to indicate the internal process that was supposedly followed in assessing the figures submitted. RAKIA also made no attempt to negotiate the figure identified by HeavyLift as the investment it had contributed. However, at RAKIA's request Mr Azima was also asked to provide an unusually drafted assurance in clause 3.2 that he had acted in good faith towards RAKIA and other entities (wherever incorporated) in which RAK or RAKIA had an interest, and so was made a party to the agreement.

94. The surrounding facts clearly indicate that RAKIA did not simply enter into the Settlement Agreement to resolve HeavyLift's claim, for the following reasons.

95. First, as set out above, RAKIA had already decided that Mr Azima was hostile:

   a. Since March 2015, RAKIA had privately identified Mr Azima as an adversary, labelling him a participant in Dr Massaad's activities, and envisaged gathering "*intelligence*" to "*ruin their plans*".

   b. The Ruler of RAK was evidently set against Mr Azima. He was "*adamant*" that charges should be brought against him, that he should be "*targeted*" and that RAKIA's advisers should "*go after*" him, including by using "*other channels*".

   c. Very shortly before the Settlement Agreement was entered, RAKIA had formed a still more definite view of Mr Azima, describing him as orchestrating or participating in Dr Massaad's "*fraudulent activities*".

96. Second, RAKIA's private view was that HeavyLift's claim was actually legally flawed. As Mr Buchanan advised the Ruler at the time, "*we have been advised that there is no legal obligation to pay*": 1st Buchanan, para 65. Mr Buchanan has stated in this litigation that the payment was made out of a sense of "*moral obligation*", but this cannot be reconciled with the fact that the RAKIA and the Ruler had privately formed the adamant view that Mr Azima was aligned with Dr Massaad, had orchestrated "frauds" against RAKIA and RAK, and should face charges.

97. The evidence therefore indicates that RAKIA entered into the Settlement Agreement as a device to pursue other, covert objectives unconnected with HeavyLift's claim. These purposes will be explored in cross-examination at trial. At present, it is noted that the available evidence indicates that RAKIA cynically entered into the Settlement Agreement as a device, insisting on the inclusion of a duty of good faith binding Mr Azima (and an English jurisdiction clause), while at the same time harbouring a

34

conviction informed by surveillance and other covert sources that he was <u>not</u> acting in good faith. In doing so, it sought to use Mr Azima in its dispute with Dr Massaad: it believed the Settlement Agreement gave it leverage over Mr Azima, insurance to recover the funds paid (which were modest compared to the $2 billion it was seeking to obtain), and possibly the means of turning Mr Azima against Dr Massaad.

98. The inclusion of an obligation of good faith on Mr Azima personally was a key part of RAKIA's purpose, indicating that RAKIA believed it could manufacture a basis for bringing an action against Mr Azima in England as part of a campaign to ruin his standing; RAKIA would then obtain leverage over Mr Azima, and the means of making an example of him, if the negotiations with Dr Massaad were to fail. The advice given to the Ruler by Mr Buchanan in relation to the Settlement Agreement indicates the importance of that obligation of good faith [**H9/417/1**]:

> *"It is on this basis that we have been able to successfully negotiate the inclusion of Clause 3.2 referred to below* <u>**which we believe is the key clause in this agreement bearing in mind your wider objectives**</u>*."*

99. It is notable that clause 3.2 purports to include an assurance of good faith by Mr Azima not only towards RAKIA, but also towards other entities in which the government of RAK had a shareholding, <u>irrespective of the place of incorporation</u>. This is notable given that HeavyLift's claim was against RAKIA and concerned a joint venture entered in 2007 with RAK Airways, which was incorporated in RAK also. There was no need to include this reference to the place of incorporation in clause 3.2 unless RAKIA envisaged that other RAK entities, such as RAKIA Georgia, might be involved in some way.

100. Entry into the Settlement Agreement was therefore a device used by RAKIA and the Ruler for pursuing their own objectives against Mr Azima. It equipped RAKIA with a new legal mechanism that it believed it could invoke in bringing a claim against Mr Azima, should it decide that doing so would serve its interests and as retribution for Mr Azima's role in the human rights campaign. RAKIA's and the Ruler's interest in bringing such proceedings was driven by the information they and their agents had gathered regarding Mr Azima up to that point leading it to determine that Mr Azima was aligned with Dr Massaad and had sought to expose human rights abuses in RAK. The obvious means by which that information could have been gathered was through

covert and illicit access to Mr Azima's confidential communications. The Settlement Agreement also at the same time offered the prospect of bringing Mr Azima into RAKIA's camp in its war against Dr Massaad, which would be (so long as he remained useful) a valuable prize.

*The July 2016 Meeting*

101. Following execution of the Settlement Agreement in March 2016, Mr Azima continued to engage with RAKIA with a view to brokering a settlement of its dispute with Dr Massaad. On 16 July 2016, a meeting was held between Mr Azima and three representatives of RAKIA: Mr Buchanan, Mr Gerrard, and an associate in Mr Gerrard's firm, Dechert.

102. Mr Azima explains that at this meeting, Mr Gerrard threatened that if Dr Massaad would not agree to a settlement on RAKIA's terms, Mr Azima would be made "collateral damage" in a war that RAKIA would wage against Dr Massaad (1st Azima, paras 54-55 [**E/3**]):

> *"On or around 16 July 2016, I went to the Churchill Hotel in London to meet with Mr Buchanan, with a view to continuing the settlement discussions. As far as I was aware, I was only to meet with Mr Buchanan at this meeting. However, unexpectedly, Mr Gerrard and another individual (who took notes during the meeting, and was likely from Dechert) also attended. Mr Gerrard was angry and belligerent, and he took over the meeting that I had thought would be a one-on-one meeting with Mr Buchanan. Mr Gerrard told me to stop acting as a mediator, and instead work solely for RAKIA to assist them in their campaign against Dr Massaad. I refused: I told him that that is not how I operate; I do not throw people 'under the bus', it is not ethical.*
>
> *"My refusal aggravated Mr Gerrard. He referenced his history, stating that he had been a policeman, a detective, a prosecutor and a lawyer, and that he had connections with "Number 10", and said that if I did not settle the case with Dr Massaad then there would be a war against Dr Massaad and I would be "collateral damage". I understood "Number 10" to be a reference to the UK*

> *Prime Minister's office. I asked Mr Gerrard whether he was threatening me. He told me that this was not a threat but a promise."*

103.  Mr Azima clearly understood Mr Gerrard to have threatened him; he informed Mr Buchanan that he considered that Mr Gerrard's comments constituted extortion and blackmail (see Mr Buchanan's email to Mr Azima of 23 July 2016 [**H10/229**]).

104.  Mr Gerrard offers a more anodyne account of this meeting, which will be explored in cross-examination. It is notable, however, that even RAKIA accepts that Mr Gerrard used the phrase "collateral damage" (1st Gerrard, para 13 [**D/7/4**]).

*The Massaad websites, the blogs and the BitTorrents*

105.  Following this meeting, the dispute between RAKIA and Dr Massaad was not resolved. Within weeks, at around the end of July 2016, websites appeared making allegations against Dr Massaad, similar to those made by RAKIA in the course of the negotiations.

106.  As noted further below, Mr King of Digitalis admits that Digitalis constructed the websites concerning Dr Massaad (1st King, para 16 [**D/13/4**]). It is also clear from the witness statement provided by Stuart Leach (formerly of Bell Pottinger) that he and Bell Pottinger were instructing Digitalis and coordinating with it in the creation of these websites (see 1st Leach, paras 13-22 [**D/4/**]). As part of Digitalis's instructions in March 2016, it had also been proposed that it would create other sites along with the "core" site concerning Dr Massaad, including blogs.

107.  Within days of the websites concerning Dr Massaad appearing, a series of other websites also appeared attacking Mr Azima. One set of websites were activated on 7 and 8 August 2016.

   a.  There were websites denigrating Mr Azima as a "fraud" and a "scammer". These websites were hosted on blogging websites. For example, "First blog about Farhad Azima scam" [**F/11**] (the "**Scam**" **blog**), "Farhad Azima Exposed Again" [**F/10**] and [**H10/361**] (the **"Exposed" blog**), and "Farhad Azima Scammer" [**H10/360**] (the **"Scammer" blog**).

37

b. As Mr Tarbell noted, the author of the "Exposed" blog was listed as "crimeboard". That individual initially allowed his or her location to be shown, which indicated that he or she was in the UAE: 1st Tarbell, paras 31, 108, 109 [**F/1/11, 38**]. This appears to have been blunder; the location reporting was subsequently disabled.

c. The "Scam" and "Scammer" blogs also referred to Mr Azima's connections with Mr Adams and Dr Massaad: *"Click the link to find Azima's involvement with some big personality's [sic] including his close associates like Ray Adams & Dr. Khater Massaad."* [**F/11/1**] and [**H10/360/3**].

d. The blogging sites in turn provided links to BitTorrent websites on which Mr Azima's personal data had been uploaded and/or cached.

108. It appears that BitTorrents containing Mr Azima's data had started to be posted slightly earlier, on 4 August 2016: see 1st Tarbell, para 93(a) [**F/1/34**]. Over the course of August and September 2016, three caches of Mr Azima's data in these torrents emerged. As Mr Tarbell explains (1st Tarbell, para 93) [**F/1/34**]:

a. The first appeared on or about 4 August 2016. This torrent was reportedly 25.75GB in size.

b. A second torrent appeared on about 30 August 2016. This torrent was reportedly 10.33MB in size.

c. A third torrent was 4.43 GB in size and appeared on about 8 September 2016.

109. The information contained on these torrents is referred to for convenience as the "**Hacked Material**". Mr Tarbell's report gives an explanation of what a torrent is and how it facilitates access to data being shared among internet users (paras 77-87) [**F/1/31-32**]:

> *"C. BitTorrent*
> *1. The Peer-to-Peer Network*
> *Every computer that is online is connected indirectly to every other computer that is online. This indirect connection makes it possible for any two online computers to share information. This is peer-to-peer ("P2P") communication.*

*BitTorrent is a decentralized P2P protocol that can be used to share computer files between online computers.*

*The collection of computers that use the same P2P protocol, such as BitTorrent, are called peers.*

*These peers use a program called a BitTorrent client that allows peers to communicate with other peers.*

*Information about the data file that is shared within the BitTorrent protocol is called a torrent file. The torrent file does not contain the shared data but contains information called trackers that allows the client to find the peers that are sharing the data file.*

*The peer that hosts the original data, in its entirety, and that data's torrent file is called a seed. The seed computer then divides the shared data file into many smaller pieces.*

*A requesting peer uses the client to open a torrent connection for the shared data.*

*The requesting peer will be sent one of the pieces of the shared data and may then get the remaining pieces over time from other peers within the BitTorrent network.*

*Within the BitTorrent network, peers are downloading some pieces of the data file from other peers and uploading additional pieces to different peers. The pieces of the shared data file are spread across many peers, with data duplicated on some peers. The peers that are downloading and uploading pieces of the torrent data are called a swarm. The increased popularity of a torrent will enlarge the number of peers in the swarm.*

*When a peer has finished downloading the torrent data, if that peer is connected to the BitTorrent network, the pieces will continue to be uploaded to other peers in the swarm, called seeding.*

*A peer that has downloaded the entirety of the torrent shared file and allows other peers in the network to download pieces of the shared file are called seeders.*

*If there are any additional seeders for a torrent shared data, the original seed can leave the BitTorrent network with little to no trace."*

110. Mr Azima learned of these websites in August 2016, and surmised that he had been hacked. He changed his passwords and upgraded his IT security: 1st Azima, para 61 [**E/3/16**].

*RAKIA deploys the Hacked Data in these proceedings*

111. On 23 September 2016, RAKIA's solicitors, Dechert LLP, wrote a letter before claim to Mr Azima's US lawyers, Miller & Chevalier [**G/38**]. Mr Hughes of Dechert informed Mr Azima's lawyers that RAKIA had obtained evidence from the BitTorrent websites. It advised that these websites could only be accessed with professional assistance and that they may contain viruses.

112. RAKIA issued proceedings on 30 September 2016. No other party in any jurisdiction has sought to use any of Mr Azima's stolen material in any proceedings. No other party has indicated that it was able to access the stolen data using the BitTorrent sites. Coincidentally, Mr Azima issued proceedings against RAKIA in the United States courts complaining of the hacking on the same day. Mr Azima's claim against RAKIA in the US was stayed on *forum non conveniens* grounds in June 2019 and his counterclaim was then commenced in this jurisdiction in August 2019.

*Timeline: Conclusion*

113. The circumstances set out above provide a strong case that it was RAKIA, and not some other unidentified person or entity, that was responsible for the hacking of Mr Azima's materials and for the creation of the malicious websites:

    a. The Ruler and hence RAK's entities including RAKIA had labelled Mr Azima as an enemy in 2015. The Ruler harboured real hostility, wanting him *"targeted"* and "gone after", using "other channels". Attempts to access Mr Azima's emails coincided with these directions from the Ruler.

    b. The people instructed to obtain information about Mr Azima included Mr Page, who has been repeatedly connected with hacking in other cases.

40

c. RAKIA was evidently able to gather information about Mr Azima that it now uses in these proceedings; by December 2015, for example, RAKIA internally recorded that a "window had been opened" through "investigations", and referred to the creation of companies with Iranian nationals.

d. The spear-phishing emails were sophisticated and included a malicious email purporting to be sent from Dr Massaad's personal assistant, Ms Beudjekian; RAKIA believed Mr Azima and Dr Massaad to be closely aligned. The blogs attacking Mr Azima also refer to Dr Massaad, and were authored by an individual in the UAE.

e. A first website was created concerning by Dr Massaad, which RAKIA and Digitalis admit to having created. Further blog websites about Mr Azima then followed. The creation of the websites followed a highly acrimonious exchange in July 2016 in which – on both sides' accounts – it was made clear that there would be "collateral damage" if the dispute with Dr Massaad was not resolved. It was not resolved, and the websites attacking both Dr Massaad and Mr Azima appeared very shortly thereafter. The websites attacking Mr Azima also refer to Dr Massaad.

114. The case for RAKIA's liability is further strengthened by a range of further highly suspicious circumstances, as set out below.

### 2. Lack of documents, evidence and disclosure from RAKIA

115. A striking aspect of this case is the extent of the gaps in the disclosure from RAKIA's side, both from Mr Buchanan and from its agents.

*Destruction of documents*

116. As set out below, it is common ground that at least some disclosable evidence on RAKIA's side was destroyed after the commencement of the proceedings and the obligation to preserve evidence arose.

117. **Legal principles** It is well-established that the intentional and dishonest destruction of disclosable documents will lead to sanctions including adverse inferences being drawn,

or in particularly serious cases a case being struck out: *Hollander on Documentary Evidence* (13th ed.), paras 11-15, 11-24.

118. However, even where the destruction of documents after proceedings have commenced is not found to have been intentional, the Court may well draw inferences against the party which failed to ensure the preservation of the materials. In *Malhotra v Dhawan* [1997] 2 WLUK 464; [1997] 8 Med LR 319, it was not argued before the Court of Appeal that the destruction of documents had been deliberate, but the Court was invited to apply the maxim, *omnia praesumuntur contra spoliatorem*, entailing a presumption against the party that had destroyed documents. The Court explained that,

> "*it was accepted that the true principle was not as extensive as the maxim would suggest for not everything is to be presumed against the destroyer. Thus the limits to the presumption must be ascertained from the cases in which it has been discussed.*"

119. Having discussed the case law, the Court of Appeal summarised the application of the principles:

   a. First, the Court addressed the position where documents are destroyed to hinder proof in a claim:

   > "*First, if it is found that the destruction of the evidence was carried out deliberately so to as hinder the proof of the plaintiff's claim, then such finding will obviously reflect on the credibility of the destroyer. In such circumstances it would enable the Court to disregard the evidence of the destroyer in the application of the principle. But that is not this case.*

   b. The Court then went on to summarise the operation of the presumption in the remaining circumstances:

   > "*Second, if the Court has difficulty in deciding which party's evidence to accept, then it would be legitimate to resolve that doubt by the application of the presumption.*

   > "*But thirdly, if the Judge otherwise forms a clear view, having borne in mind all the difficulties which may arise from the unavailability of material documents, as to which side is telling the truth, I do not accept that the*

42

*application of the presumption can require the judge to accept evidence he does not believe or to reject evidence he finds to be truthful."*

120. Thus, where the evidence, assessed in light of the fact that some documents are missing, does not lead to a clear view, it is legitimate to draw an inference against the party which destroyed documents, even if this was done without the intention of removing relevant evidence from the claim. This approach has been taken in this Court in *Infabrics v Jaytex* [1985] FSR 75:

> *"Whilst I respectfully agree with Graham J. that this maxim must be applied only with caution, in the circumstances of this case, whilst bearing in mind always that the onus rests on the plaintiffs to prove that they have suffered damage I would say two things: first, that I am not prepared to give the defendants the benefit of any doubt or to draw an inference in their favour where a document, if not destroyed, would have established the matter beyond doubt; and, secondly, that I am prepared to presume that sales were made on or after the relevant date where the fate of garments is wholly unaccounted for."*

121. Moreover, a policy of destroying documents may raise justifiable suspicions, even if the destruction may have occurred before proceedings were commenced. This Court observed in *Scammell v Farmer* [2008] EWHC 1100 (Ch), para 57:

> *"Courts do not look favourably on those who destroy relevant documents. The* maxim omnia praesumuntur contra spoliatorem *may have fallen out of use, but the premise underlying it, that those who destroy evidence cannot be trusted, remains."*

122. *Hollander* suggests that inferences may be drawn as follows (para 11-27):

> *"It is suggested that the correct position is as follows. The maxim can be applied where the court is entitled to expect that the party in question has retained the relevant documents. A copyright infringer may not be under a legal duty to retain documents, but to say that the court expects him to retain the documents which evidence the extent of the infringement does not seem controversial. Bailment, where the burden of proof is reversed is also readily explained. But where a person who is not yet party to litigation destroys documents which are relevant to the prospective litigation, it is not straightforward to hold that he has done something which enables the court to draw inferences against him*

*unless what he has done was with deliberate intent. Where there is no legal duty to retain documents because the litigation has not commenced and no deliberate intent, the court will need to examine the basis for the drawing of inferences. But there should be circumstances, where the court considers the duty to retain documents, even prior to litigation, was sufficiently obvious that it considers it entitled to draw adverse inferences. Litigation must surely be in reasonable prospect before the principle can apply. An example might be where in pre-action correspondence the lawyers for one party asked the other to retain particular classes of documents, and the documents are subsequently destroyed albeit not deliberately. There seems no reason why the court should not draw adverse inferences where a party has destroyed documents in breach of Practice Direction 31B, treating that as the relevant duty. Once proceedings have started, even if the time for disclosure has not yet arisen, there should be no difficulty in an appropriate case in drawing adverse inferences."*

123. It is submitted that the Court should be ready to apply these principles and draw inferences against RAKIA here. The reasons and circumstances in which documents were destroyed or lost will be explored at trial. While proof of deliberate destruction of documents is not necessary for inferences to be drawn, RAKIA's account of document preservation and the destruction of evidence is contradictory and raises clear prima facie concerns.

