# EXHIBIT G

(First Declaration of V. Pandey)

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO. 20-CV-954

|  |  |  |
|---|---|---|
| FARHAD AZIMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **VIKASH K. PANDEY** |
| NICHOLAS DEL ROSSO and VITAL | ) | |
| MANAGEMENT SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

I, **VIKASH K. PANDEY**, do hereby declare under penalty of perjury pursuant to

28 U.S.C § 1746 the following:

1.     I am an information technology and cybersecurity professional and I reside

in India.

2.     I am also a former employee of CyberRoot Risk Advisory Private, Limited

("CyberRoot"). CyberRoot is an Indian company that provides risk mitigation, online

reputation management, information security, and digital forensics services. I worked at

CyberRoot from approximately July 2016 through May 2020.

3.     In August 2020, I was contacted by Aditya Jain who falsely accused me of

being involved in the alleged hacking Farhad Azima. Jain represented he was assisting

Burlington Legal LLP and working on behalf of Farhad Azima.

4.     Jain warned me that I was the primary suspect in an investigation into the

hacking of Azima. He also told me that I was the primary suspect because Holden claimed

1 of 8

Initials

that he identified an individual who worked at CyberRoot and BellTroX Info Tech Services ("BellTroX") and had used my name in the alleged hacking of Azima.

5.      I denied the accusations and dismissed them as either a mistake or a fabrication.

6.      I did not hack or assist in the hacking of Farhad Azima.

7.      I did not work on any projects directed at or related to Azima.

8.      I do not know who hacked Azima or if Azima was hacked.

9.      While I worked at CyberRoot, CyberRoot did not engage in any illegal hacking activities.

10.     I do not believe that CyberRoot would be involved in illegal hacking operations, including the alleged hacking of Azima.

### Demand Letters and Threats of Legal Action

11.     On August 28, 2020, I received a demand letter from Holden on behalf of Azima. A true and accurate copy of Holden's demand letter, which is dated August 20, 2020, is attached hereto as **Exhibit A**.

12.     Holden claimed to be "in possession of information which confirms that [I was] involved and, indeed, [was] instrumental to" the alleged hacking of Azima. Holden also claimed to be "aware that [I am] not the sole player in the Hack and that [I was] performing [my] role on the instructions [I] had received from [my] client." These accusations are false and fabricated.

VᵣP.
Initials

13. While Holden did not disclose what information Azima possessed or identify my alleged client, he offered me a single opportunity to cooperate with his investigation and to provide a witness statement to avoid criminal and legal proceedings.

14. I immediately called a former colleague at CyberRoot – Chiranshu Ahuja – to determine whether he was aware of any security projects that related to Azima or work that could have been mistaken for the illegal acts of which Holden accused me.

15. I confirmed to Ahuja that I did not hack Azima and that I did not believe that CyberRoot engaged in any illegal activity. I also confirmed my recollection that CyberRoot did not work on matters related to Azima. Ahuja agreed with my recollection and believed that Holden was mistaken.

16. I also called Jain to notify him of Holden's demand letter. Jain, who I understood was acting for Holden, confirmed that he would coordinate with Holden regarding their demand that I provide testimony to avoid legal proceedings. Jain did, in fact, contact and assist Holden in Burlington's demands to me.

17. On or about August 31, 2020, Holden presented a Confidentiality Agreement to me by email and, separately, through Jain. A true and accurate copy of the Confidentiality Agreement is attached hereto as **Exhibit B**. At that time, my father was unwell and was receiving treatment.

18. Over the next week, Holden and Jain pressured me to sign the Confidentiality Agreement Holden refused to share any information supporting their accusations of me until I signed the Confidentiality Agreement. Apparently at Holden's instruction, Jain also

3 of 8

Initials

urged me to sign the Confidentiality Agreement because Azima's representatives, including Holden, would immediately commence criminal and legal charges against me if I did not comply.

## Repeated Demands for Testimony to Avoid Legal Proceedings

19.     After several days of pressuring by Holden and Jain, I explained that I could not sign the Confidentiality Agreement because I was with my father who was sick and did not have acess to a printer. However, I understand that Jain signed the Confidentiality Agreement with my name on September 2, 2020.

20.     I did not hack Azima and I do not believe that CyberRoot hacked Azima, but I feared that cooperating with Holden was the only way that I could confront the evidence that he claimed as support for his false accusations. Although I told Jain, as Holden's intermediary, that I would agree to the Confidentiality Agreement, I believe that my agreement was obtained under duress and false pretenses, as Azima's representatives refused to provide any evidence to support their accusations.

