# EXHIBIT Q

(KAS JQ privilege hearing-judgment)



Neutral Citation Number: [2023] EWHC 795 (KB)

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 5 April 2023

Before :

**THE HONOURABLE MR JUSTICE MURRAY**
- - - - - - - - - - - - - - - - - - - -

Claim No. QB-2020-000322

Between :

**KARAM SALAH AL DIN AWNI AL SADEQ**  Claimant
**- and -**
**(1) DECHERT LLP**
**(2) NEIL GERRARD**
**(3) DAVID HUGHES**
**(4) CAROLINE BLACK**  Defendants

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Ms Tamara Oppenheimer KC** and **Mr Simon Paul** (instructed by **Stokoe Partnership Solicitors**) for the **Claimant**
**Mr Philip Edey KC**, **Mr Luke Pearce** and **Mr Sandy Phipps** (instructed by **Enyo Law LLP**) for the **Defendants**

Hearing dates: 20-21 December 2021
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely by circulation to the parties' representatives by email and release to The National Archives. The date and time for hand-down are deemed to be 5 April 2023 at 10:30 am.

**Mr Justice Murray :**

1.      Mr Karam Al Din Awni Al Sadeq has brought a claim against Dechert LLP, Mr Neil Gerrard, Mr David Hughes, and Ms Caroline Black under claim number QB-2020-000322 ("the Al Sadeq Proceedings"). I have before me Mr Al Sadeq's application dated 5 November 2021 seeking a determination as to whether the defendants are entitled to withhold inspection, in whole or in part, of various documents on the basis of legal professional privilege and related relief ("the Privilege Application").

2.      Further to paragraph 1 of my order dated 5 May 2021 ("the May 2021 Order"), the Al Sadeq Proceedings are being case managed and will be tried together with proceedings brought by Mr Jihad Abdul Qader Saleh Quzmar against (1) Dechert LLP and (2) Mr Gerrard under claim number QB-2020-003142 ("the Quzmar Proceedings").

3.      Since the hearing, a third set of proceedings brought by the solicitors for each of the claimants, Stokoe Partnership Solicitors, against Dechert LLP and Mr Gerrard (and, originally, others, but discontinued in relation to those others) is being case managed and will be tried with the Al Sadeq Proceedings and the Quzmar Proceedings.

4.      The Privilege Application is made only in the Al Sadeq Proceedings. The Quzmar Proceedings are less advanced. The resolution of these issues in relation to Mr Al Sadeq will clearly, however, have implications for the relevant scope of disclosure in relation to the Quzmar Proceedings. It will not, however, be necessary to make further reference in this judgment to the Quzmar Proceedings other than in relation to matters of background.

*The scope of the challenge*

5.      The draft order accompanying the Privilege Application ("the Draft Order") sets out the declarations and directions sought by Mr Al Sadeq in relation to the defendants' compliance with their disclosure obligations. The general areas of challenge by Mr Al Sadeq to the approach taken by the defendants to date are as follows, namely, challenges to:

   i)      the defendants' claims to privilege over certain categories of documents based on the well-known exception to legal professional privilege known as the crime/fraud, fraud or iniquity exception (paragraph 1 of the Draft Order);

   ii)     the defendants' claims to legal advice privilege on various grounds (paragraphs 2-3 of the Draft Order);

   iii)    the defendants' claims to litigation privilege on various grounds (paragraphs 4-5 of the Draft Order); and

   iv)     the approach taken by the defendants to redaction of various documents that have been disclosed and made available in redacted form (paragraph 6 of the Draft Order).

6.      Paragraphs 7-8 of the Draft Order require the defendants to undertake a re-review, to be conducted by counsel, of all relevant documents, applying the principles set out in the Draft Order. Mr Al Sadeq also asked the court to address three miscellaneous

privilege issues in paragraph 9 of the Draft Order, although by the time of the hearing only one of those three issues was pursued.

7. The defendants say that all of Mr Al Sadeq's challenges to the approach that they have taken to disclosure and legal professional privilege are wrong, that the defendants' privilege claims have been carefully and properly made by experienced lawyers applying the correct principles, and that the Privilege Application should therefore be dismissed in its entirety.

8. As evidence in support of the Privilege Application, Mr Al Sadeq has served the sixth witness statement of Mr Haralambos Tsiattalou dated 5 November 2021. Mr Tsiattalou is a partner in the law firm Stokoe Partnership Solicitors. In response, the defendants have served the ninth witness statement of Mr Edward Allen dated 26 November 2021. Mr Allen is a partner in the law firm Enyo Law LLP ("Enyo Law"), the defendants' solicitors. In reply to that evidence, Mr Al Sadeq has served the ninth witness statement of Mr Tsiattalou dated 6 December 2021.

9. Mr Al Sadeq has also served evidence of Mr Ali Sultan Al Haddad, the Chairman of the law firm Al Haddad & Associates based in Dubai, which practises throughout the United Arab Emirates ("UAE"). Mr Al Haddad represents Mr Al Sadeq in criminal and civil proceedings in the UAE but did not represent him at the time of his arrest. His evidence is set out in his second witness statement dated 4 November 2021, which is exhibited to Mr Tsiattalou's sixth witness statement, and Mr Al Haddad's third witness statement dated 6 December 2021, which is exhibited to Mr Tsiattalou's ninth witness statement.

10. The defendants object to the evidence of Mr Al Haddad on the following grounds:

   i) to the extent that Mr Al Haddad purports to provide expert evidence on UAE law or practice, the court has not granted permission for that evidence to be provided and therefore it cannot be relied upon; and

   ii) to the extent that Mr Al Haddad purports to give factual evidence, it is hearsay evidence about matters concerning which Dr Al Haddad has no personal knowledge.

11. The defendants did not object to my reading the evidence of Mr Al Haddad *de bene esse*, which I have.

*The background to the Al Sadeq Proceedings*

12. In my judgment handed down on 5 May 2021 setting out my reasons for making the May 2021 Order (neutral citation: [2021] EWHC 1149 (QB)), I summarise the background to the Al Sadeq Proceedings and the Quzmar Proceedings at [8]-[20]. I note that the hearing bundle includes an agreed Case Summary and List of Issues for the Al Sadeq Proceedings at pages 9-28 and for the Quzmar Proceedings at pages 339-356.

13. For present purposes, I will set out as briefly as I can the key elements of the factual background.

14.   Mr Al Sadeq is a Jordanian citizen and a Jordanian-qualified lawyer. In November 2008, he joined the Ras Al Khaimah Investment Authority ("RAKIA"), the investment authority of the Emirate of Ras Al Khaimah ("RAK"), as a legal adviser, was promoted to Group Legal Director in 2010, and became Deputy Chief Executive Officer in June 2011. He resigned from RAKIA in late 2012, moving to Dubai in or around December 2012, where he established an investment business. He alleges that he was unlawfully arrested at his home in Dubai on 5 September 2014 by men acting on behalf Sheikh Saud bin Saqr Al Qasimi, the Ruler of RAK ("the Ruler") and taken, without proper legal process, from Dubai to RAK, where he has been detained ever since. He was subsequently tried, convicted of fraud, and sentenced to imprisonment in a number of cases in the RAK courts. He contends that he is innocent of any wrongdoing, was wrongfully convicted in a politically motivated trial, and has therefore also been wrongfully imprisoned.

15.   Dechert LLP ("Dechert-UK") is a law firm organised as a limited liability partnership registered in England and Wales, based in London. It is part of the international network of a large and well-known law firm operating under the business name "Dechert", originally founded in Philadelphia and operating there and in a number of other locations, including Dubai, through a Pennsylvania limited liability partnership, the full legal name of which is also Dechert LLP ("Dechert-US").

16.   Dechert-UK is a firm of solicitors, authorised and supervised by the Solicitors Regulation Authority. References in this judgment to "Dechert" are to the international law firm as a whole, where it is not necessary to distinguish between Dechert-UK and Dechert-US.

17.   With effect from 5 June 2013, Dechert, through its Dubai office, entered into an engagement letter ("the 2013 Engagement Letter") with the Investment and Development Office of the Government of RAK ("RAK IDO") to assist with what the defendants say was a wide-ranging investigation concerning alleged fraud and misappropriation of public assets in relation to transactions carried out by subsidiary companies of RAKIA ("the Investigation").

18.   The defendants were instructed that the suspected principal mover behind the alleged fraud and misappropriation of public assets was Dr Khater Massaad. Dr Massaad was the Chairman and Chief Executive Officer ("CEO") of RAKIA from its establishment in 2005 until 2012. He is said to have fled the UAE in 2012 and was subsequently tried and convicted *in absentia* by the RAK courts for a range of fraud, bribery and embezzlement offences. A number of individuals were alleged to have participated in this wrongdoing, including Mr Al Sadeq and Mr Quzmar. RAKIA considered that Dr Massaad and his associates had perpetrated systematic and wide-ranging frauds against RAKIA and associated entities, with losses amounting to hundreds of millions of dollars ("the Alleged Fraud").

19.   The general scope of Dechert's engagement is set out in an introductory paragraph of the 2013 Engagement Letter as follows:

> "… to act as legal counsel to [RAK IDO] in connection with an investigation into certain historical transactions carried out by subsidiary companies controlled by [RAKIA], on the instruction of Dr. Khater Massaad, particular in relation to activities and

investments in Georgia and India, together with any other transactions that are identified by the task force appointed by the IDO ('IDO Task Force') during the course of this mandate … ."

20.     The detailed scope is said to be set out in Schedule 2 to the 2013 Engagement Letter, which is fully redacted in the version in the hearing bundle. Paragraph 3 (Scope of work) of the 2013 Engagement Letter reads as follows:

"Our initial scope of work shall be as set out in Schedule 2. Though we will be providing strategic input and guidance in relation to the investigation, and providing legal professional privilege, please note that any specific legal advice we provide shall be limited to English, Georgian, UAE and US law. As the investigation progresses, a more detailed scope of works will be discussed and agreed with you based on the findings during our initial work phase."

21.     The 2013 Engagement Letter specified that instructions would be given to Dechert by members of a task force of RAK IDO that would change from time to time, but which was comprised at the time of entry into the 2013 Engagement Letter of three individuals, Mr Carl McMillan, Mr Pascal Bosse, and Mr Guram Tsanava, although Mr Tsanava was said to be involved "in relation to Georgian issues only". The 2013 Engagement Letter also specified that Dechert would:

"… assume unless and until notified to the contrary that all members of the IDO Task Force are authorised to instruct us in relation to all aspects of our work undertaken on behalf of IDO."

22.     According to Mr Allen's evidence, the defendants identified seven individuals from whom they took instructions between 5 June 2013 and 12 October 2014 when the engagement was transferred from RAK IDO to RAK Development LLC ("RAK Development"). RAK Development was responsible, among other things, for holding and management of assets previously owned by RAKIA, including assets affected by the Alleged Fraud. Upon the transfer of the engagement to RAK Development, the 2013 Engagement Letter was replaced by an engagement letter dated 12 October 2014 ("the 2014 Engagement Letter").

23.     The 2014 Engagement Letter was addressed to the Ruler at the address of RAK Development. In the first paragraph, it noted the decision of the Ruler to transfer to RAK Development responsibility for the legal services being provided by Dechert "to various entities within the Government of Ras Al Khaimah in relation to corporate, restructuring, investigation and litigation matters".

24.     After the first paragraph, the 2014 Engagement Letter continued as follows:

"The purpose of this letter is to confirm our continued instructions, and to use this opportunity to refresh and update both the description of the matters on which we have been, and will continue to be, working and to use this opportunity to set out a revised and simplified fee arrangement that will be applicable to all our work.

> Nothing in this letter shall be intended to waive (or shall be construed as having waived) the legal professional privilege attaching to all of our investigative, advisory or litigious work (including without limitation any work produced contained in reports, communications, documents or any other form whatsoever, and whether electronic or physical) previously undertaken for [RAK IDO] (or its subsidiaries), including without limitation any services in relation to those matters provided by third parties on our behalf. Neither does [RAK IDO] (or its subsidiaries) waive privilege over any confidential communications with, or documents prepared by or provided to, Dechert (or any third party providers) which have been (or will be) shared with RAK Development, as successor client.
>
> We will prepare a common interest agreement to be entered into by RAK IDO and RAK Development that will address the issue of legal professional privilege and its preservation in the context of the transfers noted above (including in relation to pre-transfer work undertaken by third party advisers). In particular, the agreement will formally reflect and confirm the common interest privilege which exists in relation to all relevant RAK parties."

25. The 2014 Engagement Letter specifies that Mr Gavin Watson, a partner in the Dubai office of Dechert, would be responsible for overseeing the firm's relationship with RAK Development and all of the firm's work in relation to the active mandates set out in Annex A to the 2014 Engagement Letter, which is fully redacted in the version in the hearing bundle. The core team dedicated to advising RAK Development on each of these matters would consist "primarily (though not exclusively)" of the lawyers identified in Annex B.

26. The 2014 Engagement Letter was signed on behalf of RAK Development by the Ruler.

27. The three individual defendants to the Al Sadeq Proceedings are all former partners (members) of Dechert LLP and solicitors of the Senior Courts of England and Wales. Although the engagement was accepted by the Dubai office of Dechert, it was principally carried out by partners of Dechert LLP and solicitors working under their supervision. It is common ground that, in respect of the allegations of Mr Al Sadeq, the acts of each individual defendant are attributable to Dechert LLP.

28. Mr Gerrard was a partner of Dechert LLP at the relevant time, having joined the firm in 2011 from the law firm DLA Piper. He retired as a partner of Dechert LLP on 31 December 2020. He was formerly the global co-head of Dechert's white collar and securities litigation practice and was lead partner for the Investigation. The 2013 Engagement Letter specified that Mr Gerrard would lead the Dechert team undertaking the mandate and be responsible for overall supervision. The 2014 Engagement Letter specified (in Annex B) that his primary focus would be oversight of all investigative and litigation matters undertaken for RAK Development under that engagement.

29. Mr Hughes is a former partner of Dechert LLP, having joined Dechert LLP in mid-September 2014. On the defendants' case, he first became involved in the Investigation

in or around September 2015. In June 2017, Mr Hughes moved to Stewarts Law LLP, where he was a partner until his retirement in October 2021.

30.    Ms Black was a partner of Dechert LLP. She joined the firm as a Senior Associate some time in 2011 from DLA Piper, becoming a partner of Dechert LLP on 1 January 2015. According to Mr Allen's evidence, her involvement in the Investigation decreased over time, and she had minimal involvement from the start of 2016. She was named in the 2013 Engagement Letter as a Senior Associate who would be a member of the team carrying out the mandate and in the 2014 Engagement Letter (in Annex B) as a Senior Associate whose primary focus would be oversight of all investigative and litigation matters under that engagement. I understand that Ms Black left Dechert LLP in February 2023.

31.    Mr Al Sadeq contends that the defendants committed serious wrongs against him in the course of their work on the Investigation, including being responsible for (i) his unlawful arrest in and abduction from his home in Dubai, (ii) his extended detention in unlawful and degrading conditions, (iii) his being tortured, and (iv) his being denied proper legal representation. He also claims that the defendants sought to draw, and to a degree succeeded in drawing, false confessions from him. Mr Al Sadeq's claim is brought under UAE law, alleging breaches of the UAE constitution and UAE criminal legislation, as well as various breaches of his human rights. Mr Al Sadeq also accuses the defendants of attempting to interfere with the preparation of his claim.

32.    Mr Quzmar, who is also a Jordanian citizen and a Jordanian-qualified lawyer, formerly worked as a legal advisor to the Ruler and served as a judge and member of the Supreme Judicial Council of RAK. He makes similar allegations to those identified in [31] above against Dechert LLP and Mr Gerrard, but not against Mr Hughes or Ms Black.

*The Privilege Application and the defendants' disclosure exercise and process for claiming privilege*

33.    Ms Tamara Oppenheimer KC, for Mr Al Sadeq, explained that the Privilege Application was made by Mr Al Sadeq because of concerns about the nature of the disclosure exercise and the process for claiming privilege carried out by the defendants. Mr Al Sadeq's legal team are concerned that the applications of the principles relevant to legal professional privilege have gone wrong in some fundamental respects. That is why Mr Al Sadeq seeks an order setting out the correct principles and also an order that a re-review be conducted by counsel applying those principles.

