## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:20-cv-00954-WO-JLW

FARHAD AZIMA,

               Plaintiff,

   v.

NICHOLAS DEL ROSSO and
VITAL MANAGEMENT SERVICES,
INC.,

               Defendants.

**DEFENDANTS' BRIEF IN
SUPPORT OF MOTION FOR
CLARIFICATION AND LIMITED
STAY RELATING TO DOCUMENT
PRODUCTION AND
DEPOSITIONS**

Defendants Nicholas Del Rosso ("Del Rosso") and Vital Management Services, Inc. ("VMS") (collectively, "Defendants"), and pursuant to 28 U.S.C. § 636, hereby seek clarification of the Magistrate's Order dated July 25, 2023, relating to discovery, (D.E. 248) (the "Order"), and request a limited stay pursuant to L.R. 72.3, until the Court can rule on this motion (the "Motion").

Specifically, Defendants have complied with the Court's Order by producing and/or logging responsive documents in good faith; however, this Motion seeks to clarify that Order to make clear that any discovery obligations are limited to documents and information relating to Plaintiff, Plaintiff's Associates, or any business or personal enterprise involving or Related to Plaintiff (hereinafter "Azima"), as explained below, and to clarify that production of documents unrelated to Azima would violate the proportionality

1

requirement found in Fed.R.Civ.P. 26(b)(1), as addressed in arguments raised by Defendants and third-parties. This Motion is necessitated also by new evidence obtained in recent weeks and notice from Plaintiff's counsel that they do not intend to abide by the temporal limitations in the Order. *See infra.*

## INTRODUCTION

In this lawsuit, Plaintiff seeks to aggressively probe the lawful work of Defendants, who served as an expert consultant for an international law firm within the scope of its representation of its client, the Government of Ras Al Khaimah and its related entities ("RAK"). As such, Defendants are in possession of considerable documents and information that remain subject to and protected by applicable privileges of third-party law firms and their clients, which have been upheld in other jurisdictions with respect to Defendants' work. (*See, e.g.*, D.E. 231 (citing April 5, 2023 ruling from the English High Court, *Al Sadeq v. Dechert LLP, et al.* [2023] EWHC 795 (KB), which upheld Dechert's assertions of privilege)).

Pursuant to the Court's Order dated July 25, 2023, dealing with discovery, Defendants have produced and are producing and logging in good faith tens of thousands of pages of material broadly relating to Azima.[1] It is

---

[1] As demonstrated below, Defendants are not objecting to that portion of the order requiring production of all documents relating to an expanded category involving Plaintiff, or if privileged, to provide a privilege log as to such items. Defendants have therefore produced and/or logged tens of thousands of pages of material even though the documents requested

apparent from Plaintiff's recent arguments, however, that he reads the Order as requiring the production of documents having nothing to do with this case, or even to Azima, and which therefore lack relevance, or alternatively, are so remotely connected to the issues at bar as to violate the proscription in Fed.R.Civ.P. 26(b), against requiring discovery which is not proportional to the needs of the case, which focuses on when (and how) Plaintiff's alleged trade secrets were published on the Internet using WeTransfer. More specifically, the "needs of the case" can be stated succinctly: (l) were Defendants responsible for the republication of Plaintiff's data, and (2) did that publication occur in 2018-19 using WeTransfer, as alleged, or did it actually took place in 2017, resulting in the case being time barred.

Therefore, clarification of the Order and a temporary stay of discovery on these matters is appropriate for the following reasons:

**_First_**, without the clarification sought by Defendants, Plaintiff contends that Defendants and third-parties are required to disclose any documents or information relating to approximately 50 entities or individuals and 15 projects listed by Plaintiff, regardless of whether these matters are related to Plaintiff and regardless of whether Defendants participated in any supposed projects. (*see* Neuman Decl. Exs. A & C). This includes RAK, which Plaintiff defines as

---

relate to many categories of evidence which were explicitly dismissed by the Court in its ruling on the motion to dismiss. (*See* D.E. 65.)

including not only three governmental entities identified as constituting RAK, but also "all current and former entities Related to the government of Ras Al Khaimah." (*Id.* Ex. A, definitions). Not only is such broad discovery irrelevant and disproportionate to the needs of this case, but it also implicates serious conflicts of law and privileges of other jurisdictions, which the Court has not yet resolved.

***Second***, the disproportionate discovery that Plaintiff continues to pursue will not aid in the resolution of the remaining issues in this case. The whole basis for this case remaining alive is the allegation by Plaintiff that his purported trade secrets at issue remained concealed from the public at large until 2018 (within the three-year statute of limitations), when Plaintiff claims that it was first published on the Internet. For the avoidance of doubt, Defendants have conducted a thorough search for ***any*** documents relating to the use of WeTransfer by Defendants ***or any other person or entity*** and – other than filings or correspondence in this case – have found none.

