UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:20-cv-00954-UA-JLW

| | | |
|---|---|---|
| FARHAD AZIMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **CHIRANSHU AHUJA** |
| NICHOLAS DEL ROSSO and | ) | |
| VITAL MANAGEMENT | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

I, **Chiranshu Ahuja**, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

1.    I am a Director of CyberRoot Risk Advisory Private Limited ["**CyberRoot**"]. CyberRoot is an Indian company that provides risk mitigation, online reputation management, information security, and digital forensics services. Except where otherwise indicated below, this affidavit is based on my personal knowledge, and I believe all facts set forth below to be true.

2.    I am over the age of eighteen years of age and competent to testify as to the matters set forth in this Declaration.

3.    I have been shown a witness statement executed by Mr. Ian Herbert, an attorney at the firm of Miller & Chevalier and submitted in the English Proceedings. A true copy of Mr. Ian Herbert's English Witness Statement is attached hereto as **Exhibit 1** and the exhibit that he filed with his

*CA*

English Witness Statement is attached hereto as **Exhibit 2**. I have also been shown a declaration executed by Mr. Ian Herbert, which includes substantially identical allegations and was contemporaneously filed in this matter, which is attached hereto as **Exhibit 3**. For the purposes of this witness statement, I will refer to Mr. Herbert's allegations in the English witness statement, but my denials apply equally to both submissions by Mr. Herbert. Mr. Herbert alleges that I communicated with him on several occasions, and met face-to-face with him in Tokyo on 20-21 June 2023. It is true that I met with Mr. Herbert in Tokyo; however, Mr. Herbert substantially misrepresents the purpose for and the substance of my communications with his firm, Miller & Chevalier. For the avoidance of doubt, the alleged admissions of hacking reported by Mr. Herbert are false and denied.

4. Since late 2020, CyberRoot and its employees have been subject to considerable false accusations by Mr. Farhad Azima. In February 2021, we learned that Mr. Haralambos Tsiattalou filed CyberRoot's confidential bank statements in open court, and we promptly worked with law enforcement to confirm that our bank statements had been stolen. On June 16, 2021, CyberRoot registered a criminal complaint with the Commissioner of Police concerning the illegal leakage of CyberRoot's bank statements. I understand that our June 16, 2021, complaint and subsequent confessions obtained by Indian law enforcement have previously been filed in this matter. Although those criminal proceedings are ongoing, the investigation has progressed to persons

2

*CA*

associated with Mr. Aditya Jain, with whom I understand Messrs. Farhad Azima and Jonas Rey have worked for several years.

5.  Based on the apparent connection between Mr. Azima and the unlawful acts committed against CyberRoot, I contacted Messrs. Kirby Behre and Dominic Holden by email on February 6, 2023. The purpose of my outreach to Mr. Azima's counsel was to address the considerable reputational harm and attacks caused to CyberRoot by Mr. Azima's unlawful acts and false allegations, which Mr. Azima promoted through his media contacts. Shortly thereafter, I spoke with Mr. Kirby Behre by telephone, and we later communicated by the messaging application, Signal. Mr. Herbert alleges in paragraph 5 of his witness statement that Mr. Vijay Bisht "repeatedly contacted Farhad Azima's counsel" and began text messaging Mr. Behre beginning in February 2023. I am the only director of CyberRoot who has communicated with Mr. Behre, and I disagree with Mr. Herbert's characterization of or allegations concerning my communications with Mr. Behre. During my calls with Mr. Behre, I raised the damages that had been caused to CyberRoot by the theft of its bank records and Mr. Azima's false allegations; however, Mr. Behre was unwilling to discuss a potential settlement unless CyberRoot accepted that it had hacked Mr. Azima, which we have denied and continue to deny. I did not "refuse" to explain the purpose for our communication and settlement demands, as alleged by Mr. Herbert in paragraph 5 of his witness statement.

3

6.      I continued to discuss the potential settlement of our claims with Mr. Behre but deny Mr. Herbert's characterizations of my communications with Mr. Behre and his attribution of these communications to Mr. Bisht. On or about March 22, 2023, I agreed to meet with Mr. Behre in a neutral location – Tokyo, Japan – as Mr. Behre was unwilling to come to India in light of our proceedings, and I was unwilling to go to the US or UK in light of Mr. Azima's proceedings.

7.      Mr. Herbert also alleges in paragraph 6 that "Mr. Bisht on behalf of CyberRoot agreed to provide a preview of the evidence CyberRoot[]" and that "CyberRoot asked M&C to communicate on a messaging application called 'Twinme." These allegations are false. No one at CyberRoot, including Mr. Bisht, offered to provide a "preview of evidence" to Mr. Behre or his colleagues. In fact, Mr. Behre asked me if I could find an anonymous messaging application for future communication. We ultimately agreed to use a newer messaging application, Twinme, which I had not previously used before.

8.      With respect to the message provided by Mr. Herbert provided as Exhibit IAH1 and attached hereto as Exhibit 2, purporting to be a Twinme message sent by Mr. Vijay Bisht from CyberRoot, I deny that Mr. Vijay Bisht, or anyone else from CyberRoot sent these messages or any similar messages, deny that the substance is true, and believe that these messages have been fabricated. As an initial matter, this Twinme message is from a username, "Fronx," that I did not and do not use. I downloaded Twinme at Mr. Behre's request on or about May 16, 2023, but I used a different username to

4



communicate with Mr. Behre, which I decline to disclose out of fear that further fabricated messages will be falsely attributed to me or my company. As I was already communicating with Mr. Behre using Signal, which is a secure messaging application, I can only assume that Mr. Behre insisted on communicating using Twinme so that he could generate a fake chat for his own interests.

9.      Mr. Herbert then goes on to allege that "Mr. Bisht, on behalf of CyberRoot" admitted several facts which he details in paragraphs 7.1 through 7.7 of his witness statement.   Ex. 1, ¶ 7. To my knowledge, Mr. Bisht never used Twinme and, in fact, I communicated with Mr. Behre using a different username. For the avoidance of doubt, I did not send the messages using Twinme or any other means of communication setting forth in words or substance any of the statements contained in Mr. Herbert's witness statement. It is also my understanding and belief that each of the statements alleged by Mr. Herbert to have been made by me are false, and the contents of these purported messages are denied as false.

10.     Mr. Herbert then alleges that to prove CyberRoot was involved in hacking Mr. Azima, Mr. Bisht provided "passwords of Mr. Azima's that CyberRoot had used to hack Mr. Azima." Ex. 1, ¶ 8. As noted above, the Twinme messages are fake, and only I communicated with Mr. Behre using Twinme, albeit under a different username. For the avoidance of doubt, I do not have any such passwords and, in any event, did not provide any such

5

passwords. For the avoidance of doubt, any allegation or suggestion that CyberRoot hacked Mr. Azima is false, and I made no such statement. Throughout CyberRoot's relationship with Vital, Mr. Bisht was the sole point of contact for this client relationship and, for the avoidance of doubt, Vital and Mr. Del Rosso have never requested or instructed that CyberRoot hack Mr. Azima or any other person. To my knowledge, Mr. Bisht did not communicate with Mr. Azima or his lawyers.

