## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:20-cv-00954-WO-JLW

| | |
|---|---|
| FARHAD AZIMA,<br><br>    Plaintiff,<br><br>  v.<br><br>NICHOLAS DEL ROSSO and<br>VITAL MANAGEMENT SERVICES,<br>INC.,<br><br>    Defendants. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PLAINTIFF TO IDENTIFY TRADE SECRETS** |

Defendants Nicholas Del Rosso ("Del Rosso") and Vital Management Services, Inc. ("VMS") (collectively, "Defendants"), through undersigned counsel, respectfully submit this Memorandum in Support of their Motion to Compel.

## INTRODUCTION

The remaining claims in this matter are (1) a misappropriation of trade secrets claim under N.C. Gen. Stat. § 66-153, *et seq.*, based on the alleged republication of data using WeTransfer; and (2) a *contingent* civil conspiracy claim under North Carolina common law, based on Defendants' alleged participation in the republication of data using WeTransfer. (*See* D.E. 65). For all practical purposes, this is a trade secrets case—yet, after nearly three years of litigation (including written discovery directly on point), Plaintiff has steadfastly refused to identify any of his purported trade secrets. Whether

1

there are *any* trade secrets at issue in this case is a central question in the case, and Plaintiff's refusal to identify his purported trade secrets materially prejudices Defendants' ability to test this assertion and seek dismissal of Plaintiff's claims.

The North Carolina Trade Secret Protection Act ("NCTSPA") requires that a party asserting a claim of trade secret misappropriation "must identify a trade secret with sufficient particularity[.]" *DSM Dyneema, LLC v. Thagard*, No. 13 CVS 1686, 2014 WL 5317770, at *3 (N.C. Super. Oct. 17, 2014) (quoting *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003)); *see also Silicon Knights, Inc. v. Epic Games, Inc.,* No. 5:07-CV-275-D, 2008 WL 2414046, at *7–9 (E.D.N.C. June 13, 2008) (granting motion to compel identification of trade secrets). As discussed herein, courts applying the NCTSPA have routinely prohibited the tactics employed by Plaintiff, including the dismissal of NCTSPA claims where the trade secret was not identified with particularity prior to the close of discovery.

Compelling a claimant to clearly identify the specific information it claims as a "trade secret" makes sense. From a practical standpoint, only Plaintiff knows what information he contends are his trade secrets, and which he contends the Defendants misappropriated. Thus, it is fundamental that Plaintiff *finally* identify his trade secrets, with particularity, and discern, from the 350,000+ documents which he indiscriminately produced on April 25, 2023,

2

those particular documents which he specifically contends constitute or contain the "trade secrets" at issue in this lawsuit.

Hence, in accordance with Rule 37 of the Federal Rules of Civil Procedure and Local Rule 37.1, Defendants bring this Motion, requesting the Court compel Plaintiff to promptly supplement his responses to Defendants' First Set of Requests for Production ("First RFPs") and First Set of Interrogatories ("ROGs"), as set forth more specifically below.

## BACKGROUND OF THE DISPUTE

The purported trade secrets at issue in this case are described in broad categories in the Complaint as follows:

- "[P]rivileged and confidential legal communications and advice and confidential internal pricing lists relating to food transport for U.S. troops in Afghanistan."

- "[E]mail accounts and computer systems contain[ing] business or technical information, formulas, patterns, programs, devices, compilations of information, methods, techniques, or process."

- "[H]ighly confidential business plans and proposals, research supporting those plans and proposals (including costs and service projections), information concerning business strategies and opportunities, and contacts for important business relationships." (*Id.*)

- "[C]onfidential internal price lists and confidential spreadsheets connected to contracts with the United States government to supply troops in Afghanistan."

