# Exhibit  3

1        UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3    ------------------------------X

4    FARHAD AZIMA,                    :

5                      Plaintiff,    :

6         v.                   :Civil Action No:

7                              :20-cv-954

8    NICHOLAS DEL ROSSO and VITAL    :

9    MANAGEMENT SERVICES, INC.,      :

10                     Defendants.   :

11   ------------------------------X

12

13

14            ORAL ARGUMENT HEARING

15          TUESDAY, JANUARY 16, 2024

16                  3:00 P.M.

17

18

19

20

21

22

23   Job No.: 522088

24   Pages 1 - 163

25   Reported by: Adrienne Mignano, RPR

1           Oral Argument Hearing held via Zoom

2    videoconferencing before Adrienne M. Mignano, a Notary

3    Public and Registered Professional Reporter in and for

4    the State of New York.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4        LAUREN BRIGGERMAN, ESQUIRE

 5        KIRBY BEHRE, ESQUIRE

 6        MILLER & CHEVALIER CHARTERED

 7        900 16th Street NW

 8        8th Floor

 9        Washington, DC 20006

10        202.626.5800

11

12   ON BEHALF OF PLAINTIFF

13        RIPLEY RAND, ESQUIRE

14        WOMBLE BOND DICKINSON

15        555 Fayetteville Street

16        Raleigh, North Carolina 27601

17        919.755.2100

18

19

20

21

22

23

24

25
```

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 4 of 164

1           APPEARANCES (Continued)

2

3    ON BEHALF OF DEFENDANTS:

4        JOHN E. BRANCH III, ESQUIRE

5        BRANDON NEUMAN, ESQUIRE

6        SAM ROSENTHAL, ESQUIRE

7        NELSON MULLINS

8        301 Hillsborough Street

9        Suite 1400

10       Raleigh, North Carolina 27603

11       919.329.3828

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. RICHEY:  I will put on the record

2    what we're here to do.

3          So my name is Alice Richey, and I'm

4    the special master appointed by Judge Osteen in

5    the case.

6          Do you have the case caption, by the

7    way, Madam Court Reporter?

8          THE COURT REPORTER:  Yes.

9          MS. RICHEY:  Okay.  And we are here

10   today for a hearing and oral argument on the

11   following motions:

12         The first is plaintiff's motion to

13   compel defendants to search their laptop and

14   other sources for responsive information.

15         The second is plaintiff's motion to

16   compel defendants to produce documents relating

17   to CyberRoot.

18         The third is plaintiff's motion to

19   compel defendants to produce information

20   improperly withheld for privilege.

21         The fourth is plaintiff's motion to

22   preserve defendant, Del Rosso's testimony for

23   trial.

24         And the fifth is defendant's motion

25   to compel plaintiff to identify his trade

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 6 of 164

1    secrets.

2              And we're going to take those in

3    approximately that order.  I will ask the

4    plaintiff and defendants to argue the first and

5    second motions together, to the extent they

6    could, because I think those arguments are

7    related.

8              I'd also ask that the parties

9    designate one lawyer to argue on behalf of each

10   issue, not necessarily each motion, and I'm

11   hopeful that can be done.  Obviously, the reason

12   to do that is to make us have an efficient

13   hearing.

14             So before I hear from the plaintiffs

15   on the first motion, just at the outset, I want

16   to let you know, on that motion, I have a couple

17   of questions that I hope will be answered by

18   somebody with respect to the first motion.  And

19   that is, the first one is a simple one, which is

20   where is the laptop?  I can't tell whether it is

21   in the United States or the UK.  And who has

22   custody, possession or control?  Those might be

23   different, but I'd like to know the answer to

24   that.

25             The defendants refer to a UK process

1    that needed to be followed in connection with

2    the laptop, and I'd like to understand that

3    process, the details of it, what it involves,

4    how long it will take, et cetera.

5              And then in connection with the other

6    sources part of that motion -- and this would be

7    true for some of the other motions -- I want to

8    have some specifics as to which request for

9    production have not been responded to.  So if

10   the plaintiffs allege the defendants haven't

11   fully responded to discovery requests, I would

12   like to know what they are.

13             I know you have attached some of your

14   discovery requests, but I need you to tell me

15   what you believe has not been fully responded

16   to, kind of chapter and verse on that, so I can

17   rule appropriately.

18             In connection with the motion to

19   produce documents -- to compel defendants to

20   produce documents relating to CyberRoot, I have

21   the same question in terms of the specific RFPs

22   that have not been answered.

23             And then with respect to the

24   defendants, the defendants stated that they have

25   conducted various searches of VMS and Del Rosso

1    to date.

2            I'm curious if, in the responses to

3    the discovery requests, whether defendants have

4    said specifically that they have conducted those

5    searches and there is no further documents to

6    provide.  In other words, sometimes there will

7    be answers to discovery and it is not clear to

8    the party that has submitted the discovery

9    questions that whoever is responding is saying,

10   we don't have anything else.  And sometimes it

11   looks like they just haven't searched.  So if

12   that's a distinction that matters, I'd want to

13   know about that.

14           Okay.  So that's my questions for

15   now.  I might have some, obviously, as you go

16   along.  But I'd like to start with hearing from

17   the plaintiffs on this motion -- these two

18   motions rather.

19           And keep in mind -- and I said I'd

20   stop talking, I want to say one other thing.  I

21   have read everything you have given me.  And I

22   have also looked through the record on Pacer and

23   read what I believe would be important things to

24   read, most of which you also gave me.  So when

25   you argue, know that I have read it.  Obviously,

1    if you want to highlight something for me or

2    clarify something, please do that.

3            Okay.  I'll stop talking.  And I'm

4    going to -- I'd like to not start out with you

5    have to stop in ten minutes and things like

6    that.  But go ahead and start.  I think these

7    arguments can be brief, given the number of

8    motions we have and given how well you've

9    briefed it.  But I do want to hear from you.

10   And if we need to -- I need to kind of stop and

11   give the other party a chance to respond, I'll

12   do that.  Okay.

13           MS. BRIGGERMAN:  Sure.  Thanks,

14   Ms. Richey.  And this is Lauren Briggerman on

15   behalf of plaintiff.  And I want to start with a

16   little bit of context to highlight what we

17   provided in our initial submission because I

18   think it is very relevant to these motions.

19           This case has been pending for more

20   than three years.  And at every turn, defendants

21   have resisted producing documents.  You asked

22   which RFPs defendants have failed to

23   substantively respond to.  And we'll identify

24   those with specificity, but sadly, I think by

25   and large, they have failed to respond to most

1   of them.  They have failed to produce any

2   meaningful discovery.  Most of what they have

3   produced to plaintiff is his own HAPS data,

4   which they have had in their possession.  And

5   they've produced very little of their own

6   custodial documents.  And they've produced very

7   little since August 8th, when the Court ordered

8   them to produce responsive documents and found

9   that our discovery requests were relevant.  And

10  nothing has been produced since the hearing on

11  September 29th.  So I think that context is

12  important.

13          And you also asked whether the issue

14  is whether defendants have failed to search or

15  not.  I think that is one question.  Another

16  issue is how they are interpreting what is

17  relevant to this case.  That is subject to a

18  motion that we will be filing later, but I think

19  it is relevant.  They have had an overly narrow

20  cramped view as to what is relevant in this case

21  and failed to produce documents accordingly.

22          And I think we need to be mindful of

23  all of the deadlines that have lapsed so far.

24  Discovery first closed in June.  There was a new

25  document production deadline in December.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 11 of 164

1    Still, we have gotten no documents.  And fact

2    discovery closes in March.  So time is of the

3    essence here.

4              And we are very careful to think

5    about the motions that were the most important

6    and efficient to get in front of you, and I

7    think we have chosen those today.  So I will

8    jump right into the first motion, and that is on

9    the searching of relevant sources of data.

10             So defendants have failed to search

11   all relevant sources of data.  And I think they

12   effectively admit that in their response.  And I

13   can go through some of the categories here that

14   they've identified and describe for you why they

15   have failed to search them.

16             VMS is one of the defendants in this

17   case.  It is a corporate entity.  And there are

18   numerous e-mail addresses associated with VMS

19   and potential custodians as well.  Defendants

20   have said that Mr. Del Rosso is the only

21   individual who has done any work for VMS.  His

22   wife was an employee, but she did no work.

23             It sounds to me like what they are

24   saying is they did not search for

25   Mrs. Del Rosso's e-mails.  That's problematic.

1          We also know through discovery that

2     there are at least three other individuals who

3     have Vital Management e-mail addresses.  And

4     they are Cynthia Sierra, Frank Cruz and Craig

5     Evers.  But defendants have suggested that they

6     have only searched for one e-mail address

7     associated with Mr. Del Rosso, and that's

8     ndr@vitalmanage.com.  So right away, they admit

9     that they have not searched all of the relevant

10    VMS e-mails.

11          Mr. Del Rosso admitted that he used

12    text messages such as Signal to communicate for

13    work.  And again, we have received no text

14    messages or Signal messages, any sort of online

15    or app messaging that he may have used on his

16    phone.

17          Del Rosso also admits that he has

18    multiple e-mail addresses, and it appears that

19    they have only searched one e-mail address

20    because they argue it's his primary e-mail

21    address.  But again, what reasonable steps were

22    taken to search all of the other e-mail

23    addresses?

24          Mr. Del Rosso has admitted during his

25    deposition that he possesses documents that are

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 13 of 164

1    facially relevant to this case, and yet

2    defendants have not produced any of these.  And

3    some of these categories of documents we have

4    not received are old financial records.

5              Now, defendants will point to the

6    bank records that we received through a

7    third-party subpoena.  Not because defendants

8    produced bank records, but because we obtained

9    them through a subpoena.  But bank records are

10   not the entirety of financial records that we

11   requested.

12             Calendar appointments, he's admitted

13   that he used Outlook.  We have received no

14   calendar appointments, for example, for meetings

15   with Mr. Gerrard of Dechert that we know he

16   attended, or meetings with law enforcement where

17   he provided our client's stolen data.

18             Travel records, reports that

19   Mr. Del Rosso prepared for Dechert as part of

20   his engagement.

21             Receipts for invoices.

22             The Project Nariman files.  He has

23   admitted that Project Nariman is the name for an

24   investigation that relates to Mr. Azima, and he

25   has failed to produce those files and travel

1    records.

2              So these are just some of the things

3    that we have not received from defendants.

4              And as I flagged earlier, this may

5    relate in part to their overly narrow definition

6    of what is relevant to this case.  They seem to

7    think that the standard for relevance is whether

8    it is something that supports our argument that

9    Mr. Del Rosso hacked our client's files, and

10   that's simply not the standard.

11             So I think what we need to determine

12   today is, are they withholding documents based

13   on their narrow view of relevance, which is

14   improper?  Do they no longer have certain

15   documents?  And that raises questions about

16   potential spoliation.  Or are they simply

17   refusing to provide them?

18             And then just quickly on the laptop,

19   I did want to address that.  Our position is

20   that the laptop is in Mr. Del Rosso's custody

21   and control.  It is a laptop that he admitted he

22   used for work.  It his laptop.  It is in his UK

23   counsel's possession in Europe right now, in the

24   UK right now.

25             Our understanding -- or we know that

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 15 of 164

1    Mr. Rosenthal, from Nelson Mullins has attended

2    hearings in the UK related to the laptop.  And a

3    question for him would be whether he has

4    impressed upon that court that we have discovery

5    deadlines in this case and that he is required

6    to search that laptop for Mr. Del Rosso's

7    responsive documents.

8                    I'll pause right there for any

9    questions.  And I didn't know, Ms. Richey, if

10   you wanted to -- I'm happy to go on to the next

11   motion, or if you wanted defendants to respond

12   here --

13                    MS. RICHEY:  Let's have the

14   defendants respond on this particular question.

15   And I would specifically like to hear about the

16   laptop.  The other thing I know I'm going to

17   want is, I would like to know a list of the

18   exact RFPs.  I presume these are all RFPs --

19   there might be interrogatories too -- and what

20   you asked and what the response was.  And that

21   way I can determine whether I agree or disagree

22   that the responses have not been fulsome.

23                    Just FYI, for purposes of my rulings,

24   I'm going to go with, obviously, what

25   Judge Osteen said or Judge Webster said -- and I

1    think Judge Osteen may have said it again --

2    that the time frame is March 2015 to

3    October 15th, 2020.  So there shouldn't be any

4    question about the temporal scope of your

5    discovery.

6                Okay.  So let's -- with that, let me

7    hear from the defendants.

8                MR. BRANCH:  Thanks, Ms. Richey.

9                To give somewhat of a similar

10   overview here, we've been at this -- and we

11   would disagree wholeheartedly with this argument

12   that the defendants have not made fulsome

13   discovery responses in this case.  We have spent

14   countless hours producing documents -- searching

15   for documents, producing records, providing

16   testimony only to be met every time with an

17   argument that, well, that's not enough; that's

18   not enough; that's not enough.

19               And the reality of the cycle that we

20   are in at this point is, that the plaintiff is

21   convinced that the defendants hacked his

22   information and posted it publicly, but that

23   didn't happen.  And so the plaintiff, through

24   his discovery request, is searching for

25   discovery responses and evidence, which does not

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 17 of 164

1    exist.  And so every time defendants get a

2    discovery request seeking evidence of hacking of

3    Mr. Azima and that information is not produced,

4    we are met with accusations of hiding

5    information, not fully responding to discovery

6    requests and additional requests for information

7    and requests for testimony.

8              So where does that put us?  As

9    everyone is aware, the 2015 Federal Rules of

10   Civil Procedure were amended to add in a

11   proportionality requirement.  Rule 26(b)(1)

12   requires the Court to consider proportionality,

13   which is based on the importance of issues at

14   stake in the action, the amount of controversy,

15   the parties relative access to information,

16   resources, the importance of discovery resolving

17   the issues and whether the burden or expense of

18   the discovery outweighs its likely benefit.

19             Now, Judge Webster and Judge Osteen

20   have recognized that limited discovery into the

21   hacking can be relevant to the remaining claims,

22   but this is hardly a license to turn the case

23   back into the hacking case that was dismissed by

24   the district court.

25             I know the plaintiff may be

1    frustrated by the lack of evidence of hacking,

2    which is understandable since our client didn't

3    hack him, but that doesn't give him a license to

4    engage in a review of every possible source of

5    information, as if the issues had never been

6    narrowed.

7              This has resulted in this constant

8    loop of discovery requests, responses,

9    accusations and additional discovery requests.

10   And these motions and our responses today

11   demonstrate why we are at the point of the

12   discovery that is being sought by the plaintiff

13   outweighing its benefit to the case.

14             Second, courts recognize that where,

15   as here, the Court is reviewing discovery in a

16   trade secret case, the first thing that is

17   supposed to happen is that the plaintiff must

18   show that he has a trade secret, which was also

19   misappropriated.  Only then, if a plaintiff can

20   do so, are they supposed to get discovery under

21   North Carolina law.

22             Now, we cited several cases in our

23   papers that reflect that important precept.  And

24   it may seemingly be lost in the list of motions

25   today, but we would respectfully urge you to

1    withhold any ruling on plaintiff's discovery

2    until we get a chance to show that they have

3    failed to prove any trade secrets that were

4    published or misapplied by defendants.

5              And as such, it is grossly improper

6    to allow the plaintiff to turn over every nook,

7    cranny and pebble in support of their dismissed

8    hacking claim, while at the same time avoiding

9    discovery into all of their trade secrets that

10   they say have been misappropriated.

11             Now, Ms. Richey, you focused -- the

12   first question I think you had for the parties

13   was about the laptop.  And this is the United

14   Kingdom laptop, not the laptop that

15   Mr. Del Rosso used for work here in the United

16   States.

17             This is a computer that Mr. Del Rosso

18   used when he worked in the United Kingdom, left

19   over there several years ago, shortly before he

20   was diagnosed with cancer, and has not been back

21   over to the United Kingdom since -- or at least

22   did not go back over to the United Kingdom to

23   retrieve the laptop due to him getting sick.

24             In the meantime, the Stokoe law firm

25   somehow came into possession of the laptop,

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 20 of 164

1    didn't inform anyone that it had possession of

2    the laptop for a number of months until it

3    became subject of what I believe is called an

4    offer-up proceeding in the United Kingdom.

5              The offer-up proceeding resulted in

6    an order on July 31st of last year, whereby the

7    Court ordered that my client's offer-up claim as

8    to the laptop was allowed.  The court set a

9    specific procedure by which the laptop was to be

10   reviewed and what was to occur during that

11   review process.  And we can share a copy of that

12   order.  What I would like to do is to see if I

13   can share part of my screen.

14             MS. RICHEY:  Have plaintiffs seen

15   this order?  I presume so.

16             MR. BRANCH:  Yes, ma'am.

17             MS. RICHEY:  Okay.

18             MS. BRIGGERMAN:  If this is from the

19   UK court case, probably.  I don't know what he

20   is about to put on the screen.

21             MR. BRANCH:  Yeah, Mr. -- plaintiff

22   is a party to the UK case.

23             MS. BRIGGERMAN:  Correct.

24             MR. BRANCH:  This is -- so the Court

25   can see, this is the beginning of the caption of

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 21 of 164

1    the order.  The date at the top is July 31, '23.

2    The first caption is the main case in the United

3    Kingdom, Ras Al Khaimah Investment Authority v.

4    Azima, claimant and defendant, and then you have

5    the additional defendants, the counterclaim,

6    Neil Gerrard, Dechert, LLP and James Edward

7    Dennison Buchanan.

8              And then you have a number of other

9    cases that are cited herein, in which parties

10   had a claim related to the laptop that was

11   subject to the offer-up proceeding.  This is the

12   order that the Court entered, setting the

13   parameters on what was to be done with the

14   laptop.

15             I've directed the Court's attention

16   to the last paragraph on page 3, which is the

17   representation that my client's lawyers,

18   Rosenblatt-- or solicitors Rosenblatt made

19   pursuant to which the Court entered the order.

20   And it includes a representation that Rosenblatt

21   will not access or examine the laptop or the

22   diligence image, which is the image of the third

23   party that Stokoe used to image the laptop prior

24   to the steps set out in paragraph 4 of the order

25   having been completed.  So Rosenblatt can't

1    access the image until the analysis contemplated

2    by paragraph 4 of the order is completed.

3            That Rosenblatt is to retain securely

4    within the jurisdiction the laptop and the

5    forensic image of the laptop, that they will not

6    supply the laptop the diligence image, the

7    forensic image, or any of the other media, to

8    the Del Rosso parties until the resolution of

9    the disclosure applications that are

10   contemplated by this order as well.

11           And, your Honor, we will submit this

12   order to you, but it cites here -- paragraph 4

13   of this order, if we scroll down.  Paragraph 4

14   here contemplates Rosenblatt's instruction of an

15   independent forensic IT specialist to examine

16   the media at issue and prepare an independent

17   forensic report.  Our understanding, as of

18   several days ago, is that the independent

19   forensic group has possession of the laptop, but

20   has not produced the report yet.

21           Rosenblatt, the defendants' UK

22   lawyers, does not have possession of the laptop.

23   And in any event, under this order, even if they

24   had possession of the laptop, until the

25   application process called for by this order is

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 23 of 164

1    worked through, we're not sure that we can

2    search the laptop for responsive information.

3              And so that all being said, we agree

4    that the laptop needs to be searched for

5    responsive information.  I mean, that is -- that

6    is not something that the parties disagree on

7    and it is something that we represented to

8    Judge Osteen at the September 29th hearing.

9              The challenge that we have is that

10   the laptop is subject to a court order and a

11   review process, where there is a third party who

12   says that he has privileged information on the

13   laptop.  He wants it pulled out of the laptop

14   before anybody else gets to look at it.  And

15   that's one of the main reasons why it is going

16   through that process.

17             MS. RICHEY:  Moore International Law

18   Firm; I saw a reference there.

19             MR. BRANCH:  Rosenblatt.

20             MS. RICHEY:  Rosenblatt?  Who is

21   Rosenblatt?

22             MR. BRANCH:  Rosenblatt is the

23   solicitors that represent Vital Management and

24   Del Rosso in the United Kingdom.

25             MS. RICHEY:  No, I was referring to

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 24 of 164

1    the third party that believed they had

2    privileged information.  Was that -- I thought

3    it referenced Moore -- okay.

4              MR. BRANCH:  That is a gentleman by

5    the name of Mr. Moore.

6              MS. RICHEY:  Okay.  But Rosenblatt is

7    the attorney for Mr. Del Rosso and VMS in the

8    UK, right?

9              MR. BRANCH:  Yes, ma'am.  That is

10   correct.

11             MS. RICHEY:  Just kind of reading

12   that order at first glance, it looks like that

13   has not been complied with in terms of timing.

14             Do you know why?

15             MR. BRANCH:  I cannot speak as to the

16   reason for exactly why it has taken as long as

17   it has taken for the forensic analysis to be

18   done by the independent forensic team in the

19   United Kingdom.

20             MS. RICHEY:  Okay.  Does

21   Mr. Rosenblatt know that this lawsuit here is

22   time challenged and that this information has

23   been requested in this lawsuit, that is, a

24   review of the laptop has been requested in this

25   lawsuit?

