# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 20-CV-954-WO-JLW

FARHAD AZIMA,

    Plaintiff,

    v.

NICHOLAS DEL ROSSO and VITAL
MANAGEMENT SERVICES, INC.,

    Defendants.

**SPECIAL DISCOVERY MASTER'S
REPORT AND DECISION # 6**

    Pursuant to the Court's Order of December 29, 2023 [Doc. 313] and the provisions of Rule 53 of the Federal Rules of Civil Procedure, Alice C. Richey, as the appointed Special Master, submits this Special Discovery Master's Report and Decision # 6 (the "Report").

    The Report addresses five motions:

A.  Defendants' Motion for Sanctions (the "Def. Sanctions Motion").

B.  Defendants' Motion to Compel Production of Documents, and Comply With the Order Requiring Supplementation of Interrogatory Answers (the "Motion to Compel").

C.  Plaintiff's Motion for Sanctions (the "Pl. Sanctions Motion").

D.  Defendants' Motion to Compel Production of Material Relating to Berkeley Research Group, LLC (the "Berkeley Motion").

E.  Plaintiff's Motion Regarding Laptop (the "Continued Laptop Motion").

## A.  Def. Sanctions Motion

On January 10, 2024, Defendants submitted to the Special Master "Defendants' Motion to Compel Plaintiff to Identify His Trade Secrets" (the "Trade Secrets Motion"). As part of its response to that motion, Plaintiff provided "Exhibit A" which he stated was "a

Case 1:20-cv-00954-WO-JLW   Document 349   Filed 04/19/24   Page 1 of 24

culled set of specific trade secrets examples." On February 6, 2024, the Special Master issued Special Discovery Master's Report and Decision #1 ("Report #1"). In connection with the Trade Secrets Motion, Report #1 provided instructions to Plaintiff with respect to identifying his trade secrets.

Specifically, Plaintiff was to:

1. Supplement his responses to RFP 1 – 16, and ROGS 3 – 8, and 10. In doing so, Plaintiff was to identify by Bates number the previously produced documents responsive to certain requests and produce any additional responsive documents;

2. Plaintiff's trade secrets were to be identified by specific Bates numbered pages. Bates ranges were only acceptable if each page within the Bates range contained trade secrets; and

3. If a particular trade secret constituted only a portion of the content on a particular Bates numbered page, the trade secret was to be further identified by highlighting or circling the trade secret on the particular page, unless the trade secret was a compilation as recognized by North Carolina law.

Report #1, at p. 22.

On March 1, 2024 Plaintiff served his "First Supplemental Objections and Responses to Defendants' First Set of Requests for Production" ("RFP Supplemental Responses") and his "Second Supplemental Responses and Objections to the First Set of Interrogatories from Defendants" (the "ROG Supplemental Responses") (together the "Supplemental Responses").

On April 2, 2024, following a March 27, 2024 status conference and in response to questions from the Special Master regarding the Trade Secrets Motion and another motion[1],

---

[1] That motion was "Defendants' Motion to Compel ALG Transportation Inc. to Submit to a Deposition and Produce Documents," which was resolved by Special Discovery Master's Report and Decision #5.

2

Plaintiff provided a "Trade Secret Identification" chart (the "Trade Secrets Chart") to "further clarif[y] the trade secrets he intends to reply upon at trial." Plaintiff stated that "to avoid any confusion, this chart replaces any prior submission Plaintiff has made." The Trade Secrets Chart lists 1.) the trade secret number (1 – 39); 2.) the Bates range for each trade secret, separately noting the Bates range of individual documents and any attachments; and 3.) a "description" of the trade secret.

       1.  <u>Arguments</u>

Defendants state that instead of identifying the trade secrets within the original chart produced by Plaintiff ("Exhibit A"), Plaintiff produced additional documents on March 1, 2024 and provided supplemental interrogatory responses that referenced documents both within and outside of Exhibit A. Defendants also note that Plaintiff "continues to maintain that the trade secrets identified in his interrogatory responses are just '"examples,"' and that Plaintiff "fails to describe how they satisfy the statutory definition of trade secrets, among other deficiencies." Defendants state that Plaintiff did not highlight or circle all the trade secrets in the documents, and that on the occasions when Plaintiff did, the highlighting was inadequate. Finally, Defendants note Plaintiff's statements in the ROG Supplemental Responses at Interrogatory 3 that he has "produced and identified *at least* the following trade secrets" (emphasis added) and that certain items are only "examples" of trade secrets, arguing that such equivocation leaves "Defendants uncertain of what they are alleged of having misappropriated."

Plaintiff responds that he has fully complied with Report #1 and has identified his trade secrets with specificity. Plaintiff says that the Supplemental Responses identify the trade secrets by Bates number and type and disputes that the responses were an entirely new set of documents from those previously produced; rather only two additional documents

3

were added to the prior identification. Plaintiff also contends that he highlighted certain documents as required by Report #1.

