# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 20-CV-954-WO-JLW

FARHAD AZIMA,

    Plaintiff,

    v.

NICHOLAS DEL ROSSO and VITAL
MANAGEMENT SERVICES, INC.,

    Defendants.

**SPECIAL DISCOVERY MASTER'S
REPORT AND DECISION #7**

Pursuant to the Court's Order of December 29, 2023 [Doc. 313] and the provisions of Rule 53 of the Federal Rules of Civil Procedure, Alice C. Richey, as the appointed Special Master, submits this Special Discovery Master's Report and Decision #7 (the "Report").

The Report addresses six motions submitted to the Special Master:

1. Plaintiff's Motion to Compel Christopher Swecker to Produce Information Improperly Withheld for Privilege ("Swecker Privilege Motion").

2. Plaintiff's Motion to Compel Dechert LLP to Produce Information Improperly Withheld for Privilege ("Dechert Privilege Motion").

3. Plaintiff's Motion to Compel Dechert LLP to Produce Improperly Withheld and Redacted Documents ("Improper Redactions Motion").

4. Plaintiff's Motion to Compel Defendants, Dechert LLP, and Chris Swecker to Revise Improper Confidentiality Designations ("Improper Confidentiality Motion").

5. Plaintiff's Motion to Compel Pursuant to the Crime-Fraud Exception ("Crime-Fraud Motion").

6. Plaintiff's Motion to Compel Dechert LLP to Produce Documents Relating to Prior Allegations of Hacking by Dechert LLP (the "Hacking Motion").

All motions have been briefed by the relevant parties, as well as additional information submitted by the parties on their own and at the request of the Special Master. All submissions have been considered and with respect to each motion, the Special Master makes the following report and decision.

## Motions 1 and 2: The Swecker Privilege Motion and the Dechert Privilege Motion

Plaintiff jointly briefed the Swecker Privilege Motion and the Dechert Privilege Motion (together the "Privilege Motions"). Through the Privilege Motions, Plaintiff seeks to compel Christopher Swecker ("Swecker") and Dechert LLP ("Dechert") to produce five categories of documents:

A. Documents related to how Swecker/Dechert and Defendants obtained Plaintiff's data;

B. Documents related to the use of Plaintiff's data, including interactions with US law enforcement;

C. Northern Technology Inc. ("NTi") reports or discussions related to Nti reports;

D. Invoices and engagement letters; and

E. Communications including Plaintiff or his agents.

Additionally, Plaintiff seeks to compel Swecker and Dechert to revise privilege log entries deemed by Plaintiff to be "insufficient to evaluate privilege claims."[1]

### A. Documents Related to How Swecker/Dechert and Defendants Obtained Plaintiff's Data

1. Arguments

---

[1] Unless otherwise noted, all quotes of the Parties, Dechert, and Swecker, are from their respective submissions to the Special Master.

Plaintiff asserts that Dechert and Ras al Khaimah ("RAK") have waived any privilege over documents regarding how "they obtained Plaintiff's hacked data" ("Plaintiff's Data") because they, Defendants, "and others" have "selectively produced documents and given sworn testimony on that issue." Plaintiff cites to the June 24, 2019 Witness Statement of David Neil Gerrard ("Gerrard Statement"), provided in the matter of *Ras Al Khaimah Investment Authority v. Farhad Azima*" (Claim No. HC-2016-002798)(the "UK Proceeding"), select portions of the testimony from Gerrard at the UK Proceeding (Days 4 and 5) (the "Gerrard Testimony"), and the production by Dechert of "attorney analysis regarding the acquisition of Plaintiff's data."

Swecker responds that privilege has not been waived because he only produced potentially privileged documents if they had previously been produced and did not produce any documents to gain an advantage in litigation, citing *Window World of Baton Rouge, LLC v. Window World, Inc.*, No. 15 CVS 1, 2019 WL 3995941, at *14 (N.C. Super. Aug. 16, 2019) (*quoting United States v. Jones*, 696 F.2d 1069, 1072 (4ᵗʰ Cir. 1982)).

Dechert responds that as a matter of law, neither it nor Gerrard has authority to waive privilege on behalf of RAKIA.[2] Dechert notes that in the Gerrard Statement and the Gerrard Testimony, Gerrard expressly noted the lack of waiver. *See* Gerrard Statement at Exh. A to Dechert Privilege Motion, ¶1 ("Nothing I say or refer to in the course of this Witness Statement is intended to or does waive privilege in any communication with RAKIA or any other client."). As to the other exhibits cited by Plaintiff in support of the Privilege Motions,

---

[2] RAKIA is the Ras al Khaimah Investment Authority, which is the state investment entity for the government of RAK, and a Dechert client. *See* Compl. [Doc. 1], at Paragraph 2; *see also*, Dechert Response to Dechert Privilege Motion at p. 1. It appears that Dechert represented both Ras Al Khaimah (RAK) and RAKIA. *See* Gerrard Statement at p. 5 and 6; *see also* the Gerrard Testimony, Day 4, pp. 187-188. For purposes of the Report, there is no meaningful distinction between RAK and RAKIA.

Dechert states they were produced under the "iniquity exception" which it says is the UK equivalent of the US crime-fraud exception, and therefore privilege did not attach to those documents. Finally, Dechert notes that even if the production of those documents was a waiver, the waiver would be limited to the "'specific transaction'" and not the entire matter, citing *Lifebrite Hospital Group of Stokes, LLC v. Blue Cross and Blue Shield of North Carolina*, 2023 WL 5096281, at *4-5 (M.D.N.C. Aug. 9, 2023)

2. <u>Decision of the Special Master</u>

a. <u>Applicable Law</u>: Dechert maintains that English attorney-client privilege law applies to this matter, at least with respect to Dechert. This is so because its representation of RAK took place mostly in the UK with engagement letters adopting English law, and the engagement centered on litigation in the UK and overseas.[3] Plaintiff asserts that North Carolina law applies, pursuant to Federal Rule of Evidence 501 and interpreting case law. Swecker does not take a position either way, noting only that he has asserted privilege under both UK and US privilege laws. The cases cited by Dechert discuss the principle of comity in the federal courts, and Dechert correctly notes that North Carolina courts "recognize that comity considerations are relevant to their determination of what privilege law to apply." However, none of the cases suggest that a North Carolina federal court sitting in diversity would adopt a foreign jurisdiction's law where the claims are governed by state law, the actions complained of occurred in the state, and all the named parties are US citizens. Dechert's reasoning is insufficient to overcome the dictates of Federal Rule of Evidence 501 ("[S]tate law governs privilege regarding a claim or defense for which state law supplies the

---

[3] Dechert notes that under either North Carolina or UK privilege law, the outcome would be the same.

rule of decision."). North Carolina law governs the attorney-client privilege issues in this matter. [4]

b. <u>Waiver</u>: For its waiver argument regarding how Dechert and Swecker obtained Plaintiff's Data, Plaintiff points to the Gerrard Statement and portions of the Gerrard Testimony, along with three documents produced by Dechert (Exhibits B,C, and D to the Privilege Motions). Plaintiff does not point to a particular paragraph or line of the Gerrard Statement or Gerrard Testimony, noting only that Gerrard "provided extensive sworn testimony…about conversations with Defendants [and others] regarding the use of Defendants and NTi to obtain Plaintiff's hacked data."

With respect to the Gerrard Statement, Paragraph 1 states affirmatively that nothing in the statement "is intended to or does waive privilege in any communication with RAKIA or any other client." After a thorough review of the Gerrard Statement, the Special Master does not find any instance in which Gerrard revealed attorney-client privileged or work product information.

With respect to the Gerrard Testimony, there were several occasions in the testimony portions provided by Plaintiff in which privilege, and its possible waiver, were discussed. For example, on one occasion counsel for Dechert[5] objected that the questions were starting to seek privileged information. After a discussion with the presiding judge, the questions were

---

[4] Federal law governs work product issues in diversity cases. *See United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988) ("Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3)").

[5] Because the Special Master was only provided portions of the Gerrard Testimony, it is not possible to know for certain who the listed counsel represented. It is assumed for the purposes of this Report that "Mr. Tomlinson" is counsel for Dechert, and that "Mr. Lord" is counsel for Azima.

