# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO. 20-cv-954-WO-JLW

FARHAD AZIMA,

     Plaintiff,

     v.

NICHOLAS DEL ROSSO and VITAL
MANAGEMENT SERVICES, INC.,

     Defendants.

**PLAINTIFF'S APPEAL OF
SPECIAL MASTER'S REPORT
AND DECISION NO. 7**

Plaintiff Farhad Azima ("Azima") respectfully appeals portions of the Special Master's May 29, 2024, Report and Decision #7 ("Ruling 7" or "the Ruling") (ECF No. 354) relating to Azima's motions to compel.[1]  Specifically, Azima appeals the decisions regarding:

> (1) the Motion to Compel Christopher Swecker and Christopher Swecker Enterprises to Produce Information Improperly Withheld for Privilege ("Swecker Privilege Motion") (Ex. 1);
>
> (2) the Motion to Compel Dechert LLP to Produce Information Improperly Withheld for Privilege ("Dechert Privilege Motion," Ex. 2, together with the Swecker Privilege Motion, the "Privilege Motions");
>
> (3) the Motion to Compel the Production of Documents Pursuant to the Crime-Fraud Exception ("Crime-Fraud Motion") (Ex. 3); and

---

[1] This appeal is pursuant to Fed. R. Civ. P. 53 and the Court's December 29, 2023 Order for the Appointment of Special Discovery Master ("Appointment Order"), *see* ECF No. 313 ¶¶ 13–14.

1

(4) the Motion to Compel Dechert LLP to Produce Documents Relating to Prior Allegations of Hacking (the "Hacking Motion") (Ex. 4).

## PRELIMINARY STATEMENT

This case is about a crime – the alleged hacking, stealing, and weaponizing of Azima's trade secrets by Nicholas Del Rosso ("Del Rosso") and his co-conspirators at the direction of a global law firm, Dechert LLP ("Dechert"). Issues of privilege, such as who holds the privilege, whether privilege applies in the face of these allegations of criminal conduct, and whether it has been waived by the co-conspirators' actions, permeate the case and significantly impact the discovery to which Azima is entitled.

The Special Master previously ruled that Dechert's client, RAK, the purported privilege holder of most documents over which a privilege dispute exists, must appear in Court to assert any privilege it may hold. That deadline has come and gone. By refusing and failing to appear, RAK has waived any privilege it could have asserted.

But even if RAK could assert privilege, Dechert has already admitted that the crime fraud exception applies, meaning that RAK sought Dechert's counsel in furtherance of a crime or fraud. On its part, RAK has disavowed Dechert's own conduct and renounced any privilege that may have existed.

Against this backdrop, the Special Master issued Ruling 7, summarily dismissing three of Azima's motions that go to the core issue of whether

2

privilege has been waived and the crime fraud exception applies. Ruling 7 also disposed of Azima's Hacking Motion, denying Azima full discovery of prior allegations of hacking against Del Rosso even though Dechert had, only weeks before, produced documents ████████████████████████ ████████████████████████████████████████ ████████████████

Ruling 7 was issued without any mention of Ruling 1 and the implication of RAK's failure to appear to assert privilege; without holding any hearing; and without any supplemental briefing. Ruling 7 also made conclusory decisions based on minimal analysis, and improperly applied a heightened burden on Mr. Azima to establish both privilege waiver and application of the crime fraud exception.

Mr. Azima raised these complex issues of privilege waiver and crime fraud constrained by a 700 word limit on motions and by the premature deadline for privilege motions before discovery was complete. For those reasons, Azima requested an evidentiary hearing where the parties could fully air the evidence. The Special Master's refusal to grant an evidentiary hearing and summary dismissal of Azima's motions without a thorough vetting of the facts was an error and must be overturned.

3

## PROCEDURAL HISTORY

On January 30, 2024, Azima filed his Privilege Motions, seeking to compel Christopher Swecker and Christopher Swecker Enterprises (collectively, "Swecker") and Dechert to produce certain categories of documents improperly withheld for privilege. Exs. 1, 2.[2] On February 6, 2024, the Special Master issued Ruling 1 holding that only RAK, and not third parties, could assert RAK's purported privilege and requiring RAK to appear in Court by March 18, 2024. ECF No. 316, Special Master Report & Decision #1 at 17 (Feb. 6, 2024). RAK refused to appear and has failed to appear as of the date of this filing.

