# Exhibit 14

Assigned to: THE HON MR JUSTICE MICHAEL GREEN

*BETWEEN:*

**RAS AL KHAIMAH INVESTMENT AUTHORITY**
*Claimant and Defendant to the Counterclaim*

- and -

**FARHAD AZIMA**
*Defendant and Counterclaimant*

-and-

~~STUART PAGE~~
~~*First Additional Defendant to the Counterclaim*~~

-and-

**DAVID NEIL GERRARD**
*Second Additional Defendant to the Counterclaim*

-and-

**DECHERT LLP**
*Third Additional Defendant to the Counterclaim*

-and-

**JAMES EDWARD DENNISTON BUCHANAN**
*Fourth Additional Defendant to the Counterclaim*

---

**WITNESS STATEMENT OF
PATRICK T.F. GRAYSON**

---

I, **PATRICK TRISTRAM FINUCANE GRAYSON**, of 3 Rosenau Crescent, London, SW11 5RY do say as follows:

1

## INTRODUCTION

1. I have been asked to provide a statement in relation to proceedings involving Mr Farhad Azima, full details of which I have not been asked to review. The purpose of this statement is to describe certain subjects about which Mr Nicholas del Rosso (**NDR**) and/or Vital Management Services, Inc. (**VMS**) sought my advice and/or instructed me in 2018 and 2019, together with related payments.

2. The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3. Over the course of about 36 years, I have worked in the business intelligence and corporate investigations sector.

4. In early 2018 I began assisting NDR and I signed a Non-Disclosure Agreement with VMS in which my role was described as 'research, strategic advice [and] media consulting'.

5. From February 2018 NDR paid my company Grayson+Co Ltd a monthly consultancy fee in respect of my services, initially through a third party and, from May 2018, indirectly, through the law firm Shanahan Law Group (**SLG**), which is based in Raleigh, North Carolina, USA. Apart from the months of April and May 2020 (when payments were received directly from VMS), this arrangement continued until November 2020, and thereafter (until February 2021) indirectly through the US law firm Nelson Mullins Riley & Scarborough (**NMRS**). Monthly fees ranged between UD$10,000 and US$25,000.

6. My professional dealings with SLG and NMRS were with Brandon Neuman and Jeff Kelly in the Raleigh NC office. At no stage did I ever provide services to them.

7. NDR's calls on my time increasingly focused on matters relating to Ras al Khaimah (**RAK**), and it became clear to me that this had for some time been

and still was NDR's main preoccupation.

8. From the onset, NDR made it clear to me that in all RAK-related matters he took his instructions from Mr Neil Gerrard **(Gerrard),** a London-based partner of the law firm Dechert. These matters were primarily the litigation being managed by Gerrard concerning Dr Khater Massaad, Mr Farhad Azima and Mr Oussama El-Omari and all related and consequential matters including, later, Mr Karam Al Sadeq.

9. I first met Gerrard in person at a meeting with NDR in Dubai in January 2019. It was clear to me that the relationship was one of deference on NDR's part.

10. At various points I also met others of the close and then-trusted advisors to Dechert's ultimate RAK client, RAK's ruler, HH Sheikh Saud Bin Saqr Al Qasimi. This core group comprised Gerrard, James Buchanan, Amir Handjani, Andrew Frank (of KARV Communications of NY) and NDR.

11. With only one exception, throughout my engagement with NDR all requests or instructions given concerning RAK-related matters were from NDR. The one exception was Project Karsk where, upon NDR's direction, I took instructions directly from Dechert lawyers in London and New York. Project Karsk concerned RAK-related litigation in India.

12. Upon NDR's referral I was on one occasion retained and paid directly by Dechert to advise on security surrounding Gerrard. This was named Project Warrior, and I took my instructions from Dechert's UK General Counsel James Croock.

**THE LEBANON LETTERS**

13. Sometime in January/February 2019 NDR described to me that he had in his possession a document which he had been tasked to have sent anonymously to a number of recipients.

14. NDR's plan (which I never doubted was in connivance with Gerrard) was that the document should be posted anonymously to lawyers (and maybe other interested parties) on both sides of litigation in which Mr Azima was engaged. NDR was keen

3

that this should be from outside the US or Europe.

15. The anonymous postings were to include a list of all the recipients so that each one would know who else had received it. Importantly, this would include Gerrard himself so that he could feign surprise, and to enable lawyers opposed to Mr Azima to weaponize the document in proceedings.

16. Jean-Renaud Fayol (**JRF**) is the Managing Partner of Axis&Co, a well-established French risk management and intelligence firm. I introduced JRF to NDR in August 2018 in response to NDR's expressed need for advice in the Democratic Republic of the Congo and the Central African Republic and he subsequently had also helped NDR in relation to, for example, the surveillance of Mr Azima on holiday.

17. I knew JRF to have a depth of knowledge and experience across both Africa and the Middle East, and I was aware that he had good connections in Lebanon; this suited NDR's wish that the postings should emanate from outside the US or Europe. I was tasked by NDR to sound out JRF on his preparedness to undertake this assignment.

18. I travelled to Paris on the evening of Tuesday 12 February 2019 and met JRF at his office on Wednesday 13 February 2019. I subsequently re-charged my travel and accommodation expenses for this trip to NDR via SLG in the usual manner. I believe that this was the occasion when I briefed JRF on the assignment and he agreed to undertake it.

19. I believe that it was I who was subsequently instructed by NDR to call JRF to a meeting in London, which was arranged for Friday 15 March 2019. JRF was accompanied at this meeting by his Axis&Co colleague Peter Bobrinsky (PB). At the meeting, NDR confirmed the assignment and provided JRF and PB with the document and an intended list of recipients.

20. I recall that the document, when I saw it, appeared to be a copy of an email trail between Mr Azima and others; beyond that I have no recollection of the content. I know that Gerrard was on the accompanying list of recipients, as well as Kirby Behre,

4

-583-

Case 1:20-cv-00954-WO-JLW   Document 358-14   Filed 06/05/24   Page 5 of 6

whose name was already known to me.

21. Sometime in late April or early May 2019 NDR informed me that there had been a mistake with the postings, as the list of recipients had not been included with the document. I passed this news on to JRF, along with NDR's instructions that the exercise should be repeated poste haste, but this time with the list of recipients included. JRF acknowledged this instruction.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

*[Signature]*

**PATRICK T.F. GRAYSON**

Dated: 8TH January 2024