EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:20-cv-00954-UA-JLW

| | |
|---|---|
| FARHAD AZIMA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) **DECLARATION OF** |
| NICHOLAS DEL ROSSO and VITAL MANAGEMENT SERVICES, INC., | ) **NICHOLAS DEL ROSSO** ) ) ) ) |
| Defendants. | ) |

I, **Nicholas del Rosso**, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

1. I am over the age of eighteen years of age and competent to testify as to the matters set forth in this Declaration.

2. I submit this Declaration in response to Mr. Azima's February 7, 2024 submission to the Special Master regarding the "crime-fraud exception" (the "Crime-Fraud Submission") including the exhibits Mr. Azima has attached thereto relating to Shanahan Law Group's ("SLG") law firm trust account, Mr. Grayson and Mr. Robinson.

3. I am the President and owner of Vital Management Services Inc. ("**VMS**"), a North Carolina corporation. VMS provides consulting services to law firms and businesses engaged in investigating or evaluating suspected fraud.

4. In August 2014, VMS was engaged by Dechert LLP to investigate assets potentially stolen from the Government of Ras Al Khaimah ("**RAK**").

Pursuant to its engagement, VMS examined potential frauds committed by various parties. At all times, I took my instructions from Dechert and assisted Dechert in providing legal representation in anticipation of litigation.

5. Preliminarily, as I have now several times explained through sworn statements in this Court and in several other related matters, part of my engagement by Dechert with respect to its representation of RAK and its related entities involved the retrieval of the data at issue in this lawsuit after its public availability had been discovered by others, to assist Dechert with its legal representation of RAK in anticipation of litigation.

6. At no time prior to or during the engagement referenced above was I (or VMS) engaged in or planning for a criminal or fraudulent scheme, much less one which I (or VMS) was seeking the advice of counsel in furtherance of. Any allegations to the contrary are false.

7. Specifically, neither I nor VMS ever enlisted or used legal counsel to further payments to anyone for their involvement in hacking and dissemination of Plaintiff's stolen data.

8. Further, neither I nor VMS ever, directly or indirectly, instructed, directed, or paid any person or entity to engage in illegal activity against anyone, including with respect to alleged "attacks" on Mr. Azima.

9. For the avoidance of doubt, I did not hack Mr. Azima's computers, cause him to be hacked, pay any party to hack, or know who hacked him. I did not upload his data to the internet, cause his data to be uploaded, pay for his data to be uploaded

2

to the internet, or know who did upload his data, nor did I republish any of Mr. Azima's data.

10. In 2017, I hired Shanahan Law Group ("SLG"). I was seeking a full service law firm to represent me and VMS, essentially to serve as outside general counsel, to represent me and VMS in legal matters and provide legal advice to VMS. In late 2020, SLG was absorbed into Nelson Mullins Riley & Scarborough LLP ("NMRS"), which is my current US counsel in this matter.

11. SLG's bank records reflect payments for SLG's work in the normal course of its representation of me and VMS, as well as payments to certain contractors performing work for VMS. This payment arrangement was done for the purposes of better managing my several contractor relationships through SLG, who was serving the role as VMS's outside general counsel.

12. At all times, I personally reviewed invoices from VMS' third-party contractors before approving payment. This arrangement was not for any illegal or fraudulent purpose, and any characterizations otherwise are false.

13. For the avoidance of any doubt, neither I nor VMS ever enlisted SLG to further payments to anyone for their involvement in hacking and dissemination of Plaintiff's stolen data, or to engage in illegal activity against anyone. SLG had no involvement in facilitating payments for criminal conduct, because neither I nor VMS never participated in, directly or indirectly, in any criminal conduct, or instructed anyone else to engage in any criminal conduct.

14. Plaintiff relies on a Declaration of Paul Robinson in support of the present Motion. Mr. Robinson and his company, Company Documents, purport to locate publicly available corporate information (or any publicly available documents) anywhere in the world. I was introduced to Mr. Robinson by a colleague in the early 2000s, although I have never met Mr. Robinson in person.