124. **Mr Buchanan's email account** Mr Buchanan is RAKIA's main witness. From an early stage in the proceedings, RAKIA represented that Mr Buchanan's MSN email account had been fully imaged, and has said that Mr Buchanan's emails were the "conduit" for all information to RAKIA, and so disclosure from his email account would capture the necessary information.

   a. At a case management hearing on 18 October 2017, RAKIA's counsel stated that RAKIA had, *"repeatedly explained that Jamie Buchanan, whose emails have been imaged, will be searched, and will be disclosed".* [**B/2/5**]

   b. RAKIA's counsel thus opposed broader disclosure on this basis [**B/2/6-9**]:

   *"So there's absolutely no need to cast the net wider, on an entirely speculative basis in circumstances where it ought to be clear that all relevant documents,*

44

*all disclosable documents, will be identified in searching Mr Buchanan's MSN email account."*

*"...The important point is that if Mr Buchanan was the conduit for all this information to RAKIA, if he's, if he's relaying or discussing points relating to negotiations to other individuals at RAKIA... if it was of relevance, it would be caught by the existing search proposals, which is we've imaged his MSN email account, that was the only email account he used in connection with these negotiations, therefore everything he received but also everything he sent that's potentially relevant and disclosable will be caught by the existing search parameters."*

c. RAKIA's EDQ [**G/12.2**], which was signed by Ms Ward of Stewarts in November 2018 with a statement of truth, stated as follows:

    i. Question 3D asks: "Where and on what type of software/equipment/media is this communication stored?" In response, as regards Mr Buchanan's emails, the EDQ stated: "Mr Buchanan's MSN account stored on the cloud".

    ii. Question 11 asks: "Are any documents which may be disclosable encrypted, password-protected, or for other reasons difficult to access, or do you have any reason to believe that they may be?" Ms Ward answered "No" for this question.

    iii. Question 12 asks: "Are you aware of any other points in relation to disclosure of your electronic documents which require discussion between the parties?" Ms Ward answered "No" for this question.

d. At a further hearing on the scope of disclosure held on 30 November 2018, leading counsel for RAKIA stated of Mr Buchanan's MSN email account [**B/12/68**]:

*"Accordingly, all emails and attachments received in that account have been preserved and included within the scope of the claimant's disclosure searches and Mr Buchanan has confirmed that he did not remove any of the deleted emails contained in the deleted items folder prior to the comprehensive imaging of that account in December 2016".*

45

e. Leading counsel added [**B/12/78**]:

"*I think that I have already dealt with the position in relation to Mr Buchanan. He has the one email account. It has been – it has been imaged, including the deleted folders and/or all relevant documents will be disclosed.*"

125. These assurances were simply incorrect. In providing disclosure, the disclosure statement of 25 April 2019 signed by Mr Buchanan admitted that a substantial number of emails had been deleted in October 2016 [**G/13/7-8**]:

"*In October 2016, Mr Buchanan's iPhone ceased being able to send emails from his MSN account on Microsoft Outlook. On 12 October 2016, Mr Buchanan therefore sought assistance from Apple to remedy this problem. It is understood that an employee of Apple deleted emails on Outlook on Mr Buchanan's iPhone in order to fix the technical issue. This was synced with MSN and had the effect of deleting those emails from Mr Buchanan's MSN account. On 14 October 2016, Mr Buchanan sought specialist assistance from IT specialists at Control Risks in order to restore the emails that Apple had deleted from his MSN account. A substantial proportion of the deleted emails were subsequently recovered with the assistance of Control Risks. All of the recovered emails have been searched using the stipulated date ranges and search terms. The remaining deleted emails cannot be recovered and therefore have not been searched.*"

126. RAKIA has since stated that the incident at the Apple store in fact occurred on 14 October 2016 (not the 12th) and that assistance was sought from Control Risks on 23 October 2016. RAKIA's disclosure statement, given more than 2½ years after the deletion was said to have occurred, was the first occasion on which RAKIA had indicated that any of Mr Buchanan's emails had been deleted. On the contrary, RAKIA's solicitors had previously provided assurances that obligations as to the preservation documents and electronic data had been complied with. Those assurances were false:

a. On 3 October 2016, within days of both the English and US claims beginning, Mr Azima's US-based lawyers, Miller & Chevalier, wrote to Dechert to seek confirmation that RAKIA and all those associated with it were complying with

46

their obligations to preserve any documents and electronically stored information in their possession in respect of both the English and the US proceedings. [**G/6.1/1-4**].

b. Miller & Chevalier reiterated its request for confirmation that the document preservation obligations were being met in further emails sent on 6 and 7 October 2016 [**G/6.1/5-8**].

c. On 20 October 2016, Dechert replied to Miller & Chevalier's requests for confirmation as to document preservation. Ms Linda Goldstein, of Dechert's New York office, stated: "*We are of course aware of our obligations to preserve evidence and have acted accordingly*" [**G/6.1/12-13**]. No reference at all was made to any deletion of Mr Buchanan's emails. Mr Gerrard and Mr Hughes (the English partners at Dechert acting for RAKIA) were copied on that email.

127. Mr Azima's solicitors repeatedly wrote to RAKIA's solicitors seeking information regarding the deletion of these emails, and received little meaningful information in response. Mr Azima then issued an application for RAKIA to provide disclosure and witness statements explaining the deletion, which was heard in November 2018 by HHJ McCahill QC. In response, and before the application was heard, RAKIA served further witness statements from Mr Buchanan [**D/12**], Ms Ward [**G/10**], and Mr Krone [**G/5**]. RAKIA invited HHJ McCahill QC to consider the matter closed, but the Judge ordered the production of a further witness statement and disclosure, which was served on 28 November 2019: 11th Ward [**G/12**].

128. In summary, the explanation provided by RAKIA before HHJ McCahill QC was as follows:

a. Mr Buchanan had attended the Apple store because of a problem in sending emails from his iPhone. He attended the Apple store in Covent Garden on 12 October 2016 and an Apple employee made some deletions from his iPhone: 4th Buchanan, para 8 [**D/12/3**].

b. Mr Buchanan was informed on 22 October 2016 by Dechert of the need to preserve documents. He informed Dechert of the possible deletion of emails: 4th Buchanan, para 10 [**D/12/4**].

47

c. Steps were then taken with Control Risks to address the situation. Control Risks ascertained that the deleted emails could be recovered. However, on advice from Dechert, Mr Buchanan instructed Control Risks to restore deleted emails only from the months of August, September and October 2016: 4th Buchanan, paras 17-20 [**D/12/5-6**]. Mr Buchanan says that this was because it was thought that restoring more of the emails would lead to recurrence of the problem in sending emails, and that other months could be restored at a later point.

d. This was incorrect: the restoration could only be effected within a limited time window, which then passed.

e. RAKIA's solicitors are said to have shared Mr Buchanan's belief that the email deletion issue had been resolved. It should be noted that Ms Ward was not made personally aware of the issue until February 2019: [**G/10/4**].

129. Before HHJ McCahill QC, RAKIA also stated that to the best of its knowledge, the deletion issue only affected emails that were in Mr Buchanan's "sent" and "deleted" folders in his emails. Leading Counsel stated: *"...to the best of our knowledge and understanding, the deletion of Mr Buchanan's emails on 14 October did not include the deletion of any emails from his inbox or its sub folders."* [**B/25/98**].

130. As HHJ McCahill QC found in his judgment ordering RAKIA to provide further evidence and disclosure (para 14 [**B/28/4**]):

> *"...it is undoubtedly the case that Mr Buchanan was portrayed as the hub of communications and that, because his emails had been retained intact, the need for secondary or other persons to be interrogated, as it were, was limited, because naturally all communications would have passed through Mr Buchanan's email account."*

131. The deletion of emails is highly unsatisfactory and RAKIA's explanation leads to a range of further questions that will be explored at trial. The following matters are noted at this stage.

132. First, as to the scale of the emails deleted from Mr Buchanan's account, Mr Azima's solicitors have sought to estimate this by comparing the emails available in the disclosure he has given, with those available on RAKIA's side. This comparison would likely provide an indication of the number of Mr Buchanan's unavailable emails. The indicated loss is significant:

a. Mr Azima disclosed some 198 emails sent to him by Mr Buchanan. RAKIA admits that only <u>one</u> of these emails is available in the image taken of Mr Buchanan's emails: 11th Ward, para 10 [**G/12/4**].

b. Mr Azima disclosed some 106 emails sent to Mr Buchanan. RAKIA admits that it has only 83 of these in the image of Mr Buchanan's emails: 11th Ward, para 11 [**G/12/4**]. This is a matter of concern given that Mr Buchanan's evidence is that he rarely deleted emails. It contradicts the assurance given by RAKIA's counsel that the incident at the Apple store is believed to have affected only the "sent" and "deleted" folders.

133. Second, internal RAKIA emails published by the "Rustavi" news station in Georgia include an exchange between Mr Buchanan and Stewarts regarding his emails, and disclosure, in 2017. Mr Buchanan was asked about issues with his MSN emails. He informed Stewarts that he had "*lost pretty much everything*" from his MSN emails in a hack in January 2016, and that the Dechert IT team had "*recovered as much as they were able*". He said he was "*comfortable*" that emails involving Mr Azima, including that emails in his "sent" folder (which had been deleted in October 2016), had been passed across "in full". He made no mention of any incident at the Apple store [**G/34/106-107**]. Mr Buchanan's competing and contradictory statements about the preservation, or rather the non-preservation, of documents by him will be explored in cross-examination.

134. Third, it remains unclear as to why RAKIA's lawyers, Dechert, gave an unqualified assurance in October 2016 that document preservation duties had been complied with, when they had not, or why Dechert did not correct that statement when they learned of the deletion only days after giving that assurance.

135. **Destruction of documents by RAKIA's agents** Concerns also arise over the destruction of documents by Digitalis and Mr Page.

136. In the course of the disclosure review, RAKIA was ordered to request documents held by Digitalis (as RAKIA's agent). In response, Digitalis provided no documents to RAKIA at all. Mr Azima then issued an application for third party disclosure against Digitalis. This would have been expected to yield substantial numbers of documents, given in particular that Digitalis had admitted preparing the websites making allegations against Dr Massaad.

49

137.  In response, Digitalis disclosed only a single, uninformative, document.  It indicated that it had in place a policy on document destruction, with the following key features [**G/35/1-6**]:

   a.  Documents are created only when necessary.

   b.  Documents are not kept longer than necessary:

      i.  Hard copy documents are shredded within 24 hours of creation;

      ii.  All emails are deleted from the server 2 years after their creation;

      iii.  Entire project files are subject to potential deletion on an *ad hoc* basis following completion.

138.  On Digitalis's account, it applied this policy to the documents relating to Mr Azima and Dr Massaad notwithstanding that it was obvious and intended that the work it was doing was connected with (and supportive of) RAKIA's position in a legal dispute, and litigation.  Stewarts have also indicated that Digitalis was instructed to preserve all documents on 1 November 2016.  It is not clear how Digitalis could have been left with practically no relevant documents while complying with that instruction.

139.  Mr Page and his companies also provided no documents to RAKIA's solicitors for the purposes of the disclosure review.  As discussed further below, Mr Page's witness statement refers only to a single documentary record, a WhatsApp message said to have been sent to him by Mr Halabi.  Mr Page's position is that he deleted that message for "security" reasons.

140.  These matters will be explored further at trial.

*Lack of witness evidence*

141.  In a similar vein, where evidence from a witness within one party's control would clearly be material, and the witness has not be called, adverse inferences may well be appropriate against that party.  RAKIA has, as noted, not been forthright about the role played by Karv, and in particular by Mr Andrew Frank of that firm.  Mr Frank features in key exchanges relevant to the hacking and RAKIA's failure to call him to address his knowledge and raises further questions.

50

*Lack of disclosure from agents and documents from important witnesses*

142.    A striking feature of RAKIA's evidence is that several of its witnesses have exhibited no contemporaneous documents at all in their witness statements. Witnesses in this category include Mr Page and Mr Halabi. These witnesses are important for a range of reasons, including that they are identified by RAKIA as the conduit through which it supposedly became aware of the data on the BitTorrent sites and the websites attacking Mr Azima in around August 2016.

143.    Another witness who provided no documents with his witness statement is the Ruler of RAK. The Ruler's statement seeks to respond to Mr Azima's evidence, including Mr Azima's explanation that he had a close and trusting relationship with the Ruler and visited him at the Ruler's palace in RAK on many occasions. The Ruler denies this, but has offered no documentary evidence to support that denial (such as records of visitors to the palace).

144.    The Defendant's solicitors wrote to RAKIA on 2 December 2019 raising the absence of any documents. That letter also noted that each of these witnesses had included a statement indicating that the basis for their evidence was as follows (emphasis added):

> "…*the facts set out below are within my own knowledge or are derived from other sources or* **_documents that I have seen_** *and which in all cases, I believe to be true.*"

145.    Given this reference to documents, the Defendant sought copies pursuant to CPR 31.14 of any documents relied on by RAKIA's witnesses in preparing their witness statements. The Defendant also requested that the sources and documents relied on by each witness be identified pursuant to PD 32. RAKIA has refused to provide any of the documents sought, contending that its witnesses had already identified any documents on which they relied.

146.    Mr Azima's solicitors have accordingly written to RAKIA's witnesses (copying in RAKIA's solicitors) to request that they provide copies of any relevant documents not already provided to Stewarts. None of RAKIA's witnesses has provided any documents in response.

### 3. The hacked material

*Availability of the material on the internet*

147. The links to the torrents placed on the BitTorrent websites appeared to contain personal and confidential files taken from Mr Azima's online accounts, including a portion of his iCloud backup data which included iMessages, SMS messages, Viber messages, WhatsApp messages, videos, contact details, call history, calendar, appointment history, voice messages, documents, recordings and photos: 1st Azima, para 60 [**E/3/15**].

148. However, both IT advisers retained by Mr Azima, and the IT expert retained by RAKIA in the proceedings brought by Mr Azima in the United States, were unable to download the majority of the materials from the BitTorrent websites:

   a. Mr Azima's advisers at an earlier stage, Sunblock, attempted to download the materials in early October 2016, and were unsuccessful [**F/3**]. The report prepared by Sunblock identifies a handful of "peers" on the BitTorrent network, identified using their IP addresses as being located in various countries and locations, but who had only a tiny fraction of the data available. Sunblock could obtain only 18 of the 3,300 "blocks" comprising the torrent: see [**F/3/13**]. As Sunblock noted, it is unlikely that any of those peers were the hacker as the hacker would possess the full set of data [**F/3/5**].

   b. Mr Azima had also sought assistance from other IT consultants in August 2016. They were also unable to download the information. Mr Azima was informed on 26 August 2016: *"Finally, while there is a 25GB torrent that has been repeatedly linked to, there is only one seeder (or owner of the content) who has either not been online or does not allow for the sharing of the content."* [**H10/277/1**].

   c. Mr James Hung of Crowdstrike was retained by RAKIA in the US to investigate the BitTorrent sites and preserve the data contained on them. He was unable to obtain more than small a portion. As Mr Hung's declaration to the US court explains:

i. As to the first and largest torrent, comprising some 25.7GB of material, CrowdStrike was unable to obtain any of these data: [**H11/85/10**].

ii. Mr Hung was able to download some 10.3MB and 4.4GB of data, respectively, from the two other torrents [**H11/85/12, 14**].

149. RAKIA's explanation for having obtained the materials is that it engaged NTi, a firm based in the US, to conduct the downloading, and thereby obtained a full set of the data, in excess of 30GB; the first torrent had been obtained, on Ms Gray's evidence, by 24 August 2016 (1st Gray, para 21 [**D/1/7**]). The manner in which this was said to have been done will be explored with Ms Gray and Mr Garcia at trial. However, even on RAKIA's case, it appears that after NTi had downloaded the first and largest torrent for RAKIA, it was thereafter no longer made available on the BitTorrent network by the hacker, or by any other persons with a full copy.

150. It appears that at various points in 2017 and 2018 after the BitTorrent sites were activated in August-September 2016, sets of Mr Azima's stolen data were made available for download from more orthodox websites, namely the file transfer service referred to as "WeTransfer": see 1st Tarbell, para 114 [**F/1/41**].

*Missing material*

151. RAKIA disclosed a set of the Hacked Material. A review of that data and of the data made available on the WeTransfer sites indicated that certain materials which had been available to the hacker when accessing Mr Azima's data were not included in the materials placed online.

152. These materials included two documents that were damaging to RAK and which would also have been available to the hacker when accessing Mr Azima's data.

153. *Institute for Gulf Affairs* **article** Mr Azima in August 2013 received an email in one of his accounts (that was the subject of a hacking attack) forwarding an article from the Institute of Gulf Affairs that is critical of the Ruler [**H7/51**]. The article also includes a summary of and a link to another article, published by the "Smoking Gun" website, detailing the Ruler's arrest for sexual assault in the US in 2006. That article includes the detailed report prepared by police officers at the time [**H1/6.01**], which indicates the distress of the complainant and notes that when questioned, the Ruler "*changed his*

53

*story many times and each time he would add a little bit more to it."* It also includes the Ruler's mug shot from his arrest [**H10/356**], which was reproduced in the Institute of Gulf Affairs article. The Ruler is said to have asserted diplomatic immunity, and after spending a weekend in custody returned directly to the UAE.

154. The email containing this story was not included in the materials published online, suggesting that it was withheld by the hacker for his or her own reasons.

155. The "Smoking Gun" article is relevant more broadly. In April-July 2018, RAK made a concerted public relations push to improve its image internationally [**G/26.18, G/26.19, G/26.20, G/26.21, G/26.22, G/26.23, G/26.24**]. As noted above, on 31 July 2018, the publishers of the "Smoking Gun" website reported that the webpage concerning the Ruler's arrest had been the subject of a cyber-attack. The publishers' statement bears repetition:

*"Beginning yesterday afternoon, TSG has been the target of a massive denial-of-service attack intended to drive the site offline. Launched from numerous international locales, the attack has swamped our servers with more than 300 million requests (and counting).*

*"The attack's specific target is a story we published in October 2009. That piece revealed the arrest of a United Arab Emirates sheikh for the sexual assault of a housekeeper at a Minnesota hotel adjacent to the Mayo Clinic.*

*"Intermediaries for Sheikh Saud bin Saqr Al Qasimi, the 62-year-old ruler of Ras al-Khaimah, one of the seven emirates comprising the UAE, have previously asked TSG to delete the story. Those requests were denied.*

*"So we've republished the story here: bit.ly/2M67Epq It would be terrible if the piece (and the sheikh's mug shot) got retweeted/recirculated."*

156. The irresistible inference is that the Ruler and his officials ordered the attack on the website. RAK and the Ruler are clearly highly sensitive regarding this damaging news story and have been willing to use cyber warfare to achieve their ends.

157. **The *Rogue State* report** A further report critical of the Ruler and of RAK under his governance, prepared in February 2010, also does not appear in the Hacked Material

54

placed on the BitTorrent and WeTransfer sites. The report states, for example [**H3/357/4**]:

*"Several months of in-depth research have turned up extensive trading activity with Iran through RAK and other northern emirates (some involving US nationals and companies); strong ties between the Bout network and a large diamond-polishing factory in Ras Al Khaimah owned by Saud and his chief advisors; deepening energy links between Iran and the northern Emirates; and signs of possible illicit operations in RAK related to Iranian proliferation and paramilitary activity as well as Al Qaeda. One of RAK's most recent projects is to turn itself into an offshore banking secrecy haven where customers do not have to disclose their identities— "the Middle East's best-kept secret," as one marketing slogan puts it."*

158. Mr Azima had discussed the "Rogue State" report in 2009 with Dr Massaad and Mr Fowler over email, when they had in fact been taking steps to refute it: see [**H3/312**] and [**H3/313**]. The report itself was sent to Mr Azima at around the time it was published: see 2nd Azima, para 47 [**E/4/10**]; but it has not appeared in the Hacked Material.

159. As Mr Azima has explained, that email and other files damaging to RAK that were accessible to the hacker appear to have been deleted by the hacker while accessing Mr Azima's emails (as well as being withheld from the data placed online). Various photographs of him and the Ruler have also disappeared, including of their visit to the Erbil, Kurdistan and Turkey in 2009/2010: 2nd Azima, para 48 [**E/4/11**]. Mr Tarbell confirms that it would have been possible for the hacker to delete materials while accessing Mr Azima's emails: 1st Tarbell, para 23 [**F/1/9**].

### 4. Other litigation involving RAKIA

*Georgian litigation*

160. RAKIA is engaged in litigation against figures it identifies on Dr Massaad's side. The evidence indicates that RAKIA is willing to adopt inappropriate tactics in pursuing its opponents.

55

161. Mr Azima's advisers have identified a set of relevant documents from RAKIA's side published in 2019 on the website of a Georgian news service, "Rustavi". It is not clear how Rustavi obtained these documents, but they include internal emails between individuals acting for RAKIA and other RAK entities.

162. The Rustavi documents indicate the improper approach that RAKIA (and key figures in these proceedings) have taken to litigation against RAKIA's adversaries. They include, for example, documents in which Mr Buchanan, RAKIA's main witness, discusses other litigation involving RAKIA in Georgia, seeking to exercise influence over the judicial system in Georgia. In one such email in March 2016, Mr Buchanan writes to RAKIA's advisers stating [**G/34/141**]:

> "*You introduced the two judges as having "influence" over the judges who would facilitate the process of hearing the 13 civil cases brought by RAK*"

> "*You mentioned in our meeting that the two judges had a material influence on the Public Registry (which had applied a very restrictive reading of charter suspension orders) and that they would seek to persuade them to apply a more flexible interpration [*sic*] of the charter suspension orders.*"

163. On the face of things, these and other emails suggest improper conduct of litigation by RAK and coordinated Mr Buchanan.

*Documents confidential to Mr Mikadze*

164. In these proceedings, RAKIA has relied on an August 2016 email chain between Mr Azima's lawyers, Mr Azima, and third parties. This email chain – referred to as the "CB Email" – was not part of the Hacked Material (since it post-dates the creation of the malicious websites: [**H10/250**]). Rather, RAKIA's position is that this email chain was received in hard copy through the post by its lawyers, Dechert (including Mr Gerrard) and Stewarts. Mr Azima's position is that the email includes confidential and privileged communications.

165. RAKIA's account is that it received this information, which was confidential to Mr Azima, anonymously through the post. This account has a clear parallel to its claim to have obtained the Hacked Material through the activities of an anonymous online benefactor, who hacked Mr Azima's data and placed it on BitTorrent sites.

166. RAKIA's receipt of this information cannot, however, be credited to good fortune. The possibility that this was an innocent coincidence cannot be entertained given that a very similar incident has occurred in respect of Mr Gela Mikadze, the former CEO of RAKIA Georgia, and his lawyers.

167. Mr Mikadze has been embroiled in substantial litigation with RAKIA since around 2015 in Georgia. He is represented by Mr. Lasha Uplisashvili of BLC Law Office, Tbilisi and RAKIA is represented by Dechert (Georgia) in those proceedings. There have been proceedings in this jurisdiction between RAKIA and Mr. Mikadze. See eg: *RAKIA v Bestfort Development* [2017] EWCA Civ 1014.