21.     On September 2, 2020, Jain arranged a Zoom audio call between me, Jain, and a legal representative of Azima. I do not know Holden's voice, so I cannot confirm whether he was on this call; however, I understood and reasonably believe that I spoke to Holden or another member of Azima's legal team with Burlingtons during this call.

22.     During this call, the Burlingtons representative told me that I needed to admit to being instrumental to the hack of Azima. He also claimed that he had evidence against

Initials

me related to the hack of Azima and accused me of being associated with BellTroX, which he claimed was also responsible for the hack of Azima. These accusations were false.

23.     I am not and have never been associated with BellTroX, and I denied any association with BellTroX.

24.     I am not and have never been involved in the hacking of Azima, and I denied any involvement in the hacking of Azima.

25.     Prior to these accusations, I did not know anything about the hacking of Azima, and I denied having any knowledge of the alleged hacking of Azima.

26.     I demanded that I be provided with the evidence that was promised to me if I signed the Confidentiality Agreement. Jain and the Burlingtons representative refused to provide any evidence of my involvement, despite insisting that I sign the Confidentiality Agreement for that purpose.

27.     I do not believe that Azima or his representatives had any evidence to support their accusations and demands to me. Rather, I believe that Holden and Jain insisted on the Confidentiality Agreement because they intended to pressure me to give false testimony during this call.

28.     Despite the falsity of these accusations and my denial of the accusations, they continued to threaten criminal and other legal battles against me unless I agreed to provide testimony for Azima's benefit. They also told me that I would be compensated very well if I provided false testimony and implicated others.

Initials

## Repeated Demands that I Sign a Consultancy Agreement and Implicate Others

29.     On September 4, 2020, Dominic Holden provided a draft "Consultancy Agreement" to me and continued to pressure me to sign it to avoid legal proceedings. True and accurate copies of messages sent by Holden using his Burlingtons email address, dominic.holden@burlingtons.legal, are attached hereto as **Exhibit C**. Jain also provided a copy of the Consultancy Agreement to me on behalf of Holden, and I understood that Jain was acting as Holden's translator and authorized representative.

30.     The first draft of the Consultancy Agreement included false representations that I was knowledgeable about the hacking of Azima. As I had previously denied having knowledge of or involvement in the hacking of Azima, I refused to sign the first draft of the Consultancy Agreement.

31.     Later that day, Holden provided a revised version of the "Consultancy Agreement" to me. A true and accurate copy of the revised draft of the Consultancy Agreement signed by Holden is attached hereto as **Exhibit D**. Jain also provided a copy of the revised Consultancy Agreement to me on behalf of Holden, and I understood that Jain was acting as Holden's translator and authorized representative.

32.     Under the revised Consultancy Agreement, Burlingtons offered to pay me to assist them in Azima's legal proceedings against the Ras Al Khaimah Investment Authority, including High Court Claim No. HC-2016-002798.

Initials

33.     Burlingtons forecasted that I would be compensated for up to 30 hours of service per calendar month. The Consultancy Agreement provided that I would be paid $550 per hour and that agreement would continue for at least 18 months.

34.     Holden delivered the Consultancy Agreement to me with his signature on behalf of Burlingtons.

35.     All versions of the Consultancy Agreement indicated that I would be subject to reputational harm and that I would require protection.

36.     Holden and Jain continued to pressure me to sign the Consultancy Agreement, even though the drafts included statements that I had previously denied and for which Holden did not provide supporting evidence.

37.     Holden and Jain insisted that I falsely implicate others, including CyberRoot, in the hacking of Azima in exchange for payment under the Consultancy Agreement. Holden demanded that I agree to statements that I had previously denied and for which Holden did not provide supporting evidence.

38.     When I refused to sign the revised Consultancy Agreement, Jain approached me at Holden's instruction and told me that I should focus on the money that I would be able to make if I signed the Consultancy Agreement. Jain estimated that I would be paid INR 3.3 crore (over $500,000) if I signed the revised Consultancy Agreement. Jain also assured me that he too would be paid if I signed the Consultancy Agreement.

39.     When I refused to sign the revised Consultancy Agreement, Holden and Jain continued to threaten legal action against me if I did not sign the Consultancy Agreement.

Initials

A true and accurate copy of a message that Holden sent to me threatening to bring legal proceedings against me if I did not sign the Consultancy Agreement is attached hereto as **Exhibit E**.