34.    Mr Allen addressed the defendants' disclosure exercise in his third witness statement, supplementing and updating that evidence in his ninth witness statement. He also set out the defendants' approach to the various privilege questions raised by the disclosure exercise. According to Mr Allen:

i)     The main body of the defendants' standard disclosure was given on 21 May 2021 with simultaneous inspection. This comprised 2,297 documents disclosed in their entirety, 1,024 disclosed in redacted form, and 7,532 documents entirely withheld for privilege. Mr Allen commented that it was not surprising that the majority of the documents would be withheld for privilege in a case involving proceedings against solicitors, arising out of their work as solicitors, in

circumstances where their former clients did not agree to waive their privilege over their documents.

ii)     Since 21 May 2021, additional disclosure had been given by the defendants in response to requests from Mr Al Sadeq and agreed directions made at or subsequent to the hearings in July 2021 and November 2021. The defendants also gave additional disclosure following the discovery of some errors since the giving of standard disclosure. None of these errors was unusual or unexpected given the scale of the disclosure exercise. The suggestions by Mr Tsiattalou in his sixth and ninth witness statements that the process of disclosure was "piecemeal" or gave rise to "very serious concerns" were rejected. In any event, any such concerns, even if well-founded, were irrelevant to the issues raised by the Privilege Application.

iii)    Mr Al Sadeq's suggestion that it was in any way inappropriate that the informational technology (IT) team at Dechert should have been used to carry out e-searches using the agreed words was also rejected. While Dechert-UK is a defendant, it is only a defendant on the basis that it is legally responsible for the alleged conduct of the individual defendants, none of whom were involved in the e-searches. There was no basis for suggesting that Dechert-UK's IT team would not perform the e-searches properly and in good faith or would be improperly influenced by the firm or any of the individual defendants in doing so. In fact, it was appropriate for Dechert-UK's IT team to be conducting the e-searches and not Enyo Law given that both Dechert-UK and Enyo Law are litigation firms doing confidential and privileged work for a variety of clients and potentially on opposite sides in cases unrelated to this one.

iv)     Because it was realised early on that a large proportion of the disclosure was likely to engage legal professional privilege, an experienced review team was set up, comprised of five Enyo Law associates and one junior counsel, under the supervision of Mr Allen. During the course of the review, the team held daily calls, during which specific issues were discussed, queries raised, and Mr Allen's input sought. Sometimes advice was sought from the wider counsel team, including leading counsel.

v)      The review process involved Allen & Overy LLP ("A&O"), who represent Dechert's clients, RAK IDO and RAK Development, and also RAKIA, for whom Dechert had acted on an earlier matter, these three entities being the relevant privilege holders ("the Dechert Clients"). None of the Dechert Clients have agreed to waive their privilege. A&O's role in the review process was to ensure that privilege was not mistakenly waived.

vi)     The review team adopted a five-stage process in relation to each document, the last three stages being concerned with privilege, and the final stage specifically with the iniquity exception. The stages were as follows:

a)      Stage 1: does the document relate to any of the issues in dispute?

b)      Stage 2: does the document meet the test for standard disclosure under CPR r 31.6?

c)    Stage 3: is the document *prima facie* subject to legal professional privilege?

d)    Stage 4: if the document is *prima facie* subject to legal professional privilege, are any parts of it unprivileged so that a redacted version can be produced?

e)    Stage 5: if the document is *prima facie* privileged, does the iniquity exception apply?

vii)    During the course of the original review process, the review team concluded that all of the documents that were subject to privilege were subject to litigation privilege and no documents were at that stage identified as subject only to legal advice privilege.

viii)    In assessing at Stage 3 whether a document was created for the sole or dominant purpose of litigation, the review team considered the contents of the document and its context. Mr Allen set out a table in his third witness statement identifying different pieces of pending, existing, or reasonably contemplated litigation and the date from when the defendants' legal team considered that such litigation was in reasonable contemplation. He set out an updated version of the table in his ninth witness statement ("the Litigation Privilege Table").

ix)    The review team described material that was not confidential, and therefore not capable of attracting privilege, as "primary material" ("Primary Material"). Examples of Primary Material included records of discussions with Mr Al Sadeq or his legal representatives or with third parties such as Mr Al Sadeq's wife. It also included records of court proceedings and descriptions of the conditions in which Mr Al Sadeq was detained.

x)    In assessing at Stage 4 whether a document that was *prima facie* privileged could be disclosed on a redacted basis, the review team identified Primary Material in the document and left it unredacted, while redacting the portions that were privileged. Relatively few redactions were made for relevance alone.

xi)    At Stage 5, the review team considered whether the iniquity exception applied, using the test of whether the document was brought into existence for the purpose of furthering an iniquity. The review team was instructed that the categories of conduct arising out of Mr Al Sadeq's allegations that would engage the iniquity exception (if the documents were brought into existence for furtherance of this purpose) included:

a)    kidnapping and extraordinary rendition;

b)    unlawful detention;

c)    torture and inhumane treatment;

d)    denial of legal representation;

e)    threats to Mr Al Sadeq and his family;

     f)      extracting false confession statements;

     g)      unlawful search of Mr Al Sadeq's home and offices; and

     h)      attempts to hamper the preparation of the Al Sadeq Proceedings.

xii)     In considering whether a document was brought into existence for the purpose of furthering any of the above categories of iniquitous conduct, the review team considered the purpose of the relevant Dechert Client(s) and the purpose of the defendants. The review team did not identify any documents to which the iniquity exception applies in relation to any of the above categories of iniquitous conduct or any other category of iniquity.

35.     The defendants have provided to Mr Al Sadeq an Excel spreadsheet that lists each document over which privilege is claimed, in whole or in part. Mr Allen referred to this in his evidence as the "Privilege Log". He considered that it was unusual for this level of detail to be provided as to a claim to privilege. The Privilege Log identified each document by a unique reference number and included information such as the date and time of the document, author and/or sender, primary addressee of the document, and other recipients (included by way of open or blind copy ("cc" or "bcc"). The Privilege Log did not distinguish between legal advice privilege and litigation privilege.

36.     Mr Allen said that if the review team identified that a document was subject to litigation privilege, it did not go on to consider whether the document was also potentially subject to legal advice privilege. This was a pragmatic decision taken to save the time and cost that a separate consideration of legal advice privilege would have entailed.

37.     Therefore, when the defendants gave their standard disclosure, they did not withhold any documents solely on the ground that they were subject to legal advice privilege. In his ninth witness statement, Mr Allen noted that a few documents forming part of the defendants' supplemental disclosure were withheld only on the ground of legal advice privilege.

38.     The defendants have also provided to Mr Al Sadeq a log of the redacted documents, identifying each document by its unique reference number and indicating the reason for the redaction, being either litigation privilege, legal advice privilege, without prejudice communication, or relevance. Mr Allen referred to this in his evidence as the "Redactions Log".

*Legal professional privilege – general principles*

39.     In the words of Lord Hoffmann in *R (Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2003] 1 AC 563 (HL) at [7], legal professional privilege is:

> "… a fundamental human right long established in the common law. It is a necessary corollary of the right of any person to obtain skilled advice about the law. Such advice cannot be effectively obtained unless the client is able to put all the facts before the adviser without fear that they may afterwards be disclosed and used to his prejudice."

40.     Lord Taylor of Gosforth in *R v Derby Magistrates' Court, ex p B* [1996] 1 AC 487 (HL) at 507-509 said:

> "The principle which runs through all these cases, and the many other cases which were cited, is that a man must be able to consult his lawyer in confidence, since otherwise he might hold back half the truth. The client must be sure that what he tells his lawyer in confident will never be revealed without his consent. Legal professional privilege is thus much more than an ordinary rule of evidence limited in its application to the facts of a particular case. It is a fundamental condition on which the administration of justice as a whole rests.
>
> …
>
> But it is not for the sake of the applicant alone that the privilege must be upheld. It is in the wider interests of all those hereafter who might otherwise be deterred from telling the whole truth to their solicitors. For this reason I am of the opinion that no exception should be allowed to the absolute nature of legal professional privilege, once established."

41.     Legal professional privilege is a single integral privilege whose sub-heads are legal advice privilege and litigation privilege: *Three Rivers District Council v Governor and Company of the Bank of England (No 6)* [2004] UKHL 48, [2005] 1 AC 610 (HL) at [105] (Lord Carswell); see also Bankim Thanki QC (ed), *The Law of Privilege* (3rd edition) ("*Thanki on Privilege*"), paragraphs 1.09-1.10.

42.     Lord Scott of Foscote in *Three Rivers (No 6)* at [24]-[26] summarised the key features of legal advice privilege as follows:

i)      it arises out of a relationship of confidence between lawyer and client, so unless the communication or document for which privilege is sought is a confidential one, legal advice privilege does not arise;

ii)     when it applies, it is absolute and cannot be overridden by some supposedly greater public interest, but it can be waived by the person entitled to the privilege and it can be overridden by statute; and

iii)    it gives the person entitled to it the right to decline to disclose or to allow to be disclosed the confidential communication or document in question.

43.     In *Three Rivers (No 6)* at [25], which is summarised at [42(ii)] above, Lord Scott referred to legal professional privilege, and not only legal advice privilege, as absolute, although he was otherwise, in that passage (at [24]-[26]), concerned only with legal advice privilege. At [27], he went on to discuss the "undoubted relationship" between legal advice privilege and litigation privilege:

> " … Legal advice is frequently sought or given in connection with current or contemplated litigation. But it may equally well be sought or given in circumstances and for purposes that have

nothing to do with litigation. *If it is sought or given in connection with litigation, then the advice would fall into both of the two categories.* …" (emphasis added)

44. *Thanki on Privilege* at paragraph 1.10, footnote 44, suggests that the sentence I have highlighted in the speech of Lord Scott is an error, inconsistent with the correct classification adopted in *Three Rivers (No 6)* by Lord Rodger at [50]-[51] and by Lord Carswell at [65].

45. At paragraph 1.11, *Thanki on Privilege* says:

"Despite the common misperception that litigation privilege covers all communications once litigation is in contemplation, litigation privilege has no application to communications between lawyer and client: these will always fall within the realm of legal advice privilege."

46. In a footnote to this passage, *Thanki on Privilege* comments that this misperception "is unfortunately persisted in by the courts, despite the clear classification provided by the House of Lords in" *Waugh v British Railways Board* [1980] AC 521 (HL) at 541-542 (Lord Edmund-Davies), *Re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16 (HL) at 24-25 (Lord Jauncey), and *Three Rivers (No 6)* at [50]-[51] (Lord Rodger) and at [65] (Lord Carswell).

47. This view is not universally shared. In *Property Alliance Group Ltd v Royal Bank of Scotland plc* [2015] EWHC 1557 (Ch), [2016] 1 WLR 361 (Ch D) at [49], Birss J commented:

"… a review of the cases and textbooks cited to me shows that it would not be unreasonable for a lawyer to approach claims to privilege on the basis that the litigation privilege and legal advice privilege overlap. Some textbook authors say that they are mutually exclusive while others do not treat the two concepts that way. Compare *The Law of Privilege*, 2nd ed (2011), ed Bankim Thanki QC, paras 1-11 to 1-13, (citing *Waugh v British Railways Board* [1980] AC 521, *In re L* [1997] AC 16 and the *Three Rivers District Council (No 6)* case with Hollander, *Documentary Evidence*, 12th ed (2015), para 18-01. The textbook Passmore, *Privilege*, 3rd ed (2013) points out the clear distinction between the two drawn by Lord Edmund-Davies in *Waugh v British Railways Board* but notes that others have not drawn such a clear distinction, referring to Lord Scott of Foscote in the *Three Rivers District Council (No 6)* case, para 27 and other judgments. …"

48. Birss J went on to say that, had this distinction mattered in that case, he would have considered the primary authorities rather than the commentaries, however he did not consider that it did matter. Respectfully, I take a similar approach. As I have already noted, the defendants have approached disclosure on the basis that there is an overlap between the categories of legal advice privilege and litigation privilege and that

therefore, for pragmatic reasons, it was not necessary to consider legal advice privilege separately in relation to any document where litigation privilege applied.

49.     Although Mr Al Sadeq objects to the defendants' approach to litigation privilege on other grounds, it appears that he no longer objects to the defendants' approach on the basis that legal advice privilege and litigation privilege are mutually exclusive, as discussed by Mr Allen in his ninth witness statement at paragraphs 118-120.

50.     Legal professional privilege belongs to the client and not to its lawyer or agent, and only the client can waive it: *Derby Magistrates* at 504-505 (Lord Taylor); *Thanki on Privilege*, paragraph 1.35. The lawyer is under a professional obligation to assert the privilege on behalf of its client unless it has been waived: *R v Central Criminal Court, ex p Francis & Francis* [1989] 1 AC 346 (HL) at 383F (Lord Griffiths); *Nationwide Building Society v Various Solicitors* [1999] PNLR 52 (Ch D) at 69 (Blackburne J); *Winterthur Swiss Insurance Company v AG (Manchester) Ltd (in Liquidation)* [2006] EWHC 839 (Comm) at [65], [69] (Aikens J); Paul Matthews and Hodge M Malek QC, *Disclosure* (5th ed) ("*Matthews and Malek on Disclosure*"), paragraph 11.10.

51.     No adverse inference may be drawn from the assertion by a person of a claim to legal professional privilege: *Wentworth v Lloyd* (1864) 10 HLC 589 at 590-592; *Sayers v Clarke Walker* [2002] EWCA Civ 910 at [16] (Brooke LJ); *Thanki on Privilege*, paragraph 1.41.

52.     If a document is subject to legal professional privilege, then, unless the privilege is waived by the client or the document ceases to be confidential, it is privileged forever: *Calcraft v Guest* [1898] 1 QB 759, 761 (CA) (Sir Nathaniel Lindley MR); *Thanki on Privilege*, paragraph 1.68 and ch 5 (passim).

53.     In *West London Pipeline and Storage Ltd v Total UK Ltd* [2008 EWHC 1729 (Comm), [2008] 2 CLC 258 at [86], Beatson J summarised the law relating to challenges to claims of legal professional privilege as follows:

> "86.     …
>
> (1)     The burden of proof is on the party claiming privilege to establish it … . A claim for privilege is an unusual claim in the sense that the party claiming privilege and that party's legal advisers are, subject to the power of the court to inspect the documents, the judges in their or their own client's cause. Because of this, the court must be particularly careful to consider how the claim for privilege is made out and affidavits should be as specific as possible without making disclosure of the very matters that the claim for privilege is designed to protect … .
>
> (2)     An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in an affidavit are not determinative and are evidence of a fact which may require to be independently proved … .

(3)     It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:

(a)     the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed … .

(b)     the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect … .

(c)     the other evidence before the court that the affidavit is incorrect or incomplete on the material points … .

(4)     Where the court is not satisfied on the basis of the affidavit and the other evidence before it that the right to withhold inspection is established, there are four options open to it:

(a)     It may conclude that the evidence does not establish a legal right to withhold inspection and order inspection … .

(b)     It may order a further affidavit to deal with matters which the earlier affidavit does not cover or on which it is unsatisfactory … .

(c)     It may inspect the documents … . Inspection should be a solution of last resort, in part because of the danger of looking at documents out of context at the interlocutory stage. It should not be undertaken unless there is credible evidence that those claiming privilege have either misunderstood their duty, or are not to be trusted with the decision making, or there is no reasonably practical alternative.

(d)     At an interlocutory stage a court may, in certain circumstances, order cross-examination of a person who has sworn an affidavit, for example, an affidavit sworn as a result of the order of the court that a defendant to a freezing injunction should disclose his assets … . However, the weight of authority is that cross-examination may not be ordered in the case of an affidavit of documents … . In cases where the issue is whether the documents exist … the existence of the documents is likely to be an issue at the trial and there is a particular risk of a court at an interlocutory stage impinging on that issue."

54.    This passage is described in *Thanki on Privilege* at paragraph 4.126 as "for the moment [providing] the definitive and comprehensive guidance in this area". It has been followed in subsequent cases: see, for example, *Starbev GP Ltd v Interbrew Central European Holding BV* [2013] EWHC 4038 (Comm) at [13]; and *Property Alliance Group* at [17]-[18]. The Court of Appeal considered this guidance in *WH Holding Ltd v E20 Stadium LLP* [2018] EWCA Civ 2652, setting out at [35] the same quotation in full that I have set out at [53] above. While for the most part implicitly endorsing that guidance, the Court of Appeal considered that Beatson J was wrong to say that the court must be "reasonably certain" before concluding that the court may inspect a document to consider whether the right to withhold it on the ground of privilege is established. The Court of Appeal considered that that was too narrow a test. The court's power to inspect a document is a matter of general discretion. See *WH Holding Ltd* at [39]-[41].