Plaintiff's right to any discovery is questionable, much less discovery relating to individuals or entities unrelated to Azima. Plaintiff omitted the fact that the data at issue in this lawsuit has been publicly available through WeTransfer since ***2017***, which is outside of the limitations period for his remaining claims. (*See* D.E. 247, pp.3-4). Plaintiff has not demonstrated how

4

his continued expansion of discovery relating to individuals or entities other than Azima will assist in the resolution of the remaining claims.

***Finally***, by filing a supplemental declaration shortly before this Court's ruling, Plaintiff made it impossible for Defendants to respond to Plaintiff's supplemental Declaration of Ian Herbert. (*See* D.E. 245 & 246). That declaration has now been shown to rely on fabricated messages and false and misleading statements. (*See* Declarations of Chiranshu Ahuja and Vijay Bisht). As reflected in the declarations of Messrs. Ahuja and Bisht, Plaintiff's counsel has falsely alleged that CyberRoot admitted hacking Azima's data and publishing it on the internet. *Id.* Those declarations further demonstrated that counsel for Azima admitted, *inter alia*, that Plaintiff conspired with the Stokoe law firm to publish bank statements that Azima had stolen from CyberRoot, (*e.g.*, Ahuja Decl., ¶ 13), and that counsel for Azima offered CyberRoot a lucrative "Consulting Agreement," (*Id.* ¶ 19), similar to Mr. Azima's failed attempt to coerce Vikash Pandey into providing false testimony in this matter, (*see, e.g.*, D.E. 157-6 ¶¶ 25-28).

Accordingly, and as explained below, Defendants respectfully request that the Court's Order be clarified to require only discovery as to documents or information related to Plaintiff, Plaintiff's Associates, or any business or personal enterprise involving or Related to Plaintiff. In order to remove any doubt that discovery will still encompass any relevant material, Defendants

5

also rely on the definition of "Associates" and "Related" used by Plaintiff in his own request for production.[2]

## BACKGROUND

Defendants have already produced or logged as privileged (or will do so contemporaneously with this filing) tens of thousands of documents in good faith, which far exceeds the narrow issues remaining in this case after the District Court dismissed all hacking claims and narrowed Plaintiff's remaining claims.

The District Court previously dismissed Plaintiff's hacking claims, finding that the only claim remaining was Plaintiff's allegation that his trade secrets were republished on the Internet in 2018 and 2019 using WeTransfer, and "the dependent civil conspiracy claim [which] likewise limited to the 2018-2019 conduct – the only allegations that are not time-barred." D.E. 65, pp.23-34. Notwithstanding that limitation, Plaintiff's initial discovery demand, served on November 2, 2022, demanded that Defendants produce documents which had nothing to do with republication of Azima's data. Plaintiff demanded production, without limitation, of all documents relating to:

---

[2] Plaintiff's First RFP contains the following definition: "Relate to," "Relating to," or "Related to" [Azima] shall mean and include constituting, discussing, mentioning, containing, embodying, reflecting, identifying, incorporating, referring to, dealing with, or pertaining to in any way." RFP No. 1, Definitions. With the exception of the reference to Dr. Massaad, *see infra,* we have adopted the definitions employed by Plaintiff.

> Dechert, Neil Gerrard, Jamie Buchanan, Buchanan
> Entities, Ras Al Khaimah Entities, CyberRoot, Aditya
> Jain, Jain Entities, Stuart Page, Stuart Page Entities,
> Amit Forlit, Forlit Entities, KARV, Chris Swecker,
> Swecker Entities, Patrick Grayson, Grayson Entities,
> Paul Robinson, Robinson Entities, Yuri Koshkin,
> Koshkin Entities, Nick McCullough, McCullough
> Entities, Jean Renaud Fayol, Fayol Entities, Northern
> Technologies Inc., Gary Lowe, or any other Person that
> performed any work for or provided any services to
> Defendants, or for whom Defendants provided,
> attempted to provide, or offered to providework [sic].

(Neuman Decl. Ex. A, RFP No. 1.)

While several requests, including request number 1, limited production sought to material "related to Plaintiff, Plaintiff's Associates, or any business or personal enterprise involving or Related to Plaintiff," (*see id*.), the requests which followed contain no such limitation, and demanded all records of any sort relating to any of the above named individuals or entities whether or not having any relationship to Azima, his Associates, or those Related to him, including all "agreements," (*see* RFP No. 4), calendar records, (*see* RFP No. 5), travel records, (*see* RFP No. 8), work of any sort, (RFP No. 9), and plans to meet Amir Handjani, whether or not the meeting related to Azima, or those businesses or corporation in which he held an interest.