11. In paragraph 10, Mr. Herbert next claims that I met, along with Mr. Vijay Bisht, "in person on June 20-21, 2023, in Tokyo" with Messrs. Herbert and Behre. While it is true that I met with Messrs. Herbert and Behre in Tokyo on June 20-21, 2023, Mr. Herbert's witness statement substantially misrepresents the substance of and purpose for those meetings, and misrepresents that Mr. Bisht attended. I met with Messrs. Behre and Herbert four times over the course of June 20-21, 2023, during which we recessed so that they could consult with their colleagues. For the avoidance of doubt, Mr. Bisht did not attend these meetings, and I address the inaccuracies and omissions of Mr. Herbert below.

12. During my meetings with Messrs. Behre and Herbert, I presented evidence to them related to (1) the dismissal of Mr. Azima's hacking claims against the Defendants in this matter; (2) evidence from Indian law enforcement regarding the illegal acquisition of CyberRoot's confidential bank statements; and (3) documentation of the involvement of Mr. Ravi Rastogi, who is the chartered accountant for Aditya Jain's companies, and that we were aware that

6

Mr. Jain had been working with Messrs. Jonas Rey and Azima on these matters. Although Messrs. Behre and Herbert were initially disinterested in discussing CyberRoot's claims, we ultimately discussed several topics, including media coverage of CyberRoot and the illegal acquisition and use of CyberRoot's bank records. For the avoidance of doubt, I did not at any time admit that CyberRoot had been instructed to carry out the hacking of Mr. Azima or any other person by Vital or Mr. del Rosso.

13. During our meetings, I accused Mr. Behre and Mr. Azima of illegally accessing our company bank statements, to which he replied that it wasn't his firm that had planned for it and, initially, he had been reluctant to use the bank statements. However, Mr. Behre represented that Burlingtons and Mr. Jonas Rey insisted that our bank information needed to be introduced, which ultimately required Mr. Haralambos Tsiattalou to introduce the bank records. Mr. Behre admitted that the main objective of Mr. Tsiattalou's discovery application in the United States was to publicly introduce the stolen bank statements to strengthen Mr. Azima's case.

14. We also discussed damaging how Mr. Azima's filings and media coverage had damaged CyberRoot. For example, we discussed a Sunday Times article that accused Messrs. Jain and Rey of carrying out hack for hire contracts, and I questioned how Mr. Behre could rely on information provided by these persons who were accused of hacking. Mr. Behre did not indicate that he trusted Messrs. Rey or Jain and, instead, told me that these individuals were

7

*CA*

being paid by Burlingtons and that it was up to Burlingtons to manage them until the cases concluded.

15. Mr. Behre expressed frustration with the fact that I wanted to focus on the damage that Mr. Azima's false allegations had caused to CyberRoot, and told me that if we cooperated with him, it would be easy to "settle" the matter with CyberRoot. When I asked Mr. Behre what he meant by "cooperate," he told me that I or CyberRoot would need to admit that I received a hacking contract from Mr. Del Rosso and that we outsourced the hacking to Mr. Aditya Jain. I denied these allegations, but Mr. Behre stressed that settling with CyberRoot on its claims wouldn't help his case. Mr. Behre told me to think about it again and told me that he would speak to Burlingtons and "other interested parties" who were trying to corner Messrs. Del Rosso and Gerrard.

16. Contrary to paragraph 11 of Mr. Herbert's Witness Statement, it was Mr. Behre who suggested that Mr. Azima and other interested parties could pay me "up to" $20 million. Mr. Behre declined to answer whether the Eurasian Natural Resources Corporation would pay that amount, but Mr. Behre later admitted that a lot of planning had gone into creating the case before the May 2020 judgment in London. Also contrary to paragraph 11 of Mr. Herbert's Witness Statement, it was Mr. Behre who offered me "immunity" from any present and future cases from their side, so long as we would mutually release them from our claims related to the bank statement leak. Contrary to paragraph 7.7 of Mr. Herbert's Witness Statement, it was Mr. Behre who asked me to

8



convince Mr. Vikash Pandey to "reverse" his two witness statements, which we did not suggest we could or would do. Mr. Behre also offered to include a written apology from Mr. Aditya Jain for obtaining and leaking CyberRoot's bank statements.

17. In addition to the financial offers, Mr. Behre stressed that they would manage the negative media coverage of CyberRoot. I told Mr. Behre that we suspected that Mr. Azima had provided media outlets with our bank statements before the lawsuits were filed, as Mr. Raphael Satter from Reuters was contacting our customers from the statement before they were public. Mr. Behre told me that he would not comment on that statement, but assured me that he could manage the media.

18. Throughout the two days that I met with Mr. Behre, he stressed that Mr. Neil Gerrard and Ras al Khaimah were their main targets, and suggested that we should not "side" with them. He told me that Mr. Del Rosso was in failing health and that they had accessed his laptop in England, so the case would be over soon. He also asked me if I knew whether Mr. Del Rosso was hiding data in London or Dubai, but told me that they were "cornering" Mr. Del Rosso. Mr. Behre also told me that a lot of people around Messrs. Del Rosso and Gerrard were switching sides, like Mr. Stuart Page, and he asked me why I would "stand on a losing team." I did not agree to anything during our meeting, but Mr. Behre offered to meet with me again in Rome as soon as possible to sign an agreement that he would send to me.

9



19.     On July 5, 2023, Mr. Behre sent two documents to me by Signal. One was a proposed settlement agreement, and the other was a consulting agreement. A true copy of the proposed settlement agreement and consulting agreement presented to me by Mr. Behre on July 5, 2023 is attached as **Exhibit 4**. The settlement agreement included allegations that CyberRoot was involved in the hacking and leaking of Mr. Azima's data on torrents, so I responded that we were not on the same page and that we would have to reconsider later on.

20.     On July 11, 2023, Mr. Behre called me to tell me that he urgently needed me to sign the agreements, as they had a crucial hearing on July 21, 2023, and that it would give them the edge to "destroy" Mr. Del Rosso. I told him that I could not agree to the language in their proposals regarding CyberRoot's alleged involvement in the hacking.

21.     On July 19, 2023, Mr. Behre sent me a strange Signal message, which appeared to be recasting his previous demands to me about admitting to hacking Mr. Azima and my denials of the same. To the best of my recollection, that message stated that Mr. Behre remained "interested in your offer to provide truthful information and documents concerning your involvement with Del Rosso, Gerrard and others in the hacking of our client. We need to move forward now, so if you would like to reach an agreement settling your disputes with our client, it will need to happen in the next few hours. Let us know whether you want to act on your proposal. thanks[.]" Upon receipt of this communication, I became highly

10



suspicious that Mr. Behre's intent was to frame us and I terminated all communication with him.

22.     Finally, with respect to Mr. Herbert's allegation that Messrs. Bisht and Pandey were pressured by Vital's legal counsel to sign witness statements, those allegations are denied. CyberRoot's counsel facilitated all interviews and witness statements independently of counsel for Vital. I have only met or spoken with any attorney acting for Vital once or twice, and that always in the presence of CyberRoot's legal counsel. Rather, I believe that these allegations, and the other false allegations addressed above, were deliberately introduced to prejudice our ability to respond to Mr. Herbert's false allegations.