3

(D.E. 1, at ¶¶ 18, 102, 108).[1]

Accordingly, on March 31, 2023, Defendants served Plaintiff with their First RFPs, seeking the production of the specific documents which Plaintiff contends are his trade secrets, as opposed to other information related to his now-dismissed claims. **Ex. A**, pp.9–13, ¶¶1–14. For example, RFP No. 1 requested that Plaintiff "[p]roduce all documents which you contend constitute 'confidential internal pricing lists relating to food transport for U.S. troops in Afghanistan,' as alleged in paragraph 18 of the Complaint, which you contend Defendants published or republished." *Id.*, p.9, ¶1. Defendants served very specific requests for production of documents to separate out each of the categories of documents that Plaintiff alleged were his trade secrets, but they also included a catch-all for any other alleged trade secrets. *Id.*, p.13, ¶15 ("To the extent not previously produced in response to Requests 1 to 7, produce all documents which you contend constitute trade secret[s] . . . which you contend Defendants published or republished.")

In an April 25, 2023, cover letter accompanying Plaintiff's response to Defendants' First RFPs, counsel for Plaintiff stated, in pertinent part:

---

[1] Several of these same categories were used to describe dismissed claims. (*See, e.g.,* D.E. 1, at ¶¶ 89–90 (generally describing Plaintiff's dismissed claim for Identity Theft as including, inter alia, "confidential business information, and personal information and communications"); ¶¶ 93–98 (generally describing Plaintiff's dismissed claim for Publication of Personal Information as including, inter alia, "financial transaction records, spreadsheets, business records, and banking information, all of which are marked confidential")).

4

This production contains documents published on WeTransfer, ***including Plaintiff's trade secrets***. This production of the trade secrets contained therein does not waive any argument that the trade secrets were still trade secrets before they were misappropriated and published onto the public domain destroying their secrecy. The documents published on WeTransfer also include privileged documents that were placed in the public domain without our client's consent. Accordingly, those documents remain privileged, and this production does not waive any privilege protections that apply. All documents are produced subject to ***forthcoming written objections***. We reserve all rights.

**Ex. B** (emphasis added).

While promising on its face, the above-referenced correspondence from Plaintiff's counsel included a ShareFile link to a production of over **350,000 documents** (over 1 million pages), comprised of irrelevant data, Azima's emails and corresponding attachments, and other documents with no indication whatsoever as to which of these hundreds of thousands of documents are Plaintiff's purported trade secrets, or fall into the categories of purported trade secrets alleged in the Complaint. As explained below, those documents constituted a transparent attempt to bury Defendants in irrelevant material—not documents responsive to the document request—and hide the ball as to whether *any* documents could constitute a trade secret.

Plaintiff subsequently served his written objections to Defendants' First RFPs on May 1, 2023. *See* **Ex. C**. Aside from boilerplate objections, Plaintiff responded to RFP Nos. 1–14 by stating "Responsive documents have already

5

been produced in response to Defendants' RFP Nos. 16–18"—referring to the April 25, 2023, production of over 350,000 documents.[2] **Ex. C**, pp.7–16. Notably, in his response to RFP Nos. 16, 17, and 18, Plaintiff states, in pertinent part:

> Azima produced all publicly available documents that Azima downloaded from WeTransfer and which Azima contends are trade secrets that Defendants and their co-conspirators stole, misappropriated, and caused to be wrongfully published or republished online."

**Ex. C**, at pp.17–19, ¶¶16–18.

Defendants next used interrogatories to seek the basic identifying information about Plaintiff's purported trade secrets, given the inadequacy of Plaintiff's document production and written responses to Defendants' First RFPs—particularly, their failure to identify which of the 350,000+ documents he claims are his trade secrets, if any. Defendants served their ROGs on May 3, 2023, requesting, *inter alia*, that Plaintiff identify his trade secrets within his April 25, 2023, document production by bates number, along with any other trade secrets that he claims are at issue in this case. **Ex. D**, p.9–10, ¶¶3–4. In addition, Defendants requested that Plaintiff also identify and describe other essential attributes of his purported trade secrets, including (a) ownership; (b) the independent, actual, or potential commercial value of each purported trade

---

[2] Request Nos. 16, 17, and 18 of Defendants' First RFPs sought production of "Azima's stolen data" that Azima alleged was republished using WeTransfer in 2018 and 2019, as alleged in paragraphs 24 and 26 of the Complaint (D.E. 1, ¶¶24, 26). **Ex. A**, p.14, ¶¶16–18).

secrets that is derived from its secrecy; (c) all measures taken to preserve each purported trade secrets' secrecy; (d) the factual basis for Plaintiff's contention that these purported trade secrets were misappropriated; and (e) damages. *Id.* at pp.10–12, ¶¶5–8, 10; *accord, e.g.*, N.C.G.S. § 66-152 (defining the requirements for misappropriation of trade secret claims under North Carolina law).