```
 1              MR. BRANCH:  My understanding is that
 2     we have been in communication with the
 3     Rosenblatt firm to get status updates, given
 4     the -- given the request the plaintiff has
 5     lodged in this lawsuit.
 6              I mean, have we filed a motion to
 7     compel the expert in the case in the UK to
 8     finish?  I don't believe so.
 9              MS. RICHEY:  No.  I'm not suggesting
10     that, of course.  My thinking, though, is that
11     if Mr. Rosenblatt is the attorney for
12     Mr. Del Rosso and VMS, that Mr. Del Rosso,
13     through you or on his own, can direct him to
14     push to get this done so that the laptop can be
15     returned to his possession.  He doesn't have to
16     tell him why, but it's his attorney.  And in my
17     view, he ought to tell him, you need to get this
18     done.  And I think the attorney needs to know
19     that there is a process going on in the United
20     States in which that laptop is implicated.
21     Because, you know, it may not be important to
22     get it done timely there, but it is important to
23     get it done timely here.
24              MS. BRIGGERMAN:  Ms. Richey, if I may
25     add, Nelson Mullins has been attending those
```

1    hearings on behalf of Mr. Del Rosso.  So I would

2    assume and hope that they have been making that

3    point at court.  But given the delays here, I'm

4    not sure that that is the case.

5              MS. RICHEY:  Well, and whether or not

6    it has been -- and I'll put this in what I

7    finally decide -- it does seem to me that

8    because Mr. Del Rosso, these are his attorneys,

9    he can and should direct them to have this

10   process hastened and done as quickly as

11   possible.  And whatever -- again, I don't know

12   what impediments are in the way and why it

13   hasn't been done to date, but he can certainly

14   direct them to do that.  And I would like him to

15   do that.

16              I was just glancing through the

17   order.  And I don't know the answer to this, but

18   is there anything in the order that prohibits a

19   copy of the laptop being provided to

20   Mr. Del Rosso, given that it is his laptop?

21   Does anyone know the answer to that?

22              MR. BRANCH:  So, yes.  The short

23   answer is yes, because there is an allegation

24   that the image of the laptop contains privileged

25   information of a third party.  And so there is a

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 27 of 164

1    representation made that Rosenblatt will not

2    supply the laptop, the diligence image, the

3    forensic image, any dedicated media or any

4    mixed-up media to the Del Rosso parties until

5    the resolution of any disclosure applications

6    pursuant to CPR 31.17.

7            MS. RICHEY:  And does that preclude a

8    copy?  I heard the things that already exist

9    they can't turn over.  Does that preclude

10   another copy being made?

11           MR. BRANCH:  I think so.  I think the

12   only -- I would have a hard time interpreting

13   the order a different way.  Because the purpose

14   of this -- the purpose of the process, in my

15   understanding, is to examine the image of the

16   laptop, determine whether there is privileged

17   information on it that is not Mr. Del Rosso's

18   privileged information on it and remove it from

19   the laptop prior to anyone else seeing it so

20   that you can keep the confidentiality prong of

21   the privilege intact.

22           And an interpretation of this order

23   that says, oh, well, they keep an image, but we

24   get an image too, I'm concerned it would defeat

25   the purpose of what this order is attempting to

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 28 of 164

1    accomplish.  And so --

2              MS. RICHEY:  Well, I think this:  You

3    can send me the order and I can look at it.  If

4    it is not clear on that point, then one of the

5    things that might make sense for us, since

6    everybody agrees that the laptop needs to be

7    searched, is for Mr. Del Rosso to inquire about

8    that and the Court or the lawyer, whoever, may

9    say no.  And if it is not clear in the order,

10   then that might be a question for the judge over

11   there.  But I think that is a question that

12   ought to be asked.

13             As I understand it, hearing

14   everybody, everybody agrees we need to get the

15   laptop, we need to search the laptop for

16   relevant information.  So let's do what we can

17   do to hasten that and get that back into his

18   control.

19             I guess another option -- well, let's

20   start there.  Okay.  And I'm not ruling, I'm

21   just sort of musing out loud about things we can

22   do.  And I'll incorporate those later into an

23   order.

24             MS. BRIGGERMAN:  My understanding is

25   that once the stolen data on the laptop is

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 29 of 164

1    removed, that an image can be made.  There is

2    nothing restricting that.  And so if an image is

3    what Del Rosso's lawyers need so that they can

4    efficiently and expeditiously search the laptop,

5    then they can do that.

6              MR. BRANCH:  I don't know that I read

7    the order the same way.  The order contemplates

8    the -- there is an application process that

9    takes place after the image.  The forensic

10   report is produced.  The image goes back to

11   Rosenblatt.

12             But in any event, I mean, our

13   position is that the order governs, and we're

14   going to get an image as soon as we're allowed

15   to in the UK proceeding.  And we'll certainly

16   reach out to Rosenblatt and ask them to, you

17   know, do what they can to expedite the process.

18             And if there is a difference in

19   interpretation of the United Kingdom order, I'm

20   happy to listen to it.  But at this point, you

21   know, I know our client is not -- it wants to be

22   careful to not get crosswise with the Court and

23   do something that is not -- I mean, frankly,

24   remediable if you disclose information that

25   you're not supposed to disclose.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 30 of 164

1          MS. RICHEY:  Okay.  So what we'll do

2    is, you'll send the order and I'm going to look

3    at it.  And I will write something when I write

4    my decision that will more than likely include a

5    directive to Mr. Del Rosso to direct his

6    attorneys to move that process along.  I'll come

7    up with some language to that effect.

8          But also to have them report to him.

9    And then you can report to me and the other

10   side, the timing and when it is likely to be

11   released to him.

12         Okay.  Anything else on the laptop?

13         MR. BRANCH:  Not from defendants.

14         MS. RICHEY:  Okay.  And anything

15   else -- I know you addressed the RFPs and the

16   general claim of failure to produce documents.

17         Anything else you want to say about

18   that?  I told you we'll talk about trade

19   secrets, and we will.

20         MR. BRANCH:  Look, when this lawsuit

21   was filed, we imaged our client's work computer.

22   We imaged our client's work e-mail account.  We

23   imaged our client's iCloud account, which is the

24   backup of his cell phone and his iPad.  We got

25   our client to collect his removable media, and

1  we made that part of the -- we copied it and we

2  made it part of the universe of documents that

3  we searched.

4           And when Judge Webster's order was

5  entered, I believe, on July 25th, we had 14 days

6  to search all of that information for responsive

7  material.  And we did it.

8           And so we -- I disagree with

9  Ms. Briggerman's characterization that we, you

10 know, must have applied unnecessarily

11 restrictive search terms because you didn't give

12 us documents.  Well, the reality is that a lot

13 of -- if items don't exist, they can't be

14 produced.  And the assumption the plaintiff has

15 baked in to these motions seeking discovery, is

16 that our clients did all of these bad things

17 with third parties.  There must be evidence of

18 these bad acts.  And you're playing some sort of

19 shell game to hide them from producing them to

20 us.  That is not what is happening.

21           MS. RICHEY:  Do the parties agree on

22 search terms?  Was that part of your

23 protective --

24           MR. BRANCH:  We did not agree on

25 search terms.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 32 of 164

1           MS. RICHEY:  Okay.

2           MR. BRANCH:  Judge Webster's order

3    gave us 14 days to produce.  Frankly, we came up

4    with search terms, I think, with -- and started

5    running them in less than 24 hours.  The search

6    terms that we came up with were derived from

7    plaintiff's own request for production of

8    documents.

9           We were able to categorize the

10   requests for production of documents into, if I

11   remember right, three general categories,

12   depending on some of the qualifiers that the

13   various requests for production had, and then

14   identified responsive documents there.

15          And the buckets of information that

16   we were able to identify that were responsive

17   was -- the first large bucket was the

18   information of Mr. Azima's that was posted on

19   the Internet and downloaded via BitTorrent.

20   That was -- the vast majority of the hits that

21   we had came from that.

22          We had already produced that

23   information to plaintiff in a previous

24   production.  But we ended up -- but we hadn't

25   Bates-stamped it.  We produced it to them as we

1    had it.  And so we reproduced it with Bates

2    numbering as part of the post July 25th order

3    process.

4                We also went through and searched our

5    client's e-mail account, our client's iPhone --

6    or iCloud records, and our client's electronic

7    file backups for responsive information.  And if

8    we had hits on the applicable search terms, the

9    documents were reviewed for responsiveness.

10   Then after they were reviewed for

11   responsiveness, we reviewed them for privilege,

12   logged them, if there was a privilege hit.  And

13   then made the production pursuant to

14   Judge Webster's order.

15               We provided a very detailed privilege

16   log and amended our privilege log, I think, two

17   and-a-half weeks later to remove a number of

18   documents from the log and produce the documents

19   that we determined on a quality control review

20   should not have been part of the assertion of

21   the privilege.  And so we've gone through all

22   this material.

23               Now, with respect to some of the

24   specific issues that are listed in the order,

25   we've covered the work computer.  The work

1    computer was imaged -- it was imaged around the

2    time the lawsuit was filed, at or within a month

3    after the lawsuit was filed, I believe.

4           The iPhone was also imaged within a

5    month or two of the lawsuit being filed -- the

6    iPhone and the iPad through the iCloud account

7    backup.

8           Mr. Del Rosso's e-mail account was

9    searched for the applicable period of time.  And

10   there has been some -- Mr. Del Rosso testified

11   that he used or had other e-mail accounts, but

12   he also testified he only used his Vital

13   Management e-mail account to conduct business on

14   there.

15          He has reviewed his other e-mail

16   accounts and there is not responsive e-mails

17   contained in those accounts.  I mean, there's,

18   you know, throwaway accounts that he used for,

19   like, shopping, for example.  It is just not the

20   accounts that he used to conduct his work.

21          The motion cites to banker's boxes of

22   hard documents.  We've gone through those

23   documents.  Those were printouts of electronic

24   documents.  And we've -- you know, we made sure

25   that to the extent that he had hard copies of

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 35 of 164

1   documents, they were copies of electronic

2   documents that were a part of the review

3   process.

4           Similarly, with regard to external

5   hard drives or thumb drives in the collection

6   process after the lawsuit got filed, we made

7   sure that that collection process encompassed

8   external hard drives or thumb drives that may

9   have responsive information.  And those were

10  copied, put into the database, and searched for

11  responsive information.

12          And so I think -- it seems that we

13  are more in an area where there may be

14  disagreement over the -- because we haven't

15  agreed on search terms, what search terms needed

16  to be used, and how to interpret those search

17  terms as opposed to the universe of hardware

18  that should have been searched.

19          MS. RICHEY:  Did you all have any

20  agreement on temporal parameters for the

21  searches?  What parameters did you use?

22          MR. BRANCH:  We used the parameters

23  from Judge Webster's order.  Yes, ma'am.

24          MS. RICHEY:  Okay.  Well, it seems

25  that -- I understand you have produced a lot of

1    information and I hear that.  I think the

2    question for me is whether the defendants have

3    fully responded to existing requests for

4    production of documents.

5            I don't -- are there any

6    interrogatories that the plaintiffs believe --

7    plaintiff believes have not been fully responded

8    to or was it just document requests?

9            MS. BRIGGERMAN:  Yes, it's

10   interrogatories as well, and we can identify

11   those.  And I believe there is a set that is

12   actually due today.  But we have two sets of

13   interrogatories that have been responded to, and

14   we find those to be willfully inadequate.

15           But if I may step back just a minute,

16   Ms. Richey.  You said something that I just want

17   to clarify.  You suggested that defendants have

18   produced a lot of documents, and that's not the

19   case.

20           As Mr. Branch said, defendants only

21   really began searching for documents after the

22   Court ordered them to do so in July of 2023.  We

23   first served RFPs in November of 2022.  They

24   asked for an extension to respond.  We gave them

25   an extension.  And once that deadline passed,

1    they didn't produce documents.

2              They then produced only our client's

3    hacked data.

4              They later produced, in May of 2023,

5    eight documents.

6              And only since the Court ordered them

7    to respond to our RFPs in July, did they

8    actually make two small productions.

9              So I don't want the special master to

10   think that they have been producing a voluminous

11   amount of documents and they have been

12   conducting a rigorous search for documents.

13   That's not the case.

14              I also do think there is a

15   fundamental dispute over what is relevant here.

16   They believe the standard is that if a document

17   doesn't support our theory of the case, that

18   Mr. Del Rosso hacked our client, then they don't

19   have to turn it over.  And that's just simply

20   not what the discovery standard is.

21              MS. RICHEY:  So what -- what --

22              MR. BRANCH:  Ms. Richey, can I jump

23   in here, please?

24              MS. RICHEY:  Very briefly.

25              MR. BRANCH:  So A, I -- just, I think

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 38 of 164

1    Ms. Briggerman missed what I just said.  We

2    designed our queries around the discovery

3    requests.  We searched for responsive documents

4    based on the discovery requests.  We did not

5    apply a unilateral view of what's relevant and

6    what's not.

7            And this idea that we didn't search

8    for documents prior to Judge Webster's order has

9    two bases.

10           One, is the fact that Judge Webster's

11   order expanded the scope of discovery beyond

12   what we thought it should have been.

13           The second basis is where we thought

14   discovery was appropriate was as to the

15   republication claim in the trade secrets, of

16   which my clients had nothing to do with.  We

17   searched for documents related to the

18   republication of trade secrets in 2018.  My

19   clients don't have anything related to it

20   because they were not involved in it.

21           So this idea that we did nothing

22   prior to the July 25th order is a misstatement

23   of the way that this case has been litigated.

24           MS. RICHEY:  So thank you all for

25   that.  I think what I -- and again, I'll follow

1    this up with a writing to you.

2            But what I would like to know from

3    the plaintiff is, I'd like to have a list of the

4    specific requests.  Go ahead and just do a

5    document for me that has an inventory and tell

6    me what their response is.  And then if there is

7    a particular objection -- I don't know how you

8    did objections.  Did you do objections specific

9    to each interrogatory?  I'm assuming you did

10   general objections that you would argue and

11   apply to each response.

12           MR. BRANCH:  I don't think we

13   asserted any general objections.  We did request

14   by request objections.

15           MS. RICHEY:  Great.  That's helpful.

16   So I would like to have included in that

17   response -- and this is verbatim.  I don't want

18   anybody to add to it.  Just, what is the

19   request?  What was the response, including the

20   objection?  And I only want to know which ones

21   you believe were not adequately responded to.

22   And that way, I can take it one by one.

23           I know you all have had a long

24   history of doing things and there is

25   disagreement about whether it was enough or not.

1    But for my purposes now, what I can do is say,

2    if I determine that defendant did not respond

3    adequately to RFP8, I'll say that and say how it

4    should be responded to.

5              I don't -- well, let me look at that

6    first.  I'm just wondering if we need to think

7    about search terms, but let me just look at the

8    responses first.

9              How soon could you get that to me?

10   And I say "you."  I would like the plaintiffs to

11   get that to me.

12             MS. BRIGGERMAN:  We can get that to

13   you tomorrow.

14             MS. RICHEY:  That would be great.

15             MS. BRIGGERMAN:  Absolutely.

16             MS. RICHEY:  Okay.

17             MS. BRIGGERMAN:  Just one further

18   point.  Mr. Branch was suggesting that the only

19   claim at issue was this trade secrets

20   misappropriation claim.  That's not the case.

21   There is a corresponding conspiracy claim.

22             MS. RICHEY:  Right.  And I've read

23   that part of the order and understand the

24   latitude that Judge Webster was going to give

25   the plaintiffs in connection with the conspiracy

1   claims.  Which, I know is not a claim-claim, but

2   it is one that does provide some enhanced

3   discovery with respect to trade secret claims.

4   So I'm aware of that.

5           And I'm also aware of kind of general

6   rules of discovery and the latitude given to

7   plaintiffs and the American system.  So we're

8   not going to bend the rules.  We're going to go

9   with them.

10          Okay.  So you're going to send me,

11  Mr. Branch, the order from the UK.

12          MR. BRANCH:  That should be in your

13  inbox.

14          MS. RICHEY:  Okay.  I don't see it.

15  Did you send it to the right e-mail address?  If

16  you didn't, just resend it to my new e-mail

17  address, which is the alice@ACRichey.com

18  address.  You may have sent it to my old one.

19  That's fine.  You can do that later, just so I

20  get it.

21          And then, Ms. Briggerman, you'll get

22  me the discovery, and so I can look at that and

23  determine.

24          Okay.  As far as I'm concerned,

25  that's all we needed to hear about the lot --

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 42 of 164

1  about motions -- plaintiff's motions one and

2  two.  So the next motion would be -- no, no,

3  that's not true.  We've got the CyberRoot is the

4  second -- is the plaintiff's submission two.

5  And that's plaintiff's motion to compel

6  defendants to produce documents related to

7  CyberRoot.

8          Is there anything different you want

9  me to hear on that motion that is different from

10  the argument you had on general responsiveness?

11          MS. BRIGGERMAN:  Well, I think

12  this -- the CyberRoot motion is similar, but it

13  come down to potentially a disagreement over

14  what is relevant as well, so I think that is

15  important to point out.  CyberRoot really is at

16  the heart of the alleged conspiracy to hack and

17  steal Mr. Azima's data.  And the defendants have

18  admitted that CyberRoot is relevant.  They

19  admitted so in their initial disclosures, in the

20  Rule 26F report.  And they also admitted that

21  they made CyberRoot over a million dollars.

22          I think fundamentally what is at

23  issue is, what was the scope of CyberRoot's

24  work?  What were they hired to do and what did

25  they do?

1           We allege that they were hired to

2    hack Mr. Azima's data and they did so.  I would

3    note that Meta, the company that owns Facebook,

4    did come out with a report finding that

5    CyberRoot was a half-for-hire company.  I'm

6    happy to provide that report to you, if it would

7    be helpful.

8           Defendants argue that they were hired

9    to put together websites, so there is a

10   fundamental dispute here as to what they did or

11   were hired to do.  And yet, defendants have

12   produced very little information related to

13   CyberRoot.  They produced no communications, no

14   engagement letters, no reports prepared by

15   CyberRoot, no bank records related to CyberRoot.

16          So again, it comes down to a

17   fundamental issue of what are they deeming is

18   relevant here?

19          And, you know, they also admitted in

20   their filing after -- when they filed their

21   motion for clarification in August with the

22   Court when they sought to have the Court

23   reconsider that motion, they basically admitted

24   that they had documents related to CyberRoot.

25   And they were asking the Court to reconsider

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 44 of 164

1    whether or not they needed to produce them.  So

2    I don't think there is a question that the

3    documents exist, but they have not been

4    produced.

5              MS. RICHEY:  Okay.  So I have --

6    recall in Judge Webster's order -- it's ECF248,

7    which is the lengthy order -- he talks about,

8    again, some latitude he will give the plaintiffs

9    to look into that because it may have to do with

10   the financial trail, I think is the word he --

11   phrase he used.  Again, I'm going to be guided

12   by that.  But what I would like to know is the

13   specific interrogatories, RFPs, about CyberRoot

14   and the responses.  And then I'll make a

15   decision about that.

16             Mr. Branch, anything you want to add

17   about CyberRoot?

18             MR. NEUMAN:  Ms. Richey, if you'll

19   allow me, I'll address that briefly.  I'll be

20   brief.

21             MS. RICHEY:  Yes.

22             MR. NEUMAN:  It follows, sort of, the

23   same themes of what Mr. Branch stated before

24   about the way discovery has gone.  I mean, it --

25   the CyberRoot motion in particular is based on a

1    series of false assumptions, right?

2             For example, it assumes that