    2. <u>Decision of the Special Master</u>

Report #1 required Plaintiff to identify by Bates number all trade secrets documents (using a range only if all documents within it were trade secrets) and where a trade secret was only a portion of a document, to further identify the trade secret with highlighting.

In his supplemental response to Interrogatory 3, Plaintiff gave a recitation of the types of trade secret documents he had previously produced and apparently produced two additional documents. In response to the Def. Sanctions Motion, Plaintiff produced a chart described as a "cross reference between Exhibit A and the [Supplemental Responses]…to avoid further confusion." This chart shows two documents listed in the Supplemental Responses that were not on Exhibit A. As noted above, following the March 27th status conference, Plaintiff submitted the Trade Secrets Chart in order to "further clarify the trade secrets he intends to rely upon at trial."  The Trade Secrets Chart is a much clearer and complete document than either Exhibit A or the cross-reference chart, and provides Defendants with a road map to identify the specific bates pages claimed as trade secrets, including identifying parent emails and attachments, and noting where the trade secret is a compilation. When considered in conjunction with the Plaintiff's descriptions of these documents in response to Interrogatory 3, the Plaintiff has for the most part sufficiently identified his trade secrets. However, to provide additional clarity with respect to the identification, Plaintiff should provide a verified supplement to the ROG Supplemental Responses that does the following:

1. Attaches and describes the Trade Secrets Chart, particularly noting that it replaces all prior submissions with respect to Plaintiff's trade secrets;

4

2. Updates, as necessary, the references to and descriptions of specific Bates numbers within the responses so that they correlate precisely to those identified in the Trade Secrets Chart;

3. Deletes the phrase "at least" from the response to Interrogatory 3. The use of this phrase suggests that Plaintiff may know of additional trade secrets which he is not identifying and describing in response to the interrogatory. At this point in the litigation, Plaintiff should have identified and described all trade secrets of which he is aware. Additionally, throughout the response to Interrogatory 3, Plaintiff points to certain documents as "specific examples" of a certain category of trade secret. As with the phrase "at least," this language suggests that there may be other, unidentified trade secrets which are not listed in the response. Now that Plaintiff has produced the Trade Secrets Chart and stated that it represents the "trade secrets he intends to rely upon at trial," this qualifying language should not be used; and

4. With respect to FA_MDNC_01027231, the document cited by Defendants as containing inappropriate highlighting, Plaintiff should clarify in his response whether he provided the highlighting or, as noted in Plaintiff's response to the Motion, it was in the native file.[2]

---

[2] While Defendants state in the Motion, that "Plaintiff did not highlight or circle all the trade secrets either in previously-produced documents or the new set," only one document was provided to the Special Master to demonstrate this assertion – Exhibit 4. That document highlights the word "or" and no other language. Plaintiff responded that this document was not identified as a trade secret and that the highlighting appears in the native file. However, the document is specifically included in the Trade Secrets Chart at Trade Secret #39, which Plaintiff lists as a "compilation." As noted in Report #1, no highlighting is required if an asserted trade secret is a compilation under North Carolina law. *See* Report #1, at p. 22. Defendants were rightfully confused by the highlighting on the document.

Finally, although Federal Rule of Civil Procedure 53 does permit a Special Master to impose on a party any noncontempt sanction provided by Rule 37, the Special Master declines to impose sanctions at this time.

### B. Motion to Compel

1. Arguments

The Motion to Compel addresses Plaintiff's response to Defendants' Fifth Request for Production of Documents ("5th RFP") and also to certain interrogatories (the "Interrogatories"). With respect to the 5th RFP, Defendants take issue with Plaintiff's objection to producing any documents which are outside the temporal scope of March 1 2015 to October 15, 2020. Additionally, Defendants object to Plaintiff's responses to RFPs 1, 3, 6, 7, 12, and 16, as more fully set forth in Exhibit C to the Motion to Compel. With respect to the Interrogatories, Defendants state that those responses are "similarly deficient" and by example, cites the Plaintiff's responses to Interrogatories 5, 6, 7, and 10 noting only that "Plaintiff did not meaningfully answer any of the foregoing on an individualized basis."

Plaintiff responds that he has fully responded to the 5th RFP, and that the requests are "unmanageably overbroad and unduly burdensome," in part because the requests are not limited by time period. With respect to the Interrogatories, without specifically referring to Interrogatories 5, 6, 7, or 10, Plaintiff states generally that he has correctly supplemented the responses as required by Report #1 (which required supplementation of these specific interrogatories, among others). Plaintiff also notes that "[i]n some instances, these answers were organized by category of trade secret rather than individual trade secret, however Plaintiff's responses still provide the relevant information." Plaintiff does not respond directly to Defendants' complaint that he has improperly applied the temporal scope.