Case 1:20-cv-00954-WO-JLW   Document 355   Filed 05/31/24   Page 5 of 39

tailored to avoid such revelations.[6] After a thorough review of the Gerrard Testimony, the Special Master does not find any instance in which Gerrard revealed attorney-client privileged or work product information.

With respect to the three documents cited by Plaintiff in support of waiver, while they may have contained information intended to be privileged,[7] Dechert states that all three documents were produced under the English "iniquity exception," which, like the crime-fraud exception, provides that privilege does not attach to communications for an iniquitous purpose. Examined under North Carolina privilege law, which governs here, privilege will

---

[6] Following Dechert counsel's assertion that Azima's counsel was beginning to ask questions about matters on which Dechert gave advice, Azima's counsel responded that the "question of the [Massaad] investigation is something that's been explored in this case." The Court then advised that Mr. Lord can ask Gerrard "in general terms what the subject matter of the investigation was. That's clearly different from asking details about the advice." Mr. Lord agreed not to ask about the detail. *See* Gerrard Statement, Day 4, pp. 190-191. Azima's counsel then asserted that RAKIA had waived any privilege regarding the investigation of Azima because of the "material that RAKIA has already served." *Id.* at 192. The Court responded that as he read Paragraph 8 [of the Gerrard Statement] "a distinction is being drawn between the investigation of Mr. Azima and the investigation of Dr. Massaad's frauds and that seems to me a position that they're entitled to take." *Id.* Mr. Lord agreed to confine himself to the "way in which Mr. Azima featured" and not "the wider investigation for now, not other aspects, not your legal advice." *Id.* at p. 193. In a later exchange, Dechert counsel grew concerned that Gerrard might be talking about privileged documents and reminded him and the participants that Gerrard had no "authority to waive any privilege on behalf of RAKIA." The Court stated in response that it had not been "persuaded that the questions had actually impinged on any privileged matters, which is why I allowed the questions to proceed, but I haven't made any ruling on the question of privilege or waiver." *Id.*, Day 5, pp. 24-25. Finally, prior to a question being asked by Azima's counsel, he advised Gerrard, "I don't want you to answer something if there's going to be a privilege objection which applies…" and then stated, "I think I'll move on in view of that privilege point being taken…." *Id.*, Day 5, p. 140.

[7] Exhibit B expressly notes that it contains "Attorney Work Product." Exhibit C has a header on each page reading "Private & confidential and subject to legal professional privilege." The UK case provided by Dechert refers to a "litigation privilege" which appears to be the same as work product, and a "legal advice privilege" which appears to be the attorney-client privilege. *See, Civil Aviation Authority v R Jet2.com Ltd* [2020] EWCA Civ 35, ¶¶ 35, 61, 95. It is unclear what the "legal professional privilege" refers to, although a paragraph in the case (*id.*, at ¶35) suggests that the "legal professional privilege" is the same as the "legal advice privilege".

not attach to an attorney-client communication not made to seek legal advice for a proper purpose. *See Window World*, 2019 WL 3995941, at *15.

Even if the production of these documents was a waiver (that is, privilege attached and the documents were disclosed to gain an advantage in litigation), the waiver is limited to other communications relating to the same subject matter. *See Window World*, 2019 WL 3995941, at *14 ("[W]hen a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter.") (citations omitted). There is no evidence presented that all communications relating to the same subject matter were not produced.

The Special Master finds that no privilege waiver occurred by way of the Gerrard Statement, the Gerrard Testimony, or Exhibits B, C, and D.

## B. Documents Related to the Use of Plaintiff's Data

1. <u>Arguments</u>.

Plaintiff asserts that Dechert and RAK have waived any privilege over documents relating to their analysis, distribution, or other uses of Plaintiff's data by producing privileged documents reflecting such use to "instigate law enforcement investigations." In support, Plaintiff cites two documents produced by Dechert, 1) a memo from Dechert attorney Linda Goldstein to "RAKIA File" containing her notes from a meeting with the Department of Justice (DECNC-00016182); and 2) an email from Dechert to NTi, a company engaged by VMS to assist with investigations (DECNC-00010812), and two documents produced by Swecker, 1) a "summary of Azima illicit dealings with American Bank and Trust" (SWECKER_00004906-427) that was shared with the FBI, and 2) a summary of "possible criminal violations" by Azima and others (SWECKER_00003143-3158), also shared with the FBI. Plaintiff maintains that the two Dechert documents summarize meetings with or

7

requests from law enforcement, that the two Swecker documents were provided "voluntarily" and not in response to a subpoena, that grand jury subpoenas "were the exception and not the rule," and that any work product protection claimed in the Dechert documents "was clearly waived when the documents were produced."

With respect to the two Swecker documents, Swecker states that all documents produced to the FBI were done so in response to either "an understanding of confidentiality or a rolling production to grand jury subpoenas." He states further that the only circumstance under which he has produced potentially privileged documents is if they were previously produced and that they were not disclosed to obtain any advantage in litigation.

Dechert responds that the two Dechert documents cited by Plaintiff were produced "because they were *not* privileged…because they reflect communications with a government agency"(emphasis in original). Dechert states that DECNC-00016182 does not contain privileged information because it is a "factual summary of communications with a government agency;" as for DECNC-00010812, Dechert states that the unredacted information is not privileged "because it is a factual recounting of conversations with law enforcement."

2. <u>Decision of the Special Master</u>

The Special Master agrees that the two Dechert documents do not contain privileged information, either attorney-client communications or work product. DECNC-00016182 is the notes of a meeting Dechert had with the Department of Justice, which meeting included personnel from NTi and Swecker. DECNC-00010812 is an email exchange between Dechert and NTi which reflects communications with the FBI, specifically with Paul Zukas (spelled "Zucas" in the email). Neither contains attorney-client communications or apparent work product. No waiver occurred by the production of these documents.

8

With respect to the Swecker documents, both are reports prepared by NTi. Neither contains attorney-client privileged information, but they do appear to contain work product prepared by NTi, who was hired by Defendant VMS as part of its work for Dechert. The cover emails for both show their distribution to the FBI, which Swecker states was done pursuant to a subpoena or confidentiality understanding. Disclosure of these reports to the FBI, whether voluntary or not, does not constitute waiver of the work product protection. This is so because waiver requires that the disclosure "must enable an adversary to gain access to the information." *U.S. v. Duke Energy*, 214 F.R.D. 383, 387 (M.D.N.C. 2003) (citations omitted). There is no indication that the FBI or other law enforcement was adverse to Dechert or Swecker, or their clients, in connection with these disclosures.

## C. NTi Reports or Discussions Related to NTi Reports

### 1. Arguments.

Plaintiff states that Dechert and RAK have waived privilege over the content of reports written by NTi which Plaintiff says was "instrumental in the analysis and distribution of Plaintiff's data, according to law enforcement." Plaintiff cites to the deposition of former NTi CEO Richard Garcia ("Garcia") who Plaintiff says testified that NTi provided reports to the FBI "often without making any changes other than removing privilege labeling." The Plaintiff then states that the "reports were not privileged, and by producing NTi reports to third parties, Defendants have waived any privilege protections over all such reports." In its March 27, 2024 email supplemental submission, Plaintiff stated that the NTi reports analyzing Plaintiff's stolen data demonstrate why no privilege should apply to any NTi reports created between 2016 and 2020. Plaintiff states that the reports were provided to the FBI and notes

9

in particular a statement in an email from Garcia with NTi to a redacted recipient,[8] that a "Privileged Attorney Client Material" header was "not relevant at this point inasmuch as we are providing this to you at this time."

Swecker responds that the privilege was not waived over the contents of any NTi reports, noting that "an investigator's documents or communications prepared in anticipation of litigation constitute protected work product" and that the disclosure of work product to another with a "shared interest in the material…does not waive the privilege" unless it creates a "significant possibility that the material" will be disclosed to an adversary, citing *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 480 (S.D.N.Y. 1993). Thus, Swecker argues that even if Garcia testified as Plaintiff suggests, because the FBI's interests were aligned with those of RAK (investigating any potential criminal activity), it was unlikely the shared information would be disclosed to an adversary.