On February 7, 2024, Azima filed his Crime-Fraud Motion,[3] seeking the production of documents withheld for privilege, including between Defendants and Shanahan Law Group ("SLG"), Swecker, Dechert, and RAK. Ex. 3 at 1. Recognizing the complexity of the crime-fraud exception, Azima requested an evidentiary hearing to provide additional context and evidence, and an *in*

---

[2] Azima filed these motions on the Court-imposed deadline for submitting all privilege motions in order to preserve key privilege issues notwithstanding the fact that minimal fact discovery had taken place and privilege logs had not been finalized.

[3] The Special Master agreed that Azima should hold this motion in abeyance past the motion deadline while certain privilege motions were pending.

4

*camera* review of communications between Defendants and the identified parties to determine whether the crime-fraud exception applies. *Id.* at 4.

Azima filed the last of the motions at issue, the Hacking Motion, on March 25, 2024. This motion seeks to compel Dechert to produce improperly withheld documents relating to prior allegations of hacking by Dechert, its attorneys, and its clients. Ex. 4 at 1.

Azima supplemented his Crime-Fraud Motion on May 16, 2024 with newly-produced documents from Dechert showing that Dechert had ███ ███████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. 5.

The Special Master issued Ruling 7 on May 29, 2024, without holding a hearing or status conference on these motions.

## STANDARD OF REVIEW

The Court reviews de novo all objections to findings of fact or conclusions of law made by the Special Master. Appointment Order ¶ 14; Fed. R. Civ. P. 53(f)(3), (4). In reviewing and ruling on such objections, the Court is authorized to receive additional evidence bearing on the arguments presented. *See* Appointment Order ¶ 13; Fed. R. Civ. P. 53(f)(1).

5

**ARGUMENT**

The Court should overrule Ruling 7 because it: (1) fails to apply a critical prior ruling on privilege that renders Ruling 7, at best, premature; (2) misapplies the law as to privilege waiver and the crime-fraud exception; and (3) denies the motion without full opportunity to be heard and a thorough examination of the facts. Instead, the Court should hold an evidentiary hearing and/or conduct an *in camera* review of documents in order to resolve these critical privilege issues. Finally, the Court should overrule Ruling 7 as to the Hacking Motion and order Dechert to produce all withheld documents related to allegations of prior hacking against Del Rosso.

**I.   RULING 7 FAILS TO CONSIDER OR APPLY A PRIOR RULING SEVERELY LIMITING PRIVILEGE ASSERTIONS.**

Ruling 7 purports to resolve significant privilege issues but fails to address the Special Master's prior ruling on privilege, which conflicts with Ruling 7. Special Master Report and Decision #1 ("Ruling 1") held that "Defendants are not authorized to assert any privileges belonging to RAK (or related parties)" and required RAK to appear in this case by March 18, 2024 in order to assert any purported privilege. ECF No. 316 at 17. RAK refused and failed to appear and has therefore waived any privilege claims.[4]

_____

[4] On February 13, 2024, Defendants appealed Ruling 1's holding that Defendants are not authorized to assert RAK's privileges and requiring RAK

6

Nevertheless, Ruling 7 makes no mention of this prior, significant conclusion of law and fails to address whether the privileges underlying the documents at issue in this Ruling belong to RAK, in which case any such privilege has been waived.

Ruling 1 remains the law of the case, and third parties cannot assert privilege over any documents whose privilege is purportedly held by RAK. The vast majority of the documents at issue in Ruling 7 appear to be subject to RAK's privilege, if any. Because Dechert and Swecker cannot assert privilege over many of the documents at issue, it is error to conclude privilege has not been waived.

## II. THE SPECIAL MASTER FAILED TO CONDUCT A COMPLETE AND THOROUGH EXAMINATION OF THE FACTS OR APPLY THE APPLICABLE LAW.

### A. Ruling 7 Misapplied Privilege Law As to Northern Technology Inc. ("NTi") Reports Provided to Third Parties.

Ruling 7 misapplied privilege law regarding NTi hacking reports that Defendants and their agents turned over to the FBI. Defendants commissioned and paid for reports that were written by NTi and contained and analyzed Azima's stolen data. *See* Ex. 6. NTi prepared dozens of those reports,

---

to appear to assert any privilege. ECF No. 320. Defendants sought a stay of the decision requiring RAK to appear by March 18, 2024. *Id.* During the nearly four months' pendency of that appeal, RAK has still not appeared notwithstanding the fact that the Court did not grant a stay.

Ex. 7, VMS Tr. 91:12-22 (Feb. 15, 2024), and voluntarily provided them to the FBI and federal prosecutors in order to create legal jeopardy for Azima, Ex. 8, P. Zukas Tr. 47:13-20 (Mar. 6, 2024). Even assuming that these reports, generated from data stolen by Defendants and their co-conspirators, were privileged (they are not), any such privilege was waived by providing them to third parties. *Fed. Election Comm'n v. Christian Coal.*, 178 F.R.D. 61, 67 (E.D. Va. 1998) (citing *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir. 1984)) ("[A]ttorney-client privilege does not extend to documents or communications relating to matters the client reveals or intends to reveal to others.").