15. Mr. Robinson and his company offered services valuable to VMS in terms of locating assets within various projects. Mr. Robinson and his company are very good at identifying how certain companies were formed and structured, ownership, locations, real estate holdings, and other items. Over the years, in connection with VMS' asset location services, VMS has regularly sought assistance from Mr. Robinson and his company.

16. For example, in April 2018, Mr. Robinson assisted VMS in identifying corporate structures created to obfuscate true ownership in a fraud perpetrated on a group of employees of a high-profile company; in December 2019, Mr. Robinson assisted VMS in identifying assets held by adverse parties suspected of misappropriating assets and intellectual property in India; in September 2019, Mr. Robinson assisted VMS by providing research into several companies in Nepal and Singapore suspected of being shadow companies created to enable the syphoning of assets from a client; in May 2020, Mr. Robinson provided research into companies involved in an attempt to recover a large sum of money held by Swiss regulators.

17. The payments to Mr. Robinson from VMS, described in the Motion and in Mr. Robinson's Declaration, were for the lawful services described above. To

4

avoid any doubt, all payments from VMS to Company Documents were in connection with lawful research on behalf of corporate clients. Indeed, the consulting agreement to which Mr. Robinson refers in his Declaration was a general engagement for the services described above consistent with Company Documents' expertise; not an engagement for any illegal or fraudulent activity.

18. In June 2020 Mr. Robinson contacted me after he was served with litigation in the UK by the Stokoe Partnership, and I subsequently directed him to my US lawyers for the sole purpose of helping him locate UK legal counsel. Mr. Robinson also informed me that he could not afford legal fees to hire an attorney, so, upon the request and urging by Mr. Grayson (who I considered to be a friend), I offered Mr. Robinson a loan to help him retain UK legal counsel, which I understand he did. When I agreed to the loan, my understanding was (and remains) that Stokoe's aggressive pursuit of litigation risked pushing Mr Robinson into financial difficulty. I agreed to loan the money – a loan, not a gift, and not in exchange for anything other than a promise to pay me back.

19. I never told Mr. Robinson that I would pay his legal fees if he did not mention my name (as Mr. Robinson states in his Declaration). I expected to be paid back for the funds I loaned Mr. Robinson. I have not pursued collection of the loan because the US litigation against me began in October 2020, and Mr. Robinson became an adverse witness. Based on this, I do not expect that Mr. Robinson will pay me what he owes even if I pursue collections activity.

20. Plaintiff also relies on a Witness Statement of Patrick Grayson in support of his present Motion. I note that both Mr. Grayson's and Mr. Robinson's Declarations/Witness Statements that make adverse allegations toward me did not surface until *after* the UK cases against them were dismissed by Stokoe.

21. I have known Patrick Grayson since the mid-1990s. My connection to Mr. Grayson was due to his past position as Chairman of CDR International Ltd, a company I previously owned and sold in 1998. As well as a longstanding business contact, I considered Patrick to be a friend. After my company was sold, Mr. Grayson went his own direction. I did not work with Mr. Grayson for many years after that point.

22. In 2017 or early 2018, I randomly ran into Mr. Grayson while in London. We spent some time catching up, but did not, at that time, discuss any professional collaboration.

23. Sometime thereafter, a professional acquaintance mentioned that he knew Mr. Grayson and indicated that Mr. Grayson was separating from his own company, which was a company that provided investigative services. I decided to contact Mr. Grayson and explore a potential professional relationship.

24. In 2018, while VMS continued to work on RAK related matters instructed by Dechert, VMS retained Mr. Grayson as a contractor, and entered into a consultancy agreement. VMS retained Mr. Grayson because of his volume of contacts and access to professional resources. I believed this capability would be valuable to VMS for work it was performing in the UK and elsewhere, including

6

helping to locate publicly available information. In addition, I believed Mr. Grayson would be helpful in VMS' marketing efforts.