168. In November 2019, Mr Azima's solicitor Mr Holden spoke with Mr Mikadze's lawyer, Mr. Lasha Uplisashvili. As set out in 6th Holden [**G/7**]:

   a. Mr Uplisashvili advised that in January 2018, he received a telephone call from Mr. Archil Giorgadze of Dechert (Georgia) asking whether Mr. Uplisashvili had sent him a letter. He was told that the letter had been received by Dechert (London) and was addressed for the attention of Mr. Neil Gerrard. When Mr. Uplisashvili enquired in relation to what the letter said, Mr. Girogadze proceeded, a couple of days later, to send him a copy of the letter by email.

   b. On inspecting the letter, Mr. Uplisashvili noted that the letter was in substance identical to an email which he had sent to his client Mr. Mikadze (save that the formatting was slightly different). Mr. Giorgadze explained to Mr Uplisashvili that the letter had been received by Dechert (Georgia) from an anonymous source through the post.

   c. Mr. Uplisashvili had serious concerns about how this letter could have come into the possession of Dechert in these circumstances. Accordingly, he investigated his computers to ascertain whether there had been any unauthorised access to his emails. As a result of these investigations, he discovered that his emails had indeed been compromised: see 6th Holden, para 15 [**G/7/3**].

169. It would appear that there are striking similarities between these cases. That is:

   a. Both Mr Azima and Mr Mikadze are engaged in a legal dispute with RAKIA.

57

b. In both instances, confidential communications between Mr Azima and his lawyer, and Mr Mikadze and his lawyer, were somehow accessed. In the case of Mr Mikadze, IT analysis indicates that access was gained without authorisation to his lawyer's emails.

c. The confidential communications were then (on RAKIA's account) sent to Dechert (and Mr Gerrard) in the post.

170. On the face of the facts, it appears that the same methodology or *modus operandi* has been used by the individual responsible in both cases. The common feature in the two cases is RAKIA, represented by Dechert, being the adversary for the two individuals in legal proceedings. The most likely explanation is that RAKIA (not some other unknown persons) was the party that in each case gained unauthorised access to the materials and sought to deploy them by sending them via Dechert (and Stewarts). The likelihood that this pattern of conduct was followed <u>twice</u> by some other person(s) would appear to be very low. This also provides a further indication of RAKIA's responsibility for hacking more generally.

5. <u>RAKIA's implausible explanations</u>

171. RAKIA has offered up a counter-narrative to Mr Azima's complaint of hacking contending that: (1) it happened upon the Hacked Material legitimately; and (2) Mr Azima was likely hacked by entities aligned with the government of Iran. Neither part of this explanation bears scrutiny and indeed the critical steps in RAKIA's story only add to the suspicion and strengthen the case pointing to its responsibility.

*RAKIA's account for obtaining the Hacked Material*

172. As noted, RAKIA contends that it had engaged various public relations and security consultants to monitor the media and the internet for information concerning Dr Massaad and Mr Azima. These included Bell Pottinger, which was engaged in November 2014, at around the same time as Mr Buchanan himself. RAKIA is also said to have received assistance from Karv Communications: 1st Buchanan, para 97 [**D/9/35**].

173. RAKIA's case as to its discovery of the materials is as follows:

58

a. In March 2015, RAKIA first engaged Mr Stuart Page (and/or his companies). It is said by RAKIA that this engagement was not recorded in writing: 1st Page, para 12 [**D/3/4**].

b. Mr Buchanan says that in February or March 2016, he asked Mr Page to "keep an ear out" for anything of interest concerning Mr Azima (1st Buchanan, para 98 [**D/9/35**]) or a negative publicity campaign against RAK (1st Page, para 15 [**D/3/5**]). Again, this instruction was not recorded in writing.

c. Mr Page says that following that discussion with Mr Buchanan in February or March 2016, he spoke to various "contacts", including Mr Majdi Halabi, an Israeli journalist. He asked Mr Halabi to keep his "ear to the ground": 1st Page, paras 16, 18 [**D/3/5**]. No documents referring to any of these requests have been disclosed.

d. Mr Halabi says that following this conversation, which he thinks occurred in March or April 2016 (1st Halabi, para 6 [**D/6/2**]), he "*searched for those names*" of the persons mentioned to him by Mr Page on Google. The names were those of the Ruler, Dr Massaad and Mr Azima, and perhaps other names that Mr Halabi says he cannot remember (1st Halabi, para 5 [**D/6/2**]). No notes of any of these requests or of any of Mr Halabi's searches have been disclosed. This is all said to have been done by Mr Halabi as a favour to Mr Page, for no remuneration.

e. Mr Halabi says that he did not set up any Google alerts; the creation of a Google alert would automatically lead to emails being sent to Mr Halabi if the subject of the alert featured in information online (1st Halabi, para 7 [**D/6/3**]). Rather, Mr Halabi's evidence is that "*Every couple of days*", he would "*search again to see if there was anything new, interesting or different*" (1st Halabi, para 7 [**D/6/3**]).

f. Mr Halabi's evidence is that he continued doing these searches every couple of days from March or April 2016 until "in early August 2016" he happened upon the torrents containing Mr Azima's data: 1st Halabi, para 8 [**D/6/3**].

59

g. Mr Halabi says that he telephoned Mr Page and informed him of this. He sent Mr Page the details of two links via WhatsApp. The WhatsApp message has not been disclosed in these proceedings. Mr Halabi says that he "no longer has" the phone he used to do so and does not have access to the WhatsApp message via any other means, such as a server or backup: 1st Halabi, para 8 [**D/6/3**]. Mr Page says that he deleted the WhatsApp message for "security" reasons: 1st Page, para 19 [**D/3/6**].

h. Mr Page's evidence is that he then would have "picked up the phone" to Mr Buchanan, and that he also spoke to Mr Gerrard (1st Page, para 20 [**D/3/6**]; 1st Buchanan, para 106 [**D/9/38**]). No email, message, WhatsApp or other record showing the means by which Mr Page provided Mr Buchanan or Mr Gerrard with the links to the torrent websites has been disclosed. Mr Page says that he "does not recall" how he provided the links to Mr Buchanan and Mr Gerrard: 1st Page, para 20 [**D/3/6**]. Mr Gerrard believes that he "may have written them down during the call" with Mr Page: 1st Gerrard, para 18 [**D/7/5**]. The URLs for the torrent sites are typically include a jumble of unintelligible numbers and/or letters: see, for example, the list of URLs set out by RAKIA in its Part 18 response of November 2018: [**A/7/2**].

i. RAKIA's case is that Mr Gerrard contacted Mr del Rosso of Vital, to make arrangements for the materials to be investigated. Mr del Rosso then contacted NTi.

j. Mr Page's evidence is that he discovered a second cache of the Hacked Data "a few weeks later". He recalls none of the details: "*I recall that I learned that a second set of data relating to Mr Azima had been put onto the Internet. I cannot recall when or how exactly I learned of this. As I had not discussed the first set with any of my sources other than Majdi Halabi, I believe it may have been him that told me about the second set but it is possible that I was told by one of my other sources. I do not recall being told anything about how or when the second set had been discovered.*": 1st Page, para 22 [**D/3/7**]. The source of this second discovery has not been revealed.

k. The dates on which these events occurred is not clear. None of Mr Buchanan, Mr Page, Mr Halabi or Mr Gerrard (who is, it bears emphasis, a solicitor) can recall the date on which the links were first discovered and shared by Mr Halabi and then Mr Page. The position on RAKIA's side is simply unclear:

    i. No records have been disclosed of those communications regarding the initial discovery of the links.

    ii. Mr del Rosso believes that his first conversation with Mr Gerrard took place on 9 August 2016 and there is an email from Mr del Rosso to NTi (who undertook the downloading of materials from the torrent sites) on that day: 1st del Rosso, para 7 [**D/5/3**].

    iii. An email from Mr Buchanan to Mr Frank, Mr Gerrard and Mr Handjani dated 16 August 2016, however, indicates that he was informed by Mr Page of the material on the internet on 15 August 2016: *"Good morning. I have been informed by Stuart last night that there is an internet site that is carrying a huge amount of material relating to FA - I will get you the link later. I have asked Neil to have a team start reviewing the material as a matter of urgency."* [**H10/262**]. Mr Buchanan says that he cannot fully explain the timing of this email: 1st Buchanan, para 110 [**D/9/39**].

174. RAKIA's account of having found the Hacked Materials innocently will be challenged in cross-examination. Even on its face it is risible.

175. At its heart is RAKIA's contention that Mr Halabi simply conducted Google searches for names every other day, for 4 or 5 months. Yet he made no records of the names or of those searches or of Mr Page's requests. He had no connection with RAK and no interest in the subject and no interest in the individuals. He was not paid. He no longer has the telephone that he used to send the link to Mr Page. He cannot be specific about any of the dates. Despite the obviously critical nature of the links once discovered, he wrote nothing down at that stage. After finding the links he took no interest in it and never discussed it with Mr Page thereafter. The whole story defies credulity.

176. Similarly, Mr Page has conveniently deleted the WhatsApp message that he received from Mr Halabi. He purports to have no other written records, at all. He cannot pinpoint the days of these events or the way that he communicated with Mr Gerrard and Mr Buchanan. He also cannot recall how he found the second cache of data. His account simply raises a series of key questions which he appears unable to answer.

*RAKIA's alternative explanation: Iranian hacking*

177. RAKIA does not deny that Mr Azima was hacked. It had pleaded in the autumn of 2018 that the likely culprit was the Iranian state: RRARep, para 7G.2 [**A/4/9**]. It referred to a 2012 email from Mr Azima's colleague Ms Azadeh suggesting surveillance by the Iranian state, and noted that Ms Azadeh had been detained in Iran and had then sued Iran as a result.

178. No other evidence supporting this theory was offered, until two weeks before trial, when, on 6 January 2020, RAKIA's solicitors wrote to draw attention to a possibly malicious email sent to Mr Azima in May 2016, noting that the email appeared to have been sent from an IP address in Iran. This email, however, does not assist RAKIA's theory and smacks of desperation:

   a. The email was sent to Mr Azima **well after** unauthorised access had been gained to his email accounts, which Mr Tarbell's analysis shows to have been from October/November 2015, as discussed above.

   b. The fact that the apparent IP address registers in Iran does not itself indicate that the sender was actually located in Iran. One feature of the spear-phishing emails (as described in both experts' reports) is that the sender can conceal their true location in various ways, using virtual private networks (VPNs) and other means.

   c. In the copy of the Hacked Material that is available in these proceedings, the malicious email appears in a junk email folder. As the email was in a junk email folder, it appears unlikely to have been opened by Mr Azima. Following receipt of Stewarts' letter, Mr Azima's expert Mr Tarbell examined the image taken of Mr Azima's emails after the hacking was discovered and Mr Azima engaged IT consultants (Sunblock). The malicious email does not appear in that image.

62

179. Later that week, RAKIA also provided disclosure of several news articles referring to Mr Azima and suggesting hostility towards him on the part of Iran. The reliability of these articles is open to question in light of the acknowledged role played by Bell Pottinger, the master of 'dark arts' in public relations. In light of RAKIA pointing to Iran as a culprit, it will be necessary to address at trial the part played by Bell Pottinger and RAKIA's other agents in the publication of these materials, and to explore the well-documented connections between RAK and Iran, as are addressed, for example, in the *Rogue State* report [**H3/357/4**], US diplomatic cables available on Wikileaks [**G/26.29**] and press reports [**G26.53/3**]. Even materials apparently relied on by RAKIA indicate that documents provided to journalists on the supposed hostility between Iran and Mr Azima had come "over the transom", from Bell Pottinger and/or Dechert on RAKIA's behest: [**G/26.7/11**].

### C. *Conclusion*

180. If the Court finds that RAKIA is likely responsible for the hacking, there would be a strong case for applying the legal principles discussed in *Hunter* and *Summers v Fairclough Homes*, to strike out RAKIA's claim regardless of its merits. If RAKIA was responsible, then it must follow that:

    a. It illegally and covertly obtained evidence;

    b. It committed gross breaches of Mr Azima's privacy and legal rights, including his legal professional privilege;

    c. It dishonestly denied to the Court any involvement in or knowledge of the hacking. This deception is egregious and it would be a deep affront to the administration of justice to allow this claim to be pursued in those circumstances.

    d. It would also indicate that RAKIA's entry into the Settlement Agreement was motivated by bad faith.

181. Further and in the alternative, the evidence obtained by RAKIA from the Hacked Material should be excluded from the evidence and from the Court's consideration of the merits.

182. Mr Azima has also brought a counter-claim against RAKIA for the hacking and dissemination of his data and for its associated creation of malicious websites, seeking

substantial damages exceeding the amounts sought by RAKIA. That counter-claim is stayed pending the outcome of this trial for case management reasons, but the compensation RAKIA is liable to pay is pleaded in Mr Azima's defence by way of set-off, extinguishing RAKIA's claims: RRADef, para 60A [**A/3/45**].

64

## IV. THE TRAINING ACADEMY ALLEGATION

183. RAKIA's case is that it was induced to enter into the Settlement Agreement by a fraudulent misrepresentation made by Mr Azima concerning a joint venture between HeavyLift, a company at one stage owned by Mr Azima, and RAK Airways (RAPoC, paras 4B-4R [**A/2/4-10**]). Mr Azima denies this claim. RAKIA makes this allegation of fraudulent misrepresentation to claim damages, and to assert a breach of the duty of good faith in the settlement agreement (RAPoC, para 8.20 [**A/2/5**]). In either case and as set out below, its claim is flawed at each stage.

184. While the civil standard of proof applies, RAKIA must adduce particularly cogent evidence to establish a fraudulent misrepresentation: *UK Insurance v Gentry* [2018] EWHC 37 (QB) (Teare J), para 21. This is because, "the more serious the allegation is, the greater the proof is needed to persuade a court that it can be satisfied that the allegation is established": *Smith New Court Securities v Citibank* [1997] AC 254, at 274 (Lord Steyn).

185. As the Court considers RAKIA's claim regarding the joint venture with RAK Airways, it should keep in mind that many of the events in question occurred more than a decade ago and, crucially, that much of HeavyLift's records relating to the operation of the joint venture were kept at the premises of the joint venture at the airport in RAK. The joint venture was terminated as a result of RAK Airways' breach of its obligations. At that stage, HeavyLift was directed to leave the premises, and to leave behind its records: 1st Azima, para 22. Having been assured that these records would be properly stored, RAKIA advised that the records are in disarray: 1st Buchanan, para 37. In addition, at the disclosure stage in these proceedings, RAKIA successfully resisted Mr Azima's request that it conduct searches over the full set of electronic documents held by RAK Airways, on the basis that this would entail a cost of £50,000: Judgment of HHJ Kramer, 20 December 2018 [**B/16/13**].

186. Given the very serious allegations of wrongdoing made by RAKIA, it is obviously necessary that its contentions are substantiated with evidence. As set out below, there is a significant body of evidence contradicting RAKIA's case, but to the extent that there are gaps in the evidence, responsibility for this should be laid at RAKIA's door and Mr Azima given the benefit of any uncertainty, especially given the need for

RAKIA to show particularly "cogent evidence" as explained in the authorities cited above.

### A. The JV Agreement and negotiation of the Settlement Agreement

1. The JV Agreement

187. In 2007, Mr Azima had discussions with RAKIA (including through its then CEO Dr Massaad), and with other RAK entities and HH Sheikh Saud, to engage in various business ventures, including the creation of an aviation training academy involving RAK Airways: 1st Azima, para 20. Consideration had been given to creating a training academy involving HeavyLift, a company then owned by Mr Azima, in the latter months of 2006.

188. These discussions led to HeavyLift, RAK Airways, and RAKIA executing an agreement dated 12 April 2007 (the '**JV Agreement**'): [**H8/274**]. Under the JV Agreement, HeavyLift and RAK Airways had the following obligations:

   a. HeavyLift's obligations were specified under clause 1.1 and included the supply of a specific DC-8 flight simulator, a range of related equipment and materials, installation, commissioning, securing regulatory approval and the supply of management staff:

   *"HeavyLift's contribution to the Joint Venture consists of the following:*

   *a. Supply of free and unencumbered title to one DC-8, three-axis, full flight simulator manufactured by Singer Link, Binghamton and marked with manufacturer's serial number 532000-1 including all computers, software, applications, hydraulics components, spare parts and other equipment or property of any kind installed therein or thereon, and any documents or records relating to said simulator.*

   *b. Packing and freight, including ocean and inland transport.*

   *c. Installation and commissioning.*

   *d. All related mock-ups, training aids and training materials.*

   *e. Irish CAA, EASA and UAE GCAA approvals.*

66

*f. Training Manuals, Training Syllabus, and Training Curriculum as required by Irish CAA, EASA and UAE GCAA.*

*g. Management, including required Post Holders for regulatory compliance, and maintaining the authority for the Joint Venture."*

b. RAK Airways had the following obligations under clause 2.1, including construction of the required building, the supply of electricity, and the provision of title to the required land and buildings:

*"RAK Airways' contribution to the Joint Venture consists of the following:*

*a. Supply of free and unencumbered title to a purpose-built 3-Bay simulator facility to house simulators, training rooms and classrooms, including all fabrication and construction.*

*b. Supply of free and unencumbered title to the land to accommodate the above purpose-built facility.*

*c. Design and construction to accommodate the required floor load, ceiling height and clearance, and special air conditioning and electrical service for 3 commercial multi-axis aircraft simulators and computers, and HVAC for the building.*

*d. Supply of required commercial electric power and other utilities necessary for the normal operation of 3 commercial multi-axis aircraft simulators and the training rooms, offices, and facilities.*

*e. Marketing for Joint Venture training facility.*

*f. Guarantees for the required working capital."*

189. The JV Agreement also made provision for the future acquisition of other simulators (clause 3). It provided for HeavyLift and RAK Airways to have 50/50 shares of any profits or losses, and for the board to comprise of Mr Azima and Dr Massaad (clause 4). Its term was initially to be for 10 years, with termination possible thereafter on 1 year's notice (clause 5).

190. As RAKIA has pleaded, the JV Agreement contained a provision under which RAKIA guaranteed RAK Airways' performance of its obligations under that Agreement:

67

RAPoC, para 4B [**A/2/4**].  It stated: "*The performance of RAK Airways PJSC is consented to and guaranteed by RAK Investment Authority.*"

191.  In correspondence, RAKIA has referred to other draft versions of the JV Agreement with different content, including versions in which no guarantee clause appears.  It is unclear as to whether RAKIA intends to suggest that the signed version of the JV Agreement (which does include a guarantee clause) is not authentic.  Mr Azima's solicitors have invited RAKIA to clarify whether that is its case, but it has not done so [**G/41/1-5, G/43/1-1, G/44/1-2**].  RAKIA's positive pleaded case is therefore that the JV Agreement did contain a clause under which RAKIA guaranteed RAK Airways' performance of its obligations.

192.  Following entry into the JV Agreement, a company was established in which HeavyLift and RAK Airways were 50% shareholders and naming Dr Massaad and Mr Azima as shareholders; the articles of association were executed also by RAKIA and bore the heading "Government of Ras Al Khaimah: RAK Investment Authority", as well as RAKIA's seal [**H7/41**].

2.  The Training Academy

193.  As required by the JV Agreement, HeavyLift undertook the work and procurement necessary to supply, install and commission the simulator, to provide a wide range of other complex equipment, and to obtain the necessary regulatory approvals:

a.  A DC-8 simulator was acquired from a UK firm, MK Airlines, in October 2006. It was transported to RAK, installed and commissioned.  The simulator is a large and complicated piece of moving mechanical equipment.  The steps taken involved a very substantial amount of work and cost on HeavyLift's part, including obtaining new parts for the simulator, installing and calibrating the equipment, and engaging consultants and engineers (see for example [**H1/439, 440** and **441**]).

b.  HeavyLift also supplied the staff necessary to arrange the commissioning and then the operation of the simulator.

c.  HeavyLift contributed a range of other equipment needed for the operation of the training academy, such as manuals and training aids.  The training aids are

68

large and complex pieces of equipment, necessary for the operation of the training academy.

d. The simulator was commissioned in 2007 and the training academy then received regulatory approval from the Irish Aviation Authority in early December 2007: see [**H2/90**] and [**H2/114**]. This approval was effective throughout the area covered by the European Aviation Safety Agency (the EU 28 plus several other countries). Regulatory approvals were then also obtained from the UAE's regulator: [**H2/137**].

194. HeavyLift had therefore complied with its obligations under the JV Agreement. It had provided the JV with a valuable working asset built from scratch, using HeavyLift's expertise and contacts, and Mr Azima's expertise and time in particular. It also procured equipment, parts, and the services of external consultants, for which HeavyLift was responsible. The simulator was obviously indispensable to the operation of the JV. It began operating and earning revenues in late 2007 and in 2008: see for example [**H2/168**] and [**H2/405**].

195. The Training Academy was to encounter problems throughout its operation, however, given RAK Airways' failure to uphold its side of the joint venture. As is clear from the contemporaneous documents, the building constructed by RAK Airways was not fit for purpose: it lacked air-conditioning (which was problematic as the simulator had to be kept at a low temperature to operate) and (at least for a time) windows: [**H1/283**], [**H2/14**]. The building also lacked the structural capacity and height to accommodate the additional simulators that had been contemplated: 1st Azima, para 34.

196. Of particular concern, the building lacked the reliable supply of electricity that RAK Airways was obliged to provide (see a survey report prepared by external consultants: [**H2/440/6**]. The lack of electricity compelled HeavyLift to obtain electricity from generators at significant cost, and to consider installing new and expensive electrical switching equipment to ensure a reliable power supply: see [**H1/344**], [**H1/437**].