40.     I refused to sign the Consultancy Agreement on the basis that the information and admissions that Holden sought from me was false, and I understood that the proposed payments to implicate CyberRoot were intended to frame CyberRoot in the hacking of Azima.

41.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 22, 2020 in Dehli, India.

_____
Vikash K. Pandey

Initials

# Exhibit A



## BURLINGTONS

MORE THAN LAW

Mr. Vikash Kumar Pandey
S/O Narmda Pasad Pandey, 272
N Pa Pasan, Pasan, Maharani
Laxmi Ward No 12, Kotma
Anuppur
Madhya Pradesh – 484336

Date: 20 August 2020
Our Ref: DH/AZI0003.2

**Dear Sir,**

**RE: OUR CLIENT: MR. FARHAD AZIMA**

We act for Mr. Farhad Azima.

**Background**

In August 2016, Mr. Azima's private and confidential data was published on the internet after it was illegally obtained by a cyber security hack (**"the Hack"**).

As a result of the dissemination of his data, he has suffered substantial damage to his reputation and earning potential. We estimate that his losses amount to in excess of $20,000,000.

**Your role**

We are in possession of information which confirms that you were involved and, indeed, were instrumental to the Hack. This is a very serious matter and you are liable to compensate Mr. Azima for the damage he has suffered as a result of the Hack.

We are however aware that you are not the sole player in the Hack and that you were performing your role on the instructions you had received from your client.

In the circumstances, we are offering you a single opportunity to co-operate with Mr. Azima's legal team to reveal the identity of the client who instructed you to hack Mr. Azima and to provide a Witness Statement sworn by a statement of truth explaining (1) your role in the Hack (2) the means by which the Hack occurred and (3) on whose instructions you were acting.

You have 3 days on receipt of this letter to respond to this request. If we have not received a satisfactory reply that you will co-operate willingly, our client will proceed with legal proceedings against you.

5 Stratford Place, London W1C 1AX

Representative offices:
Almaty, Geneva, Gibraltar, Malta, Moscow, St. Petersburg

Tel:    +44 (0) 207 529 5420
Fax:    +44 (0) 207 495 7450
DX:     82986 Mayfair
Web:    www.burlingtons.legal

Burlingtons Legal LLP is a limited liability partnership trading as Burlingtons and registered in England and Wales with registered number OC360876 whose registered office is at 5 Stratford Place, London W1C 1AX. Burlingtons Legal LLP is regulated and authorised by the Solicitors Regulation Authority with authorisation number 558409. A list of the members of Burlingtons Legal LLP together with those non-members who are designated as partners is open to inspection at the registered office.



We urge you to take legal advice on the contents and effect of this letter.

All our client's rights and remedies are reserved.

Yours faithfully,

*Dominic Holden*

**BURLINGTONS LEGAL LLP**

# Exhibit B

**STRICTLY PRIVATE, CONFIDENTIAL AND PRIVILEGED**

**Confidentiality Agreement**



5 Stratford Place, London, W1C 1AX
Tel: 0207 529 5420 Fax: 0207 495 7450
www.burlingtonsllp.com

Ref: DH/AZI

**CONTENTS**

---

**CLAUSE**

1.   Interpretation.................................................................................................... 2

2.   Confidential Information ...................................................................................... 3

3.   Confidentiality obligations ................................................................................. 5

4.   Permitted disclosure .......................................................................................... 5

5.   Mandatory disclosure......................................................................................... 5

6.   Return or destruction of Confidential Information ............................................... 6

7.   Reservation of rights and acknowledgement........................ **Error! Bookmark not defined.**

8.   Inadequacy of damages...................................................... **Error! Bookmark not defined.**

9.   No obligation to continue discussions ................................................................ 6

10.   Ending discussions and duration of confidentiality obligations ......................... 6

11.   No partnership or agency ................................................................................ 6

12.   General ........................................................................................................... 7

This agreement is dated ……………………………………………

**Parties**

(1)     Burlingtons Legal LLP incorporated and registered in England and Wales with company number OC360876 whose registered office is at 5 Stratford Place, London, W1C 1AX (**Party 1**).

(2)     Vikash Kumar Pandey of S/O Narmda Prasad Pandey, 272 N Pa Pasan, Pasan, Maharani Laxmi Ward No 12, Kotma, Anuppur, Madhya Pradesh – 484336 (**Party 2**).

**BACKGROUND**

(A)     The parties intend to enter into discussions relating to the Purpose which will involve the exchange of Confidential Information between them.

(B)     The parties have agreed to comply with this agreement in connection with the disclosure and use of Confidential Information.