55.    As to which communications between a client and a lawyer are protected by legal advice privilege in a case where the client is a legal person such as a company, rather than a natural person, the Court of Appeal decided in *Three Rivers District Council v Governor and Company of the Bank of England (No 5)* [2003] QB 1556 (CA), that only those communications passing between a lawyer and a person at the client who is authorised, expressly or impliedly, by the client to give instructions to obtain legal advice and/or to receive and/or act on legal advice will attract legal advice privilege.

56.    The House of Lords refused the Bank of England's petition for permission to appeal in *Three Rivers (No 5)* and subsequently declined the opportunity in *Three Rivers (No 6)* to express a view on the correct approach to determining whether a communication between an employee and the employer's lawyers should be treated as a communication protected by legal advice privilege. This was despite the fact that the House had received written submissions that addressed the correctness of the Court of Appeal's decision in *Three Rivers (No 5)*. The issue did not arise for decision in that case and therefore anything that the House said on the point would have been *obiter*.

57.    The decision in *Three Rivers (No 5)* has been controversial and criticised as too restrictive, including *obiter* criticism in subsequent appellate decisions. The defendants confirmed during the course of the hearing that they recognised the decision was binding on this court (albeit the defendants contend that it was wrong), but they contended that it had not been relevant to their existing disclosure and would only potentially become relevant if Mr Al Sadeq's litigation privilege challenge succeeded. For his part, Mr Al Sadeq did not accept that the defendants' disclosure review had been conducted in accordance with *Three Rivers (No 5)*, in particular, having regard to paragraphs 144-146 of Mr Allen's ninth witness statement, which included the following (at paragraph 146):

> "… I do not accept that legal advice privilege only extends to communications with individuals within Dechert's Clients who were authorised to seek or receive legal advice on behalf of Dechert's Clients."

*Challenges based on the iniquity exception*

58.    Mr Al Sadeq contends that the defendants are not permitted to claim privilege over documents that fall within one or more of three categories of conduct set out in

paragraph 1 of the Draft Order, as such documents are excluded from legal professional privilege by the iniquity exception.

59.    Paragraph 1 of the Draft Order reads as follows:

"1.    The Defendants shall not be entitled to withhold from inspection any documents or parts thereof which have been generated by or report on the following categories of conduct:

1.1    The detention of Mr Al Sadeq in Dubai on 5 September 2014, his rendition to Ras-Al-Khaimah and subsequent detention in the following locations (as defined in the Amended Particulars of Claim):

(a)    GHQ;

(b)    Al Barirat;

(c)    The Prison Villa;

(d)    RAK Central Prison.

1.2    The conditions in which Mr Al Sadeq was detained in the locations identified at paragraph 1.1 above;

1.3    Mr Al Sadeq's access to legal representation during his detention in Ras-Al-Khaimah."

60.    The defendants say that the direction sought by Mr Al Sadeq should be refused as it sets out the wrong test. The correct test is, simply, whether a document was brought into existence for the purpose of furthering a criminal or fraudulent purpose. A test based on whether the document is generated by or reports on conduct falling within one of the relevant categories is far too broad.

61.    Mr Allen, in his third and ninth witness statements, set out how the defendants conducted their disclosure exercise, how they determined whether legal professional privilege applied *prima facie* to a document, and whether, in such a case, the iniquity exception applied. Mr Allen considered that the defendants' legal team had applied the correct test, as set out in the relevant authorities, and he stated that no documents were identified to which the iniquity exception applied.

62.    Mr Al Sadeq's reply to this is, in a nutshell, that the defendants are eliding two separate questions. The first question is whether the iniquity exception is engaged. If the iniquity exception is engaged, the second question is which documents should be ordered to be disclosed as a result. Paragraph 1 of the Draft Order is concerned only with this second question. The approach taken by the defendants is, therefore, impermissibly narrow.

63.    It is common ground that the following passage from *Thanki on Privilege* at paragraph 4.37 accurately summarises the law relating to the iniquity exception:

> "Probably the most important and well-known exception to legal professional privilege is the crime/fraud exception. The exception provides that there is no privilege in documents or communications which are themselves part of a crime or fraud. As set out further below, there has been a tendance more recently to refer to this principle as the 'iniquity exception' in the light of certain cases which arguably suggest that the type of conduct required for the exception to apply may fall short of crime or fraud."

64. The most important early case on the iniquity exception to legal professional privilege is *R v Cox and Railton* [1884] 14 QBD 153, in which Stephen J gave judgment on behalf of a ten judge court. Having first discussed the question of "the privilege of legal advisers" by reference to the decision of Lord Brougham, the Lord Chancellor, in *Greenough v Gaskell* (1833) 1 My & K 98, 39 ER 618. Stephen J then went on in *Cox and Railton* at 167 to state as follows:

> "The reason on which the [privilege] rule is said to rest cannot include the case of communications, criminal in themselves, or intended to further any criminal purpose, for the protection of such communications cannot possibly be otherwise than injurious to the interests of justice, and to those of the administration of justice. Nor do such communications fall within the terms of the rule. A communication in furtherance of a criminal purpose does not 'come into the ordinary scope of professional employment.' "

65. There is some discussion in the cases and commentaries (see, for example, *Thanki on Privilege*, paragraph 4.41 and related footnotes) as to whether the iniquity exception is, properly speaking, an exception to legal professional privilege or, instead, defines a class of communications that do not come within the scope of legal professional privilege (as suggested by the excerpt at [64] above from *Cox and Railton*). For present purposes, the distinction has no practical significance, and therefore I will continue to refer to it as the iniquity "exception".

66. *Cox and Railton* was a criminal case, but it has always been recognised that the iniquity exception applies also to civil cases: *Kuwait Airways Corporation v Iraqi Airways Company (No 6)* [2005] EWCA Civ 286, [2005] 1 WLR 2734 (CA) at [25].

67. As to the range of conduct that may fall within the scope of the iniquity exception, Popplewell J in *JSC BTA Bank v Ablyazov* [2014] EWHC 2788 (Comm), [2014] 2 CLC 263, having considered various authorities, said at [68]:

> "The principle is not confined to criminal purposes, but extends to fraud or other equivalent underhand conduct which is in breach of a duty of good faith or contrary to public policy or the interests of justice."

For this reason, as noted by *Thanki on Privilege*, the term "iniquity exception" is often preferred (as it is in this judgment) to the terms "crime/fraud exception" and "fraud exception", which are also commonly used in cases and commentaries.

68. The iniquity exception applies to litigation privilege as well as to legal advice privilege: *Kuwait Airways (No 6)* at [31].

69. The application of the iniquity exception does not depend on the conduct of the lawyer or on the lawyer's having knowledge of the iniquity. In *Banque Keyser Ullman SA v Skandia (UK) Insurance Company Limited* [1986] 1 Lloyd's Rep 336, at 337 Parker LJ said:

> "… legal professional privilege does not arise in respect of documents which are in themselves part of a criminal or unlawful fraudulent proceeding or, if it be different, communications made in order to get advice for the purpose of carrying out a fraud, and that this is so whether the solicitor was or was not ignorant of the fact that he is being used for that purpose."

70. The principle can also arise where the iniquitous purpose is possessed by neither the client nor the lawyer, but the client is being used as an "innocent tool" of a third party to perpetrate a crime or fraud: *Ex p Francis & Francis* at 396E-G (Lord Goff of Chieveley).

71. Given the fundamental importance of legal professional privilege as highlighted, for example, by the authorities cited at [39]-[40], it is unsurprising that the iniquity exception will only be applied in an exceptional case; the court will be slow to deprive a defendant of the privilege, particularly, on an interlocutory application: *Cox and Railton* at 176; *Buttes Gas and Oil Co v Hammer (No 3)* [1981] 1 QB 223 (CA), at 246G (Lord Denning) and 252D (Donaldson LJ); *Thanki on Privilege*, paragraphs 4.43 and 4.75.

72. As a general matter, there is some uncertainty as to the full scope of the types of conduct that could fall within the scope of the iniquity exception, which, as noted in *Thanki on Privilege*, can include conduct falling short of crime or fraud. In this case, however, it is common ground that the categories of conduct set out by Mr Allen in paragraph 52 of his fourth witness statement, which I have listed above at [34(xi)], which arise out of Mr Al Sadeq's allegations, would engage the iniquity exception in relation to a document if that document were brought into existence for the furtherance of conduct falling within that category.

73. The question arises as to how to determine whether a particular communication is in furtherance of an iniquitous purpose, falling within the iniquity exception, or is instead a communication by which a client properly seeks legal advice in relation to past iniquitous conduct. Popplewell J considered this in *Ablyazov*, and gave the following guidance at [76] and [93]:

> "76. Where is the line to be drawn between 'the ordinary run of cases' in which privilege attaches to communications with a solicitor by a client with a view to advancing a knowingly false case, and the conduct in *Kuwait Airways (No. 6)*? The answer lies, in my view, in a focus on three aspects of legal professional privilege and the iniquity exception. The first is that legal professional

privilege attaches to communications between solicitor and client which are confidential. The quality of confidence is a prerequisite to the privilege, because it is the protection of such confidence which forms the bedrock of the rationale for the privilege as essential to the administration of justice. Secondly, communications made in furtherance of an iniquitous purpose negate the necessary condition of confidentiality. It is this which prevents legal professional privilege attaching to communications for such purpose. Thirdly, the reason that communications in furtherance of iniquity lack the necessary quality of confidentiality is that communications can only attract the confidence if they are made in the ordinary course of professional engagement of a solicitor. It is the absence or abuse of the normal relationship which arises where a solicitor is rendering a service falling within the ordinary course of professional engagement which negates the necessary confidentiality and therefore the privilege. The 'ordinary run of cases' involve no such abuse: a solicitor instructed to defend his client of a criminal charge performs his proper professional role in advancing what the client knows to be an untrue case.

…

93.     I would conclude, therefore, that the touchstone is whether the communication is made for the purposes of giving or receiving legal advice, or for the purposes of the conduct of actual or contemplated litigation, which is advice or conduct in which the solicitor is acting in the ordinary course of the professional engagement of a solicitor. If the iniquity puts the advice or conduct outside the normal scope of such professional engagement, or renders it an abuse of the relationship which properly falls within the ordinary course of such an engagement, a communication for such purpose cannot attract legal professional privilege. In cases where a lawyer is engaged to put forward a false case supported by false evidence, it will be a question of fact and degree whether it involves an abuse of the ordinary professional engagement of a solicitor in the circumstances in question. In the 'ordinary run' of criminal cases the solicitor will be acting in the ordinary course of professional engagement, and the client doing no more than using him to provide the services inherent in the proper fulfilment of such engagement, even where in denying the crime the defendant puts forward what the jury finds to be a bogus defence. But where in civil proceedings there is deception of the solicitors in

order to use them as an instrument to perpetrate a substantial fraud on the other party and the court, that may well be indicative of a lack of confidentiality which is the essential prerequisite for the attachment of legal professional privilege. The deception of the solicitors, and therefore the abuse of the normal solicitor/client relationship, will often be the hallmark of iniquity which negates the privilege."

74.    As to the strength of the case that a claimant must show in order to establish, in relation to a document, that it is part of iniquitous conduct or seeks/gives legal advice about how to facilitate the commission of iniquitous conduct, Vinelott J in *Derby & Co Ltd v Weldon (No 7)* [1990] 1 WLR 1156 (Ch D) at 1173 noted that " … every case must be judged on its own facts. … There is a continuous spectrum, and it is impossible to, as it were, calibrate or express in any simple formula the strength of the case that the plaintiff must show … ."

75.    The general position, however, appears to be that at least a strong *prima facie* case is needed. In *Kuwait Airways (No 6)* at [36]-[37], [42], Longmore LJ said the following:

"36.    … courts will be cautious about ordering disclosure or inspection of … documents [that further a fraud or criminal purpose]. That caution has two aspects: (1) it may be unfair to a defendant to make such an order if all that is shown on the evidence is a prima facie case which may turn out on full investigation to be incorrect and (2) it may be unfair in what Glidewell LJ in the Snaresbrook case [1988] QB 532, 538 called the ordinary run of cases (such as cross−allegations of assault or drivers falsely saying they were driving on the correct side of the road) to order disclosure and inspection merely because communications with a party's solicitors 'are untrue and would, if acted upon, lead to the commission of the crime of perjury' – per Lord Goff of Chieveley in *R v Central Criminal Court, Ex p Francis & Francis* [1989] AC 346, 397.

37.    These two reasons for caution are, of course, somewhat interdependent. If all one has is disputed versions of events, it will be difficult to say that there is even a prima facie case of fraud. This will be particularly so if the disputed version of events is the very same issue that is to be tried in the proceedings. If, however, the evidence of crime or fraud is free−standing and independent and particularly if its evaluation 'does not require any judgment to be reached in relation to the issues to be tried' (per Rose LJ in the *Hallinan* case [2005] 1 WLR 766, 771) it may be perfectly possible, even on a prima facie case basis, to decide whether the fraud exception applies.

…

42.     I would therefore summarise the position thus: (1) the
        fraud exception can apply where there is a claim to
        litigation privilege as much as where there is a claim to
        legal advice privilege; (2) nevertheless it can only be
        used in cases in which the issue of fraud is one of the
        issues in the action where there is a strong (I would
        myself use the words 'very strong') prima facie case of
        fraud, as there was in *Dubai Aluminium Co Ltd v Al-
        Alawi* [1999] 1 WLR 1964 and there was not in
        *Chandler v Church* 137 NLF 451; (3) where the issue of
        fraud is not one of the issues in the action, a prima facie
        case of fraud may be enough as in the *Hallinan* case
        [2005] 1 WLR 766."

76.  In *Dubai Aluminium Co Ltd v Al-Alawi* [1999] 1 WLR 1964 (QBD), Rix J ordered that
     the iniquity exception applied so that reports and other documents relating to the
     investigation by agents of the plaintiff into the financial affairs of the defendant were
     not, in the hands of the plaintiff, protected by legal professional privilege. He found
     that there was a strong *prima facie* case of criminal or fraudulent conduct in the
     obtaining of information relating to the defendant's finances by the plaintiff's agents.
     He concluded at 1969F that:

     "… criminal or fraudulent conduct for the purposes of acquiring
     evidence in or for litigation cannot properly escape the
     consequence that *any documents generated by or reporting on
     such conduct* and which are relevant to the issues in the case are
     discoverable and fall outside the legitimate area of legal
     professional privilege." (emphasis added)

77.  Ms Oppenheimer made the following preliminary points in relation to this part of the
     Privilege Application:

     i)     it is common ground that the types of conduct set out in paragraph 52 of
            Mr Allen's fourth witness statement (which I have set out at [34(xi)] above), to
            the extent that they fall within one of the categories set out in paragraph 1 of the
            Draft Order, would be conduct capable of engaging the iniquity exception;

     ii)    the defendants' pleaded case does not involve any positive denial that such
            conduct occurred;

     iii)   this part of the Privilege Application focuses on discrete aspects of the factual
            background where a combination of the absence of a positive case by the
            defendants and the presence of corroborating material in the defendants'
            disclosure to date enables Mr Al Sadeq to meet the evidential threshold for
            establishing that the iniquity exception is engaged;

     iv)    Mr Al Sadeq's case does not require the court to make any findings about the
            defendants' knowledge or involvement in the relevant iniquitous conduct, which
            will be a matter for trial, as the court need only be concerned with the conduct

of the privilege-holder (or, where the privilege-holder is being used as an innocent tool by an iniquitous third party, the conduct of the third party); and

v) the relevant iniquitous conduct in this case arose during the course of a prior transaction, namely, the Investigation, and not in the context of the defendants' defence to this claim, which means that the court need not be concerned that there is a risk of disclosure of documents concerning the defence of the claim.

78. In relation to the evidential threshold, Ms Oppenheimer said that it was common ground that Mr Al Sadeq needed to demonstrate at least a *prima facie* case of iniquitous conduct. She acknowledged that some authorities supported the proposition that, where the allegation of iniquity is one of the issues in the case, then the relevant standard is a strong or very strong *prima facie* case. However, on an analysis of those authorities, it was clear that the policy underlying that higher standard did not apply in this case.