Defendants objected to the document requests on the grounds that they sought materials which was irrelevant, and which additionally, violated the proportionality requirement contained in Rule 26(b)(1). (D.E. 159, pp.1-2

7

("Plaintiff seeks disproportionate party and third-party discovery to probe nearly every transaction and commercial relationship of Defendants without regard for the scope of the lawsuit set by the Court.") & p.3 ("Plaintiff should not be permitted to conduct disproportionate discovery for other parties' benefit or for his pecuniary benefit.")).

Plaintiff also deposed Mr. del Rosso on numerous grounds which bore little, if any, resemblance to the allegations remaining in the case after the Court granted the motion to dismiss. Following that deposition, both sides filed motions disputing whether the examination was appropriate. (*See, e.g.*, D.E. 216). Several questions from Plaintiff appeared to be fishing for information concerning Defendants' laptop, which the Court in the U.K. found within the last week had been stolen from del Rosso, which the Stokoe law firm had obtained under suspicious circumstances, and which the Stokoe law firm was ordered to return to Defendants.

The depositions of Mr. del Rosso, which lasted seven hours, and the upcoming 30(b)(6) deposition in which Mr. del Rosso anticipates again being deposed, raises similar issues, and is being used as an opportunity by Plaintiff to go far beyond documents and information regarding Azima. For instance, correspondence received from Azima's counsel in anticipation of Del Rosso's deposition shows that the 27 categories of individuals and entities suddenly ballooned to 48 identified entities and individuals, 15 identified projects, and

8

"any litigation involving Plaintiff Azima." (Neuman Decl. Ex. B). Again, Defendants are producing and logging documents relating to any litigation involving Azima, as well as any documents in the 48 identified entities and individuals, and 15 identified projects which relate to Azima, to the extent the same is in Defendants' possession, custody, or control. Defendants continue to object to a limited extent, however, as to documents and information unrelated to Azima. In fact, permitting examination of Defendants on "any litigation involving Plaintiff Azima" conflicts with the SDNY Court's order staying discovery related to that matter, as noted in prior briefing.

Plaintiff has also voiced his position that he is not going to limit discovery to this Court's ruling. Following the Court's Order limiting discovery to a period beginning in 2015, Plaintiff's counsel provided notice that they were not going to abide by that Order, continues to inquire about events in 2014, and additionally, intended to depose Mr. del Rosso for more than the three hours which they sought in their earlier motion to compel the resumption of his deposition. (*See* Neuman Decl. Ex. E ("we provide notice that we will exceed the previously anticipated additional period of three hours for [Mr. del Rosso's] continued depositions for as long as necessary to correct the record as to this issue")). This demand followed correspondence in which defense counsel pointed out that counsel for Plaintiff had questioned Mr. del Rosso during is prior deposition about a document which appears to have been stolen from

9

Dechert's files, and which bore the legend "attorney client privilege; work product doctrine." (*See* Neuman Decl. Ex. F). Although Plaintiff later produced the Dechert work product in discovery, Plaintiff refused to divulge how Miller & Chevalier acquired the document, and in fact, responded that they "didn't want to spoil the mystery," when asked about the document during Mr. del Rosso's deposition. (*Id.*) To date, Plaintiff has refused to explain how he came into possession of an adverse law firm's confidential work product.

In contrast to the broad disclosures made by Defendants to date, and as of the filing of this Motion, Plaintiff has provided virtually no responsive discovery. He has refused to sit for his deposition without a proper justification. (*See* Neuman Decl. Ex. C). He has even refused to produce any answers to interrogatories identifying his trade secrets which were supposedly published in 2018-19. (*See* Neuman Decl. Ex. D). Plaintiff has, likewise, refused to produce copies of the republished data, which his expert witness opined was published using WeTransfer outside of the limitations period, in 2017. (*See, e.g.*, D.E. 247 p.10 (quoting Tarbell Aff. Dec. 8, 2020, ¶ 117)). In short, Plaintiff refuses to respond to mounting evidence that he concocted this case against Defendant, refuses to participate in discovery of the basic elements of his claim, and demands that Plaintiff produce everything in Defendants' possession, irrespective of whether it relates to Azima.

## DISCUSSION

10

There is no indication in the Court's Order that it intended to open discovery to anything Mr. del Rosso or Vital did pertaining to any of the expansive list of individuals, entities or subjects set forth in the discovery demands and examination of Mr. del Rosso. Accordingly, we respectfully request that the Court clarify its opinion to address questions of proportionality and indicate that discovery requests are limited to those specifically relating to "Plaintiff, Plaintiff's Associates, or any business or personal enterprise involving or related to Plaintiff," as Plaintiff himself indicated was appropriate in fashioning Request for Production Number 1.[3]

Discovery unrelated to Azima would require production of irrelevant material. But even setting aside the lack of probative force any allegations of unrelated hacking would have to Plaintiffs' claims, he ignores the fact that this case is no longer about hacking; those claims were dismissed. (*See* D.E. 65).