23.     I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Executed on July 28, 2023 in Gurugram, Haryana, India.

_____
Chiranshu Ahuja

# Exhibit 1

# (Witness Statement of Ian Herbert)

Filed on behalf of: Counterclaimant / Applicant

Witness: Ian A. Herbert

Number: 1

20 July 2023

Exhibit IAH1

**IN THE HIGH COURT OF JUSTICE**          **Case No. HC-2016-002798**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**BUSINESS LIST (ChD)**

**Assigned to: THE HON MR JUSTICE MICHAEL GREEN**

**BETWEEN:**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Claimant and Defendant to Counterclaim**

-and-

**FARHAD AZIMA**

**Defendant, Counterclaimant and Applicant**

-and-

**DAVID NEIL GERRARD**

**Second Additional Defendant to Counterclaim**

-and-

**DECHERT LLP**

**Third Additional Defendant to Counterclaim**

-and-

**JAMES EDWARD DENISTON BUCHANAN**

**Fourth Additional Defendant to Counterclaim**

-and-

**STOKOE PARTNERSHIP SOLICITORS**

**Respondent**

_____

**WITNESS STATEMENT OF IAN A. HERBERT**

_____

I, **Ian A. Herbert**, of Miller & Chevalier Chartered, of 900 16th Street NW, Black Lives Matter Plaza, Washington, D.C. 20006, United States of America, **SAY AS FOLLOWS**:

1.  I am counsel at Miller & Chevalier Chartered in Washington, D.C., and I am part of the team that represents Farhad Azima in the United States.

2.  The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3.  There is now produced and shown to me a document marked "Exhibit IAH1" to which reference will be made in the course of this statement in the form '[**IAH1/[page number]**]'.

4.  I make this statement in support of Farhad Azima in connection with his application for a third-party disclosure order against Stokoe Partnership Solicitors ("**Stokoe**") in respect of a laptop Mr Nicholas Del Rosso seeks an order in respect of.  Below I describe information provided to me and my firm by CyberRoot Group ("**CyberRoot**") concerning Mr. Del Rosso.

5.  Beginning in February 2023, CyberRoot, through its director Vijay Bisht, repeatedly contacted Farhad Azima's counsel at Miller & Chevalier ("**M&C**"), Kirby Behre, through the text messaging application Signal, seeking to provide evidence Mr. Bisht said supported Mr. Azima's case against Vital Management Services and Nicholas Del Rosso concerning the hacking of Mr. Azima. When asked for details about the information CyberRoot wished to share, Mr. Bisht repeatedly insisted upon an in-person meeting to provide CyberRoot's information. Mr. Azima's counsel declined to meet in person without CyberRoot first indicating what they were prepared to admit to and what documentary evidence they hold.  M&C also asked what CyberRoot hoped to get out of an in-person meeting, and they refused to say.

6.  Mr. Bisht on behalf of CyberRoot eventually agreed to provide a preview of the evidence CyberRoot possessed. In May 2023, CyberRoot asked M&C to communicate on a messaging application called "Twinme," a secure and encrypted end-to-end application for (among other things) text messages. CyberRoot then sent M&C a series of text messages on Twinme in which CyberRoot admitted to working with Mr. Del Rosso and others to

successfully phish and hack Mr. Azima and others starting in 2016. Attached as Exhibit 1 is a true and correct copy of those text messages as received **[IAH1/2-5]**.

7. Specifically, in the text messages, Mr. Bisht, on behalf of CyberRoot, admitted that:

    7.1. Mr. Del Rosso first contacted CyberRoot in 2015 and asked CyberRoot to hack Mr. Azima.

    7.2. CyberRoot successfully hacked Mr. Azima and others beginning in 2016.

    7.3. After obtaining Mr. Azima's data by hack, CyberRoot sent that data to Mr. Del Rosso via WeTransfer links via encrypted messaging applications.

    7.4. In June 2016, Mr. Del Rosso asked CyberRoot to transfer the hacked data onto laptops to be delivered to Mr. Neil Gerrard.

    7.5. Mr. Gerrard instructed CyberRoot (through Mr. Del Rosso) to place the hacked data on the Internet, which CyberRoot did.

    7.6. In 2017, at Mr. Del Rosso's instructions, CyberRoot delivered two mobile phones and one iPad to Mr. Del Rosso for secure communication.

    7.7. Vikash Pandey would be willing to "reverse" his prior witness statement.

8. To prove that CyberRoot was behind the hacking that Mr. Del Rosso and Mr. Gerrard ordered, the Twinme text messages from Mr. Bisht also included the passwords of Mr. Azima's that CyberRoot had used to hack Mr. Azima.

9. CyberRoot said that they could provide additional information and corroboration if M&C agreed to meet in person. CyberRoot refused to meet in the U.S. or Europe, and it was eventually agreed that the parties would meet in Tokyo, Japan.

10. Kirby Behre and I met with CyberRoot directors Mr. Bisht and Mr. Chiranshu Ahuja in person on June 20-21, 2023, in Tokyo. I recognized Mr. Ahuja from photos available on the Internet. Mr. Bisht and Mr. Ahuja claimed to be speaking for CyberRoot and the remaining director, Mr. Vibhor Sharma. At the meetings, CyberRoot again admitted to hacking Mr. Azima at the direction of Mr. Del Rosso, Mr. Gerrard, and others, starting in 2015. CyberRoot provided more detail beyond what was included in the May 2023 text

3

messages and presented some documentary support. For example, Mr. Bisht and Mr. Ahuja admitted that:

10.1. Mr. Del Rosso continued to ask CyberRoot to attempt to target Mr. Azima and others as late as 2020, and CyberRoot did so.

10.2. Mr. Del Rosso requested that CyberRoot attempt to hack Mr. Azima in 2019 to assist Mr. Gerrard in an upcoming trial involving Mr. Azima, and CyberRoot did so.

10.3. Mr. Del Rosso requested CyberRoot target the email addresses of others, such as cameron@riskprofiling.co.uk during 2018, and CyberRoot did so.

10.4. Mr. Del Rosso and Mr. Gerrard instructed CyberRoot to publish Mr. Azima's stolen data on the Internet, first in 2016 and then again in 2018 and 2019, which CyberRoot did.

10.5. In 2017, Mr. Del Rosso stopped paying CyberRoot through Vital Management Services because he was worried about the payments being traced back to him. He used multiple other entities to make payments to CyberRoot, totalling more than $2.3 million.

10.6. After Mr. Azima sued Mr. Del Rosso in the United States in October 2020, Mr. Del Rosso instructed CyberRoot to destroy all documents, but CyberRoot did not do so.

10.7. After this lawsuit was filed, Mr. Del Rosso's lawyers, including Brandon Neuman and Jeffrey Kelly, pressured Mr. Bisht and Mr. Vikash Pandey to sign false statements denying the hacking of Mr. Azima.