On June 8, 2023, having still not yet received Plaintiff's responses to their ROGs (which were due June 2, 2023), Defendants sent a letter to Plaintiff confronting his steadfast refusal to provide even basic information regarding his narrow remaining claims related to his allegation that Defendants conspired to republish his purported trade secrets using WeTransfer in 2018 and 2019. *See* **Ex. E**. As noted in that letter, Plaintiff failed to timely respond to Defendants' ROGs, and Plaintiff unilaterally "cancelled" his duly notice deposition. *Id.* Defendants also addressed ongoing deficiencies in Plaintiff's response to the earlier document request and why supplementation remained necessary. *Id.* Pertinently, Defendants' counsel pointed out that:

> Plaintiff has failed to identify, in either his written responses or the production, where his purported trade secrets are located in the more than one million pages of documents he has produced to date. Plaintiff must identify, by Bates Number, where in the document production his purported trade secrets are located.

*Id.*, p.3.

Notwithstanding such efforts, Plaintiff continued to obfuscate the basic facts surrounding his Complaint. Despite failing to timely respond to Defendants ROGs, on June 12, 2023, Plaintiff purported to serve written responses and objections thereto which only consisted of boilerplate objections and non-substantive responses. *See* **Ex. F**. In response to ROG Nos. 3 through 8 and ROG No. 10 (requesting, *inter alia*, that Plaintiff identify his trade secrets with particularity and provide other factual predicates to trade secrets claim), Plaintiff objected that these interrogatories are somehow "premature", "unduly burdensome," "duplicative," "disproportionate to the needs of the case", and "privilege[d]". *Id*. at pp.10–15, ¶¶3–8, 10. This in addition to Plaintiff's objection that a response should be "deferred until discovery has been complete" pursuant to Fed. R. Civ. P. 33(a)(2), without indicating *why* this would be the case for such basic information that has been in the possession of Defendants since at least 2017. *Id*.

On June 23, 2023, Plaintiff partially responded to Defendants' June 8, 2023 letter. *See* **Ex. G**. In the letter, Plaintiff's counsel stated: (1) "Defendants' letter is a backdoor attempt to obtain information about the documents that should properly be elicited through interrogatories or depositions testimony"— despite Plaintiff having already received and responded to Defendants' First ROGs requesting this information, and despite Plaintiff having unilaterally cancelled Azima's deposition; (2) "Plaintiff is not required to identify to which

8

request each document is responsive, what documents remain to be produced, if any, and when they will be produced"; and (3) "Defendants [have not] cited any legal authority to support their request for this information[,]" citing to several cases which are inapposite for reasons to be set out further below. **Ex. G**, p.2.

Finally, on June 23, 2023, Defendants sent Plaintiff a letter which, amongst other things, reiterated Plaintiff's continued failure to identify what he claims to be the trade secrets at issue in this case, both in Plaintiff's responses to Defendants' First RFPs and in response to Defendants' ROGs. *See* **Ex. H**.

Having tried document requests, interrogatories, meet and confers, and written submissions identifying Plaintiff's refusal to comply with basic discovery demands, Defendants are left with no option but to seek relief from the Court. Indeed, the above back-and-forth correspondence does not reflect the several emails and phone calls that also occurred regarding this issue.

Accordingly, Defendants bring the present Motion, requesting that the Court immediately compel Plaintiff to supplement his responses to Defendants' First RFPs and ROGs, as set out further below.