3    documents related -- certain categories of

4    documents related to CyberRoot exist in

5    defendants' data and that we withheld any such

6    data.  Well, we haven't.

7             It assumes that because Mr. Del Rosso

8    has admitted that it did work with CyberRoot in

9    the past, that substantial communications exist.

10   Well, it doesn't.

11            And those are just a few examples.

12   CyberRoot has been a key allegation in this

13   matter, right?  We know that.  We haven't

14   limited our searches in the database related to

15   CyberRoot in any way.

16            In fact, we ran multiple searches

17   regarding CyberRoot in multiple spellings, even.

18   We broke it up in our analytics to make sure we

19   were capturing every single document we could

20   possibly locate within the database.  And we

21   even searched for people that we knew were

22   associated with CyberRoot by name.  And we

23   didn't find any e-mails.  We didn't find any

24   reports.  We didn't find any communications of

25   any type whatsoever between the parties, between

1    CyberRoot and our client.

2            But what we did find are a series of

3    invoices and payment records, right, within the

4    temporal time frame and we produced those by

5    Bates number.

6            We also found in the database some

7    letters that our client had received from

8    opposing counsel that mentioned CyberRoot.  We

9    even produced those to make sure we were

10   capturing everything that we had having to do

11   with CyberRoot.  So I'm just not sure what else

12   we can do.  We certainly cannot be forced to

13   produce data we don't have.

14           If we found a report that was

15   related, we would produce it.  If we found

16   communications, we produced it.  It just doesn't

17   exist.  It is not how the parties interact --

18   how I understand our client and CyberRoot

19   interacted.  So everything else is pretty

20   similar to what John stated, as to how we run

21   through our searches, but it just doesn't exist.

22           MS. RICHEY:  Has Mr. Del Rosso

23   testified how he communicated with CyberRoot --

24           MR. NEUMAN:  Yes.  He test --

25           MS. RICHEY:  -- not oral

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 47 of 164

1    communications, but yeah.

2              MR. NEUMAN:  Yes.  He testified that

3    he used a messaging app.  I believe -- and I

4    don't have the transcript in front of me -- but

5    I believe that he testified that he used an app

6    called Signal.

7              MS. RICHEY:  Okay.  And that's the

8    one that hasn't been searched?  Can't be

9    searched?  I read that, but remind me, I can't

10   recall.

11             MR. NEUMAN:  We looked for messages

12   and there are no Signal messages in existence in

13   our client's database or copies or images of

14   any.

15             MS. RICHEY:  Would those -- well, all

16   right, I'm not going to ask you that.  That's

17   not a -- okay.  I'll change that one.

18             Let me ask this, though.  The laptop

19   that is in the UK, what is the time frame of the

20   information on it?  Does anybody know?  It

21   hadn't been used in a couple of years, it sounds

22   like?

23             MR. NEUMAN:  I'm not sure we know the

24   answer -- great question.  I'm not sure we know

25   because we haven't peered into it.  But I just

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 48 of 164

1    don't know at this point, but we'll inquire.

2          MS. RICHEY:  Okay.  All right.  Thank

3    you.

4          Okay.  Anything else on CyberRoot?

5          MS. BRIGGERMAN:  I would just

6    appreciate the clarification.  Is Mr. Neuman

7    saying that there are no communications

8    whatsoever between defendants in CyberRoot?

9    Because before you used the term "related to."

10   And I want to make sure we're not having a

11   dispute over what is relevant.

12          MR. NEUMAN:  No, that's -- I

13   understand that question, Ms. Briggerman and my

14   answer to that is, our searches in the database

15   have not yielded any communications, regardless

16   of the subject matter.

17          MS. BRIGGERMAN:  And same goes with

18   reports, engagement letters, and the other

19   documents that I mentioned?

20          MR. NEUMAN:  Yes.  I know for sure

21   reports.  I know for sure communications.  And I

22   believe that applies to engagement letters, but

23   I will -- I'll inquire and come back to you on

24   that to make sure.

25          MS. RICHEY:  Mr. Neuman, do you

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 49 of 164

1   happen to recall when you all responded to those

2   particular RFPs about the CyberRoot documents,

3   did you say in there that you did not have

4   anything to produce or that you -- how did you

5   state that?

6            MR. NEUMAN:  Yeah, there has been a

7   couple of them.  CyberRoot information was

8   sought, and I believe the first request for

9   production of documents and, more specifically,

10  the fourth set of requests for production of

11  documents -- and I'm referring to our responses

12  to the fourth set in particular where we made it

13  abundantly clear in the actual responses that

14  our client is not in possession of what was

15  requested, in their possession, custody, and

16  control when applicable.

17           I need to go back and review what our

18  responses were to CyberRoot requests in the

19  earlier request for production of documents.

20  I'm happy to do that and come back to you on

21  that.

22           MS. RICHEY:  I think sometimes that's

23  helpful.  I know that sometimes the attorneys

24  will say, We don't have it.  Well, what they

25  mean is, we looked everywhere, it doesn't exist,

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 50 of 164

1  and it may be interpreted as we didn't look.  So

2  if any clarification on that can help resolve

3  some of this, let's do that.

4           But when I see those interrogatories

5  and those responses -- or RFPs and responses as

6  well, I might have some input on how you all can

7  supplement it to make that --

8           MR. NEUMAN:  Agreed.

9           MS. BRIGGERMAN:  I think we're also

10 trying to get to the bottom of, if nothing

11 really exists and yet CyberRoot was paid a

12 million dollars for their work, then there is a

13 potential issue of spoliation.  So we would

14 request a certification as to how they searched

15 for documents and confirming that they don't

16 have anything, if that's really the case.

17           But I would still push back on that,

18 because you did file a motion in August for

19 reconsideration of the Court's July 25th order,

20 which compelled you to search for CyberRoot

21 documents.  And you pushed back -- and I want to

22 quote from your motion -- you said, "Another

23 area where Azima is seeking documents unrelated

24 to Azima is with respect to CyberRoot."

25           So my concern here is that there may

1    be a category of documents that you deem

2    unrelated to Azima, but we argue are relevant

3    and should be produced.

4            MS. RICHEY:  So again, when I see the

5    discovery responses, I'll probably have some

6    input on that.

7            Is it possible -- well, I'm not going

8    to ask questions, but I'll just make a

9    statement.  If, in fact, there is information

10   related to communications, reports, data, et

11   cetera, about CyberRoot on the UK computer, I

12   don't want -- the defendants will have to make

13   their statement here relevant to what it is that

14   they were able to search.  Because it might be

15   that there is some information on that computer

16   that no one knows about yet.

17           Okay.  Anything else, Mr. Neuman or

18   Ms. Briggerman on that motion?

19           MS. BRIGGERMAN:  No, thank you.

20           MR. NEUMAN:  No, thank you.

21           MS. RICHEY:  All right.  Now, let's

22   move on to the plaintiff's motion to compel

23   defendants to produce information improperly

24   withheld for privilege.

25           I had a couple of questions about

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 52 of 164

1  that, that I would -- maybe have been answered

2  and I missed, but I couldn't answer for myself.

3  Which is, again, going back to the discovery.

4            So what specific interrogatories,

5  document requests, deposition questions have

6  been asked, and the privilege -- privilege

7  objection has been interposed.  I presume that's

8  there.  I would like to know what those are.  I

9  can't tell what has been -- what exactly hasn't

10  been responded to on the basis of privilege.

11           I have seen I think just one

12  privilege log.  But I wasn't clear who -- I

13  think that came from you, Ms. Briggerman.  And I

14  wasn't clear exactly who prepared it.  It looked

15  like maybe Dechert prepared it.  And I'm sorry

16  if I missed another one.  But I don't know if

17  you're at the point where you want me to review

18  documents.  But if you -- I don't know that I

19  can -- I can't rule on privilege if I don't have

20  a specific document or piece of testimony to

21  look at.  It is not, you know, enough, as I

22  think Judge Osteen said, to simply say, it is

23  privileged because it involves attorney/client

24  communications.  You all know what the privilege

25  covers and what it doesn't cover.

1          And so I don't know if we're at the

2    point where you want me to do that.  But I'll

3    just say, without doing that, it may be limited

4    what I can do at this moment.  So, all right.

5    I'll hear from the plaintiff on that.

6          MS. BRIGGERMAN:  Sure.  So a key

7    issue in this case is how defendants obtained

8    Azima's stolen data.  There is no dispute the

9    defendants have the data.  The question is how

10   they obtained it.

11         Their position is that they came into

12   the data innocently on the Internet, and used

13   NTI, a cybersecurity firm, to retrieve it.

14         Our position, of course, is that

15   Mr. Del Rosso was involved in the hacking of

16   Mr. Azima and did so improperly and illegally.

17         Mr. Del Rosso and others have

18   testified in court in the UK and submitted

19   numerous witness statements attesting to that

20   narrative, that they came into the data

21   innocently.

22         Del Rosso and others have also turned

23   over analysis prepared by their vendor, NTI, who

24   was acting at their direction to a third party,

25   to the FBI, in order to instigate an

1    investigation into Mr. Azima.  And yet

2    Mr. Del Rosso is holding back those reports.

3              Azima is entitled to probe the

4    veracity of defendants' narrative here as to how

5    they obtained the data.  They can't open the

6    door by testifying about how they allegedly and

7    innocently obtained the data, and then withhold

8    all other information about how the data was

9    obtained and used because that gives them a

10   tactical advantage here.

11             RAK's, the purported privilege

12   folder, has voluntarily waived any potential

13   privilege by disclosing information they now

14   seek to cloak in privilege.  The general rule is

15   when a party reveals part of a privileged

16   communication to gain advantage, as defendants

17   did in the UK, then the party waives privilege

18   as to all other communications on that subject

19   matter.

20             And as I mentioned, Del Rosso has

21   given nine sworn statements, alongside trial

22   testimony, divulging information related to the

23   hacking of Azima, but now del Rosso suggests is

24   privileged.

25             For example, in a sworn statement

1    submitted on behalf of RAK in UK, Del Rosso

2    testified about his conversation with a

3    lawyer -- then, Dechert partner, Neil Gerrard,

4    and how Del Rosso used NTI to obtain Azima's

5    data.

6              Dechert has also produced documents

7    treated at the time as privileged, including

8    notes containing attorney mental impressions

9    from a key interview with one of the

10   coconspirators, Stuart Page, a detailed

11   chronology analyzing Azima's hacked data, and

12   internal attorney communications opining on

13   legal strategies, some of which were actually

14   marked "privileged and confidential" at the top.

15             In addition, defendants and Dechert

16   have withheld more than 60 reports prepared by

17   NTI, purportedly on the basis of privilege.  And

18   that is part of their privilege log, which is

19   rather lengthy.

20             The defendants have already testified

21   about the work that NTI did to obtain Azima's

22   data.  They can't use a small portion of that

23   work to attack Azima's case, and then claim

24   privilege over the work NTI did related to

25   Azima's data.

1          It is our view that these privileged

2  communications were revealed in the UK matter to

3  be an advantage at trial to support their false

4  claim that they didn't hack Azima.  And so they

5  shouldn't be allowed to selectively pull the

6  documents.

7          I'll pause there.  And the other

8  issue, I think, that is relevant to the motion,

9  is whether or not defendants can assert RAK's

10 privilege.  It's our position that they can't.

11 Only the privilege holder has standing to assert

12 privilege.  And submitting a vague, conclusory

13 letter like they did from RAK's attorney,

14 Allen & Overy, is not sufficient.  Defendants

15 have not cited any case law suggesting that such

16 letters are sufficient.

17          So I'll pause right there if you have

18 any questions.

19          MS. RICHEY:  Yeah, so I read that

20 letter.  And to me, that letter -- well, I read

21 the cases and -- only the ones that people

22 cited.  But there is language in one of the

23 cases that was cited by the defendant about

24 getting -- being directed by a third party to

25 assert the privilege.  I have no idea, though,

1    how far that goes.

2              And I don't know if we need to look

3    into that further.  We can table that for a

4    minute.  But I can't say that I fully understand

5    what it means for a third party to direct

6    someone else to assert the privilege.  I can see

7    it in the instance -- well, I can see it in some

8    instances.  I don't know what that means.

9              However, in the method that -- do you

10   pronounce it RAK, the acronym?  Okay.  The

11   language that they chose to do so is, in my

12   view, very non-specific.  And as you all know,

13   you can't just say, everything here is

14   privileged.  You have got to be very specific

15   about what it is, because otherwise, a court or

16   someone in my position, can't make any sort of

17   determination about whether it is or is not, and

18   the plaintiff is in a position to challenge it.

19             I noted that -- so the Dechert

20   privilege log, was that in this matter or was

21   that in the UK?

22             MS. BRIGGERMAN:  Yes, that is in this

23   matter.  Dechert has submitted a privilege log.

24   And similar to defendants', has a portion, the

25   majority of it -- the entirety of it where they

1    purport to insert RAK's privilege.

2               MS. RICHEY:  Okay.

3               MS. BRIGGERMAN:  And defendants the

4    same way.  I believe they also have a portion

5    where it may be relevant to their own privilege,

6    which is different.  But we're talking here

7    about the vast majority of the privilege log and

8    documents withheld that RAK is claiming

9    privilege over.

10              MS. RICHEY:  And so have the

11   defendants produced a privilege log or documents

12   over which either it claims privilege or RAK

13   claims privilege in this matter?

14              MS. BRIGGERMAN:  So my understanding

15   is, that the privilege log they've submitted

16   is one giant privilege log.  I think there are

17   about three pages.  And John and Brandon, please

18   correct me if I'm wrong.  But I think it is

19   about three pages where they assert their own

20   privilege.  And the remainder of the 90-some

21   pages are where they say that RAK is asserting

22   privilege, but there is no indication that RAK

23   itself has actually asserted the privilege and

24   gone through and identified privileged

25   documents.

1          MS. RICHEY:  Okay.  There was also a

2     note -- and John, I'll just wait until -- who is

3     going to speak on this one?  Is that you,

4     Mr. Branch?  Okay.  Why don't you start.  I had

5     a question about your response, but go ahead and

6     respond.

7          MR. BRANCH:  So to address a couple

8     of the issues that have come up.

9          First, my client has testified about

10    how they came into possession of Mr. Azima's

11    data.  He has testified about that.  We're not

12    withholding his privileged information about how

13    he came into possession of the data.  What we're

14    holding as privilege and what RAK is asserting

15    as a protective order of the privilege, is the

16    analysis that was done with the data, what was

17    done with the data after our client came into

18    possession of it.

19          Our client was put into a very bad

20    spot by the allegations that the plaintiff

21    raised in regards to him arguing that he hacked

22    Mr. Azima's material.  Because on the one hand,

23    he was a contractor for a law firm rendering

24    legal advice to a client, so the work that he

25    did was subject to privilege.

1          And on the second hand, how does he

2     defend himself on that?

3          And so he has provided testimony and

4     statements about how he acquired the data.  But

5     that has been the extent to it.  And we have not

6     withheld data -- or withheld documents from

7     production based on a privilege assertion over

8     communications about how he came into possession

9     of the data.

10          Our understanding is that that's been

11     a consistent possession of RAK throughout the

12     multiple lawsuits that are ongoing in New York

13     and the United Kingdom and here, which is that

14     the -- to the extent where the privilege has

15     been asserted, it has not been asserted over

16     documents and communications relevant to the

17     acquisition of the data.  That's reflected in

18     our document productions here, which is where we

19     produced, among other things, the documents that

20     were produced in the United Kingdom case and in

21     which the privilege assertion was not withheld.

22          After we had received the plaintiff's

23     motion on the privilege issue, what we were in

24     the process of doing is, double-checking the

25     documents listed in the privilege log and the

1    production that's been made, and comparing it

2    with the productions that have been made in the

3    United Kingdom matter to make sure that there

4    has been a full production and to double-check

5    and make sure that we have not withheld anything

6    about the acquisition of the data.

7             But that's -- our position is not --

8    Nick can testify about how he acquired the data

9    and doesn't have to produce things.  That is a

10   mischaracterization of the defendants' position

11   in this case.  Our position is he testified

12   about how he acquired the data and we're not --

13   and RAK is not asserting the privilege on that

14   issue.

15            Where it is asserting the privilege

16   is with regards to what was done with the data

17   after it was acquired because that -- those acts

18   were done in furtherance of legal advice that

19   was provided by Dechert to RAK.

20            To your second point, about the

21   letter being very non-specific in assertion, I

22   hear you.  But the letter is not the only aspect

23   that has occurred in the privilege process here.

24   What has occurred is, we have served a privilege

25   log -- I think it was 99 pages long.  Three

1    pages of which are documents that our clients

2    asserted their attorney-client privilege over.

3    The balance of the privilege log has privilege

4    designations by RAK.  Those privilege

5    designations were identified, reviewed and

6    approved by counsel for RAK.

7                And so to the extent that there are

8    concerns about, oh, well, specific instructions

9    on asserting the privilege and whatnot, well,

10   they selected the documents that they are

11   asserting the privilege over.  And logically,

12   that's what has to happen.

13               RAK is the end client on this.  They

14   received the legal advice.  They are the ones

15   that can identify the documents and information

16   that were utilized in receiving the legal advice

17   from their lawyers.

18               We went through that process with

19   RAK, we identified those documents and we logged

20   them.  And those have been provided.  So there

21   is specificity here.

22               I understand that there will likely

23   be disagreement about specific documents within

24   the log, but this -- an overarching -- we hoped

25   that we've addressed an overarching concern

1    about a non-specific letter by providing a

2    detailed privilege log that has been signed off

3    on by the end client.

4              MS. RICHEY:  That privilege log, the

5    99 pages, is it the position of the defendants

6    that all of those documents are responsive, but

7    not being produced because of the privilege or

8    is this just a general privilege log that RAK

9    has prepared for other matters?

10             MR. BRANCH:  No.  This is -- this is

11   a privilege log prepared specifically for this

12   case in response to plaintiff's request for

13   production of documents and documents that we

14   identified that were responsive to those

15   requests.

16             MS. RICHEY:  Okay.  I just want to be

17   sure, because you had mentioned the fact that,

18   with respect to documents, as to how your

19   clients came into possession of the data, you

20   were distinguishing those from documents that

21   dealt with what happened to the data after they

22   came into possession of it.

23             So I just want to make sure that your

24   position on the privilege log is that whether it

25   is about that -- the first issue of how it came

1   into possession or the second issue of what they

2   did with it, that the documents on that log are

3   responsive to certain discovery requests of the

4   plaintiff, but being withheld on the grounds of

5   privilege, not relevance.

6         MR. BRANCH:  Yes, ma'am, that's

7   correct.  It is a privilege log, not a list of

8   documents that are -- that our position is they

9   are not relevant.

10         MS. RICHEY:  And is it the position

11   of the plaintiff that all of those documents

12   should be produced based on what you see on the

13   privilege log?

14         MS. BRIGGERMAN:  Yes, that's

15   correct -- well, within the category of

16   documents we're discussing here.  The scope of

17   which is anything related to how Mr. Del Ross

18   obtained the data and how he used it.

19         MS. RICHEY:  Okay.  All right.

20         MR. BRANCH:  And, Ms. Richey, I think

21   the end of that sentence is going to end up

22   being the key here.  Because our -- the

23   defendants' position -- and you can look at his

24   testimony -- is Mr. Del Rosso didn't testify

25   about how the documents were used.  Because that

1    was part of the legal representation of RAK by

2    Dechert, and for which our client was, in part,

3    engaged.  That has never been a part of the