2. Special Master Decision

Temporal Scope:

6

In the Court's Order dated July 25, 2023 [Doc. 248] (the "July 2023 Order"), the Court set a temporal scope of March 2015 to October 15, 2020 (the "Temporal Scope") for the then-pending discovery, noting that the Plaintiff's allegations extended back to early 2015 and the Complaint was filed on October 15, 2020. In Report #1, the Special Master applied the Temporal Scope as to some, but not all, of the discovery addressed therein, and in later orders has applied it in some instances and not in others. For example, the Special Discovery Master's Report and Decision #5 concluded that if any trade secret document identified by Plaintiff referred to a creation date outside of the Temporal Scope, discovery could be had outside the scope.

The 5th RFP appears to seek information gleaned mostly, if not entirely, from Plaintiff's trade secrets document production. For example, FA_MDNC_01011825 (cited in Exhibit C) is a document listed on the Trade Secrets Chart. The cover page of the document states it is the "Tbilisi International Airport MRO Business Plan," dated April 2014, which is outside the Temporal Scope. The Temporal Scope is not intended to prevent relevant discovery and here, where the Plaintiff has claimed that a document predating March 2015 is a trade secret, Defendant is entitled to probe whether it is in fact a trade secret protectable under North Carolina law and, if so, how it fits into Plaintiff's damages scheme, even if the inquiry requires the production of information outside the scope. Further, it may be the case that a trade secret document within the Temporal Scope requires the production of documents outside the scope in order to provide relevant historical context, including information reflecting creation/development, secrecy efforts, or value. Thus, Plaintiff should not withhold any otherwise relevant documents in response to the 5th RFP on the basis of the Temporal Scope.

RFPs 1, 3, 6, 7, 12 and 16:

Defendants complain that Plaintiff improperly limited his responses to RFPs 1, 3, 6, 7, 12 and 16 to "tax records, contracts, or non-disclosure agreements." Defendants state that the requests "were designed to elicit information [establishing] whether the documents identified as containing trade secrets meet the statutory definition of a trade secret." Citing *Area Landscaping, LLC v. Glaxo-Wellcome*, 586 S.E.2d 507 (N.C. App. 2003), Defendants list the factors that a North Carolina court will take into consideration when making this determination:

1. The extent to which information is known outside the business;

2. The extent to which it is known to employees and others involved in the business;

3. The extent of measures taken to guard the secrecy of the information;

4. The value of information to business and its competitors;

5. The amount of effort or money expended in developing the information; and

6. The ease or difficulty with which the information could properly be acquired or duplicated by others;

(the "Trade Secret Factors"). *Id.* at 511 (a court "should consider the following factors"); *see also, Spirax Sarco, Inc. v. SSI Engineering, Inc.*, 122 F. Supp. 3d 408, 425-426 (E.D.N.C. 2015) (applying North Carolina law and listing same factors). RFPs 1, 3, 6, 7, 12, and 16 should be evaluated in the context of these factors. The RFPs each seek the same information about certain entities, with one exception noted below. Evaluated in the context of the Trade Secret Factors, the RFPs are not sufficiently limited to eliciting information to assist in the evaluation of the alleged trade secrets. However, Plaintiff's limitation to providing only "tax returns, contracts, and non-disclosure agreements" is similarly insufficient.

Plaintiff should respond fully to these requests, not limited by the Temporal Scope and as modified by this Report (modifications are italicized; brackets are intended to reflect deleted individual information not present in each request]):

8

a. All documents concerning any business, commercial and/or client or customer relationship between You and [entity], or any party acting on behalf of You or [entity] *to the extent they reflect or relate to the Trade Secret Factors and any alleged trade secret.*

b. Contracts or subcontracts, invoices, bills, requests for payment, statements of work, change orders and/or proposals *to the extent they reflect or relate to the Trade Secret Factors and any alleged trade secret.*

c. Documents *sufficient to show* the period during which You had any relationship with [entity];

d. Tax returns, income statements, balance sheets, cash flow statements or other documents concerning any income or revenue obtained by You from [entity] *to the extent they reflect or relate to the Trade Secret Factors and any alleged trade secret;*

e. Documents showing efforts You made to keep your relationship and/or work for [entity] a secret and/or confidential *to the extent those efforts reflect or relate to efforts to guard the secrecy of any alleged trade secret*;

f. Documents showing any value obtained by You from keeping your relationship and/or work for [entity] a secret *to the extent they reflect or relate to the value of any alleged trade secret*;

g. Documents showing disclosure to any third party of your relationship with [entity] *to the extent such disclosure reflects or relates to the Trade Secret Factors and any alleged trade secret*;

h. Documents showing all drafts of the document bates stamped number [specific Bates number(s)], including documents *sufficient to show* the identity of each person who drafted the foregoing document [Note: this request is not included in RFP 1] *and to the extent they reflect or relate to the Trade Secret Factors and any alleged trade secret*;

i. All documents concerning or pertaining to the above data or information showing that any portion of that data or information was used for any purpose by any third party, including but not limited to the third party who used such data or information, how it was used, and how that use impacted Plaintiff, if at all, *to the extent they reflect or relate to the Trade Secret Factors and any alleged trade secret.*

j. As with earlier discovery responses, where Plaintiff agreed to produce documents, he stated that he would "conduct a reasonable search." As noted in Report #1, a search by either Party for responsive documents is reasonable only if it meets the requirements of Federal Rules of Civil Procedure 26 and 34. As necessary, Plaintiff should supplement to provide the results of a search complying with these rules.