Dechert notes that Plaintiff has not identified any reports disclosed to the FBI, much less that Dechert made a disclosure. Further, although Dechert is not aware of any reports disclosed to the FBI, disclosure in a confidential setting and pursuant to a grand jury subpoena would not constitute waiver. Further, it argues that because law enforcement was not adverse to Dechert in connection with any investigation of Azima and had a common interest in investigating Azima, no work-product protection was waived.

2. Decision of the Special Master

Plaintiff identified certain reports apparently produced by the FBI, all of which appear to be information prepared by NTi (or NC, which is apparently the same or a related entity) and provided to the FBI. Plaintiff cites Garcia's deposition testimony for the propositions that

---

[8] The recipient appears to be with the FBI in Houston, because Garcia's email is a response to someone whose signature line reads "FBI-Houston."

NTi produced reports to the FBI with no changes "other than removing privilege labeling" and that the reports were prepared by non-lawyers at NTi. It is unclear what Plaintiff is suggesting with respect to non-lawyers. Work product protection can apply to an investigator's documents such that NTi reports prepared at the behest of Dechert, or at the behest of VMS (at the behest of Dechert) can be protected. Whether the documents were prepared by non-lawyers is immaterial to the work product analysis.

Garcia testified that his team "marked all of the reports 'privileged and confidential'" but then removed that labeling before providing the documents to the FBI. The removal of the labeling is not relevant to the analysis because the reports provided by Plaintiff do not reveal any attorney-client privileged information. They do appear to contain work product information but, as noted, waiver of work product requires that the disclosure must enable an adversary to get hold of the information. *See id.* ("[T]he disclosure of work-product to another person with a shared interest in the material, even if not a litigation interest, does not waive the privilege unless the circumstances of the disclosure created a significant possibility that the material would ultimately be disclosed to an adversary.") There is nothing to suggest that the FBI was adverse to Dechert or Swecker, or any of their clients or agents. No privilege was waived as a result of the provision of certain NTi reports to the FBI.

### D. Invoices and Engagement Letters

1. <u>Arguments</u>

Plaintiff states that Dechert has either "improperly withheld or redacted invoices and engagement letters, which are presumptively not privileged." Dechert responds that it has produced all "relevant, final invoices and engagement letters" which have been properly

redacted. Swecker responds that he has not improperly withheld or redacted such documents.[9]

2. <u>Decision of the Special Master</u>

Plaintiff is correct that the attorney-client privilege will not typically extend to invoices. *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999). However, like other documents, invoices and engagement letters may contain privileged information or work product. *See id.* ("'[T]he identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege. However, correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege.'") (citations omitted).

Plaintiff provided four examples of invoices which he says were improperly redacted.[10] Following a meet and confer, Dechert agreed to reproduce the four invoices without redactions. Plaintiff points to these invoices to support its position that these and other redactions are without support. The Special Master agrees that the original redactions on the invoices were without basis. Dechert has an ongoing obligation to be certain that all of its produced documents have been properly redacted. While the Special Master appreciates

---

[9] On February 28, 2024, Plaintiff submitted an email to supplement its Improper Confidentiality Motion and supplied four invoices produced by Dechert for which Plaintiff asserted Dechert had made "baseless privilege redactions." Following a response from Dechert, Plaintiff submitted a further supplement on March 7, 2024, and requested that the February 28, 2024 email supplement the Dechert Privilege Motion. The Special Master has considered both the February 28, 2024 and March 7, 2024 emails from Plaintiff, as well as Dechert's February 28, 2024 email in response, in connection with the Dechert Privilege Motion.

[10] At least two other Dechert invoices contained similar redactions. See "Improper Redactions Motion" at page 18, below. Plaintiff has not provided any engagement letters for review in connection with the Privilege Motions.

the general burden on a non-party to comply with subpoenas issued under Rule 45, it is no "burden" as defined in Rule 45, for a producing party to meet its obligations under Rule 26, including responding to Plaintiff's privilege challenges and reproducing documents, as necessary. This is exactly what Dechert did when confronted with the four invoices provided by Plaintiff. If Plaintiff has any additional invoices[11] he believes were improperly redacted, he should bring those to Dechert's attention to resolve, and if not resolved, Plaintiff can make a submission to the Special Master.

It is unclear from Swecker's response whether he has withheld any invoices or engagement letters or instead provided redacted versions. Swecker quotes *Chaudhry's* conclusion that because a lawyer's invoices "would divulge confidential information regarding legal advice" those records did not need to be disclosed. While this is an accurate quote from *Chaudhry*, it is specific to the particular invoices reviewed by that court, which also noted that certain information often contained in invoices was not protected. Because invoices and engagement letters are not per se protected by privilege, Swecker should produce any responsive documents with appropriate redactions.

### E. Communications Including Plaintiff and His Agents

1. <u>Arguments</u>

Plaintiff states only that Dechert has "improperly logged and withheld communications to which Plaintiff and his agents were parties." Dechert responds that any such withheld communications included a third party, Dr. Massaad, and "cannot be disclosed without his consent under the English 'without prejudice' privilege," which appears to relate to their production in the context of settlement negotiations. Swecker responds that all

---

[11] Plaintiff brought two additional invoices to the Special Master's attention and those are dealt with separately in the determination of the Improper Redactions Motion.

13

communications including Plaintiff and his agents have been produced elsewhere in Defendants' production and that "Plaintiff is not entitled to know which of those communications Swecker considered most relevant in providing legal advice or that NTI selected and analyzed in its confidential reports."

### 2. Decision of the Special Master

Plaintiff has not provided the Special Master with any specifics on this claim and therefore it is impossible to evaluate with respect to Dechert. Swecker states that all communications which include Plaintiff "and his agents" have been produced in Defendants' production. Given Swecker's position as an attorney for VMS, he appears concerned that a separate production by him of those documents, or a portion thereof, will reveal work product. Plaintiff has received the information from Defendants and there is no reason to compel that information separately from Swecker given the risk of revealing work product information.

### F. Privilege Log Entries

### 1. Arguments

Plaintiff asserts that Dechert should revise its privilege log to address "the numerous entries with insufficient detail to identify whether the entry is subject to waiver." Plaintiff says there are emails logged with redacted or blank subject lines and no other detail. Further, Plaintiff states that some entries assert that a document was for the "purpose of litigation without explanation of the nature of the litigation," a concern particularly for "documents prior to August 2016, when Defendants claim to have first obtained Plaintiff's data, providing the purported basis for any litigation." With respect to Swecker, Plaintiff seeks to compel him "to revise privilege log entries that are insufficient to evaluate privilege claims." No specific entries are provided by Plaintiff as to either Dechert or Swecker.

14

Dechert responds that privilege log entries were redacted where the "email headers themselves contain privileged information." Swecker responds that his privilege log entries are sufficient.

### 2. Decision of the Special Master

The Court has previously addressed the adequacy of privilege assertions in its Order dated July 25, 2023 [Doc. 248] (the "July 2023 Order"). Privilege designations also have been previously addressed in Special Master Report and Decision #4. As noted there, Rule 26(b)(5)(A) requires a party withholding otherwise discoverable documents for reasons of privilege to describe the nature of the documents "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). Thus, a "'party's conclusory assertion that a document is privileged is inadequate to meet the burden imposed by [the Rule].'" *Window World*, 2019 WL 3995941, at *30-31 (noting the finding in *Nucap Indus., Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 U.S. Dist. LEXIS 135288, at *5 (N.D. Ill. Aug. 23, 2027) that a "privilege log description reading '[c]ommunication reflecting legal advice regarding anticipated litigation' to be inadequate"); *see also*, July 2023 Order ("'describing a document as "regarding" or "related to" "legal advice" is of no more assistance…than generally asserting that the document is protected by the [privilege],'" citing *Window World).*

In the Swecker Privilege Motion, Plaintiff notes only that he should be compelled to "revise privilege log entries that are insufficient to evaluate privilege claims." However, no specifics are provided as to how his entries are insufficient and thus it is not possible for the Special Master to evaluate Plaintiff's motion as to Swecker's entries

Plaintiff's complaint as to Dechert is that certain emails were logged with redacted or blank subject lines without further detail and that other entries were logged with the notation that they were for the purpose of litigation with no further explanation of that

15

litigation. Dechert says it redacted email headers if they contained privileged information and the Special Master has no specific entries by which to evaluate the arguments.