During his January 9, 2024, deposition, former NTi CEO Richard Garcia testified that 

*See* Ex. 9, R. Garcia Dep. Tr. 315:24-316:9; 343:19-344:18 (Jan. 9, 2024).

In addition, NTi's Garcia sent the FBI an email attaching an NTi report marked privilege, dismissing the labeling as "not relevant." Ex. 6 (Oct. 21, 2016 email from R. Garcia to the FBI and attached NC report).[5] The removal

---

[5] "NC" is a reference to NTi.

or disavowal of privileged legends are a tacit admission that Defendants and NTi did not consider the reports privileged.

Ruling 7 nevertheless found these reports are protected by the attorney work product doctrine without developing the facts surrounding the creation of the documents to apply the work product protection in the first place. The Ruling makes the erroneous conclusion that, to be a waiver of work product, "the disclosure must enable an adversary to get hold of the information," and because "there is nothing to suggest that the FBI was adverse to Dechert or Swecker," there was no waiver. Ruling 7 at 11. But this conclusion misstates the appropriate legal standard and ignores key facts:

***First***, the FBI was not in a common interest relationship with Dechert, Swecker, or NTi. FBI agent Zukas testified that he knew that Dechert's client had been accused of stealing the data contained in the Reports and seemed to suggest that Dechert's client was the subject of the government's investigation. Ex. 8 at 21:17-22:13; 192:10-193:12. "[W]here the third party to whom the disclosure is made is not allied in interest with the disclosing party or does not have litigation objectives in common, the protection of the doctrine will be waived." *Medinol, Ltd. v. Bos. Sci. Corp.*, 214 F.R.D. 113, 115 (S.D.N.Y. 2002). The court in *Medinol* found that a company waived work product protection by disclosing its information to an independent auditor. *Id.* Like the FBI, an independent auditor is subject to professional standards that oblige it to follow

9

the evidence to come to its own conclusions. *Id.* at 115-16. In such a situation, "the auditor's interests are not necessarily aligned with the interests of the company." *Id.* at 116.

Here, a law enforcement organization like the FBI was not "allied in interest" with Dechert or its client. The FBI had to investigate the evidence presented and come to its own conclusions about the reports, and Agent Zukas testified as such. Ex. 8 at 26:24-27:13.

Furthermore, it is clear that the recipient of those reports – the FBI – did not consider them to be privileged, and there is no indication that Dechert made any attempt to restrict the FBI's distribution of those reports. In fact, the FBI produced three of the NTi reports to Azima, demonstrating that it correctly did not consider them privileged or subject to any protection. Ex. 6.

**Second**, Ruling 7 erroneously relies upon *dicta* to support the notion that work product protection is not waived unless a disclosure creates a significant possibility that the material would be disclosed to an adversary. *See* ECF No. 354 at 9 (citing *United States v. Duke Energy,* 214 F.R.D. 383, 387 (M.D.N.C. 2003)), and at 11 (citing *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 480 (S.D.N.Y. 1993)). Yet both *Duke Energy* and *Bowne* rejected disclosing parties' attempts to protect material that had been voluntarily disclosed to a non-aligned third-party. *Duke Energy*, 214 F.R.D. at 389 (information disclosed to a trade group); *Bowne*, 150 F.R.D. at 480

10

(information disclosed to a party in another litigation). And *Duke Energy* specifically acknowledged that "it is not clear whether the standard for protecting work product documents against waiver would be higher where a disclosure is intentionally made, as in the instant case." *Id.* at 389.

***Third***, Ruling 7 fails to address the fact that the FBI would have been required to disclose this material to Azima in discovery and/or as exculpatory *Brady* evidence if he had been prosecuted criminally or sued civilly. *See generally* Fed. R. Crim. P. 16(a). Ruling 7 is wrong to conclude that there was not a "significant possibility that the material would ultimately be disclosed to an adversary." ECF No. 354 at 11. Indeed, that was exactly the intent. Dechert, Swecker, and NTi disclosed the material to the FBI in order to spur prosecutors to indict Azima, which, would have required the FBI to disclose the material to Defendants' adversary, Azima. Dechert and Swecker should not be allowed to hide behind the shortcomings of their scheme to instigate the indictment of Azima.[6]

---

[6] The fact that Dechert and Del Rosso did not keep records of what reports they provided to the FBI should not shield them from having to produce those documents. Garcia testified ███████████████████████████████████████ ████████████████████████████████████████████ *See* Ex. 9 at 329:16-330:1; 346:1-347:6; 388:6-17.