25. Over the years, VMS has sought assistance from Mr. Robinson and his company.

26. For example, in June 2018, Mr. Grayson assisted VMS by identifying resources for a project in Eastern Europe and he provided background and research into company and individuals suspected of holding stolen assets; in October 2019, Mr. Grayson assisted VMS to identify suitable experts in India for a confidential arbitration involving the termination of access to bauxite in mines near an aluminum refinery.

27. The payments to Mr. Grayson described in the Plaintiff's current Motion and in his Witness Statement were based on a general retainer for his services, plus expenses associated with his work. From time to time, I would ask Mr. Grayson to conduct work within various VMS projects, some related to RAK/Dechert, and some not. VMS' engagement of Mr. Grayson, and payments to him, were not for the purpose of conducting any illegal or fraudulent activity.

28. In Mr. Grayson's Witness Statement, he mentions J.R. Fayol. Mr. Fayol and his Company, Axis & Co, provides security, research, and investigative services in French speaking countries and territories. I was introduced to Mr. Fayol by Mr. Grayson, as VMS had a need for research in an unrelated project located in a former French territory of Africa. I do not recall instructing Fayol on any work associated with Mr. Azima.

7

29. VMS' payments to Mr. Fayol were for the lawful work described above.

30. Neither VMS nor I ever enlisted legal counsel to further payments to any party (including Mr. Robinson, Mr. Grayson, and Mr. Fayol) for the hacking and dissemination of Mr. Azima's data. Similarly, neither VMS nor I ever engaged any party to participate in illegal activity or attacks on Mr. Azima, or paid any party—directly or indirectly—to participate in illegal activities or attacks on Mr. Azima. Neither VMS nor I ever enlisted legal counsel to further payments to any party (including Mr. Robinson, Mr. Grayson, and Mr. Fayol) for any illegal or fraudulent work.

31. Any assertions otherwise, including the allegations in Mr. Azima's Crime-Fraud Submission or the exhibits thereto, are false.

*Robinson Declaration*

32. Mr. Robinson's Declaration submitted in support of Plaintiff's present Motion contains many false, misleading, and/or purely speculative allegations.

33. As an initial matter, I confirm that neither I nor VMS were the source of the instructions described in Mr. Robinson's Declaration. My understanding is that Company Documents (owned by Mr. Robinson) is a lawful open-source document aggregator and research company, and contrary to the assertions made in Mr. Robinson's Declaration and Plaintiff's present Motion, VMS' payments to Company Documents were in connection with requests for lawful research on behalf of VMS's corporate clients

34. For example, Mr. Robinson describes, in Paragraph 5 of his Declaration, that the purpose of his Declaration is to provide "further details" of my involvement in certain instructions that I gave to Mr. Grayson. I understand that the alleged instructions to which Mr. Robinson refers are that I instructed Mr. Grayson to obtain certain confidential information related to the Stokoe Partnership, which are characterized by Mr. Robinson as the "Grayson enquires."

35. For the avoidance of doubt, I never gave any such instructions to Mr. Grayson, Mr. Robinson, or anyone else, I never paid anyone for any such work, and I was never involved, in any way, in the Grayson enquiries, or the acquisition of any information, confidential or otherwise, associated with the Stokoe Partnership.

36. Paragraphs 8 and 9 of Mr. Robinson's Declaration allege methods in which I participated in the Grayson enquiries. These allegations are false, as I never participated in the instructions described by Mr. Robinson, nor did I or VMS pay anyone to undertake the matters described by Mr. Robinson.

37. In Paragraph 11 of Mr. Robinson's Declaration, Mr. Robinson alleges that I was responsible for paying him in connection with the Grayson enquires – to obtain confidential information of the Stokoe Partnership. This is completely false, as I never instructed or paid anyone for the activity described as the Grayson enquiries, and never participated in the same.

38. For the avoidance of doubt, I was never asked to obtain confidential information of the Stokoe Partnership, never instructed anyone to obtain confidential information of the Stokoe Partnership, never paid anyone to obtain

9

confidential information of the Stokoe Partnership, and indeed never obtained confidential information of the Stokoe Partnership.