197. Moreover, far from RAK Airways arranging to transfer title to the land and building to the JV company, in September 2008 RAK Airways in fact served notice on HeavyLift requiring the JV the premises to be vacated and the simulator and other equipment and staff removed: [**H2/482**], [**H2/484**]. It purported to do so by way of an "administrative decision" signed by Dr Massaad, which provided no legal basis for this act and made

69

no allegation of any breach of the JV Agreement. Ultimately, HeavyLift avoided quitting the premises but was forced to agree to pay rent to RAK Airways, of $136,000 initially, adding substantially to the overall costs: see 1st Azima, para 36.

198. The Training Academy was therefore in the long run not a commercial success, stemming from RAK Airways' failures to meet its obligations, and it ceased to operate in around 2010. As a result of RAK Airways' breach, HeavyLift lost the value of its interest in the training academy, was deprived of the possession or use of the simulator and the other equipment that it had contributed, and had been deprived of its share of the value of the land and building (title to which RAK Airways had failed to transfer). The simulator and other equipment thereafter remained in RAK Airways' possession, and ultimately then in RAKIA's possession.

3.      The Training Academy accounts

199. From early 2008, HeavyLift had sought to prepare a set of joint financial accounts with RAK Airways, for submission to HeavyLift's auditors, PriceWaterhouseCoopers ('**PWC'**), and informed RAK Airways of this [**H2/290**]. It therefore submitted a proposed balance sheet contained in preliminary management accounts, showing HeavyLift's contributions to RAK Airways in February 2008: [**H2/198**] and [**H2/199**]. This balance sheet showed total assets contributed by HeavyLift of $2,281,883. The more detailed spreadsheets supporting this balance sheet indicate that the value attributed to the simulator was a total of $1 million, comprised of $167,500 paid to MK Airlines, and an investment by HeavyLift of $832,500: [**H2/183**], "Simulator" tab, cells G8-G11. They also book the training aids as being $450,000, attributed to "Mr Azima/HeavyLift": "Fixed Assets" tab, cell F80.

200. The accounting of the value of assets at this level had earlier been discussed between HeavyLift and RAKIA. It was agreed that the value of HeavyLift's contribution of the simulator itself (which would be separate from other contributions, such as the costs of installation and commissioning and the cost of other equipment, or operating costs) was to be $1 million. This is reflected in the contemporaneous documents. A letter to Dr Massaad (who was then the head of RAKIA) drafted by Mr Adams and sent to Mr Azima for his signature on 24 January 2008 (see [**H2/187**]) noted that the value of HeavyLift's contribution of the simulator alone had been agreed in this amount: [**H2/188**]. It cannot be credibly suggested that Dr Massaad was covertly working with

70

HeavyLift or Mr Azima in agreeing that value; as noted above, later in that year Dr Massaad and RAK Airways purported to evict HeavyLift from the premises at the airport.

201. The valuation of this contribution of the simulator at $1million was entirely reasonable and commercially justified. A simulator is a very substantial item made up of complex mechanical equipment. Mr Azima's expertise and time (and that of his HeavyLift's employees) was required in sourcing all the necessary parts and in bringing these all together.

202. Following receipt of the draft from HeavyLift, RAK Airways engaged in discussions with HeavyLift over the figures to be included in the management accounts. Figures were added, for example, showing RAK Airways' contributions: [**H2/239**] and [**H2/240**].

203. RAK Airways did at certain points query some of the entries included by HeavyLift in the proposed accounts: see eg [**H2/366**]. HeavyLift's estimate of the value of the simulator was corroborated by a valuation obtained from a third party, Aerospace Management Capital Limited [**H2/348**], which put it in a range of $1.575 to $1.675 million. RAK Airways contended (as does RAKIA now) that this valuation was unreasonable given that the simulator was 40 years old. However, that valuation shows that many other DC-8 simulators of a similar age (or older) had been used by other operators; the question is not as to the age of the equipment but rather whether there is a market for it to be used. HeavyLift, moreover, gathered information concerning the simulator, including operating manuals and information from the previous owner, to be provided to the valuer: [**H2/296**]. RAKIA's suggestion that the valuation was not at arm's length is also not credible: the value estimated was <u>lower</u> than the value that had been tentatively suggested by Mr Adams [**H2/276**], confirming the valuer's independence.

204. Ultimately and in any event, the management accounts were submitted to PWC. PWC reviewed the accounts submitted for the joint venture; for example, it convened a meeting to discuss the accounts for the year ending 31 December 2007: see [**H2/443/1**]. This meeting appears to have taken place on 19 May 2008 (the reference to 19 May 2007 must be a typo given that the meeting concerned the year up to 31 December 2007).

205. PWC subsequently provided a reviewed set of statements for the year ending 2007 on 30 September 2009 (see **H3/295**). This appears to be the set of draft statements dated 30 September 2009 available at [**H3/294**]. These statements show that as at 31 December 2007, the training academy had assets in the form of plant, property and equipment of $2,250,144 [**H3/294/6**]. A set of statements (for the year ending 2008) including this column of figures was later signed and this signed version submitted to RAKIA in 2015 in support of HeavyLift's claim for compensation [**H7/444/19**] and [**H7/444/20**]. As addressed further below, RAKIA contends that the submission of this document to it in 2015 was fraudulent, but it was in fact simply a document whose contents had been prepared by the joint venture's own auditors.

206. The accounts for HeavyLift itself for the year ending 31 December 2007 were consolidated with those of the joint venture: [**H2/343**] at pages 3, 9. These make clear that PWC was aware that part of the value attributed to the simulator, and the value of the training aids, was accounted for on the basis of the transactions under which Mr Azima had sold them to HeavyLift: in the "Related Parties" section of the accounts, a total of $1,282,500 is shown in respect of "Purchase of Simulator and Training Aid Equipment" (see [**H2/434**] at page 19). This comprised $832,500 for the simulator, and $450,000 for the training aids, which was consistent with invoices issued at the time. These individual figures are also recorded in section 4 of the Notes to those statements: [**H2/434/18**].

4.     HeavyLift's request for compensation

207. The figures identified through the process summarised above formed the basis of HeavyLift's claim for compensation from RAKIA, that is the subject of this part of RAKIA's case. HeavyLift's claim simply reflected the very valuable contribution it had made to the joint venture, a contribution whose value had been recognised, independently assessed, and agreed at the time.

208. For example, the letter signed by Mr Adams of 2 September 2013 [**H8/275**] indicated that HeavyLift's claim as regards contributions to assets was worth $2,260,000; this same figure was cited in Mr Azima's email of 11 November 2015 [**H8/279/1**]. The basis for this figure was explained in the management accounts, enclosed with Mr Adams' letter of 6 July 2015 (see [**H7/444/16**]). Those accounts show in the year ending 31 December 2007, the property, plant and equipment assets were valued at

$2,250,144. A modest addition of some \$9,000 over the following year produced a total figure of \$2,259,266, supporting the figure claimed of \$2,260,000. The figure of \$2,250,144 for the year ending 31 December 2007 was also confirmed (as noted above) in the accounts audited by PWC, also provided to RAKIA with Mr Adams' July 2015 letter: [**H7/444/20**].

209. Moreover, the documents provided to RAKIA in support of the HeavyLift claim for compensation included the audited consolidated HeavyLift accounts for the year ending 31 December 2007. As noted above, those accounts included the note that a total of \$1,282,500 attributable to the value of the simulator and the training aids arose from related party transactions: [**H7/444/43**]. It would therefore have been obvious to RAKIA that the basis for HeavyLift's claim included this contribution to the assets in question.

210. In short, the claim submitted on HeavyLift's behalf was advanced on the very same basis and by reference to the same documents as had been provided by HeavyLift in 2008/2009 to its auditors, to its joint venture partner, and to RAKIA (as Dr Massaad received HeavyLift's proposed management accounts and was the representative of both RAK Airways and RAKIA). This is entirely unremarkable and is entirely at odds with RAKIA's claim of fraud or any kind of dishonesty.

### B. *RAKIA's claim*

#### 1. Content of the alleged representation

211. RAKIA's case is that, through communications sent between September 2013 and November 2015, Mr Azima represented that, "*HeavyLift had invested a total of US\$2,685,000 into the Training Academy Joint Venture, which included expenditure of approximately US\$1,726,000 in respect of the flight simulator as described in the documents provided to RAKIA*" (the '**Alleged Representation**') (RAPoC, para 4N [**A/2/5**]).

212. RAKIA's case is that there was a specific representation that HeavyLift had actually incurred costs in these amounts and that compensation was sought on that basis: RRARep, para7C [**A/4/4**].

213. The interpretation of an alleged misrepresentation will depend on the context in which the statement is made. In *IFE Fund v Goldman Sachs International* [2006] 2 CLC 1043, Toulson J held (para 50):

> *"In determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used. In determining what, if any, implied representation has been made, the court has to perform a similar task, except that it has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context."*

214. The communications relied on by RAKIA set out the basis on which it was said that HeavyLift was entitled to be compensated for the termination of the Training Academy Joint Venture. This request for compensation had two aspects.

215. The first aspect concerned RAK Airways' failure to contribute the land and buildings to the JV, depriving HeavyLift of its share of that asset. HeavyLift was *inter alia* obliged to construct the facility to house the training academy, and then transfer title to that facility as well as the land at the airport on which it was situated: see JV Agreement, clause 2.1(a)-(c) [**H7/444/5**]. This point was repeatedly made:

   a. Mr Adams' email of 15 November 2015 stated [**H8/327/1**]: *"Part 1 of the claim is for 50% of the value of the land and building at the airport. We have estimated the value because we do not know the cost or the current market value."*

   b. HeavyLift's letter of 6 July 2015 (signed by Mr Adams) stated [**H7/444/2**]: *"HeavyLift was promised 50% ownership of the building and, in exchange HeavyLift was to pay rent. The title for the building was never transferred."*

   c. The May 2015 Statement of Account enclosed with Mr Azima's email of 11 November 2015 [**H8/279/1**] referred to the: "*50% of Value of Airport Land and Building*".

   d. HeavyLift's letter of 2 September 2013 (signed by Mr Adams) stated [**H8/275**]: "*We estimate the value of the land and the building to be approximately $5,000,000 USD, of which HeavyLift would be entitled to its 50% share on dissolution.*"

74

216. The second aspect concerned HeavyLift's contributions to the JV. The communications relied on by RAKIA referred to the "investments" contributed or provided by HeavyLift to the JV. RAKIA contends that "investments" means "expenditures" actually made and "costs" actually incurred. Seen in context, it is clear that contrary to RAKIA's case these references were not limited to the particular sums outlaid by HeavyLift but rather reflected the total value of the various assets making up the training academy once installed and commissioned, including certain costs, and were understood as such at the time:

   a. In the particular context of this negotiation, it would make no commercial sense for HeavyLift to limit its claim only to the amounts actually spent in relation to the JV. HeavyLift's position was that the JV had wrongfully been terminated by RAK Airways. A party in HeavyLift's position would seek to be compensated for the value it had created and of which it had been wrongfully deprived by the other JV partner's breach, not simply for the amounts it had actually outlaid. This is particularly so given that RAKIA indicated that it would be too complicated to provide HeavyLift with its half share of the land and buildings that RAK Airways failed to contribute (Mr Buchanan's email of 14 November 2015 [**H8/327/3**]).

   b. The May 2015 Statement of Account enclosed with Mr Azima's email of 11 November 2015 referred to various items contributed by HeavyLift including the simulator, training aids, and other assets under the heading "Fixed Asset Investment" [**H8/282/1**]. By contrast, other parts of HeavyLift's claim were explicitly labelled in this document as costs: "Staff & Related Costs from US Company".

   c. Mr Buchanan understood the communications as referring to this concept of "value", not restricted to specific expenditures or costs. His email to Mr Azima of 14 November 2015 stated [**H8/327/2**]: *"I have now reviewed Ray's email and have been authorised to verify the various valuations referenced in his email."*

217. Moreover, it was clear to RAKIA from the communications in question that a substantial portion of the value attributed to the simulator and the training aids arose from related party transactions. The accounts for HeavyLift provided (twice) to

RAKIA included a specific note that a total of $1,282,500 attributable to the value of the simulator and the training aids arose from related party transactions: **[H7/444/43]**.

2. Identity of the representor

218. RAKIA's pleaded case is that the communications pleaded in paras 4E, 4F, 4I, 4J and 4M of its RAPoC were sent "by or on behalf of" Mr Azima: RAPoC, para 4N [**A/2**]. This allegation is necessary for RAKIA to bring a case against Mr Azima, as opposed to any other party; the distinction between Mr Azima and HeavyLift is important given that in December 2009, Mr Azima transferred the majority of his shareholding in HeavyLift to a RAK entity: RAK Trans Holding FZ LLC.

219. Only one of the communications pleaded by RAKIA was actually sent by Mr Azima; namely, the email pleaded at para 4I of the RAPoC, attaching the documents referred to at para 4J. RAKIA does not contend that the single email sent by Mr Azima itself constituted the Alleged Representation on which it relies; rather, RAKIA's case is that the pleaded communications "constituted a representation"; on its face, RAKIA's pleading is that these communications collectively constituted a single representation.

220. RAKIA's case that the other communications were sent "on behalf of" Mr Azima is at odds with the content of the communications themselves, which indicate that they were sent on behalf of HeavyLift:

   a. All of the communications (including that sent by Mr Azima) concern a claim by HeavyLift (not Mr Azima).

   b. The claim relates to a JV to which HeavyLift (and not Mr Azima) was a party.

   c. The Settlement Agreement that resulted entailed a payment by RAKIA, described by the Settlement Agreement as being a payment to HeavyLift (not to Mr Azima).

221. The communications which initiated the claim were not sent by Mr Azima and were explicitly made on behalf of HeavyLift, not Mr Azima:

   a. The first communication (see para 4E of the RAPoC) is a September 2013 letter on HeavyLift letterhead, signed by Mr Adams in his capacity as the CFO of HeavyLift over his HeavyLift email address [**H8/275**]. It refers to HeavyLift's investment and HeavyLift's conduct during the JV. That letter also makes clear

that the claim was being made in light of the need to wind up HeavyLift's affairs.

    b. The second communication (see para 4F of the RAPoC) is, again, a letter of July 2015 on HeavyLift letterhead (emailed by Ms Azadeh), signed again by Mr Adams as the former CFO of HeavyLift, describing HeavyLift's investments [**H7/444**].

222. The remaining communications then continued in the same vein.

223. In the face of these facts, RAKIA seeks to support its contention that the communications were sent on behalf of Mr Azima by:

    a. contending that Mr Adams and Ms Azadeh are longstanding close associates of Mr Azima (RRARep, para 7B.2(a);

    b. emphasising the use of non-HeavyLift email addresses in sending the communications in question (RRARep, para 7B.2(b); and

    c. noting that the communications led to the Settlement Agreement, to which Mr Azima was a party.

224. These points do not assist RAKIA:

    a. Whether Mr Adams and Ms Azadeh were associates of Mr Azima is beside the point. Their communications were on their face sent by and for HeavyLift, for which both those individuals worked.

    b. Reference to the range of corporate and personal email addresses used does not establish that either individual was acting for Mr Azima. Moreover, Mr Adams also used his HeavyLift email address in the first communication, and his title as HeavyLift's CFO in both of the letters he sent.

    c. The identity of the parties to the ultimate Settlement Agreement does not bear on the identity of the party on whose behalf the communications were sent. HeavyLift was in any event also a party to the Settlement Agreement. Mr Azima's position as a party to the Settlement Agreement appears to have been at Mr Buchanan's suggestion (see 1st Buchanan, para 59), rather than any proposal from HeavyLift or Mr Azima, still less any proposal made in the course of the communications relied on by RAKIA.

77

225. Moreover, Mr Buchanan, with whom the negotiations were conducted, rightly characterises the representations made to him as being by and on behalf of HeavyLift, not Mr Azima. 1st Buchanan states (underlining added):

    a. Para 33: "sometime later allegations were <u>made by HeavyLift</u> that RAK Airways had not fulfilled its contractual obligations under the JVA…"

    b. Para 33: "…Ms Azadeh provided me with a copy of a letter dated 2 September 2013 which had been sent by Ray Adams (another close associate of Mr Azima), <u>on behalf of HeavyLift</u>, to Jim Stewart…"

    c. Para 34: "As far as I am aware, no substantive steps had been taken in response to Mr Adams' letter of 2 September 2013 prior to my involvement in mid-2015. The reasons for this are not known to me, nor are the reasons <u>why HeavyLift failed to pursue the issue</u> until almost two years later."

    d. Para 37: "The Dr Massaad investigation was my main focus around this time and, in contrast to <u>the HeavyLift claim</u>, it included individual frauds where the amount in issue exceeded US$100m and, as I have said, an overall loss to RAK exceeding US$2 billion. <u>The HeavyLift claim</u> was not therefore my top priority…"

    e. Para 38: "Mr Adams wrote to me on 6 July 2015. This letter set out some of the history to the Training Academy JV <u>and HeavyLift's complaints</u>…"

    f. Para 40: "She then listed <u>HeavyLift's grievances</u> as follows…"

    g. Para 41: "I faced a situation where <u>HeavyLift was making allegations of wrongdoing</u> by RAK Airways and expressing frustration at the delay, but was also telling me they had no documents because they had left them in RAK."

    h. Para 44: "Mr Azima made clear in that email that he was grateful for the efforts being made to resolve <u>the HeavyLift claim</u>…"

226. While accepting that the various communications were made by HeavyLift or on its behalf, Mr Buchanan contends that Mr Azima was ultimately the negotiating party, "who would be deciding what may be an acceptable compromise" (1st Buchanan, para 44). Whether or not that is correct, it does not follow that the pre-contractual communications relied on by RAKIA were sent on behalf of Mr Azima.

227. On the face of the documents and the evidence from RAKIA's main witness, who was party to the negotiations, RAKIA's case that the communications were sent on Mr Azima's behalf is not established.

### 3. Allegation of falsity

228. RAKIA's case is that the Alleged Representation was that HeavyLift had incurred expenditures and costs in relation to the JV. If, contrary to Mr Azima's case that the Alleged Representation did not have that meaning, RAKIA will then bear the burden of showing that the Alleged Representation was false; ie, not "substantially correct": see *Avon Insurance v Swire* [2000] CLC 665, para 16.

229. The matters cited by RAKIA as showing that the Alleged Representation was not substantially correct take too narrow a view of the costs and expenditures incurred by HeavyLift. RAKIA refers to:

   a. Documents relating to the price paid for the simulator to MK Airlines, of $167,500 (RAPoC, para 4P.1(a) and (b));

   b. A 10 June 2007 email [**H1/206**] indicating that the costs incurred on the simulator were US$291,788.78 in total (see RAPoC, para 4P.1(b)). RAKIA thus contends that less than $125,000 was spent on equipment and services ancillary to the simulator (RRARep, para 7E.4);

   c. Emails from a RAK Airways employee in 2008 suggesting that the valuation of the simulator proposed by Mr Adams was too high (RAPoC, para 4P.1(c) and (d)).

230. As noted above, the records available to Mr Azima to investigate the costs incurred by HeavyLift are limited because of RAK Airways' failure to maintain HeavyLift's records of the JV properly, and RAKIA's resistance to undertaking a broader disclosure exercise across RAK Airways' electronic records. It is likely that relevant documents concerning the costs of operating the JV were held by RAK Airways, and have not been identified through the disclosure review. RAKIA bears the burden of proof on this issue. To the extent that the Court considers that relevant evidence as to material costs may be unavailable, the benefit of the doubt should be afforded to Mr Azima and RAKIA's case on this aspect of its claim dismissed.

231. The starting point is that the accounts show that HeavyLift did incur costs of c.$2,260,000 as regards assets, at least in the sense used by accountants and auditors if not otherwise. As discussed above, PWC's consolidated accounts for HeavyLift confirmed the value of the simulator and the training aids contributed to the joint venture. It did so on the basis that "Property, plant and equipment are stated at cost less accumulated depreciation": see Note 2.3 to the statements [**H7/444/32**]. Part of that cost included costs arising from related party transactions (ie, transactions in which HeavyLift acquired these assets from Mr Azima), as also recorded explicitly in those statements, in Note 8: [**H7/444/43**].

232. Even leaving aside the audited HeavyLift accounts, the limited evidence indicates that HeavyLift incurred a range of substantial outlays beyond those identified by RAKIA. RAKIA relies on the 10 June 2007 email breaking down certain of HeavyLift's costs as at 31 May 2007; it is clear that HeavyLift continued to incur very substantial costs even after that date, and it is also clear that HeavyLift's costs beyond the purchase of the bare simulator were much higher than the $125,000 alleged by RAKIA. For example, the evidence indicates:

   a. Costs for spare parts, repairs and remedial work on the training academy facility, see: [**H1/220**], [**H1/250**], [**H1/257**], [**H1/304**], [**H1/349**], [**H1/437**], [**H1/456**], [**H2/398**].

   b. Costs for the attendance of third party engineers to commission the simulator: [**H1/276**], [**H1/293**], [**H1/385**], [**H1/387**], [**H1/388**], [**H1/406**], [**H1/407**], [**H1/408**], [**H1/473**], [**H1/496**].

   c. Costs for the attendance of engineers from the manufacturer, and spare parts from the manufacturer: [**H1/368**], [**H1/409**], [**H1/418**], [**H1/439**], [**H1/440**], [**H1/441**], [**H1/484**], [**H1/486**], [**H2/65**], [**H2/66**], [**H2/67**], [**H2/68**], [**H2/69**].

   d. Further payments to the vendor of the simulator: [**H1/346**].

   e. Other costs, such as freight, shipping and customs duties: [**H1/374**], [**H1/416**], [**H1/500**].