**Agreed terms**

**1.     Interpretation**

**1.1    Definitions:**

**Business Day**:  a day other than a Saturday, Sunday or public holiday in England when banks in London are open for business.

**Confidential Information**:  has the meaning given in clause 2.

**Discloser**:  a party to this agreement when it discloses its Confidential Information, directly or indirectly, to the other party.

**Group**: in relation to a company, that company, any subsidiary or any holding company from time to time of that company, and any subsidiary from time to time of a holding company of that company. Each company in a Group is a member of the Group.

**Group Company**: in relation to a company, any member of its Group.

**Holding company**: has the meaning give in clause 1.2(e).

**Purpose**: to assist in relation to ongoing litigation (including arbitration and other forms of dispute resolution fora) concerning Party 1 and / or Party 1's clients.

**Recipient**:  a party to this agreement when it receives Confidential Information, directly or indirectly, from the other party.

2

**Representative(s)**: in relation to each party and any member of its Group:

> a) its officers and employees that need to know the Confidential Information for the Purpose;
>
> b) its professional advisers or consultants who are engaged to advise that party and/or any member of its Group in connection with the Purpose;
>
> c) its contractors and sub-contractors engaged by that party and/or any member of its Group in connection with the Purpose; and
>
> d) any other person to whom the other party agrees in writing that Confidential Information may be disclosed in connection with the Purpose.

**Subsidiary**: has the meaning given in clause 1.2(e).

**1.2    Interpretation**.

> (a) A reference to a statute or statutory provision is a reference to it as amended or re-enacted. A reference to a statute or statutory provision includes any subordinate legislation made under that statute or statutory provision, as amended or re-enacted.
>
> (b) Any words following the terms **including**, **include**, **in particular**, **for example** or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.
>
> (c) A reference to **writing** or **written** includes fax and email.
>
> (d) A reference to a **company** shall include any company, corporation or other body corporate, wherever and however incorporated or established.
>
> (e) A reference to a **holding company** or a **subsidiary** means a holding company or a subsidiary (as the case may be) as defined in section 1159 of the Companies Act 2006 and a company shall be treated, for the purposes only of the membership requirement contained in section 1159(1)(b) and (c), as a member of another company even if its shares in that other company are registered in the name of:
>
> > (i) another person (or its nominee) by way of security or in connection with the taking of security; or
> >
> > (ii) its nominee.
>
> (f) Any obligation on a party not to do something includes an obligation not to allow that thing to be done.

**2.    Confidential Information**

**2.1    Confidential Information** means all confidential information relating to the Purpose which the Discloser or its Representatives or any of its Group Companies, or their

3

Representatives directly or indirectly discloses, or makes available, to the Recipient or its Representatives or any of its Group Companies, or their Representatives, before, on or after the date of this agreement. This includes:

(a) the fact that discussions and negotiations are taking place concerning the Purpose and the status of those discussions and negotiations;

(b) the existence and terms of this agreement;

(c) all confidential or proprietary information relating to:

(i) the business, affairs, customers, clients, suppliers, plans, intentions, or market opportunities of the Discloser or of any of the Discloser's Group Companies; and

(ii) the operations, processes, product information, know-how, technical information, designs, trade secrets or software of the Discloser, or of any of the Discloser's Group Companies;

(d) any information, findings, data or analysis derived from Confidential Information; and

(e) any other information that is identified as being of a confidential or proprietary nature;

but excludes any information referred to in clause 2.2.

2.2 Information is not Confidential Information if:

(a) it is, or becomes, generally available to the public other than as a direct or indirect result of the information being disclosed by the Recipient or its Representatives or by any of the Recipient's Group Companies or their Representatives in breach of this agreement (except that any compilation of otherwise public information in a form not publicly known shall still be treated as Confidential Information);

(b) it was available to the Recipient on a non-confidential basis prior to disclosure by the Discloser;

(c) it was, is, or becomes available to the Recipient on a non-confidential basis from a person who, to the Recipient's actual knowledge, is not under any confidentiality obligation in respect of that information;

(d) it was lawfully in the possession of the Recipient before the information was disclosed by the Discloser; and

(e) the parties agree in writing that the information is not confidential.

4

**3. Confidentiality obligations**

3.1 In return for the Discloser making Confidential Information available to the Recipient, the Recipient undertakes to the Discloser that it shall:

    (a) keep the Confidential Information secret and confidential;

    (b) not use or exploit the Confidential Information in any way except for the Purpose;

    (c) not disclose or make available any Confidential Information in whole or in part to any person, except as expressly permitted by, and in accordance with this agreement.