79. Having regard, for example, to *Kuwait Airways (No 6)* at [36], Ms Oppenheimer submitted that the rationale for a higher standard (strong or very strong) arose from two factors: (i) potential unfairness to the defendant if an allegation based only on a *prima facie* case was eventually shown to be unfounded and (ii) potential unfairness if a defendant was required to disclose communications with their solicitors generated in preparing their defence. The first of these rationales would not apply (or not with the same force) if the overlap between the iniquity and an issue in the proceedings was not determinative of the defendant's liability. The second rationale would not apply where the iniquity concerns a prior transaction rather than the conduct of the proceedings. In support of these propositions, Ms Oppenheimer referred to *Chandler v Church* (1987) 137 NLJ 451 (Ch D) (Hoffman J), *Trustee of the Estate of Omar (a Bankrupt) v Omar* [2000] BCC 434 (Ch D) at 439-440 (Jacob J), and *Dadourian Group International Inc v Simms* [2008] EWHC 1784 (Ch) at [136]-[137] (Patten J).

80. Ms Oppenheimer submitted that, in this case, the iniquitous conduct alleged is not determinative of the defendants' liability because it is quite possible that the defendants could succeed in dissociating themselves from the wrongdoing to a sufficient extent so as to escape liability under UAE law. She further submitted that all the disclosure sought comprises historic documents relating to matters arising out of the Investigation and not to the defendants' defence of this claim. Therefore, the relevant evidential threshold that Mr Al Sadeq needs to surmount in this case is only a *prima facie* case.

81. Ms Oppenheimer submitted that, the iniquity having been established to the relevant threshold, the next issue to determine is the scope of documents falling within the exception. This is done by identifying those documents that were "generated by or report on" the relevant iniquitous conduct. In support of this proposition, she relied on the passage in the *Dubai Aluminium* case at 1969F, which I have set out at [76] above. This approach has been followed in other cases, she submitted, without criticism, and is supported by Charles Hollander QC, *Documentary Evidence* (13th edition) ("*Hollander on Documentary Evidence*") at paragraph 25-16. It was applied by Mr Richard Spearman QC, sitting as a Deputy High Court Judge, in *Gerrard v Eurasian Natural Resources Corporation Ltd* [2020] EWHC 3241 (QB) at [125(5)] and [162], a case involving Mr Gerrard as claimant.

82. Ms Oppenheimer submitted that the defendants' approach to determination of scope, simply relying on the words "in furtherance of", led to an impermissibly narrow

application of the test. It would be a rare case where a lawyer-client communication actually did, or was intended to, further a crime, especially where the lawyer was entirely innocent or ignorant of the iniquity. This is clear from the authorities on the iniquity exception.

83. Ms Oppenheimer submitted that, even if the standard is a strong or very strong *prima facie* case, the evidential threshold is surmounted in relation to each of the three areas of iniquity described in paragraph 1 of the Draft Order. She said that this case, in which the allegations of iniquity are met only with non-admissions and no contrary evidence, is akin to other cases where the burden was found to be discharged and the iniquity exception engaged, including at the higher standard of strong *prima facie* case.

84. In support of this proposition, Ms Oppenheimer relied on *O'Rourke v Darbishire* at 633 (Lord Wrenbury), *Derby & Co Ltd v Weldon* at 1173F-G (Vinelott J), *BBGP Managing General Partner Ltd v Babcock & Brown Global Partners* [2011] EWHC 2176 (Ch), [2011] Ch 296 at [62]-[65] (Norris J), *Group Seven Limited v Allied Investments Corporation Limited* [2013] EWHC 1423 (Ch) at [28] (Norris J), *The David Agmashenebeli* [2001] CLC 942 at 945-947 (Colman J), and *Nationwide Building Society* at [75A].

85. Ms Oppenheimer said that Mr Al Sadeq relied on the following categories of evidence to establish that the evidential threshold has been surmounted:

   i)     the documents disclosed to date, regarding which she made various specific submissions;

   ii)    the general background of human rights abuses in RAK as demonstrated by public documents from international bodies and observers, which supported the inherent probability of Mr Al Sadeq's allegations, including in relation to abuses such as arrest without charge, arbitrary detention at the behest of the Ruler, detention incommunicado and otherwise in inhumane conditions, denial of access to legal representation, and other human rights abuses, including criticisms of the human rights situation in RAK by specific reference to the cases of Mr Al Sadeq and Mr Quzmar in publicly available documents, all as summarised in the evidence of Mr Tsiattalou in his sixth witness statement;

   iii)   contemporaneous letters written by Mr Al Sadeq to the Ruler and to Major Al Awadhi, a security official working for the Ruler, concerning his treatment, corroborating important aspects of his allegations;

   iv)    the absence of any positive pleaded case of denial or any documentary evidence served in response to the Privilege Application, from which inferences can properly be drawn, as demonstrated by various cases (see [84] above); and

   v)     the evidence of Dr Al Haddad in his second and third witness statements as to the process by which a criminal investigation and prosecution in RAK ordinarily occurs, the process adopted in the case of Mr Al Sadeq, the position regarding legal professional privilege in RAK, and the absence of any extradition request made in respect of Mr Al Sadeq in the proceedings in RAK or in any of the documents supplied to Dr Al Haddad by the RAK public prosecutor.

86. Ms Oppenheimer then reviewed the evidence that she submitted supported each of the three forms of iniquity reflected in paragraph 1 of the Draft Order. In relation to paragraph 1.1 of the Draft Order, it was significant that no copy of any extradition request for Mr Al Sadeq has been disclosed, nor is there any reference to such a request in any of the materials disclosed.

87. In relation to paragraph 1.2 of the Draft Order, it is common ground that Dr Mitchell found, when he travelled to RAK in October 2015 and inspected the conditions in which Mr Al Sadeq and Mr Quzmar were held at Al Barirat, that those conditions were not compliant with Article 3 of the European Convention on Human Rights. This, together with other documentary evidence referred to by Ms Oppenheimer, was sufficient, she submitted, to establish to the standard of a strong *prima facie* case that the conditions of his detention in all four locations were such as to engage the iniquity principle.

88. In relation to paragraph 1.3, Ms Oppenheimer relied on documentary evidence that she submitted showed that Mr Al Sadeq was denied legal representation until at least April 2015, and that obstacles were put in the way of Dr Al Shamsi's attempts to represent Mr Al Sadeq, which lead ultimately to Dr Al Shamsi ceasing to act for him. This was supported by the background evidence of the human rights situation in RAK in which persons, such as Mr Al Sadeq and Mr Quzmar, involved in criminal cases with a political complexion found themselves denied effective access to legal representation.

89. In response to these submissions, Mr Philip Edey KC, for the defendants, stated that this part of the Privilege Application gives rise to three issues:

    i)   What is the test implicit in the "in furtherance of" the iniquity standard?

    ii)  What is the standard of proof that Mr Al Sadeq would have to meet in order to establish that he was entitled, by reason of the iniquity exception, to see otherwise privileged documents?

    iii) In relation to each of the three categories of iniquity set out in paragraph 1 of the Draft Order, has Mr Al Sadeq established to the necessary standard of proof that the relevant iniquity existed such that a document created "in furtherance of" that iniquity in accordance with the correct test falls within the iniquity exception and must be disclosed?

90. In relation to the first issue, Mr Edey submitted that Mr Al Sadeq is simply wrong about the test that applies. The defendants have applied the correct test on orthodox principles and done so conscientiously, as is clear from the evidence of Mr Allen set out in his third and ninth witness statements.

91. Mr Edey submitted that the second and third issues only arise if the defendants are wrong about the test for determining what is in furtherance of an iniquity for purposes of the iniquity exception. Mr Al Sadeq is wrong to say that a *prima facie* case is sufficient to meet the relevant standard of proof. It is clear that it must be a very strong *prima facie* case, as per the decision of the Court of Appeal in *Kuwait Airways (No 6)*. This is so in this case given the nature of the case, the allegations against the defendants, and the issues thereby raised and also given that the application of the iniquity exception has to be determined on this interlocutory application before the court has decided, in light of all the evidence that will be available at trial, that each relevant iniquity existed.

Furthermore, Mr Edey submitted, the evidence that Mr Al Sadeq seeks to rely on in support of this part of the Privilege Application fails to meet the necessary standard.

92.     Mr Edey submitted that, while it is trite (and common ground) that a document must be "in furtherance of" relevant iniquitous conduct, Mr Al Sadeq has taken the position that a document is "in furtherance of" the iniquitous conduct, for purposes of the iniquity exception, if it is merely "created as a result of, or reporting on" the relevant iniquitous conduct. In the Draft Order Mr Al Sadeq has used the phrase "have been generated by or report on" the relevant iniquitous conduct, which the defendants understand is intended to mean the same thing. This interpretation of the "in furtherance of" test is wrong as a matter of the natural meaning of those words, wrong as a matter of principle, unworkable in practice, and unsupported by, and inconsistent with, the authorities and leading text books.

93.     In relation to the natural meaning of the words "in furtherance of", Mr Edey submitted that the mere fact that a document has been created "as a result of" iniquitous conduct or "reports on it" does not, as a matter of normal usage, mean that it has been brought into existence "in furtherance of" the iniquitous conduct. Otherwise, a document in which a solicitor advises a client that certain iniquitous conduct of the client, regarding which the client has sought advice, amounts to a criminal offence would be caught by Mr Al Sadeq's broad test. This clearly cannot be right.

94.     Mr Edey submitted that "in furtherance of" an iniquity plainly means something else, namely, that the document is created as part of the iniquity or for the purpose of obtaining or giving advice in order to facilitate the iniquity. That is the sense, he submitted, in which the words "in furtherance of" are used in the authorities and text books.

95.     In relation to the question of principle, Mr Edey submitted that Mr Al Sadeq's broad test is inconsistent with the exceptional nature of the iniquity principle, which should not be applied lightly. In any case where iniquitous conduct by a client can be established to the relevant standard, Mr Al Sadeq's test would potentially bring all communications between the client and their lawyer within the iniquity exception since those communications would, self-evidently, be generated by (and most likely, to a degree, report on) the relevant iniquity regarding which the client is seeking the lawyer's advice and assistance. The requirement that there be a very strong *prima facie* would not necessarily provide appropriate protection for the client since in some cases the fact that iniquitous conduct has occurred will be clear (even common ground), for example, where an accused charged with murder accepts that he killed someone unlawfully and is willing to plead to manslaughter.

96.     As to the unworkability of Mr Al Sadeq's proposed test, Mr Edey submitted that:

i)      it is not clear what the "reporting on" limb of the test adds given that any document that "reports" on iniquitous conduct has been created as a result of or generated by that conduct; and

ii)     the suggestion that it is enough that the relevant document was created "as a result of" the iniquity opens a causal inquiry that is almost impossible to conduct sensibly in practice and is likely to lead to unending debate.

97.     Mr Edey submitted that Mr Al Sadeq's test is inconsistent with the relevant authorities, including the leading authorities of *Cox and Railton* and *O'Rourke v Darbishire*. He also submitted that had Mr Al Sadeq's test been correct, various leading cases would have been reasoned or decided differently, including *Banque Keyser Ullmann*, *Ex p Francis & Francis*, *Accident Exchange Ltd v McLean* [2018] EWHC 23 (Comm), [2018] 4 WLR 26 (QB), and *Various Claimants v News Group Newspapers Limited* [2021] EWHC 680 (Ch).

98.     Mr Edey noted that the phrase "generated by or reported on" was used by Rix J in the *Dubai Aluminium* case at 1969F (see [76] above), but he submitted that Rix J was not, in that case, applying the broad test proposed by Mr Al Sadeq. He used that phrase to identify documents that were "in furtherance of" the iniquitous conduct of a private investigator who was alleged to have used illegal means in carrying out his investigation. Such documents were the fruits of the investigator's iniquitous conduct and therefore not protected by privilege even though produced for the purposes of litigation. In other words, they were plainly "part of" the iniquity, being the fruits of it. Mr Edey noted that, as far as the defendants were aware, no authority subsequent to the *Dubai Aluminium* case has applied the test proposed by Mr Al Sadeq, relying on that case.

99.     For these reasons, Mr Edey submitted, this part of the Privilege Application must be refused. It is therefore not necessary and would be inappropriate for the court to go on to consider and express a view about the question that would otherwise have arisen, namely, whether Mr Al Sadeq can establish the relevant iniquities to the requisite standard.

100.    If, however, that question does arise, Mr Edey submitted, then the court should have regard to the following points:

   i)     The statements of Mr Tsiattalou in his evidence and the submissions by Ms Oppenheimer that allegations made by Mr Al Sadeq as to his treatment are "unchallenged" or "not seriously" contested by the defendants is a potentially misleading way of characterising the defendants' position. The fact that the allegations are made does not mean, at this stage, that there is a very strong *prima facie* case that the allegations are true.

   ii)    Whether the alleged iniquities occurred will be key issues at the trial, as can be seen from the agreed Case Summary and List of Issues in the Case, which was in the hearing bundle. See, for example, in Part B of the Summary the issues numbered 5, 6, 7, 8, and 29. The defendants do not admit that the alleged iniquities occurred because they do not know if they occurred. It is not appropriate for the court to form a preliminary view on them now in the absence of evidence meeting the relevant standard. The fact that resolution of the question of whether these iniquities occurred is not necessarily determinative of the liability of the defendants (as Ms Oppenheimer had submitted) does not have the effect of lowering the evidential standard that must apply in relation to a challenge based on the iniquity exception at this stage of the proceedings, namely, a very strong *prima facie* case.

   iii)   The various reports on alleged human rights abuses said to have been committed against other people in the UAE situated in different prisons on which Mr Al

Sadeq is seeking to rely in support of this part of the Privilege Application are of no probative weight for this purpose. They contain multiple hearsay derived from anonymous sources. The accuracy of the reports is outside the defendants' knowledge. The court has no way of assessing the accuracy of those reports, and it should bear in mind the likelihood that they would be strongly refuted by RAK. Furthermore, the allegations in those reports are entirely unconnected to this case.

iv)  The court cannot safely rely for this purpose on documents that Mr Al Sadeq infers were obtained from the hacking of Mr Azima's data, as discussed at paragraph 66 of Mr Tsiattalou's sixth witness statement, particularly where, as pointed out by Mr Allen at paragraph 72(6) of his ninth witness statement, the allegations made in those documents appear to be materially inaccurate even on Mr Al Sadeq's own case. Furthermore, the source of the information contained in the documents is unknown.

v)  Mr Al Sadeq relies heavily on contemporaneous letters written by him to the Ruler of RAK and to Major Al Awadhi. The letters deal only with the second category of iniquitous conduct. His uncorroborated allegations are not sufficient, of themselves, to establish the second category to the relevant standard at this stage. Those are matters for trial.

101.  In relation to the allegation that Mr Al Sadeq's initial arrest was unlawful under UAE law, Mr Edey submitted that this appears to rest almost entirely on a chain of reasoning that is not sufficient to establish a very strong *prima facie* case that the arrest was unlawful. The fact that a copy of the extradition request for Mr Al Sadeq from the RAK authorities to the Dubai authorities is not in the possession and control of the defendants does not mean that no such extradition request exists.

102.  In relation to the alleged conditions of Mr Al Sadeq's detention, Mr Edey accepted that the views of Dr Mitchell as to the conditions at Al Barirat were sufficient, for the purposes of the Privilege Application, to establish a sufficient *prima facie* case that on or around 29 October 2015 the conditions in which Mr Al Sadeq was kept at Al Barirat did not comply with Article 3 of the European Human Rights Convention. Beyond that, however, the evidence put forward by Mr Al Sadeq did not demonstrate a very strong *prima facie* case that the allegations he makes are true, as to which the defendants have no direct knowledge. For these reasons, and having regard to the proper test, the iniquity exception was not engaged in relation to any documents for which the defendants have claimed legal professional privilege.

103.  In relation to the alleged denial of legal representation, Mr Philip Edey noted that the evidence of Mr Allen made clear that, at least from April 2015, on any view there was no such denial, Mr Al Sadeq having been actively represented by Dr Al Shamsi, a local lawyer. Prior to that time, it was the understanding of Mr Gerrard and Ms Black that Mr Al Sadeq, a lawyer himself, was unrepresented on a voluntary basis. It was noteworthy that there was no evidence from Dr Al Shamsi to support the allegations in paragraphs 115-117 of the Amended Particulars of Claim that he was denied access to Mr Al Sadeq during the period between his arrest on 5 September 2014 and April 2015. The defendants therefore did not accept that there was a very strong *prima facie* case that Mr Al Sadeq was denied legal representation during this period or at all.

104.    For these reasons, Mr Edey submitted, the iniquity exception challenge in the Privilege Application should be rejected.