Moreover, even if some argument in favor of finding that such documents meet the test for relevance, production should still be denied. While there is a relatively low bar which must be met for discovery to be "relevant," the discovery sought must also be "proportional to the needs of the case,

---

[3] The sole exception is that Defendant included Dr. Massaad in defining anyone "related to Dr. Massaad." Plaintiff evidently tried to assist Dr. Massaad in trying to negotiate an agreement between Dr. Massaad and RAK prior to any alleged hacking of Azima in 2016. Other than the fact that Azima's present counsel, Miller & Chevalier, previously represented Massaad, and appear to still represent him, there is no reason why documents relating to Massaad should be deemed relevant to an alleged conspiracy to republish data in 2018-19 relating to Azima.

11

considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Rule 26(b)(1).

Relevancy is not the end of the inquiry, but only the beginning. "[R]elevance alone is insufficient to require production. [The party seeking production] must also show that its request is "proportional to the needs of the case." *Arrow Enterprise Computing Solutions, Inc. v. BlueAlly, LLC*, 2017 WL 876266, at *4 (E.D.N.C. 2017); *see also Insight Psychology and Addiction, Inc. v. City of Costa*, slip op., 2021 WL 6102425 (Oct. 20, 2021) ("Although relevance for discovery purposes is defined very broadly, it is not without boundaries"); *Chestnut v. Kincaid*, slip op., 2022 WL 358170 (D. Md. 2022) ("all permissible discovery must be measured against the yardstick of proportionality") (citation omitted); *Dowdy v. GEICO General Insurance Company,* 2017 WL 10765264 (M.D. Ga., 2017) ("it is now clear that the Court has a responsibility to consider the proportionality of all discovery requests no matter how relevant the information sought may be."). The proportionality requirement extends both to document requests and depositions. *See Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs.*, No. 1:13CV651, 2016 WL 4007605, at *2–5 (M.D.N.C. July 26, 2016) (finding Rule 30(b)(6) deponent did not have to be

12

prepared to discuss irrelevant topics, or topics that were relevant but, considering proportionality, were otherwise "overbroad and unduly burdensome").

As demonstrated below, without clarification, the Order would contravene Rule 26(b)(1) if extended to discovery unrelated to Azima and his remaining claims. We address below the specific factors showing that discovery unrelated to Azima far exceeds anything which is proportional to the needs of the case.

## I. Discovery Sought From Defendants Unrelated to Azima Raises Serious Confidentiality And Privilege Issues With No Apparent Benefit For the Needs of the Case.

The discovery sought by Defendants implicates important privilege and confidentiality concerns. Plaintiff demands all documents relating to Chris Swecker, the Dechert law firm, Dechert's clients (including RAK and RAK's counsel), and other clients of Vital, which clearly encompass materials subject to the attorney-client privilege, work product doctrine and confidentiality concerns in multiple jurisdictions. There are unresolved conflicts of law issues regarding the privileges applicable to Vital's lawful work in assisting lawyers related to foreign proceedings; however, United States law would also protect privilege and confidentiality under the circumstances.

For instance, documents relating to Swecker, Vital's counsel, directly implicate attorney-client privilege and work product. The same is true of work

for Dechert, which was communicating with Defendants in connection with its representation, for instance, of RAK. *See, e.g.*, *U.S. v. Kovel*, 296 F.2d 918, 921–22 (2nd Cir. 1961); *Grand Jury Proc. Under Seal v. United States*, 947 F.2d 1188, 1190-91 (4th Cir. 1991) ("[I]f the client first consults with a lawyer who retains an [consultant] . . . the privilege applies."); *Liggett Grp., Inc. v. Brown & Williamson Tobacco Corp.*, 116 F.R.D. 205, 210-11 (M.D.N.C. 1986) (privilege applies to an "agent" of the party asserting the privilege); see also Fed. R. Civ. P. 26(b)(3)(A) (protecting work product prepared in anticipation of litigation or for trial, including a party's consultants); *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 134 (D.D.C. 2012) ("[A]lthough the doctrine is known as the attorney work-product doctrine, work product created by non-attorneys can also be protected if it is so intertwined with the legal analysis as to warrant protection." (internal quotation and citation omitted)).

Notwithstanding that profound problem with this request, Defendants are either producing or logging all documents relating to Swecker, Dechert, or RAK, or subcontractors assisting Defendants in connection with their work for Dechert relating to Azima. Plaintiff, however, insists that Vital produce documents involving communications with counsel irrespective of whether they have anything to do with Azima. Plaintiff has not made the slightest showing why such documents unrelated to Azima are relevant or proportional to the needs of the case. In fact, there are tens of thousands of pages of material

14

unrelated to Azima, all of which arguably would have to be reviewed, and either produced or reflected in a privilege log, based on Plaintiff's reading of the Order.