11.    After CyberRoot's presentation admitting to hacking and related illegal activity, CyberRoot for the first time explained what it was seeking. CyberRoot said that it wished to be paid $20 million in exchange for documentation backing up the information they had already provided. We rejected it as not being a serious request. CyberRoot also requested "immunity."

12.    This week, Mr. Bisht used the settings within Signal and Twinme to delete text messages, including the admissions attached to this statement. Mr. Bisht changed the settings on Signal to delete messages after 24 hours and deleted portions of the text messages on

4

Twinme attached to this statement, specifically those in which he confessed that CyberRoot hacked Mr. Azima. I therefore prepared this witness statement.

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

*Ian Herbert*
……………………………….

**IAN A. HERBERT**

Dated: 20 July 2023

Case No. HC-2016-002798

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
BUSINESS LIST (ChD)

_____

RAS AL KHAIMAH INVESTMENT

AUTHORITY

Claimant and Defendant to Counterclaim

-and-

FARHAD AZIMA

Defendant, Counterclaimant and Applicant

-and-

DECHERT LLP

Third Additional Defendant to Counterclaim

-and-

JAMES EDWARD DENISTON BUCHANAN

Fourth Additional Defendant to Counterclaim

-and-

STOKOE PARTNERSHIP SOLICITORS

Respondent

_____

Burlingtons Legal LLP

5 Stratford Place

London W1C 1AX

Ref: DPH25/AZI.3/2

Solicitors for the Defendant, Counterclaimant and Applicant

6

# Exhibit 2

# (Exhibit to Herbert Witness Statement)

B E T W E E N:

### RAS AL KHAIMAH INVESTMENT AUTHORITY
**Claimant and Defendant to Counterclaim**

-and-
### FARHAD AZIMA
**Defendant and Counterclaimant**

~~-and-~~
~~STUART ROBERT PAGE~~
~~First Additional Defendant to Counterclaim~~

-and-
### DAVID NEIL GERRARD
**Second Additional Defendant to Counterclaim**

-and-
### DECHERT LLP
**Third Additional Defendant to Counterclaim**

-and-
### JAMES EDWARD DENNISTON BUCHANAN
**Fourth Additional Defendant to Counterclaim**

_____

## EXHIBIT IAH1

_____

1


Hi, please wait. Let me arrange details.

How long? I have a meeting soon

5-10 min

1. NDR came in our contact in mid-2015. In early 2016 NDR contacted us for a special project related to FA whereby he shared two detailed documents on FA.
2. In early 2016, one of FA's close associate(not identified by anyone till now) was compromised subsequently Rey Adams, Afsaneh Azadeh etc. data was successfully breached. After this FA's accounts were also breached( fa system password- alglondon22 & fa wifi username- Farhad Azima and wifi password- 0123456789)
3. All the data was shared

Type a message

with NDR through we transfer links via an encrypted communication app.
Further updates of data for Rey and FA were shared with NDR.
4. On instructions of NDR in June 2016; three laptops were arranged and all the breached data was copied into them. These laptops were delivered in London to Neil Gerrard via special route.
5. Around July 2016, based on detailed discussion between NDR, Neil and others it was considered to use the data of FA in court and for this purpose data had to be put on Internet securely without traces.
6. FA data was divided into 3 tranches and was put on torrents and we-transfer in multiple phases as instructed by Neil via NDR.
7. In 2017, two mobile phones and one ipad were

instructed by Neil via NDR.
7. In 2017, two mobile phones and one ipad were specifically crafted and delivered to NDR in Dubai on his instructions.
8. In late 2017, number of meeting were held in RAK. Multiple meetings were held in London and Dubai in 2017, 2018 and so on.

This is just a small writeup, everything in detail and what transpired from 2018 till now can be discussed later on physically.

Also, Pandey can assist in reversing his 2 witness statement and assist further if needed.

18 May 4:07 AM

Hi, I hope our intent is clear to you now.
Let me know if we can proceed further on this?

Type a message


8. In late 2017, number of meeting were held in RAK. Multiple meetings were held in London and Dubai in 2017, 2018 and so on.

This is just a small writeup, everything in detail and what transpired from 2018 till now can be discussed later on physically.

Also, Pandey can assist in reversing his 2 witness statement and assist further if needed.

18 May 4:07 AM

Hi, I hope our intent is clear to you now.
Let me know if we can proceed further on this?

19 May 10:36 AM

Hi, Is there any further update?

Type a message

   

# Exhibit 3

# (Declaration of Ian Herbert)

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO. 20-cv-954-WO-JLW

| | |
|---|---|
| FARHAD AZIMA, <br><br> Plaintiff, <br><br> v. <br><br> NICHOLAS DEL ROSSO and VITAL MANAGEMENT SERVICES, INC., <br><br> Defendants. | **DECLARATION OF IAN A. HERBERT IN SUPPORT OF PLAINTIFF'S SUPPLEMENT TO HIS MOTIONS TO COMPEL PRODUCTION OF DOCUMENTS (ECF No. 130) AND FURTHER DEPOSITION TESTIMONY (ECF No. 188)** |

I, Ian A. Herbert**,** pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury the following:

1. I am counsel at the law firm of Miller & Chevalier Chartered, 900 16th Street NW, Washington, D.C., 20036. I am a member in good standing of the bar of the District of Columbia Bar and I have made a special appearance in this Court on behalf of Plaintiff Farhad Azima. ECF No. 19.

2. Recently, CyberRoot Group ("**CyberRoot**") has provided to me and my firm information concerning this matter. I have included in this declaration the information that is most relevant to Mr. Azima's Supplement to Plaintiff's Motion to Compel, but not all information provided by CyberRoot.

3. Beginning in February 2023, CyberRoot, through its director Vijay Bisht, repeatedly contacted Farhad Azima's counsel at Miller & Chevalier

1

("**M&C**"), Kirby Behre, through the text messaging application Signal, seeking to provide evidence Mr. Bisht said supported Mr. Azima's case against Vital Management Services and Nicholas Del Rosso concerning the hacking of Mr. Azima. When asked for details about the information CyberRoot wished to share, Mr. Bisht repeatedly insisted upon an in-person meeting to provide CyberRoot's information. Mr. Azima's counsel declined to meet in person without CyberRoot first indicating what they were prepared to admit to and what documentary evidence they hold. M&C also asked what CyberRoot hoped to get out of an in-person meeting, and they refused to say.

4.  Mr. Bisht on behalf of CyberRoot eventually agreed to provide a preview of the evidence CyberRoot possessed. In May 2023, CyberRoot asked M&C to communicate on a messaging application called "Twinme," a secure and encrypted end-to-end application for (among other things) text messages. CyberRoot then sent M&C a series of text messages on Twinme in which CyberRoot admitted to working with Mr. Del Rosso and others to successfully phish and hack Mr. Azima and others starting in 2016. Attached as Exhibit A is a true and correct copy of those text messages as received.