## LEGAL STANDARD

Rule 26 of the Federal Rules of Civil Procedure provides the general rules regarding the scope of discovery:

9

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). "When a party fails to respond to a discovery request, the party seeking discovery 'may move for an order compelling disclosure or discovery.' " *Horton v. Love's Travel Stops & Country Stores, Inc.*, No. 1:19CV1193, 2021 WL 7162555, at *2 (M.D.N.C. Mar. 29, 2021) (quoting Fed. R. Civ. P. 37(a)). For the purposes of a motion to compel, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). "District courts generally have broad discretion in managing discovery, including whether to grant or deny a motion to compel." *Id*. (citation omitted). "The party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Id*. (cleaned up).

With respect to discovery in NCTSPA claims, North Carolina courts consistently recognize the "strong practical and policy reasons" for ensuring trade secrets are sufficiently identified prior to broad discovery into a defendant, including (1) "to assist the trial court in determining relevancy and the scope of discovery"; (2) "to prevent fishing expeditions"; (3) "to permit the

10

defendant a fair opportunity to develop its defense"; and (4) "to allow well-investigated claims to proceed while discouraging meritless trade secret claims." *DSM Dyneema, LLC,* 2014 WL 5317770, at *5 (cleaned up).

## ARGUMENT

The most central issue in this case is whether Plaintiff's data published using WeTransfer constitutes a trade secret within the meaning of the NCTSPA. *See Jacobs Vehicle Sys., Inc. v. Zhou Yang*, No. 1:12CV181, 2015 WL 4622734, at *6 (M.D.N.C. July 31, 2015) ("The threshold question in any trade secrets case is whether the information obtained constitutes a trade secret." (citing *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 369, 555 S.E.2d 634, 639 (2001)). If none of the republished data constitutes a trade secret under the NCTSPA, then Plaintiff's remaining claims immediately fail, regardless of other fatal flaws in his accusations.

Defendants are therefore simply requesting what they are rightfully entitled: a clear and detailed identification of the purported trade secrets such that they can reasonably assess whether they meet the statutory definition. *DSM Dyneema, LLC*, 2014 WL 5317770, at *5. The law requires that Azima identify his *trade secrets* "with sufficient particularity so as to enable [Defendants] to delineate which [they are] accused of misappropriating and a court to determine whether a misappropriation has or is threatened to occur." *Silicon Knights, Inc.*, 2008 WL 2414046, at *8 (quoting *Analog Devices, Inc.*,

11

157 N.C. App. at 468, 579 S.E.2d at 453)). The Court should require Plaintiff to meet his burden, and it is a threshold issue for either party to advance their case.

## I. Plaintiff's Discovery Responses to RFP Nos. 1–14 and ROG Nos. 3–8 And 10 Fail to Identify The Purported Trade Secrets At Issue With Particularity, or Justify His Refusal to Do So.

RFP Nos. 1–14 and ROG Nos. 3–8 and 10 request documents and information sufficient to identify, specifically, what purported trade secrets are at issue in this matter. Yet, as detailed above, other than the general allegations in the Complaint, and a 350,000+ document production comprised of Azima's emails, Plaintiff has yet to meaningfully respond to these discovery requests and identify—"with particularity"—what he contends to be the specific trade secrets at issue in this case.

What is particularly brazen here is that Plaintiff has not attempted, at all, to identify his trade secrets and has refused to answer basic discovery about his claims, which exacerbated the need for an extension of the discovery period. Yet following the extension of the discovery period, Plaintiff has still made no effort to provide compliant responses and continues to delay discovery in this case. For example, with regard to RFP Nos. 1–14, Plaintiff believes he has no obligation to identify within the 350,000+ documents he has produced which he asserts to be the trade secrets Defendants allegedly misappropriated. *See supra*. Moreover, with regard to ROG Nos. 3–8 and 10, Plaintiff raised

12

untimely and boilerplate objections that responding at all to these interrogatories would be:

- "premature," which is contrary to the law (*see infra* section (III)(B);

- "unduly burdensome," despite relating to the claims Plaintiff himself brought, and despite having had possession, custody, or control of this data for at least five years, (*see infra* section III(C));

- "duplicative," despite not having previously identified *with particularity* each document (much less groups of documents) within his production that he contends to be his trade secret in response to any other document request, *see* **Ex. D**;

- "disproportionate to the needs of the case," despite being focused solely on the body of data that Plaintiff has identified as the data at issue—*i.e.*, the data purportedly republished using WeTransfer, *see* **Ex. B**; and

- "privilege[d]," despite refusing to produce a privilege log.