4    testimony that he's offered up.  And RAK has

5    been consistent in asserting its privilege over

6    those documents.

7               Which is why we get to this argument

8    that the plaintiff is making, that RAK can't

9    assert its privilege through the defendants in

10   this case or RAK has to intervene.

11              Your Honor has read the cases.  The

12   cases don't support that.  I have not found case

13   law that requires a third-party privilege holder

14   who is not a party to a lawsuit to intervene to

15   protect the privilege.

16              And that's -- it is inconsistent with

17   the sanctity with which the attorney-client

18   privilege is held under the common law.  You

19   have to take an action to protect the privilege.

20              For example, the Gibbs case makes it

21   plain that a lawyer can't assert a privilege

22   without the client's authority, for example.

23   But at the same point, there is not case law

24   that raises extensive hoops that privilege

25   holders have to jump through in order to

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 66 of 164

1    maintain the privilege.

2              I mean, if -- let's say a law firm

3    got a civil subpoena for a production of their

4    electronic database for some reason.  Would

5    every client in the law firm then have to

6    intervene in the case in order to protect the

7    privilege?  I have not found any case law that

8    would require that sort of effort by the

9    privilege holder.

10             And so we understand that it poses

11   some challenges in going through the review

12   process on privileged documents, and we're doing

13   everything we can to provide that data.  And I

14   hope the description of what we've done to come

15   up with the privilege log provides you with some

16   assurances that we are working in good faith to

17   get that.

18             But the case law, we've not found

19   case law support for a requirement for a party

20   to intervene in order to protect the

21   attorney-client privilege.

22             MS. RICHEY:  So on that point, I read

23   the cases that you cited, which said what they

24   said, but didn't go into process at all.  I

25   mean, they didn't say, well, therefore, there

1    has to -- there doesn't have to be an

2    intervention, et cetera.  I don't know the

3    answer to that.

4              I would like -- I'd like to have a

5    little more case law on that if there is

6    anything.  I would like to know the plaintiff's

7    position on that.  I don't see -- your cases say

8    what they say.  But again, it didn't tell me --

9    and maybe there is nothing out there and I'll

10   just have to decide -- but it didn't tell me

11   that that meant categorically if someone simply

12   says to another party asserted, that then that

13   party doesn't have to intervene.  It may be the

14   case.  I just don't know.  I haven't dealt with

15   that before.

16             Is it the plaintiff's position that

17   they would like these documents to be reviewed

18   to determine if the privilege applies?

19             MS. BRIGGERMAN:  So what we would

20   prefer and ask the special master to do is,

21   issue a ruling that, within this scope of any

22   documents or communications related to how

23   Mr. Del Rosso obtained or used the data, are not

24   privileged, whether it's privilege has been

25   waived or privilege just simply doesn't apply,

1    and that they must be turned over.

2                  MS. RICHEY:  Yeah.  Okay.  Go ahead.

3                  MS. BRIGGERMAN:  If -- another -- an

4    alternative would be that we could go through

5    the defendants' privilege log and identify --

6    you know, it is a long privilege log -- at least

7    categories, certain documents we argue no

8    privilege applies, whether through waiver or

9    simply for which didn't exist, and then you

10   could make a ruling that way.

11                 MS. RICHEY:  Without looking at the

12   documents?

13                 MS. BRIGGERMAN:  Well, no.  I assumed

14   that you would probably have to look at the

15   documents as well.

16                 MS. RICHEY:  Yeah.

17                 MS. BRIGGERMAN:  But, I mean, our

18   position is that Mr. Del Rosso has already

19   testified on these topics, and so there is a

20   subject matter waiver.  And that's -- I'm not

21   sure you need to look at documents to reach that

22   conclusion.

23                 MS. RICHEY:  So, yeah.  Two

24   questions.  One would be waiver.  And I have

25   seen the arguments and I have seen a little of

1    the testimony.  I'll say I don't feel competent,

2    based on what I have seen so far, to say waive

3    or no waiver.  I don't -- I didn't get a full

4    rundown of what happened in the UK.

5              But yes, if they have been waived,

6    they have been waived.  But you know as well as

7    I, that is very fact specific and what exactly

8    has been waived and how and whatnot.

9              I don't know that I'm in a position

10   to make an order or to make any decisions that

11   says categorically, that there is no

12   attorney-client privilege in connection with

13   those documents.  It's been asserted with a pen

14   in the issue of whether it's been properly

15   asserted given that RAK has not intervened.

16              But assuming that it has been

17   properly asserted, then I think the burden

18   shifts.  And I think the plaintiff needs to say,

19   With respect to these documents -- whether it is

20   five or whether it is 99, we don't believe that

21   these are privileged.  We would like an

22   in camera review, and maybe put this at the

23   beginning -- we think it has been waived as to

24   these documents, and tell me why.

25              I don't want to put more work on you

1    all, but I think it would be negligent of me to

2    simply say, privilege waived, or there is no

3    privilege without getting more information.  I

4    don't think that stops the other things you're

5    doing, unless you believe that some of those

6    things need to be resolved before another

7    deposition of Mr. Del Rosso -- that we'll get to

8    in a minute -- or a 30(b)(6) or any other

9    depositions in play.  But I need more

10   information.

11          MS. BRIGGERMAN:  I do want to

12   foreshadow that we do have a motion to you

13   coming related specifically to the reports that

14   NTI prepared at Del Rosso's direction because

15   those were turned over to the FBI as part of the

16   meetings that Mr. Del Rosso had with the FBI, as

17   plaintiff alleges, to instigate an investigation

18   into him.

19          So it is a somewhat separate issue.

20   You could argue waiver, as we have here.  But

21   also, waiver in the context that Mr. Del Rosso

22   has testified about this topic.  But also, that

23   the documents have been turned over to a third

24   party and, therefore, are non-privileged.  So --

25   and that is forthcoming.

1          MS. RICHEY:  Okay.  Were those turned

2     over voluntarily or subject to --

3          MS. BRIGGERMAN:  Yes.

4          MS. RICHEY:  Okay.  Mr. Branch --

5          MR. BRANCH:  So, Ms. Richey, if I may

6     respond to it.

7          MS. RICHEY:  -- do you want to

8     respond?

9          MR. BRANCH:  A few things there.

10    First of all, with regard to these reports that

11    were turned over to the FBI, this is something

12    that Rich Garcia testified to last week in a

13    deposition that we were not -- I can say we were

14    not aware of until the deposition.  So we're

15    doing due diligence on that item right now.  So

16    I understand plaintiff's position on it.

17          I also note, however, that the

18    documents would be subject to work product

19    protection, irrespective of the attorney-client

20    privilege.  These are reports that NTI generated

21    analyzing the Azima data that they downloaded

22    from BitTorrent and provided to Dechert in

23    connection with Dechert's representation of RAK.

24    And so it comes under this idea of plaintiff's

25    trying to pierce the attorney-client privilege

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 72 of 164

1    on how the data was used as opposed to how it

2    was acquired.  So just to flag for you, that is

3    a bit of a new issue for us, at least.

4            The second piece of information I

5    wanted to offer to you is, you said you hadn't

6    seen a number of the statements.

7    Mr. Del Rosso's witness statements in the UK

8    litigation are located at docket entry 132-1,

9    Exhibits A and B.  There is an additional

10   witness statement as Exhibit C as well.  So it

11   is A, B and C on docket entry 132-1.

12           There is also a declaration filed at

13   docket entry 157-8.  And then there is the

14   transcripts of Mr. Del Rosso's depositions in

15   this case as well.

16           And then there is a declaration that

17   he filed in a 1782 application that is pending

18   in the middle district.  It's at 21MC-6 also.

19           So those are where his testimony is

20   located.  And Brandon, Lauren, if I've missed

21   one, you all feel free to jump in.  This was

22   kind of a back of the envelope list that I was

23   putting together.  And I'm certain that we can

24   provide you with his deposition transcript as

25   you may want.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 73 of 164

1          The one thing I will point out also

2     is, I understand your -- the concern you have in

3     deciding the privilege issues without looking at

4     the documents.  I will note again that my client

5     is caught between a rock and a hard place on

6     this one.  He needs to defend himself against

7     these allegations that are untrue that he hacked

8     Mr. Azima.

9          At the same point, he professionally

10    was a contractor for a law firm who was

11    providing legal advice and has the end client

12    asserting privilege.  And we're about to -- you

13    know, what is being discussed is what appears to

14    be a very lengthy privilege review process that

15    will be expensive for everybody.

16          And I will, you know, cite back to

17    the proportionality construct in Rule 26 that,

18    you know, as we work through how to do some of

19    this, I do think we need to be keeping

20    proportionality in mind.  My client has been

21    through a lot, your Honor.  Notwithstanding some

22    of the statements plaintiffs have made, he has

23    produced documents.  He has engaged in good

24    faith in the discovery process.  And at some

25    point, there needs to be an end to it.

1          So we're here, we're going to do what
2     we have to.  But it doesn't seem to be an end
3     point to the process, is one of our main
4     concerns here.  So --
5               MS. RICHEY:  Okay.
6               MS. BRIGGERMAN:  Ms. Richey, may I
7     address the case law issue that you just
8     mentioned with respect to whether RAK has to
9     formally intervene in this matter?
10          And I agree the case law is not
11    crystal clear, although in Gibbs, the Court did
12    order the third party to intervene.  And the
13    Court found it was insufficient that the third
14    party had a letter that was very similar to the
15    Allen & Overy letter we see here.  And it said
16    something like -- in the letter, that the
17    company is not waiving attorney-client privilege
18    and instructed the defendants in that case not
19    to do something different than what the company
20    wants to do with respect to its privilege.  So
21    it was sort of these conclusory statements that
22    were not sufficient.
23          And, you know, here it is a similar
24    situation.  RAK is sort of hiding in the
25    background here, and in his vague, conclusory

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 75 of 164

1   way is asserting privilege over all of the

2   documents that are on this 90-page privilege

3   log.  And yet, we don't have a way to hold him

4   accountable or, you know -- or to hold them

5   subject to, frankly, your rulings, if they are

6   not a party here.

7            MS. RICHEY:  Well, if the documents

8   are in the possession of Mr. Del Rosso and he is

9   ordered to turn them over, then that's the

10  relief.  But I don't, right now, feel adequately

11  prepared to make that decision.

12           I did read the Gibbs case and I saw

13  what you saw, but I don't think those facts were

14  similar.  And I don't think it was as clear.

15  And certainly the parties weren't arguing that

16  they had been requested and directed by the

17  privilege holder to assert it.  So I'm not sure

18  if the Court just didn't address that, but I

19  didn't see that in this case.

20           Okay.  All right.  I think -- I'm

21  not -- again, I'm not making -- on this hearing,

22  I'm not making any decisions.  I'm just going to

23  forecast what I'm thinking about, and then I'll

24  put it in writing.

25           But I think on this issue, I'm going

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 76 of 164

1    to need to get from you any additional case law

2    that is out there -- and again, there might not

3    be; we just might have to deal with what we

4    have -- that would seem to require RAK to

5    intervene, or on the defendants' side to say no,

6    they definitely don't have to intervene.  And

7    this is some cases where that wasn't done.

8              I would like the plaintiff to go

9    through that privilege log and identify

10   documents that it believes are both responsive

11   and believe are not privileged, again, based on

12   the description.  I'm going to hope that's not

13   99 pages or 90 pages worth, however many it is.

14   If it is, we'll have to think about that and

15   think about proportionality in those issues.

16             I'm not at this moment overly

17   concerned about proportionality in reviewing

18   documents.  I've already spent a lot of time

19   reviewing documents that you have provided me,

20   and somebody might have to do that.  So I'm not

21   yet overly concerned about that.  You might

22   change my mind when I see what's out there, but

23   let's table that for the moment.

24             MR. BRANCH:  Yes, ma'am.

25             MS. RICHEY:  And you mentioned that

1   there are some documents -- and I read this in

2   your papers -- that Dechert had asserted a crime

3   fraud exception, or whatever they call it in the

4   UK, something else, that there were certain

5   documents they had said there was a crime fraud

6   exception had produced them.  But none of those

7   covered their communications with your client.

8           Did I understand that correctly?

9           MR. BRANCH:  Yes, ma'am.  There is

10  iniquity exception to the --

11          MS. RICHEY:  Right.  Is that like the

12  crime fraud exception?

13          MR. BRANCH:  Sort of.  And I don't --

14  I can't tell you I understand it well enough to

15  really speak to it.  But what I can tell you is,

16  it concerned somebody by the name of Stuart

17  Page, and representations that Mr. Page made.

18  It did not concern VMS or Mr. Del Rosso.  So

19  it's just -- the inequity rule doesn't apply to

20  our client as --

21          MS. RICHEY:  Well, of course, yeah.

22  I think the plaintiffs would take exception to

23  that.  But yes, I understand.

24          And I understand too from your papers

25  that Dechert has produced some more documents,

1    and you all need to review those and see if any

2    of those are responsive.  Did I get that

3    correctly?

4              It was a footnote, where you said

5    that Dechert has produced additional documents

6    based on the application of the inequity

7    exception and that you were verifying whether

8    any documents will be produced here.

9              MR. BRANCH:  Yeah, we're double --

10   basically, crosschecking with the Dechert

11   production to make sure that our production is

12   complete.  I think it is, but this is -- you

13   know, we're largely doing a quality control

14   review on a couple of issues that have been

15   raised in the motion that plaintiff submitted

16   last week that were -- you know, there might --

17   I'll put it this way:  There might be a

18   supplementation of a few documents.  I am

19   unaware of any concern that there is, like, a

20   tranche of anything out there that would need to

21   be disclosed.

22             MS. RICHEY:  Okay.  I guess this

23   was -- I thought I read this in your privilege

24   response, so I didn't know if any of those

25   documents might result in a change to your

1    privilege log.  But you'll look at those and

2    compare --

3              MR. BRANCH:  I don't think so.  I

4    think we'll -- we will double-check and make

5    sure.  This is where -- and I believe what that

6    is talking about is, Dechert, in the UK matter,

7    disclosed documents.  And, you know, our

8    position here is, if we're asserting privilege

9    but it has been disclosed in the UK matter, it

10   is no longer confidential.  We can't assert

11   privilege.  And therefore we have to produce

12   them.

13             And so we're -- I think there is a

14   pretty small universe of documents that there is

15   a supplemental production of in the UK matter,

16   and we're trying to make sure that they are

17   responsive in this matter.  And if so, if they

18   are, they will be produced.

19             MS. RICHEY:  And to that end, you

20   will also cross-reference that with your

21   privilege log so that if anything needs to come

22   off that log, you'll let the plaintiff know?

23             MR. BRANCH:  Absolutely.

24             MS. RICHEY:  Okay.  Okay.  All right.

25   Let's skip over the deposition motion.  We'll

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 80 of 164

1    get back to that.  But I would like to turn to

2    the defendant's motion to compel the plaintiff

3    to identify trade secrets, if that's all right.

4    We'll do that next.

5              MR. ROSENTHAL:  It's very much all

6    right.  This is Sam Rosenthal from Nelson

7    Mullins.  And to Ms. Richey, I heard -- your --

8    the format that it seems like you prefer is what

9    is the request, what are the response to it, and

10   why was that response deficient?  And that's

11   exactly what I want to do.

12             I would like to do a PowerPoint --

13   and let me share it now -- which does exactly

14   that.  And it touches on the law, but I don't

15   think you need much discussion about what the

16   law is.  I just have to figure out how to share

17   my screen.  I take it, it is not sharing at this

18   point.  Let's see.  Share screen.  There we go.

19             Is that now showing up?

20             MS. RICHEY:  No, it's not.  I'm just

21   checking that you're allowed to do it.

22             MR. ROSENTHAL:  That would be a

23   problem.  That would be a problem.  Let's see.

24   Share screen.

25             MS. RICHEY:  Since Mr. Branch was

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 81 of 164

1  able to share his, could you maybe send it to

2  him and he could share?  If that's -- well, keep

3  trying.  Keep trying.  We're fine.

4            MR. ROSENTHAL:  I know what the

5  problem is.  I have to put it on my screen.  And

6  now I have to --

7            MS. RICHEY:  Yeah.

8            MR. ROSENTHAL:  Yeah.  Why isn't it

9  sharing?

10           MR. BRANCH:  I can -- Sam, if you

11  want to e-mail it to me, I can call it up and

12  you can just tell me "slide."

13           MR. ROSENTHAL:  Sure.  Okay.  If I

14  can do that.  I'm showing my age, I know.

15           Let's see.  I think you have it from

16  earlier.  Give me one second.

17           MS. RICHEY:  Take your time.

18           MR. ROSENTHAL:  Okay.  All right.

19  Mr. Branch, you have the controls.

20           All right.  Did it come through?

21           MR. BRANCH:  One moment.  I've got

22  the version from earlier today, so I can do it.

23           MR. ROSENTHAL:  Okay.  Actually, if

24  you have the one that says "Tuesday" on it.

25           So as I said, the idea is to talk

Case 1:20-cv-00954-WO-JLW  Document 322-3  Filed 02/20/24  Page 82 of 164

1    specifically about what was the request, what

2    was the response and why is it deficient.

3              Is it showing up, John?

4              MR. BRANCH:  Yes, one moment.  There

5    we go.

6              MS. RICHEY:  I can see that.

7              Can everyone else?

8              MR. ROSENTHAL:  Yeah.  So go to the

9    next slide.

10             John, do you want to go to the next

11   slide?

12             Okay.  So the law is clear.  I don't

13   really want to dwell on it, because I think,

14   Ms. Richey, you probably know it better than I

15   do.  But there has got to be two things at

16   least.  One, there has got to be a trade secret.

17   Two, it's got to have some value if it is

18   disclosed.  And three, there have to be steps

19   that is -- that are taken by the plaintiff in

20   order to keep it as a trade secret.

21             Let's go to the next slide.

22             And so what are the requests that we

23   ask for?  And I wrote down here it's 1-13 and

24   it's 14.  But in truth, there are many others

25   that go to those issues.  These are the ones

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 83 of 164

1    that most directly in the request for production

2    go to exactly the statutory issues.  What was

3    the secret?  How was it maintained in a secret

4    way?  And what was the value that it would have

5    had if disclosed?

6                 Do you want to go to the next slide,

7    John?

8                 Interrogating, the same thing.  As

9    you can see, it is three, six and seven exactly

10   follow the statute.

11                What is your trade secret?  How did

12   it have any value?  And what did you do to

13   maintain it in the secret fashion?  Those are

14   the specific interrogatory numbers that we have

15   there.

16                Do you want to go to the next slide?

17                In looking at the case law, and

18   specifically the Niederland case that we cited

19   in the brief, it is in red.  It says

20   "Identifying categories of information, and

21   thousands of pages of documents without more

22   explanation does not seem to be sufficient."

23                That is the law, and there is just

24   no, really, any dispute about it.  You can't

25   identify thousands of pages and say, You go

1    hunt, you go find it, and we'll tell you if it's

2    a trade secret; and if so, what we did to

3    protect it and how we lost value.

4                So let's see what they did.  Next

5    slide.

6                So what they did was, they said there

7    were over one million documents that, quote,

8    "contain trade secrets."  They then said that,

9    as an example, we'll give you a 56,741

10   Bates-number range.  You go find them.

11               And we're going to look at what that

12   range actually entails.  And what we see are

13   vulgar jokes, making fun of people for their

14   sexual identity, things that are taken from

15   websites.  Let's go to some of the examples and

16   see what is contained within the range.

17               Here is one, for example -- and

18   actually, my screen is kind of tiny.  Let me

19   just blow it up there.

20               It is one in which they are, I guess,

21   talking about an individual and his sexual

22   preference and applying something they call the

23   "man test."  It is vulgar.  It has nothing

24   secretive.  It has no value.  No one is going to