Interrogatory Nos. 5, 6, 7, and 10.

Interrogatory Nos. 5, 6, and 7, seek information as to each alleged trade secret as follows:

9

1. All facts supporting [Plaintiff's] ownership of the trade secret (ROG 5);

2. All facts regarding how the trade secret derives commercial value from not being generally known (ROG 6); and

3. All measures taken by Plaintiff to preserve the secrecy and confidentiality of the trade secret (ROG 7).

Plaintiff responded to each by category, i.e., "financial forecasts," "business plans," "proposals," and "government contracting," with the exception of the Plaintiff's rolodex which he identifies as a "compilation of information…assembled over nearly 50 years…." Plaintiff's response regarding his rolodex is sufficient with respect to Interrogatories 5, 6, and 7. However, Plaintiff should supplement his responses to those interrogatories with respect to all other trade secrets listed on the Trade Secrets Chart, and include in the response all information requested in these interrogatories. These requests go directly to Plaintiff's burden under North Carolina trade secrets law to prove the elements of a trade secrets claim as outlined by the North Carolina Trade Secrets Protection Act (§66-152).

Interrogatory No. 10 seeks information regarding Plaintiff's damages including each element of damages, the method of calculation, and the amount attributable to each claim. Plaintiff stated in its supplemental response to this interrogatory, that a "complete response to this Interrogatory should be deferred until discovery is complete" citing Federal Rule of Civil Procedure 33(a)(2). This Rule states that a "court may order that" an interrogatory not be answered until "designated discovery is complete, or until a pretrial conference or some other time." That has not occurred here, and it is not clear whether Plaintiff has withheld any information based on this rule or any other objection interposed to the interrogatory. Plaintiff should supplement his response and provide as complete information as he has at this time. At the very least, Plaintiff should be able to describe each element of damages, the method of calculation or formula for each element, and the factual bases of liability as known

by Plaintiff at the time of his response. The Federal Rules of Civil Procedure contemplate supplementation if new information is learned that may require a further supplement. But that does not relieve Plaintiff of the obligation to fully respond with the knowledge he has now.

### C. Pl. Sanctions Motion

1. Arguments

Plaintiff argues that Defendants have failed to adequately supplement their responses to Plaintiff's discovery in accordance with Report #1. Plaintiff is concerned by the lack of documents produced by Defendants in their supplemental responses and questions whether Defendants have undertaken the searches they were required to do pursuant to Report #1. Plaintiff seeks sanctions for Defendants' "delay" in producing documents and seeks an order compelling Defendants to cure their alleged deficiencies. In addition, Plaintiff seeks an affidavit from counsel for Defendants describing their search, collection, and review process, identifying the RFPs for which Defendants withheld documents based on the Relevance Limitation[3], and identifying all responsive documents that no longer exist and explaining the circumstances surrounding their destruction.[4]

Defendants state they have appropriately responded to each discovery request and that Plaintiff has not been prejudiced by any delay. With respect to their supplemental responses, Defendants state they searched for additional documents and produced or logged

---

[3] The "Relevance Limitation" was set forth in Report #1 and limits certain discovery requests to information or documents relating to i.) Plaintiff and Plaintiff's Associates, as defined in the Definitions in Plaintiff's First RFP; ii.) any personal or business enterprise or financial transaction, involving or related to Plaintiff or Plaintiff's Associates; or, iii.) any documents, communications, or data that belonged or belong to Plaintiff or any company in which Plaintiff holds an ownership interest.

[4] Plaintiff also argues that "Defendants have failed to take appropriate steps to secure Mr. Del Rosso's laptop for review in violation of [Report #1]." This issue will be addressed separately below.

any responsive ones, and that the small number of supplemental documents produced is only indicative of a lack of responsive documents within their possession, custody, or control. Defendants argue that sanctions are not appropriate under the circumstances.

    2. Special Master's Decision

Plaintiff provided "Appendix B" to the Motion for Sanctions, which Defendants argue was a violation of the agreed word limit for motions to the Special Master. Defendants asked for the opportunity to respond separately to Appendix B and were provided the same. The Special Master has considered all submissions of the Parties and has reviewed carefully the "Defendants' Supplemental Discovery Responses Pursuant to Special Discovery Master's Report and Decision #1" (the "Def. Supplemental Responses"). After review, the Special Master directs the Defendants to further supplement as follows:

    a. "Other sources of information:" Defendants state that they have "searched all accessible email accounts used by Mr. Del Rosso or VMS." Defendants should identify all email addresses that might contain responsive information and state briefly why they are no longer accessible;

    b. Responsive Bank Records: Defendants state that they have "reviewed and confirmed that they do not possess any responsive documents beyond what has already been produced by PNC Bank in response to Plaintiff's subpoena [to PNC]." However, Plaintiff is entitled to know what responsive documents are in Defendants' possession and those documents, even if already produced by PNC, should be produced by Defendants using Defendants' distinctive Bates prefix;

    c. Plaintiff's First Set of Requests for Production (the "Plaintiff's First RFP"): Report #1 required Defendants to "supplement their written responses to Plaintiff's First RFP, and produce all responsive documents [subject to General Instructions]."