That being said, Dechert and Swecker, like the Plaintiff and Defendants, must make every effort to sustain their obligations under Rule 26(b)(5)(A) to describe withheld documents such that the parties can assess the claim. If the only information provided about an email is, as Plaintiff suggests, "redacted or blank subject lines and no additional detail," the obligation may not be sustained and additional information about the communication should be provided such as the nature of the communication (if not privileged), the date of its transmission or creation, the author and recipient, and the subject (if non-privileged). If a document is withheld because it was for the purpose of litigation, that purpose does not per se provide protection and further explanation or detail might be warranted. If Plaintiff has any specific entries he believes do not comply with Rule 26(b)(5)(A), he should bring those to Dechert's attention to resolve, and if not resolved, Plaintiff can make a submission to the Special Master.

**Motion 3: Improper Redactions Motion**

A. <u>Arguments</u>

Plaintiff seeks an order compelling Dechert to review all redacted or withheld documents that are responsive to Plaintiff's December 2022 subpoena to Dechert. Plaintiff asserts that Dechert has withheld or produced documents with "indefensible redactions" and that Plaintiff is concerned that such redactions will continue as other documents are produced (or withheld) making it a burden for Plaintiff to challenge the redactions/withholdings one by one. By way of example, Plaintiff points to its challenges of four "VMS invoices" and Dechert's agreement to reproduce them without redaction. These same invoices were cited in the Dechert Privilege Motion. Plaintiff also points to additional documents, including two invoices, which contain what he suggests are more "baseless redactions" and one document

16

which was initially withheld "for irrelevance" but then, after notice from Plaintiff, changed to being withheld because it was "work product." Finally, Plaintiff is concerned that Dechert has withheld documents under UK privilege law, rather than US privilege law, pointing to DECNC-00009975 which Plaintiff says lists documents "as redacted or withheld based on U.K. privilege terms such as 'LIT' (litigation privilege) and 'LAP' (legal advice privilege). [12] Plaintiff does not want the burden of examining each redacted document and requesting a reconsideration on a document-by-document basis. Instead, he wants Dechert to undertake a complete review of its redacted and withheld documents and produce in full any which have been improperly redacted or withheld.

Dechert responds that there is no authority for a "redo" of all documents simply because a discrete number of documents had some issues that were addressed by Dechert. Dechert cites the time, effort, and expenses it has incurred in responding to Plaintiff's subpoenas, and maintains that its non-party status requires Plaintiff to "avoid imposing undue burden or expense" under Federal Rule of Civil Procedure 45. With respect to the documents produced by Plaintiff at Exhibit B to its Improper Redactions Motion, Dechert says it has re-reviewed those documents and the redactions made and document withheld, are all appropriate. Finally, Dechert complains (as it has with respect to other motions), that Plaintiff has failed to follow the processes set forth in Local Rule 37.1(a) and the Parties' agreement regarding the Special Master process, as they relate to a meet and confer prior to filing discovery disputes.

B. <u>Decision of the Special Master</u>

Requiring Dechert to conduct a "re-review" of all produced and withheld documents would be in the nature of a sanction, and there is no basis on this record for the imposition of a

---

[12] The Special Master was not provided a copy of this document.

sanction. However, to the extent that Dechert has made privilege redactions on the basis of UK law rather than North Carolina (attorney-client privilege) or US law (work product) and to the extent that UK law is inconsistent with the correct applicable law, Dechert must re-review its prior redactions/withholdings and modify, as necessary. Finally, because the redactions shown on DECNC-0003163 and DECNC-00031451 look to be similar to those on the four invoices for which Dechert removed redactions, those documents, without redactions, should be submitted by Dechert to the Special Master for an in camera review along with an explanation from Dechert as to why they should remain redacted

**Motion 4: The Improper Confidentiality Motion**

    A. <u>Relevant Prior Order</u>

Discovery in this action is governed by a "Protective Order" [Doc. 177] which was entered on February 22, 2023. The Protective Order applies to the Parties and non-parties. Section 2 of the Protective order permits a "Producing Party" to designate as "Confidential," information which "it, in good faith, contends contains trade secrets, confidential research or development, confidential commercial information, confidential financial information, confidential health information, information treated as confidential by third parties, and other personal or private information whose disclosure would result in annoyance, embarrassment, oppression, or undue burden pursuant to Rule 26(c) of the Federal Rules of Civil Procedure (the 'Confidential Information')" (also referred to as "Protected Information").

Section 6 lists the persons to whom Protected Information may be disclosed. With respect to witnesses, it provides that the information can be disclosed to "any witness who is called to testify at trial or deposition in this action, provided that Protective Information may only be disclosed to such witnesses upon consent of the designating Party, and that such disclosure be limited to the scope of the witnesses' expected testimony."

    B. <u>Arguments and Decision of the Special Master</u>

1. <u>Documents Designated as Confidential Information</u>

Plaintiff first addresses certain documents produced by Defendants, Dechert, and Swecker, all of which were designated as Confidential Information. With respect to the documents produced by Defendants and Dechert, they have agreed to remove the designations so the motion as to these documents is moot. Plaintiff notes that these particular documents "are just some of the examples produced by Defendants, Dechert, and Swecker that have no basis to be designated confidential." The relief sought by Plaintiff is an order that they "reproduce all designated documents without confidentiality designations." Presumably, Plaintiff wants an order governing all produced documents and not just the documents cited by example. However, such an order would be in the nature of a sanction which is not warranted here. The only documents that the Special Master can address are specific documents provided for review.

With respect to the two Swecker documents cited by Plaintiff, Swecker responds that all of his information was "acquired and discussed pursuant to his representation of defendants in this action." He opposes the de-designation of the two documents cited by Plaintiff, SWECKER_00004907 and SWECKER_00003143, because they represent "confidential communications on behalf of his clients and work product created pursuant to his legal representation." Plaintiff is correct that these documents were produced to a third party (the FBI); however, they were done so under "an understanding of confidentiality or a rolling production to grand jury subpoenas."[13]  *See* Swecker's Responses to Special Master's Inquiries and Partially Amended Responses to Special Master's Inquiries.

---

[13] There is no concept of waiver in the Protective Order. Nothing in it suggests that because a third party received the information in another context, that same information  cannot be afforded the protections of the designation, assuming it otherwise meets the definition of Confidential Information set forth in Section 2 of the Protective Order.

Through his designations, Swecker is addressing the tension between his obligations to comply with a lawfully issued subpoena and his "ethical obligation to maintain the confidentiality of his clients' confidences" pursuant to N.C.R. Prof. Conduct 1.6 & Comment 3 (2013). He has navigated this tension by producing the documents while seeking the protection of the "Confidential" designation under the Protective Order. Meantime, Plaintiff has access to the information and may use it as permitted under Section 6 of the Protective Order. Plaintiff is concerned that the Confidential designation will impede his ability to prepare for trial, including preventing him from "showing third parties and potential trial witnesses relevant documents." Section 6(g) permits Plaintiff to show a trial or discovery witness a protected document, "upon consent of the designating Party." Understandably, Plaintiff would prefer to have unfettered use of the Swecker Information. But given that Swecker is a non-party attorney with obligations to protect confidential information, the production of documents with the Confidential designation is a good balance for the competing concerns. The designation can remain. However, Swecker, and any other party or non-party, should not unreasonably withhold the consent required by Section 6(g). Any issues regarding Section 6 consent may be brought to the Special Master.