Case 1:20-cv-00954-WO-JLW   Document 358   Filed 06/05/24   Page 11 of 30

**B.      Ruling 7 Was Issued without Affording Azima Full Opportunity to Be Heard.**

Ruling 7 reaches the conclusory decision that no privilege waiver occurred without adequate opportunity to be heard or analysis to support its decision.  There was no hearing held on this issue, there was no supplemental briefing ordered by the Special Master.  The Ruling on this critical issue was based on just a few pages of initial briefing and exemplary documents.

Azima filed its Privilege Motions on January 30, 2024, which was the deadline for the parties to file all privilege motions.  Azima complied with that deadline but recognized and raised to the Special Master that full resolution of the privilege waiver issues was premature.  *See* Ex. 2 at 1 n.1.  Azima also was restricted to just 700 words, which makes decisions on complex issues like privilege difficult or impossible.

More than four months later, Ruling 7 summarily denied a finding of privilege waiver on the merits without a single hearing or conference call on the motions.  In contrast, a hearing was held before Ruling 1 was issued, and conference calls have been convened on numerous other motions.  Nor did the Special Master permit any supplemental briefing on the law.[7]  In short, the brief on this issue should have been the springboard for further analysis;

_____

[7] The Special Master at times requested copies of cases or documents cited in the briefs to which she did not have access.

instead, those 700 word briefs filed months before the Ruling became the last word on the subject. This lack of due process alone invalidates the Ruling.

Ruling 7 also failed to address or consider the impact of the privilege decision in Ruling 1. The Special Master held that RAK must appear to assert any purported privilege by March 18, 2024—RAK failed to appear. ECF No. 316 at 17. Yet, inexplicably, Ruling 7 makes absolutely no mention of this, even though Ruling 1 means that many of the documents Defendants seek to protect are no longer privileged. This inherent incongruity between Rulings 1 and 7 is a fatal flaw in Ruling 7 that requires it be set aside on these issues.

Finally, Ruling 7 contains minimal and inadequate analysis of the facts and law. For example, Ruling 7 dismisses, without any analysis, the fact that the sworn statement of Dechert's Neil Gerrard about how Dechert obtained and used Azima's stolen data was itself a subject matter privilege waiver. Ruling 7 concludes summarily in one sentence, "the Special Master does not find any instance in which Gerrard revealed attorney-client privileged or work product information." Ruling 7 at 5. No further information or analysis is given to support this bald conclusion.

Likewise, Ruling 7 references two Dechert documents that are presumably privileged – ███████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ *See*

Ex. 10, DECNC-00010812, DECNC-00016812. Yet the Ruling ignores the fact that the memo is labeled privileged, and the Ruling simply concludes that "[n]either contains attorney-client communications or apparent work product. No waiver occurred by the production of these documents." Ruling 7 at 8. Both documents clearly appear to contain attorney impressions and analysis. Ruling 7 also fails to address the unfounded claim by Dechert, a purportedly premier white collar law firm, that attorney-prepared summaries of meetings with law enforcement are not protected by attorney work product. Indeed, this position conflicts with Dechert's decision to withhold on privilege grounds and log 545 documents related to meetings or communications with the FBI.

Ruling 7 also refers to three Dechert documents produced pursuant to the U.K.'s crime-fraud exception and rules, in one sentence, that no additional documents must be produced to Azima even if a privilege waiver occurred because "[t]here is no evidence presented that all communications relating to the same subject matter were not produced." *Id.* at 7. There was no evidence presented because the Special Master failed to conduct an evidentiary hearing, solicit supplemental briefing, or request oral argument. The Ruling provides no explanation as to why no privilege waiver occurred or how it determined that Dechert had produced all documents related to the same subject matter, *i.e.*, how Dechert and its co-conspirators had obtained Azima's stolen data. Nor was there any request to examine Dechert's privilege log, which clearly

14

demonstrates the conflicting positions Dechert is taking about privilege relating to its meetings and communications with the FBI.

In light of the significant procedural deficiencies and lack of analysis in Ruling 7, the Court should overrule the denial of privilege waiver.

## C. Azima Has Presented Sufficient Evidence for An Evidentiary Hearing on Privilege Waiver.

Azima has presented sufficient evidence to hold an evidentiary hearing and present additional evidence on the issue of privilege waiver.