39. In Paragraph 12 of Mr. Robinson's Declaration, Mr. Robinson alleges that he sent VMS an invoice in relation to the "Grayson enquiries" - to obtain confidential information of the Stokoe Partnership. This is false, as I never instructed Mr. Robinson, directly or indirectly, to undertake this activity, I never received any invoices from Mr. Robinson for this activity, and I never paid Mr. Robinson or his company for this activity.

40. Likewise, Paragraph 13 of Mr. Robinson's Declaration attributes certain invoice issued to VMS for the "Grayson enquires." This is false, as I never instructed Mr. Robinson, directly or indirectly, to undertake this activity, I never received any invoices from Mr. Robinson for this activity, and I never paid Mr. Robinson or his company for this activity.

41. Mr. Robinson alleges in Paragraph 14 of his Declaration that on July 1, 2020, I told him not to mention my name in relation to this work. This is false, as I never told Mr. Robinson "not to mention my name" or anything like that. Indeed, I never instructed him, directly or indirectly, to do any of the work he describes in his Declaration. Also in Paragraph 14 of his Declaration, Mr. Robinson alleges that he deleted six invoices to distance himself from me. To be clear, I never instructed, directly or indirectly, or even suggested, Mr. Robinson to delete any data, including invoices.

42. Mr. Robinson references, in Paragraph 15 of his Declaration, that certain invoices were related to Radha Stirling and "OP Dotty." I never instructed, directly or indirectly, Mr. Robinson to perform any work associated with Radha Stirling or "OP Dotty." In fact, I have no idea what "OP Dotty" means.

43. In Paragraph 16 of Mr. Robinson's Declaration, he alleges that he paid John Gunning for work related to the "Grayson enquires." I do not know who John Gunning is, I never instructed or paid John Gunning, either directly or indirectly, to perform any work, including in relation to the Stokoe Partnership. I certainly did not authorize the work described by Mr. Robinson in his Declaration.

44. In Paragraph 18 of Mr. Robinson's Declaration, he alleges that I offered to pay his legal fees in exchange for him not mentioning my name. This is completely false, as I never instructed or suggested that Mr. Robinson "not mention my name." As I stated above, I offered Mr. Robinson a loan for the sole purpose of helping him retain legal counsel in the UK after Mr. Grayson requested that I do so, and Mr. Robinson informed me that he could not afford to pay an attorney at that time, especially in relation to the Stokoe's expected highly aggressive litigation tactics.

*Grayson Witness Statement*

45. Mr. Grayson's Witness Statement submitted in support of Plaintiff's current Motion also contains many false, misleading, and/or purely speculative allegations.

46. For example, regarding Mr. Grayson's Witness Statement attached to Mr. Azima's submission, neither VMS nor I have any knowledge of "The Lebanon

11

Letters" discussed therein. Any assertion that VMS or I were involved with anything related to the so-called "Lebanon Letters" is completely false.

47. Specifically, I was never "tasked" with sending any documents anonymously to any recipients and never instructed or paid Mr. Grayson or Mr. Fayol, directly or indirectly, to do the same. Indeed, I never posted or sent, or participated in posting or sending, any documents to any recipients, as described in Mr. Grayson's Witness Statement. For the avoidance of doubt, Mr. Grayson's statements, as they relate to me or VMS, in the section of his Witness Statement entitled "The Lebanon Letters" are false.

48. In Paragraph 13 of Mr. Grayson's Witness Statement, Mr. Grayson alleges that in 2019 I described to Mr. Grayson that I had a document which I had been tasked to have sent anonymously to a number of recipients. That statement is false. I never had any such document, nor was I ever "tasked" to send any documents anonymously.

49. In Paragraph 14 of Mr. Grayson's Witness Statement, Mr Grayson alleges that I had a "plan" that the document should be posted anonymously to lawyers (and other interested parties) on both sides of litigation in which Mr. Azima was engaged, and that the document should be sent from outside the US or UK. This allegation is false. I never had any such "plan."