233. On 14 December 2007, several spreadsheets were created which provide some indication of at least some of the costs incurred up to that point:

80

a. One spreadsheet [**H2/123**] lists certain plant and equipment costs relating to the simulator incurred in 2006 and the first half of 2007, totalling $268,242.74 (cell X23).

b. Another spreadsheet [**H2/125**] indicates total costs on "RAK-Training-COS" (which appears to refer to 'cost of sales'; ie direct costs) of $278,302.94, and on "RAK-Training-Admin" of $174,121.38 (which appears to relate to overhead costs).

234. These costs are significantly more than as accepted by RAKIA. Even then, HeavyLift continued to incur further costs not captured in these spreadsheets. For example:

a. Further additional parts were continually required: see eg [**H2/197**];

b. HeavyLift was invoiced for various costs of certification: see eg [**H2/202**];

c. In breach of the JV Agreement, HeavyLift was forced to pay rent to RAK Airways of around $136,000: see 1st Azima, para 36. This followed RAK Airways serving notice to vacate the premises [**H2/482**] and [**H2/484**];

d. HeavyLift paid all the required capital and operating expenses, including for the staff required to run the simulator: 1st Azima, para 35. Some indication of the operating costs (direct and overhead costs) that would have been involved in running the Training Academy is given by the figures in the December 2007 spreadsheets noted above on "Cost of Sales" and "Admin" [**H2/125**]. Those costs were substantial – in excess of $450,000 – notwithstanding that they relate only to part of a year: the simulator was not installed until around June 2007 [**H1/196**], and was not accredited until early December 2007 [**H2/90**]. Substantial operating costs of that degree would have been incurred from that point forward and a range of significant other expenses to keep the simulator operational were incurred, eg [**H3/32**]. A set of preliminary financial statements for the year ending 2008 indicates that operating costs of in excess of $350,000 were incurred in that period [**H3/93**].

e. A lack of a reliable electricity supply compelled HeavyLift to consider other changes to the structure of the facility, involving further substantial costs: [**H3/34**], [**H3/41**].

81

235. The evidence of invoices and payments discussed above is not intended to be exhaustive of all the costs that HeavyLift incurred in connection with the training academy, but they show that they costs borne by HeavyLift are much higher than those pleaded by RAKIA. RAKIA bears the burden of proof in showing that HeavyLift did not incur costs at the level of the Alleged Representation. Mr Azima's ability to adduce evidence of the costs incurred by HeavyLift has been very significantly constrained by RAK Airways' direction to leave the JV records at the training academy premises, and by the restrictive approach taken by RAKIA to disclosure from RAK Airways' own records.

236. RAKIA purports to bring an alternative case in its Reply, contending that if the communications are properly interpreted as referring to the value of the simulator once installed, that value is overstated: RRARep, para 7C.5. However, the communications clearly were not limited to referring to the value of the simulator; they refer to all the contributions made by HeavyLift to the joint venture. Moreover, the figures set out in the communications were justified in any event; as set out above, the figures had been discussed with RAK Airways, included by PWC in the audited reports, and supported by the valuation from Aerospace Management Capital.

### 4. Allegation of fraudulent intent

237. RAKIA must establish that Mr Azima did not believe the Alleged Representation to be true, or to have been reckless as to whether it was. To prove fraud, RAKIA must also establish that Mr Azima understood the communications to have the meaning for which they contend. If Mr Azima subjectively and honestly believed the communications to have a different meaning, RAKIA's claim fails: see *Bonham-Carter v SITU Ventures* [2018] EWHC 3589 (Ch) at para 119 (Asplin J).

238. In fact, HeavyLift and Mr Azima honestly believed the statements made and the figures advanced to be fully justified, and the claim to be fairly presented. As set out in detail above, the claim for compensation was presented based on accounts and valuations that had been: (1) endorsed by independent third parties; and (2) shared with RAK Airways at the time. HeavyLift's claim was simply presented on the same basis as it and Mr Azima had always dealt with RAK Airways and RAKIA during the operation of the JV. In particular:

   a. HeavyLift and Dr Massaad (who represented both RAK Airways and RAKIA) had agreed that the value of HeavyLift's contribution of the simulator was $1

82

million, as reflected in a draft letter prepared at the time and referring to that agreement: [**H2/188**]. Dr Massaad was acting at arms' length in doing so, as shown by him some months thereafter initiating steps to evict HeavyLift from the training academy facility: [**H2/487**] and [**H2/488**].

b. The values of the assets were set out in management accounts for the joint venture, provided to RAK Airways and to the auditors. PWC had included those figures in the statements that were then approved and adopted: [**H7/444/20**].

c. The value of the simulator had been further verified by an independent third party valuation: [**H2/348**].

d. The fact that part of the value of the fixed assets was attributable to transactions with Mr Azima had been disclosed to RAKIA. The audited accounts for HeavyLift correctly identified the value of the related party transactions, and were twice provided to RAKIA.

239. It bears emphasis that HeavyLift's claim arose because of RAK Airways' breach of the JV Agreement. It was entirely reasonable and in no sense dishonest for it to claim for the contribution it had made to the joint venture.

5. <u>Inducement to enter the Settlement Agreement</u>

240. To entitle a claimant to succeed in an action in deceit, he must show that he acted in reliance on the defendant's misrepresentation: *Clerk and Lindsell on Torts* (22nd ed) para 18-34. RAKIA maintains that the Alleged Misrepresentation induced it to enter into the Settlement Agreement: RAPoC, para 4Q.

241. As noted in section III above on the issue of hacking, RAKIA was evidently willing to enter into the Settlement Agreement for purposes unconnected with the settlement of the claim. The "moral obligation" that Mr Buchanan and RAKIA claim to have felt is inconsistent with the internal evaluation that RAKIA had made that Mr Azima was acting against RAKIA, and fraudulently.

242. There is otherwise very little disclosure at all on RAKIA's side as to how it understood the communications or the weight, if any, that it placed on them. The reasons for this and the effect of the Alleged Misrepresentation on RAKIA's decision-making will be explored in cross-examination.

83

### 6. RAKIA's claimed loss

243. In the alternative, to the extent that RAKIA's contention of a misrepresentation is upheld, the damages to which it is entitled should be limited to the difference between: (1) the costs that the Court finds HeavyLift did incur, and (2) the level of costs that the Court finds were represented as having been incurred.

244. Evidence of various costs incurred (albeit it is not accepted that these are all the costs) is set out above in Section IV.C above. These are significantly greater than the costs that RAKIA has accepted as having been incurred.

## V. THE HOTEL ALLEGATION

### A. RAKIA's case

245. RAKIA contends that Mr Azima engaged in "misconduct" contrary to clause 3.2 of the Settlement Agreement, and an unlawful conspiracy against RAKIA, in relation to the proposed sale of the Sheraton Hotel in Tbilisi, which was owned by RAKIA Georgia (the '**Hotel**').

246. In summary, RAKIA makes the following four allegations:

   a. **Mr Azima's share in purchasing entity**  RAKIA contends that Mr Azima failed to disclose to it that he was intended to acquire a 10% share in the entity that was to purchase the Hotel from RAKIA Georgia for nominal consideration: RRARep, paras 10.1 [**A/4/17**], 14.3 [**A/4/19**].  This appears to have two dimensions: it is said both that Mr Azima failed to disclose the alleged fact that he was to acquire that interest for a nominal amount, and it specifically contends that the fact that Mr Azima was intended to have any interest in the Hotel itself was also kept secret from RAKIA: RRARep, para 16.3 [**A/4/19-20**].

   b. **Introduction of Buyers**  RAKIA contends that Mr Azima falsely represented that he had introduced and referred the three Iranian businessmen (the '**Potential Buyers'**) who sought to buy the Hotel, to RAKIA: RAPoC, para 8.12.13 [**A/2/16**].  It contends that RAKIA was already in negotiation with the Potential Buyers when Mr Azima became involved in the transaction.

   c. **Creation of the referral agreement**  RAKIA contends that Mr Azima created a "sham" referral agreement in August-October 2012, which was signed and dated 25 October 2011.  RAKIA contends that in this document, Mr Azima sought to create the "false appearance" that he was lawfully entitled to receive a sum of $1,562,500 (the '**Referral Fee**') in respect of referring the Potential Buyers in connection with the sale of the Hotel: RAPoC, para 8.12.12 [**A/2/16**].

   d. **Payment to Dr Massaad**  RAKIA contends that Mr Azima paid a bribe of $500,000 to Dr Massaad on 18 January 2012.  This was said to have been to reward Dr Massaad for having procured RAKIA to pay the Referral Fee to Mr Azima: RAPoC, paras 8.10 – 8.11 [**A/2/12**].

85

247. It is telling that RAKIA's case on the Hotel has in fact already changed twice, between the letter before claim, the claim as originally pleaded in September 2016, and then as amended in 2017. The shifting sands of RAKIA's contentions underscore the weakness of its case. RAKIA's case against Mr Azima is on analysis hopeless, ignorant of commercial reality, and flatly contradicted by the contemporaneous documents. These allegations should not have been pursued and ought now to be withdrawn.

248. Mr Azima's full account of these matters is addressed in his 1st statement, at paras 79-128 [**E/3/20-31**]. That account is not repeated here but the Court is respectfully invited to read it as context to Mr Azima's response to RAKIA's specific allegations, which are addressed in turn below.

### B. *Mr Azima's share in the purchasing entity*

249. Following negotiations between the Potential Buyers and RAKIA, an understanding was reached between them as to the sale of the Hotel by RAKIA to them. RAKIA Georgia entered into a Memorandum of Understanding for the sale of the Hotel dated 8 October 2011 ('**Hotel MoU**'); the counterparty purchaser in the Hotel MoU was Eurasia Hotel Holdings Limited ('**Eurasian HHL**'), a BVI company [**H3/493**]. The MoU listed the price as being $62,500,000, payable in stages.

250. Mr Azima was invited by the three Potential Buyers to purchase a 10% interest in the Hotel: 1st Azima, para 88 [**E/3/22**]. There were good reasons for Mr Azima to be involved, including that Mr Azima was well-known in Georgia (whereas they were not) and he had good contacts with Sheraton senior management. In particular Mr Azima's involvement would assist in the Hotel obtaining a casino licence, which would generate revenue to finance the acquisition. In parallel, Mr Azima investigated the possibility of establishing casino activities in the Hotel. For example, on 9 October 2011, a presentation on establishing a casino [**H3/478**] was prepared and sent to Mr Adams with the explanation that, *"I am sending you some info on what is needed for a casino, if you have any questions please call me anytime, FA needs a three four pages presentation by tomorrow morning."* [**H3/477**]. Further investigations followed later in October 2011 [**H4/73**].

251. The terms proposed by the Potential Buyers were for Mr Azima's share to be funded by a 5% payment by him, with the remaining 5% to be funded through a loan by them to him: [**H5/16**].

252. The Court should note that ultimately, this deal did not proceed and Eurasian HHL was not the party to the contract of sale with RAKIA Georgia; that company was Merchant Saving and Loan Ltd ('**MSLL**'). Mr Azima in the end did not obtain any interest in MSLL. Indeed, RAKIA Georgia did not actually convey the Hotel to MSLL at all, but did receive a substantial down-payment of $20 million, which it appears RAKIA has kept for the last eight years: 1st Azima, para 103 [**E/3/26**].

253. RAKIA's case is that Mr Azima's proposed share in the Hotel was not disclosed and was in fact kept secret from it. This has two dimensions.

254. The first is that Mr Azima did not disclose the alleged fact that he was to acquire a 10% interest in the Hotel for a nominal sum. The factual basis for this part of RAKIA's case is simply flawed. It was not intended that Mr Azima would receive a 10% share for a nominal sum. As noted above, the terms of the arrangement were for Mr Azima to purchase his share, to be funded by a 5% payment by him, with the remaining 5% to be funded through a loan by them to him: [**H5/16**]. This is reflected in contemporaneous emails between Mr Azima and the Potential Buyers at the time.

255. The purported basis of RAKIA's case that Mr Azima was to receive a 10% share for nominal consideration is a draft and unexecuted "Transfer Agreement" which it is said refers to payment only of a "nominal sum". However:

    a. The intention of the parties was as reflected in their ongoing discussions, which made clear that Mr Azima was to provide actual financing, and enter a loan obligation;

    b. As Mr Azima explains, the "Transfer Agreement" document referred not only to payment of a nominal sum of $10. It reads: "*For Ten U.S. Dollars (US$10.00) and other good and valuable consideration…*"

    c. In any event, the "Transfer Agreement" was only an unexecuted draft, that was never realised in any form as Mr Azima was not ultimately part of the deal. The preliminary draft of the document is indicative of the fact that the discussions did not proceed.

256. RAKIA secondly contends that Mr Azima did not disclose his proposed interest in the Hotel at all. This is simply inconsistent with the contemporaneous documents from RAKIA's side, including from RAKIA's own lawyers.

87

257. Throughout October and November 2011, Mr Adams was engaged in preparing and circulating documentation regarding the proposed sale and purchase of the Hotel. Indeed, Mr Adams was playing an important role in lining up the documentation for the sale, communicating with the Potential Buyers, RAKIA, and counsel. For example, on 10 October 2011, Mr Adams sent by email [**H3/481**] word versions of both the Hotel MoU [**H3/482**] and a document headed "Transfer Agreement" [**H3/483**] to Mr Azima. The Transfer Agreement, which was unsigned, provided for Mr Azima to receive a 10% interest in Eurasian HHL; ie, the interest that RAKIA describes as a "secret commission", and that it says was not disclosed to it.

258. Mr Adams had earlier (on 9 October 2011) sent a different version of the Hotel MoU naming a different entity as the purchaser to Mr Azima and two of the Potential Buyers, noting that he had made revisions [**H3/474**]. That email indicates that the signing of the MoU was intended to take place on 10 October 2011.

259. On 10 October 2011, Mr Adams in fact forwarded his email of 10 October 2011, attaching a word version of both the MoU and the Transfer Agreement, to RAK Ceramics, which is one of the main companies on RAKIA's side [**H3/487**]. RAKIA thus had a copy of the Transfer Agreement indicating Mr Azima's stake from a very early stage.

260. RAKIA's in-house and external counsel engaged on the transaction were also clearly aware of Mr Azima's interest in the proposed purchase:

    a. An email from Louise Bernstein of Dewey & LeBoeuf to Mr Adams dated 19 October 2011 regarding the Sheraton stated (emphasis added): *"The pleasure was ours as well and we look forward to developing a mutually beneficial relationship with your group. **It seems we are both starting off on similar exciting paths of investment and development in Georgia.**"* [**H4/79/1**]

    b. On 11 November 2011, DLA Piper (acting on the purchasing side of the transaction) emailed Dewey & LeBoeuf, acting for RAKIA. Mr Jonas of DLA Piper identified Mr Azima as having an interest in the purchase: "*I am copying in your client's Georgian CEO, Gela Mikadze, who is also a lawyer, **and one of the principals on the buyer side, Farhad Azima**.*" (emphasis added) [**H4/313/1**].

c. Dewey & Leboeuf looked to Mr Adams and Mr Azima to make decisions for the purchasers, including for example as to the name of the vehicle that was to hold shares in the entity: [**H4/410**].

d. RAKIA Georgia's chief legal officer, Mr Neparizde, emailed a "Confidentiality Letter" to Mr Adams on 2 November 2011 [**H4/208**]. The letter would facilitate the sharing of confidential information for due diligence on the purchase, and was to be signed by Eurasian HHL, the purchaser [**H4/209**]. Mr Neparidze's email to Mr Adams sought a signature from Mr Adams, clearly consistent with RAKIA understanding Mr Azima to have an interest in the purchase: "*Please kindly find attached signed copy of last version of confidentiality letter **for your signature**.*" (emphasis added).

261. Mr Azima otherwise made no attempt to conceal his interest in the proposed purchase and was in fact open about it:

a. He told his own bank about his intention to acquire an interest on 24 October 2011: [**H4/107**].

b. The external lawyers engaged to handle transaction on the purchasers' side, DLA Piper, were told about Mr Azima's (and indeed Dr Massaad's) proposed interest: [**H5/31**]. As noted above, DLA Piper dealt with Dewey & LeBoeuf and in doing so (unsurprisingly) notified Dewey & Leboeuf of principals on the purchasers' side.

c. When the arrangement between Mr Azima and the Proposed Purchasers was called off, Mr Azima also notified DLA Piper in an email of 10 December 2011 which made clear that the intention had previously been for him to have an interest in the purchase. Other parties, including bankers, were copied in on this email: [**H5/120**].

262. If Mr Azima had wished to conceal his interest in the acquisition from RAKIA or from anyone, he simply would not have acted in this way.

263. The fact that Mr Azima was to have an interest in the purchase would also have been obvious from the role played by Mr Adams, on Mr Azima's instructions. As noted above, throughout October and November 2011 Mr Adams was in the thick of obtaining and preparing documentation for the sale, and he dealt frequently both directly with

RAKIA and with RAKIA's external lawyers. Importantly, RAKIA and its lawyers tended not to deal directly with the Potential Buyers in these discussions, but rather with Mr Adams. For example, and in addition to the communications listed above:

a. Mr Adams and/or Mr Azima repeatedly dealt with Mr Sayed Khawaja at RAKIA Georgia as regards the documents needed for due diligence and completion. See eg [**H4/16**], [**H4/26**], [**H4/48**], [**H4/49**], [**H4/50**].

b. Mr Adams dealt directly with Dewey & LeBoeuf as to the contractual documents (see eg [**H4/105**], [**H4/153**]), and the documents needed for due diligence and completion on the purchasers' side: see [**H4/156**], [**H4/190**].

c. In addition to emailing Dewey & LeBoeuf, Mr Adams met with them: [**H4/104**].

d. Mr Adams also dealt with Mr Mikadze, the CEO of RAKIA Georgia: [**H4/277**].

264. There could realistically have been no doubt that Mr Azima had an interest in the purchase, given Mr Adams' extensive activities (and the low-key role played by the Potential Buyers).

265. Importantly, moreover, when Mr Azima declined to be involved in the purchase, Mr Adams ceased engaging with RAKIA's lawyers and referred their queries to the Potential Purchasers directly: [**H5/194**]. It would have been obvious to RAKIA (if it was not already) that the change in the identity of the company making the purchase meant that Mr Azima no longer had an interest, but by contrast was to have had an interest when Eurasian HHL was the proposed purchaser.

266. It is telling that RAKIA has called no witness or documentary evidence from its own external lawyers on the transaction at the time. It should be inferred that their evidence would have flatly contradicted RAKIA's claims of fraud.

267. Mr Azima's overall approach to the transaction was simply not one of a person seeking to conceal his interest in the transaction at all, from anyone. On the contrary, Mr Azima approached the deal with energy and ambition. He and Mr Adams were, for example, engaged in plans to improve and renovate the Hotel, as is shown by many emails at the time, including emails with RAKIA. For example:

a. Mr Adams interacted with Mr Khawaja at RAKIA Georgia, sharing plans and drawings of the hotel: [**H4/61**].

90

b. Mr Azima also received architectural drawings of the Hotel from the Sheraton: [**H4/459**]. Mr Azima discussed plans for works at the Sheraton with other consultants, such as developers: [**H4/487**].

c. Mr Adams discussed the feasibility of works at the Hotel with RAKIA Georgia: [**H4/223**].

268. These efforts led the manager of the Hotel to write to Mr Azima as follows on 11 November 2011: "*Thank you in advance for your effort and support aiming to bring Sheraton Metechi to the level as supposed to be. I highly admire your vision to create the new product and provoke the trend!*" [**H4/321**]. It bears emphasis that the hotel was at that stage owned by RAKIA; the manager was thus a person in RAKIA's camp.

269. In summary, RAKIA's contention that Mr Azima's proposed interest in the Hotel was concealed from them is unfounded.

270. It is noted that the Ruler has given evidence denying any knowledge of Mr Azima having a possible stake in the Hotel following its sale, or of Mr Azima's commission: 1st Saud, para 17 [**D/17/6**]. Mr Azima's evidence is that the Ruler was fully aware of the proposed 10% stake, indeed encouraged it (just as other RAK officials were aware of it), and approved the commission: 1st Azima, paras 90-93 [**E/3/23-24**]. The Ruler has not seen fit to answer questions on this (or any other) point. Given the wholly inaccurate nature of RAKIA's case on this issue, the Court should infer that the Ruler's account is simply untrue and would not have withstood scrutiny had he been questioned.

### C. Referral of the Potential Buyers

271. RAKIA contends that Mr Azima falsely represented that he had introduced and referred the Potential Buyers to RAKIA. This contention is also unfounded.

272. As Mr Azima explains, he had met with the Potential Buyers in the summer of 2011 to discuss other potential business deals. Photographs taken of their meeting in Istanbul are at [**H3/440**]-[**H3/444**]. The metadata for these photographs indicates that four of them were taken on 26 August 2011, and one of them on 28 August 2011 (as set out in Mr Azima's Supplemental Disclosure List). Given the work done by Mr Azima on getting the deal done (as discussed above), Mr Azima was also integral to the deal.