3.2 The Recipient shall establish and maintain adequate security measures (including any reasonable security measures proposed by the Discloser from time to time) to safeguard the Confidential Information from unauthorised access or use.

**4. Permitted disclosure**

**4.1 Disclosure to Representatives.**

    (a) The Recipient may disclose the Confidential Information to its Representatives, any of its Group Companies, or their Representatives on the basis that it:

        (i) informs those Representatives, Group Companies or their Representatives of the confidential nature of the Confidential Information before it is disclosed; and

        (ii) takes reasonable steps to procure that those Representatives, Group Companies or their Representatives comply with the confidentiality obligations in clause 3.1 as if they were the Recipient.

    (b) The Recipient shall be liable for the actions or omissions of the Representatives, any of its Group Companies or their Representatives in relation to the Confidential Information as if they were the actions or omissions of the Recipient.

**5. Mandatory disclosure**

5.1 Subject to the provisions of this clause 5, a party may disclose Confidential Information to the minimum extent required by:

    (a) an order of any court of competent jurisdiction or any regulatory, judicial, governmental or similar body or any taxation authority of competent jurisdiction;

    (b) the rules of any listing authority or stock exchange on which its shares or those of any of its Group Companies are listed or traded; or

    (c) the laws or regulations of any country to which its affairs or those of any of its Group Companies are subject.

5

**6. Return or destruction of Confidential Information**

6.1 At the reasonable written request of the Discloser, the Recipient shall:

(a) destroy all documents and materials containing, reflecting, incorporating or based on the Confidential Information; and

(b) to the extent legally and technically practicable, erase all the Confidential Information from its computer and communications systems and devices used by it, or which is stored in electronic form.

6.2 Nothing in clause **Error! Reference source not found.** shall require the Recipient to return or destroy any documents and materials containing or based on the Discloser's Confidential Information that the Recipient is required to retain by applicable law, or to satisfy the requirements of a regulatory authority or body of competent jurisdiction or the rules of any listing authority or stock exchange, to which it is subject. The provisions of this agreement shall continue to apply to any documents and materials retained by the Recipient pursuant to this clause 6.2.

**7. No obligation to continue discussions**

Nothing in this agreement shall impose an obligation on either party to continue discussions or negotiations in connection with the Purpose, or an obligation on each party, or any of its Group Companies to disclose any information (whether Confidential Information or otherwise) to the other party.

**8. Ending discussions and duration of confidentiality obligations**

8.1 If either party decides not to continue to be involved in the Purpose with the other party, it shall notify that other party in writing immediately.

8.2 Notwithstanding the end of discussions between the parties in relation to the Purpose pursuant to clause 8.1, each party's obligations under this agreement shall continue in full force and effect.

8.3 The end of discussions relating to the Purpose shall not affect any accrued rights or remedies to which either party is entitled.

**9. No partnership or agency**

9.1 Nothing in this agreement is intended to, or shall be deemed to, establish any partnership or joint venture between the parties, constitute any party the agent of another party, or authorise any party to make or enter into any commitments for or on behalf of any other party.

6

9.2     Each party confirms it is acting on its own behalf and not for the benefit of any other person.

**10.    General**

**10.1   Assignment and other dealings.** Neither party shall assign, transfer, mortgage, charge, subcontract, declare a trust over or deal in any other manner with any of its rights and obligations under this agreement.

**10.2   Entire agreement**

(a)     This agreement constitutes the entire agreement between the parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

(b)     Each party agrees that it shall have no remedies in respect of any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this agreement. Each party agrees that it shall have no claim for innocent or negligent misrepresentation or negligent misstatement based on any statement in this agreement.

**10.3   Variation.** No variation of this agreement shall be effective unless it is in writing and signed by the parties (or their authorised representatives).

**10.4   Waiver.** No failure or delay by a party to exercise any right or remedy provided under this agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

**10.5   Severance**

**(a)**     If any provision or part-provision of this agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this agreement.