105.    The following propositions do not appear to be in dispute:

    i)    Legal professional privilege does not apply to a communication or other document that falls within the iniquity exception. The iniquity exception applies to a communication or other document if it is:

        a)    criminal, fraudulent, or otherwise iniquitous in itself; or

        b)    intended to further a purpose that is criminal, fraudulent, or otherwise iniquitous.

    ii)    The types of conduct set out in paragraph 52 of Mr Allen's fourth witness statement, to the extent that they fall within one of the categories set out in paragraph 1 of the Draft Order, would be conduct capable of engaging the iniquity exception.

    iii)    The Privilege Application does not require the court to find that the defendants had any knowledge of or involvement in the relevant (or any) iniquitous conduct. That will be a matter for trial. The court need only be concerned with the conduct of the privilege-holder or, where the privilege-holder is being used as an innocent tool by an iniquitous third party, the conduct of the third party.

    iv)    The iniquity exception applies to litigation privilege as well as legal advice privilege and regardless of whether any relevant legal advice relates to civil or criminal matters or whether any relevant litigation, current, pending, or in contemplation, is civil or criminal in nature.

    v)    Legal professional privilege is of fundamental importance. The iniquity exception will only be applied in an exceptional case.

106.    In relation to the last point at (v) of the preceding paragraph, I noted at [71] above that the authorities make clear that the court will be slow to deprive a privilege-holder of the privilege, particularly on an interlocutory application. That must be the case whether the privilege holder is (i) a party to the proceedings in which a challenge to a claim of legal professional privilege arises or (ii) a third party. In this case, for the most part, the privilege holder is one or more of the Dechert Clients, the exception being privilege claimed by Dechert-UK and Mr Gerrard in relation to communications falling within row 11 of the Litigation Privilege Table.

107.    The defendants submit that the test set out in paragraph 1 of the Draft Order is too broad, namely, "any documents or parts thereof which have been generated by or report on" any of the relevant iniquitous conduct.

108.    Mr Al Sadeq says that the defendants' reliance on the words "in furtherance of" has led them, in this case, to an impermissibly narrow application of the test. As noted at [62] above, Ms Oppenheimer also submitted that the defendants, in their response to the submissions on behalf of Mr Al Sadeq, have elided two important questions, namely:

i) whether the iniquity exception is engaged, because the relevant test is satisfied; and

ii) where the iniquity exception is engaged, what documents should be ordered as a result.

109. Ms Oppenheimer submitted that the wording in paragraph 1 of the Draft Order is not a statement of the relevant test, which, as is common ground, is set out in *Thanki on Privilege* at paragraph 4.37, in *Cox and Railton* at 167, and elsewhere. Instead, paragraph 1 identifies those documents that should be disclosed, once the test has been engaged. The defendants' failure to grasp this distinction has led to confusion in their responsive submissions, which are misconceived. The distinction between (i) the test and (ii) the determination of which documents are within the scope of the exception once the test is engaged is reflected, for example, in *Hollander on Documentary Evidence* at paragraphs 25-11 and 25-16, respectively.

110. In relation to (ii) above, Ms Oppenheimer submitted, Mr Al Sadeq does not have to be right that this approach to identifying the scope of documents within the iniquity exception applies in all cases. He merely has to be right that it applies in this case.

111. I am not persuaded, however, that Mr Sadeq is right in this case. I agree with the submissions made by Mr Edey that this approach leads to far too broad an application of the iniquity exception. I agree with Mr Edey's submission that the wording was appropriate in *Dubai Aluminium* given the facts of that case and the nature of the iniquitous conduct relied upon, which is quite different from the facts of this case.

112. It is clear, in my view, from the evidence of Mr Allen that the approach applied by the defendants' legal team to determining whether a document for which legal professional privilege was claimed fell within the iniquity exception was correct and consistent with the test set out [105(i)] above. It is perfectly possible, in theory, for a communication between, say, RAK Development and Dechert to have been instigated by a third party communicating with RAK Development with the intention of furthering iniquitous conduct falling within one of the agreed categories of iniquitous conduct, where each of RAK Development and Dechert is an "innocent tool" of the third party. Having regard to Mr Allen's evidence, which I have no reason to doubt, I do not accept Mr Al Sadeq's submission that the defendants' legal team have taken an impermissibly narrow approach.

113. The distinction that Ms Oppenheimer drew during her submissions between the test and the approach to determining which documents are within scope once the test is engaged is not, in any event, in my view properly reflected in the drafting of paragraph 1 of the Draft Order. Contrary to her submission, paragraph 1 of the Draft Order, as a matter of drafting, sets out a test for determining which documents fall within the iniquity exception and does so on a basis that, at any rate on the facts of this case, is wrong as a matter of law.

114. Accordingly, this part of the Privilege Application fails. It is not necessary, therefore, to address the question of what standard of evidential burden must be met or the question of whether, having regard to the relevant standard, the evidential burden has been met in this case in relation to the alleged iniquitous conduct. The points having been argued, however, I will indicate briefly that had I needed to determine these

questions I would have found that, given the close relationship between the categories of iniquitous conduct set out in paragraph 1 of the Draft Order and the allegations made against the defendants, as is clear from the Agreed Case Summary and List of Issues, the evidential burden would have to be at least a strong *prima facie* case, if not a very strong *prima facie* case. The iniquities relied on are issues in the case, to be determined at trial. It would be unfair and inappropriate to attempt to determine them now, even if only on a *prima facie* basis (strong or otherwise) and assuming that the iniquitous conduct was only that of persons other than the defendants.

115. Moreover, save as accepted by the defendants (as indicated at [102] above), I would not have found that the standard was met by the evidence put forward by Mr Al Sadeq, broadly for the reasons given by Mr Edey in his submissions, which I have summarised at [101]-[103] above and which I accept.

*Challenges to claim of legal advice privilege*

116. In relation to Mr Al Sadeq's challenges to the defendants' claims of legal advice privilege, paragraph 2 of the Draft Order requires the defendants to identify by a specified date and time the persons whom they contend were authorised at material times to seek or receive legal advice on behalf of their clients. Paragraph 3.2 of the Draft Order seeks a declaration that the defendants were not entitled to withhold from inspection on the grounds of legal advice privilege communications between the defendants and representatives of their clients who were not authorised to obtain legal advice.

117. Enyo Law wrote to Stokoe on 17 December 2021, shortly before the hearing, regarding various aspects of the legal advice privilege challenge with the intention that "this may help to narrow the issues between the parties and streamline this aspect of next week's hearing". Ms Oppenheimer confirmed during the hearing that Mr Al Sadeq was content not to pursue paragraph 2 of the Draft Order, on the understanding that if legal advice privilege was claimed in due course over any communication with an individual whom the defendants have not identified, then they would need at that stage to identify the individual. Initially, Mr Al Sadeq continued to seek paragraph 3.2 of the Draft Order on the basis that it understood the defendants did not accept that they were bound by *Three Rivers (No 5)*. I did not understand paragraph 3.2 to have been formally abandoned by Mr Al Sadeq at the hearing, and I will invited the parties to make further submissions as to whether it is appropriate to make a declaration at this point in light of the defendants' clarification of their position on this point as referred to at [57] above.

118. Paragraphs 3.1 and 3.3 of the Draft Order, which are still sought by Mr Al Sadeq, read as follows:

> "3.    The Defendants shall not be entitled to withhold from inspection any documents or parts thereof on grounds of legal advice privilege, which involve:
>
>    3.1    Communications created for the dominant purpose of the Defendants' investigatory work;
>
>    …

3.3    Communications between the Defendants or the representatives of their clients (whether or not authorised to seek or receive legal advice and conduct litigation) and third parties.

Save that the Defendants shall be entitled to withhold from inspection on grounds of legal advice privilege documents or parts of documents which comprise secondary evidence of separate communications which are themselves subject to legal advice privilege."

119.    While, as already noted, the dominant purpose test applies to litigation privilege, there has historically been some uncertainty as to the extent that it applies in relation to legal advice privilege: see, for example, *Thanki on Disclosure*, paragraphs 2.177-2.184. However, in *R (Jet2.com Ltd) v Civil Aviation Authority* [2020] EWCA Civ 35, [2020] QB 1027, Hickinbottom LJ, after an extensive consideration of the authorities at [70]-[96], concluded that for legal advice privilege to apply to a particular communication or document the dominant purpose of the communication or document had to be to obtain or give legal advice. This is common ground.

120.    Per Hickinbottom LJ in *Jet2.com* at [42] and [96], therefore, legal advice privilege is capable of arising if the following four conditions are satisfied:

i)    there is a communication, whether written or oral;

ii)    the communication is made by a client to a lawyer or by a lawyer to a client;

iii)    the communication is made in confidence; and

iv)    the dominant purpose of the communication is to obtain or to give legal advice.

121.    In *Three Rivers (No 6)*, the House of Lords considered, as a matter of the scope of the privilege, what fell within the obtaining or giving of legal advice. The House concluded that "legal advice" extended to advice "as to what should prudently and sensibly be done in the relevant legal context", referring to the decision of the Court of Appeal in *Balabel v Air India* [1988] 1 Ch 317 at 330G (Taylor LJ) and applying the principles set out there. In *Balabel*, Taylor LJ said at 330D-F:

"In my judgment, therefore, the test is whether the communication or other document was made confidentially for the purposes of legal advice. Those purposes have to be construed broadly. Privilege obviously attaches to a document conveying legal advice from solicitor to client and to a specific request from the client for such advice. But it does not follow that all other communications between them lack privilege. In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages. There will be a continuum of communication and meetings between the solicitor and the client. … *Where information is passed by the solicitor or client to the other as part of the continuum aimed at*

> *keeping both informed so that advice may be sought and given*
> *as required, privilege will attach.*" (emphasis added)

122. Ms Oppenheimer noted that the purpose of this part of the Privilege Application was to have the court, by giving an appropriate direction, ensure that the defendants properly limited any claim for legal advice privilege to communications created for the dominant purpose of obtaining or giving legal advice. Given the wide-ranging work undertaken by the defendants for RAK IDO and RAK Development across various jurisdictions, in which matters relating to Mr Al Sadeq played only a confined role, the critical question is whether documents generated by the defendants in the course of the investigatory work they conducted concerning Mr Al Sadeq can properly be regarded as created for the dominant purpose of legal advice sought from or given by the defendants to their clients.

123. In relation to the global investigatory work carried out by the defendants during the course of the Investigation, Ms Oppenheimer submitted that there are unusual features of the defendants' work that raise a doubt about whether all of the communications over which they have claimed legal advice privilege fall within the scope of the "relevant legal context" and "continuum of communications" that would properly bring them within scope. To the extent that the defendants were gathering factual information for their clients or providing that information to the RAK public prosecutor, such activities do not attract legal advice privilege. They would be for the dominant purpose of conveying factual information, without any prospect of legal advice being given. This is because that work did not raise any issues of English law, but concerned only Mr Al Sadeq's potential criminal liability under UAE law. This doubt is supported by their own evidence advanced in response to the Privilege Application.

124. Ms Oppenheimer submitted that it is noteworthy that Al Tamimi, who are qualified UAE lawyers, were only instructed to assist with elements of the work for the Dechert Clients in December 2014. This calls into question what the defendants were doing before that time. It is not clear how the defendants' information gathering and reporting to their clients regarding Mr Al Sadeq could satisfy the dominant purpose test for legal advice privilege in circumstances where no locally qualified lawyers were engaged.

125. Ms Oppenheimer referred to various documents in the defendants' disclosure which, she submitted, supported the contention that at least some of the work carried out by the defendants in relation to Mr Al Sadeq was investigative work in which the defendants were not being consulted in their capacity as lawyers. She referred, in particular, to the evidence given by Mr Tsiattalou in his sixth witness statement at paragraphs 111-112.

126. Ms Oppenheimer noted, in particular, that the defendants denied that they had anything to do with the circumstances of Mr Al Sadeq's original detention in Dubai, the conditions in which Mr Al Sadeq was subsequently detained, the process by which he was transferred between the locations referred to in paragraph 1.1 of the Draft Order, or whether Mr Al Sadeq was legally represented at various points. She submitted that it is hard to see how any communications relating to these matters could attract legal advice privilege.

127. In relation to paragraph 3.3 of the Draft Order, Ms Oppenheimer submitted that this direction was necessary to ensure that if Mr Al Sadeq succeeded in any part of his

challenge to the defendants' claims of legal advice privilege or litigation privilege, then the defendants should apply the correct principles upon any re-review and not withhold on the basis of legal advice privilege any communications between, on the one hand, Dechert or either of its clients, and, on the other hand, any third party.

128.    Mr Edey noted, at the outset of his submissions on this part of the Privilege Application, that the defendants have withheld, in whole or in part, very few documents on the basis of legal advice privilege alone. None were withheld on that basis in the original disclosure and very few subsequently. He submitted that, given that the vast majority of the relevant documents were covered by litigation privilege, the defendants took the sensible and proportionate approach of not spending additional time assessing documents for legal advice privilege.

129.    Mr Edey also noted that Mr Al Sadeq does not positively contend that legal advice privilege has been wrongly claimed, except possibly in relation to four documents, but has merely expressed a concern that this may have been the case.

130.    Mr Edey outlined the nature of Dechert's role for the Dechert Clients in the Investigation in relation to the Alleged Fraud by reference to the 2013 Engagement Letter and the 2014 Engagement Letter. It is clear that the defendants were engaged as lawyers to advise and assist their clients. This included helping their clients to determine what had occurred for the purpose of exploring their legal options to recover these losses. All of this work was undertaken in a relevant legal context and involved advice and assistance as to what its clients might prudently and sensibly do in that context. It was artificial and wrong to attempt to separate the defendants' investigatory work into factual matters from their role as lawyers.

131.    Mr Edey submitted that the defendants have not approached this part of their disclosure exercise on the basis that all communications between Dechert and its clients are automatically subject to legal advice privilege. As confirmed by the evidence of Mr Allen in his ninth witness statement at paragraph 143, where the defendants have asserted legal advice privilege in relation to a document, they have done so on the basis that the document was created for the dominant purpose of obtaining or giving legal advice or assistance.

132.    Mr Edey submitted that the relief sought by paragraph 3.1 of the Draft Order is inappropriate because it is based on the false assumption that the defendants had carried out investigatory work outside the context of their role as lawyers to the Dechert Clients. The defendants specifically denied that they were engaged by their clients or by the RAK public prosecutor to carry out investigatory work and/or gather evidence for the public prosecutor outside the scope of their engagement as lawyers by their clients. They also rejected any suggestion by Mr Al Sadeq that the defendants were "stepping into the shoes of the RAK public prosecutor and performing its role in its stead" (the words of Mr Tsiattalou in his sixth witness statement at paragraph 114).

133.    In relation to the evidence of Mr Al Haddad, Mr Edey submitted that it was not appropriate to rely on it, for the reasons I have already summarised (see [10] above), or, if taken into account, to give it any weight.

134.    In relation to paragraph 3.3 of the Draft Order, Mr Edey submitted that it set out a principle that was common ground. It was not appropriate for the court to grant

declaratory relief in the form of an uncontroversial and undisputed statement of principle.

135. For these reasons, Mr Edey submitted, this part of the Privilege Application, to the extent still pursued, should be rejected.

136. In my view, it is clear from a review of the 2013 Engagement Letter and the 2014 Engagement Letter, taken together with the relevant evidence of Mr Allen regarding the work undertaken by the defendants in relation to the Investigation, that the defendants were engaged by the Dechert Clients to advise and assist in their capacity as lawyers, including as lawyers experienced in conducting investigations on a cross-border basis in relation to alleged fraudulent activity such as that said to constitute the Alleged Fraud. In other words, I accept the submission made on behalf of the defendants that the work was undertaken in a relevant legal context.

137. I am not persuaded by the evidence of Mr Tsiattalou in his sixth witness statement at paragraphs 111-112, which appears to be based on an unrealistic and artificial distinction between "investigatory work", on the one hand, and legal advice and assistance, on the other hand. Where lawyers are engaged to conduct an investigation, it is a reasonable and fair assumption that the engagement encompasses the investigatory work and related legal advice and assistance as part of a continuum of legal service. It would take strong evidence to rebut this. The examples given by Mr Tsiattalou do not, with respect, persuade me that Mr Al Sadeq has successfully rebutted this reasonable and fair assumption.

138. I am satisfied on the evidence of Mr Allen that, where the defendants' legal team has considered the applicability of legal advice privilege to a communication or other document, they have done so on correct principles.