## II. Disproportionate Discovery Sought by Plaintiff is Not "Important in Resolving the Issues" Remaining in this Case.

The discovery sought in this case must, according to the explicit language of Rule 26, be viewed not only in terms of the burden imposed on any party, but also as to whether the discovery is "important in resolving the issues" in the case. Courts interpret this issue as requiring the court to "look to whether the discovery sought is at the very heart of the litigation." *Labrier v. State Farm Fire and Casualty Co.*, 314 F.R.D. 637, 643 (W.D. Mo. 2016).

### A. Discovery Unrelated to Azima Would Be Irrelevant to a Dispositive Threshold Issue

Although the Court may consider the evidence presented by Defendants showing that Plaintiff's claims lack merit and are time-barred, doing so is unnecessary to conclude that information unrelated to Azima hardly goes to "the very heart of the litigation." *See Labrier*, *supra*. As previously demonstrated, the District Court refused to dismiss the remaining trade secret claims because the Complaint in this case alleged trade secrets were disclosed in 2016 on blog sites that used BitTorrent peer-to-peer transfers that were unavailable to the general public, (D.E. 1 ¶¶ 20, 21, & 23) and then only in 2018-19 was his data published on new links involving WeTransfer which

15

rendered that data publicly accessible for the first time. (*Id.* ¶¶ 24 & 26). Based on Plaintiff's allegations and arguments, which failed to disclose Plaintiff's expert opinion that the data at issue was actually republished using WeTransfer in *2017*, (*see* D.E. 247 p.10), the Court denied the motion to dismiss, in part, holding that because the alleged use of WeTransfer occurred less than three years prior to filing the lawsuit, the statute of limitations had not expired. (D.E. 79 p.11).

Accordingly, and as this Court has observed, the central issue needed to be addressed in order to resolve Plaintiff's remaining claims is whether Defendants instructed CyberRoot to republish Plaintiff's still-unidentified "trade secrets" using WeTransfer, which Plaintiff inaccurately argued began within the limitations period in 2018 and 2019. (*See e.g.*, D.E. 65 pp.23–25 (holding that the "2018-2019 conduct—the only allegations that are not time-barred"); D.E. 79 p.11 ("Crucially – from a statute of limitations standpoint – in May 2018, June 2018, and June 2019, the blogs were allegedly updated with links to WeTransfer sites that contained Plaintiff's trade secrets.")). None of the discovery as to which this Motion is directed relate in any way to that key issue.

And while a consideration of the key issue in this case is sufficient to deny extending discovery to issues unrelated to Azima, it is also appropriate

for the Court to consider the fact that Plaintiff's entire theory set forth in the Complaint is based on a falsehood. Courts are free to consider not only whether claims are made in bad faith, they also can consider whether the discovery is likely to have any impact on the outcome of the lawsuit. *See, e.g.*, *United States v. Drake,* 64 F.4th 220 (4th Cir. 2023) (affirming denial of "discovery and . . . attorney's fees based on its review of the evidence").

Not only have Defendants presented mounting evidence that Plaintiff and his agents stole CyberRoot's bank statements in 2020 and presented false witness statements, at the close of discovery in this matter, Defendants independently learned that Plaintiff has known for ***years*** that it was false to claim, as he did in the Complaint, that the data remained on dark web sites inaccessible to the public until 2018-19, when it was first published on blog sites appearing on the Internet using WeTransfer. (*See* D.E. 247). In fact, Plaintiff's expert rendered an opinion that the data he alleged was published using WeTransfer in 2018-19 had been published on the same WeTransfer account in ***January 2017, more than three years prior to filing the lawsuit, and thus beyond the statute of limitations***. (*Id*. p.10)

Accordingly, there is no need for Plaintiff to force Defendants to incur the incredible costs of reviewing documents and responding to excessive discovery if – as the evidence clearly demonstrates – the requested discovery is irrelevant to the statute of limitations issue, and dismissal of the Complaint

17

as time-barred would have been appropriate if Plaintiff had fully disclosed these facts.

## B. Discovery Unrelated to Azima Has Nothing to Do With Another Central Issue in this Case: Whether Any of the Documents Published on the Internet Constituted Trade Secrets.

When asked to produce his alleged trade secrets in response to Defendants' Request to Produce Documents, Plaintiff simply grabbed handfuls of documents which had been published on the Internet and produced them to Defendants. He made no effort to explain how these documents constitute trade secrets, and nothing produced was evidently a trade secret within the meaning of N.C. Gen. Stat. § 66-152. Plaintiff also asked in interrogatories for Plaintiff to identify his alleged trade secrets. (*See* Neuman Decl. Ex. D). Plaintiff refused that request as well. (*Id.*)

Plaintiff has an obligation to seek discovery based only on a good faith basis for asserting that he has a valid claim. Given his complete failure to cooperate in any discovery process as to the basic elements of his claim, (*see, e.g.*, Neuman Decl. Ex. D), it is particularly improper for him to seek documents which are not even related to him, his Associates, or those Related to him.