5.  Specifically, in the text messages, Mr. Bisht, on behalf of CyberRoot, admitted that:

a. Mr. Del Rosso first contacted CyberRoot in 2015 and asked CyberRoot to hack Mr. Azima.

b. CyberRoot successfully hacked Mr. Azima and others beginning in 2016.

c. After obtaining Mr. Azima's data by hack, CyberRoot sent that data to Mr. Del Rosso via WeTransfer links via encrypted messaging applications.

d. In June 2016, Mr. Del Rosso asked CyberRoot to transfer the hacked data onto laptops to be delivered to Mr. Neil Gerrard.

e. Mr. Gerrard instructed CyberRoot (through Mr. Del Rosso) to place the hacked data on the Internet, which CyberRoot did.

f. In 2017, at Mr. Del Rosso's instructions, CyberRoot delivered two mobile phones and one iPad to Mr. Del Rosso for secure communication.

g. Vikash Pandey would be willing to "reverse" his prior witness statement.

6. To prove that CyberRoot was behind the hacking that Mr. Del Rosso and Mr. Gerrard ordered, the Twinme text messages from Mr. Bisht also included the passwords of Mr. Azima's that CyberRoot had used to hack Mr. Azima.

7. CyberRoot said that they could provide additional information and corroboration if M&C agreed to meet in person. CyberRoot refused to

3

meet in the U.S. or Europe, and it was eventually agreed that the parties would meet in Tokyo, Japan.

8. Kirby Behre and I met with CyberRoot directors Mr. Bisht and Mr. Chiranshu Ahuja in person on June 20-21, 2023, in Tokyo. I recognized Mr. Ahuja from photos available on the Internet. Mr. Bisht and Mr. Ahuja claimed to be speaking for CyberRoot and the remaining director, Mr. Vibhor Sharma. At the meetings, CyberRoot again admitted to hacking Mr. Azima at the direction of Mr. Del Rosso, Mr. Gerrard, and others, starting in 2015. CyberRoot provided more detail beyond what was included in the May 2023 text messages and presented some documentary support. For example, Mr. Bisht and Mr. Ahuja admitted that:

   a. Mr. Del Rosso continued to ask CyberRoot to attempt to target Mr. Azima and others as late as 2020, and CyberRoot did so.

   b. Mr. Del Rosso requested that CyberRoot attempt to hack Mr. Azima in 2019 to assist Mr. Gerrard in an upcoming trial involving Mr. Azima, and CyberRoot did so.

   c. Mr. Del Rosso requested CyberRoot target the email addresses of others, such as [cameron@riskprofiling.co.uk](mailto:cameron@riskprofiling.co.uk) during 2018, and CyberRoot did so.

d. Mr. Del Rosso and Mr. Gerrard instructed CyberRoot to publish Mr. Azima's stolen data on the Internet, first in 2016 and then again in 2018 and 2019, which CyberRoot did.

e. In 2017, Mr. Del Rosso stopped paying CyberRoot through Vital Management Services because he was worried about the payments being traced back to him. He used multiple other entities to make payments to CyberRoot, totalling more than $2.3 million.

f. After Mr. Azima sued Mr. Del Rosso in this proceeding in October 2020, Mr. Del Rosso instructed CyberRoot to destroy all documents, but CyberRoot did not do so.

g. After this lawsuit was filed, Mr. Del Rosso's lawyers, including Brandon Neuman and Jeffrey Kelly, pressured Mr. Bisht and Mr. Vikash Pandey to sign false statements denying the hacking of Mr. Azima.

9. After CyberRoot's presentation admitting to hacking and related illegal activity, CyberRoot for the first time explained what it was seeking. CyberRoot said that it wished to be paid $20 million in exchange for documentation backing up the information they had already provided. We rejected it as not being a serious request. CyberRoot also requested "immunity."

10. This week, Mr. Bisht used the settings within Signal and Twinme to delete text messages, including the admissions attached to this

statement. Mr. Bisht changed the settings on Signal to delete messages after 24 hours and deleted portions of the text messages on Twinme attached to this statement, specifically those in which he confessed that CyberRoot hacked Mr. Azima. I therefore prepared this witness statement.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 20, 2023, in Washington, D.C.

Ian A. Herbert

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO. 20-CV-954-WO-JLW

FARHAD AZIMA,

    Plaintiff,

v.

NICHOLAS DEL ROSSO and
VITAL MANAGEMENT
SERVICES, INC.,

    Defendants.

**CERTIFICATE OF SERVICE**

    I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification of this Declaration to the following attorneys:

Brandon S. Neuman, Esq.
John Branch, III, Esq.
Jeffrey M. Kelly, Esq.
Nathaniel J. Pencook, Esq.
NELSON MULLINS RILEY & SCARBOROUGH, LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
brandon.neuman@nelsonmullins.com
jeff.kelly@nelsonmullins.com
nate.pencook@nelsonmullins.com
john.branch@nelsonmullins.com
Tel.: 919.329.3800
Fax.: 919.329.3799

1

Samuel Rosenthal, Esq.
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave NW, Suite 900
Washington, DC 20001
Tel.: 202-689-2951
Fax: 202-689-2860
sam.rosenthal@nelsonmullins.com

*Counsel for Defendants*


This, the 20th day of July, 2023.

**WOMBLE BOND DICKINSON (US) LLP**

  /s/ *Ripley Rand*
Ripley Rand
North Carolina State Bar No. 22275
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone:   (919) 755-8125
Facsimile:   (919) 755-6752
Email:      ripley.rand@wbd-us.com


*Counsel for Plaintiff*

2

# Exhibit A to Declaration of Ian A. Herbert

  
 Hi, please wait. Let me arrange details.

How long?  I have a meeting soon

5-10 min

1. NDR came in our contact in mid-2015. In early 2016 NDR contacted us for a special project related to FA whereby he shared two detailed documents on FA.
2. In early 2016, one of FA's close associate(not identified by anyone till now) was compromised subsequently Rey Adams, Afsaneh Azadeh etc. data was successfully breached. After this FA's accounts were also breached( fa system password- alglondon22 & fa wifi username- Farhad Azima and wifi password- 0123456789)
3. All the data was shared

 

   


with NDR through we
transfer links via an
encrypted communication
app.
Further updates of data for
Rey and FA were shared
with NDR.
4. On instructions of NDR in
June 2016; three laptops
were arranged and all the
breached data was copied
into them. These laptops
were delivered in London to
Neil Gerrard  via special
route.
5. Around July 2016, based
on detailed discussion
between NDR, Neil and
others it was considered to
use the data of FA in court
and for this purpose data
had to be put on Internet
securely without traces.
6. FA data was divided into
3 tranches and was put on
torrents and we-transfer in
multiple phases as
instructed by Neil via NDR.
7. In 2017, two mobile
phones and one ipad were



Type a message



   

 **Fronx**

instructed by Neil via NDR.
7. In 2017, two mobile phones and one ipad were specifically crafted and delivered to NDR in Dubai on his instructions.
8. In late 2017, number of meeting were held in RAK. Multiple meetings were held in London and Dubai in 2017, 2018 and so on.

This is just a small writeup, everything in detail and what transpired from 2018 till now can be discussed later on physically.

Also, Pandey can assist in reversing his 2 witness statement and assist further if needed.

18 May 4:07 AM

Hi, I hope our intent is clear to you now.
Let me know if we can proceed further on this?