*See, e.g.,* **Ex. F**, pp.10, ¶3.

It is well-settled that a Plaintiff cannot rely on mere "categories of information and thousands of pages of documents" as sufficient identification of his purported trade secrets. *See Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-CV-021-MOC-DCK, 2021 WL 1234596, at *5 (W.D.N.C. Mar. 31, 2021) (granting motion to compel, ordering plaintiff to identify trade secrets and be "more explicit and precise about the alleged wrongdoing"); *Lwin Fam. Co. v. Aung Min Tun, No. 3:11CV569,* 2012 WL 11922875, at *1 (W.D.N.C. Oct. 11, 2012) (granting motion to compel, ordering

plaintiff to "identify forthwith those trade secrets which it reasonably believes Defendants have misappropriated so as to enable Defendants to determine exactly what they are alleged to have done").

In cases where data is at issue, Plaintiff must "***specif[y] the files*** that embody the trade secret" and "[t]he description of each trade secret must clearly separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *See Silicon Knights, Inc.*, 2008 WL 2414046, at *9 (granting motion to compel, ordering non-movant to provide a "particularized description of its trade secrets") (emphasis added); *see also Decision Insights, Inc. v. Sentia Grp., Inc.*, 311 F. App'x 586, 599 (4th Cir. 2009) (agreeing with district court's finding on a motion to compel that plaintiff "failed in its efforts to adequately identify . . . [what] it contended were trade secrets").

Further, upon identifying his purported trade secrets with particularity, Plaintiff should also be ordered to provide complete discovery responses to identify and describe other details of his purported trade secrets, as requested in ROG Nos. 5–8 and ROG 10, pertaining to ownership, value, measures to protect secrecy, the circumstances of the alleged misappropriation, and damages. *See Philips Med. Sys. Nederland B.V.*, 2021 WL 1234596, at *6 (granting motion to compel supplementation of other details of trade secret

14

misappropriation claim upon supplementation of information adequately identifying purported trade secrets).

The bottom line—Plaintiff has been in possession of the 350,000+ documents (which purportedly contain his trade secrets) since the outset of this case (almost *three* years), and has had the benefit of expert analysis and assistance analyzing this leaked data for at least *five* years (*see infra* section III(C)). Thus, while it may indeed be a burden for him to identify what in his data is actually a trade secret, Plaintiff has no legitimate basis for refusing to identify—with "particularity"—his purported trade secrets, especially while he continues his broad campaign of discovery into every facet of Defendants' existence. Simply put, Plaintiff's identification of his trade secrets is insufficient, and Plaintiff must be required to show his hand.

## II. Plaintiff Cannot Refuse To Identify What He Contends Are The Trade Secrets At Issue Until After The Close Of Discovery.

Plaintiff argues that he is entitled to delay identifying his trade secrets until after the close of discovery. *See, e.g.,* **Ex. F**, p.10, ¶3; **Ex G**, p.2, n.3. Specifically, in his June 23, 2023, letter, he states that Defendants' ROG No. 3 (requesting identification of trade secrets by bates number) is "inappropriate and premature" and that this issue is "best reserved for summary judgment, after discovery is complete," citing to *Computer Design & Integration, LLC v. Brown*, No. 16-cv-11847, 2018 WL 6609014, at *13 (N.C. Super. Dec. 10, 2018)

15

and *Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. 510, 519, 677 S.E.2d 868, 875 (2009). **Ex. G**, p.2, n.3. Case law, however, is clear that Plaintiff cannot simply refuse to identify his trade secrets until the close of discovery.