25   pay a dime for this thing.  And for them to

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 85 of 164

1    identify a document, 95626, specifically, as one

2    of the documents in the Bates range that they

3    say is a trade secret is really, you know, quite

4    in bad faith.

5                As is the next one.  Let's go to the

6    next one.

7                This is an e-mail from a friend of

8    Mr. Azima named Jay Solomon, a journalist.  And

9    what he is sending is something talking about

10   spending 36 hours in Nice, France.  Has no

11   personal observations.  It is something that I

12   presume Mr. Solomon found talking about what a

13   wonderful trip it is to Nice, France.

14               No value.  It is not a trade secret.

15   It has no business being marked confidential,

16   pursuant to court order.  Let's go to the next

17   one that they identify as part of that -- as

18   trade secrets.

19               Here is one that talks about is

20   Hillary Clinton a crook, crooked Hillary

21   Clinton.  Truthfully, I don't think anyone cares

22   about Mr. Azima's political affiliations.  This

23   has no business being a trade secret.  They

24   nevertheless identify it as one.

25               Next slide.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 86 of 164

1            This is one that -- another one of

2    those vulgar ones that we find in Mr. Azima's

3    designated trade secrets, marked "confidential"

4    pursuant to court order.  It is a vulgar joke.

5    The kind of ironic thing about this, it is the

6    only one that looks like it is a formula.  It's

7    a formula about nothing that really belongs in

8    litigation over trade secrets.  I doubt very

9    seriously that Mr. Azima would contend to trial

10   that this is a trade secret, even though he

11   identified it as such in his discovery to us.

12            Let's go to the next slide.

13            So after they gave us this range of a

14   million documents and then the hundreds of

15   thousands of pages as an example, we said that's

16   not enough.  We're going to move to compel.  So

17   they said, okay, we have a new designation.  It

18   is 587 documents.  A narrow, 587 documents that,

19   quote, "purportedly contained trade secrets."

20   but this wasn't even a complete list.  It was

21   simply examples.  So let's see what their

22   examples are.

23            Next slide.

24            What we see are photographs that they

25   have literally copied from Internet sites that

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 87 of 164

1    they don't own, they don't control and that are

2    publicly available.

3              Let's give an example on the next

4    slide.  The picture is the one that they have

5    and it was marked "confidential" pursuant to

6    court order.  I put the nice brown framing

7    around it.  But this is their document that they

8    call a trade secret.  I don't know why they

9    think this particular piece of equipment has any

10   function that they can claim is their trade

11   secret, but the most amazing thing about this

12   piece of equipment --

13             Let's go to the next slide.

14             -- is it is not even theirs.  It

15   comes from a website.  What they did -- and

16   let's go back to the other picture -- is the

17   identical picture.  It is not a similar picture.

18   It is the identical picture that they simply

19   copied, marked it "confidential pursuant to

20   court order," and treated as one of their 577

21   trade secrets.  Well, maybe this was a mistake.

22             So was the next one.  Which are

23   containers that Mr. Azima has marked

24   confidential pursuant to court order.  These are

25   supposedly his trade secrets.  Where did he get

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 88 of 164

1    it from?  Same website.  Same picture.  Not

2    similar, same.  Identical.

3              Let's go to the next one.

4              Ah, two Mercedes trucks.

5    Confidential pursuant to court order?  No.

6              Let's go to the next website.  Next

7    one, John.  I don't know if you're on the

8    website, John, with a -- John?

9              MR. BRANCH:  Sorry.  Were you looking

10   for the crane trucks or the Mercedes trucks?

11             MR. ROSENTHAL:  Mercedes trucks.

12             MR. BRANCH:  Okay. So --

13             MR. ROSENTHAL:  I wanted to show --

14             MR. BRANCH:  -- this is the one that

15   was marked.  This is the website.

16             MR. ROSENTHAL:  694689.  Again,

17   another one that comes directly from a

18   third-party website.  It is a copy of a picture

19   that they simply took off the Internet.  They

20   marked it "confidential pursuant to court

21   order."

22             Let's go to the website one.  And

23   then let's go to slide of the blue and white

24   truck with the crane.

25             Another example.

1            Let's go to the next slide, where you

2    can see it comes from the Internet.

3            And these are just examples, because

4    that's what they said they gave us.  Examples of

5    what their trade secrets are.  And I could go

6    through dozens of them, which are simply -- I

7    can't call it anything other than lies.  They

8    are not trade secrets.  They are not secrets.

9    They are simply copies of pictures that are

10   found on the Internet that Mr. Azima didn't

11   take.  He didn't authorize anyone to take the

12   photograph.  He didn't operate the equipment.

13   It is simply something that is publicly

14   available and there's nothing even close to a

15   trade secret.

16           And so I can go through the other

17   ones.  But then --

18           And you can kind of flip through

19   them, John.

20           More containers.  And then you get to

21   an interesting one.

22           If you can flip through to the dirt

23   and the mountains in the background.  I don't

24   know if you're on that one, John.

25           MR. BRANCH:  I am.  I am on the

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 90 of 164

1    mountains in the background.

2              MR. ROSENTHAL:  Okay.  So you look at

3    that one and you say, Well, gee what is this?

4    What is he contending?  Is the dirt a trade

5    secret?  Is it the fence along the left-hand

6    side?  Is if the mountains?  It is nothing.

7    There is no equipment.  It is just a picture of

8    mountains and dirt, and he is contending it's a

9    trade secret.  We'll get to in a minute where

10   that comes from.

11             But then you get to 100 blank pages

12   marked "confidential pursuant to court order."

13   Not -- you know, occasionally, one slips in.

14   But when they say they produced over 500, 100 of

15   them, bear in mind, are simply blank.  Nothing

16   on it, but "confidential pursuant to court

17   order."

18             Let's go to the next slide, which is

19   the third tactic.

20             So in response to our motion, they

21   did something interesting.  Even though they

22   have never withdrawn their one million pages,

23   they have never withdrawn their 577 examples,

24   now they say, Well, we'll give you 47 new ones.

25   These are 47 that are not included in the 577.

1   These are just entirely a new set of documents.

2              So what do they include in the new

3   set of documents?

4              Let's go to the next one, which is a

5   proposal by a third party, not Mr. Azima.  Yeah.

6   It shows that Farhad Azima is copied.  And what

7   is it?  It is simply a proposal by a third party

8   in which Mr. Azima is copied, talking about the

9   number of refers that they could provide.  It

10  has a pricing proposal.  And the interesting

11  thing about this is not only is it not

12  Mr. Azima's document, but it is dated in 2012.

13  In other words, nine years before it was

14  supposedly published -- or six or seven years

15  before it was supposedly published on the

16  Internet.

17             Does anyone really care what Farhdi

18  proposed six years earlier?  I doubt it.  But

19  the most significant thing is, it is not even

20  Mr. Azima's trade secret, if it is anyone's at

21  all.

22             Let's go to the next document.

23             This is the proposal itself.  And

24  once again, this is not Mr. Azima's proposal.

25  He has not told us what, within this document,

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 92 of 164

1    he contends is confidential or what he contends

2    is a trade secret, which is akin to a formula.

3              But the interesting thing, if you

4    look on the right-hand column, there is our dirt

5    and our mountains.  What Mr. Azima did was, he

6    went to a proposal submitted by a third party.

7    He copied a picture from that proposal.  He

8    stuck it in his production.  And he marked it

9    "confidential pursuant to court order."  That's

10   my trade secret.  I don't think so.

11             Let's go to the next document.

12   Included in his new 47 is an invoice from Habaab

13   company.

14             Are you on that document, John?

15             MR. BRANCH:  Yes.

16             MR. ROSENTHAL:  So this is a document

17   that Mr. Azima, who has no ownership interest in

18   Habaab, has not asserted any of the statutory

19   criteria why an invoice from Habaab or a

20   proposal from Habaab should be regarded as a

21   trade secret.

22             Again, the statute is pretty clear.

23   He has to show what value this would have if

24   disclosed.  We asked them that in our document

25   request.  We asked them that in their

1    interrogatories.  What does he do?  He gives us

2    this document without any explanation as to why

3    it is a trade secret.

4              Let's go to the next one.

5              This is an interesting one.  It is a

6    proposal by a company called Heavy Lift.  Heavy

7    Lift is no longer in business.  This is dated

8    June of 2008.  Heavy Lift was defunct long

9    before this document was supposedly published on

10   the Internet in 2017, 2018 or 2019.

11             Again, there is no indication in

12   answering our interrogatory why a document from

13   a defunct company, which is over a decade old,

14   had any value whatsoever to anybody.  No answer

15   in terms of the interrogatories.

16             Let's go to the next one just to

17   show, again, more information from 2008.

18             Again, it is a defunct company:

19             Let's go to the next slide.

20             So just to make the point, they gave

21   us examples.  They have never withdrawn their

22   one million pages, their 577 documents.  We are

23   left guessing which of their trade secrets, to

24   use their word, are we going to have to defend

25   against.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 94 of 164

1          If it is limited to what they have

2    produced, that is their 47, let them say so.

3    Let them say what economic value it has and how

4    Mr. Azima treated them as secret.  And we'll

5    file a motion for summary judgment, the case

6    will be over and that will be the end of it.

7    But we shouldn't have to guess.

8          And just to go to the last one, which

9    is the relief.  The most important thing is, we

10   have to designate an expert.  And even now, we

11   are left guessing at which of their -- I can't

12   think of another word -- their cockamamie

13   documents, which they copied from someone else's

14   website we are going to have to confront.  We

15   can't have an expert guessing which of the 577

16   documents or the hundreds of thousands that they

17   earlier had designated as trade secrets he has

18   to testify to.

19         So what we are requesting is that

20   they should be limited to their documents that

21   they have already identified.  That is, the 47

22   or they can use the 577 ones.  They can't add to

23   it.  And they have to provide the information in

24   response to our interrogatories and our document

25   requests that fill out the statutory criteria.

1    Namely, how did you maintain it as secret?  And

2    what evidence do you have, what documents, what

3    information that it had any value?  And we

4    should do that before we have to designate an

5    expert.  And I think that deadline is coming up.

6             And that's all I have.

7             MS. BRIGGERMAN:  Ms. Richey, may I

8    respond?

9             MS. RICHEY:  Absolutely, yes.

10            MS. BRIGGERMAN:  I do appreciate that

11   Mr. Rosenthal took the time to go through dozens

12   of gigabytes of our client's stolen data, which

13   are in the possession of his client.  And that

14   shows how complicated this case is.  It is not

15   the typical case.

16            This is not a case where a competitor

17   has stolen the recipe for Coke to try to start

18   another company.  Decades and decades of work of

19   our client's data was stolen.  And so it is very

20   difficult to identify trade secrets with

21   specificity.  But we have done that.

22            We first identified the hacked data

23   back in April.  And within that hacked data, we

24   provided specific examples of trade secrets.

25   Now, some of those trade secrets, for completion

1   purposes, we included the entirety of an e-mail

2   chain for example.  If it was attached to a

3   cover e-mail, we included that as well for

4   completion purposes.  And I believe the RFPs did

5   request communications as well.  And so it was

6   broader than just specific trade secrets.

7             But then in December, to assist the

8   defendants, we did produce a call down set of

9   specific examples of trade secrets.  And that is

10  the -- Sam says 48 -- I don't have the exact

11  number in front of me, but it is certainly a

12  call down set of trade secrets that are

13  Mr. Azima's.

14            And like I said, it is impossible to

15  specify all of the trade secrets with certainty

16  because all of his data was stolen.  But those

17  are concrete examples and we think we fulfilled

18  our obligations there.  There is nothing under

19  the case law at this stage -- we're not at the

20  summary judgment stage -- that requires

21  Mr. Azima to identify the specific value of a

22  trade secret.  All the case law says is that we

23  are required to do more than simply identify

24  categories of documents and what those types of

25  documents are.

1           And we think we have done so.  We
2    have explained what the trade secrets relate to.
3    We've identified them with specificity.  And of
4    course they are all Mr. Azima's.  So we think we
5    complied with our obligations.
6           MR. ROSENTHAL:  Let me respond to
7    that.  It's pretty much impossible to identify
8    with certainty the trade secrets.  They did.
9    They identified silly documents that were copied
10   from the Internet and marked it "confidential
11   pursuant to state order."  If they are standing
12   on that, so be it.  If they are standing on the
13   ones that they've identified, quote, "with
14   certainty," we're okay with that.  Tell us how
15   it would value.  Give us the other information
16   required by the statute.  And let's move for
17   summary judgment.
18           In terms of how difficult this is,
19   this is a trade secret case.  It is a little bit
20   like trying to make a glass of fresh-squeezed
21   orange juice and saying, well, it's kind of
22   difficult, we don't have any oranges, but we'll
23   do our best.
24           This is a trade secrets case.  If
25   they don't have trade secrets, they can't bring

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 98 of 164

1   the case.  So far, all they have given us are

2   documents which don't even come close.  And they

3   haven't withdrawn their one million page

4   designation.  They haven't withdrawn their 577.

5            All we're saying to them is, give us

6   your trade secrets.  Give us the ones that the

7   577 documents plus the 47 new ones you have

8   added, we'll deal with those.  Just give us the

9   additional information.  But we can't have an

10  expert guessing at which of the million pages

11  you're going to come up with next.

12           It is a clear example of -- this is

13  why the sequencing that we've suggested is so

14  right.  If they don't have trade secrets, we

15  don't have to deal with whether a sick man has

16  to be deposed for another nine hours.  We don't

17  have to deal with whether we have difficult

18  privilege issues.

19           If you don't have trade secrets, and

20  all you've got are documents you have copied

21  from the Internet, let's know it and let's move

22  on so we can make this case simple and proceed.

23           MS. RICHEY:  Let me understand the

24  universe of trade secrets from the plaintiff.

25  As I understand it from hearing Mr. Rosenthal,

1    there was a big -- I think you said hundreds of

2    thousands of pages of documents listed.  Then it

3    went down to 587.  And now it is 47.

4              Are these categories inclusive?  In

5    other words, is it the hundreds of thousands, or

6    however many pages it is, plus 587, 47?  Or how

7    many exactly -- how much -- how many documents

8    are we talking about at this point in terms of

9    the specification and identification of trade

10   secrets?

11             MS. BRIGGERMAN:  So on December 1st

12   we identified -- I actually thought it was more

13   like 80 -- but they are discreet documents that

14   are trade secrets.  And so we stand on those

15   trade secrets.

16             What I am saying is, that when our

17   client's -- dozens of gigabytes of documents and

18   data representing his entire career of work are

19   stolen, we cannot say with certainty that we

20   have identified every single one.  We have gone

21   through and done our best to identify with

22   specificity those documents that we identified

23   on December 1st and we stand with those.

24             Now, we reserve the right to

25   supplement that if we come across something

1    during discovery.

2                   MS. RICHEY:  Of course.  Of course.

3    So of the documents that you know about, I think

4    it is incumbent on the plaintiffs to review the

5    documents you know about, and within those

6    documents identify which the plaintiff contend

7    are trade secrets.

8                   Has that been done?

9                   MS. BRIGGERMAN:  Yes, that is the

10   December 1st production that we made.  It is a

11   culled set of trade secrets.

12                  MS. RICHEY:  And that's the 47, or

13   however many it is?

14                  MS. BRIGGERMAN:  Yeah.  I apologize.

15   My math isn't good.  I was looking -- I think we

16   listed it as attachment A to our motion, so it

17   is those documents listed there, just for

18   clarity.

19                  MS. RICHEY:  Okay.  I've got that.

20   All right.

21                  Which motion to your response to --

22                  MS. BRIGGERMAN:  Oh, yes.  Yes.  It

23   is the response to their motion to compel.  And

24   I counted more than 80, personally.  But it is a

25   discreet set of documents that are Mr. Azima's

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 101 of 164

1    trade secrets.  And really important within

2    that, are his Rolodex of created business

3    contacts that he's developed over 50 years.

4                MS. RICHEY:  Okay.  That just gave me

5    the Bates range, right?  That was that

6    Exhibit A.  Yeah, I remember that.

7                MS. BRIGGERMAN:  Yes.

8                MS. RICHEY:  So that just gives me a

9    Bates range.

10               MS. BRIGGERMAN:  Well, they're

11   individual documents.  I believe it is a list.

12               MS. RICHEY:  The only thing Exhibit A

13   is, is Bates ranges.  So it's -- yeah, that's

14   all it is.

15               MS. BRIGGERMAN:  Well, it's -- it is

16   a list, and it goes on two pages, if I have the

17   correct line, of individual documents.

18               MS. RICHEY:  Yeah, I'm sorry.  I said

19   Bates ranges.  I meant Bates -- yeah, it is

20   Bates numbers.  But -- yeah.  Okay.

21               But is the plaintiff saying, this is

22   the universe of trade secrets, this exhibit A,

23   or does it include other things that have been

24   produced earlier?

25               MS. BRIGGERMAN:  So this is the set

1    of trade secrets.  And I caveat that if we come

2    across anything else in discovery, we --

3              MS. RICHEY:  I understand.

4              MS. BRIGGERMAN:  -- have the right to

5    supplement.

6              MS. RICHEY:  Absolutely.  I

7    understand.

8              Hang on one second, Mr. Rosenthal.  I

9    just want to make sure I understand what it is

10   the plaintiff says it has identified.

11             And so Ms. Briggerman, again,

12   Exhibit A, is that the plaintiff's most complete

13   response to the question of identify with

14   particularity the trade secrets?

15             MS. BRIGGERMAN:  That is correct.

16             MS. RICHEY:  And does that mean that

17   the documents that were part of the hundreds of

18   thousands and the 587 are now taken out of that

19   category of being trade secrets or are you also

20   including those documents?

21             MS. BRIGGERMAN:  So we will withdraw

22   those and we will go with this -- this list.

23   This is a culled down list.

24             MS. RICHEY:  Okay.  All right.  And

25   so that -- you know, because it seems to me you

1   all have a different -- another issue which

2   needs to be resolved, which is a lot of

3   documents that are listed as confidential that

4   may not be.

5          Now, again, I don't know if what was

6   shown to me was an individual document or part

7   of something else.  But at any rate, that's not

8   what you asked me to look at.

9          Okay.  So Exhibit A, that's the

10  universe of trade secrets.

11         And the defendants, I'm assuming you

12  still take issue with what was listed on

13  Exhibit A and maintain that those are not

14  been -- are you saying they have not been

15  identified with particularity or that you --

16  just that they are trade secrets?

17         MR. ROSENTHAL:  Well, if they take

18  the position that a photograph of a container

19  which they copied from the Internet is a trade

20  secret, so be it.  But do explain to us what is

21  required under the law and required by our

22  interrogatory and document requests; how is it

23  your trade secret; how does it value; and what

24  did you do to protect the secrecy of that

25  photograph?

1            And I think what we're going to hear

2    at trial is, well, that's not really our trade

3    secret.  And so that's what we want to do at

4    this point, is nail down what is your trade

5    secret.

6            Ms. Briggerman, if it's a picture of

7    something that is on the Internet and it's not

8    even a secret, then can you kind of tell us why

9    you're labeling it as a trade secret?  That's

10   what our interrogatories and our document

11   requests are getting at.  We've got nothing.

12           MS. RICHEY:  So in connection with

13   the discovery, I'm assuming that the defendant

14   has proffered questions that ask the plaintiff

15   to identify the trade secret with particularity,

16   state the value, state all efforts maintained to

17   keep it secret, all the things that are in

18   chapter 66.

19           I'm assuming you have got

20   interrogatories for each of those points; is

21   that correct?

22           MR. ROSENTHAL:  Correct.  And they're

23   in the Powerpoint.  Both document requests and

24   interrogatories go to each of those statutory

25   outlines.