Report #1, at page 10. Defendants shall provide a supplement to the Plaintiff's First RFP in full compliance with the General Instructions included in Report #1;

d. <u>Request for Production #40</u>: Defendants' response applied the Relevance Limitation; however, it does not apply to this request (*see* Report #1 at p.12). Additionally, the response does not otherwise comply with the precise guidelines set out in Report #1. Therefore, Defendants should supplement their response in conformance with Report #1, to include a search for responsive documents without application of the Relevance Limitation;

e. <u>Interrogatory #1</u>: Defendants' response is incomplete as it does not provide any information other than the names of persons or entities. Defendants should fully respond to this interrogatory;

f. <u>Interrogatory #9</u>: Defendants did not supplement Interrogatory #9, as required by Report #1; and

g. <u>Interrogatory #16</u>: Defendants improperly apply the Relevance Limitation to this interrogatory. They should supplement their response without application of the Relevance Limitation.

Finally, although Federal Rule of Civil Procedure 53 does permit a Special Master to impose on a party any noncontempt sanction provided by Rule 37, the Special Master declines to impose sanctions at this time.

**D. The Berkeley Motion**

1. <u>Arguments</u>

In March 2023, Defendants served its First Set of Requests for Production to Plaintiff ("Def. First RFP") seeking, among other things, documents that Plaintiff's "Agents downloaded from the WeTransfer links." On April 25, 2023, Plaintiff produced certain responsive documents; however, Defendants state that Plaintiff produced "only materials

13

downloaded in 2019." On August 8, 2023, Defendants issued a subpoena to Berkeley Research Group, LLC ("BRG") seeking documents relating to an expert report (the "Expert Report") published in the Supreme Court of Queensland, Australia in the matter of *Farhad Azima v. Didtheyreadit.com and Readnotify.com"* (BS 13611/20). A second subpoena, seeking the same documents, was issued on December 11, 2023 to Christopher W. Tarbell ("Tarbell"), a former BRG employee who authored the Expert Report. BRG responded to its subpoena on August 25, 2023, by simply stating "None" with respect to the requested documents. It is not known to the Special Master whether Tarbell responded, but Defendants advise that neither produced any information in response to the subpoenas.

With respect to the relevance of the information sought, Defendants point to Paragraph 117 of the Expert Report which they say is an opinion that certain modifications to WeTransfer sites containing Plaintiff's data occurred in 2017, rather than 2018 or 2019 as set forth in the Complaint, and thus relevant to the accrual of Plaintiff's claims. The subpoenas, among other things, seek documents and data supporting the statement made by Tarbell in Paragraph 117 of the Expert Report. Defendants state they were recently notified by Berkeley that it had located some data and turned it over to Plaintiff and Tarbell, but Plaintiff refuses to release the information to Defendants.

Plaintiff responds that the documents sought by the Berkeley Motion were already produced by Plaintiff in April 2023 – specifically the Plaintiff's data that "his expert [Tarbell] downloaded from the WeTransfer website in 2018." Plaintiff says that Defendants are simply attempting to obtain "premature discovery" into Tarbell's expert opinion, noting that Tarbell is Plaintiff's expert in this case, a status disclosed to Defendants "in December 2023." With respect to the recent discovery by BRG of Tarbell's expert files, Plaintiff states that "[t]o the extent those files include the WeTransfer Files that Tarbell downloaded, the WeTransfer files are *the same data files that Plaintiff produced to Defendants in April 2023"* (emphasis in

14

original). Plaintiff says that this data was provided to Plaintiff by BRG and Tarbell, and produced to Defendants in April 2023.  Finally, Plaintiff states that Defendants will receive "all responsive, non-privileged documents in connection with [Tarbell's expert report in this matter]."[5]

    2.  Special Master's Decision

    Defendants cite to their requests in the Def. First RFP seeking information regarding the WeTransfer download(s). Plaintiff says it produced responsive documents in April 2023[6] noting that there was a download in 2018 done by BRG and Tarbell, that BRG and Tarbell provided that data to Plaintiff, who in turn produced a copy to Defendants in April 2023. However, what Defendants are seeking through the subpoena and requests is information regarding *all* downloads, including that in 2018. Request Nos. 16, 17, and 18 of the Def. First RFP, seek documents that Plaintiff or his "Agents downloaded from the WeTransfer links which you contend were modified in [May 2018 – RFP 17, June 2019 – RFP 18]" and documents "concerning" those downloaded documents.  The references to May 2018 and June 2019 do not limit the requests to *downloads in 2018 or 2019*; the references to these dates are simply how Plaintiff describes those links in Paragraphs 24 and 26 of the Complaint. Further, with respect to Plaintiff's sequence of events (download in 2018, data provided to Plaintiff, who then provided it to Defendants in April 2023), Defendants note that while the Plaintiff made its production in April 2023, it was not until sometime in March 2024, that BRG located information presumably responsive to the subpoena and turned it over to

_____

[5] In preparing this Report, the Special Master also reviewed "Plaintiff Farhad Azima's Responses and Objections to the First Set of Requests for Production from Defendants' Nicholas Del Rosso and Vital Management Services, Inc.," served May 1, 2023.