2. Deposition testimony designated as Confidential Information

a. Deposition Transcript of Nicholas Del Rosso, Corporate Designee (Vols. 1 and 2) ("VMS Deposition"): Plaintiff states that deposition testimony regarding 13 exhibits used in the VMS Deposition was improperly designated as confidential. After a review of the testimony provided by Plaintiff to support its position, the Special Master finds that the confidentiality designations are for the most part warranted because they either explicate the contents of a document designated as Confidential Information or they rely on that information to form or answer a question. There are a few lines of testimony, however, that

should not be designated as confidential, and Defendants should de-designate these portions.[14]

Plaintiff also argues that Defendants improperly designated testimony as confidential because the testimony is "harmful and inculpatory" to Defendants, and cites specific portions of the VMS Deposition transcript. The Special Master concludes that while some very minor questions and answers might not rightfully be considered confidential, in the context of other information it is acceptable for them to remain so. Because Plaintiff can use this information within the confines of Section 6 of the Protective Order, there is no prejudice resulting from their designation. However, as noted earlier, all parties are instructed not to unreasonably withhold their consent to the use of such material. Any issues regarding Section 6 consent may be brought to the Special Master,

b. <u>Deposition Transcript of Benjamin E. Rosenberg, Esq., Corporate Designee (Dechert Deposition)</u>: Plaintiff states that Dechert has improperly designated as confidential, testimony from this deposition implicating or referencing the contents of Gerrard's sworn UK witness statements.[15] Dechert responds that its designations go only to i) exhibits designated as Confidential, and ii) information that appears in Gerrard's witness statement(s), that according to Dechert are confidential pursuant to UK rules. As with the VMS Deposition, Plaintiff has not shown sufficient prejudice to override these designations.

Plaintiff also states Dechert has improperly designated deposition testimony as confidential because it "implicates Dechert" with respect to "hacked" information belonging to Plaintiff. Dechert states that its designations are proper because either they relate to a

---

[14] VMS Deposition at pp. 95:16-20; 198:2-4, 7, 11-15.
[15] The VMS Deposition references four witness statements provided by Gerrard in the UK Proceeding. The Special Master has been provided one statement, along with portions of the Gerrard Testimony.

confidential exhibit or to Gerrard's witness statements. For the most part, the information provided to the Special Master is insufficient to permit a decision. For example, Plaintiff cites to testimony at pp. 64:1-65:11, which refers to a Dechert "form." The Special Master does not know if the form refers to a confidential exhibit, as there is no reference to an exhibit in that portion of testimony (or the immediately preceding or subsequent testimony). That segment also references other litigation which Plaintiff refers to as "public;" however, there is no information provided about that litigation from which the Special Master can determine what was public and how the cited testimony relates to the litigation. While other passages are clearly referencing an exhibit, it is not clear whether those exhibits have been designated as confidential.[16] If the Plaintiff wishes to provide additional information regarding the specific instances cited in his April 23, 2024 supplement to the Improper Confidentiality Motion, he may do so subject to the following:

i. Before involving the Special Master, Plaintiff shall engage in a meet and confer with Dechert;

ii. No new passages may be addressed; only the sixteen itemized passages regarding the Dechert Deposition addressed on pages two and three of the supplement, following the Paragraph beginning "**Fourth**;"

iii. If the passages refer to, explicate, or rely on information from an exhibit designated as Confidential, then the passage shall remain confidential; and

iv. If the passage refers to any of the Gerrard witness statements, it shall remain confidential.[17]

---

[16] This is unlike the Plaintiff's argument regarding the VMS Deposition, where Plaintiff and Defendants agreed that the referenced exhibits were designated as confidential.

[17] On this point, the Special Master is assuming that such information should remain confidential under UK rules. If Plaintiff has information suggesting otherwise, he can inform the Special Master. However, given that this information is not being withheld from Plaintiff

c. Swecker Deposition Designations: Plaintiff notes only that he has received "improper designations" regarding the Swecker deposition, but provides no specifics. If Plaintiff has an objection to particular designations, he should follow the procedures outlined in Section 3 of the Protective Order.

## Motion 5: Crime-Fraud Motion

A. Arguments

Plaintiff asserts that Defendants should produce documents withheld for privilege because privilege did not attach to those documents due to the crime-fraud exception to attorney-client privilege. Specifically, Plaintiff seeks documents between 1.) Defendants and Shanahan Law Group ("SLG") regarding work performed for RAK or Dechert; 2.) documents between Defendants and Swecker regarding work related to Plaintiff; and 3.) documents between Defendants and Dechert or RAK "related to the hacking and use of Azima's data."

Regarding the SLG documents, Plaintiff argues that Defendants "enlisted" SLG to pay "co-conspirators" Patrick Grayson ("Grayson"), Paul Robinson ("Robinson"), and J.R. Fayol ("Fayol") "for their involvement in hacking and dissemination of Plaintiff's stolen data." Plaintiff points to SLG's receipt of payments from Defendants totaling $6.8 million "during the conspiracy period," citing Plaintiff's brief in opposition to Defendants' Motion to Quash or For Protective Order ("Resp. to Motion to Quash") [Doc. 125, pp. 5-7]. That brief recites a similar amount of payments to SLG from Defendants by reference to "Defendants' PNC Bank records." Plaintiff then states that "[e]ach co-conspirator engaged in illegal activity in the attacks on Azima", citing the "Witness Statement of Patrick T.F. Grayson" in the UK Proceeding ("Grayson Statement") and the "Declaration of Paul Robinson" in *In re*

---

and can be used pursuant to Section 6 of the Protective Order, the Special Master is inclined to defer to any such UK rules.

*Application of Karam Salah AL Din Awni Al Sadeq and Stokoe Partnership Solicitors for an Order under 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings*, 1:21-mc-0006, (MDNC) ("Robinson Declaration").

Regarding the Swecker documents, Plaintiff argues that Defendants and Swecker "pressured U.S. law enforcement to investigate Azima," "used his stolen data and reports analyzing that data to ensnare him in a criminal investigation," and "lied to law enforcement" as to the origin of the data, citing documents from Dechert and Swecker regarding meetings and communications with law enforcement.

Regarding the communications with Dechert or RAK, Plaintiff argues that Dechert has admitted that the UK iniquity exception applies to certain produced documents and that RAK "disavowed at least some of Dechert's conduct as being 'outside the scope' of its engagement and concluded that '[n]o legal privilege attaches.'" Plaintiff also states that a UK court entered default against RAK related to "claims of hacking Azima, creating a presumption that Dechert's engagements involved illegal behavior."

Plaintiff requests an evidentiary hearing involving RAK, Dechert, SLG, and Swecker and an in camera review of communications between Defendants and SLG, Swecker, and Dechert, to determine whether the crime-fraud exception applies.

Although the Crime-Fraud Motion is directed at Defendants, because it seeks a hearing involving Dechert and Swecker, both submitted responses to the motion.

Dechert responds that with respect to the iniquity exception production in the UK, the exception was applied to the unlawful obtainment of information by non-party Stuart Page and "alleged attempts to mislead Plaintiff" and the UK court as to how Plaintiff's data was discovered, citing a witness statement submitted in the UK by Dechert attorney, Edward Allen. *See* Fifth Witness Statement of Edward Allen, in the UK Proceeding [Doc. 250-1; and Exhibit 5 to Plaintiff's motion] (the "Allen Statement"). Dechert notes that it has made "no

24

determination that Dechert engaged Del Rosso and [VMS] for the purposes of obtaining information unlawfully." With respect to Plaintiff's argument that RAK disavowed some of Dechert's conduct, Dechert states that Plaintiff cites to a meeting that did not involve Defendants and RAK's position was that "no privilege applied because the meeting was unauthorized." This "limited waiver," Dechert argues, has no bearing on communications unrelated to that meeting. Finally, Dechert states that the default judgment in the UK was against RAK alone and was "not a judgment on the merits" and therefore not to be used "against other defendants to Plaintiff's claims."

Swecker states it is not a crime or fraud to "'pressure' the FBI and there is no evidence [pressure] occurred." He states Plaintiff's evidence shows only that Swecker "communicated with the FBI about Plaintiff's alleged criminal conduct," and that the communications with the FBI "pursuant to his representation of Defendants for a legitimate purpose is not criminal." Finally, he states that Plaintiff's evidence (Exhibit 4 to the Crime-Fraud Motion) "contains no affirmative 'lies'" as to the origin of the Plaintiff's data and that Swecker had no duty to disclose to the FBI the "purportedly stolen nature" of the data, even if he was aware of it (which he says he was not).

Defendants respond that Plaintiff has failed to make the "'prima facie showing'" required to apply the crime-fraud exception. With respect to the SLG communications, Defendants note that Plaintiff relies on SLG's payment to Defendants' subcontractors, which payment was made at the direction of Defendants. Those subcontractors "do not claim to have hacked Plaintiff or published his data online." Defendants state that neither Grayson or Robinson "communicated to SLG an intent to use those payments for purposes of a crime or fraud."