***First***, Azima has presented enough evidence to warrant further inquiry into whether Dechert and RAK waived privilege over the content of reports written by NTi. NTi CEO Richard Garcia testified that ███████████ ████████████████████████████████████████████████████ ██████████████████████████████ *See* Ex. 9 at 315:24-316:9; 343:19-344:18. The reports were not privileged, and by producing NTi reports to third parties, Defendants have waived any privilege protections over all such reports. The removal of privileged legends from those reports is telling and dispositive.

***Second***, Azima has demonstrated that Swecker, Dechert, and RAK waived privilege over documents and communications regarding how they obtained Azima's hacked data. Defendants, Dechert, and Swecker have selectively produced documents and given sworn (and false) testimony on the

15

issue of how they obtained Azima's data. Former Dechert partner Neil Gerrard

provided extensive sworn testimony, including at RAK's instruction, about

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *See*

Ex. 2, Dechert Privilege Motion at Ex. A (select Gerrard witness statements

and testimony). Dechert also produced ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**Third**, Azima has presented enough evidence for an evidentiary hearing

as to whether Dechert, Swecker, and RAK have waived any privilege over

documents and communications related to how they analyzed, distributed, or

otherwise used Azima's data. For instance, Defendants and others have

produced several privileged documents reflecting how they used Azima's data

to instigate law enforcement investigations. In addition to the Dechert

attorney impressions discussed in Section II(B) above, Swecker, Defendant

VMS's then-attorney, also produced ████████████████████████████

███████████████████████████████████████████████████████████

Ex. 11, SWECKER_00004906-07; SWECKER_00003143; *see also* Ex. 10,

DECNC-00010812.

16

Ruling 7 denied Azima's Privilege Motions summarily and prematurely, without opportunity to be fully heard. Azima has made sufficient showing to permit an evidentiary hearing and further evidence and testimony as to whether privilege has been waived.

## III. AZIMA HAS MADE A PRIMA FACIE SHOWING THAT THE CRIME FRAUD EXCEPTION APPLIES.

How privilege intersects with the allegations of criminality is at the heart of this litigation. Azima alleges that Defendants were hired by an international law firm, Dechert, to oversee a scheme to hack and distribute Azima's confidential information, and that Defendants then deployed others, like attorneys Swecker and SLG, to facilitate the scheme. Defendants, Dechert, Swecker, SLG, and others have claimed privilege over most relevant documents relating to this litigation, while at the same time selectively disclosing documents that would otherwise be privileged. Dechert has admitted that the U.K. equivalent of the crime-fraud exception requires them to disclose certain documents regarding (1) how they obtained Azima's stolen data and (2) their lies to Azima and the U.K. court about how they obtained Azima's stolen data. But they arbitrarily limit their disclosure to avoid producing documents about Defendants' involvement in these topics.

Ruling 7 fails to apply correct legal standards to this critical issue, but it also fails to give Azima an appropriate opportunity to be fully heard. Under

17

the discovery motion rules, Azima's argument about the application of the crime fraud exception had to be made in a 700-word motion. Understanding an issue as complex as the crime fraud exception requires much more information, which is why Azima also requested an evidentiary hearing. Instead, Ruling 7 was issued without a hearing or asking for any more information other than what was contained in the motion.

### A. Ruling 7 Incorrectly Holds the Crime Fraud Exception Must be Shown by a Preponderance of the Evidence.

"[T]he attorney-client and work product privileges may be lost . . . when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud." *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005). "The party invoking the crime-fraud exception . . . must make a prima facie showing" "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's . . . scheme." *Id.*

As a threshold matter, Ruling 7 misapplied Azima's burden of proof regarding this prima facie showing. Ruling 7 relies heavily on a single, unpublished North Carolina Superior Court decision—W*indow World of Baton Rouge, LLC v. Window World, Inc.*, Nos. 15-cvs-1, 15-cvs-2, 2019 WL 3995941, at *18 (N.C. Super. Ct. Aug. 16, 2019)—which reasoned "a preponderance of

18

the evidence standard is appropriate in the civil context." But this holding is explicitly contrary to Fourth Circuit case law. "In satisfying [the crime fraud exception's] prima facie standard, proof either by a preponderance or beyond a reasonable doubt of the crime or fraud is not required." *In re Grand Jury Proceedings*, 401 F.3d at 251 (citing *Union Camp Corp. v. Lewis*, 385 F.2d 143, 145 (4th Cir. 1967) ("[The Government] was not at this [prima facie] stage of the proceedings required to prove the crime or fraud in order to secure the evidence.")). Azima must only present "evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed" and that "the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *Id.* Ruling 7 improperly applies a higher burden.

## B. Azima Has Established a Prima Facie Case That the Crime Fraud Exception Applies.

Azima has established a prima facie case that the crime fraud exception should apply to all documents related to how Defendants and their co-conspirators obtained Azima's data, as well as efforts to mislead Azima and others about how they obtained that data.