50. In Paragraph 15 of Mr. Grayson's Witness Statement, Mr. Grayson alleged that the "plan" included that the anonymous postings were to include a list of all the recipients so that each one would know who else had received it, and that this would

include Neil Gerrard himself so that he could "feign surprise", and to enable lawyers opposed to Mr. Azima to weaponize the document in proceedings. Again, the entirety of these statements are false and fanciful as I never had such a plan and never instructed or paid anyone, directly or indirectly, to conduct the activity described by Mr. Grayson.

51. In Paragraph 17 of Mr. Grayson's Witness Statement, Mr Grayson alleged that, based on my "plan" that the postings should come from outside of the US or Europe, I tasked Mr. Grayson to "sound out" Mr. Fayol's ability to undertake this activity. This is completely false, as I never tasked Mr. Grayson to do what he describes, and indeed, I never instructed or paid, directly or indirectly, Mr. Grayson to find out if Mr. Fayol (or anyone else) was able to assist with this activity.

52. In Paragraph 18 of Mr. Grayson's Witness Statement, Mr. Grayson describes an alleged meeting that occurred between Mr. Grayson and Mr. Fayol where Mr. Grayson "briefed" Mr. Fayol on the "assignment." I never gave anybody an "assignment" as described by Mr. Grayson, I was never instructed on any such assignment, and I do not have any awareness of the meeting as described.

53. In Paragraph 19 of Mr. Grayson's Witness Statement, Mr. Grayson describes an alleged meeting that occurred in London between me, Mr. Grayson, Mr. Fayol, and Mr. Bobrinsky in March 2019, and Mr. Grayson alleges that, during this meeting, I "confirmed" the assignment and gave Mr. Fayol and Mr. Bobrinsky a document. These allegations are completely false and fanciful, as I never gave anybody an "assignment" as described by Mr. Grayson, I was never instructed on

13

any such assignment, I never had a "document" as described by Mr. Grayson, and I do not know Mr. Bobrinsky.

54. In Paragraph 20 of Mr. Grayson's Witness Statement, Mr. Grayson fancifully describes the "document" as an email trail between Mr. Azima and others, and that the document included a list of certain recipients. This is completely false, as I never gave any such document to Mr. Grayson, Mr. Fayol, or Mr. Bobrinsky, nor did I ever task anybody, including Mr. Grayson, Mr. Fayol, or Mr. Bobrinsky to undertake the activity described by Mr. Grayson. Further, I have no knowledge with respect to the "document" Mr. Grayson describes.

55. In Paragraph 21 of Mr. Grayson's Witness Statement, Mr. Grayson falsely alleges that sometime in late April or early May 2019, I informed him that there had been a mistake with the "postings", as the list of recipients had not been included with the document. Mr. Grayson further alleges that he passed this information to Mr. Fayol, along with my instructions that the mailing should be repeated. Again, the allegations in that paragraph are entirely false. I never had any such conversation with Mr. Grayson, as I never gave anybody an "assignment" as described by Mr. Grayson, I was never instructed on any such assignment, I never had a "document" as described by Mr. Grayson, I never instructed the "posting" or mailing as described by Mr. Grayson, I never paid anybody, including Mr. Grayson or Mr. Fayol, to mail or post any documents as described by Mr. Grayson, and I never participated in any such activity.

14

56. Very simply, there was no "criminal or fraudulent scheme" in which VMS or I were involved. The advice that VMS and I received from counsel was not in furtherance of any such scheme.

57. Specifically, neither I nor VMS were engaged in or planning a criminal or fraudulent scheme when we sought the advice of counsel, and there are no privileged documents or communications bearing any relationship to an existing or future scheme to commit a crime or fraud, because no such scheme to commit a crime or fraud existed.

Executed on February 12th, 2024 in Chapel Hill, North Carolina.

_____
Nicholas Del Rosso