91

273. RAKIA places great weight on a memorandum prepared by Mr Adams in March 2016, more than 4 years after these events, which states, *"We were informed that a group of businessmen from Dubai were already negotiating the purchase of the SMP and were introduced to them."* [**H9/485**]. That statement is simply mistaken, as would not be surprising given the time that had passed and given the fact that the focus of the memorandum was a different matter, as Mr Adams states: 1st Adams, para 16 [**E/2/3**]. It is contradicted by the photographs taken in August 2011, which show that Mr Azima was well known to the Potential Buyers, having met with them in Istanbul.

274. The contemporaneous documents also indicate that Mr Azima did in fact refer the Potential Buyers to RAKIA.

275. First, Mr Azima had met with the Potential Buyers in Dubai before the MoU was signed: see 1st Azima, para 85. An email on 2 October 2011 shows that a meeting was convened between Mr Azima (accompanied by a Mr Mahallati) on 3 October 2011 with two of the Potential Buyers [**H3/459**]. Mr Mahallati then wrote to the third of the Potential Buyers, Mr Nayebi, to report on the meeting between him, Mr Azima and the "two Hs" (which was a reference to the other Potential Buyer(s) – the others were Hoshang Hosseinpur and Houshang Farsoodeh): *"Just wanted to confirm we had a great meeting with the two H's. Based on what we agreed we are moving forward."* [**H3/460**].

276. In the following days, before the MoU was signed (which appears to have taken place on 10 October 2011: see [**H3/494**]), two of the Potential Buyers then travelled with Mr Azima and Dr Massaad on one of RAKIA's private jets. It was Mr Azima that obtained the necessary information (passenger names and passports: see [**H3/463**] – [**H3/466**]) from the Potential Buyers and provided this to RAKIA [**H3/467**], which used it to create a passenger list [**H3/468**]. Mr Azima gathering this kind of information for RAKIA is not consistent with RAKIA's case.

277. Second, after the MoU was signed, the Potential Buyers repeatedly wrote to Mr Azima to stress their appreciation for his work and services and to keep him informed of their meetings regarding both the Hotel, and the possible acquisition of an interest in the Poti free zone, owned by RAKIA Georgia:

   a. 19 October 2011, Mr Hosseinpour: *"Hi dear farhad. Ru ok? Where are you? Thanks for your managment. Tonight me and houshang with our team traveling*

92

*to Tbilisi. My team will go poti port directly from airport. for visiting. and they have meeting there with raki a group."* [**H4/56**]

b. 19 October 2011, Mr Hosseinpour: *"Hi dear farhad. Pls try ur best for our team. U r a part of our life. We are like a puzzle. team working. what is the best for us .we will do that. Take care."* [**H4/75**]

c. 25 November 2011, Mr Hosseinpour: *"We will be in Tbilisi next Thursday closing deal 2 nd dec.we push sayed also. We need more information. ...You will be for ever our big brother. You have more power. conection. experience .but we are business men. young. And your student."* [**H5/22**].

278. It is very difficult to see why the Potential Buyers would express their appreciation for Mr Azima's efforts, and describe him in these terms, unless he had assisted in bringing the parties together and brokering the deal. The Potential Buyers also kept Mr Azima informed about their contacts with RAKIA. For example:

a. Mr Farsoudeh shared information with Mr Azima about the Hotel's occupancy, room classifications, etc, received from the Hotel's auditors: [**H4/40**].

b. Mr Hosseinpour emailed Mr Azima to provide him with a copy of the cheques made out by them to RAKIA as a down-payment: [**H4/41**] and [**H4/42**].

279. These communications would make little sense unless the Potential Buyers understood Mr Azima to play an important role in the transaction.

280. Third, after the arrangement between Mr Azima and the Potential Buyers fell through, Mr Azima on 7 December 2011 emailed them to wish them success, and referred to the time spent in seeking to close the deal: *"I am sorry that I was not able to stay and see the finish line! **For the past nearly 3 month** we lived and hoped for the day that the contract gets signed and transaction completed."* [**H5/106**] (emphasis added). This contemporaneous email confirms that Mr Azima had been working with the Potential Buyers on the Hotel transaction since September 2011. This is consistent with Mr Azima's evidence, that he was in contact with the Potential Buyers regarding the Hotel from September 2011: 1st Azima, para 82 [**E/3/21**].

93

281. Fourth, the communications from RAKIA's own lawyers at the time support the position that Mr Azima had made the referral. On 11 October 2011 (so, shortly after the MoU was signed), Mr Renwick of Dewey & Leboeuf emailed Mr Sadeq of RAKIA:

    a. [**H4/19**]: "*I will forward to you separate emails relating to (1) BVI counsel's fee estimate; and (ii) a draft referral agreement in respect of the referral to RAKIA of the proposed transaction.*"

    b. [**H4/20**]: "*As referred to in my earlier email, please find attached a very simple form of referral agreement which may be useful as a basis for your agreement with the individual responsible for referring the proposed transaction to RAKIA. It is a short form, generic document and may require a little tailoring to suit your precise requirements.*"

282. It was clearly understood at the time that a referral had been made. RAKIA has not identified any party other than Mr Azima as the person who made the introduction.

283. Fifth, Mr Azima prepared invoices shortly after these events (in January 2012) that made clear his role in the referral and introduction of the Potential Buyers. These invoices spelled out the work done by Mr Azima in terms, and sought payment of his commission. As Mr Azima says, this payment had been agreed with RAKIA; it was initially to be 5%, as shown in a version of the invoice sent on around 11 January 2012 [**H5/226**]; this was then **reduced** to 2.5%: [**H5/237**] – [**H5/239**]. The reduction was made on the request of Dr Massaad and the Ruler: 1st Azima, para 101 [**E/3/26**]. The final version of the invoice states:

> "*To services rendered in respect of the sale of the Sheraton Metechi Palace at two and one-half percent (2.5%) of Sale Price:*
>
> *Client introduction, management, and contract coordination;*
>
> *Trips to UAE and Tbilisi during Oct, Nov, and Dec, 2011;*
>
> *Due diligence management and coordination;*
>
> *Liaison with legal, commercial, and financial team;*
>
> *Review relevant documents;*
>
> *Attend contract execution and closing meeting;*

> *Post closing follow-up.*
>
> *Staff assigned to the Project in UAE, Tbilisi and others:*
>
> *Farhad Azima*      *Oct, Nov, and Dec*
>
> *Ray Adams*      *44 days*
>
> *Afsaneh Azadeh*      *22 days"*

284. The invoices were addressed to the attention of Mr Al Sadeq, the deputy CEO of RAKIA, and were also sent to Dr Massaad: letter contemporaneous with the invoice with a commission at 5%: [**H5/228**], [**H5/229**]; and with the 2.5% invoice: [**H5/239**].

285. Sixth, Mr Adams and Mr Azima took on the task of undertaking the steps needed to complete the deal, and acted as an interface between the Potential Buyers and RAKIA and RAKIA's lawyers, Dewey & Leboeuf. This is entirely consistent with Mr Azima having made the introduction and being involved in the deal; it is entirely inconsistent with RAKIA's theory that Mr Azima was some kind of interloper seeking to take credit for the deal long after the fact. The communications are detailed above.

286. It is striking that despite alleging dishonesty against Mr Azima, RAKIA has offered no counter-narrative to identify the other person or means by which the Potential Buyers were introduced to RAKIA. In summary, the evidence overwhelmingly confirms that Mr Azima did introduce and refer the Potential Buyers to RAKIA, and that this was acknowledged at the time and was the basis on which he was to be paid. Even after he withdrew from the transaction, Mr Azima offered some ongoing assistance, at RAK's request.

### D. *Creation of the Referral Agreement*

287. RAKIA's case is that Mr Azima created a "sham" referral agreement in July-October 2012, which was signed by Mr Azima and dated 25 October 2011, and sent to RAKIA. RAKIA contends that in this document, Mr Azima sought to create the "false appearance" that he was lawfully entitled to receive the Referral Fee of $1,562,500 in respect of referring the Potential Buyers in connection with the sale of the Hotel.

288. This case is unsustainable. As Mr Azima explains, the commission he was paid had been agreed: 1st Azima, para 112 [**E/3/28**]. The document that was drafted and ultimately sent to RAKIA was based on an original draft prepared by RAKIA's lawyers.

95

The draft that was signed reflected the agreement reached as at 25 October 2011 and the work done by Mr Azima. Mr Azima had thanked the Ruler for the commission.

289. Contrary to RAKIA's case, Mr Azima had in fact referred the Potential Buyers and so was entitled to a referral fee. These matters are addressed in detail above, but the following key points arising from the documents bear repetition in contradicting RAKIA's attempts to airbrush Mr Azima out of the picture:

    a. Mr Azima had met with the Potential Buyers well before the MoU was signed. He had provided their personal details to RAKIA when travel arrangements were being planned. Contemporaneous emails show Mr Azima's dealings with the Potential Buyers over the Hotel began by September 2011.

    b. The Potential Buyers regarded Mr Azima as a close associate and were very appreciative of his efforts in brokering the deal. They kept him informed of key developments, including their interest in acquiring a minority interest in the free zone at Poti, in Georgia.

    c. RAKIA's own external lawyers at the time understood that a referral had been made. RAKIA has not identified any other individual as having done so.

    d. Mr Azima invoiced for his work in making the referral at the time. He and Mr Adams also took carriage of the sale on the purchasers' side, spending a great deal of time and effort in trying to close the transaction. It would be entirely illogical for Mr Azima and Mr Adams to have done so without an expectation of payment; the fee specified in the invoice was expressly stated to be inclusive of that work.

290. RAKIA's case that the document was a sham for services that were not actually provided cannot be reconciled with this evidence. Moreover, the Ruler had also approved (or Mr Azima believed he had approved) Mr Azima's receipt of a referral fee: 1st Azima, paras 80, 95, 101, 120 [**E/3**]. The Ruler's denial of having done so cannot be tested in cross-examination and should be rejected.

291. RAKIA's case otherwise makes no sense, even leaving aside the contemporaneous evidence that Mr Azima did refer the Potential Buyers to RAKIA:

a. While RAKIA contends that there was a conspiracy between Mr Azima and Dr Massaad, it is notable that Mr Azima did not seek to have Dr Massaad (or anyone else on RAKIA's side) sign the document. The version provided to RAKIA had only been signed by Mr Azima.

b. The document said by RAKIA to be a "sham" was prepared well after Mr Azima had already received the Referral Fee in full (and long after RAKIA had entered into its advantageous contract with the Potential Buyers). The document was not used to make a claim for any payment.

c. The document sent to RAKIA in August 2012 and said by RAKIA to be a "sham" included a commission of 5%. This was the amount of commission that had in fact been agreed at that stage, as reflected in the invoice initially sent to RAKIA on 11 January 2012. The amount of the commission was then reduced to 2.5%. However, when submitting the document to RAKIA in August 2012, Mr Azima made no suggestion that he was owed the difference. The intention was simply to provide a document summarising the understanding that had been reached in October 2011.

292. It therefore cannot sensibly be said that Mr Azima created the document in order to procure payment. Payment had already been made; this payment was for only half the amount specified in the document; and the document would not have been seen as creating an obligation on RAKIA to pay in any event. RAKIA's case is entirely unrealistic and uncommercial, resting on an assumption that Mr Azima should receive nothing for his contribution and services.

### E.   *The payment to Dr Massaad*

293. RAKIA contends that Mr Azima paid a bribe to Dr Massaad of $500,000, to reward Dr Massaad for having secured payment of the Referral Fee. This allegation is baseless.

294. The allegation faces an unpromising start.

295. First, it rests on the premise that Mr Azima had no legitimate basis to receive the Referral Fee. For the reasons set out above, that premise is utterly flawed: Mr Azima did refer the Potential Buyers to RAKIA; Mr Azima was quite obviously acting as the interface between the Potential Buyers and RAKIA, fully consistent with his role in having brought the Potential Buyers to RAKIA; he and his staff provided valuable

services in seeking to close the transaction; and his fee was agreed by RAKIA at the time. It was entirely legitimate for Mr Azima to receive a fee, particularly bearing in mind the enormous gain RAKIA stood to make on the transaction.

296. Second, RAKIA's case then faces the conundrum that Mr Azima is accused of paying a bribe <u>after</u> the amount of his commission had been <u>halved</u>, and to the very person who reduced the commission. As set out above, the fee that had been agreed with RAKIA was 5% of the purchase price, which was reflected in the invoice first sent to RAKIA on 11 January 2012. RAKIA then informed Mr Azima that the amount of the invoice would have to be reduced to 2.5%; the final invoice issued did so and the payment received was in line with that reduction.

297. In any event, as Mr Azima explains the funds paid to Dr Massaad were not a bribe at all, but rather a payment made towards the acquisition of a share in an aircraft. The money was later repaid after that transaction did not proceed and Mr Azima and Dr Massaad purchased a different aircraft: 1st Azima, paras 122-128 [**E/3/31**]. The underlying documents confirm this evidence.

298. Mr Azima has had a very long and successful career in aviation, which includes acquiring aircraft for different enterprises. In 2011, Mr Azima had been undertaking a search for executive jets, including Hawker aircraft. These searches involved assistance from agents, for example:

   a. Niki Rokni of Axon Aviation, who reported on her researches: [**H4/210**]. On 2 November 2011, Mr Adams signed a mandate authorising Axon to search for and seek to procure a Hawker 800 aircraft, or a Challenger 604 aircraft: [**H4/229**].

   b. Mr Azima's contact at RBS, Mr McWilliams, provided Mr Azima with myriad information on acquiring different Hawker jets in November 2011 – January 2012: see [**H4/232**], [**H4/249**], [**H4/250**], [**H4/251**], [**H4/322**], [**H4/372**], [**H5/113**], [**H5/117**], [**H5/173**], [**H5/346**].

   c. Isabelle Newson, at Credit Suisse, who provided information on aircraft in November 2011: [**H4/386**], [**H5/35**].

299. Mr Azima was considering acquiring an interest in a Hawker 800A operated by Dana Executive Jets ("**Dana**"), a firm owed by the RAK government: 1st Azima, paras 123-

98

125 [**E/3/30**] – [**E/3/31**].  He had specifications for Dana's Hawker aircraft in October 2011: [**H4/45**] and [**H4/46**].  RAKIA contends that the aircraft were wholly owned by the Ruler, but Mr Azima understood that Dr Massaad had an interest in these aircraft (1st Azima, para 124 [**E/3/30**]); at the time, Mr Azima spoke in these terms: "*Dear Dr Massaad, Thank you for making **your Hawker** 800A available for Georgian Executive Business service.*" [**H5/300**] (emphasis added).

300.  As Mr Azima explains, he agreed with Dr Massaad to acquire half of Dr Massaad's 50% share, for $500,000, since this was 25% of the hull value of $2,000,000: 1st Azima, para 126 [**E/3/30**].  This payment (which RAKIA wrongly contends was a bribe) was made on 18 January 2012.  Mr Azima also proposed that the aircraft could in turn be leased to his executive charter airline in Georgia.  Mr Adams did in fact write various drafts of a leasing proposal using different figures: see eg [**H5/312**] (which again refers to "Dr Massaad's Hawker 800A"), [**H5/313**], [**H5/331**] and [**H5/336**].  This leasing arrangement would have generated an income for the owners of the aircraft, which was being under-utilised: 1st Azima, para 125 [**E/3/31**].

301.  Mr Azima in fact recorded the $500,000 payment against Dr Massaad's name in a list (of 28 January 2012) of payments made and received: [**H8/320**].  It would be odd for a person who had paid a bribe to record it in that way.

302.  Ultimately, these proposals for purchasing the Hawker 800A were not pursued as RAKIA appears to have found a buyer interested in purchasing Dana outright (a search for a buyer for Dana had been commenced earlier: [**H5/142**]).  Mr Adams advised Mr Azima on 25 January 2012: "*Dear Farhad, Had a very good meeting. He said he can't firmly commit before next week as they are selling Dana and the Hawker is supposed to be part* [sic] *of the sale.*" [**H5/333**]**.**

303.  As Mr Azima explains in his evidence, the result was that he and Dr Massaad instead acquired a Hawker 400XP: 1st Azima, para 127 [**E/3/31**].  The documents record this as follows:

   a.  As noted above, in parallel with the discussions regarding Dana, Mr Azima had been searching for aircraft through other channels.  In doing so he decided to purchase a Hawker 400XP.  The arrangements for this purchase began on 18 January 2012: [**H5/255**].

99

b. Mr Azima approved Mr Adams' proposal of 20 January 2012 that the aircraft would be held by Eurasian Aviation Holdings Ltd. This was the same BVI company as had been established in connection with the Hotel purchase (and which Mr Adams had arranged with BVI advisers before Mr Azima ceased to be involved in the deal), repurposed and renamed. Mr Azima was to be the sole shareholder: [**H5/268**].

c. Following the indication that Dana was to be sold entirely, Dr Massaad was brought into the incipient deal to purchase the Hawker 400XP. It was then decided that the shares in Eurasian Aviation Holdings were to be allocated 50/50 between Mr Azima and Dr Massaad: email of 1 February 2012 [**H5/384**].

d. Mr Adams accordingly also shared the specifications for the aircraft with Dr Massaad: *"Dear Dr. Massaad, Farhad asked that I forward the attached regarding the Hawker 400: Draft purchase contract, specs, and photos of the Hawker 400 aircraft. The aircraft will be purchased by the BVI company and Farhad has already made the down payment."* [**H5/404**].

e. A contract for purchase by Eurasian Aviation Holdings for a price of $1,625,000 was signed on 23 February 2012 [**H5/488**] and the purchase completed in April 2012: see eg [**H6/96**].

304. Ultimately, the $500,000 paid by Mr Azima to Dr Massaad was repaid as a result of these transactions, as Mr Azima explains: 1st Azima, para 127 [**E/3/31**]. This is borne out by the documents. A total of c.$575,000 was paid by Dr Massaad to Mr Azima in November 2012 ([**H6/461**] and [**H1/467**]). That figure is the sum of:

a. the $500,000 advanced to Dr Massaad in January 2012; and

b. a further $75,000, which would balance out the contributions that had been made towards the purchase of the Hawker 400XP by Dr Massaad and Mr Azima. As an email exchange between them in October 2012 set out [**H6/437**], Mr Azima had contributed $150,000 more towards the purchase than Dr Massaad had done. Dr Massaad's payment of $75,000 to Mr Azima therefore left the position square between them.

305. In summary, RAKIA's case that the payment to Dr Massaad was a bribe was based on the false premise that Mr Azima otherwise had no justification for receiving a Referral

100

Fee.  That is incorrect for the reasons stated and RAKIA's case more generally defies commercial logic.  The payment of $500,000 was legitimate, made in connection with the purchase of aircraft and was paid back to Mr Azima in due course.

### F.    *Conclusion: RAKIA's claims*

306.    For the reasons set out above, RAKIA's factual case that Mr Azima behaved dishonestly or in bad faith in relation to the Hotel are simply hopeless.  RAKIA's case faces further fatal objections, as noted above:

   a.    The arrangements and transactions involving Mr Azima were known (and approved) by, variously, Dr Massaad, Mr Al Sadeq, and the Ruler (in addition to the external lawyers acting for RAKIA, which it had failed to call).  RAKIA cannot simply assert that those individuals lacked authority or that their knowledge is not imputable.

   b.    Its case in conspiracy that the submission of the Referral Agreement caused the payment of the commission does not bear scrutiny given that the payment had been made much earlier.

   c.    RAKIA's contention that under the Referral Agreement, Mr Azima acted as an agent and hence as RAKIA's fiduciary, is unexplained and flawed.

307.    In any event, RAKIA's case is that Mr Azima's "representation" that he had acted in good faith caused it to enter the Settlement Agreement.  It is clear, as discussed above, that RAKIA both already believed that Mr Azima was acting other than in good faith, and had ulterior motives for entering that agreement in any event.

308.    RAKIA contends that Mr Azima's conduct constitutes a breach of clause 3.2, and as such claims for contractual damages.  However, the contractual measure of damages, however, places the claimant in the position that s/he would have been in had the warranty been correct (or the contract otherwise performed).  RAKIA has adduced no evidence to establish that Mr Azima's alleged breach of the warranty has caused it any loss.

309.    RAKIA's reliance on clause 3.2 as relating to this transaction is misguided in any event, as developed further below at Section VI.D.1.

## VI. ISR JOINT VENTURE

### A. RAKIA's case

310. RAKIA contends that Mr Azima committed a further act of "misconduct" in conflict with the duty of good faith and professional conduct in clause 3.2 of the Settlement Agreement in relation to a proposed joint venture between Global Defence Services Corporation (**GDS**) and RAKIA (the '**ISR JV**').

311. These acts of misconduct are, in broad summary, said to have been forms of misrepresentation made in the course of discussions regarding that ISR JV. It is said that these acts were incompatible with clause 3.2 such that RAKIA has a claim for breach of the Settlement Agreement, or that the acts meant that any representation by Mr Azima that he had acted in good faith was false, and as such a misrepresentation which induced RAKIA to enter into the Settlement Agreement.

312. While RAKIA had sought to characterise the joint venture as relating to the purchase of aircraft, it now accepts that the joint venture was for the commercial provision of intelligence, surveillance and reconnaissance ('**ISR**') and defence services (RRARep, para 29.1 [**A/4/34**]). This involves the use of appropriate aircraft equipped with ISR components and operated by a team of experienced ISR pilots, engineers, technicians and mechanics, subject to US Government approval.