**10.6   Notices**

(a)     Any notice or other communication given to a party under or in connection with this agreement shall be in writing and shall be:

Case 1:20-cv-00954-WO-JLW   Document 157-7   Filed 02/09/23   Page 21 of 35

<ol type="i" start="1">
<li>delivered by hand or by pre-paid first-class post or other next working day delivery service at its registered office (if a company) or its principal place of business (in any other case); or</li>
<li>sent by email to the following addresses:</li>
</ol>

<ol type="A">
<li>Party 1: *dominic.holden@burlingtons.legal*</li>
<li>Party 2: *vikz.hax@gmail.com*</li>
</ol>

(b) Any notice or communication shall be deemed to have been received:

<ol type="i">
<li>if delivered by hand, on signature of a delivery receipt or at the time the notice is left at the proper address; and</li>
<li>if sent by pre-paid first-class post or other next working day delivery service, at 9.00 am on the second Business Day after posting or at the time recorded by the delivery service; and</li>
<li>if sent by email, at the time of transmission, or, if this time falls outside business hours in the place of receipt, when business hours resume. In this Clause 10.6(b)(iii), business hours means 9.00am to 5.00pm Monday to Friday on a day that is not a public holiday in the place of receipt.</li>
</ol>

(c) This clause does not apply to the service of any proceedings or other documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

(d) A notice given under this agreement is not valid if sent by email.

### 10.7 **Third party rights**

(a) Unless it expressly states otherwise, this agreement does not give rise to any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this agreement.

(b) The rights of the parties to rescind or vary this agreement are not subject to the consent of any other person.

### 10.8 **Governing law.** This agreement and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales.

### 10.9 **Jurisdiction.** Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this agreement or its subject matter or formation.

8

This agreement has been entered into on the date stated at the beginning of it.

| Signed by Dominic Holden and on behalf of **Burlingtons Legal LLP** | .................... Partner |
| --- | --- |
| Signed by **Vikash Kumar Pandey** | .................... |

9

# Exhibit C

# Private, Confidential and Privileged - Subject to Contract 

 Inbox

 **Dominic Holden** 4 Sep

to me ⌃  

| From | Dominic Holden · dominic.holden@burlingtons.legal |
|------|---------------------------------------------------|
| To | vikz.hax@gmail.com |
| Date | 4 Sep 2020, 11:05 pm |
| 🔒 | Standard encryption (TLS). See security details |

 Show pictures

**Dear Vikash,**

I attach our signed counterpart of the Consultancy Agreement.

Please could you sign and then return to me a copy of the complete signed version (scan and email is fine).

Please do not hesitate to telephone me to discuss – my contact details are below.

**Kind regards,**

 **Dominic Holden** 4 Sep

to me ∧



| From | Dominic Holden • dominic.holden@burlingtons.legal |
|------|------|
| To | vikz.hax@gmail.com |
| Date | 4 Sep 2020, 11:34 pm |
| 🔒 | Standard encryption (TLS). See security details |

Show pictures

**Dear Vikash,**

Further to my email below, I attach signed Confidentiality Agreement / NDA.

Please sign and return the complete, signed version to me (scan and email is fine).

Show quoted text

DocuSign Envelope ID: D17C2DFD-AC9D-43C7-A760-BEFADEDB0551

# Exhibit D

DocuSign Envelope ID: 36F28BA5-27EF-462E-A370-84FCC76F8EDA

DATED _____ 04 SEPTEMBER 2020

**VIKASH KUMAR PANDEY**

- and -

**BURLINGTONS LEGAL LLP**

**CONSULTANCY AGREEMENT**

DocuSign Envelope ID: 36F28BA5-27EF-462E-A370-84FCC76F8EDA

AGREEMENT IS MADE ON ......<sup>04</sup> SEPTEMBER 2020

**BETWEEN:**

(1)     **Vikash Kumar Pandey** of S/O Narmada Pasad Pandey, 272 N Pa Pasan, Pasan, Maharani Laxmi Ward No 12, Kotma Anuppur, Madhya Pradesh - 484336 (**"the Consultant"**); (**"the Consultant"**); and

(2)     **Burlingtons Legal LLP** incorporated and registered in England & Wales with company number OC360876 whose registered office is at 5 Stratford Place, London W1C 1AX ("**Burlingtons**").

**WHEREAS:**

(A)     The Consultant is an IT expert and ex-employee of Cyber Root Risk Advisory Private Limited (**"CR"**).

(B)     Burlingtons are the English solicitors acting for Mr. Azima who is the Defendant, Counterclaimant and Proposed Appellant in proceedings commenced by Ras Al Khaimah Investment Authority ("**RAKIA**") in the High Court in London under Claim No. HC-2016-002798 (the "**RAKIA Proceedings**"). The RAKIA Proceedings concern, amongst other matters, the hacking of Mr. Azima's emails in around 2015 / 2016 (**"the Hack"**).