139. For these reasons, I consider that it is not appropriate to make the order set out in paragraph 3.1 of the Draft Order. In relation to paragraph 3.3 of the Draft Order, I agree with the submission made on behalf of the defendants that it is not appropriate to grant declaratory relief in the form of an uncontroversial and undisputed statement of principle.

140. Accordingly, this part of the Privilege Application fails.

*Challenges to claim of litigation privilege*

141. In relation to Mr Al Sadeq's challenges to the defendants' claims to litigation privilege, paragraphs 4-5 of the Draft Order read as follows:

> "4.     The Defendants shall by 4pm on […] identify the persons who they contend were authorised to conduct litigation on behalf of their clients, RAK Development LLC and [RAK IDO] (for the purposes of the litigations set out in the Litigation Privilege Table at paragraph 36 of Allen 3), and the reasons why they contend those persons were so authorised.

5.      The Defendants shall not be entitled to withhold from inspection on grounds of litigation privilege documents or parts thereof on the grounds that such communications:

> 5.1      Were created for the dominant purpose of the litigation(s) set out in the table at paragraph 36 of Allen 3.

> 5.2      Are communications between persons not identified as authorised representatives of Dechert's clients pursuant to paragraph 4 of this Order, and third parties.

> 5.3      [*Alternative to para 5.1*] Were created for the dominant purpose of actual or anticipated criminal proceedings in RAK or other jurisdictions;

> 5.4      [*Alternative to para 5.1*] Were created for the dominant purpose of RAK criminal proceedings against Mr Al Sadeq prior to 19 February 2015"

142.    As I noted at [34(viii)] above, the litigation privilege table set out at paragraph 36 of Mr Allen's third witness statement was updated and set out at paragraph 117 of Mr Allen's ninth witness statement. The above text, if the court were to make this order, would be revised accordingly. In their respective submissions at the hearing, Ms Oppenheimer and Mr Edey primarily referred to the updated statement, which I have been referring to as the Litigation Privilege Table.

143.    In *Three Rivers (No 6)* at [85], Lord Carswell set out in quotation the classic statement of the object of litigation privilege made by Sir George Jessel MR in the first instance decision in *Anderson v Bank of British Columbia* (1876) 2 Ch D 644 (Ch D) at 649:

> "The object and meaning of the rule is this: that as, by reason of the complexity and difficulty of our law, litigation can only be properly be conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enabled properly to conduct his litigation. That is the meaning of the rule."

144.  In the Court of Appeal decision in *Anderson*, affirming the decision of the Master of the Rolls, James LJ summarised the essential object of litigation privilege more succinctly as follows ((1976) 2 Ch D 644 (CA) at 656):

> "… as you have no right to see your adversary's brief, you have no right to see that which comes into existence as the materials for the brief."

145.  In *Starbev GP Ltd* at [11]-[13], Hamblen J set out the legal requirements for a claim to litigation privilege as follows:

> "11.  The legal requirements of a claim to litigation privilege may be summarised as follows:
>
> (1)  The burden of proof is on the party claiming privilege to establish it … .
>
> (2)  An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in a witness statement are not determinative and are evidence of a fact which may require to be independently proved. The court will scrutinise carefully how the claim to privilege is made out and the witness statements should be as specific as possible … .
>
> (3)  The party claiming privilege must establish that litigation was reasonably contemplated or anticipated. It is not sufficient to show that there is a mere possibility of litigation, or that there was a distinct possibility that someone might at some stage bring proceedings, or a general apprehension of future litigation … . As Eder J stated in *Tchenguiz* [*v Director of the Serious Fraud Office* [2013] EWHC 2297 (QB)] at [48(iii)]: 'Where litigation has not been commenced at the time of the communication, it has to be "reasonably in prospect"; this does not require the prospect of litigation to be greater than 50% but it must be more than a mere possibility'.
>
> (4)  It is not enough for a party to show that proceedings were reasonably anticipated or in contemplation; the party must also show that the relevant communications were for the dominant purpose of either (i) enabling legal advice to be sought or given, and/or (ii) seeking or obtaining evidence or information to be used in or in connection with such anticipated or contemplated proceedings. Where communications may have taken place for a number of purposes, it is

incumbent on the party claiming privilege to establish that the dominant purpose was litigation. If there is another purpose, this test will not be satisfied … .

12. In relation to the Court's approach to the assessment of evidence in support of a claim for privilege, it has been stated that it is necessary to subject the evidence 'to "anxious scrutiny" in particular because of the difficulties in going behind that evidence' – per Eder J in *Tchenguiz* at [52]. 'The Court will look at "purpose" from an objective standpoint, looking at all relevant evidence including evidence of subjective purpose' – ibid. 48(iv). Further, as Beatson J pointed out in the *West London Pipeline* case at [53], it is desirable that the party claiming such privilege 'should refer to such contemporary material as it is possible to do without making disclosure of the very matters that the claim for privilege is designed to protect'.

146. Hamblen J then set out a passage in the judgment of Beatson J in the *West London Pipeline* case at [86(3)-(4)], which is set out, as part of a fuller quotation, at [53] above.

147. The test of when litigation is reasonably in contemplation is an objective one, having regard to the time when and purpose for which the documents were brought into existence: *Dadourian Group International* at [87].

148. There must be a real prospect of litigation. Although the test is objective, if litigation is neither pending nor threatened, it must be "in the active contemplation of the party seeking advice": *Plummers Ltd v Debenham plc* [1986] BCLC 447 at 454 (Millet J).

149. In *United States of America v Philip Morris Inc* [2003] EWHC 3028 (Comm) at [46], Moore-Bick J said, in relation to a claim of litigation privilege:

"The requirement that litigation be 'reasonably in prospect' is not in my view satisfied unless the party seeking to claim privilege can show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility."

150. In this case, the evidence supporting the claim to litigation privilege is principally set out in the ninth witness statement of Mr Allen. Beatson J in the *West London Pipeline* case at [53] said the following in relation to evidence provided by a legal adviser in relation to a claim of privilege:

"53. Thus, affidavits claiming privilege whether sworn by the legal advisers to the party claiming privilege as is often the case, or, as in this case, by a Director of the party, should be specific enough to show something of the deponent's analysis of the documents or, in the case of a claim to litigation privilege, the purpose for which

> they were created. It is desirable that they should refer
> to such contemporary material as it is possible to do so
> without making disclosure of the very matters that the
> claim for privilege is designed to protect. On the need
> for specificity in such affidavits, see for example,
> Andrew Smith J in *Sumitomo Corp v Credit Lyonnais
> Rouse Ltd* (2001) 151 NLJ 272 at [39], referred to
> without criticism by the Court of Appeal [2002] 1 WLR
> 479 at [28], although the court did not (see [81])
> consider the criticisms of the affidavit in that case were
> justified."

151. Ms Oppenheimer noted that this part of the Privilege Application raised four principal questions:

   i) whether the defendants should be required to identify the persons authorised to conduct litigation on behalf of their clients for the purposes of claims to litigation privilege;

   ii) whether the defendants failed to discharge their burden of establishing that litigation was reasonably in contemplation at the dates alleged in the Litigation Privilege Table;

   iii) whether the defendants were entitled to claim litigation privilege on behalf of their clients in respect of documents produced for the dominant purpose of criminal proceedings in RAK or other jurisdictions, given that their clients were not parties to those proceedings; and

   iv) if they were so entitled, whether they were entitled to do so for the dominant purpose of criminal proceedings involving Mr Al Sadeq prior to 19 February 2015 on the basis that such litigation was not reasonably in contemplation prior to that date.

152. In relation to (i) above, Ms Oppenheimer noted that, although it is unclear whether the *Three Rivers (No 5)* principle (regarding the scope of privileged communications between lawyers and persons authorised to obtain or receive legal advice on behalf of a client that is a legal, as opposed to natural, person) applies to litigation privilege, it should be assumed that it does: see *Thanki on Privilege* at paragraph 3.23;

153. Ms Oppenheimer acknowledged the difficulty of going behind a solicitor's assertion in an "affidavit of documents" (as described in some of the cases) that relevant documents are subject to litigation privilege. In this case, that evidence is provided by Mr Allen, principally in his ninth witness statement. Ms Oppenheimer noted, however, that this was a different sort of case and a different sort of challenge. The issue here is the general approach taken by the defendants to litigation privilege. Accordingly, she submitted, some of the concerns expressed in the authorities about going behind the solicitor's assertions of litigation privilege do not carry the same force in this case.

154. Ms Oppenheimer drew my attention to the summary of the relevant principles concerning claims to litigation privilege and challenges to those claims set out by

Hamblen J in the *Starbev* case at [11]-[12], which I have set out at [144145] above. Ms Oppenheimer emphasised the following points from that passage:

i)      the burden of proof is on the party claiming the privilege;

ii)     an assertion of privilege and a statement of the purpose of the communication over which it is asserted are not enough;

iii)    the court will scrutinise carefully how the claim to privilege is made out, and witness statements should be as specific as possible;

iv)     the party claiming privilege must establish that litigation was reasonably contemplated or anticipated; it must be more than a "mere possibility", "distinct possibility", or "general apprehension" of litigation, although it does not require that the prospect be greater than 50%; and

v)      it is desirable that the party claiming privilege "should refer to such contemporary material as it is possible to do without making disclosure of the very matters that the claim for privilege is designed to protect".

155.    Ms Oppenheimer took me to various authorities which she submitted were illustrative of the extent and nature of the evidence that may be required to discharge the evidential burden in establishing a claim to litigation privilege, including *Director of the Serious Fraud Office v Eurasian National Resources Corporation* ("*SFO v ENRC*") at [91]-[95], the *West London Pipeline* case at [44], [95], and [99] (where the judge was critical of the affidavit that had been provided in support of the claim of privilege and concluded that it was insufficient), and *Qatar v Banque Havilland* [2021] EWHC 2172 (Comm) (the deputy High Court Judge having undertaken a detailed review of the extensive evidence in support of the claim to privilege at [42]-[84] but ultimately rejecting the evidence as insufficient at [158]-[188]).

156.    Ms Oppenheimer submitted that these authorities show that, in some circumstances, it may be necessary to waive privilege over certain matters in order to substantiate a claim to litigation privilege. In support of this submission, she cited *SFO v ENRC* at [86].

157.    Ms Oppenheimer submitted that this is not inconsistent with the observation of Beatson J in the *West London Pipeline* case at [53] (see [150] above) that it is desirable that evidence supporting a claim of litigation privilege "should refer to such contemporary material as it is possible to do without making disclosure of the very matters that the claim for privilege is designed to protect". The real point of Beatson J's statement was to emphasise the desirability of evidential support from contemporary sources and the need for specificity in such evidence. The evidence provided by the defendants in support of their claim for litigation privilege is, she submitted, notably lacking in both reference to contemporary material and also specificity, despite the privilege challenge having been intimated for months before the hearing of the Privilege Application. This strongly suggests that the necessary detailed analysis has not been carried out by the defendants.

158.    Ms Oppenheimer submitted that these points are illustrated by consideration of row 3 of the Litigation Privilege Table. In the earlier version of this table set out in Mr Allen's third witness statement at paragraph 36, it was simply asserted that criminal litigation

was reasonably contemplated from "September 2014 onwards", the implication being that it was reasonably contemplated from the start of September. In the Litigation Privilege Table, it is asserted that criminal litigation was reasonably contemplated after "admissions" made by Mr Al Sadeq in interview, the first of which was on 9 September 2014. Even if this is correct, it means that criminal litigation was not reasonably in contemplation before 9 September 2014. It is unclear why this mismatch should have arisen, if the reasoning set out in the Litigation Privilege Table had actually occurred at the time of the disclosure exercise rather than *ex post facto* in response to this privilege challenge.

159.     Turning to the issue of whether any of the Dechert Clients is entitled to claim litigation privilege in relation to criminal proceedings in RAK or other jurisdictions in respect of which the relevant Dechert Client is not a party (namely, rows 2, 3, 9 and 10 of the Litigation Privilege Table), the short legal point is that litigation privilege can only be claimed in respect of communications between a party to the relevant proceedings or the party's lawyer, on the one hand, and third parties, on the other hand. This would not, therefore, include a victim of a crime, as the victim is not a party to criminal proceedings concerning the crime.

160.     Ms Oppenheimer referred to the decision of Moulder J in *Minera Las Bambas SA v Glencore Queensland Limited* [2018] EWHC 286 (Comm) at [31] where she held that it is an "established principle" that litigation privilege can only arise in favour of a person who is a party to the litigation in question. Ms Oppenheimer submitted that, as a matter of judicial comity, I should follow that decision unless I am persuaded that the decision is wrong: see *Lornamead Acquisitions Ltd v Kaupthing Bank HF* [2011] EWHC 2611 (Comm) at [53], [56] (Gloster J).

161.     Ms Oppenheimer submitted that the principle that litigation privilege can only arise in favour of a party to the litigation in question flows from the rationale for litigation privilege, which is that a party should be free to seek evidence without being obliged to disclose the results to the other side. That rationale does not apply to a non-party.

162.     Ms Oppenheimer noted that a victim of a crime or a complainant is not treated as a party for purposes of criminal litigation in English criminal procedure, nor is there any suggestion that in RAK the position is different. The defendants asserted as part of their Defence, and in response to the Privilege Application, that the public prosecutor in RAK is wholly independent from their clients. Therefore, she submitted, it is not permissible for the defendants to claim litigation privilege on behalf of their clients in respect of documents created for the dominant purpose of actual or anticipated criminal proceedings to which they are not parties.

163.     Ms Oppenheimer submitted that, if the court is not with Mr Al Sadeq in relation to this issue, Mr Al Sadeq raises a specific objection to the claim to litigation privilege set out at row 3 of the Litigation Privilege Table. This claim could not have been in reasonable contemplation before a complaint was accepted by the RAK public prosecutor, which occurred on or about 19 February 2015. Criminal proceedings cannot reasonably have been contemplated by the public prosecutor before it has opened an investigation into the complaint, much less before it has even seen the allegations upon which the complaint is based.

164.    In response to this part of the Privilege Application and the general challenge by Mr Al Sadeq to the defendants' claim to litigation privilege, Mr Edey submitted that the general challenge fails on the basis that the defendants have provided more than sufficient evidence from Mr Allen in his third and ninth witness statements. There is no proper basis for the court to go behind Mr Allen's assessment in relation to each set of proceedings that the relevant litigation was in reasonable prospect as claimed by the defendants, particularly bearing in mind the rigorous approach to privilege issues adopted by the defendants as set out in Mr Allen's evidence (summarised at [34]-[38] above).

165.    Mr Edey submitted that it is clear from Mr Allen's evidence that the right principles have been applied by the defendants' legal team as to when litigation is reasonably in prospect for purposes of a claim to litigation privilege. Providing evidence in support of the contention that a relevant piece of litigation was in reasonable contemplation at the material time is difficult given that the contemporaneous documents demonstrating the point on which Enyo Law has relied will themselves be subject to privilege in favour of the relevant Dechert Clients, who have not waived that privilege. This is well-recognised in the authorities. As pointed out by Beatson J in the *West London Pipeline* case at [86(1)], the party claiming privilege should not be required to waive privilege over such documents as a condition of asserting privilege.

166.    Mr Edey submitted that, without waiving privilege over otherwise privileged documents, Mr Allen has provided as much non-privileged information as he has been able to in support of the claim to privilege. In his ninth witness statement at paragraph 151, Mr Allen has confirmed that he personally considered in each case whether the relevant litigation was reasonably in contemplation at the time stated. He undertook this consideration, not only at the time the disclosure review was carried out, but also subsequently, including for the purpose of preparing his witness statement.

167.    Mr Edey submitted that it is clear from the relevant authorities that the court should only go behind Mr Allen's confirmation if it is "reasonably certain" (in the words of Beatson J in the *West London Pipeline* case at [86(3)]) from the other materials before it that his evidence must be factually wrong, given that there is no suggestion that he has applied the wrong test. It is wrong of Mr Al Sadeq apparently to suggest that Mr Allen's confirmation is of no evidential weight and that the issue must be determined solely by reference to other material. The authorities also make clear that a solicitor's evidence supporting a claim to litigation privilege, although it should also be supported by other materials (as it is in this case) to the extent possible, is often determinative: see, for example, *Various Claimants v News Group Newspapers Limited* at [13]-[16].