18

**C. Seeking Discovery Note related to Azima Is Not Needed to Resolve the Unsupported Allegation that there Was a Conspiracy to Publish Defendant's Trade Secrets on the Internet in 2018-19**

Even if the Court were to indulge Plaintiff in the assumption that the case will not be dismissed as time-barred (although Plaintiff has yet to explain why it isn't), and it can ignore Plaintiff's refusal to even identify any trade secrets allegedly published by Defendants, the Order does not provide clarity as to the proportionate scope of discovery necessary to prove a conspiracy existed to republish Plaintiff's data using WeTransfer in 2018-19.

For instance, there is no dispute that much of Plaintiff's discovery sought here would be relevant to allegations made in other lawsuits, including those against other parties, that there was a conspiracy to hack lawyers and their clients accusing the Government of RAK of improper conduct, ranging from coerced interrogations to criminal prosecutions based on insufficient evidence. *See, Azima, et. al., v. Dechert, et al.*, 1:22-cv-08728 (PGG). Despite the contrary evidence and sworn witness statements in this matter, the theory advanced for seeking such evidence is that if Plaintiff can prove that Defendants hacked anyone, including non-parties, or made false statements in litigation in any of the various lawsuits, it is more likely that Plaintiff could convince a jury that they hacked him. But this tortured theory overlooks a fundamental fact: Plaintiff's claims in this case relating to hacking have long been dismissed and

19

Plaintiff has offered no evidence to show Defendants' use of WeTransfer or his participation in the republication of the same. See D.E. 65. Accordingly, even if one could accept the logic in Plaintiff's position, it is simply too attenuated to the publication claim to pass muster under Rule 26(b)(1).

## III. Discovery Unrelated to Azima Is Out of Proportion to Any Realistic Amount in Controversy

Under the explicit language of Rule 26(b)(1), the discovery sought must be proportional to the "amount in controversy." Plaintiff has never contended that the discovery sought by him is proportional to the amount in controversy. *Compare Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Company*, 322 F.R.D. 1 (D.D.C. 2017) (finding that discovery was proportional where "Defendants have suggested that Oxbow seeks to recover over $150 million—a figure that Defendants do not appear to dispute."). Nor could the Court reasonably find that the discovery unrelated to Azima met any such requirement since: (1) the Complaint contains no indication of the amount in controversy and simply seeks an amount to be determined at trial, (*see* D.E. 1, Prayer for Relief, ¶ 1), and (2) Plaintiff has steadfastly refused to produce any discovery bearing on that issue or to quantify this amount. As stated above, when asked to produce documents constituting trade secrets, and how the disclosure has impacted Plaintiff, Plaintiff refused to provide any information whatsoever. *See supra.* Plaintiff has no right to hide facts bearing on the

20

proportionality analysis, and then claim that the Court should nevertheless order production.

Consequently, because the cost of discovery in this case far exceeds any possible damages or claim, the motion for clarification should be granted to avoid further disputes over disproportionate discovery by Plaintiff.

## IV. The Herbert Declaration Misrepresents Purported Communications by Plaintiff's Counsel with CyberRoot and Undermines Plaintiff's Sweeping Request for Documents Unrelated to Azima.

Another area where Azima is seeking documents unrelated to Azima is with respect to CyberRoot. As the Court will recall, Azima has repeatedly alleged in this case that CyberRoot was directed by Defendants to access and publish Azima's data. (Compl., ¶¶ 2-3.) In seeking documents relating to CyberRoot, Plaintiff's argument invites the Court to consider the merits of the claims in ruling on discovery by submitting the declaration of Ian Herbert, who claims that CyerRoot directors admitted to the hacking scheme, even though CyberRoot has repeatedly denied these false allegations. (*See* Ahuja Decl. & Second Bisht Decl.). The Court may in fact consider whether a discovery claim is made in good faith, or contrary to the evidence. *See, e.g.*, *United States v. Drake*, 64 F.4th at 222 (4th Cir. 2023) (affirming the district court's denial of "discovery and . . . attorney's fees based on its review of the evidence"). Plaintiff's allegations directed at CyberRoot show that this is just such a case

21

and the Court should consider the falsity of Plaintiff's supplemental motion directed at CyberRoot.

On the eve of a hearing in the English Proceedings and shortly before the Court entered its Order, Plaintiff filed a supplemental declaration by Ian Herbert to support Plaintiff's discovery demands by claiming that CyberRoot Directors Bisht and Ahuja admitted that CyberRoot was in fact directed by Defendants to hack Azima's data and publish the contents. (*See* D.E. 245, 246.) Based on declarations filed by Vijay Bisht and Chiranshu Ahuja, the allegations made by Mr. Herbert are patently false, and indeed, are either wildly reckless or knowing falsehoods. (*See* Ahuja Decl. & Second Bisht Decl.)