Type a message


8. In late 2017, number of meeting were held in RAK. Multiple meetings were held in London and Dubai in 2017, 2018 and so on.

This is just a small writeup, everything in detail and what transpired from 2018 till now can be discussed later on physically.

Also, Pandey can assist in reversing his 2 witness statement and assist further if needed.

18 May 4:07 AM

Hi, I hope our intent is clear to you now.
Let me know if we can proceed further on this?

19 May 10:36 AM

Hi, Is there any further update?

Type a message



# Exhibit 4

# (Proposed Settlement Agreement and Consulting Agreement)

**RELEASE AND SETTLEMENT AGREEMENT**

**This Settlement Agreement and Release** (the "Settlement Agreement" or "Agreement") is entered into as of July ___, 2023 (the "Effective Date"), by and among Farhad Azima ("Azima"), a Missouri individual, and CyberRoot Risk Advisory Pvt. Ltd. ("CyberRoot"), an Indian limited company whose principal place of business is India, and Vijay Bisht, Chiranshu Ahuja, and Vibhor Sharma, all Indian individuals in their personal capacities and as directors of CyberRoot ("CyberRoot Parties") (collectively, the "Parties").

**WHEREAS,** the Parties have disputes ("Disputes") with each other, including those stemming from allegations of computer hacking;

**WHEREAS**, the Parties desire to fully and finally settle all disputes between them on the terms set forth in this Settlement Agreement;

**WHEREAS**, the Parties, directly or through their counsel, met for two days in Tokyo on June 20 and 21, and during those meetings the CyberRoot Parties confirmed that Nicholas Del Rosso hired CyberRoot to hack Azima and others and publish Azima's hacked data online; that Del Rosso paid CyberRoot through his company Vital Management Services, Gravitas International LLC, and other companies; that CyberRoot provided Azima's hacked data to Del Rosso through WeTransfer and to Dechert's Neil Gerrard through laptops created at Gerrard's request; that Del Rosso and Gerrard asked CyberRoot to hack Azima several times including in 2018 and 2019; and that Del Rosso ordered CyberRoot to delete relevant data after Azima had initiated a lawsuit against Del Rosso and Vital in October 2022;

**WHEREAS**, each Party acknowledges that it will derive substantial benefit from this Settlement Agreement and that it is receiving fair consideration for the exchanges and releases contemplated herein; and

**NOW, THEREFORE**, in consideration of the mutual promises, covenants, and obligations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      **Release of CyberRoot Parties**.

(a)      Azima hereby waives, releases, and forever discharges the CyberRoot Parties from any and all claims and causes of action of every kind and nature whatsoever that are in any way related to, connected to, or arising out of, from or under the Disputes.

(b)      Expressly excluded from the release contained in Section 1(a), however, are (i) any and all claims by Azima to enforce any of his rights and remedies under this Settlement Agreement and (ii) the obligations of the CyberRoot Parties under this Settlement Agreement.

2.      **Release of Azima**.

(a)      The CyberRoot Parties do hereby waive, release, and forever discharge Azima from all claims and causes of action of every kind and nature whatsoever that are in any way related to, connected to, or arising out of, from or under the Disputes.

**Error! Unknown document property name.**

(b)     Expressly excluded from the release contained in Section 2(a), however, are (i) any and all Claims by the CyberRoot Parties to enforce any of their rights and remedies under this Settlement Agreement and (ii) the obligations of Azima under this Settlement Agreement.

3.      **Covenant Not to Sue.** The Parties agree that they shall never, individually or with or through any other person or entity, commence, prosecute, or cause or permit to be commenced or prosecuted, any action or other proceeding (including but not limited to litigation, arbitration, enforcement action, administrative proceeding, or proceeding in any other tribunal) based on any claim or Potential Claim that is the subject of this Agreement.

4.      **Settlement Obligations.** Following execution of this Settlement Agreement, the CyberRoot Parties agree to provide access to Azima to all non-privileged documents in the possession, custody, or control of the CyberRoot Parties that relate to Azima. Access will be provided to Azima's attorneys, including but not limited to Miller & Chevalier, within seven days of a request made by Azima. The CyberRoot Parties also agree to explain and discuss with Azima's attorneys the documents at the time access is provided. The CyberRoot Parties agree that those documents may be used by Azima for any purpose in any pending or future litigation. The Parties agree and understand that this Paragraph is a material term of this Agreement, and breach of this term will permit Azima to seek redress, including but not limited to cancellation of this Agreement for such breach and a suit regarding both the breach and the underlying claims this Agreement seeks to resolve.

5.      **Confidentiality.** The Parties and their attorneys, if any, agree to keep the terms and conditions of this Settlement Agreement, and the existence thereof, confidential.  Except as required by subpoena or an order of a court of competent jurisdiction or as otherwise required by law, the contents, terms and conditions, and the negotiations or consideration for this Settlement Agreement shall not be disclosed to any individual or entity, except for the Parties' respective legal or financial advisors in the context of obtaining legal or financial advice.

6.      **Entire Agreement**. This Settlement Agreement, including the recitals, represents the entire agreement of the Parties with respect to the subject matter hereof. This Settlement Agreement may not be modified, changed, amended, supplemented or rescinded except pursuant to a written instrument duly executed by all the Parties. Each Party acknowledges and agrees that it shall not make any claim, at any time, that this Settlement Agreement has been orally altered or modified in any respect whatsoever.

7.      **Interpretation.** The language of this Settlement Agreement shall be construed as a whole according to its fair meaning. Notwithstanding the foregoing, the paragraph headings in this Settlement Agreement are included for convenience only, and do not in any way define, limit, alter, affect or control the matters contained in this Settlement Agreement.

8.      **Amendment.** This Settlement Agreement shall not be amended except in a writing signed by each of the Parties.

9.      **Severability**. The provisions of this Settlement Agreement are severable, and if any provision or any portion of any provision of this Settlement Agreement is at any time deemed, found or declared by a court of competent jurisdiction to be invalid or unenforceable, then such

Error! Unknown document property name.

provision, or any portion of any such provision, if severed from the remainder of the Settlement Agreement without substantially affecting the consideration to be received by any Party hereto, shall be deemed to be deleted as if never included herein. Such an invalid or unenforceable provision, or any portion of such a provision, shall not affect the validity of the remainder of this Settlement Agreement, and the remaining provisions shall continue in full force and effect.

10.     **No Waiver**. No waiver or indulgence of any breach or series of breaches of this Settlement Agreement shall be deemed a waiver of any other breach of this Settlement Agreement or any of its provisions or affect the enforceability of the remainder of this Settlement Agreement.

11.     **Choice of Law**. Any dispute, claim or controversy arising out of or relating to this Settlement Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Washington, D.C. before a sole arbitrator in accordance with the laws of the District of Columbia. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgments on the award may be entered in any court having jurisdiction. The arbitrator, shall, in the award, allocate all of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

12.     **Comprehension.** Each Party acknowledges to the other Parties that it has been represented by independent legal counsel of its own choice, or has had the opportunity to seek legal counsel, throughout all of the negotiations which preceded the execution of this Settlement Agreement and that it has executed this Settlement Agreement with the consent and on the advice of such independent legal counsel, if so retained. Each Party further acknowledges that it and its counsel, if any, have had adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution hereof.