First, courts regularly hold that a plaintiff must come forward with discovery, identifying his trade secrets with particularity ***before*** demanding discovery from an adversary. *See*, *e.g.*, *DSM Dyneema, LLC*, 2014 WL 5317770, at *4–6 (N.C. Super. Oct. 17, 2014) (finding plaintiff required to identify trade secrets prior to conducting discovery of defendants); *Ikon Off. Sols., Inc. v. Konica Minolta Bus. Sols., U.S.A., Inc.*, No. 3:08-CV-539-RLV-DCK, 2009 WL 4429156, at *4 (W.D.N.C. Nov. 25, 2009) (holding that "a [p]laintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets"); *Lwin Fam. Co.*, 2012 WL 11922875, at *1 (noting that a "trade secret defendant is protected from discovery until the claimant has made a pre-discovery identification of the trade secrets involved"); *BioD, LLC v. Amnio Tech., LLC*, No. 2:13-CV-1670-HRH, 2014 WL 3864658, at *5 (D. Ariz. Aug. 6, 2014) (holding that "to ensure that plaintiffs are not on a fishing expedition and so that the court and defendants can discern the relevancy of plaintiffs' discovery requests, it would be appropriate for plaintiffs to identify their trade secrets with reasonable particularity"); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint.,*

16

*Inc.*, No. 10-CV-02868-MSK-KMT, 2011 WL 10858409, at \*1 (D. Colo. Oct. 12, 2011) ("[A] plaintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed . . . to compel discovery of its adversary's trade secrets.").

Moreover, in response to similar tactics, the North Carolina Business Court dismissed a plaintiff's trade secret claim based on an alleged trade secret that was not identified until *after* the close of discovery. *DSM Dyneema, LLC v. Thagard*, No. 13 CVS 1686, 2019 WL 3228346, at \*21 (N.C. Super. June 19, 2019) ("[T]he Court concludes that [plaintiff] failed to identify the alleged . . . trade secret until after discovery in this matter was closed, and the Court concludes, in the exercise of its discretion, that [plaintiff] should not be permitted to do so now."). So too should be the case here, should Plaintiff fail to identify his trade secrets prior to the close of discovery.

Second, Plaintiff's attempt to cite *Computer Design & Integration* and *Panos* is unavailing. Specifically, Plaintiff attempts to cite these cases for the proposition that, since the trade secrets at issue therein were decided on summary judgment, he does not have to respond to a discovery request and identify, with particularity, his trade secrets *prior to* the close of discovery. *See* **Ex. G**, p.2, n.3. But those cases addressed arguments as to whether (or not) the purported trade secrets at issue *actually qualify* as trade secrets under the NCTSPA. *See Computer Design & Integration, LLC* 2018 WL 6609014, at \*11–

17

19; *Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. at 518–22. Here, Defendants are seeking something much more fundamental—an identification of what Plaintiff only *contends* to be the trade secrets in this case. Even more simply—an identification of the documents within his own production which he claims are the trade secrets at issue. Without such an identification, Defendants are prejudiced in that they cannot conduct any meaningful discovery to analyze whether they meet the statutory definition.

Moreover, these cases cited by Plaintiff are also distinguishable in that they fall into the more traditional employment-related line of trade secrets cases—where, for example, a former employee knowingly targets and takes proprietary business information—the company's so-called secret sauce—and immediately uses that information to compete with his former employer. *See, generally, Computer Design & Integration, LLC* 2018 WL 6609014, at *1–6; *Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. at 511–14. Here, Defendants— who do not "compete" with Azima in any business sense—are alleged to have simply published his emails on the internet.

As previously stated, this is *not* the usual trade secrets case. It would be one thing if Defendants were actually using Azima's data—confidential, proprietary, trade secret, or otherwise—to compete with him; however, that is not alleged. Here, we are talking about 350,000+ documents that Plaintiffs are alleged to have published on the internet using WeTransfer. It is evident from

18

a reasonable review of these 350,000+ documents that the vast majority of the documents could not plausibly be considered even confidential or business information—nevertheless, without a more specific identification from Azima, Defendants cannot possibly discern what it is they are claimed to have misappropriated. To demonstrate this point, a few examples of documents pulled from Azima's 350,000+ document production are attached at **Ex. I**.