```
1              MS. RICHEY:  All right.  Okay.  And
2    is it your position that they've simply not
3    answered those, or is it your position that you,
4    having answered those, you don't believe they
5    are trade secrets?
6              MR. ROSENTHAL:  Oh, I clearly don't
7    believe they are trade secrets because they are
8    publicly available photographs in most cases or
9    documents from third parties.
10             However, if they want to stand on
11   that -- this is not a motion for summary
12   judgment, this is a discovery motion -- give us
13   the basis for your allegation it is a trade
14   secret.  Tell us, as you're required to do in
15   answering an interrogatory, what you did to
16   maintain it a secret, why is it your trade
17   secret, and why would it have value if it was
18   posted on the Internet, despite the fact that
19   that is where it came from?
20             MS. RICHEY:  And so with respect to
21   my role, you're right, that if -- you certainly
22   have the right to ask that question in
23   discovery.  And it sounds like you have asked
24   that question.
25             But have you asked about efforts to
```

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 106 of 164

1    keep secret, et cetera, all those elements?

2              MR. ROSENTHAL:  Absolutely.  And the

3    interrogatories that we cited in the PowerPoint.

4              MS. RICHEY:  Okay.  And have those

5    interrogatories been answered?  Whether you

6    agree with the answer or not, have they been

7    answered?

8              MR. ROSENTHAL:  No, they have not.

9              MS. BRIGGERMAN:  Okay.  So just to

10   clarify, we did respond to the interrogatory.  I

11   don't think it's been updated since we further

12   identified the trade secrets on December 1st.

13             MS. RICHEY:  Okay.

14             MS. BRIGGERMAN:  I'm happy to do

15   that.

16             MS. RICHEY:  Okay.  Let me --

17             MR. BRANCH:  And not to jump over

18   Sam, but I will note that the plaintiff's

19   objections were waived to the interrogatories

20   because they were not -- the responses were not

21   served timely.

22             MR. ROSENTHAL:  Nor has there been

23   any -- nor has there been any information

24   addressing what was required, just the

25   objections.

1          MS. RICHEY:  So let's do -- what I
2    want to do on this issue is this.  As I have
3    asked the plaintiff on the first two motions, to
4    provide me with the exact discovery requests
5    that were asked and what the answers and
6    objections were.  I'd like to have that in
7    connection with the trade secrets from the
8    defendants.
9          And I'd like to -- the defendants to
10   tell me which responses they believe to be
11   inadequate.
12         Now, on that, I don't think -- the
13   question I'm asking is not do you believe it is
14   a trade secret.  My question is, have they
15   adequately responded to the discovery.
16         I know that you're going to have some
17   issues about whether or not you believe them to
18   be trade secrets.  That's a separate issue from
19   what we are talking about right now.
20         MR. ROSENTHAL:  We agree with that.
21         MS. RICHEY:  Okay.
22         MS. BRIGGERMAN:  And if I may add,
23   Ms. Richey, the interrogatory they proposed is
24   far too strict of a standard.  It's not the
25   appropriate standard.  It may be one for summary

1    judgment or trial.  But I believe they requested

2    that we ascribe a particular value to each trade

3    secret, and that's not what is called for under

4    the case laws.

5           MS. RICHEY:  Well, I think the

6    question would be -- and I haven't seen the

7    interrogatory -- if it is a properly posed

8    interrogatory, it doesn't necessarily have to

9    come directly out of the statute for it to be a

10   relevant inquiry.  But point that out.

11          And we'll go through the process in a

12   minute of how I'm going to let you all respond

13   to each other on this -- these points.  But I do

14   need that information.  And I think what I can

15   help with is determining whether in fact the

16   plaintiff has or has not properly responded, and

17   then whether it should.

18          As I view the case law, it is

19   absolutely clear in North Carolina that a

20   plaintiff in a trade secret case must identify

21   trade secrets with sufficient particularity for

22   two reasons.  One, it allows the defendant to

23   know how to defend the case.  And secondly, it

24   helps the Court determine issues of relevancy in

25   discovery.  So it is an appropriate question.

1          What I don't know and I think about,

2   is whether -- well, I don't think we need to get

3   to that right now.  But for now, it is incumbent

4   upon the plaintiff to respond to the discovery.

5   And you'll send that to me and I'll decide

6   whether it's been responded to or not.  And then

7   the issue of whether there's disagreement about

8   if something is or isn't a trade secret to me,

9   that's not in front of me right now.

10          Okay.

11          MR. ROSENTHAL:  We do have the

12   lingering problem of the expert, though.  And

13   that is --

14          MS. RICHEY:  Yeah.

15          MR. ROSENTHAL:  -- get an expert to

16   testify --

17          MS. RICHEY:  I understand.  Right.

18   And so what I would like to do when we're done

19   is, I want to go through the schedule of

20   upcoming deadlines and make sure that we're in

21   line to meet those deadlines.  I recognize

22   you've got that expert issue coming up pretty

23   soon.

24          Okay.  All right.  Anything else on

25   the trade secrets?  And then I want to move to

1    the deposition.

2              Okay.  Madam Court Reporter, it's a

3    little after 5:00.  Are you okay to hang around

4    for a bit?  We had said 3:00 to 5:00 on this

5    hearing.

6              THE COURT REPORTER:  Yes, I'm fine.

7              MS. RICHEY:  Okay.  Thank you.

8              All right.  So then I want to hear

9    first from the plaintiff on the motion to compel

10   the deposition, an additional deposition, the

11   emergency deposition of Mr. Del Rosso.  I did

12   read the information that the plaintiffs sent

13   over at noon.  Thank you for getting that on

14   short notice.  I know that was difficult with

15   the doctor always, but certainly on a holiday

16   weekend.  And it was helpful to see what he had

17   to say.  And it was helpful to see what he had

18   to say.

19             One of the questions I have at the

20   beginning is, I'm a little unclear, Plaintiff,

21   as to what you all are seeking from

22   Mr. Del Rosso.

23             That is, are you seeking him to

24   answer specific questions?  Are you seeking a

25   full day deposition?  Are you seeking a partial

1   deposition?  I also want to know the status of

2   the February 7th deposition.  That might be

3   something we'll resolve in here today.

4           But I wasn't clear when you asked for

5   the emergency deposition whether you were

6   seeking more videotaped discovery deposition,

7   whether you were, in fact, seeking a trial

8   deposition that would allow the defendants to

9   cross -- to redirect, rather, direct their own

10  witness, et cetera.  I just want to make sure I

11  know what it is you're seeking.  And you can get

12  to that in your argument, but those are my

13  initial --

14          MS. BRIGGERMAN:  Sure.  And yes, to

15  clarify, what we are seeking is to take

16  Mr. Del Rosso's trial testimony in the form of a

17  deposition, both in his personal capacity as a

18  fact witness, but also as a corporate

19  representative for VMS.  Presumably, he is the

20  designated representative for VMS, so he would

21  be the one to testify in that capacity.

22          And the reason for needing this

23  deposition to preserve his testimony for trial,

24  is it is very clear that he is dying.  And his

25  health has taken a significant turn for the

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 112 of 164

1  worse as of November.  Unfortunately, we were

2  not apprised of that information until right

3  before his rescheduled deposition.  And then he

4  sat for that deposition in December.

5           Right before the deposition, the day

6  before, he changed his meds and increased the

7  meds, such that his counsel advised at the

8  deposition that he was not competent to testify.

9  He gave some testimony that was lucid at times

10 and some where he appeared very sleepy and under

11 the influence of drugs.

12          But we were -- the fact that they did

13 not inform us of his situation was very

14 concerning, because they have told us since last

15 year when they brought a motion before the Court

16 to prevent his deposition, that they would keep

17 us apprised of the situation and they have not

18 done so.

19          But it is very clear they are still

20 relying on the November 30th doctor's letter

21 that says that the cancer has come back, that it

22 is aggressive, and that he doesn't have long to

23 live.  So our concern is that he may not be

24 available for trial, and that would

25 substantially prejudice us.

1        I think in the alternative, I would

2   say it is unclear what defendants' position is.

3   Is he competent?  Is he not?  I still am not

4   convinced from the doctor's note or their filing

5   as to whether they say he is competent to

6   testify at a deposition or not.

7        But it is clear that his December

8   deposition was not a full deposition.  We were

9   entitled to three hours based on the Court's

10  order.  He appeared.  He was clearly sleepy and

11  unable to testify, and so that should not count

12  as part of his fact witness deposition.

13        MS. RICHEY:  Okay.  Who is going to

14  talk on behalf of the defendant?

15        MR. NEUMAN:  Thank you, your Honor.

16  I'll address that.

17        Right off the bat, I have got to

18  address what is now another misrepresentation.

19  I mean, Mr. Del Rosso did not medicate himself

20  prior to that deposition.  He was prescribed

21  increased pain medications by his chief

22  oncologist, okay, around the time that that

23  deposition occurred because of the pain that he

24  was in.  He simply followed his doctor's

25  instructions.

1          I want to make it very clear that

2     there was no action on his own behalf to

3     manipulate his condition prior to that

4     deposition.  His doctor and his pain management

5     physicians would support that statement.  So I

6     just want to make that clear right off the bat.

7          We have been transparent about his

8     health from the very beginning.  We let them

9     know very early on when he was first diagnosed

10    with cancer that he was suffering from cancer

11    when the case started to activate again.  We

12    have done our best to keep in touch with our

13    client and our client's doctor, chief

14    oncologist, who you can see from the letters

15    we've established a good chain of communication

16    to make sure that we have his availability to

17    provide information when necessary.

18          We need to reframe, really, what

19    we're looking at here.  We have got a client who

20    is suffering from a serious disease, right,

21    causing him a great deal of pain and causing him

22    the need to undergo a bunch of different

23    treatments.  One of which resulted in a pretty

24    good period of time of remission.

25          When he came out of remission, nobody

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 115 of 164

1   kept information from -- he didn't keep

2   information from us.  We didn't keep any

3   information away from counsel.  He was trying to

4   evaluate what was occurring when he started to

5   have pain again, increased pain.  He was always

6   in pain, but there was increased pain.

7               He scheduled appointments

8   immediately.  He was waiting for evaluation from

9   his doctors, which is pretty serious stuff.  He

10  has got to go through PET scans and things to

11  determine, really, what was going on.  Right?

12  And it all happened pretty close in time to when

13  the deposition occurred.

14              Notwithstanding his pain and the

15  things that he is going through, he has sat for

16  two depositions in three separate sessions.

17  Even getting him to the deposition was

18  excruciating the last time around, but we did.

19  And he appeared and he did his very best.

20              What is critical to point out about

21  the last deposition is plaintiff's counsel was

22  fully informed about the nature of his condition

23  prior to that deposition occurring, yet they

24  pushed it.  They pushed it to the point where we

25  had to file a motion for Protective Order, which

1    was denied by Judge Osteen.  We don't believe

2    that Judge Osteen contemplated yet there would

3    be more deposition testimony by giving

4    plaintiffs the opportunity to move forward with

5    the deposition, even in light of his condition,

6    the pain he was suffering, the medications he

7    was on, and a letter from his doctor that we put

8    into the record prior to that deposition

9    occurring.

10           So they shouldn't get another bite at

11   the apple.  This is essentially another bite at

12   the apple.  They have taken video depositions of

13   him on three separate occasions.

14           We now have his doctor a second time

15   in a letter saying, he's unlikely to be

16   unavailable to testify by the time this trial is

17   currently scheduled in September.  There is

18   nobody in his healthcare world who is saying he

19   is going to be not with us immediately.

20           I interviewed him myself as part of

21   this process, okay, prior to this hearing, to

22   determine what his own belief is about what he

23   has been told.  And he said the same thing.  He

24   has been told that the regimen that he's on,

25   radiation and chemo that's happening right now,

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 117 of 164

1    should buy him another -- more time, and

2    hopefully buy him another remission.  But either

3    way, it could be as much as two years, right,

4    according to what he has been told.

5              So this is not an emergency

6    situation.  It is akin to another bite at the

7    apple to take more deposition testimony of

8    somebody who is in -- who's already gone out of

9    his way to be deposed in difficult circumstances

10   and provide as much testimony as he can possibly

11   give.

12             Then we get this unilaterally noticed

13   30(b)(6) deposition for February 7th.  Right?

14   Which, if you look at the topic areas, well,

15   this is going to be addressed separately.  They

16   are going to completely overlap with questions

17   that he has already been asked and testimony

18   that he has already given in oral testimony, on

19   video, and in witness statements.

20             We don't even think that there is a

21   need for it, based on the circumstances.  But

22   we'll address that separately with counsel,

23   whether that is going to go forward and when it

24   is going to go forward.

25             So our position here is, there is no

1    need for a trial deposition right now.

2    Discovery is ongoing.  What makes this very

3    unique, usually when an emergency trial

4    deposition is requested, there hasn't been any

5    prior testimony.  None.  There has been no

6    record testimony.  And the argument is, this is

7    our shot, because we have somebody who is dying

8    and may not be around by the time of trial.

9    Okay?

10            Our facts here are completely

11   different than that.  We have somebody that's

12   been deposed, twice in three separate settings.

13   We have somebody whose doctors are saying, yes,

14   he has cancer, but he is being treated and

15   highly unlikely -- highly unlikely -- that he

16   won't be able at the time of trial to give

17   testimony.

18            So none of the facts here support

19   this need for not only another deposition,

20   another piled-on deposition, but an emergency

21   trial deposition, where we're going to have to

22   subject him to essentially direct examination

23   and cross examination, right, and he is likely

24   going to be available to appear at trial anyway

25   after all of this.

1              So we have to really look at what

2     we're dealing with here.  We're not dealing with

3     an emergency situation.  As counsel, we have a

4     duty to immediately pick up the phone and call

5     our opposing counsel and inform the Court if our

6     client takes a turn for the worse and make him

7     available for essentially a de bene esse

8     deposition.

9              Okay.  We understand that duty and we

10    understand that obligation as officers of the

11    court.  And we will absolutely comply with that

12    obligation.  And we're in touch with him.  And

13    we're closely communicating, not only with our

14    client but with his doctors.  So we're getting

15    information from independent experts on his

16    situation.

17             So this is completely unnecessary.

18    And I would argue that borderlines inhumane and

19    harassing, given that he has already been

20    deposed.  So I would ask that, you know, we move

21    on and conduct discovery in the normal course,

22    not under some made-up, emergency circumstances.

23             MS. BRIGGERMAN:  Ms. Richey, may I

24    respond to some of Mr. Newman's points?

25             MS. RICHEY:  You may.

 1            MS. BRIGGERMAN:  So this is not a

 2    third bite at the apple.  Unfortunately, this is

 3    all Mr. Del Rosso's doing.  We first noticed his

 4    deposition in December of 2022.  He sought to

 5    delay that deposition because he was undergoing

 6    treatment.  The court agreed to a short delay,

 7    but made it very clear that any future requests

 8    to delay the deposition would not be treated

 9    timely unless there was sufficient medical

10    information to support it.

11            We went forward in February.  And to

12    accommodate the situation, the deposition was

13    scheduled across two days so that he could sit

14    for a couple of hours each day.  Unfortunately,

15    he refused to answer substantive questions.

16            In July, Judge Webster ruled that his

17    refusal to answer questions was improper and

18    that he needed to sit for the deposition again.

19    We agreed with opposing counsel to set a

20    deposition for three hours, even though

21    Judge Webster did not put a time limit on that

22    deposition.

23            So we attempted to depose him again

24    in December.  Again, opposing counsel sought to

25    delay that deposition.  The court ruled that it

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 121 of 164

1  should go forward.  When he showed up that day,

2  he appeared groggy and out of it.  He was able

3  to answer some questions and not others.  But in

4  our view, that deposition was not a completion

5  of the deposition that the Court ordered to be

6  completed.

7          So there's -- I want to dissuade the

8  special master of any argument that this is

9  three bites at the Apple.  It's been one

10  deposition that we sought to complete for some

11  time now, and Mr. Del Rosso has not been able to

12  do it.

13          We have not yet had the 30(b)(6)

14  deposition that is noticed for February 7th.

15  Again, the Court, in July, ruled that that

16  should go forward and ruled that the 30(b)(6)

17  topics were relevant.

18          If Mr. Neuman is saying that that

19  deposition is not going to happen, then that's

20  concerning to us because we are ready to move

21  forward with it.

22          MS. RICHEY:  Okay.  In the December

23  deposition, and I was looking back

24  at Judge Webster's order, was it the

25  understanding that the only thing that could be

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 122 of 164

1  asked were the questions for which he refused to

2  answer or was it broader than that?  You

3  mentioned that in the first deposition there

4  were questions he refused to answer,

5  therefore --

6           MS. BRIGGERMAN:  Correct.

7           MS. RICHEY:  -- so you had an

8  opportunity to redepose him.

9           MS. BRIGGERMAN:  Yeah.  I think -- I

10 mean it is hard to say how that would really

11 work.  How, if you ask one question, is it

12 something he has already answered if it is

13 phrased differently?  I mean, I --

14          MS. RICHEY:  Yeah.  I don't mean the

15 exact questions, but was that the construct and

16 the reason why it was three hours, there were

17 certain topics he had refused to go into?

18          MS. BRIGGERMAN:  Correct.  Both on

19 relevance and privilege grounds.

20          MS. RICHEY:  And at the deposition in

21 December, I know that there were times he was

22 not able to answer.  Were there also objections

23 asserted to those questions and was he prevented

24 from answering anything by objection or was it

25 just the medical situation that was the

1    difficulty?

2              MS. BRIGGERMAN:  It was the medical

3    situation, if I recall directly.  I don't think

4    the parties had reached any agreement as to what

5    the scope was for that deposition.  We had

6    agreed to three hours.

7              MR. NEUMAN:  And I will say, just to

8    add, that the large majority of the refusal not

9    to answer was upon counsel's instruction based

10   on privilege and work product, the same

11   privilege and work product that we discussed

12   earlier regarding RAK's privilege.

13             The point I want to make -- and I'm

14   happy to answer any questions, of course.  I

15   think it is important to understand that we've

16   never said that Mr. Del Rosso shouldn't be

17   deposed, all right.  All we've said is, let's

18   get him through treatment and have him deposed

19   so we can provide testimony.  That was our

20   messaging before the December 7th deposition,

21   yet they took him as he was.

22             It is an important theme here.  They

23   took him as he was that day.  All right.  They

24   took him in the condition that he was in.  We

25   were not saying you will never get to depose

1  Mr. Del Rosso that day.  We were saying he is

2  going through treatment and let's make sure he

3  is in a condition where he can provide adequate

4  testimony.

5            So, you know, this isn't strategic by

6  any means.  This business of difficulty in

7  scheduling his deposition, I understand all of

8  that.  It has been difficult.  And we don't

9  dispute that, that it has been difficult.  It's

10  been difficult because of something out of our

11  client's control.

12            But any way you look at it, what they

13  are essentially asking here for is a death bed

14  deposition.  That is what a de bene esse

15  deposition is by its nature.  Okay.  It

16  contemplates somebody who is sitting in a

17  hospital bed in hospice with days, weeks to go.

18  Right?  That's what the purpose of this is.  It

19  is an extreme remedy that is appropriate under

20  certain circumstances.

21            We are not under those circumstances

22  in our current situation.  There are no facts

23  supporting an emergency de bene deposition.  We

24  have evidence from his doctor contrary to that.

25  Right?  So I just don't think we need it.  I

1    don't think it is necessary.

2              MS. RICHEY:  So as I read the

3    January 15th letter from Dr. Rubinstein, I

4    looked at the November 30th one, but I think

5    that's old news and most in respects.  He says

6    that in three months we will -- he is very

7    likely to enter a meaningful period of disease

8    control, which we should find out about this in

9    around three months.

10             It seems to me with respect to a de

11   bene esse deposition, it is too soon to know

12   whether we are there or not.  And it seems to me

13   that in the three months when they are able to

14   do more imaging and see how the cancer has

15   progressed or hopefully not progressed that

16   might be the time to consider a de bene esse

17   deposition.  So I'm going to put that aside for

18   the moment.

19             I think the current question is can

20   he sit for a deposition and be competent to

21   answer the questions that were asked in the

22   December deposition?  That deposition, did it

23   last for three hours?

24             MS. BRIGGERMAN:  It did not last

25   three hours.  And a lot of it was -- was

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 126 of 164

1    frankly, it was clear he was not capable.  And

2    in fact, his counsel said that he was

3    incompetent.

4              MS. RICHEY:  How long was that?

5              MS. BRIGGERMAN:  I want to say it was

6    under two hours of taped testimony at the most.

7              MS. RICHEY:  Okay.

8              MR. ROSENTHAL:  I believe it was two

9    and-a-half hours.

10             MS. RICHEY:  Okay.

11             MS. BRIGGERMAN:  Again, a lot of that

12   was unfortunately wasted time.

13             MS. RICHEY:  So the doctor also says

14   he should not be asked to sit for periods of

15   time in excess of three hours.  I'm not inclined

16   to make this man sit for more than three hours.

17   I also am questioning the need for another full