[6] It is not clear whether the production is for documents from a 2018 download or a 2019 download, and also not clear whether there was more than one download. Defendants state that Plaintiff produced "only materials downloaded in 2019, whereas Plaintiff states that "BRG and Tarbell downloaded data from WeTransfer at Plaintiff's direction in 2018."

15

Plaintiff. It is unclear from Plaintiff's response whether he has searched this additional information for documents responsive to the Def. First RFP.

Federal Rule of Civil Procedure 34 requires the production of documents within the "responding party's possession, custody, or control." It is clear from the Parties' submissions that both BRG and Tarbell acted as agents of Plaintiff with respect to the WeTransfer files, and other issues. Any documents in the possession of BRG or Tarbell that are related to the work it performed for Plaintiff are, under even the most restrictive view of "possession, custody, or control," available to Plaintiff and should be reviewed by him to fully respond to the Def. First RFP. This is especially so when it appears that Plaintiff has received additional information from BRG in response to the BRG subpoena, following Plaintiff's production of responsive documents in April 2023.

Therefore, Plaintiff should search all documents created by its agents, BRG and Tarbell, including the documents apparently already delivered to Plaintiff, and supplement its response to the Def. First RFP. In so doing, the Plaintiff should not withhold any documents that predate 2018 or 2019, so long as they are otherwise responsive.[7]

### E. **Continued Laptop Motion**

#### 1. Background

This Report addresses continuing issues regarding the Plaintiff's Motion to Compel Defendants to Search Their Laptop and Other Sources for Responsive Information (the

---

[7] RFPs 17 and 18 seek "documents *concerning* those documents that [Plaintiff or his agents] downloaded from the WeTransfer links…" (emphasis added). In the Def. First RFP Definitions, "'Concerning means any fact, document, or communication that supports, evidences, refutes, contradicts, relates, or refers to any fact or allegation." If Plaintiff has information that either refutes or contradicts that the WeTransfer or other links were modified in 2018 and 2019 as alleged in Paragraphs 24 and 26 of the Complaint, or that downloads only occurred in 2018 or 2019, Plaintiff should provide that information in response to these requests.

"Laptop Motion") which was first addressed in Report #1. In the Laptop Motion, Plaintiff asserted that a personal laptop belonging to Defendant Del Rosso (the "Laptop") was in the possession of Mr. Del Rosso or his attorneys, contained relevant information, and should be searched. Defendants agreed that the information on the Laptop could be relevant and agreed that the Laptop will be searched once it is available. Defendants disagreed that the Laptop was in the possession of Mr. Del Rosso or his attorneys, stating that the Laptop is subject to a process set forth in an order submitted in proceedings in the United Kingdom, specifically, the "Del Rosso Proceedings (Claim No. KB-2023-0028)" (the "UK Proceedings"), and therefore not in the possession of Mr. Del Rosso or his attorneys in this matter.

In Report #1, the Special Master agreed with the Parties that the Laptop could have relevant information on it and should be searched by Mr. Del Rosso's North Carolina counsel. The Special Master directed that Defendants take a number of steps to secure the Laptop (or a forensic image), and advise the Special Master of compliance with the same. Thereafter, counsel for Defendants made a report to the Special Master on February 16, 2024. Plaintiff responded with respect to the current location of the Laptop and advised that Plaintiff's UK counsel had submitted a proposal to Mr. Del Rosso's UK counsel that would allow (subject to approval by the UK court) the Laptop to be provided to Mr. Del Rosso's US counsel. Plaintiff also advised that there would be a hearing on March 8, 2024 in the UK Proceedings to consider Plaintiff's "Third Party Disclosure Application" to have the Laptop reviewed by Mr. Del Rosso's UK counsel for disclosure in the UK Proceedings. Finally, Plaintiff advised that other parties whose data may be on the Laptop had until April 9, 2024 to make their own Applications which must be resolved by the UK court before the Laptop is released to Mr. Del Rosso's counsel for review.