With respect to the Defendants' communications with Swecker, Defendants state that "'pressuring'" the FBI is not a crime or fraud and there is no evidence it occurred, that Plaintiff's Exhibit 4 shows only that Swecker and others communicated with the FBI

25

regarding Plaintiff's conduct, and that there is nothing "false" in those communications and "no dispute that the reports are based on Plaintiff's authentic records." Finally, Defendants state that there are no "affirmative lies" about the origin of Plaintiff's data and that Swecker had no duty to disclose the alleged stolen origin of the data (assuming he knew of it).

With respect to Defendants' communications with RAK and Dechert, Defendants state that the iniquity exception was applied on a "very limited basis," regarding documents relating to Stuart Page's activities and "alleged attempts" to mislead Plaintiff and the UK court regarding how Plaintiff's data was discovered. Defendants state that Dechert did not apply the exception to any communications regarding Defendants' services.

Finally, as to the UK default judgment and RAK's "disavowal" of Dechert's conduct, Defendants state that the former was "not predicated on an assessment of the merits of the hacking claim" and the latter "was unrelated to Defendants."

B. <u>Decision of the Special Master</u>

As determined above, North Carolina law applies to the application of the attorney-client privilege in this case. The crime-fraud exception is recognized in North Carolina. The crime-fraud exception "may be invoked in 'certain extraordinary circumstances.'" *Window World*, 2019 WL 3995941, at *15. If it is determined the exception applies, the communication is not protected by the attorney-client privilege. The *Window World* court noted there is scant North Carolina case law regarding the crime-fraud exception, so looked to federal cases for "useful guidance," citing approvingly the case of *United States v. Under Seal (In re Grand Jury Proceedings #5),* 401 F.2d 247, 251 (4th Cir. 2005), which was cited by Plaintiff, Defendants, and Dechert. With respect to Plaintiff's prima facie showing, he must demonstrate "by a preponderance of the evidence that the opposing party was committing or intending to commit a crime or fraud and that the attorney-client communications were used in furtherance of the alleged crime or fraud." *Window World*, 2019 WL 3995941, at *18.

26

However, while a prima facie showing is necessary to apply the exception, "*it does not necessarily compel such a finding.*" *Id.* (emphasis in original) (citation omitted). It is the "knowledge and intentions" of the client that are primary in determining whether the exception applies. *Id.*

Plaintiff has requested an evidentiary hearing to involve RAK, Dechert, SLG, and Swecker to determine the extent of RAK's disavowal of Dechert's work, Dechert's position on the scope of the requested exception, SLG's involvement in making payments to third parties (e.g., Grayson, Robinson) for "criminal conduct," and Swecker's "false statements to law enforcement about Azima's data." However, this request is premature because Plaintiff must first make his prima facie, or "at first sight" claim.

1. SLG Documents

Plaintiff states that Defendants' "co-conspirators" Grayson, Robinson, and Fayol "engaged in illegal activity in the attacks on Azima." Plaintiff notes that SLG received large payments from Defendants and made payments out to Grayson, Robinson, Fayol, and their entities, all of whom were "co-conspirators" of Defendants.[18] Plaintiff points to the Grayson Statement and the Robinson Declaration to support the conclusion that the payments from SLG were made for their involvement in "hacking and dissemination" of Plaintiff's data. The Grayson Statement does not discuss hacking at all. It does discuss in Paragraphs 13 – 21

---

[18] In the Resp. to Motion to Quash, Plaintiff lists $6.2 million paid to SLG "by Defendants" between June 2017 and November 2020. In the Crime-Fraud Motion, Plaintiff lists $6.8 million paid "during the conspiracy period" which is not defined. Plaintiff attached certain SLG bank statements for March 2019, April 2019, and July 2020, which do show payments coming into SLG's trust account from "Vital Management Services Inc VMS". Based on the limited information provided, the Special Master is not able to confirm the amounts claimed by Plaintiff, but can confirm that payments came into the account from VMS and that payments went out from the account to Grayson + Co., to Company Documents (which Plaintiff says is Robinson's d/b/a), and to Axis and Co. (which Plaintiff says is Fayol's d/b/a). The amount of funds in or out is not material to the determination of this motion.

(the portions cited by Plaintiff) that Defendant Del Rosso had a plan in January/February 2019 to post anonymously a "document" to lawyers, and perhaps others, on "both sides of litigation in which Mr. Azima was engaged." According to Grayson, he introduced Del Rosso to Fayol to get advice in certain countries, and help with "the surveillance of Mr. Azima on holiday." Grayson states that Fayol assisted with the "postings." The document, as described by Grayson, was "an email trail between Mr. Azima and others; beyond that I have no recollection of the content."

Plaintiff provides no evidence of the nexus between the "posting" and any misappropriation or conspiracy to hack or disseminate Plaintiff's trade secrets. Further, there is no evidence as to the contents of the document and thus no way to determine whether it is or contains a trade secret. And there is no evidence as to how the document came into the possession of Del Rosso or RAK, or anyone else (i.e., via misappropriation or lawfully). Without such evidence, Plaintiff cannot prove by a "preponderance" of the evidence that "the opposing party was committing or intending to commit a crime or fraud." *See Window World,* 2019 WL 3995941, at *18. Even if he had carried that prong, he has not proven by a preponderance of the evidence that the communications between SLG and its client were "used in furtherance of the alleged crime or fraud." *Id*. All that is shown is that SLG, through its trust account, paid third party service providers on behalf of its client, an event which occurs with frequency in law firms.[19] This is insufficient evidence to support the exception.

Turning to the Robinson Declaration, Plaintiff states that Robinson "also admits Defendants paid him through SLG to conceal Del Rosso's involvement in illegal conduct," citing Paragraph 18, and Exhibits F and G to the Robinson Declaration. Paragraph 18 states

---

[19] Plaintiff notes the statement by Grayson that he did not provide any services to SLG. This proves nothing as law firms frequently pay third-party providers on behalf of their clients.

that Robinson called Del Rosso after being served with a letter from "Claimant"[20] seeking "Norwich Pharmacal" relief.[21] At Paragraphs 14 and 18, Robinson says Del Rosso agreed to pay his legal fees incurred in relation to "the proceedings" if Robinson did not mention Del Rosso's name in relation to "this work and to keep his name out of the entire matter." It is not clear which proceeding is referred to in this statement — the action for which the statement was submitted, the resulting proceeding against Robinson, or another proceeding entirely. Robinson states in Paragraph 19 that Del Rosso's US counsel advised he could not assist with Robinson's legal bills and thereafter, Robinson's company set up a $25,000 loan agreement with VMS, which loan was never repaid. Exhibits F and G demonstrate a) that Robinson contacted Del Rosso's US counsel, who in turn asked Robinson to give him a call, and b) that there was a loan agreement between Robinson's company and VMS.

Plaintiff concludes in his motion that the deal between Robinson and Del Rosso to keep Del Rosso's name out of the proceedings was an effort to "conceal Del Rosso's involvement in illegal conduct."[22] But the evidence in the Robinson Declaration could just as easily support legal conduct (e.g., Del Rosso did not want to become involved with a UK court proceeding, even though his involvement in the underlying facts was not fraudulent or unlawful). Nowhere in the Robinson Declaration, does Robinson state or suggest that the services provided to Del Rosso that are related to this lawsuit were criminal or fraudulent. Indeed, in Paragraph 9 of the statement he refers to "open source research investigations concerning Mr. Azima." Open-source information is just that and requires no hacking or other fraudulent conduct to obtain. Finally, there is no evidence in the Robinson Declaration

---

[20] It is not clear who the "Claimant" refers to here.
[21] A "Norwich Pharmacal" order is a UK court order compelling a third-party to disclose documents or information, helping the applicant determine the appropriate defendants to an action.
[22] Presumably, the payment to Robinson for his efforts was the unpaid loan agreement.

to show that any attorney-client communications were used in furtherance of an alleged crime or fraud.

Plaintiff has not met his burden with respect to the communications between Defendants and SLG.