Importantly, Dechert admits that the U.K.'s corollary to the crime-fraud exception required it to produce documents related to RAK's (Dechert's client) (1) illegal obtaining of Azima's and others' data and (2) misleading of Azima

19

and courts as to their involvement in the hacking. Ex. 12 ¶¶ 122, 136(1)-(2).
Dechert seeks to limit this production to documents involving Stuart Page, a
co-conspirator, who has admitted to lying to the U.K. court about how he
obtained the stolen data. Ex. 13 (FA_MDNC_00000516 ¶ 41). But there is no
distinction between Page's involvement in obtaining Azima's stolen data and
Del Rosso's in this conspiracy case. Given that Dechert has already admitted
that the equivalent of the crime fraud exception requires production of some
documents related to how they obtained Azima's data and their lies to the UK
court regarding the same, all related documents must be produced.

Ruling 7 implies that Azima seeks to turn Dechert's admission into a
subject matter waiver requiring production of all documents, but that is not
true. The documents Azima seeks are specifically related to the crime or fraud
perpetrated through Dechert. Azima seeks documents related to how
Defendants and their co-conspirators obtained his stolen data and lies told
about obtaining that stolen data. That includes the use of SLG to pay Del
Rosso's co-conspirators to anonymously mail one of Azima's documents to a
court and lies to the FBI about how Defendants and their co-conspirators
obtained the stolen data. Ex. 14, Witness Statement of Patrick Grayson ¶¶13-
21.

Beyond Dechert's admission that the exception should apply, the
documents received in discovery are more than sufficient to establish a prima

20

facie case that a crime or fraud was committed with regard to the how Defendants and their co-conspirators obtained Azima's data and false statements made about how they obtained those documents. For example:

- ███████████████████████████████████████████████ Ex. 15 (DECNC-00053980).

- Defendants have admitted to paying CyberRoot more than $1 million. ECF No. 86 ¶¶ 28-29. CyberRoot, which Meta, in a report on cybersecurity independently determined was a hack for hire company, Ex. 16 (FA_MDNC_00000552), admitted in text messages that they hacked Azima on behalf of Defendants and Del Rosso. *See* ECF No. 246-1.

- Dechert received hacking reports with excerpts of Azima's stolen data. One of these reports, ███████████████████ ████████████████████ Ex. 17 (DECNC-00004174), ████████████████████████████████████████ Ex. 18 (FA_MDNC_01013828).

- Del Rosso ███████████████████████████ Ex. 19 (DECNC-00004911).

- The Dechert general counsel admitted that the conduct was "unquestionably extraordinarily problematic" and "deeply, deeply troubling." Ex. 20 (Dechert 30(b)(6) Dep. Tr. at 202:10-14).

- Dechert, Defendants and others conspired to conceal how they obtained Azima's stolen data. One example is a clandestine meeting in Switzerland where Gerrard met with UK trial witnesses to rehearse their false stories.[8] Ex. 13 (FA_MDNC_00000516 ¶¶ 46-53); *see also* Ex. 21 (DECNC-00004761)████████████████████████████████

---

[8] RAK has said that this meeting took place outside the scope of Dechert's representation of RAK.

- Defendants also used their law firm, SLG, to pay individuals to mail documents belonging to Azima to a court in the U.S. to mislead the court about the origin of that document. Ex. 14, Grayson Witness Statement ¶¶ 5-6, 13-21.[9] SLG paid these individuals even though the individuals performed no work for SLG. *Id.* ¶¶ 5-6.[10]

- Defendants and their co-conspirators never revealed that Azima's data was obtained through hacking. Ex. 22, Memo to RAKIA File at DECNC-00009505 ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ [11]

---

[9] The Special Master said that the witness statement of Patrick Grayson did not support Azima's prima facie case because it did not mention hacking. But the statement says that Grayson and JR Fayol were paid to mail a copy of a document between Azima and others so that Neil Gerrard could "feign surprise" at having seen it. Ex. 14 ¶ 15. The implication is clear that the purpose of the mailing was to mislead the Court as to how the document had been obtained.

[10] The Special Master incorrectly discounted the fact that SLG paid Grayson for work done on behalf of Del Rosso rather than SLG. Grayson says that, even though he was paid by SLG, he did no work for SLG, meaning that SLG was paying Grayson for work that was performed by Defendants. Ex. 14 ¶¶ 5-6. Ruling 7 incorrectly states that this does not support Azima's prima facie case because "law firms frequently pay third-party providers on behalf of their clients." Ruling 7 at 28 n.19. Azima disagrees. Though it is normal for law firms to pay consultants working for the law firm on behalf of a client (like an investigator or expert working on the law firm's case), here Grayson says he did not work for SLG. Using a law firm to pay someone conducting work unrelated to the law firm is not standard practice and, given the other evidence presented in this case, is strong indicia that the payments were improper.