313. RAKIA has made allegations in two broad categories.

314. First, it complains about an alleged representation in a document signed by Mr Dawayne Lepper and forwarded to Mr Buchanan by Mr Azima on 28 December 2015 ('**December Proposal**'). RAKIA's case on this alleged representation is presented in two contradictory ways:

   a. Its Particulars of Claim complain about a representation as to the value of the four aircraft to be contributed to the joint venture from GDS's side: *"the joint venture proposal submitted by GDS to RAKIA grossly overstated the value of the aircraft that would be acquired by the joint venture SPV, and that, if RAKIA had participated in the joint venture on the terms proposed by Mr Azima, it would have contributed approximately US$20 million more than would have been fair to acquire its interest in the joint venture."* (RAPoC, para 16 [**A/2/9**]).

b. RAKIA's Reply then stated that the complaint was of a representation as to the cost of acquiring the assets: *"The written proposal provided to RAKIA ascribed an acquisition cost to the joint venture's assets which was far above their true acquisition cost."* (RRARep, para 29.4(a)). Although RAKIA's Particulars of Claim have been amended several times, it did not amend the Particulars to allege a misrepresentation as to cost as opposed to value.

c. Consistent with the Particulars of Claim, however, Mr Buchanan's evidence is that the December Proposal made a representation as to the value of the aircraft: *"This [proposal] provided, in very brief terms, that GDS would contribute aircraft to the ISR JV said to be worth a total of US$52,665,252 and RAKIA would contribute the sum of US$21,066,100 (being 40% of the purported value of the aircraft to be acquired) plus US$2m working capital."* (1st Buchanan, para 72 [**D/9/27**]).

315. Mr Azima therefore understands RAKIA's case to be that a misrepresentation was made in the proposal document as to the value of the aircraft, but addresses below both that case and the contention that the proposal made representations as to cost.

316. RAKIA's case is that GDS was planning to acquire the four aircraft for $6 million, and that the representations made in the proposal signed by Mr Lepper were misleading.

317. The second aspect of RAKIA's case is that misrepresentations were made to RAKIA in the course of negotiations by Mr Lepper (which Mr Azima is said to have failed to correct), and by Mr Azima personally: RAPoC, para 8.18 [**A/2/19**]. Those misrepresentations are said to have been: (1) that GDS was a licensed weapons dealer; (2) that a document entitled "Technical Assistance Agreement" had been issued by the US Department of State; (3) that Mr Lepper was working to obtain the approval of the US government for GDS' participation in the joint venture; and (4) that the US government supported the joint venture and would be its ultimate customer.

318. It is said by RAKIA that each of these points constitutes a form of misconduct contrary to the terms of clause 3.2 of the Settlement Agreement, and hence a breach of contract and/or a misrepresentation. For the reasons set out, RAKIA's claim regarding the ISR joint venture is flawed and baseless at each turn. These points are addressed in turn, below, starting with the allegations of misconduct in the course of the negotiations, and then addressing the legal premises of RAKIA's claim. It should be noted as a

preliminary matter, however, that throughout these discussions both parties were represented by lawyers.

### B.      Alleged misrepresentation in the December Proposal

319.    The December Proposal [**H9/62**] was for a joint venture for the provision of ISR services.  It was the opening written proposal, authored by Mr Lepper, made to RAKIA, and was described by Mr Lepper as a draft, seeking RAKIA's input: *"please to forward a draft of our proposed terms sheet for the Middle East ISR Project and invite your input."* [**H9/62/1**].  Mr Lepper was part of the management of JFJ International Logistics LLC, a company in which he and Mr Azima held an interest: 1st Azima, para 129 [**E/3/33**].

320.    Mr Buchanan rightly accepts that the joint venture would have provided important advantages and opportunities to RAK, beyond the direct earnings that could have been made from the ISR services themselves:

*"I was happy to explore the possibility of the ISR JV with Mr Azima and his associates as I believed it could have economic and other potential benefits to RAKIA and RAK more generally, not least as His Highness was keen to attract higher skilled jobs to the emirate."* (1st Buchanan, para 71 [**D/9/26**])

321.    The advantages identified by Mr Buchanan were also noted at the time in the December Proposal [**H9/62/1**]:

*"Advantages for RAK.*
*A. Economic Impact for Ras A1 Khaimah.*
*a. Expats. Approximately thirty (30) expat families will be relocated from the USA to RAK.*
*b. Housing and infrastructure. Approximately thirty (30) 1 and 2-bedroom apartments will be required.*
*c. Geopolitical recognition of RAK's advanced technical capabilities in the UAE*
*and the Region in the field of Defense and Security.*
*d. Office & support personnel, etc.*
*e. Micro-economic multiplier impact."*

322.    The December Proposal contemplated the creation of a special purpose vehicle with a 60/40 split in ownership between GDS and a RAK-designated entity [**H9/62/2**].  It

104

listed the aircraft assets to be contributed from GDS's side, noting that the aircraft would be ISR equipped, and referring to their "*value for the purposes of this proposal*" [**H9/62/2-3**]:

"***King Air ISR Assets*** *Two (2) GDS-provided ISR equipped and decommissioned US Army King Air C-12 extended range ("ER") aircraft (specs attached), each equipped with Pratt & Whitney PT6A-60A turboprop engines, together with all appliances, instruments, accessories, equipment or parts which are installed on the aircraft, together with all of the maintenance logbooks, maintenance records, flight records and historical information concerning the foregoing hereinafter collectively referred to as "the King Air Aircrraft". The value of the King Air Aircraft for the purposes of this proposal is US$17,000,000 each for a total of US$34,000,000.*"

"***Falcon ISR Assets****. Two (2) GDS-provided ISR equipped and decommissioned from the US Coast Guard Falcon HU-25 extended range ("ER") jet aircraft (specs attached), each equipped with Garrett ATF3-6 turbofan engines, together with all appliances, instruments, accessories, equipment or parts which are installed on the aircrafts, together with all of the maintenance logbooks, maintenance records, flight records and historical information concerning the foregoing hereinafter collectively referred to as "the Falcon Aircrraft". The value of the Falcon Aircraft for the purposes of this proposal is US$9,332,626 each for a total of US$18,665,252.*"

323. The December Proposal also made clear that the contribution from GDS's side was not simply the aircraft, but rather a fully operational ISR service [**H9/62/3**]:

"*Operational Business Plan. GDS Middle East will offer all four (4) ISR Aircraft (2 x King Air and 2 x Falcons as part of a fully managed operational and manned ISR service (including flight personnel, engineering staff, and ISR expertise, both on the aircraft and on the ground)*".

### 1. Purported misrepresentation as to value

324. RAKIA's RAPoC and Mr Buchanan's evidence contend that the December Proposal made representations as to the value of the aircraft to be contributed from GDS's side. This is said to be a misrepresentation on the basis that GDS was exploring a proposal for the cost of taking the initial step of acquiring the aircraft.

325. These costs are in no way a representative account of the value of the operational ISR assets to be contributed by GDS and indeed represent only a portion of it. In particular:

    a. The creation of an operational ISR service involved very significant expertise, contacts and experience, which GDS was contributing.

    b. The costs of acquiring the aircraft were only part of the costs to be incurred in any event. The aircraft would need to be overhauled (airframes and engines), equipped with ISR equipment and operated, supported, marketed and managed by an experienced team of ISR professionals: 1st Azima, para 135 [**E/3/32**].

    c. Moreover, the acquisition costs cited by RAKIA would have involved the seller, AGD, having also become a participant and part owner of the joint venture (see 1st Azima, para 136 [**E/3/33**]). This would therefore have reduced the value of the share held by both GDS and the RAK-designated entity. The overall financial cost of acquiring the aircraft would therefore have been higher than the bare cost of sale.

    d. The concept of "value" would encompass factors such as the earning potential and the other benefits of the JV to the parties, which Mr Buchanan accepts were real.

326. RAKIA has in fact presented no evidence to suggest that the value of the assets to be contributed by GDS (four aircraft, ISR equipped and operated, and approved), would be materially lower than the value set out in the December Proposal. Its case that there was any misrepresentation as to value is simply flawed and baseless.

    2.    <u>Purported misrepresentation as to cost</u>

327. Insofar as RAKIA contends that the December Proposal made a misrepresentation as to the cost of acquiring the aircraft or equipment (as opposed to the value to be contributed), that is similarly unsustainable:

    a. The December Proposal in clear terms repeatedly stated that the figures cited by RAKIA were advanced as statements of "*value*", which were *"for the purposes of this proposal"*.

    b. As the parties were both aware at the time, this December Proposal was made at a stage where the capabilities to be included in the ISR project had not been

decided or agreed, still less costed. It would make no sense to construe the proposal as providing figures based on the costs that GDS would incur in acquiring the necessary equipment.

c. It would also be illogical for the parties to read the December Proposal as referring only to the costs of acquisition given the significant expertise, experience and contacts being contributed by GDS. Commercial reality would dictate that significant value should be attributed to these matters; a commercial party would not expect to get them for nothing.

d. RAKIA picks out statements in the materials enclosed with the December Proposal, which set out the capabilities of the aircraft and provide photographs. Properly construed, these statements do not support RAKIA's case:

    i. The first statement, regarding the King Air assets, refers to the costs as being for the "aircraft + communications equipment modifications" [**H9/62/5**]. There is no representation that the cost of acquiring only the aircraft would be $17 million. It bears emphasis also that the reference to "communications equipment" does not indicate that this is the cost of the ISR equipment. ISR equipment can include a diverse range of complex and expensive equipment well beyond communications. What it entails depends on the customer's requirements.

    ii. As to the Falcon aircraft, two statements referring to cost were made [**H9/62/9**]. A "total acquisition cost" is indicated, and the same figure is then provided in reference to the "original unit acquisition cost". These different terms are at best ambiguous (and for that very reason should not be read in isolation); there is hardly a clear representation that the cost of purchasing the aircraft itself would be c.$9.3 million.

e. These statements in the materials enclosed with the December Proposal must be read with the information provided in the proposal letter itself. The same figures are plainly used in the letter to indicate the value of a totally overhauled, fully-equipped aircraft, and a fully-staffed, operational and approved ISR service to be contributed by GDS. That is clearly a different proposition, encompassing a much broader concept of value, as compared with a representation as to the cost

of acquiring only the aircraft. It would make no sense to construe the materials overall as providing a representation as to the costs of acquiring those aircraft.

328. The proposal was provided at a very early stage as a guide before RAK / UAE's requirements were fully known. The details of the Proposal would have been ironed out in further negotiations and would always have been subject to the license they would need to obtain from the US Government. The product is bespoke and the price varies accordingly. Any pricing information could only ever have been a guide until the requirements were fully known, particularly as ISR equipment is very technical and complex and the necessary elements depend on the client: a police client might need (e.g. relatively low-tech intercept equipment), as opposed to the equipment sought by an army or secret service (high-tech intercept equipment / and topographical mapping capability).

329. Even if RAKIA's case that the representation was made as to the costs to be incurred is (contrary to the above submissions) correct, it has not sought to prove that the costs were actually less than represented. RAKIA's case is based on the contention that the costs of acquiring the aircraft alone, from GDS, were lower than the overall figures in the proposal. It has not sought to ascertain or prove the costs of any of the other works and services necessary were less than the amounts given in the December Proposal. These would include the very significant costs of ISR equipment, staff and management costs, costs in installing the ISR equipment and/or overhauling the aircraft, or obtaining authorisations, as well as management time and expenses.

330. RAKIA's case that the December Proposal entailed a misrepresentation as to cost is therefore simply unsubstantiated. It is in any event denied that any such putative misrepresentation constitutes conduct inconsistent with the duty of good faith recorded in clause 3.2 of the Settlement Agreement, or gives rise to any other claim by RAKIA, as addressed further below at section D.

### C. *Alleged misrepresentations in the course of subsequent discussions*

331. RAKIA also contends that other representations were made in the course of negotiations, which were inaccurate and for which it is said Mr Azima is responsible because he "dishonestly failed to correct" statements made by others. This section addresses the underlying factual questions: the legal premises of RAKIA's claim are then addressed below at section D.

108

332. First, RAKIA relies on an email sent to Mr Buchanan on 25 January 2016 [**H9/245**]. The email sent to Mr Buchanan was a chain, beginning with an email from Mark Daniels of another firm, AGD, which he had sent to Mr Lepper, attaching a document that Mr Daniels said "provides instruction" on the issue of obtaining a Technical Assistance Agreement ('**TAA**'), which is required under the International Trade in Arms Regulations (the '**ITA Regulations**'). Mr Lepper in turn forwarded the email to Mr Buchanan. RAKIA contends that the email constituted a representation that GDS was a licensed weapons dealer. As to this:

    a. Mr Lepper's email forwarding the email from Mr Daniels included the phrase (relied on by RAKIA), *"I understand you are under controls of protocol and due diligence. As you will read below and was firmly explained to me, we are as well. We are a licensed weapons dealer with many restrictions and oversight controls. The attached document officially outlines the required course of action for the TAA and legal guidelines which we must follow."* [**H9/245**]

    b. Mr Lepper's email was not on its face representing Mr Azima's position. It was sent from Mr Lepper's JFJ International email address, it was explaining the position of AGD (whose email on the subject of arms controls Mr Lepper was forwarding), and it did not refer to GDS at all in any way. The basis for RAKIA's contention that the email was making a representation as to GDS's position is unclear.

    c. It is said by RAKIA that Mr Azima "dishonestly failed to correct" Mr Lepper's statement. Mr Azima, however, understood the email to refer to AGD's position, and he believed AGD to have been registered under the ITA Regulations. In any event, it was subsequently made clear to Mr Buchanan that GDS was not registered under the ITA Regulations: 1st Azima, para 138(b). RAKIA has offered no evidence to dispute Mr Azima's evidence that Mr Buchanan was informed that GDS was not a weapons dealer and it would appear that this aspect of its case is unfounded from the outset. Mr Azima's account in this regard is supported by a later note taken by Dechert of a meeting attended by Mr Buchanan, at which it was noted that there were different options for structuring the joint vesnture, which would include the need to obtain ITA Regulations authorisations: *"Option 2 was for FA to take the lead through ACG*

109

*or GDS and get the necessary ITAR authorizations."* [**H9/500/4**] Ultimately Mr. Azima did obtain ITAR authorisation: 1st Azima, para 142.

333. RAKIA also complains that the attachment to Mr Lepper's email had been altered to include the seal of the US State Department. The attachment was a document setting out matters concerning the requirements for obtaining a TAA under the ITA Regulations [**H9/246**]. RAKIA's complaint here verges on the bizarre. There is no evidence to suggest that Mr Lepper (still less Mr Azima) added the seal of the US Department of State to the document; Mr Daniels of AGD had sent a document to Mr Lepper, which Mr Lepper appears then to have forwarded to Mr Buchanan.

334. In any event, it is very difficult to see where this complaint would lead even if it had any substance. RAKIA makes no suggestion that the contents of the document were in any way incorrect. Moreover, the requirements of the ITA Regulations were later discussed in detail between the parties, both of which were represented by counsel: see [**H9/500**]. As discussed further below, it was made clear by Timothy O'Toole (of Miller & Chevalier) that RAK would need to through the ITAR approval process before the project could move forward. This approval would need to be obtained by RAK at the Federal level i.e. the approval would need to be provided by the US Government (State Department) to the UAE.

335. Third, RAKIA contends that Mr Lepper represented that GDS was working to obtain the approval of the US government for GDS's participation in the proposed joint venture. It is unclear what RAKIA means by "the approval of the US government" in this regard; Mr Lepper's email is also expressed in non-specific terms.

336. In any event, the contention that Mr Azima left the position unclear is baseless:

    a. It was made clear to RAKIA that the approval of the US government in the form of a TAA would first require an initial agreement to be in place. The email sent to Mr Buchanan on 25 January 2016 said this in terms: *"it is critical to have an initial agreement in place for justification and then to develop and submit the TAA to DTC"* [**H9/245**].

    b. Mr Azima similarly set out the position very clearly in an email to Mr Buchanan on 17 February 2016, indicating the steps that would need to be taken in the future, without suggesting that they had been initiated [**H9/424**]: *"I would like*

110

*to summarize our discussion and as 1 have state* [sic] *previously the ISR aircraft are defense articles and as such ITAR controlled articles; technical data and services cannot be exported/shared to a foreign person without State Department approval. In our meeting on the 26th we can discuss the path forward with regards to a DSP 5 or DSP 73. These licenses will need to be considered for both the marketing and the permanent or temporary export plan. After our meeting we will be in a position to initiate/select together a path forward with the State Department. State Department approval process is approximately 90-120 days from submittal."*

    c. The requirement for government approval and the steps that the parties would need before the ISR JV could proceed was also discussed in detail between the parties, with their counsel present, as recorded in RAKIA's own note. It was clear that these steps were <u>prospective</u>. For example, Mr O'Toole, a lawyer assisting Mr Azima's side of the negotiations: *"noted that the United States imposes a rigid regulatory regime for sales and transfers of equipment for military purposes that requires approval from the US State Department under the ITAR. The parties need to present a clear plan to the State Department to apply for necessary authorizations, and need to identify all other parties to which equipment or technology may be transferred and to vet such parties prior to applying for any authorizations."* [**H9/500/2**]

337. Fourth, RAKIA contends that Mr Azima represented that the US government backed the ISR JV and would become its customer. This is at odds with the evidence:

    a. Mr Azima explains that, unsurprisingly, he hoped the US government would become a customer. The possibility of the US government being a customer was obviously discussed, as was the possibility of other possible clients. For example, at the meeting on 26 February 2016, Mr Buchanan referred to both possibilities: "*[JB] also said that if the US Government is a founding client then the project would be easy, but if it is another client such as Djibouti then it could take up to three years to establish the framework*." [**H9/500/2**].

    b. However, it would not have been possible for the government to commit to doing so before the project had been approved. The parties were well aware of this given the complex approvals required (as discussed as that same meeting).

111

c. Neither of the written proposals submitted to RAKIA from GDS's/Mr Azima's side identified the US government as a client. The later proposal was prepared by counsel and indeed it defined the likely client base in narrower terms [**H10/34/1**]: *"The purpose of this MOU is to set forth certain understandings of the parties in relation to the terms and conditions to be agreed between ALG and RAKDL for the formation of a joint venture to provide ISR services to governmental clients in the UAE and the region, subject to and in full compliance with applicable laws in the US and in the UAE."*

d. Mr Buchanan in fact understood this definition of the client base as excluding the US government as a possible client: [**H10/64**]. The involvement of counsel and the drafting of these agreements are plainly inconsistent with the contention that Mr Azima set out to deceive RAKIA in the manner alleged.

338. RAKIA's factual contentions that in the course of the ISR JV negotiations, Mr Azima dishonestly misled RAKIA, or permitted it to be misled, are therefore baseless.

### D.     *Legal premises of RAKIA's claim*

339. RAKIA's case regarding the ISR Joint Venture is hollow given that the proposal did not proceed, and the action RAKIA brings is that Mr Azima's conduct was in contravention of a clause in an agreement settling a claim brought by HeavyLift in relation to an entirely different transaction that took place years earlier. Even if, contrary to Mr Azima's case, the Court finds that there was any misrepresentation in the course of discussions regarding the ISR JV, RAKIA's claim still fails.

1.     Allegation of conduct inconsistent with cl.3.2 of the Settlement Agreement

340. RAKIA's case that the conduct alleged as regards the negotiations concerning the ISR JV breached clause 3.2 of the Settlement Agreement is flawed for several reasons.

341. **First**, RAKIA seeks to invoke the clause in this case in order to contend that Mr Azima had duties to act to a standard in the course of the negotiations – namely, that of "*reasonable business persons*" and with the "*utmost professional integrity*". That putative standard is expressed in very broad language and, in the context of commercial negotiations, vague. Broadly expressed promises to negotiate in good faith, by analogy, have been held unworkably broad and uncertain: *Barbudev v Eurocom Cable Management* [2012] EWCA Civ 548, paras 44-46.

112

342. At the pleadings stage, Mr Azima called for RAKIA to particularise its case as to the meaning of the words in clause 3.2 (see RRADef, para 10 [**A/3/14**]). RAKIA did not do so: RRARep, para 9 [**A/4/16**]. In the absence of any good reason and in light of the vagueness of the clause, it should not be held to govern the parties' conduct of negotiations.

343. **Second**, even if the clause does apply to negotiations in general, on its proper construction, clause 3.2 does not apply in relation to the specific negotiations concerning the proposed ISR JV. The Settlement Agreement was drafted and agreed by reference not to the ISR JV at all, but rather to two other matters. These are noted in the recitals as being: (1) HeavyLift's claim for compensation under the training academy joint venture (recitals A-D); and (2) recognition that "Mr Azima has recently provided negotiation assistance to RAKIA on an informal basis" (recital E) [**H9/491/2**].

344. RAKIA's interpretation of the clause would impose duties on Mr Azima as to any interaction he had had, or will have in the future, with RAKIA, or any other RAK-entity, concerning any subject. That interpretation is unworkably broad and uncertain, and uncommercial, particularly given that the standard of conduct that it then imposed is similarly expressed in very broad language, lacking certainty. It is therefore appropriate to construe the clause as applying only to the matters referred to by the parties as being within their contemplation: namely, the settlement of HeavyLift's claim, and the negotiation assistance provided by Mr Azima. It should not, therefore, apply to the conduct of negotiations concerning the ISR JV.