(C)     The Consultant has agreed to provide assistance to Burlingtons in relation to their investigation into the Hack (**"the Hacking Investigation"**).

(D)     It is understood that by assisting Burlingtons with the Hacking Investigation (**"the Purpose"**) the Consultant is risking his reputation within the IT industry and his personal security and that the Consultant may be required to incur substantial costs to ensure that his personal security is protected.

(E)     The Consultant has dedicated time, and will need to dedicate further time, to providing information and assistance in connection with the Hacking Investigation. It is agreed that the Consultant will be engaged for the Purpose on the terms set out below.

**IT IS AGREED:**

1.      **INTERPRETATION**

1.1     In this Agreement:

"**Commencement Date**" means 1 August 2020;

"**Confidential Information**" means confidential or secret information relating to Mr. Azima and / or the Hacking Investigation, including, without limitation, the existence and terms of this Agreement and any communications between Burlingtons (and / or its agents and / or advisers) and the Consultant;

"**Services**" means the services described in clause 3.

1.2 In this Agreement, any reference to a statutory provision is a reference to the provision from time to time renumbered, amended, re-enacted or consolidated.

1.3 In this Agreement, unless the context otherwise requires:

(a) references to clauses are to clauses of this Agreement; and

(b) the headings to the clauses are for convenience only and do not affect the Agreement's construction or interpretation.

2. **APPOINTMENT**

2.1 With effect from the Commencement Date, Burlingtons has engaged the Consultant to perform the Services.

3. **SERVICES**

3.1 During his engagement under this Agreement, the Consultant will give information and assistance to Burlingtons and / or its agents in connection with the Hacking Investigation.

3.2 The Consultant acknowledges that this could involve, but is not limited to, assisting in relation to any regulatory or legal process, preparing witness statements and giving evidence in person.

3.3 Without prejudice to the generality of clause 3.1, the Consultant shall make himself available for meetings for up to 30 hours per calendar month (via Zoom or other form of agreed upon video conferring platform), such meetings to take place at Burlington's request upon giving the Consultant at least 3 business days' notice; and

3.4 The Consultant represents, warrants and agrees that:

(a) any information or assistance provided to Burlingtons pursuant to this Agreement will be complete and accurate, and will be given truthfully to the best of the Consultant's knowledge and belief.

(b) he is a former employee of CR and has knowledge of the practices of the company.

(c) The execution, delivery and performance of this agreement will not conflict with:-

(i) Any law or regulation applicable to him; and / or

(ii) Any agreement or instrument binding upon him.

3.5 The Consultant shall indemnify Burlingtons against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other reasonable professional costs and expenses) suffered or incurred arising out of or in connection with:-

(a) Any breach of the warranties contained in clause 3.4.

(b) Any breach of this agreement.

(c) The enforcement of this agreement.

(d) Any claim made against Burlingtons by a third party arising out of or in connection with the provision of the Services.

3.6 It is agreed that no information or documentation (except as required by an order of a court of competent jurisdiction, or pursuant to any proper order or demand made by any competent authority or body where Burlingtons is under a legal or regulatory obligation to disclose the information and / or documentation) provided by the Consultant pursuant to this Agreement will be used by Burlingtons (on behalf of Mr. Azima) in support of any, action, claim, or prosecution against the Consultant in relation to his liability for the Hack.

4. **REMUNERATION**

4.1 Subject to the terms of this Agreement, Burlingtons shall pay the Consultant the sum of $550 per hour (exclusive of any applicable VAT) in consideration for the provision of the Services for a period of at least 18 months.

4.2 Subject to Burlingtons' prior written approval, Burlingtons shall reimburse all reasonable expenses properly and necessarily incurred by the Consultant in the course of this Agreement, subject to production of receipts or other appropriate evidence of payment.

4.3 The payment referred to at paragraph 4.1 shall include all work undertaken and assistance provided to Burlingtons by the Consultant to the date of this Agreement.

4.4 The period of service referred to at paragraph 4.1 may be extended by written agreement between the parties.

5. **CONFIDENTIAL INFORMATION**

5.1 The Consultant will not, except with the prior written consent of Burlingtons or pursuant to an order of a court of competent jurisdiction, or pursuant to any proper order or demand made by any competent authority or body where the Consultant is under a legal or regulatory obligation to make such disclosure, or to the Consultant's lawyers, auditors or insurers on terms which preserve confidentiality:

(a) disclose or communicate to any person, firm or company;

(b) cause unauthorised disclosure of; or

(c) otherwise make use of,

any Confidential Information that he has or may have acquired in the course of his engagement (whether before, on or after the date of this Agreement) and will use his best endeavours to prevent the unauthorised disclosure or publication of such information. This obligation survives the termination of this Agreement.