168.    Mr Edey noted that in the Litigation Privilege Table and in paragraphs 152-170 of his ninth witness statement, Mr Allen addressed each of the specific criticisms made by Mr Al Sadeq of the evidence put forward by the defendants in support of the contention that litigation was in reasonable prospect on the dates asserted in relation to the six pieces of litigation on which Mr Tsiattalou focused in his sixth witness statement. There is no proper basis, Mr Edey submitted, for going behind Mr Allen's assessment of when litigation was in reasonable prospect in the respects and from the dates claimed by the defendants. Accordingly, Mr Al Sadeq's general challenge to the litigation privilege claims should be rejected.

169.   In relation to the question of whether a putative victim of a crime can claim litigation privilege in relation to criminal proceedings relating to that crime, Mr Edey conceded that there was some support in the textbooks for the proposition that it is necessary for the person claiming privilege to be, or to be contemplated as being, a party to the litigation: *Thanki on Privilege* at paragraph 3.80, *Hollander on Documentary Evidence* at paragraph 18.01; and Colin Passmore, *Privilege* (4th edition) ("*Passmore on Privilege*") at paragraph 3.006. He noted, however, that each of these text books relies on a different authority for this purpose, and he submitted that the authority relied on, in each case, does not support the proposition that a victim cannot claim litigation privilege in relation to relevant criminal proceedings.

170.   *Thanki on Privilege* at paragraph 3.80 cites *USA v Philip Morris* at [72]-[73]. Mr Edey submitted that the decision in that case is authority only for the proposition that communications for the dominant purpose of non-party disclosure proceedings do not attract litigation privilege. It says nothing about whether a third party to litigation, such as a victim in relation to criminal proceedings, can claim litigation privilege arising from that litigation.

171.   *Hollander on Documentary Evidence* at 18.01 cites *Lee v South West Thames Regional Health Authority* [1985] 1 WLR 845 at 850 (Sir John Donaldson MR). Mr Edey submitted that the court did not consider whether a person could claim privilege over a document generated for the dominant purpose of litigation to which that person was not a party or prospective party, that not being an issue in the case. The issue in that case was whether the defendant health authority could assert privilege over a document that had been created at the request of a different health authority for the dominant purpose of litigation contemplated against it, which the defendant also had in its possession and control. The court held that where the privilege holder had not waived privilege, the defendant could rely on litigation privilege. That was not surprising, but not authority for the proposition that litigation privilege is only available to a party or prospective party to litigation.

172.   *Passmore on Privilege* at paragraph 3.006 cites the speech of Lord Carswell in *Three Rivers (No 6)* at [102], which reads in its entirety as follows:

>   "The conclusion to be drawn from the trilogy of 19th century cases to which I have referred and the qualifications expressed in the modern case-law is that communications between parties or their solicitors and third parties for the purpose of obtaining information or advice in connection with existing or contemplated litigation are privileged, but only when the following conditions are satisfied: (a) litigation must be in progress or in contemplation; (b) the communications must be made for the sole or dominant purpose of conducting that litigation; (c) the litigation must be adversarial, not investigative or inquisitorial."

173.   Mr Edey submitted that there is nothing in that statement of principle to suggest that the party who is claiming privilege must necessarily be a party to the existing or contemplated litigation. That issue was not addressed in *Three Rivers (No 6)* or in the cases referred to by Lord Carswell at [96]-[101] as forming the basis for his statement of law.

174. Mr Edey submitted that other authorities either do not support or contradict the proposition that the privilege holder must be a party or prospective party to the relevant litigation. In the leading case of *Waugh* at 543H-544B, Lord Edmund-Davies adopted the test set out by Barwick CJ in the Australian High Court case of *Grant v Downs* (1976) 135 CLR 674 at 677 as follows:

> "… a document which was produced or brought into existence either with the dominant purpose of its author, or of the person or authority under whose direction, whether particular or general, it was produced or brought into existence, of using it or its contents in order to obtain legal advice or to conduct or aid in the conduct of litigation, at the time of its production in reasonable prospect, should be privileged and excluded from inspection."

175. Mr Edey submitted that neither in this quotation nor in any other part of the speeches in the House of Lords in *Waugh* was there a suggestion that the party claiming privilege must be a party or prospective party to the contemplated litigation.

176. Mr Edey referred to *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027 (CA) and *Winterthur Swiss Insurance v AG* as examples of cases in which a non-party to litigation was entitled to assert litigation privilege in relation to that litigation. He also submitted that section 10(1)(b) of the Police and Criminal Evidence Act 1984, which sets out the test for litigation privilege in respect of criminal proceedings (enacting the common law test, per Lord Goff of Chieveley in *Ex p Francis & Francis* at 392H and 395D), does not suggest that the person claiming privilege must be a party or prospective party to the criminal proceedings.

177. As a matter of principle, Mr Edey submitted, it is difficult to see why litigation privilege should be limited to a party or prospective party to the relevant litigation if the test is otherwise met. In practice, in the vast majority of cases, it may well be the case that a non-party will not be able to meet the dominant purpose test in relation to communications or other documents. But if a person, although not a party or prospective party, has a sufficient interest in litigation so as to create documents for the dominant purpose of that litigation, then it is difficult to see why litigation privilege should not attach to those documents. A victim of fraud, as in this case, who appoints a solicitor to investigate, gather evidence, and advise for the purposes of reasonably contemplated criminal proceedings is a good example of a person who would have a sufficient interest in those proceedings despite not being a party.

178. Mr Edey submitted that the argument that a victim should be able to claim litigation privilege in respect of relevant criminal proceedings is even stronger in relation to criminal proceedings where the procedure is as it is in the UAE. That is because:

i) the victim has to file a complaint with the prosecuting authority, which in the case of a fraud such as the Alleged Fraud, will almost inevitably require prior investigation by lawyers acting on behalf of the victim; and

ii) UAE criminal procedure permits a victim of criminal conduct to make a civil claim for damages as part of criminal proceedings, which can either be determined in the criminal proceedings or remitted to separate civil proceedings.

179. Mr Edey noted that RAKIA had successfully used the procedure referred to at (ii) above to make claims for restitution in some of the RAK criminal proceedings in which Mr Al Sadeq was convicted, without having been a party to those proceedings. Mr Edey submitted that not permitting a victim the protection of litigation privilege in relation to criminal proceedings in the UAE involving this procedure would be arbitrary and unprincipled, given that in civil proceedings in the UAE involving the very same claim for damages the victim would have such protection.

180. Mr Edey submitted that the decision of Moulder J in *Minera Las Bambas v Glencore*, relied on by Mr Al Sadeq, cited as authority only *Hollander on Documentary Evidence* at paragraph 18-01, which is wrong on this point and, in any event, did not specifically consider the position of a victim in relation to criminal proceedings. He therefore invited the court to decline to follow it.

181. For these reasons, Mr Edey submitted, Mr Al Sadeq's challenge to the claim to litigation privilege on behalf of the Dechert Clients in relation to the criminal proceedings referred to at rows 2, 3, 8, 9 and 10 of the Litigation Privilege Table should be rejected.

182. In relation to the specific challenge to the claim for litigation privilege in relation to the proceedings set out in row 3 of the Litigation Privilege Table, Mr Edey submitted that it is clear from Mr Allen's evidence in his ninth witness statement at paragraph 173 that criminal proceedings were in contemplation against Mr Al Sadeq from the point of his arrest on 5 September 2014. That is a question of fact. Mr Allen applied to those facts the correct principles as to when litigation is reasonably in contemplation. What matters for this purpose is when the relevant litigation was in the reasonable contemplation of the party who created the relevant document or under whose direction it was created, namely, in this case, the defendants and the Dechert Clients, not the RAK public prosecutor. Accordingly, this aspect of the litigation privilege challenge should also be rejected.

183. In relation to the first of the four questions raised by Mr Al Sadeq's litigation privilege challenge, as summarised by Ms Oppenheimer (see [151] above), namely, whether it is necessary for the defendants to identify the persons authorised to conduct litigation on behalf of their clients, any need to do so appears to have been resolved by correspondence, as discussed above. I am not persuaded that it is necessary to make the order sought by paragraph 4 of the Draft Order.

184. In relation to the second of the four questions summarised by Ms Oppenheimer, namely, Mr Al Sadeq's general challenge to the defendants' claim of litigation privilege, I have carefully reviewed the authorities relied on by Ms Oppenheimer, to which I have referred at [155] above. The facts of each case, unsurprisingly, vary from each other and from this case.

185. Having regard, to the nature and factual background (as far as that is established for present purposes) of this case, it seems to me that the defendants have, through the evidence of Mr Allen, discharged the burden of giving as much information about each of the strands of pending, reasonably contemplated, or existing adversarial litigation as could reasonably be expected given the nature of the defendants' role for the Dechert Clients. In other words, it is not surprising that it has been necessary to rely predominantly on Mr Allen's evidence in relation to the claim of litigation privilege for communications and other documents generated by the defendants or coming into their

possession and control as a result of their role as legal advisers to the Dechert Clients. There is nothing in the evidence put forward by Mr Al Sadeq that leads me to conclude that it is "reasonably certain" that Mr Allen's evidence must be factually wrong or, even if that is too narrow a test, that I should as a matter of discretion go behind Mr Allen's evidence. His evidence shows that the defendants' legal team have taken a meticulous approach to the assessment of legal professional privilege. Inevitably, given the scope of the exercise, there have been some errors and inconsistencies, which have been resolved by correspondence. None of the examples put forward by Mr Al Sadeq persuades me that something has gone wrong in the way that the defendants' legal team have carried out the exercise in relation to legal professional privilege. I deal with row 3 of the Litigation Privilege Table separately below.

186.  For these reasons, I reject the general challenge to the defendants' claim to litigation privilege.

187.  Turning to the third question summarised by Ms Oppenheimer, namely, the issue of whether litigation privilege can be claimed in relation to criminal proceedings by the putative victim of any offence or offences that are the subject of those proceedings, I have found this to be the most interesting and difficult issue raised by the Privilege Application.

188.  I note the conclusion reached by Moulder J in the *Minera Las Bambas* case at [31]. I am mindful of the principles summarised by Gloster J (as she then was) in the *Lornamead Acquisitions* case, referred to by Ms Oppenheimer. I also bear in mind the guidance given by the Supreme Court in *Willers v Joyce (No 2)* at [9], that a High Court judge, although not technically bound by a prior decision of another High Court judge, should generally follow it unless there is a powerful reason for not doing so. With respect to Moulder J, I am persuaded, for reasons that I will develop, that she was wrong to conclude that it is an established principle that litigation privilege can only arise in favour of a person who is a party to the actual or prospective litigation in question. Given the importance of this question to the Privilege Application and my reasoning and conclusions below, I am satisfied that I have a powerful reason for not following the decision of Moulder J on this point.

189.  It is telling, in my view, that while three of the text books support the proposition that only a potential or actual party to prospective or pending litigation can claim litigation privilege, each appears to rely on a different authority and the authority relied on in each case appears not to support the proposition. There is a superficial appeal to the proposition. Having regard, however, to the underlying purpose of litigation privilege, I can see no reason as a matter of principle or policy to limit its availability to a prospective or actual party to prospective, pending or actual litigation. Furthermore, the leading authorities on litigation privilege, including *Waugh*, do not do so.

190.  Having said that, it is not surprising that the bulk of cases and commentary discuss litigation privilege by reference to a prospective or actual party to prospective or actual litigation. It will not often be the case that a non-party will have a sufficient interest in the litigation such as to seek legal advice in relation to the litigation and, crucially, for that purpose communicating with third parties (either directly or via their lawyer) in order to seek "materials for the brief" to ensure that the instructed lawyer has a proper basis on which to advise. A victim of a crime and, in particular, a victim of fraud is a

good example of a person likely to have a sufficient interest in litigation such as to wish to obtain legal advice regarding the proceedings.

191.   It is irrelevant that the vast majority of victims of a crime do not seek separate legal advice about criminal litigation relating to the crime. Where a victim of a crime (for example, of a fraud) has a sufficient interest in criminal litigation arising out of the crime such that they are motivated to seek legal advice, there is no reason of principle or policy why documents generated by the victim or their lawyer in communication with third parties or other documents coming into their possession or control in connection with those communications should not be protected by litigation privilege, provided that the necessary conditions are otherwise satisfied, including that the relevant litigation is in reasonable contemplation and that the communications are for the dominant purpose of enabling the relevant legal advice to be sought or given and/or seeking or obtaining evidence or information to be used in or in connection with the relevant litigation.

192.   In the *Minera Las Bambas* case at [31], Moulder J relied on *Hollander on Documentary Evidence* (12th edition) at 18-01 for the proposition that a party should be free to seek evidence without being obliged to disclose the results to the other side, noting without further analysis that this rationale does not apply to a non-party. The relevant passage in *Hollander on Documentary Evidence*, as noted by Mr Edey, relies on *Lee v SW Thames Health Authority* at 850. I accept Mr Edey's submission that in that case the Court of Appeal was not required to consider, and did not consider, whether a non-party to litigation could assert litigation privilege. A different health authority from the defendant health authority had obtained a document from an ambulance crew with a view to obtaining legal advice, the other health authority being a potential defendant to litigation contemplated against it. The defendant health authority had come into possession of the document. The privilege holder did not waive privilege. The defendant health authority could therefore rely on that privilege, which, as Mr Edey also noted, was not a surprising result.

193.   I note that the passage in *Hollander on Documentary Evidence* (12th edition) on which Moulder J relied assumes, rather than asserts supported by reasoning or authority, that litigation privilege is only available to a party or potential party to litigation. Paragraph 18-01 of *Hollander on Documentary Evidence* (13th edition), which I assume for present purposes is substantially the same as in the 12th edition (which I do not have to hand), reads in relevant part as follows:

> "The second category of legal professional privilege is wider than the first, but arises only when litigation is in prospect or pending. From that moment on, any communications between the client and his solicitor or agent, or between one of them and a third party, will be privileged if they come into existence for the sole or dominant purpose of either giving or getting legal advice with regard to the litigation or collecting evidence for use in the litigation. This is the basis for claiming privilege for correspondence with witnesses of fact or experts, and proofs, reports or documents generated by them. **The principle is that a party or potential party should be free to seek evidence without being obliged to disclose the result of the searches to the other side.** …" (emphasis added)

194.    In *Minera Las Bambas* at [31], Moulder J relied on, and closely followed the wording of, the sentence that I have highlighted in the above passage. She then commented, "This rationale does not extend to a non-party." With respect, I see no reason why that rationale should not extend to a non-party where the non-party has such an interest in the litigation that the non-party chooses to seek legal advice in relation to that litigation. Where the non-party does so, the non-party's "materials for the brief" should, as a matter of principle and policy, be protected.

195.    *Thanki on Privilege* at paragraph 3.80 addresses the issue squarely by asserting that:

> "Litigation privilege can only arise in favour of someone who was a party (or in respect of whom there was a reasonable prospect they would be a party) to the litigation which is said to give rise to the privilege."

196.    No authority is cited for this broad proposition. In the next sentence, an example is given in relation to an application for disclosure from a non-party, where it is said that the person cannot claim privilege to avoid having to disclose a communication between the person and a third party even if the communication was made for the dominant purpose of that litigation, unless there was a reasonable prospect of the person being a party to the litigation. That is said to be supported by *USA v Philip Morris* at [72]-[73]. That case, however, was not concerned with adversarial proceedings but with proceedings to obtain evidence from a non-party, where the only issue regarding which the non-party would relevantly be seeking legal advice would be whether the non-party was required to provide the evidence sought. The litigation privilege rationale of "collecting evidence from third parties as part of the material for the brief in the action, or of seeking information which lead to the obtaining of such evidence" would not apply in such a case. *USA v Philip Morris*, therefore, does not provide support for the broad proposition in *Thanki on Privilege* at paragraph 3.80, which I have quoted immediately above.

197.    *Passmore on Privilege* at paragraph 3-006 sets out in summary what a person must establish in order to be able successfully to assert litigation privilege in relation to a communication, including that the communication is made:

> "… for the dominant purpose of use in litigation that, at the time the communication is made … is litigation in which the [person] is, or reasonably anticipates becoming, a party … ."

198.    In support of the summary of which the above statement forms part, *Passmore on Privilege* refers to the passage from the judgment of Lord Carswell in *Three Rivers (No 6)* at [102], which is set out in its entirety at [172] above. Mr Edey, as I have already noted, submitted that this passage does not say anything about a person seeking to assert litigation privilege having to be party or potential party to the relevant litigation. I agree.