Mr. Herbert claims in his Declaration that he and his partner, Kirby Behre, communicated repeatedly with CyberRoot Director Vijay Bisht between February and the end of June, 2023, and even met with him in Tokyo over two days. (D.E. 246 ¶ 8). Herbert claims that Bisht confessed both in writing and at the Tokyo meeting to having hacked Azima and publishing his data at Defendants' direction. (*Id.*) He also claims that discussions broke off after Bisht demanded in Tokyo that CyberRoot receive $20 million and immunity, and thereafter deleted all messages. (*Id.*, ¶¶ 9-10). Herbert claims that critical text message were deleted using an app he and Behre were using to communicate.

In reality, Bisht and co-director Ahuja vigorously dispute this account, offering documentation demonstrating that Herbert's account is false.

Bisht never communicated with Herbert, never met him in Tokyo (he was home in India, thousands of miles away), and never confessed to having hacked or published Azima's data. (*E.g.*, Second Bisht Decl., ¶ 11).

CyberRoot director Ahuja did communicate with Behre and later met with Herbert and Behre to confront them over the theft of CyberRoot's bank records, and to have Azima cease falsely accusing CyberRoot of being a hack for hire firm. Ahuja never told Behre or Herbert that CyberRoot hacked or published Azima's data. Ahuja Decl., ¶¶ 12-13. And Herbert's account as to how they ended discussions after CyberRoot demanded $20 million and immunity is also false and omits material facts. As reflected in the Ahuja Declaration, Miller & Chevalier sent Ahuja a settlement agreement and "consultancy agreement" after the Tokyo meeting explicitly ***offering to pay CyberRoot*** if it would settle with Azima, copies of which he attached to his declaration, (*id*. ¶ 19). Obviously aware how it would look if it came out that Plaintiff's counsel offered to pay the entity supposedly responsible for hacking Plaintiff and divulging his "trade secrets" to the world, Herbert omitted any mention of this material fact in his declaration. This settlement offer follows others in which supposed wrongdoers were repeatedly subject to unsupported

23

legal threats and told that they would be paid handsomely if they would admit facts helpful to plaintiffs, regardless of whether those facts were true.[4]

During the meeting with Ahuja, counsel for Plaintiff also admitted that, *inter alia*, they had conspired with an individual assisting Azima, Mr. Jonas Rey, to introduce CyberRoot's stolen bank statements and that "the main objective of [Stokoe Partner] Mr. Tsiattalou's discovery application in the United States was to publicly introduce the stolen bank statements to strengthen Mr. Azima's case." (*Id.* ¶ 13.) It is increasingly clear from discovery in this matter that Plaintiff and his agents, Jonas Rey and Aditya Jain (another individual working for Azima), stole CyberRoot's bank information in 2020 to help create this case, and Plaintiff's agents have admitted that discovery proceedings are being pursued for improper purposes, (*id.*).

Accordingly, the Herbert Declaration offers no support for expanding discovery as to CyberRoot and underscores fundamental issues of fairness in this case. Defendants have already agreed to either produce and/or log any documents relating to CyberRoot which also relate to Azima.

---

[4] As the Court will recall, Cameron Findlay also alleged that he needed discovery from Defendants del Rosso and Vital. Despite the fact that Findlay was accused of leaking sensitive data relating to another entity, he was paid over £ 1 million pounds after he agreed to cooperate. The same modus operandi was tried and failed with Vikash Pandey. As the Court will recall, Plaintiff's counsel alleged that Vikash Pandey was instrumental in hacking Azima, but then turned around and offered him a consultancy agreement (worth $500,000), much like the one offered Ahuja if Pandey would "cooperate with Azima in the case. (*See, e.g.*, D.E. 157-7 ¶ 38).

## V. The Discovery Order Should Exclude the Laptop Stolen from Mr. del Rosso, which the Stokoe Firm Has Resisted Returning to del Rosso, and Which is Now Subject to Disclosure Obligations in London, at Azima's Request

Finally, there is no basis for insisting that Defendants produce documents from a laptop which was stolen from Mr. del Rosso, and which is currently in the hands of the Stokoe Partners law firm. That laptop was the subject of an extensive hearing in London, which resulted in the Court commenting on July 31, 2023, that the laptop had been stolen from del Rosso, and questioning the suspicious circumstances surrounding how the Stokoe law firm had acquired and accessed it. There are serious questions about the extent to which the Stokoe law firm and their co-conspirators have altered or unlawfully accessed the data and accounts on del Rosso's laptop. Indeed, counsel for Azima has apparently "accessed his laptop in England[.]" (*Id.* ¶ 18).