13.     **Counterparts**. This Settlement Agreement may be executed in two or more counterparts and/or by facsimile, each of which shall be deemed an original and any set of which, when taken together, shall constitute one and the same instrument and be sufficient proof of the instrument so constituted.

14.     **Release as Defense to Any Further Action.** This Settlement Agreement may be pleaded as a full and complete defense to any action, suit, or other proceeding that may be instituted or prosecuted with respect to any of the Disputes released hereby. Each of the Parties fully agrees that the Settlement Agreement may be pleaded as necessary for the purpose of enforcing the Settlement Agreement in any court of competent jurisdiction. This release, however, does not include any claims arising out of a failure of a party to perform in conformity with the terms of this Settlement Agreement.

15.     **Representations and Warranties**. Each Party signing this Settlement Agreement represents and warrants that (i) it has read and understands the terms of the Settlement Agreement and that such Party is duly authorized to execute and deliver this Settlement Agreement and to perform its obligations hereunder, and has taken all necessary actions to

Error! Unknown document property name.

authorize such execution, delivery, and performance; (ii) such Party has not assigned, pledged, hypothecated or otherwise in any manner whatsoever sold, or transferred or abandoned, either by instrument or writing, operation of law or otherwise, any right, title, or interest in any Potential Claim of any kind subject to the releases contained herein; (iii) there are no third-party beneficiaries to this Settlement Agreement; (iv) the person signing this Settlement Agreement was duly authorized to do so on the date this Settlement Agreement was executed by such person; (v) this Settlement Agreement constitutes its legal, valid, and binding obligation, enforceable against it in accordance with its terms; and (vi) its execution and delivery of this Settlement Agreement does not contravene, or constitute a default under, any provision of applicable law or regulation (including any order, decree, judgment, injunction, or other judicial or governmental restriction applicable to such Party or any portion of its assets) or the formation agreements or governing instruments of such Party or of any such other material agreement, judgment, injunction, order, decree or other instrument binding upon such Party.

16.     **Costs of Settlement**. All costs of settlement shall be borne by each respective Party or their indemnifier, including but not limited to, any attorneys' fees or other professional fees and court costs, if any.

17.     **Disclaimer of Warranties**. The Parties expressly represent that they have had full access to all information made the subject of this Settlement Agreement and that each Party's decision to consummate this Settlement Agreement is expressly predicated upon its own investigation of such material and is not predicated upon any representations, warranties or covenants of the other Party except as expressly set forth in this Settlement Agreement.

THE PARTIES FURTHER STATE THAT THEY HAVE CAREFULLY READ THIS SETTLEMENT AGREEMENT, WHICH INCLUDES A RELEASE BY THEM OF CLAIMS, THAT THEY HAVE HAD SUFFICIENT TIME TO REVIEW THE SETTLEMENT AGREEMENT AND CONSULT WITH SUCH ADVISORS AS THEY DEEM APPROPRIATE, THAT THEY FULLY UNDERSTAND THE FINAL AND BINDING EFFECT OF THE SETTLEMENT AGREEMENT, THAT THE ONLY PROMISES MADE ARE THOSE STATED HEREIN AND THAT THEY ARE SIGNING THIS SETTLEMENT AGREEMENT KNOWINGLY AND VOLUNTARILY AND WITH THE FULL INTENT OF RELEASING THE OTHER PARTY AND ITS AFFILIATED PERSONS AND ENTITIES IN THE MANNER DESCRIBED HEREIN.

**IN WITNESS WHEREOF**, the Parties have executed this Settlement Agreement as of the date written above.

*[Signature Page Follows]*

Error! Unknown document property name.

_____      _____
Farhad Azima                               Date

_____      _____
CyberRoot Risk Advisory Pvt. Ltd.       Date
By [        ]

_____      _____
Vijay Bisht                               Date
Director
CyberRoot Risk Advisory Pvt. Ltd.

_____      _____
Chiranshu Ahuja                        Date
Director
CyberRoot Risk Advisory Pvt. Ltd.

_____      _____
Vibhor Sharma                        Date
Director
CyberRoot Risk Advisory Pvt. Ltd.

5

PRIVILEGED & CONFIDENTIAL / ATTORNEY WORK PRODUCT

Kirby Behre
Member
(202) 626-5960
kbehre@milchev.com

July XX, 2023

**PRIVILEGED & CONFIDENTIAL**

Vijay Bisht, Director
Chiranshu Ahuja, Director
Vibhor Sharma, Director
CyberRoot Risk Advisory Pvt. Ltd.
[Address]

Dear Messrs. Bisht, Ahuja, and Sharma:

This letter (the "Agreement") formalizes the retention of CyberRoot Risk Advisory Pvt. Ltd. ("CR"), through its directors Vijay Bisht, Chiranshu Ahuja, Vibhor Sharma (the "Directors"), as a consultant to provide research, analysis, and/or consulting services for the purpose of assisting Miller & Chevalier Chartered ("Miller" or the "Firm") in rendering legal services to its client, Farhad Azima (the "Client"), relating to *Azima v. Del Rosso*, No. 1:20-cv-954 (MDNC) (the " Litigation"). Miller and CR are hereinafter referred to individually as a "Party" and/or collectively as the "Parties."

1.     **Engagement**

On behalf of our Client, Miller has retained CR in order to obtain its research, analysis, and/or consulting services on matters relating to the Litigation (hereinafter referred to as the "Engagement"). CR and Miller agree that, among other services, CR shall:

1.  Review and analyze documents, data, case statements and legal briefs, and other information made available in the Litigation, at the direction of counsel;

2.  To the extent permitted by law, provide access to and analysis of non-privileged documents in its possession or control relevant to the claims and defenses in the Litigation, at the direction of counsel;

3.  Provide information and assistance to Miller related to the Litigation, as directed by counsel, including by assisting in preparation for depositions, submitting to informal interviews, and the preparation of sworn affidavits, declarations, and witness statements, and oral presentation of evidence in court.

Miller & Chevalier Chartered  .  900 16th Street NW  .  Black Lives Matter Plaza  .  Washington, DC 20006
T 202.626.5800  .  millerchevalier.com Error! Unknown document property name.

Case 1:20-cv-00954-WO-JLW   Document 259   Filed 08/08/23   Page 45 of 49

PRIVILEGED & CONFIDENTIAL / ATTORNEY WORK PRODUCT

These services are solely for the benefit of the Firm in its advisement of the Client.

CR will work at the Firm's direction and will report directly and exclusively to the Firm. CR understands that it has not been retained to render advice of any nature directly to the Client, regardless of whether the advice is with respect to any matters related to the Firm's representation of the Client or to the Firm's rendering of legal services to the Client.