III. **Plaintiff Failed to Disclose or Produce Responsive Data To RFP Nos. 16–18 Showing That The WeTransfer Data at Issue was Published Outside of the Limitations Period in 2017.**

Plaintiff's 350,000+ document production was purportedly produced in response to RFP Nos. 16–18. *See* **Ex. C**, at pp.17–19, ¶¶16–18. These RFPs required Plaintiff to produce the data collected by Plaintiff and his agents relating to his representations that any of his data was republished using WeTransfer in 2018 and 2019. *See* **Ex. A**, p.14, ¶16 ("Produce all documents that You, Your Attorneys, or Your Agents downloaded from the WeTransfer links which you contend were modified in May 2018 and 'contained copies of Azima's stolen data[,]'" as alleged in paragraph 24 of the Complaint."); *Id.* at ¶17 (same for June 2018); *Id.* at ¶18 (same for June 2019)).

Defendants specifically sought this data because Plaintiff originally alleged that his data was disclosed in 2016 on blog sites that used BitTorrent peer-to-peer transfers that were unavailable to the general public, (D.E. 1 ¶¶ 20, 21, & 23), and then only in 2018-19 was his data published on new links

19

involving WeTransfer which rendered that data publicly accessible for the first time, (*id.* ¶¶ 24 & 26). Based on these representations, the Court denied Defendants' motion to dismiss in part, holding that because the alleged use of WeTransfer rendering the data publicly available for the first time occurred less than three years prior to filing the lawsuit (in 2018 and 2019), the statute of limitations had not yet expired as to Plaintiff's North Carolina misappropriation of trade secrets claim. (*See, e.g.*, D.E. 79, p.11).

However, as previously briefed, at the original close of discovery in this matter, Defendants obtained filings by Plaintiff in an undisclosed Australian lawsuit relating to the same data at issue in this case. (*See* D.E. 247 p.10). In support of his claim in Australia, Plaintiff relied on a report by a computer expert, Christopher Tarbell. (*Id.*; *see also* **Ex. J** (Tarbell Aff.)). Significantly, Mr. Tarbell opined on how the same data at issue in both cases was published on the internet, and specifically, the use of WeTransfer to publish that data. (*Id.*) Contrary to Plaintiff's allegations and arguments in this case that Plaintiff's data remained on the dark web until 2018 and 2019 (which is conveniently, within the limitations period) Mr. Tarbell opined:

> The downloadable content, distributed via WeTransfer, appears to have been at least initially uploaded to WeTransfer on or about January 27, 2017. This date is based on the timestamps and the file identification numbers that are available from the source code of the WeTransfer download webpages. The file identification numbers assigned to the upload appears to contain the date/time

and the upload time stamp is accompanied with the size of the upload that matches the data.

(**Ex. J** (Tarbell Aff.), ¶ 117).

Indeed, Mr. Tarbell's affidavits and expert reports have not been produced to Defendants or otherwise disclosed by Plaintiff in this case; however, Mr. Tarbell's expert report confirms that he collected an "Archive of wetransfer.com file shares collected by BRG on July 13, 2018," (*Id.* ¶ 15(f)), which was analyzed to reach his conclusion that the WeTransfer data in this case was actually uploaded on or about January 27, 2017, (*Id.* ¶ 117).

Accordingly, in light of Mr. Tarbell's report, Plaintiff withheld archived data responsive to RFP Nos. 16–18, which should have been produced in native format, including any "file identification numbers that are available from the source code of the WeTransfer download pages" and "date/time" and "upload time stamp[s]" that Mr. Tarbell used to opine on the initial upload date of the data. In other words, Plaintiff should be required to produce *exactly* what was collected by their expert, Mr. Tarbell, resulting in his conclusion that the WeTransfer data at issue was actually uploaded on or about January 27, 2017, such that Defendants can also assess whether the data was published outside the limitations period.