18   day 30(b)(6) plus the three hours.  And it seems

19   to me there ought to be a way to come up with a

20   solution where he is deposed and he can finish

21   answering the questions that have to do with his

22   personal knowledge and be asked his questions as

23   a representative of the VMS that doesn't require

24   ten more hours of deposition.

25             The problem that the plaintiff has

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 127 of 164

1   is, he is going to be on medication.  And at

2   some point, the plaintiff is going to have to

3   decide whether it makes sense to take his

4   deposition or if they take his deposition, to

5   get what they can get -- get what you can get

6   from it.  And then later on, if it is handed to

7   a jury, that jury will decide whether he was

8   competent to answer the questions.

9             But he is in active cancer treatment.

10  He is on pain meds.  I'm again looking at the

11  sentence that the doctor says, "He should not be

12  asked to sit for periods of time in excess of

13  three hours."  And maybe that's our guidepost,

14  that under no circumstances will a deposition

15  last more than three hours.  It might need to be

16  broken up.

17            But it also seems to me that another

18  full day of deposition for both the 30(b)(6) and

19  the additional questions that he wasn't able to

20  answer in December should be sufficient, given

21  that he is the member of VMS who was taking

22  action.  And everything he did as far as I

23  understood -- tell me if I'm wrong, Plaintiff --

24  is that all the steps that he allegedly took and

25  that he is alleged to have taken in the

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 128 of 164

1  complaint he did as a representative of VMS.

2               And so what I'm wondering is, if it

3  can be arranged that he has another deposition,

4  but it is three hours one day, maybe three hours

5  the next week, maybe we kind of work through

6  that.  But that it is not another ten hours.

7               And then I think the plaintiff is

8  going to have to decide whether you want to wait

9  and see what happens in three months and if he

10 is actually in a period of disease control such

11 that he doesn't have to be medicated so heavily.

12 It is important that his deposition is taken.

13 It is important that he is fully able to answer

14 questions, that his testimony is competent.  And

15 the plaintiff is entitled to take the 30(b)(6)

16 and entitled to complete his deposition.  But I

17 do think that has to be weighed with the reality

18 of where he is now in his treatment.

19               The doctor is not saying he is about

20 to die.  I don't think -- I do not think this is

21 the situation where a de bene esse deposition is

22 warranted.  I do think it is a situation where a

23 discovery deposition needs to be completed or at

24 least an effort in that regard.  And I think,

25 Plaintiff, the challenged ledge you have is

1    when.

2              And do you want it to go forward now,

3    when he is in active treatment and taking pain

4    meds or do you want to wait?  If you're going to

5    wait three months, then we're going to have to,

6    you know, talk to the judge about a discovery

7    extension and you may not want to wait that

8    long.

9              But the doctor says he can sit for

10   three hours.  And so maybe, what I'd like to do

11   is have the doctor know his deposition is going

12   to be taken on this day for three hours, and

13   that he is appropriately medicated.  Because it

14   is -- I agree, it is not right to ask him to be

15   in terrible pain just to have a deposition

16   taken.  But I don't hear the doctor saying he

17   can't be deposed.

18              In fact, he is saying he can sit for

19   periods of time in excess of three hours.

20   And -- but that's where he is.  I mean, the man

21   is getting chemotherapy treatment and it is

22   happening now.  It certainly can't stop.  And I

23   don't know, frankly, the correlation between the

24   therapy and the pain.  It sounds like the

25   therapy is there to treat the pain and

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 130 of 164

1    perhaps it is going to be lessened after -- has

2    he completed the radiation, does anyone know?

3              MR. NEUMAN:  Yeah, he completed a

4    full round of radiation and went right into

5    chemo after that.  So that the nature of his

6    cancer, I'm told, is that you can't just do a

7    blood test to determine whether or not the chemo

8    radiation is working.  You have to do a PET

9    scan.  And you don't get tumor reduction

10   reactions until the, you know, the 90-day mark

11   is when it really starts to take effect, and

12   that's why the doctor is saying it takes that

13   long to determine where he is at that point.

14             The point of it is, the pain is

15   caused by the size of the tumors in the

16   locations that they are.

17             MS. RICHEY:  Right.

18             MR. NEUMAN:  So the point of this --

19   part of the plan is to reduce the -- you know,

20   the size of the tumors so he can be without as

21   much pain.

22             MS. RICHEY:  So the doctor's

23   November 30 letter said that they were arranging

24   radiation therapy to treat his 12th rib lesion,

25   which will accelerate relief of pain.  And that

1  would occur for five days starting after that

2  deposition in December.

3          So has that therapy helped with his

4  pain?

5          MR. NEUMAN:  It hasn't helped with

6  pain as much as they expected it would be.  And

7  that's why they accelerated right into

8  chemotherapy.  And the original plan for chemo

9  was to do three weeks on and then a period of

10  time off to see how it adjusted.  And now they

11  have converted it to no periods of down time.

12  They are just going to run it right up until

13  they're ready to do a PET scan to determine

14  whether it's had any positive effect, which they

15  are expecting it to.

16          MS. RICHEY:  So do you know whether

17  his pain, though, has improved such that he

18  could sit for a deposition and not have to be

19  quite as drugged up as he was in December?

20          MR. NEUMAN:  So they have been able

21  to balance his medication -- and part of

22  palliative care, is when you -- they run you

23  right up to the maximum so you can manage it,

24  and then they back you off pain, what I'm told,

25  as time goes on.

1                So they've -- he is on a -- he is on

2      a lower dose combination of the medications --

3      same medications he is still on, but a lower

4      dosage time and different time frames than he

5      was on the day of the deposition.

6                So I guess the answer to your

7      question is yes, the medication has been

8      balanced and more regulated so he can function

9      better.  Certainly, according to his doctor,

10     doesn't alleviate the natural somewhat cognitive

11     issues that come from that.  But what I'm told

12     is, they are regulated at this point to the

13     point it is not as extreme as what he was

14     experiencing on the 7th.

15                MS. RICHEY:  And do you know whether

16     he does better in the morning or the afternoon?

17                MR. NEUMAN:  I do not.  And I can --

18     I can inquire about that.

19                MS. RICHEY:  Yeah, I think what I'm

20     inclined to do is direct that he be deposed

21     again, but that the deposition, the 30(b)(6) and

22     the rest of the personal, be combined into two,

23     three-hour chunks one day -- and you'll have to

24     help us with this, Counsel for the defendants

25     that is.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 133 of 164

1              Is it better for him to do

2     three hours one day, three hours the next, or

3     does he need a day for recovery?  And I know,

4     Plaintiff, that puts you in a situation that no

5     lawyer likes, which is a deposition is broken

6     up.  But I think we have to recognize the

7     reality of what you're dealing with here.

8              And I would say a three hours of one

9     sitting and a three hour another session, and

10    work with his doctor to determine whether that's

11    best in the morning, the afternoon, how much of

12    a break he needs in between.

13             And that deposition would be a joint

14    30(b)(6) and the rest of the personal.

15             I feel like that should give

16    sufficient time, given that he is both the

17    company and the individual.  It is not as if he

18    has got to talk to five or six other people to

19    get the information.

20             I know you all -- somebody mentioned

21    it, but I don't think I have seen the topics,

22    the 30(b)(6) topics.  They exist?  They have

23    been sent out?

24             MS. BRIGGERMAN:  Yes.  Yes.  And the

25    deposition is currently set for February 7.  The

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 134 of 164

1  30(b)(6) is really important.  Obviously, it is

2  important that the plaintiff get a full

3  seven hours in a deposition.  And I understand

4  the reality of the situation.  But another

5  alternative, of course, is for him, just like

6  any other 30(b)(6) situation, to get someone

7  else up to speed.  His wife was also an employee

8  of the company.

9           MR. NEUMAN:  There isn't anybody

10  else.  We have inquired deeply into that.  There

11  is nobody else to designate for this particular

12  deposition.

13           You know, and I'll say about the

14  topics -- and this is for a different day -- but

15  I just want to preview.  I mean, they are overly

16  broad.  They implicate privilege and work

17  product, same stuff we've been talking about

18  here.  And so we intend to address that in the

19  next couple of days.  And I guess what we'll do

20  is reboot objections that we'll serve when the

21  30(b)(6) was first noticed a while ago and meet

22  and confer and deal with that.

23           But there is so much overlap in what

24  he's been asked already.  And we're going to run

25  into the same objections, same situations, where

1    we sit right now.  And, you know, I appreciate

2    the accommodations and I really appreciate the

3    sensitivity to this.  And, you know, we

4    understand the need to give discovery.  We

5    understand the need to be deposed.  But this

6    feels like a pile on, given what he is dealing

7    with.

8              MS. RICHEY:  Well, one of the things

9    you don't want to happen in the deposition is

10   for time to be taken up by objections.  So if

11   there's anything we can do in advance of that to

12   mitigate, I'd want to do that because I do think

13   the plaintiff should be allowed to get actual

14   testimony during the time it has and not have it

15   be spent with any arguments about objections.

16             So if those objections include

17   privileged areas, seems to me those can be

18   resolved in advance.  If it involves relevancy

19   and scope, you know, you know the rules.  I mean

20   they are entitled to ask and relevancy issues

21   can come up later.  But I don't want to have a

22   lot of argument at the deposition on those kinds

23   of topics if we can avoid that.

24             MR. NEUMAN:  Yeah, the big ticket

25   item is privilege.  I think we're past the

1    scope.  I mean, proportionality is always an

2    issue.  But I think meeting and conferring on

3    the topics in their notice that we believe

4    implicate privilege, we're happy to address

5    those in good faith meeting and conferring

6    prior.

7            MS. RICHEY:  I think you should.  I

8    think that you all should endeavor to do that.

9    I think there are two completing interests.  The

10   plaintiff is entitled to depose the defendant.

11   That's the rules that's the way it goes.  The

12   defendant is very ill.  I have great sympathy

13   for that.  And we have got to make these two

14   things work together as best we can.

15           MR. NEUMAN:  Understood.

16           MS. RICHEY:  So I think if the

17   parties could meet and confer and mitigate as

18   many of these issues as you can in advance of

19   the deposition, if there are any of these that

20   you need me to resolve, please bring them to me,

21   but talk first.

22           MR. ROSENTHAL:  Just one thing that

23   was said.  Ms. Briggerman mentioned

24   February 7th.  There is a conflict.  We are

25   trying, all counsel, oral argument in another

1    case, and so I think there is a conflict on the

2    7th.  We will work with the plaintiff if there

3    is a deposition on a mutually agreeable date.

4    We're not going to use that as a delay, but the

5    7th, I don't think, is going to work.

6              MS. BRIGGERMAN:  That's actually --

7    that is not the case.  I don't think that

8    that -- yeah.

9              MR. BEHRE:  That's not the case.

10   It's definitely been rejected, the 7th.  There

11   is no conflict, Sam; you know that.

12             MR. ROSENTHAL:  Let me explain.  Let

13   me explain.

14             MR. BEHRE:  You do know that.

15             MR. ROSENTHAL:  There is only one day

16   that all counsel can appear for an oral argument

17   in the Southern District of New York, and it is

18   February the 8th.  Mr. Behre has indicated he

19   will not agree to that date because the

20   deposition of Mr. Del Rosso is on the 7th.  So

21   we're happy to work with him and do the

22   deposition on the 9th, the 10th, whatever date,

23   you know, works.  But if there is only one day

24   in the next month that all counsel can appear

25   for an oral argument in the Southern District,

1   we shouldn't use Mr. Del Rosso's deposition to

2   avoid that.  That's all.

3           We'll work with you, Kirby, on a

4   mutually agreeable date.  We will.

5           MS. RICHEY:  Well, you all talk about

6   it.  And if you can't come to an agreement and

7   you need me to intervene on that, do.

8           MR. ROSENTHAL:  Okay.

9           MS. BRIGGERMAN:  What is essential is

10  that this deposition needs to take place soon.

11  We've noticed it for the 7th.  This was

12  previously noticed a year ago.  And the Court

13  in -- on July 25th ruled that the 30(b)(6)

14  topics were relevant and any privilege

15  assertions were conclusory and they needed to be

16  made at the deposition.

17          We ordered that deposition to take

18  place in August.  It did not occur.  Time is of

19  the essence.  Fact discovery closes in March.

20  We really need to move forward soon.

21          MR. ROSENTHAL:  And may I remind you

22  that Mr. Azima has refused to be deposed for

23  four months now.

24          MS. BRIGGERMAN:  That is not correct.

25          MS. RICHEY:  Let's stop that so --

1   because that's not in front of me.  So I want to

2   go back and talk about what we're going to do

3   next.

4              Because I do agree, Ms. Briggerman --

5   and I think everyone does -- that we have got a

6   lot of deadlines coming up and a lot of things

7   have to happen.

8              On your deadlines, your expert

9   reports are due when?  Is that still

10  February 9th?  Or have they been moved.

11             MS. BRIGGERMAN:  It is, although I'm

12  not -- at this point, I'm not sure how that is

13  going to happen with fact discovery still going

14  on.  We still have depositions.

15             MS. RICHEY:  Well, I guess -- right.

16  And fact discovery is supposed to close

17  March 29th, and then all discovery April 29th.

18  Dispositive motions in May.  That's an

19  aggressive schedule.  I don't have any marching

20  orders and I can't change it, so we have to

21  operate as if that's going to happen.

22             I would say this.  If you all have

23  any desire or intention to seek moving those

24  deadlines -- I'm not suggesting you should -- I

25  think that will likely go over better with the

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 140 of 164

1    Court if the Court sees progress and that things

2    are moving forward.

3           So let's go back and talk about what

4    you all are going to get to me.  With respect to

5    the documents that the plaintiffs maintain the

6    defendants have not produced or the discovery,

7    you're going to get me those discovery

8    responses.  You're going to get me the questions

9    and the responses, including any objections.

10   Today is Tuesday.

11          Do you think you can get those to me

12   by the end of the day tomorrow?

13          MS. BRIGGERMAN:  Yes, we can do that.

14          MS. RICHEY:  And then, Defendant,

15   with respect to the trade secret discovery, can

16   you do the same?  That is, get me the specific

17   requests, the answers, objections, so I can

18   determine whether any orders need to be made

19   about those?

20          MR. ROSENTHAL:  Absolutely.

21          MS. RICHEY:  Okay.  Also, by the end

22   of the day tomorrow?  Listen, I'm still you.  I

23   don't want to give you work you can't do, but

24   this case is hopefully a priority.

25          So end of the day tomorrow still work

1    for everybody?

2              MR. ROSENTHAL:  Yes, I think it does.

3              MS. RICHEY:  Okay.  All right.  On

4    the laptop, I'm going to -- I'll put this in a

5    written document, but I'm going to direct

6    Mr. Del Rosso and VMS to, in essence, direct

7    their counsel in the UK.  I'll look at what

8    Mr. Grant sent me, which was the UK documents,

9    to pursue the process that was set forward in

10   the UK order and to report back about the status

11   of that.  I'll put that in a document.  Because

12   I want to understand when we can get a copy of

13   this laptop.

14             I would like him also to ask his

15   counsel if a copy of the laptop can be provided

16   just to Mr. Del Rosso.  Not anyone else.  And

17   then, obviously, you would have a forensic

18   person look at that and pull out all of the

19   documents, just so it can be done.  The answer

20   may be no, but I think it's worth --

21             I'm sorry?

22             MR. BRANCH:  I'm sorry.  I had

23   something blow up on my computer.  I apologize.

24             MS. RICHEY:  Oh, okay.

25             And then the privilege.  So I would

1    like to understand what the case law says about

2    my ability -- or rather about RAK's ability to

3    assert the privilege through Mr. Del Rosso.  And

4    there may be nothing better out there than what

5    you have provided.  Just look and tell me.

6              And then my understanding was that

7    the plaintiff is going to go through the

8    privilege log and identify which documents you

9    believe the privilege was improperly asserted.

10   Really, it is going to be a combination of the

11   documents you think you want to see and you're

12   contesting the privilege.  And then we'll figure

13   out whether it makes sense for me to review

14   those documents.

15             MS. BRIGGERMAN:  Sure.  And would you

16   like us to do that with the entire privilege

17   log?  It is 90 pages.  And we're happy to do it

18   once.  Or alternatively, we could pull up

19   samples because you might see an e-mail chain,

20   for example, that has the same subject line ten

21   times and it's follow-on is the same.  So

22   whatever is going to be easiest for you.

23             MS. RICHEY:  I don't know, having not

24   seen the documents.  But, you know, at some

25   point, if there is going to be any inspection of

1    the documents, you'll have to proffer those

2    exact documents to me.  And obviously there

3    might be duplications.  I mean, if you can de

4    dupe things, that's always great.  That makes it

5    quicker.  I'll have to leave that up to you.

6              MS. BRIGGERMAN:  Okay.

7              MS. RICHEY:  When we were talking

8    about the privilege -- and I think there was a

9    deposition of Rick Garcia, who is he?

10             MS. BRIGGERMAN:  He was with NTI.

11             MS. RICHEY:  He's with NTI.

12             Does that deposition and the fact

13   that now the defendants know that that

14   information was turned over to the FBI, does

15   that cause you to change the privilege log at

16   all, Mr. Branch?

17             MR. BRANCH:  It may.  We're trying to

18   figure out -- so we don't have the transcript,

19   first of all.  Secondly, we're doing due

20   diligence on some of the things that Mr. Garcia

21   testified about.  So I hesitate to say with

22   ironclad certainty that it will, but his

23   testimony will have some impact, I would

24   imagine, on the way that we have asserted that

25   some things are privileged.

1          I would anticipate that we continue

2     to contend that the work product protection

3     applies to reports, even if they were turned

4     over to the FBI.  But we're -- I mean, frankly,

5     we're trying to figure out exactly what happened

6     at this point.

7          MS. BRIGGERMAN:  And that transcript

8     is available now.  It is just the rough, but it

9     has come out, John.

10         MR. BRANCH:  If you would

11    appreciate -- we weren't sent a copy of it.  So

12    if you all would appreciate circulating --

13         MS. BRIGGERMAN:  Sure.

14         MR. BRANCH:  -- that would be very

15    helpful.  Thank you very much.

16         MS. RICHEY:  Okay.  Let's put some

17    time frame around the privilege issues.  So the

18    things that I need are some case law.  I need to

19    know what is the universe of privileged

20    documents.  And specifically, the documents that

21    plaintiff would like to get, because plaintiff

22    would maintain that the privilege is improperly

23    asserted.  If you have the transcript and if you

24    think that transcript might change that

25    privilege log, then that needs to happen pretty

1    quickly.

2            And so how soon do you think you all

3    could look through the transcript and then make

4    any changes to the privilege log.  And let me --

5    before we go there, there was also, looking at

6    the Dechert documents that were produced in the

7    UK, that may or may not change the privilege

8    log.

9            MR. BRANCH:  The challenge that I

10   think we have is, that defendants in this case

11   are not in control of some of the information

12   that would be determinative of how the privilege

13   log would change.

14            The testimony at issue is Mr. Garcia,

15   who was the former FBI -- head of the FBI

16   offices for the LA offices and the Houston

17   office, when he went out into private business,

18   he testified that as part of his work for NTI,

19   as a contractor for Dechert, he interfaced with

20   the FBI after his team had identified what they

21   believe were violations of Title 18 of the U.S.

22   Code.  And in connection with his interface with

23   the FBI, he turned over what he called are

24   reports that NTI generated.

25            Defendant's position in the

1    litigation is that all of these reports are

2    privileged and work product.  I was not aware

3    until Mr. Garcia's deposition that the reports

4    had been turned over to the FBI.

5              And he was unable at his

6    deposition -- he knew that some reports had been

7    turned over and some reports hadn't, but he

8    wasn't really able to describe with any

9    specificity the reports that he says he turned

10   over.  And we're in the process of trying to

11   figure out if that can be done right now.

12             MS. RICHEY:  He wasn't able to

13   describe, who, Mr. Garcia?

14             MR. BRANCH:  Mr. Garcia was not able

15   to describe with specificity which reports

16   because there are --

17             MS. RICHEY:  I see.

18             MR. BRANCH:  Because we've logged the

19   reports, right, the reports are all over the

20   privilege logs.  And -- but he was not able to

21   describe, you know, for example a report that

22   says blah, blah, blah went over to the FBI.  I

23   mean, so there is -- and frankly, our clients

24   weren't involved in that -- VMS was not involved

25   in handing off the reports to the FBI.

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 147 of 164

1           So we're working on that, with the

2    understanding that there could be some impact on

3    the privilege designations.  I believe that a

4    series of demand letters have gone out from

5    plaintiff's counsel over this over the last

6    several days as well.

7           MS. RICHEY:  Well, it may be that

8    that's -- we'll just have to set that aside and

9    you might not be able to modify or don't even

10   know if you can modify the privilege log.  So I

11   think for now, if you can, do.  If you can't,

12   plaintiff will just need to look at what you

13   have set out.

14           MR. BRANCH:  We -- you know, the way

15   we're looking at this, ma'am, is we have new

16   information.  We're doing due diligence on the

17   new information.  If the due diligence causes

18   the assertions that we've based privileged

19   designations on the change, we will change the

20   privilege log accordingly.  We just -- we are

21   not in the position to jump the gun without

22   accurate information at this point.

23           MR. NEUMAN:  We also need to do some

24   research to determine whether the work product

25   protection flows, even though it was turned