In response, the Special Master convened a conference on February 21, 2024 to discuss the Laptop with all counsel. That conference raised additional questions and a second

conference was convened on February 23, 2024. Following that conference, the Special Master asked the Parties to provide a written memo by March 1, 2024, with an update on the Laptop, addressing certain topics. Both Parties made submissions as requested, and continued to submit updates to the Special Master regarding the Laptop. In a February 23, 2024 email to the Special Master and his March 1, 2024 submission, Plaintiff advised that a forensic analysis of the Laptop in the UK had resulted in a report (the "A&M Report") which "determined that Mr. Del Rosso downloaded hacked data onto his laptop, transferred that data to an external hard drive (the 'Fortress Device') and attempted (but failed) to delete data" Pl. March 1, 2024 submission at page 2.[8]  The Parties made further submissions and updates to the Special Master and on March 10, 2024, the Special Master asked counsel for Defendants to provide a status update as to four specific items including whether UK laws/rules prohibit the provision of the A&M Report to Plaintiff.

The Parties responded, and Defendants suggested that Plaintiff had no right to see the A&M Report because it was not responsive to any of his document requests, was not relevant to any claims or defenses, was outside the Temporal Scope (March 2015 to October 15, 2020), and could not be used in the US proceeding until referred to in open court in the UK. Plaintiff maintains that the Report is responsive to certain of his discovery requests, namely the Plaintiff's First RFP No. 7 and Plaintiff's Third RFPs 20, 21.

---

[8] Plaintiff cited to an Order entered in the UK that resulting from a hearing on a request for an injunction by Claimants Gela Mikadze and Khater Massaad, which hearing was held without notice to the Respondents, who included the Defendants. In denying the request, the court noted in Paragraph 7 of the Order that a report of  "Mr. Beckett…contained the assertion that [Del Rosso] accessed the laptop in late January 2020, the day before he was due to give evidence in one of the 5 actions and he downloaded information from the internet (which the Claimants assume contained some of their hacked information) and then transferred it to a Fortress storage device and deleted the information (only to the recycling bin, so it is still on the hard drive).  He then deleted lots of other files which the Claimants think may include their information as well."

On March 27, 2024, another status conference was held with the Parties, and among other things, the A&M Report was discussed. The Special Master requested that the parties make submissions regarding the issue of spoliation as it related to the Laptop. The Parties submitted additional submissions. All submissions, including Party emails, regarding the Laptop have been considered by the Special Master in connection with this Report.

2. <u>Arguments</u>

Plaintiff asserts that Defendants have not taken prompt steps to secure the Laptop such that it can be searched by Defendants' NC counsel for responsive documents. Plaintiff also seeks an order compelling Defendants to produce to Plaintiff's NC counsel, a copy of the A&M Report, arguing that it contains "critical evidence of hacking and spoliation," and is "evidence of Defendants' (1) prior bad acts under [Rule 404(b)(2)] and (2) violation of their independent duty to preserve relevant documents." Finally, Plaintiff argues that the information contained in the A&M Report was requested in prior discovery issued by Plaintiff, namely, request for production nos. 7, 20, and 21.[9] Finally, Plaintiff argues that the A&M Report bears on the issue of spoliation, stating that Defendants' obligation to preserve documents "related to the hacking and use of Azima's data years before this litigation was filed."

---

[9] RFP 7 seeks "[a]ll Documents or Communications Related to any attempt or effort (whether successful or unsuccessful) by Defendants or any Person to conceal the receipt, possession, transfer, or copying of any Document or Communication that belonged or belongs to Plaintiff, including, but not limited to, any attempt by Defendants or any Person to destroy or delete any such Documents or Communications."
RFP 20 seeks "[a]ll Documents and Communications Relating to Defendants' document retention, preservation, and/or destruction policies, practices, or procedures from 2014 to present."
RFP 21 seeks "[a] All Documents and Communications Relating to instructions to preserve, destroy, purge, return, transfer, move, or otherwise get rid of any documents from 2014 to present."

Case 1:20-cv-00954-WO-JLW   Document 349   Filed 04/19/24   Page 19 of 24

Defendants argue that the delays in returning the Laptop to Defendants' counsel are due to actions of the Plaintiff. With respect to Plaintiff's request to receive a copy of the A&M Report, Defendants state that it is an improper motion to compel documents and information never requested by Plaintiff in his discovery requests. Defendants state further that the information sought is not relevant to any claim or defense, and the request is tantamount to a "fishing expedition" in an effort to find "*some* evidence of a prior bad act to show 'motive, opportunity, or intent'" (emphasis in original).

3. Special Master's Decision

The Laptop

As found in Report #1, both Parties agree that the Laptop may contain relevant information and should be searched by Defendants' NC counsel for responsive documents in this matter. However, the latest information submitted from Plaintiff on March 28, 2024, indicates that the Laptop still has not been delivered to Defendants' NC counsel. Plaintiff's UK counsel proposed an amendment to the order submitted in UK Proceedings which set forth a process regarding the Laptop. According to Plaintiff, Defendants' UK counsel has not responded to the proposed amendment, or taken any other action to retrieve the Laptop (or an image) so that it can be searched by Defendants' NC counsel. A March 18, 2024 email to the Special Master from Defendants' counsel stated that pursuant to a revised consent order, "the data contained on the forensic image of the Laptop will be shared with [Defendants' NC counsel]." It is unclear to the Special Master the current status of the delivery to NC counsel of the Laptop (or an image).