### 2. Communications between VMS and Swecker

Plaintiff points to Swecker's communications with the FBI to argue that he and Defendants pressured law enforcement to investigate Plaintiff and used Plaintiff's stolen data and reports of the same to "ensnare" Plaintiff in a criminal investigation. Plaintiff also argues that Swecker and Defendants lied to law enforcement as to the origins of that data, presumably by not revealing it was hacked. Plaintiff provides several exhibits in support of his conclusions. These exhibits show that Swecker met with certain law enforcement agents and others (including Dechert attorneys) to discuss certain activities of Plaintiff and provided certain documents to law enforcement. However, nothing in the exhibits suggests that Swecker knew any of the Plaintiff's data he was providing, or any reports analyzing the data, had been hacked or that he was lying to law enforcement about the origin of the data. It is not per se criminal or fraudulent to provide law enforcement with truthful information, whether in response to a subpoena or not.

Plaintiff has not met his burden with respect to the communications between Defendants and Swecker.

### 3. Communications between Defendants and Dechert or RAK

Plaintiff posits three arguments with respect to these communications. First, he says that because Dechert produced otherwise privileged documents under the UK's iniquity exception related to "RAK's...illegal obtaining of Azima's and others' data and...misleading of Azima and courts as to their involvement in the hacking" that "no privilege applies to certain communications involving Dechert and RAK." Second, he cites RAK's disavowal of "at

30

least some of Dechert's conduct as being 'outside the scope' of its engagement" and conclusion that "[n]o legal privilege attaches." Third, he says that because a UK court entered default against RAK "related to [] claims of hacking Azima," a presumption is created that Dechert's "engagements involved illegal behavior." Finally, he cites three documents produced by Dechert regarding the intake process when Dechert was considering hiring VMS.[23]

With respect to the iniquity exception disclosures, Plaintiff cites Paragraphs 122 and 136(1)-(2) of the Allen Statement. At Paragraph 122, Allen states that Dechert determined that the "iniquity exception does apply to certain categories of documents." In Paragraph 136 he describes the two "potential iniquitous purposes" which meet the UK test for application of the iniquity exception: documents "which further the purpose of RAKIA obtaining information unlawfully, including the hacking of email accounts and computer data" and "documents which further the purpose of RAKIA misleading Mr. Azima and/or the court at the First Trial as to the involvement of RAKIA and/or its agents in the hacking of Mr. Azima's email accounts and computer data (including as to how RAKIA discovered that Mr. Azima's hacked data had been placed on the internet)." Dechert cites additional paragraphs in the Allen Statement, including Paragraph 133 which addresses which documents are "caught by the iniquity exception" under English law: [24]

> "What are caught...are relevant communications, not all communications.....The iniquity does not touch, for example, the entirety of the work concerned with the defence of the claims on the merits. The negation of legal professional privilege is confined to communications which can be said to be in furtherance of the iniquitous strategy."

---

[23] These documents are DECNC-00031254-31258, DECNC-00053978-53979, and DECNC-00053980-53981.

[24] See also the fulsome discussion of the iniquity exception in a related lawsuit against Dechert brought by Karam Al Sadeq in the UK (*Al Sadeq v. Dechert LLP, et al.* [2023] EWHC 795 (KB) [58 – 115] [Doc. 205-17] ("Legal professional privilege does not apply to a communication or other document that falls within the iniquity exception.).

Under North Carolina and federal law, the crime-fraud exception provides that the attorney-client privilege does not apply to communications made in the course of seeking legal advice "in aid of a contemplated violation of law." *See Window World*, 2019 WL 3995941, at *15, *18 (citing federal law for the proposition that the moving party must establish the existence or non-existence of the attorney-client privilege—including whether the crime-fraud exception terminate[s] the privilege) (citations omitted); *see also, Rambus, Inc. v. Infineon Technologies AG*, 220 F.R.D. 264, 281 (E.D. VA. 2004) (the "exception is not truly an exception. Rather it is an exclusion of certain activity from the reach of the privileges.") Plaintiff is correct that the privilege will not apply "to certain communications involving Dechert or RAK" where the crime-fraud exception has been applied, but then invites the conclusion that because Dechert produced certain documents under the UK iniquity exception, Defendants must produce all documents "between Dechert or RAK related to the hacking and use of Azima's data." Such a result would mean that the production of non-privileged documents (which crime-fraud exception documents are) waives the attorney-client privilege as to all attorney-client communications. When the crime-fraud exception is applied, it is applied only to those documents that "bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *See Window World*, 2019 WL 3995941, at *17 (*citing United States v. Under Seal (In re Grand Jury Proceedings #5)*), 401 F.3d 247, 251 (4th Cir. 2005)). The fact of the iniquity exception production in the UK Proceeding does not substitute for Plaintiff's separate obligation in this matter to make his prima facie showing that the exception should be applied to documents unrelated to the "iniquitous purposes" set forth in the Allen Statement.

Similarly, Plaintiff does not meet his burden by a reliance on RAK's "disavowal" of Dechert's representation at a meeting that took place in December 2019, a meeting at which neither Defendants nor RAK was present. RAK's conclusion that "no legal privilege" attached

32

to communications at that meeting is insufficient to support Plaintiff's argument. There is no evidence as to what transpired at the meeting, who was present (other than Gerrard), what actions were taken, or what follow-up occurred.[25] Lastly, Plaintiff's reliance on a UK court's entry of default judgment against RAK in August 2023, does not support his argument that Defendants' communications with Dechert or RAK are not privileged. As Dechert and Defendants correctly note, the judgment was not on the merits. *See* Exhibit A to "Non-Party Dechert LLP's Response to Plaintiff Farhad Azima's Motion to Compel Pursuant to the Crime-Fraud Exception" at Paragraph 48.

Lastly, the intake documents provided by Plaintiff reveal that ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████" The documents note that ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████[26] However, there is no information to suggest that those instructions were

[25] Plaintiff also relies on Doc. 144-1, which is a letter from RAKIA to a UK court stating in part that "[i]n light of these developments [referring to a judgment finding Gerrard to be "a dishonest witness who engaged in serious wrongdoing and ethical violations towards a client"], it appears that RAKIA and its officers may have been the victims of dishonest and unscrupulous former third party advisers who have taken steps to advance their own interests for their own gains, and at RAKIA's expense." This language does not provide evidence that Defendants engaged in any fraud or crime to support Plaintiff's motion. It provides no information as to the specific "wrongdoings" or "ethical violations" of Gerrard and how they might connect, if they do, to Plaintiff's claims in this lawsuit.
[26] Dechert notes in its response to Plaintiff's supplement regarding these documents that it produced an earlier version of the due diligence checklist (the "Checklist"), and Plaintiff questioned Dechert about it during the Dechert 30(b)(6) deposition. Finally, Dechert notes that it produced versions of the Checklist that predated and postdated the email interaction regarding disposing of a draft (citing DECNC-00063443 and DECNC-00063452).

given in order to conceal a crime or fraud or to conceal evidence in anticipation of litigation. To find that these documents support Plaintiff's prima facie showing to support a crime-fraud exception requires a chasmic sized leap of faith.

Plaintiff has not met his burden with respect to the communications between Defendants and Dechert or RAK.

**Motion 6: Hacking Motion**

A. <u>Arguments</u>

Plaintiff seeks to compel Dechert to produce documents which "relate to prior allegations of hacking, data theft, or improper acquisition of confidential information by Dechert, its attorneys, and its clients." Plaintiff maintains that Dechert and its clients have been accused of hacking "numerous times" citing Dechert's 30(b)(6) testimony and the testimony of a former Dechert partner. Plaintiff notes the Court's statement at the September 29, 2023 hearing that it would "give the Plaintiff some latitude because you're working backwards to establish as an evidentiary matter the hacking…So it's a much more complicated case than simply saying over and over again, well, it's one claim, and the hacking stuff has been, you know, dismissed. There's overlap in my mind, without a doubt, regardless of whether the hacking claim is in the case or not as opposed to just a one-count trade secret or two-count trade secrets case." *See* Exhibit 6 to Plaintiff's Hacking Motion, Transcript of Status Conference, 9:2-9:13. Plaintiff argues that "evidence of prior hacking is relevant" under Federal Rule of Evidence 404(b) to show "absence of mistake, lack of accident, or pattern." Plaintiff cites specifically one document referenced in the former Dechert partner deposition—a letter filed by an attorney in an unrelated lawsuit which accused certain Dechert partners of hacking. Plaintiff asserts that because this action alleges that Defendants hacked Plaintiff's computer and posted his "stolen data" online, "prior allegations of hacking are relevant."