[11] Ruling 7 concludes that nothing in these documents suggests Swecker knew that Azima's data (or reports analyzing that data) had been hacked, or that he was lying to law enforcement about the origin of the data. But that is not the standard. In applying the crime-fraud exception, "it is the client's knowledge and intentions that are of paramount concern because the client is the holder

Finally, the fact that the U.K. court has entered a default judgment against RAK for hacking supports Azima's prima facie case that a crime or fraud occurred. Ruling 7 incorrectly held that the default judgment against RAK did not show criminal activity because the judgment was not on the merits. ECF No. 354 at 33. However, RAK chose to default and refused to take part in the proceeding. Ex. 23 (FA_MDNC_00000573). This was after an overwhelming amount of evidence had been revealed regarding their fraud. It would create perverse incentives if a client engaged in committing crimes could avoid the application of the crime fraud exception merely by refusing to show up for litigation.

The evidence of a crime or fraud in this case is overwhelming. The evidence shows that Defendants and their co-conspirators paid hackers and had access to Azima's data in real time. They then lied to Azima, courts, and the FBI about how they obtained that data. Dechert has admitted that the U.K. equivalent of the crime fraud exception should apply. This is more than

---

of the privilege." 401 F.3d at 251. "Therefore, for the exception to apply, the attorney need not be aware of the illegality involved." *Id.* Rather, "it is enough that the communication furthered, or was intended by the client to further, that illegality." *Id.* (quoting *In re Grand Jury Proceedings*, 102 F.3d 748, 751 (4th Cir. 1996)). Here, that is clearly the case. Del Rosso did not have permission to assess or possess Azima's confidential information but nevertheless provided stolen documents to Swecker to pass on to the FBI.

sufficient to establish a prima facie case of crime fraud and hold a hearing about the scope of what must be produced.

## IV. AZIMA IS ENTITLED TO FURTHER DISCOVERY FROM DECHERT REGARDING ALLEGATIONS OF PRIOR HACKING BY DEL ROSSO.

The Court should overrule Ruling 7 denying Azima's Hacking Motion and require Dechert to produce any withheld documents that relate to prior allegations of hacking against Del Rosso.[12]

This case relates to the hacking of Azima by Defendants and their co-conspirators at the direction of Dechert and the misappropriation and online publication of that hacked data. The Court has ruled that documents relating to the hacking of Azima are relevant to the claims and defenses in this matter.[13] Accordingly, Azima has sought evidence of Defendants' involvement in prior acts of hacking from Dechert, a co-conspirator, through third party subpoenas.

---

[12] Azima appeals only the ruling as to documents related to allegations of other acts of hacking against Defendants and not documents related to allegations of hacking by Dechert or its clients.

[13] During the September 29, 2023, discovery hearing, the Court stated, "I'm going to give the Azima some latitude because you're working backwards to establish as an evidentiary matter the hacking. . . . So it's a more complicated case than simply saying over and over again, well, it's one claim, and the hacking stuff has been, you know, dismissed. There's overlap, in my mind, without a doubt, regardless of whether the hacking claim is in the case or not as opposed to just a one-count trade secret or two-count trade secrets case." Ex. 25, Tr. of Status Conf. at 9:2-13 (Sept. 29, 2023).

24

Evidence of other acts of hacking by Defendants is relevant under Federal Rule of Evidence 404(b) to show intent, knowledge, motive, pattern, mistake, or lack of accident – all relevant in a conspiracy case such as this. Rather than acknowledge the numerous permissible purposes for which such information may be relevant, Ruling 7 summarily denies Azima's motion on the assumption that Azima seeks it for impermissible propensity purposes. ECF No. 354 at 37.

Documents produced during discovery confirm that Dechert hired Del Rosso knowing that he had been accused of hacking during other litigation for Dechert partners. *See* Ex. 24 at DECNC-00031258 (Sept. 2014 Dechert due diligence checklist identified as document "192809.1" stating that "VMS were accused of hacking a computer outside the EU to obtain information for the claimant in a civil fraud claim.").

Dechert only recently produced documents revealing that Dechert ordered the destruction of documents acknowledging that Defendants previously had been accused of hacking. Those documents show that ███

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ *See* Ex.