345. **Third**, if (contrary to the submissions above) clause 3.2 does in principle apply to the conduct of negotiations for the ISR JV, it is submitted that the conduct complained of does not contravene it:

    a. The conduct relied on by RAKIA occurred in the course of negotiations, which were largely preliminary and did not proceed close to any kind of concluded agreement. It is common for misunderstandings, ambiguities or inaccuracies to arise in the course of such discussions, which generally fall away as the discussions continue. Good examples of this are provided in this case: to the extent that RAKIA formed the impression that GDS had sought approvals under the ITA Regulations, that impression would have been corrected as the parties continued their discussions.

113

b. It would therefore be unrealistic to impose the standard of conduct that RAKIA urges. For example, the contention that Mr Azima should have been reviewing and correcting all the statements made by Mr Lepper cannot be right.

c. Both parties were in due course represented by counsel in the course of the negotiations. Mr Azima's involvement of his own counsel and his willingness to deal with RAKIA's counsel weighs heavily against any dishonest intent.

346. RAKIA makes much of an email sent by Mr Lepper in which he commends the possible ISR deal to Mr Adams, suggesting that $10 million could be distributed and that the parties could "have a cocktail": [**H9/277**]. A duty of good faith does not, however, prevent a commercial party from seeking out profit; a range of direct and indirect benefits were available to RAKIA from an ISR joint venture, even if its counterparty would also enjoy gains.

## 2. RAKIA's breach of contract claim

347. RAKIA contends that Mr Azima's conduct constitutes a breach of clause 3.2, and as such claims for contractual damages. However, the contractual measure of damages, however, places the claimant in the position that s/he would have been in had the warranty been correct (or the contract otherwise performed). RAKIA has not suggested that the alleged "misconduct" complained of in relation to the ISR JV discussions actually caused it any loss at all, still less sought to explain how that loss equates to $2.6 million.

## 3. RAKIA's misrepresentation claim

348. RAKIA also claims in misrepresentation, contending that it relied on a representation that Mr Azima had acted in good faith and with the utmost professional integrity towards RAKIA and other RAK entities: RAPoC, para 13 [**A/2/22**]. As noted elsewhere, this is simply untrue and RAKIA's position in this regard is entirely disingenuous: RAKIA was <u>well aware</u> from early 2015 that Mr Azima was involved in investigating the circumstances in which individuals were detained in RAK, and seeking to draw press attention to this.

349. Indeed, only 2 months before the Settlement Agreement was entered into, an internal RAKIA report stated that, "*There have been accusations that these prisoners have been*

*ill treated,*" and labelled Mr Azima as responsible: "*FA, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities.*".

350. The evidence clearly indicates that RAKIA regarded the Settlement Agreement as a device and so did not rely on any statement by Mr Azima in entering into it.

## VII. "CAMPAIGN" ALLEGATION

### A. RAKIA's case

351. RAKIA's pleaded case is that Mr Azima played a "central role in instigating and coordinating a wide-ranging media and public relations campaign which sought to denigrate the reputation of the Ruler and the governing authorities in RAK": RAPoC, para 8.21 [**A/2/20-21**].

352. This was said to include Mr Azima having been "involved in procuring and editing" a "Security Assessment" document which RAKIA says proposed various forms of improper action, including enticing government institutions and businesses in RAK into entering into transactions with criminals.

353. In a Part 18 response, RAKIA's case was expanded to allege that the "campaign" also included planning and implementing "Project Clay", which is said to have involved procuring and planting "*damaging false stories*" in the press alleging that individuals were being unlawfully detained in a "*dungeon*" operated by the Ruler of RAK and RAKIA's lawyers, including Dechert, and stories that the Ruler of RAK had abdicated judicial, prosecutorial and governmental functions to unlicensed UK lawyers, overseeing the operation of the secret prison in RAK (stories which RAKIA also contends are untrue): RAKIA's Part 18 Response of 7 August 2018, response 1 [**A/5/2**].

354. RAKIA's pleaded case therefore has two parts: one focussing on so-called Project Clay, and one focussing on the so-called Security Assessment document. It is alleged by RAKIA that Mr Azima's was involved in these activities and that this was contrary to the duty of good faith under clause 3.2 of the Settlement Agreement.

### B. Mr Azima's case

1. <u>Investigation and exposure of human rights abuses / "Project Clay"</u>

*The evidence*

355. Mr Azima was involved in efforts to shine a light on serious human rights abuses in RAK, including by investigating allegations that RAK was holding suspects without due process for them to be interrogated, which it was believed that Mr Gerrard was orchestrating: 1st Azima, paras 146-148 [**E/3/35**].

116

356. Mr Azima had become involved in these activities as a result of Dr Massaad's concern that he could be subjected to such persecution by RAKIA. Dr Massad's US lawyers, Miller & Chevalier, in November 2014 enlisted Mr Azima's assistance in investigating and taking action against these abuses: [**H7/124**]. The Court will note that this document was marked by the author as Privileged and Confidential (as relating to Dr Massaad's privilege) and is drawn from RAKIA's disclosure. It is one of the documents that was illegally hacked from Mr Azima, and which RAKIA has now sought to deploy and weaponise.

357. Various documents (generally prepared by Dr Massaad's lawyer, Mr Behre) describe the activities then undertaken, which were on occasion referred to as "Project Clay". One line of inquiry was to engage investigators to research illegal detention in RAK. This included, for example, instructions given to Christopher Cooper of Potomac Group in November 2014, to find information on "*the RAK Ruler detaining people in his private jail / dungeon.*" Mr Cooper was told to, "*Check for amnesty international and human rights watch and organisations too. May want to push a story about these detentions*" [**H7/158**].

358. The instructions to Mr Cooper were then developed as further information was uncovered. The objective was to seek to publicise abuses by RAK, assisted by Mr Gerrard, and to thereby place pressure on Mr Gerrard's firm, Dechert, to cease assisting RAK with these activities [**H7/208**]:

> *"OVERVIEW*
>
> *New information has surfaced regarding the operation of a secret prison in RAK, presumably overseen by RAK's outside legal adviser, Neil Gerrard of Dechert, LLP. The information concerns the incarceration of these men with RAK. Unconfirmed reports suggest that these men may have been administered drugs in an attempt to get them to confess to crimes.*
>
> *"Based upon your recitation of the facts, we have or will be able to obtain basic documentary evidence demonstrating that these gentlemen are or were being held unlawfully.*
>
> *"OBJECTIVE*
>
> *Bring improper interrogation tactics to light and push Dechert to fire RAK as a client by making further representation politically unfeasible."*

359. A broad summary was given in a PowerPoint presentation (entitled Project Clay: Action Plan) prepared in February 2015 [**H7/218**]:

   a. Page 2 [**H7/218/2**]:

      *"Objective 1: End Illegal Detentions orchestrated by UK firm"*

      *"Method: Bring Public attention to Illegal Detentions through press coverage"*

   b. Page 5 [**H7/218/5**]

      **"Objective 2: Determine the scope of the investigation being conducted"*

   c. A list of individuals that were the subject of investigation, including individuals detained by RAK, was then set out: [**H7/218/6**].

360. Further information was compiled about the various individuals unlawfully detained by the RAK authorities. In March 2015, Mr Cooper circulated a table identifying several people who had been detained and held in the RAK "dungeon": [**H7/261**]. Mr Cooper shared information regarding the detention of individuals with a journalist at the *Guardian*, Simon Goodley, who began investigating it and showed real interest: [**H7/242**], [**H7/283**]. Ultimately, it appears that Mr Goodley chose not to publish an article as Mr Gerrard refused to be interviewed [**H7/257**] and other key witnesses (including the wife of one detainee, facing intimidation or retribution) preferred not to speak to the press [**H7/259**].

361. Much of this activity was conducted over emails using pseudonyms, oriented around a "Church" theme; Mr Azima, for example, was referred to as "Father George" and for much of this work used the email address "hh@fathers.church". There was good reason for this secrecy: the matters being investigated were highly sensitive and involved the liberty and physical well-being of a range of persons, and would likely have attracted the attention of the RAK authorities. There was a need to protect those who were being targeted and persecuted, and they were right to be cautious: RAK and RAKIA had in fact learned of these activities at practically the same time as they were taking place. A "Project Update" document dated 26 March 2015 [**H7/298**], and emailed to Mr Buchanan [**H7/299**] identified the key individuals involved and the work being undertaken:

118

> *"In the US, KM's hired a team of advisors managed by Farhad Azima [FA] in order to spread allegations against our client. The main allegations against the client are on human rights issues and in particular the allegation that RAK uses a dedicated facility in RAK where it imprisons and torture political opponents. "FA, who might also be responsible for paying the US team, handles all KM's activities in the US. KM's lawyer in the US, Kirby D. Behre, hired a consultant, who is a former WSJ reporter, named Christopher Cooper, who due to his good contacts. Cooper approached a British reporter named Simon Goodly of The Guardian and briefed him on the RAK torture allegations, in order to raise public opinion against RAK and to harness international civil rights organizations to the subject."*

362. How Mr Buchanan and RAKIA came by this information will be explored with RAKIA's witnesses in cross-examination.

363. RAKIA pleads that "Project Clay" involved the promulgation of "false" stories regarding detention and abuses in and by RAK, RAKIA, and its lawyers: Claimant's Part 18 Response of 7 August 2018, para 1(b). It is striking that RAKIA has adduced no evidence to support its contention that these stories were false. Both the Ruler and Mr Gerrard have sworn witness statements. Neither they, nor any other of RAKIA's witnesses, has given evidence that these accounts of detention and human rights abuses are in fact untrue. Indeed, the subject is not even mentioned in their witness statements. RAKIA has not, therefore, sought to substantiate this aspect of its case.

364. Mr Azima and the other individuals involved in these activities in fact had very good reason to believe that there were abuses calling for investigation and exposure. Numerous authoritative reports show RAK and the UAE to abduct and arbitrarily detain individuals, denying them due process.

365. A lengthy November 2014 Amnesty International Report described the authorities in the UAE having "arbitrarily arrested scores of peaceful government critics", holding them incommunicado. It found in summary [**G/26.3/16**]:

> *"Many have been victims of enforced disappearance, held in secret locations by authorities who refused to acknowledge their detention or disclose any information to their families – such as the reasons and legal basis for their*

*imprisonment, where they were being held, and in what conditions – and also denied them access to legal counsel. Such conditions breach both the UAE's own laws, as well as customary international law, which defines enforced disappearance as a crime. Many of those arrested have been held in solitary confinement and tortured or otherwise ill-treated while under interrogation; some, when brought to trial, told the court that they were forced under torture or other duress to put their signatures to statements that their interrogators did not permit them to read and which were then presented to the court as their "confessions"."*

366. The 2014 Amnesty International report identified cases of abuse in Ras-Al-Khaimah specifically:

   a. It addressed, for example, the case of Saleh Mohammed al-Dhufairi, who was detained at the palace of the Ruler for 133 days (page 18):

   *"He was charged in connection with his activities on Twitter but released on bail after two weeks in custody. He was at liberty only briefly. On 29 April 2012, 10 plain-clothed security officers arrested him without producing a judicial warrant and took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al-Khaimah. He remained there without charge under armed guard for some 133 days. During this period, he was permitted visits from his family but they were prevented from discussing his whereabouts with anyone outside their immediate family.*

   *The authorities did not inform Saleh Mohammed al-Dhufairi of the reason for his detention, and under what law he was held, or whether they intended to bring charges against him. He was not allowed to meet with a lawyer or taken before any judge or court during this time. On 9 September 2012, the security authorities moved him to a new place of detention, whose location they did not disclose to his family, where they held him in solitary confinement in a freezing cold cell that they kept permanently lit, causing him extreme discomfort and making it difficult for him to sleep."*

   b. Saleh Mohammed al-Dhufairi was later convicted to a lengthy prison term. Amnesty International considers him to be a prisoner of conscience (p.19).

120

c. Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a member of the Ruler's own family, was also arbitrarily detained at the Ruler's palace (p.19):

*"Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a senior member of the ruling family in Ras al-Khaimah emirate who helped found Ittihad University in the UAE and headed the board of directors of al-Islah, was arrested on 20 April 2012 by armed State Security officers who raided his home and failed to produce a judicial warrant for his arrest. They took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al Khaimah, and then held him there without charge or trial for five months during which the authorities denied to his family that they were holding him there and refused to disclose any information as to his whereabouts. A victim of enforced disappearance, he was kept in solitary confinement in a locked room and watched over by armed guards. In September 2012, the security authorities moved him to a secret detention facility, where he remained until he went on trial as one of the UAE 94 defendants. Throughout his detention, the authorities denied him access to a lawyer and contact with his family."*

d. Dr Mohammed al-Mansoori, a prominent lawyer in RAK was arbitrarily detained, forced to confess, and sentenced to a lengthy prison term (pp.45-46):

*"Dr Mohammed al-Mansoori, a prominent lawyer and former head of the UAE's Jurists' Association, was detained by a group of State Security officers whose faces were concealed by balaclavas on 16 July 2012 near his home in Ras al-Khaimah emirate. The officers took him first to his home, which they searched for six hours, and then to an undisclosed location where they detained him incommunicado and in solitary confinement for eight months. At his trial as one of the UAE 94, the prosecution submitted a "confession" that they said he had signed while he was held in incommunicado detention as evidence against him; he told the court that it was untrue that he had signed the statement and testified that he had not signed any documents when he was in pre-trial detention. The court took no steps to order an expert examination of the signature to verify it but accepted the confession as evidence. It then returned a guilty verdict against Dr Mohammed al-Mansoori and sentenced him to 10 years imprisonment, followed by three years' probation. He stood trial again*

121

*with nine other UAE nationals and 20 Egyptian nationals and was convicted in January 2014, receiving an additional 15-month prison sentence, which he is to serve after his initial 10-year sentence is complete. In the second mass trial, he had refused, along with many of the other defendants, to attend a number of the court proceedings, in protest at not being allowed to access to his case documents."*

e.  Dr Mansoori's treatment by the RAK authorities has also been raised by UN officials:  his case was raised by Special Representative of the UN Secretary-General on the situation of human rights defenders, the Chairperson-Rapporteur of the Working Group on Arbitrary Detention, the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression and the Special Rapporteur on the independence of judges and lawyers: Amnesty International report, p.46.  More recently, an expert panel appointed by the UN High Commissioner for Human Rights made further trenchant criticisms of Dr Mansoori's detention by RAK:

*"According to reports at our disposal, throughout his deprivation of liberty, Mr Mansoor has been kept in solitary confinement, and in conditions of detention that violate basic international human rights standards and which risk taking an irrevocable toll on Mr Mansoor's health," the experts said. "We implore the authorities of the United Arab Emirates to immediately grant him access to vital and consented medical care and to ensure that his conditions of detention conform to the United Nations' Standard Minimum Rules for the Treatment of Prisoners."*

*"We are also alarmed at repeated and consistent reports that Mr Mansoor has not received a fair trial and call on the authorities to ensure his retrial in accordance with the fundamental judicial guarantees provided for in international human rights law, or his immediate release," the experts said.*

f.  Amnesty International also drew attention to the arrest, abuse and arbitrary imprisonment of Saud Kulaib, who is from RAK.  He was initially detained for some 6 months and then was moved to Abu Dhabi, where he was physically and mentally abused (p.28):

> *"In another case, Saud Kulaib, a member of al-Islah from Ras al-Khaimah emirate who had posted messages on Twitter in support of those detained following the mass arrests, was himself arrested on 29 December 2012 and subjected to enforced disappearance until 27 May 2013 when he was moved to al-Sadr Prison in Abu Dhabi. From there, he told members of his family and other prisoners that security officials had beaten him, cut his hand with a razor blade, held him by turns in extremely hot and cold conditions, deprived him of sleep and threatened to pull out his fingernails. He said that the authorities also tried to break him down by misleading him into believing that his wife was also detained and on hunger strike."*

367. The evidence in this case also indicates that the exercise of prosecutorial powers in RAK is capricious and opaque. As discussed above, the Ruler of RAK in April 2015 gave directions for Mr Azima to be targeted through the bringing of <u>criminal charges</u>. This direction was not given to or discussed among public prosecutors or justice officials, but rather:

    a. Mr Bustami, who is a director of a RAK firm making ceramics;

    b. Mr Buchanan, who was the head of RAK Development; and

    c. Mr Handjani, who is a director of a petroleum firm.

368. The investigations in which Mr Azima and others were involved (including legal advisers) also ascertained that the RAK authorities were, in addition to holding various individuals in arbitrary detention (as noted above: see [**H7/261**]), placing pressure on their family members: [**H7/251**].

    2.    The "Security Assessment"

369. RAKIA's pleaded case on the so-called Security Assessment document (authored by Scott Modell) is that Mr Azima had procured and edited this document.

370. As Mr Azima explains, however, the Security Assessment (see [**H7/171**]) was prepared by Scott Modell. Mr Modell was seeking to pitch for work from Dr Massaad, including a proposal to provide security services to Dr Massaad: [**H7/133**].

371. The activities described in the Security Assessment were not implemented by Dr Massaad or Mr Azima, and the proposals it made were not taken up. As Mr Azima

notes, and as is evident also from the contents of the Security Assessment, its proposals were ill-conceived and naïve: 1st Azima, para 145.

372. While RAKIA alleges a "campaign", the Security Assessment is a red herring, presented out of context, that was not pursued. As set out above, Mr Azima's activities in this period were, rather, directed at investigating the detention of various individuals, with a view to drawing attention to them. For the reasons set out above, those activities did not constitute "misconduct" as alleged by RAKIA.

373. In any event, even if the Security Assessment is considered to constitute a form of "misconduct", it is not actionable by RAKIA:

    a. There is no indication that RAKIA was harmed in any way by the preparation of the Security Assessment, or by any of the proposals it contained (since they did not materialise and were not pursued);

    b. RAKIA had already privately and definitively identified Mr Azima as an enemy. Its contention that it relied on any representation from Mr Azima does not bear scrutiny.

### C. Legal basis of RAKIA's claim

374. RAKIA's case that these efforts to investigate and expose human rights abuses was a breach of the duty of good faith in the Settlement Agreement ultimately does not withstand scrutiny.

375. **Factual basis** As noted, while RAKIA's pleaded case is that Mr Azima sought generate "false" stories regarding the RAK legal system, no evidence has been offered to show that these stories were in fact false. On the contrary, the available evidence shows that there were good reasons for having serious concerns at human rights abuses.

376. **Alleged "misconduct"** In any event, RAKIA has not explained how the conduct it alleges could constitute a breach of clause 3.2 of the Settlement Agreement, or how any representation that Mr Azima had acted in accordance with the duties set out in that clause could be incorrect. The clause requires Mr Azima to have,

> "*acted in good faith and with the utmost professional integrity and will continue in the future to act in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK Entity.*"

124

377. A "RAK entity" is defined to *"mean any entity in which RAKIA or the Government of RAK has a shareholding interest (irrespective of where that entity may be incorporated)."*

378. It is entirely unclear as to how it could be said that the activities alleged by RAKIA could constitute a breach of good faith or professional integrity <u>as regards those entities</u>. At its highest, RAKIA's case appears to be that the activities alleged could harm the reputation of the Ruler or the Emirate of Ras Al Khaimah itself. The clause does not, however, require Mr Azima to act in good faith and with professional integrity towards the Emirate or the Ruler in any such general sense.

379. **Causation and damage** RAKIA's claim is structured as both a breach of contract, and as a misrepresentation.

380. The claim for breach of contract is entirely misconceived. RAKIA contends that the alleged breach of warranty in clause 3.2 entitles it to damages equal to the money ($2.6 million) it had paid under the Settlement Agreement. This is said to be because "but for Mr Azima's breach of the Warranty", RAKIA would not have entered into the Settlement Agreement. RAPoC, para 11.1 [**A/2/22**]. The contractual measure of damages, however, places the claimant in the position that s/he would have been in had the warranty been correct (or the contract otherwise performed). RAKIA has not suggested that the activities complained of actually caused it any loss at all, still less sought to explain how that loss equates to $2.6 million.

381. RAKIA also claims in misrepresentation, contending that it relied on a representation that Mr Azima had acted in good faith and with the utmost professional integrity towards RAKIA and other RAK entities: RAPoC, para 13 [**A/2/22**]. This, however, is untrue and RAKIA's position in this regard is entirely disingenuous: RAKIA was <u>well aware</u> from early 2015 that Mr Azima was involved in investigating the circumstances in which individuals were detained in RAK, and seeking to draw press attention to this.

382. Indeed, only 2 months before the Settlement Agreement was entered, an internal RAKIA report stated that, "*There have been accusations that these prisoners have been ill treated,*" and labelled Mr Azima as responsible: "*FA, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities.*".

383. The evidence clearly indicates that RAKIA regarded the Settlement Agreement as a device and so did not rely on any statement by Mr Azima in entering into it.

126

## VIII. CONCLUSION

384. For the reasons set out above and as will be developed at trial, the Court will be invited:

    a. To find that RAKIA is responsible for the hacking of Mr Azima's emails and data; and

    b. To dismiss RAKIA's claim as unfounded and/or in any event as an abuse of process.

TIM LORD QC

HUGO LEITH

*Brick Court Chambers*

15 January 2020