5.2 The obligations in clause 5.1 will cease if the relevant Confidential Information comes into the public domain other than through the Consultant's default or negligence.

6. **TERMINATION**

6.1 Upon the termination of this Agreement for whatever reason, the Consultant will deliver up all property and any documents or other information belonging to Burlingtons (and / or to Mr. Azima), including any Confidential Information, whether held electronically or in hard copy, which is in the Consultant's possession or under his control. The Consultant will not retain any copies of any such property, documents or information without written permission from Burlingtons.

6.2 The termination of this Agreement will not affect any of the provisions of this Agreement that are expressed to operate or have effect after its termination (including without limitation clause 5.1) and will not prejudice the exercise of any right or remedy of either party that has accrued prior to termination.

7. **STATUS**

7.1 The relationship of the Consultant to Burlingtons will be that of independent contractor and nothing in this Agreement shall render him an employee, worker, agent or partner of Burlingtons and the Consultant shall not hold himself out as such.

7.2 This Agreement constitutes a contract for the provision of services and not a contract of employment and accordingly the Consultant shall be fully responsible for and shall indemnify Burlingtons for and in respect of:

(a) any income tax, National Insurance and social security contributions and any other liability, deduction, contribution, assessment or claim arising from or made in connection with the performance of the Services, where the recovery is not prohibited by law. The Consultant shall further indemnify Burlingtons against all reasonable costs, expenses and any penalty, fine or interest incurred or payable by Burlingtons in connection with or in consequence of any such liability, deduction, contribution, assessment or claim; and

(b) any liability arising from any employment-related claim or any claim based on worker status (including reasonable costs and expenses) brought by the Consultant against Burlingtons arising out of or in connection with the provision of the Services.

8. **MISCELLANEOUS**

8.1 This Agreement contains the entire agreement and understanding of the parties and supersedes all prior agreements, understandings or arrangements (both oral and written) relating to the subject matter of the same.

8.2 If a provision of this Agreement is found to be illegal, invalid or unenforceable, then to the extent it is illegal, invalid or unenforceable, that provision will be given no effect and will be treated as though it were not included in this Agreement, but the validity or enforceability of the remaining provisions of this Agreement will not be affected.

8.3 This Agreement may be entered into in any number of counterparts and any party may enter into this Agreement by executing any counterpart. A counterpart constitutes an original of this Agreement and all executed counterparts together have the same effect as if each party had executed the same document.

8.4 The parties do not intend by virtue of this Agreement to confer any rights on any third party pursuant to the provisions of the Contracts (Rights of Third Parties) Act 1999, except that any Group Company shall be entitled to enforce this Agreement.

9. **APPLICABLE LAW AND JURISDICTION**

9.1 Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause.

9.2 The number of arbitrators shall be one.

9.3 The seat, or legal place, of arbitration shall be London.

9.4 The language to be used in the arbitral proceedings shall be English.

9.5     The governing law of the contract shall be the substantive law of England & Wales.

Signed by **Burlingtons Legal LLP**               )

)          *Dominic Holden*

)          Dominic Holden

)

)          Partner

04 September 2020

Signed by **Vikash Kumar Pandey**               )

)

)

)

)

# Exhibit E

**Dear Vikash,**

We note that we have not yet received from you a signed copy of the Consultancy Agreement (sent under cover of our email of 4 September 2020, timed at 19:04).

We are further concerned by reports that in recent days you have spoken to current employees of Cyber Root about this matter in clear breach of the Confidentiality Agreement you signed on 2 September 2020.

We reiterate the points made in our letter of 20 August 2020. Our client has suffered an egregious breach of his rights as a result of the hacking and he intends to bring proceedings against the individuals and entities responsible with the full force of the law.

Our client had understood that you wished to avoid legal proceedings being pursued against you and so had agreed to compromise and to co-operate on the basis discussed, as reflected in the Consultancy Agreement (by which our client will agree not to use the information you have provided against *you*).

Our client sincerely hopes that this remains the case and that you will agree to work with him in relation to this matter and litigation against you can be avoided. We therefore invite you to: (1) immediately confirm that you will henceforth comply fully with the Confidentiality Agreement; and (2) sign and return the Consultancy Agreement by 4pm tomorrow (Tuesday, 8 September 2020).

All of our and our client's rights are otherwise reserved, including to issue proceedings without further notice.