199.    I note that Lord Carswell in *Three Rivers (No 6)* at [102] articulated the dominant purpose test by reference to a person's "conducting" litigation. "Conducting" might be considered an odd word to use to describe a non-party's involvement in litigation, but I do not consider that Lord Carswell was intending by the choice of that word to refer to anything more specific than attending to the interests of the person in relation to the actual or prospective litigation. The same holds true in relation to the use of the word

"conduct" in the passage from *Anderson* quoted at [143] above and in the passage from *Grant v Downs* quoted at [174] above, each of which appears in the speech of Lord Edmund-Davies in *Waugh* at 542C-F and 544A-B, respectively.

200. I accept Mr Edey's submission that *Guinness Peat Properties* and *Winterthur Swiss Insurance* provide support for the proposition that a non-party to litigation may, in appropriate circumstances, be entitled to assert litigation privilege in relation to litigation in which the non-party had, for the purposes of each of those cases, a sufficient interest.

201. In *Guinness Peat Properties*, one of the issues that the Court of Appeal had to grapple with was whose intention counted for purposes of determining the dominant purpose for which a document was prepared. In that case, the defendant firm of architects had written the letter over which litigation privilege was claimed in order, it was said, simply to comply with the terms of the defendant's professional indemnity insurance policy, one of the conditions of which required that a letter be sent to a specified insurance broker notifying the claim.

202. Slade LJ dealt with this issue in *Guinness Peat Properties* at 1036C-1039A. He held that the dominant purpose of a document does not necessarily fall to be ascertained by reference to the intention of its actual composer. The intention of the insurer, who required the letter to be created by and therefore under whose direction it was created, determined the dominant purpose for purposes of litigation privilege. The insurer had a "real interest in seeing that the claim is defended". The defendant could rely on the "common interest" between it and the insurer. Slade LJ referred to the articulation of that principle by Brightman LJ in *Buttes Gas and Oil Co* at 267. In that case, Lord Denning MR also dealt with "common interest privilege" at 243.

203. Ms Oppenheimer sought to distinguish *Guinness Peat Properties* on the basis that the case was focused on whose purpose counted for determining the dominant purpose and is explained by reference to the principle of common interest privilege. Regardless, however, of the basis on which the defendant in *Guinness Peat Properties* was permitted to assert the privilege in that case, the key point is that the insurer, a non-party to the relevant litigation, was entitled to assert litigation privilege in relation to that litigation. In this case, the defendants say that they must assert litigation privilege on behalf of the relevant Dechert Clients because it exists and has not been waived by them: see, for example, *Winterthur Swiss Insurance* at [72]. So, the fact that *Guinness Peat Properties* resolved on a different basis does not disturb the fundamental point that *Guinness Peat Properties* shows that a non-party is able to assert litigation privilege in relation to litigation to which it is not a party provided that it has a sufficient interest in the litigation.

204. In *Winterthur Swiss Insurance*, the second claimant (NIG) underwrote "After the Event" (ATE) legal expenses insurance policies in connection with a litigation funding scheme operated by the first defendant (TAG). Under the scheme, a potential claimant would apply to TAG for ATE insurance cover. TAG would refer the claim to a multi-stage vetting process, involving at one stage the second defendant, a specialist firm of solicitors, and at a subsequent stage, a firm selected from a panel of solicitors firms, one of which was the third defendant. The purpose of the vetting process was to establish whether the claim had a greater than 50% chance of recovering at least £1,500, in order to ensure that the ATE scheme remained profitable. If the claim passed the

vetting process, TAG would issue an ATE policy to the potential claimant on behalf of NIG. As part of the vetting process, the potential claimant had to prepare documents regarding the prospective claim. NIG sought disclosure of these documents. The defendants resisted on the grounds that the documents were privileged.

205.   In *Winterthur Swiss Insurance*, Aikens J held at [91] that the documents were not privileged because the dominant purpose of the preparation of the documents was to establish whether an ATE policy should be issued to the relevant prospective claimant. However, in his judgment at [92] and at [127]-[128], Aikens J made it clear that if litigation privilege had applied to the documents, the privilege holder would have been NIG, given that the documents were prepared under its direction according to a scheme of its devising. It is noteworthy, for present purposes, that NIG would not have been a party to the underlying litigation giving rise to such litigation privilege. For this reason, *Winterthur Swiss Insurance* also provides support for the proposition that a non-party with a sufficient interest in litigation can invoke litigation privilege if the necessary conditions of confidentiality, litigation in reasonable prospect, and dominant purpose are otherwise satisfied.

206.   I add, parenthetically, that it will be relatively uncommon that a non-party to civil or criminal litigation will have a sufficient interest in the litigation to be motivated, notwithstanding the cost, to seek legal advice and, in connection with the legal advice, to create or seek to obtain documents for the purpose of ensuring that the legal advice is properly based ("materials for the brief"). That is why it is natural that discussion of litigation privilege in cases and commentary often appears to assume that the person seeking to assert the privilege is a party or prospective party. This also explains the use of words such as "conduct of" or "conducting" litigation in relation to litigation privilege. But it is also notable that nowhere in case law, other than in the *Minera Las Bambas* case, does the question of whether a non-party can invoke litigation privilege appear to be considered directly. In my view, this is most likely because the question will not arise often in practice, at least not often enough to have generated case law.

207.   In *R v Gibbins* [2004] EWCA Crim 311, the Court of Appeal considered an appeal from a ruling by Field J during the course of a trial at Southwark Crown Court, where the issue was whether draft instructions to counsel, prepared by a co-defendant of the appellant and annotated by the appellant, which were never sent to counsel, should be excluded from the prosecution evidence under section 78 of the Police and Criminal Evidence Act 1984 on the basis that the document was protected by legal professional privilege. At [46], the Court of Appeal said:

> "So far as policy is concerned, it is clear that the existence and application of the rule respecting LPP is one of policy which applies equally to civil and criminal proceedings **and is applicable whether or not the party relying upon it is or is not a party to, or witness in, the proceedings**." (emphasis added)

208.   The Court of Appeal in this statement refers to the "single integral privilege" (*Three Rivers (No 6)* at [105]), making no distinction between, on the one hand, legal advice privilege, where the existence of proceedings, prospective or actual, is not in any event required, and, on the other hand, litigation privilege.

209.    I note that in *Gibbins* at [19], the Court of Appeal referred to the legal professional privilege asserted in this case as falling under the sub-head of legal advice privilege (presumably on the basis that the co-defendant who drafted the instructions to counsel was the appellant's former solicitor), but it appears that it could equally (and probably should) have been characterised as litigation privilege, given that the sole purpose of the document was to obtain legal advice from counsel, but it was never sent and therefore the legal advice was never obtained.

210.    I treat this authority with some caution on this point for the foregoing reason, but at a minimum it suggests that there is no "established principle" that litigation privilege can only arise in favour of a person who is an actual or prospective party to the litigation in question.

211.    Where a non-party is a victim of fraud, the non-party (especially, as in this case, if it is a governmental entity) is likely to have a real interest in seeing that the fraud is successfully criminally prosecuted. This is all the more the case where, as under UAE criminal procedure, the non-party may make a civil claim for damages in the criminal proceedings.

212.    I hasten to add that the question is not whether the relevant non-party has a *legitimate* interest, namely, an interest that must meet some qualitative threshold, however formulated, before it is recognised for this purpose. (But, if a legitimate interest were required, a victim would have a legitimate interest in the successful conviction of the perpetrator of the crime against it.) What is necessary (if not sufficient), in my view, in order for litigation privilege to be available to a non-party to relevant actual or prospective litigation is the non-party's having a *sufficient* interest in prospective or actual litigation such that it seeks legal advice and, in connection with that legal advice, communicates with third parties (directly or through its lawyer) and obtains documents to ensure that the legal advice is properly founded. The policy underlying litigation privilege clearly applies to this situation.

213.    Turning finally to the last of the four questions summarised by Ms Oppenheimer, relating to Mr Al Sadeq's specific objection to the claim to litigation privilege set out in row 3 of the Litigation Privilege Table, I do not accept the submission by Mr Al Sadeq that criminal litigation could not have been in reasonable contemplation before a complaint was accepted by the RAK public prosecutor on or about 19 February 2015. What matters is what was in reasonable prospect from the point of view of the relevant Dechert Clients, which had engaged the defendants with a view to enlisting their help in relation to the Investigation of the Alleged Fraud. I accept the evidence of Mr Allen that, as far as criminal proceedings in respect of Mr Al Sadeq were concerned, they were in the reasonable contemplation of the relevant Dechert Clients shortly after Mr Al Sadeq's arrest, as set out in row 3.

214.    For these reasons, this part of the Privilege Application fails.

*Challenges to defendants' approach to redactions*

215.    Paragraph 6 of the Draft Order reads as follows:

        "6.    In applying redactions to disclosed documents made available for inspection, the Defendants shall:

6.1    Not be entitled to withhold from inspection parts of documents on grounds of legal professional privilege or otherwise which do not represent separate or severable communications from the unredacted parts.

6.2    Ensure that, in applying the dominant purpose test for legal advice privilege or litigation privilege, any parts of documents which are properly severable and have been made available for inspection in redacted form satisfy the dominant purpose test.

6.3    Ensure that, where parts of documents have been made available for inspection on the basis that they contain 'primary material' (as defined at paragraphs 38-40 of Allen 3), that all such material is made available for inspection, and that the meaning and context of such material is not obscured by any redactions applied."

216.   Ms Oppenheimer submitted that paragraph 6 of the Draft Order was necessary because the way in which redactions have been applied by the defendants' legal team obscures the meaning of the document in a manner that suggests that the dominant purpose test has not been properly applied.

217.   Ms Oppenheimer submitted that where a document can be severed into distinct parts, the privileged parts can be redacted, and the rest should be disclosed. If, however, the document cannot be divided into severable parts, then the dominant purpose test falls to be applied to the document as a whole in order to determine whether legal professional privilege can be claimed. If the defendants are not satisfied that the dominant purpose test is satisfied in relation to the document as a whole, then the document should be disclosed in its entirety. Thirty-three specific examples of questionable redactions are given in Appendix 1 to Mr Tsiattalou's sixth witness statement ("the Redactions Schedule"). The current position is unsatisfactory, Ms Oppenheimer submitted, and would be remedied if the defendants complied with a direction in the form sought by Mr Al Sadeq in paragraph 6 of the Draft Order.

218.   In relation to this part of the Privilege Application, Mr Edey submitted that there is no proper basis for the order sought. In his third witness statement, Mr Allen had properly acknowledged the possibility of minor inconsistencies or other errors in the redactions process. When such errors have been raised with the defendants, they have been dealt with. This does not provide a basis for any wider concern.

219.   Mr Edey noted that Mr Allen had worked through and provided responses to each alleged error in the Redactions Schedule, providing a table in the form of the Redactions Schedule with an additional column headed "Enyo Response", which is exhibited to Mr Allen's ninth witness statement. Mr Edey noted that Mr Al Sadeq's principal criticism appeared to be that some of the redactions were applied to passages that were not properly "severable" from the rest of the document. This and similar criticisms were based on an incorrect view of the law.

220. Mr Edey submitted that there is no principle that says it is only permissible to redact a part of a document on privilege grounds where that part is "properly severable" from the unredacted parts. He submitted that the authorities are to the contrary, citing: *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd, The Good Luck* [1992] 2 Lloyd's Rep 540 (Comm); *GE Capital Corporate Finance Group Ltd v Bankers Trust Co* [1995] 1 WLR 172 (CA) at 176F (Hoffmann LJ) approving the judgment of Saville J in *The Good Luck* "when he held that disclosure of the unprivileged part of a document was not a waiver of privilege for the rest, even though both dealt with the same subject matter"; and *Shah v HSBC Private Bank (UK) Ltd* [2011] EWCA Civ 1154 in which the Court of Appeal confirmed at [29] (Lewison LJ) that the approach of Hoffmann LJ in the *GE Capital v Bankers Trust* case remained good law "in the changed landscape of the CPR". Mr Edey submitted that the law was correctly summarised in *Thanki on Privilege* at paragraphs 4.03 and 4.06 and that the defendants had correctly applied the principles summarised there.

221. In relation to the dominant purpose test, Mr Edey submitted that the defendants had correctly applied it in relation to each document as a whole, but then made unredacted sections available for inspection, not because they were not for a privileged purpose, but because they were not confidential for privilege purposes, for example, communications between Dechert and the RAK public prosecutor.

222. In relation to paragraph 6.3 of the Draft Order dealing with Primary Material, Mr Edey submitted that the defendants have, save in a few minor respects (which have been corrected when identified), correctly left Primary Material unredacted and available for inspection. Mr Al Sadeq has failed to establish that there is any general or systemic concern about the way the defendants have applied the redactions. The criticism that the meaning and context of some unredacted Primary Material may be obscured does not mean that privileged material must also be unredacted and made available for inspection.

223. Accordingly, Mr Edey submitted, there was no basis for making the order set out in paragraph 6 of the Draft Order.

224. I accept the submissions of Mr Edey in relation to this part of the Privilege Application. I have not been able to discover any authority for the proposition that it is only permissible to redact a part of a document on the grounds of privilege if it is severable from the unredacted parts. The authorities (see [220] above) appear to be the contrary. As noted in *Thanki on Privilege* at 4.06, if privileged and non-privileged information are so inter-twined that redacting the privileged parts of a document becomes impracticable or unfeasible, then the balance will have to fall in favour of withholding the entire document on the basis of privilege. I have no good reason to conclude that the defendants' legal team have not applied the proper principles to the process of redaction. Mr Allen has confirmed in his evidence that, in relation to each document containing privileged and non-privileged material, the defendants have applied the dominant purpose test to the document as a whole.

225. Accordingly, this part of the Privilege Application fails.

*Miscellaneous privilege issues*

226.    It was confirmed at the hearing that Mr Al Sadeq no longer pursues the relief sought in paragraphs 9.1 and 9.3 of the Draft Order. That leaves only paragraph 9.2, which reads as follows:

> "9.        The Defendants shall by 4pm on [...]:
>
> ...
>
> 9.2        Disclose and make available for inspection documents containing or evidencing the advice received by Mr Gerrard and Ms Black during the period 12 August 2015 [to] 30 August 2015, by which it is alleged to have become apparent to them that a settlement not involving a conviction of Mr Al Sadeq was impossible due to Article 106 of the Federal Criminal Law.
>
> ... ."

227.    Ms Oppenheimer noted that at paragraph 131 of their Amended Defence, the defendants pleaded that between 12 August 2015 and 30 August 2015, it "became apparent" to Mr Gerrard and Ms Black that a settlement with Mr Al Sadeq involving withdrawal of prosecution would not be possible because of the effect of Article 16 of the Federal Criminal Procedure Law of the UAE. She submitted that, contrary to the evidence of Mr Allen in his ninth witness statement that this had been communicated to Mr Al Sadeq at the time (and therefore communication of that fact involved no waiver of privilege), it is clear from the words "became apparent" that Mr Gerrard and Ms Black received advice, which they relied on as an explanation for acting as they did. Ms Oppenheimer submitted that this plainly constituted a waiver, judging that question objectively: see *Digicel (St Lucia) Limited v Cable & Wireless Plc* [2009] EWHC 1437 (Ch) at [31] (Morgan J).

228.    Mr Edey submitted that this part of the Privilege Application is misconceived. Acknowledging that the law on waiver is complex and the authorities are difficult to reconcile, he submitted that in broad terms waiver only occurs during the course of proceedings if a privileged document or its contents are deployed in court. It is generally not sufficient if a mere reference is made to a privileged document or to its effect.

229.    Mr Edey submitted that paragraph 131 of the Amended Defence is not even a "mere reference". It simply pleads that the defendants became aware of the effect of Article 16 of the UAE Federal Criminal Procedure Law. Further, no question of waiver arises at present because the defendants have not "deployed in court" any privileged document. Furthermore, any privilege would belong to the relevant Dechert Clients. Apparent authority to waive privilege does not arise in this case because the defendants have filed the Amended Defence on their own behalf. The defendants are not acting in this case on behalf of the privilege holder(s).

230.    In relation to this final part of the Privilege Application and paragraph 9.2 of the Draft Order, I do not consider that there has been any waiver of privilege by the defendants. The words "became apparent" in paragraph 131 of the Amended Defence are too

slender a reed on which to hang a waiver at this stage of the proceedings. I also accept Mr Edey's submission that, in any event, the defendants are not acting in this case on behalf of the privilege holders, the Dechert Clients, and therefore do not have apparent authority to waive privilege on their behalf.

231.    Accordingly, this part of the Privilege Application fails.

*Conclusion*

232.    For the foregoing reasons, the Privilege Application is dismissed.