Plaintiff knows full well that his request for documents contained on the Laptop cannot be produced pursuant to the Court's Order in this case. For one thing, the U.K court recently ordered that the laptop be returned to Mr. del Rosso's counsel, although the Stokoe firm has still retained possession of the laptop. Moreover, ***at Azima's request,*** Mr. del Rosso agreed that the laptop will remain in London in the custody of del Rosso's U.K. solicitors, and further, disclosure requests could be made by Azima to those U.K. solicitors once the laptop is returned and examined by del Rosso's U.K. solicitors and experts.

25

Based on the procedure now adopted by the Court in London and the fact that the Stokoe law firm has refused to give up possession of the Laptop, notwithstanding the Court's ruling, there is no possibility that Defendants can assess whether the laptop includes responsive information or produce discovery from the laptop, especially within the time frame set forth in this Court's order. Any discovery from that laptop will be subject to disclosure obligations in London, as urged by Azima's counsel in the U.K. action, rendering it improper to deal with discovery in the context of this proceeding.

## VI. Plaintiff Cannot Unilaterally Expand the Scope of Discovery, Ignoring this Court's Order.

As explained above, Defendants have recently been told that Plaintiff has no intention of limiting his questioning of Mr. del Rosso to events between March 2015 and October 2020. (*See* Neuman Decl., Ex. E). Moreover, Plaintiff has advised that they also do not intend to limit themselves to the 3 hours which they sought in asking to re-depose Mr. del Rosso. *Id.*

As far as any limitation on temporal scope of discovery, this Court's order was clear. Defendant has not sought permission for the Court to reconsider that Order, and accordingly, has no right to unilaterally set the rules. As far as the right to depose Mr. del Rosso at all, we understand that the Court's Order may be read as granting the motion to depose Mr. del Rosso for an additional three hours. In light of the fact that Mr. del Rosso has already been

26

deposed for 7 hours and will be deposed for an additional 7 hours in connection with the rule 30(b)(6) deposition, we respectfully request that no further deposition be conducted of Mr. del Rosso in his individual capacity.

## CONCLUSION

The Court's Order dated July 25, 2023 should be modified to require only production of documents related to Azima, his Associates or Any parties Related to Him, as defined above, and any further deposition in which Mr. del Rosso is ordered to appear be limited to proportionate topics in any 30(b)(6) deposition.

Respectfully submitted, this the 8th day of August, 2023.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By:     *Brandon S. Neuman*
    Brandon S. Neuman, NCSB# 33590
    Jeffrey M. Kelly, NCSB# 47269
    John E. Branch III, NCSB# 32598
    Nathaniel Pencook, NCSB# 52339
    Sam Rosenthal *(special appearance)*
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Telephone: (919) 329-3800
    Facsimile: (919) 329-3799
    brandon.neuman@nelsonmulli ns.com
    jeff.kelly@nelsonmullins.com
    john.branch@nelsonmullins.com
    nate.pencook@nelsonmullins.com
    sam.rosenthal@nelsonmullins.com
    *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send electronic notification of filing to the following:

Jonathan D. Townsend
Christopher W. Jones
Ripley Rand
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
jonathon.townsend@wbd-us.com
chris.jones@wbd-us.com
ripley.rand@wbd-us.com

Ian A. Herbert
Joseph Rillotta
Kirby D. Behre
Timothy O'Toole
Cody Marden
Calvin Lee
Miller & Chevalier Chartered
900 16th Street, N.W.
Washington, D.C. 20006
iherbert@milchev.com
jrillotta@milchev.com
kbehre@milchev.com
totoole@milchev.com
cmarden@milchev.com
clee@milchev.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:  *Brandon S. Neuman*
Brandon S. Neuman, NCSB# 33590
Jeffrey M. Kelly, NCSB# 47269
John E. Branch III, NCSB# 32598
Nathaniel J. Pencook, NCSB# 52339
Sam A. Rosenthal (*special appearance*)
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
brandon.neuman@nelsonmullins.com
jeff.kelly@nelsonmullins.com
john.branch@nelsonmullins.com
nate.pencook@nelsonmullins.com
sam.rosenthal@nelsonmullins.com
*Counsel for Defendants*

28

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), I hereby certify, subject to Fed. R. Civ. P. 11, that the foregoing document contains 6,234 words, according to the word count feature of the word processing system used to prepare the brief. Accordingly, the brief does not exceed the word limitation.

Respectfully submitted this 8th day of August, 2023.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: *Brandon S. Neuman*
    Brandon S. Neuman, NCSB# 33590
    Jeffrey M. Kelly, NCSB# 47269
    John E. Branch III, NCSB# 32598
    Nathaniel J. Pencook, NCSB# 52339
    Sam A. Rosenthal (*special appearance*)
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Telephone: (919) 329-3800
    Facsimile: (919) 329-3799
    brandon.neuman@nelsonmullins.com
    jeff.kelly@nelsonmullins.com
    john.branch@nelsonmullins.com
    nate.pencook@nelsonmullins.com
    sam.rosenthal@nelsonmullins.com
    *Counsel for Defendants*