2.      **Performance**

CR may not retain any person or entity to assist with this Engagement without Miller's permission. No employee of CR other than the Directors may assist with this Engagement without Miller's permission. The Directors may not share documents, data, or information provided to them by Miller with any other person, without the prior written consent of Miller. Miller shall have the right to vet and approve any employee of CR or any other third party who CR seeks to use for this Engagement. If CR seeks to engage persons or entities beyond the Directors, CR shall append such names to Appendix A and provide a copy to the Firm.  In its discretion, Miller will vet any persons or entities listed on Appendix A and advise CR whether CR may retain said persons or entities for purposes of the Engagement.

CR, its Directors, and any person or entity retained by CR shall engage only in lawful activities.  This means that they must not engage in any activity, undertaking, or project that is unlawful or illegal under the laws of the United States, any state of the United States, or any other jurisdiction in which the relevant work is to be performed.

CR, its Directors, and any person or entity retained by CR to assist with this Engagement shall abide by the protective order entered in the Litigation, which is attached here as Appendix B.

3.      **Compensation**

In consideration of the services that CR has agreed to perform, the Client has agreed to ensure payment of CR at a standard rate of $500 per hour, plus reasonable costs. In addition, CR shall be entitled to reimbursement for its time attending the meetings with Azima's counsel in Tokyo on June 20 and June 21 at this rate, plus reasonable expenses.

CR shall submit to the Firm an invoice describing in detail the services provided by CR pursuant to this Agreement and the hours attributable to each task performed by each person. The invoice shall be marked "Privileged and Confidential." The Firm will include CR's invoice as a cost of the Firm's representation of Client. When the Firm receives payment for CR's invoices from its Client, the Firm will make payment to CR. The Client is solely responsible for ensuring payment of CR's bills, and the Firm confirms that it has been authorized by the Client to retain

Miller & Chevalier Chartered  .  900 16th Street NW  .  Black Lives Matter Plaza  .  Washington, DC 20006
T 202.626.5800  .  millerchevalier.comError! Unknown document property name.

Case 1:20-cv-00954-WO-JLW   Document 259   Filed 08/08/23   Page 46 of 49

PRIVILEGED & CONFIDENTIAL / ATTORNEY WORK PRODUCT

CR for this matter and that payment to CR of the compensation to which the Parties have agreed will be made. Miller shall not be responsible for any payment due under this Agreement.

**4.        Consent to Arbitration of Disputes**

Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Washington, D.C. before a sole arbitrator in accordance with the laws of the District of Columbia. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgments on the award may be entered in any court having jurisdiction. The arbitrator, shall, in the award, allocate all of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

**5.        Confidentiality**

As noted above, the purpose of the Engagement is to enable counsel to render legal advice to the Client in connection with the Litigation. All information that Miller discloses to CR, all requests that Miller makes to CR, and any information that CR learns from anyone else regarding these matters as a result of its work in connection with the Engagement, whether orally or in writing, is to remain strictly confidential unless authorized by Miller or otherwise disclosable pursuant to this Paragraph. The existence of this agreement is to remain strictly confidential unless authorized by Miller or otherwise disclosable pursuant to this Paragraph. Communications between CR and the Firm and/or the Client, the Parties' work product, and all information and data received from the Firm or the Client related to the Engagement are, in each case, covered by attorney-client privilege and/or the work product doctrine, or both. In addition to maintaining the confidentiality of all information and data CR receives from the Firm or the Client as a result of the Engagement, CR also agrees that any documents or information provided to CR during the course of its consultation are also to be kept confidential, and shall be returned to the Firm at the conclusion of its services under this Agreement. All correspondence between CR and the Firm shall be marked as "Privileged and Confidential."

This Agreement does not prohibit the use or disclosure of confidential information to the extent that such confidential information is required to be disclosed by law or by order of a court of competent jurisdiction; or at the time of disclosure being made, is in the public domain other than through a breach of this Agreement.

Unless provided otherwise by law, CR shall notify the Firm promptly and before disclosure if any confidential information is required to be disclosed and shall co-operate with

Miller & Chevalier Chartered  .  900 16th Street NW  .  Black Lives Matter Plaza  .  Washington, DC 20006
T 202.626.5800  .  millerchevalier.comError! Unknown document property name.

Case 1:20-cv-00954-WO-JLW   Document 259   Filed 08/08/23   Page 47 of 49

PRIVILEGED & CONFIDENTIAL / ATTORNEY WORK PRODUCT

the Firm regarding the scope, manner and timing of such disclosure and in any action which may be taken to challenge the validity of such requirement.

CR and the Firm further agree that the services and any work product provided in accordance with this Agreement are confidential and exclusively for the benefit of the Client. CR further agrees that it will not disclose the existence or content of this Agreement or of CR's services or work product to any third party, other than a director, employee, authorized agent or subcontractor of the Client or of the Firm, without the Firm's prior written consent. Such consent is not to be unreasonably withheld, and disclosure is permitted to the extent necessary for the Parties to comply with any applicable law or regulation.

**6.      Effective Date**

This Agreement is effective on the date it is signed by all parties.

**7.      Termination**

This Agreement shall remain in effect until Miller notifies CR that no additional services of are required.  This Agreement may otherwise be terminated on written notice by Miller at any time and for any reason.

Whether or not this Agreement is terminated, CR agrees not to work for any other person or entity with respect to the Litigation unless authorized to do so by the Firm.  The confidentiality obligations discussed above will also continue subsequent to the termination of this Agreement.

*                    *                    *

By signing below, CR agrees not to use any of the work it does at the Firm's instruction (as outlined above) for any purpose other than the Engagement, or to disclose the existence of this engagement. Further, CR agrees not to advertise the work it does at the Firm's instruction (as outlined above) or disclose it to anyone (except to such other persons as are expressly authorized by the Firm), either in writing or orally.

The terms of this Agreement may not be waived except by express written consent. If the terms outlined in this letter are acceptable, please sign the letter in the space below and return the original to Miller, keeping a copy for your file.

We look forward to working with you.

Very truly yours,

Miller & Chevalier Chartered  .  900 16th Street NW  .  Black Lives Matter Plaza  .  Washington, DC 20006
T 202.626.5800  .  millerchevalier.com Error! Unknown document property name.

Case 1:20-cv-00954-WO-JLW   Document 259   Filed 08/08/23   Page 48 of 49

PRIVILEGED & CONFIDENTIAL / ATTORNEY WORK PRODUCT

Kirby D. Behre
of MILLER & CHEVALIER CHTD.

ACCEPTED AND AGREED:

_____          _____
 CyberRoot Risk Advisory Pvt. Ltd.          Date
By [          ]


_____          _____
Vijay Bisht                                 Date
Director
CyberRoot Risk Advisory Pvt. Ltd.


_____          _____
Chiranshu Ahuja                             Date
Director
CyberRoot Risk Advisory Pvt. Ltd.


_____          _____
Vibhor Sharma                               Date
Director
CyberRoot Risk Advisory Pvt. Ltd.

Miller & Chevalier Chartered  .  900 16th Street NW  .  Black Lives Matter Plaza  .  Washington, DC 20006
T 202.626.5800  .  millerchevalier.com Error! Unknown document property name.

Case 1:20-cv-00954-WO-JLW   Document 259   Filed 08/08/23   Page 49 of 49