In sum, Plaintiff's refusal to provide complete or compliant responses to Defendants' ROGs and First RFPs is contrary to the law, and has prejudiced—

21

and continues to prejudice—Defendants' ability to meaningfully test Plaintiff's assertions and allegations, including (a) whether the purported trade secrets at issue are, in fact, trade secrets under the NCTSPA; and (b) whether this data purportedly containing his trade secrets was published within the limitations period.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court order Plaintiff to:

(1) supplement his responses to ROG Nos. 3 and 4 and RFP Nos. 1 through 14 to identify each alleged trade secret that he contends was misappropriated on an individual-by-individual, including

    a. a description of each allegedly misappropriated trade secret sufficient to separate the alleged trade secrets from what is generally known in the requisite field, and

    b. an identification—by bates number—of each document within Plaintiff's April 25, 2023 document production that Plaintiff believes contain his trade secrets;

(2) upon identification of his purported trade secrets, supplement his responses to ROG Nos. 5 through 8, and ROG No. 10, to adequately identify and describe details pertaining to ownership, value (including

22

how that value was determined), measures to protect secrecy, the circumstances of the alleged misappropriation, and damages, including when each alleged trade secret was initially published on the Internet using WeTransfer; and

(3) re-produce or otherwise supplement the data produced in response to RFP Nos. 16–18 to include archived data in native format, including any "file identification numbers that are available from the source code of the WeTransfer download pages" and "date/time" and "upload time stamp[s]" that Mr. Tarbell used to opine on the initial upload date of the data, including any data not already produced that was collected by Mr. Tarbell and specifically disclosed in his expert report.

Respectfully submitted, this the 16th day of August, 2023.

NELSON MULLINS RILEY &
SCARBOROUGH LLP

By: *Brandon S. Neuman*
Brandon S. Neuman, NCSB# 33590
Jeffrey M. Kelly, NCSB# 47269
John E. Branch III, NCSB# 32598
Nathaniel J. Pencook, NCSB# 52339
Sam A. Rosenthal (*special appearance*)
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
brandon.neuman@nelsonmullins.com
jeff.kelly@nelsonmullins.com
john.branch@nelsonmullins.com
nate.pencook@nelsonmullins.com
sam.rosenthal@nelsonmullins.com
*Counsel for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send electronic notification of filing to the following:

Jonathan D. Townsend
Christopher W. Jones
Ripley Rand
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
jonathon.townsend@wbd-us.com
chris.jones@wbd-us.com
ripley.rand@wbd-us.com

Douglas W. Hanna
Fitzgerald Hanna & Sullivan, PLLC
3737 Glenwood Ave, Suite 375
Raleigh, NC 27612
dhanna@fhslitigation.com

Ian A. Herbert
Kirby D. Behre
Brian A. Hill
Timothy O'Toole
Lauren E. Briggerman
Cody Marden
Calvin Lee
Miller & Chevalier Chartered
900 16th Street, N.W.
Washington, D.C. 20006
iherbert@milchev.com
kbehre@milchev.com
bhill@milchev.com
totoole@milchev.com
lbriggerman@milchev.com
cmarden@milchev.com
clee@milchev.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:     *Brandon S. Neuman*
     Brandon S. Neuman, NCSB# 33590
     Jeffrey M. Kelly, NCSB# 47269
     John E. Branch III, NCSB# 32598
     Nathaniel J. Pencook, NCSB# 52339
     Sam A. Rosenthal (*special appearance*)
     301 Hillsborough Street, Suite 1400
     Raleigh, North Carolina 27603
     brandon.neuman@nelsonmullins.com
     jeff.kelly@nelsonmullins.com
     john.branch@nelsonmullins.com
     nate.pencook@nelsonmullins.com
     sam.rosenthal@nelsonmullins.com
     *Counsel for Defendants*

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), I hereby certify, subject to Fed. R. Civ. P. 11, that the foregoing document contains 5,205 words, according to the word count feature of the word processing system used to prepare the brief. Accordingly, the brief does not exceed the word limitation.

Respectfully submitted this 16th day of August, 2023.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: *Brandon S. Neuman*
    Brandon S. Neuman, NCSB# 33590
    Jeffrey M. Kelly, NCSB# 47269
    John E. Branch III, NCSB# 32598
    Nathaniel J. Pencook, NCSB# 52339
    Sam A. Rosenthal (*special appearance*)
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Telephone: (919) 329-3800
    Facsimile: (919) 329-3799
    brandon.neuman@nelsonmullins.com
    jeff.kelly@nelsonmullins.com
    john.branch@nelsonmullins.com
    nate.pencook@nelsonmullins.com
    sam.rosenthal@nelsonmullins.com
    *Counsel for Defendants*