```
 1   over.
 2            MS. RICHEY:  Right.  So it may be
 3   that that just can't be done, but we do need to
 4   move forward.
 5            Okay. so with respect to getting me
 6   some law around the assertion of the privilege,
 7   when can you all do that?  Could that be done
 8   this week, earlier this week?  I don't -- again,
 9   I don't want to give you more than you can do,
10   but it is Tuesday.  The reason I want to look at
11   that is, I just want to understand the threshold
12   issue of whether or not you can even assert the
13   privilege.  And then assuming I get past that
14   and determine, yes, you can, then I would like
15   to have -- go ahead and have the plaintiff be
16   looking through the privilege log, and coming up
17   and being able to tell me, Here are the
18   documents we want you to review.
19            MS. BRIGGERMAN:  Yeah, we can
20   absolutely do that this week.
21            Shall we say COD Thursday?
22            MR. BRANCH:  That is consistent with
23   what I was thinking.
24            MS. BRIGGERMAN:  And, Ms. Richey,
25   would you like a short statement of the case
```

1  law, like a 700 word statement as we have been

2  doing?  Or how would you like it?

3          MS. RICHEY:  I'll leave that to you.

4  I mean, you know, if it is just a couple of

5  cases, I can read those.  But if you want to

6  summarize them, that's fine too.  I won't

7  object.

8          All right.  Okay.  Let me just make

9  sure.  So tomorrow are the -- okay.  In

10  connection with the deposition, I would like you

11  all to confer.

12          Do we want to go ahead and set a time

13  for that to happen so that there is no dispute

14  about that?  Do you want to look at your

15  calendars and come up with a time to have a

16  conversation about when the deposition can be

17  taken?  I don't need to be part of that

18  conversation, but if we can get that on the

19  calendar, I think that would be useful.

20          MR. NEUMAN:  Sure.  How about,

21  Lauren, if it's okay with you, we will retreat

22  tonight, look at the calendars, and why don't we

23  touch base tomorrow about setting a meeting

24  confer time?

25          MS. BRIGGERMAN:  Yeah, yeah, we're

1    happy to do it tomorrow.

2              MS. RICHEY:  Okay.  If there's -- if

3    you all can't come up with a time to meet and

4    confer by the end of the day tomorrow -- I don't

5    mean you meet and confer tomorrow -- I mean, if

6    you haven't agreed on a time by the end of the

7    day tomorrow, then you all let me know and we'll

8    get together and have a brief conference and see

9    if we can't -- I'm happy to be part of that, but

10   I just want to make sure it happens.

11             MR. NEUMAN:  Yeah, we'll absolutely

12   get that nailed down.  We're going to need a

13   little bit of time to go through the topics,

14   Lauren, so we can have a -- again, go through

15   the topics and have a meaningful conversation

16   about that.

17             The one thing I wanted to maybe ask,

18   I guess, or offer for conversation, Ms. Richey,

19   is the thing that has gummed up the depositions

20   in the past have been privileged objections and

21   instructions not to answer, which are entirely

22   based on -- or a large majority based on our

23   instruction from RAK to protect their privilege.

24   So we have been put in a position when a

25   question is asked, right, that implicates that

1    privilege, we're in a tough position.  We have

2    to instruct our own client not to answer.

3           Those privilege issues have not been

4    worked through yet.  So in order to have a

5    meaningful deposition or a client in the future

6    along the sort of parameters that you have set

7    out about the timing and everything, we strongly

8    believe it makes sense to get through the

9    privilege issues.  Right?  Get determination on

10   the privilege issues one way or the other so we

11   can then go forward with the deposition, either

12   allowed to continue to assert instructions not

13   to answer and protect the privilege and work

14   product or not.  That changes the way the

15   depositions go.

16          So I would just put it out there for

17   discussion that, you know, in light of our -- we

18   know that it needs to be -- there needs to be a

19   deposition.  We know that we need to offer

20   discovery.  But we want to do it in a way that's

21   meaningful so we don't spend, you know,

22   three hours of the six, or whatever it is he is

23   going to be deposed, talking about objections as

24   opposed to --

25          MS. RICHEY:  Yeah, I agree.  Let me

1    ask you this.  If I determined that privilege

2    didn't apply to documents A, B, C, whatever they

3    are, and everyone accepted that.  I know you all

4    have the right to go to Judge Osteen.  Whether

5    you did or didn't, but that was the final

6    conclusion, are you and your client comfortable

7    revealing that information or would you, at that

8    point, want to get RAK -- tell RAK and RAK might

9    say, Well, we're going to intervene.  In other

10   words, if you're asserting it, are you also able

11   to have him answer questions if the

12   determination is made that they're not

13   privileged?

14           MR. NEUMAN:  So it is a great

15   question.  As I sit right now, I need to think

16   through that, but I think we would have to get

17   RAK involved in it as we have all along.

18   Because their position is, it is their

19   documents.  It is their privilege that is being

20   protected.  And so I think there would be a

21   process that would flow from that.

22           MS. RICHEY:  Okay.  And that's my

23   concern too, you know, given who RAK is and that

24   they have got strong opinions about this, as no

25   doubt they should.

1            What I would like to know, then, is,

2     and we're looking at the case law, my assumption

3     would be, if the Court says, you may assert a

4     third-party's privilege objection, then it also

5     means that if the Court says that privilege

6     objection does not apply, then you have to

7     answer the question.  You can't view -- I don't

8     mean you, personally -- I mean the party can't

9     say, Oh, no, wait a minute, this third party has

10    to intervene, that you're in it fully on behalf

11    of RAK.

12            If your position is different from

13    that, I think we need to talk about requiring an

14    intervention.  So I want you to think that

15    through.  Because if that's the case, I don't

16    think we wait on that topic -- on that issue,

17    because that's simply going to cause more delay.

18    And that would be -- what I would do, then, is

19    go and talk to Judge Osteen about it.

20            MR. NEUMAN:  Understood.  I

21    appreciate that.  And, you know, the distinction

22    on privilege has deeper implications because we

23    have Dechert as a third party in this particular

24    case.  They have asserted objections based on

25    privilege.  And there is a 30(b)(6) deposition

Case 1:20-cv-00954-WO-JLW   Document 322-3   Filed 02/20/24   Page 154 of 164

1    of Dechert coming up at some point, I think near

2    the end of February.  So, you know, I don't know

3    if we need their participation in it as well, in

4    this whole privilege decision, because they are

5    asserting the privileges on behalf of RAK.

6            MS. RICHEY:  The privilege log, the

7    99-page privilege log, does that include Dechert

8    documents?

9            MS. BRIGGERMAN:  No.  They have their

10   own extremely long privilege log as well.  And

11   this is the reason that we feel that RAK needs

12   to intervene now.  If they are the ones holding

13   the privilege, they need to assert it, and they

14   need to live with the rulings on it.

15           MS. RICHEY:  Well, I think the

16   question is, if either me or Judge Osteen

17   or Judge Webster says the privilege doesn't

18   apply to this document, but the plaintiff's --

19   I'm sorry -- the defendants' position is still,

20   We still can't answer that question because RAK

21   is telling us not to, in that case, it would

22   seem to me that RAK should intervene.

23           And so I guess, counsel for

24   defendants, I'd like you to consider that and

25   get back to me, say, by the end of the day

1    Thursday, if you think you can do that.  I don't

2    know if that requires you to talk to RAK or just

3    to convene among yourselves to decide if that's

4    the position you're going to take.

5             And if that is the case, I do think

6    we need to talk about intervention.  Because it

7    sounds like that is going to hold up a lot if we

8    can't actually -- it makes no sense to take his

9    deposition if he is not going to be able to

10   respond to questions on privilege that either me

11   or Judge Webster or Judge Osteen determines

12   doesn't apply.

13            MR. NEUMAN:  That makes sense.  We'll

14   confer on that pretty quickly internally.  It's

15   probably going to require us to go to RAK and

16   have a discussion.  Because, you know, I assume

17   what their response is going to be, No, we're

18   still holding privilege.  And we're just going

19   to have to figure out how to deal with that

20   situation.

21            MS. RICHEY:  You know, I think the

22   answer will be, then, that you have to

23   intervene.  In other words, if they are

24   directing you -- not you personally -- but

25   directing your client not to abide by a court

1    order, they need to intervene.  Otherwise, I

2    don't know how your client can -- if I make a

3    decision and that decision becomes binding

4    because no one appeals it to Judge Osteen -- or

5    even if they do and Judge Osteen enters an order

6    and that order says there is no privilege on

7    this document, then when your client's in a

8    deposition, he has got to respond.

9              And if RAK is going to tell them, You

10   can't, then I think it behooves everybody --

11   particularly, your client -- for RAK to

12   intervene and take the heat on that and --

13             MR. NEUMAN:  Understood.

14             MS. RICHEY:  Okay.  So I think if you

15   come back and say we can't -- we're still

16   subject to RAK's direction on this, I think

17   we're at a position where RAK probably ought to

18   intervene.  Or RAK would -- if RAK doesn't want

19   to intervene, then RAK would need to say --

20   however that happens, but you would need to tell

21   me if there is a decision that this document or

22   documents are not subject to privilege, then the

23   client will testify about this and we will

24   produce them.  In other words, that you're free

25   of RAK's direction.

1            MR. NEUMAN:  Understood.

2            MS. RICHEY:  I see that you're in a

3    tough situation.

4            Okay.  So you all are going to

5    confer.  I would like if -- this week is --

6    we're on -- given what needs to happen before a

7    meet and confer, and given that we don't know

8    privilege, we won't know all of the answers to

9    the privilege answers right away, do you think

10   you all could meet and confer by the end of the

11   day on Monday the 22nd and come up with some

12   dates for deposition?  It would be two dates,

13   three hours and three hours?

14           MR. NEUMAN:  Sure, we can do that.

15           MS. RICHEY:  Okay.  And then also, at

16   the same time of that meet and confer, talk

17   about the topics and see if you can agree on --

18   what you can agree to on the topics.  If there

19   are things that can be resolved before the

20   deposition, I would like to try to resolve them.

21           And then meantime, if I hear from you

22   all by the end of the day on Thursday, did I

23   say?  I think that was right.  About getting up

24   with RAK, and the response is we can't, we have

25   to do what RAK says, then I think I should

1    probably let Judge Osteen know that we might

2    need to deal with an intervention pretty

3    quickly.

4                Does RAK have U.S. counsel?  I saw

5    the one letter from --

6                MR. NEUMAN:  It does, yeah.

7                MS. RICHEY:  That was that firm.  I

8    can't remember -- it wasn't a firm I was

9    familiar with.

10                But that's still their counsel?

11                MR. NEUMAN:  Yes.

12                MS. RICHEY:  That letter?

13                MR. NEUMAN:  Yes.

14                MS. RICHEY:  Okay.  Well, then I will

15    presume you're in contact with that counsel.

16                MR. NEUMAN:  That's who I will

17    contact about this, yeah.  And I'll do my best

18    to get a response from them.  It's also going to

19    be - hinge upon what some of the case law says,

20    too.  If RAK takes the position and we can

21    support it by case law that intervention is not

22    necessary or not required in order to protect

23    privilege, that changes the dynamic a bit too.

24    That goes hand in hand with the research we'll

25    do prior to that.

1            MS. RICHEY:  Right.  But I do think

2    if that is true, if you're allowed to assert the

3    privilege, then it also seems to me that that

4    means that your client has to abide by whatever

5    the Court says about that privilege.  And you

6    might decide -- and I'm just -- you didn't say

7    this, I am -- you might decide you need some

8    cover on that, and you might want RAK to

9    intervene for that reason.  I'll let you make

10   that call.

11            MR. NEUMAN:  Understood.

12            MS. RICHEY:  So I think the question

13   I need to know is, is it the defendant's

14   position that no matter what I say or the Court

15   says -- and I don't want you to put this in

16   writing necessarily.  I don't want it to be some

17   statement that your client is not going to abide

18   by a court order, but maybe the decision is that

19   RAK is the party that is going to ultimately be

20   objecting to any decisions about privilege.  And

21   that is the answer, that in other words, RAK

22   hasn't given your client full authority to make

23   decisions on that, let me know.

24            I think I know what the answer will

25   be, more than likely.  And then I think we've

1    got to look at intervention.  And I'll just have

2    to talk to Judge Osteen about how that -- how

3    that goes.

4              MR. NEUMAN:  Okay.  Appreciate that.

5              MS. RICHEY:  Have I answered -- is

6    there something I've missed?  I feel like there

7    is so many things we've talked about.  Does

8    everyone understand what's going on?  I'm going

9    to write something up, not a formal document

10   just yet, but just sort of a scheduling thing.

11             Anything that I have missed that

12   anyone has a question about?

13             MS. BRIGGERMAN:  I don't think so.

14             MS. RICHEY:  Okay.  Let me just make

15   a couple of comments.  And I realize we've gone

16   way over.

17             Thank you, Madam Court Reporter, for

18   hanging in there.

19             We are all under tight time

20   restrictions, you know, under the order that --

21   the joint statement of agreement that you all

22   came up with.  I'm supposed to decide these

23   things within a week.  It is not a directive.

24   It is aspirational, I know.

25             I think we'll move faster going

1    forward because I won't have to go back and read

2    reams of documents to get up to speed since I

3    now have a context that I didn't have until you

4    all started sending me documents and I started

5    reading.  It would make it quicker going

6    forward, though, if you want me to read -- like,

7    in a couple of instances, somebody would provide

8    me briefing from earlier motions.  I've read

9    everything you've asked me to read, and I will

10   do that.  But it might make it go quicker if you

11   do that in the future to tell me what you want

12   me to read in that brief, rather than the whole

13   thing.  Maybe you wanted me to read the whole

14   thing.

15            It would also help in these motions

16   if you're talking specifically about a failure

17   to produce or respond to tell me the exact

18   discovery question, the number, and then provide

19   me with the answer.  Just, it would make it go

20   much faster.

21            I know that it has been a problematic

22   case and it's been difficult to work together on

23   it.  I'm going to try ideally to help you all do

24   that and make decisions where that can't be

25   done.

1          I also want this to be efficient for

2     your clients.  And so every time I read

3     something that's timed, I'm happy to spend the

4     time, but I don't want to waste your client's

5     money.  So -- but if you give it to me to read,

6     I'm going to read it.  I have read everything

7     you have given me to read.  So that is all that

8     I have.

9          Anything else from anybody?

10          Okay.  Well, we're at 6:00.  We're

11     just a little over.  Thanks everybody for your

12     time today.  And I'll send out an e-mail, if not

13     later tonight, then first thing in the morning

14     with what our next steps are and how we're going

15     to proceed.

16          MR. NEUMAN:  Thank you very much.

17          MS. BRIGGERMAN:  Thank you,

18     Ms. Richey.

19          MR. RAND:  Thank you for your time

20     this afternoon.

21          MS. RICHEY:  Thanks, Madam Court

22     Reporter.

23          (Time noted: 6:03 p.m.)

24

25

```
 1               C E R T I F I C A T E

 2    STATE OF NEW YORK )

 3                      :  SS

 4    COUNTY OF NEW YORK)

 5

 6              I, Adrienne M. Mignano, a Registered

 7    Professional Reporter and Notary Public within and

 8    for the State of New York, do hereby certify the

 9    within is a true and accurate transcript of the

10    proceedings taken on January 16, 2024.

11              I further certify that I am not

12    related to any of the parties to this action by

13    blood or marriage, and that I am in no way

14    interested in the outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto

16    set my hand this 18th day of January, 2024.

17

18

19              ADRIENNE M. MIGNANO, RPR

20

21

22

23

24

25
```