Report #1 directed Defendants to take specific steps to secure the Laptop (or an image). This remains the directive of the Special Master. Because of recent developments, not all of which are clear, the Parties are directed to confer and advise the Special Master no later than 5:00 pm on April 19, 2024, of a time that works for all counsel to have another

20

status conference to discuss the Laptop. The Parties should be prepared to have the following information available to discuss at the conference:

a. The current location of the Laptop, and any images or data from the Laptop;

b. The status of all efforts to amend the UK Order;

c. Any UK legal impediments to immediate delivery of the Laptop (or an image) to Defendants' NC counsel. This should include input, as necessary, from each Party's UK counsel as to how to overcome these impediments;

d. The status of all Third-Party Disclosure Applications in the UK with respect to the Laptop and the timing related to those applications, including the date of any anticipated ruling;

e. The steps taken by both parties to advise the UK court of the NC proceeding, including that the Laptop is the subject of discovery in the NC proceeding; and

f. Any other information that will assist the Special Master in understanding the status of the Laptop and fashioning any further decisions with respect to it.

<u>The A&M Report</u>

The Special Master asked the Parties to address the issue of spoliation, including relevant case law, in their last formal submissions regarding the A&M Report. However, that issue will be sidelined, for now, for three reasons: First, the information obtained by Plaintiff about the A&M Report comes from a hearing at which the Defendants did not participate. Second, Paragraph 7 of the UK order is less than clear about the contents of the A&M Report as they relate to Defendant Del Rosso's alleged actions regarding either extraction or deletion of data from the Laptop. Finally, the Plaintiff's previously submitted discovery requests sufficiently seek information that may be contained in the A&M Report. RFP 7 seeks documents relating to any effort by Defendants "to conceal the receipt, possession, transfer, or copying of any [documents belonging to Plaintiff]' including any

21

efforts by Defendants to "destroy or delete" any such documents. RFP 20 seeks documents relating to Defendants' document retention "practices" which would include the actual activities undertaken by Defendants to preserve or destroy any documents. RFP 21 seeks documents relating to instructions to preserve, destroy, etc. any documents from 2014 to the present.

Defendants argue that because RFP 7 is limited to the deletion or destruction of documents belonging to Plaintiff, it does not cover the A&M Report because "the Report does not mention Plaintiff whatsoever (meaning there is no indication the Laptop contains or ever did contain his data."[10] However, even if there is no "indication" on the A&M Report that the Laptop contained Plaintiff's data, the lack of such an indication does not mean the Plaintiff's data is not on the Laptop or that no data of Plaintiff was deleted or destroyed. What is known is that a judge in the UK, issuing an order in another proceeding, alluded to the possible deletion, transfer, or destruction of data off of a Laptop that all Parties agree may contain relevant information in this matter. This cannot be ignored, particularly where Plaintiff's discovery requests seek information regarding the destruction of data. If the A&M Report in fact reveals that a Defendant undertook efforts to conceal or destroy information, that fact could be relevant to the claims and defenses in this matter, and could trigger additional actions.

Defendants have raised the issue as to whether UK law or the UK Court's orders prohibit the sharing of the A&M Report with non-parties to that proceeding. In their March 13, 2024 email to the Special Master, Defendants stated that their UK counsel had not been able to evaluate Plaintiff's request to receive the A&M Report or seek any necessary guidance from the Court there. Because the Special Master has determined herein that the A&M

---

[10] RFP Nos. 20 and 21 are not limited to Plaintiff's data.

Report, or at least portions of it, is responsive to the Plaintiff's discovery requests, this issue must be resolved. Therefore, the Parties are directed to provide additional information to the Plaintiff and the Special Master at the next status conference as follows:

    a.  Has the A&M Report been shared with any non-parties to the Stokoe UK proceeding?

    b.  Does Stokoe's consent to the A&M Report being shared with Plaintiff's UK counsel assist in the production of the A&M Report to Plaintiff?

    c.  Is any guidance from the UK court required to share the A&M Report with Plaintiff's counsel? If so, has it been requested and, if not, why not?

    d.  What specific UK law, rules, or court order prohibit the provision of the A&M Report to Plaintiff? If connected to the restriction of use in the US proceeding until it has been referred to in open court in the UK, when will that referral occur?

    e.  What is the status of efforts to amend the UK Order to clarify that the A&M Report can be provided to Plaintiff's counsel?

    f.  What other efforts should be made to permit the review of the A&M Report by Plaintiff?

    g.  Any additional information that will assist the Special Master.

Following the status conference referenced herein, an additional report or other communication will be issued regarding the Laptop and the A&M Report as determined at the conference.

With respect to the additional production of documents and supplementation of discovery as directed in this Report, those should be served by each Party on or before May 1, 2024.

This the 15th day of April, 2024.

_____
Alice C. Richey
Special Master

24