34

Dechert responds that Plaintiff is seeking "fourth party" allegations against a non-party and has no explanation as to why any showing that Dechert's actions of those of its clients (even if true) have any bearing on the claims asserted against Defendants in this matter. Dechert cites *Virginia Dept. of Corr. v. Jordan*, 921 F.3d 180 (4th Cir. 2019) which affirms that nonparty discovery requires "'an even more demanding and sensitive inquiry than the one governing discovery generally.'" *See id.*, 921 F.3d. at 189. With respect to the California lawsuit document cited by Plaintiff, Dechert provides the background: Dechert was defending a client in litigation in the Southern District of New York. Opposing counsel had computer difficulties and could not meet a filing deadline. Rather than seek an extension of time, he wrote a letter to the court, filed on the public docket, accusing Dechert of hacking his computer to prevent him from meeting the deadline. The court struck the letter from the docket. Dechert states that Plaintiff's request "bears no relevance to the issues at stake, it requires enormous cost to review any hacking allegations against Dechert or any of its lawyers, it invades confidential and privileged attorney-client relationships, and it is overly broad."

B. Decision of the Special Master

The "demanding and sensitive inquiry" set forth by the Fourth Circuit in *Va. Dep't of Corr.* requires that certain considerations should go into the analysis of whether the benefits of discovery to the requesting party outweigh the burdens on the recipient. *See* 921 F.3d. at 189. On the benefit side, they include "not just the relevance of the information sought, but the requesting party's need for it." Thus, the information "must likely (not just theoretically) have marginal benefit in litigating important issues," noting that "marginal" was meant "in the economic sense that the information must offer some value over and above what the requesting party already has, not in the sense that a mere *de minimis* benefit will suffice." *Id*. It is also a consideration what information is available to the requesting party from other

35

sources. *Id.* As to the burden, courts "should of course consider the dollars-and-cents costs associated with a large and demanding document production," as well as the "inva[sion] of privacy or confidentiality interests." *Id*. Another consideration is how others might be affected; for example, a subpoena seeking information from a business about its customers, could "implicate the business's interest in protecting competitively sensitive information, as well as the customers' interest in protecting their privacy." *Id*. at 190.

Plaintiff lists several instances of hacking that involved Dechert or its clients. Plaintiff first states that a former Dechert partner identified "four cases she was involved in that concerned allegations of hacking by Dechert, its partners, and/or clients." An examination of the transcript excerpts provided by Plaintiff shows the following: 1.) Dechert was involved in lawsuits in New York in which a party accused several Defendants, including Dechert, Gerrard, James Buchanan and others, of hacking; and 2.) Dechert was involved in "a couple of cases for a client…that involved allegations of hacking." In one of those cases, an arbitration, the client was accused of taking control of the claimant's computer; the other was the case noted above where opposing counsel accused Dechert of hacking.

Plaintiff also points to the Dechert Deposition transcript regarding allegations of hacking against Del Rosso when he was "███████████████████████████████ ███████████████████." Plaintiff notes that Del Rosso continued to work with these same attorneys once they were at Dechert. A review of the transcript excerpts provided by Plaintiff shows the following: A form that appears to be part of the hiring of Del Rosso by Dechert on behalf of RAK, indicated there had been an ██████████████████████ ████. The form further indicated that there had been ████████████████████████ ████████████████████████████. The allegation of hacking ██████████████████

36

█████████████████████████████████████████████████

██████████████████████████████████.[27]

    Plaintiff argues that "evidence of prior hacking is relevant" to show lack of mistake or accident, or a pattern under Rule 404(b). But to be relevant, Rule 404(b)(1) evidence must have some connection between the proffered other acts and the alleged claims against the Defendants in the lawsuit. Otherwise, the only purpose in introducing the other acts is to show a propensity of a person to behave in a certain matter, a purpose expressly forbidden by Rule 404(a). *See Huddleston v. United States*, 485 U.S. 681, 689, 691 (1988) (only "relevant" evidence is admissible under Rule 404(b) and "relevancy…exists only as a relation between an item of evidence and a matter properly provable in the case," noting also that the relevancy requirement of Rule 402, "as enforced through Rule 104(b)" applies to Rule 404(b) evidence).

    The Plaintiff's evidence falls into three categories: 1.) allegations of hacking against Dechert; 2.) allegations of hacking against Dechert's clients; and 3.) allegations of hacking against Del Rosso at a time when he was represented by attorneys who are now, but were not at the time, Dechert attorneys. With respect to the first category, the discovery of allegations of hacking against Dechert in an unrelated case constrains the bounds of relevancy. Moreover, when examined in the context of Rule 45 considerations as explained in *Va. Dep't. of Corr.*, the burden on Dechert clearly outweighs the benefit to Plaintiff. If, hypothetically, Plaintiff was to discover all the details of the instance where opposing counsel in an unrelated case accused Dechert of hacking his computer to stop him from filing a

---

[27] In Plaintiff's May 16, 2024 supplement to the Hacking Motion, he provided additional documents produced by Dechert regarding the due diligence of VMS. Those documents are discussed in detail in connection with the Crime-Fraud Motion at page 33 above, and were considered also with respect to the Hacking Motion.

pleading, those details would provide no elucidation as to the trade secrets allegations in this matter. Plaintiff is correct that the Court here has appropriately given Plaintiff "some latitude [in his discovery efforts] because [he is] working backwards to establish as an evidentiary matter the hacking." However, the latitude was intended to permit Plaintiff to discover evidence regarding the alleged hacking by Defendants. The accusations against Dechert (which were not proven true), have absolutely no bearing on the hacking alleged in this action – even if fully discovered, they answer not one question as to who, what, when, how, or whether the hacking of Plaintiff's trade secrets occurred in this case.

With respect to the second category, allegations of hacking by Dechert's clients, such allegations likewise constrain the bounds of relevancy. Whether clients of a third-party law firm were alleged to have engaged in hacking has no bearing on whether Defendants engaged in hacking, no more than if a law firm's prior representation of a murderer has any bearing on whether its current client committed murder. The burden on Dechert clearly outweighs the benefit to Plaintiff as to this category.

Finally, with respect to the third category, allegations against Del Rosso of hacking in connection with an unrelated lawsuit, those allegations are more properly probed through Defendants. Examined in connection with the *Va. Dep't of Correction* factors, the burden to Dechert outweighs the benefit to Plaintiff. Dechert has already provided to Plaintiff its 30(b)(6) testimony on this topic which revealed that Dechert ███████████████████████████, that ████████████████████████████████████. This begs the question as to what other information Dechert could even provide on this topic, but assuming it could, it would require Dechert to inquire (or allow Plaintiff to inquire) of its current attorneys about a matter handled at another law firm. Notwithstanding the obvious privilege and work product considerations involved in such an endeavor, the burden both in

cost and time to Dechert to seek information about an allegation in an unrelated matter, would have no relation to "a matter properly provable" in this case – that is, whether Defendants engaged in hacking as to Plaintiff's trade secrets. At most it would result in inadmissible character evidence. The Hacking Motion is denied.

**Additional Directives**

1. All actions directed herein shall be completed by June 19, 2024.

2. Any party, including a third party, seeking the benefits of the Protective Order or the Special Master process must abide by their respective dispute resolution obligations before submitting a motion. Section 3 of the Protective Order outlines its meet and confer and notice obligations, while the "Joint Agreement Regarding Special Master" [Doc. 312-1; incorporated specifically into the appointment Order [Doc. 313]] requires that the parties "attempt to resolve all discovery disputes amicably prior to seeking a ruling from the Special Master." Going forward, all motions submitted to the Special Master must state in the opening paragraph that the moving party has complied with the Special Master dispute resolution process and, where applicable, Section 3 of the Protective Order. Any motion submitted without an affirmative statement of compliance will not be considered, unless specific permission to bypass compliance is provided by the Special Master.

This, the 29th day of May, 2024.

_____
Alice C. Richey
Special Master

39