26 (DECNC-00053978-79). █████████████████████████████

████████████████████████████████████████████████

25

███████████████████████████████████████

████████████████████████████ *See* Ex. 27, DECNC-00063472. █████

███████████████████████████████████████

███████ *Id.* at DECNC-00063471. ████████████████████

███████████████████████████████████████

████████████████████████████ *Id.*

Dechert's recent production at the close of fact discovery raises concerns that the firm has not produced all documents related to prior hacking allegations against Del Rosso in response to Azima's subpoena. Gerrard's statement described above suggests that more than the few versions of the due diligence checklist that Dechert produced may exist. And contrary to Ruling 7's conclusion, Azima cannot simply seek these documents from Defendants, *see* ECF No. 354 at 38, as the documents produced thus far are internal Dechert communications that Defendants are not on. Dechert, a co-conspirator in the alleged conspiracy to hack and misappropriate Azima's data, faces no undue burden in having to produce documents on this narrow but critical issue that goes to the core of Del Rosso's history as a hacker.

Azima intends to question Dechert at trial about its motivations for hiring Del Rosso, someone who had allegedly engaged in hacking for Dechert partners in the past. He therefore should be permitted to obtain documents about those allegations.

26

## CONCLUSION

For the reasons stated above, Ruling 7 erred in misapplying privilege law and summarily denying Azima's motions on the merits without adequate opportunity to be heard, and should therefore be reversed.

This, the 5th day of June, 2024.

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Ripley Rand*

Ripley Rand (N.C. State Bar No. 22275)
Christopher W. Jones (N.C. State Bar No. 27265)
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Telephone: (919) 755-2100
Facsimile: (919) 755-2150
Email:     ripley.rand@wbd-us.com
         chris.jones@wbd-us.com

Kirby D. Behre (*pro hac vice*)
Timothy P. O'Toole (*pro hac vice*)
Lauren Briggerman (*pro hac vice*)
Ian Herbert (*pro hac vice*)
Calvin Lee (*pro hac vice*)
Cody Marden (*pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, D.C. 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Email:     kbehre@milchev.com
         totoole@milchev.com
         lbriggerman@milchev.com
         iherbert@milchev.com
         clee@milchev.com
         cmarden@milchev.com

*Counsel for Plaintiff Farhad Azima*

27

## CERTIFICATE OF WORD COUNT

I hereby certify under LR 7.3(d)(1) that the body of this Memorandum, including any headings and footnotes together, contains fewer than 6,250 words, as reported by the word count feature in Microsoft Word.

This, the 5th day of June, 2024.

WOMBLE BOND DICKINSON (US) LLP

/s/ *Ripley Rand*
Ripley Rand
North Carolina State Bar No. 22275
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: (919) 755-8125
Facsimile: (919) 755-6752
Email:      ripley.rand@wbd-us.com

*Counsel for Plaintiff*

28

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## Case No. 20-CV-954-WO-JLW

| | |
|---|---|
| FARHAD AZIMA, | |
| Plaintiff, | |
| v. | **CERTIFICATE OF SERVICE** |
| NICHOLAS DEL ROSSO and VITAL MANAGEMENT SERVICES, INC., | |
| Defendants. | |

I hereby certify that I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send electronic notification of this

Notice to the following attorneys:

Brandon S. Neuman, Esq.
Jeffrey M. Kelly, Esq.
NELSON MULLINS RILEY & SCARBOROUGH, LLP
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
brandon.neuman@nelsonmullins.com
jeff.kelly@nelsonmullins.com

Samuel Rosenthal
NELSON MULLINS RILEY & SCARBOROUGH, LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
sam.rosenthal@nelsonmullins.com

Justin B. Kaplan
George C. Mahfood
NELSON MULLINS RILEY & SCARBOROUGH, LLP
2 South Biscayne Blvd., 21st Floor
Miami, FL 33131
Email: justin.kaplan@nelsonmullins.com
Email: george.mahfood@nelsonmullins.com

*Counsel for Defendants*

Richard S. Glaser
Parker Poe Adams & Bernstein LLP
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Email: rickglaser@parkerpoe.com

Nana Asante-Smith
Parker Poe Adams & Bernstein LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, NC 27601
Email: nanaasantesmith@parkerpoe.com

*Counsel for Christopher Swecker and Christopher Swecker Enters. LLC*

This, the 5th day of June, 2024.

                  **WOMBLE BOND DICKINSON (US) LLP**

                  */s/ Ripley Rand*
                  Ripley Rand
                  North Carolina State Bar No. 22275
                  555 Fayetteville Street, Suite 1100
                  Raleigh, NC 27601
                  Telephone: (919) 755-8125
                  Facsimile: (919) 755-6752
                  Email: ripley.rand@wbd-us.com

                  *Counsel for Plaintiff*

30