Page 1

EXHIBIT

**D**

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

-------------------------------X

FARHAD AZIMA,                    )

               Plaintiff,      )Case No.

        vs.                     )1:20-cv-954-UA-JLW

NICHOLAS DEL ROSSO and           )

VITAL MANAGEMENT SERVICES,       )

           Defendants.      )

-------------------------------X

30(b)(6) DEPOSITION OF RAY ADAMS

WASHINGTON, D.C.

APRIL 30, 2024

REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

 1          MR. HERBERT:  Ian Herbert on behalf of the

 2     Plaintiff.

 3          THE VIDEOGRAPHER:  Will the court reporter

 4     please swear in the witness.

 5                    (Witness sworn.)

 6     WHEREUPON:

 7                    RAY ADAMS,

 8     called as a witness herein, having been first duly

 9     sworn, was examined and testified as follows:

10                    EXAMINATION

11     BY MR. ROSENTHAL:

12          Q.  Mr. Adams.  As you heard, my name is Sam

13     Rosenthal.  We've never communicated or met before,

14     have we?

15          A.  Don't believe so.

16          Q.  I'm going to ask you some questions and,

17     as I understand it, you're here as a 30(b)(6)

18     witness.  Do you understand that?

19          A.  I believe I understand that.

20          Q.  What do you understand your obligations to

21     be as a 30(b)(6) witness?

22          A.  I'm representing the company.

Page 85

1    Bates stamp FA-MDNC-00137022 through 32.

2              THE WITNESS:  Thank you.

3                        (ALG Exhibit 10 was marked for

4                         identification.)

5                        (Witness reviewing document.)

6         A.  I'm ready.

7         Q.  When was the last time you saw this

8    document?

9         A.  I don't recall, but I've seen it before.

10        Q.  I don't recall, but --

11        A.  I don't recall the last time I saw it.

12

13

14

15

16

17

18

19

20

21

22

4/30/2024          Farhad Azima v. Nicholas Del Rosso et al.          Ray Adams 30(b)(6)

Page 86

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



Page 87



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18                    (Whereupon a discussion was had
19                     sotto voce between Mr.
20                     Rosenthal and Mr. Mahfood.)
21   BY MR. ROSENTHAL:
22        Q.  When you -- now, when you reviewed your --
```

4/30/2024     Farhad Azima v. Nicholas Del Rosso et al.     Ray Adams 30(b)(6)

Page 88

 1   strike that.



21           MR. BEHRE:  Objection, assumes facts not

22   in evidence, calls for speculation, no foundation.

Case 1:20-cv-00954-WO-JLW   Document 379-5   Filed 07/15/24   Page 6 of 21

Page 89

1          MR. ROSENTHAL:   You can answer.

2      A.   I don't know.

3      Q.   Did you have any understanding -- strike

4   that.

5   [REDACTED]

6

7

8          MR. BEHRE:   Objection, foundation, assumes

9   facts not in evidence.

10  [REDACTED]

11

12

13

14

15

16

17

18

19

20

21          Who was Mr. Avasthi?

22      A.   He's an acquaintance of Mr. Azima.

Page 90

1          Q.  And did you have any understanding whether

2     he was employed by the government of South Sudan?

3          A.  No, I did -- I don't know.  He was

4     acquaintance of Mr. Azima, not mine.

5               THE REPORTER:  What's the last name?

6               THE WITNESS:  Avasthi.

7               MR. ROSENTHAL:  A-V-A-S-T-H-I.

8     BY MR. ROSENTHAL:

9          Q.  And are you aware that Mr. Avasthi was

10    communicating with someone in South Sudan who was

11    not a member of the South Sudan government?

12         A.  I'm not aware of that.

13         Q.  What was your understanding as to who

14    would receive a copy of the South Sudan proposal

15    once it was sent to Mr. Avasthi?

16         A.  I didn't have an understanding.  It was

17    marked confidential.

18         Q.  And that language came from the Task

19    proposal, correct?

20         A.  No.  It came from our proposal.

21         Q.  Do you have any understanding whether or

22    not Mr. Avasthi would be required to circulate the

1   proposal to other individuals within South Sudan if

2   they wanted to proceed?

3      A.  I was not aware of that.

4      Q.  Do you know what he was supposed to do

5   with the proposal once he got it?

6      A.  He's the one that asked for the proposal.

7      Q.  My question was do you know what he was

8   going to do with it?

9      A.  I said I'm not aware of what he was going

10   to do with the proposal.

11      Q.  Do you know whether or not South Sudan

12   could have proceeded with the proposal without it

13   being distributed within the government of South

14   Sudan?

15          MR. BEHRE:  Object --

16      A.  I don't know.

17          MR. BEHRE:  You've got to let me object.

18          THE WITNESS:  Okay.

19          MR. BEHRE:  It calls for rank speculation.

20      Q.  In this document what information do you

21   consider to be secret?

22          MR. BEHRE:  Objection, calls for a legal

Page 92

1   conclusion, ambiguous term "secret."

2          MR. ROSENTHAL:  I'm asking for his

3   understanding.  You can answer.

4          MR. BEHRE:  It's an ambiguous term.  If

5   you want to ask what's confidential, that's not so

6   bad.

7          MR. ROSENTHAL:  You can answer.

8      A.  The proposal taken as a whole is our

9   proposal and our pricing.

10     Q.  Well, it's actually Task's proposal and

11  your pricing, correct?

12         MR. BEHRE:  Objection, mischaracterizes

13  the two documents.

14         MR. ROSENTHAL:  Correct?

15     A.  I gave you the answer, it's our proposal.

16     Q.  What information in there -- strike that.

17         How much time did you spend preparing the

18  proposal?

19     A.  Again, this is 2011.  I couldn't tell you.

20     Q.  Well, you were given a markup by Mr. Azima

21  and you handed it off to Ms. Lopez.  How much time

22  did you spend on it?

Case 1:20-cv-00954-WO-JLW   Document 379-5   Filed 07/15/24   Page 10 of 21

Page 93

1       A.   You're assuming I never read it.

2       Q.   How much time did you spend on it reading

3    it?

4       A.   I don't know.

5       Q.   More than a few minutes?

6       A.   I would think more than a few minutes.

7       Q.   More than an hour?

8       A.   Could be.

9       Q.   And it could be not; is that correct?

10      A.   It could be not.

11      Q.   How much time did Mr. Azima spend on it,

12   to your knowledge?

13      A.   I don't know.

14           MR. BEHRE:  Objection, calls for

15   speculation.

16           MR. ROSENTHAL:  He's answered.

17           How much time did Ms. Lopez --

18           MR. BEHRE:  Then you need to let me --

19           THE WITNESS:  Yeah.

20           MR. BEHRE:  -- you need to pause before

21   answering so that he doesn't claim you answered

22   before I've objected.  Okay?

Page 94

1    BY MR. ROSENTHAL:

2         Q.   How much time did Ms. Lopez spend on it?

3         A.   I don't know.

4         Q.   Now, her input was just typing, correct?

5         A.   Typing and formatting, yes.

6         Q.   In the 11 -- strike that.

7              In the seven years approximately between

8    August -- between September of 2011 and January of

9    2018 did any third party obtain a copy of this

10   proposal?

11             MR. BEHRE:  Objection, foundation.

12        A.   I'm not aware, although it was published.

13        Q.   When you say it was published, you mean

14   using We Transfer?

15        A.   Yes, sir.

16        Q.   But you don't know whether any third party

17   obtained a copy of it before then?

18        A.   That's what I just said.

19        Q.   So they may have or may not have, you just

20   don't know?

21             THE REPORTER:  I didn't hear the answer.

22        A.   I'm not aware of anyone obtaining a copy.

Page 95

1      Q.   And I take it you don't know how widely it

2  was distributed, do you?

3           MR. BEHRE:  Objection, assumes facts not

4  in evidence, calls for speculation, no foundation.

5           MR. ROSENTHAL:  Mr. Adams, I just want to

6  make sure the record is clear.  You don't know one

7  way or the other whether it was distributed prior

8  to January 2018?

9      A.   I don't.

10     Q.   And you don't know who might have received

11  a copy of it prior to January 2018?

12     A.   Well, we are aware that there were torrent

13  links that were published prior to January of 2018,

14  but we're not sure they were accessible.

15          MR. ROSENTHAL:  Let me ask the court

16  reporter to mark as ALG 11 a document

17  FA-MDNC-00356403 to FA-MDNC-00356421.

18                    (ALG Exhibit 11 was marked for

19                     identification.)

20  BY MR. ROSENTHAL:

21     Q.   Just let me know when you're ready to

22  proceed.  My question to you will be have you ever

Case 1:20-cv-00954-WO-JLW   Document 379-5   Filed 07/15/24   Page 13 of 21

Page 96

1    seen this document before?

2                      (Witness reviewing document.)

3         A.  It appears to be the original Task

4    proposal, although there appears to be a lot more

5    to it.

6         Q.  Are you finished?

7         A.  Uh-huh.

8         Q.  My question's whether you've ever seen it

9    before?

10        A.  I haven't.

11        Q.  Do you know one way or the other whether

12   the information contained in what's been marked as

13   ALG 11 was used to prepare the Sudan proposal?

14        A.  Well, without doing a comparison I can't

15   tell you that they're the same document.  They

16   appear to be the same document.

17        Q.  Okay.  But you have no information one way

18   or the other how, if at all, it was used to prepare

19   the ALG Sudan proposal?

20        A.  No.

21        Q.  In the period between the transmittal of

22   the Sudan proposal and January of 2018 are you

Page 97

1    aware of any harm that came to ALG from the

2    disclosure of the proposal?

3            THE WITNESS:  Can I answer?

4            MR. BEHRE:  Uh-huh.

5    BY THE WITNESS:

6        A.  Prior to 2018?

7        Q.  Correct.

8        A.  Not prior to 2018.

9        Q.  In 2018 what value did the Sudan proposal

10   have to ALG?

11       A.  It was our confidential work product.

12       Q.  I'm asking you about value.  Was it worth

13   anything?

14           MR. BEHRE:  Objection, foundation, vague,

15   calls for speculation.

16           MR. ROSENTHAL:  You can answer.

17       A.  It has pricing information in it.

18       Q.  Did that pricing information have any

19   monetary value to ALG?

20           MR. BEHRE:  Objection, no foundation,

21   vague as to "monetary value."

22       A.  Did it have any value to ALG?

1          Q.   Any monetary value.

2          A.   I don't know how you value the paper.

3          Q.   Are you aware of anyone who would have

4     paid ALG for that information?

5          A.   That proposal could have been made to any

6     number of people.

7          Q.   Are you aware -- let me -- let me be more

8     precise.  Are you aware in 2018 or after whether

9     anyone would have been willing to pay ALG for that

10    pricing information?

11         A.   ALG wasn't in the business of selling its

12    work product to others.

13         Q.   Not my question.  Are you aware of anyone

14    who would have paid anything for that information?

15         A.   I'm not aware of anyone.

16         Q.   If I wanted to monetize that information,

17    how would I do that?

18              MR. BEHRE:  Objection, vague, ambiguous

19    with regard to "monetize."

20         A.   I don't know how you would do it.

21         Q.   How would you do it?

22         A.   I would do it based upon the pricing of

1  the proposal.

2      Q.  My question to you is if I wanted to

3  determine what the value of that information was,

4  how would I go about that exercise?

5      A.  Well --

6      MR. BEHRE:  Objection, vague, ambiguous as

7  to the term "value."

8      THE WITNESS:  A proposal of that magnitude

9  has a number of elements, what is the pricing in

10  the proposal itself and then what are the follow-on

11  pieces that you could develop if the proposal was

12  successful, and one of the most significant

13  follow-ons was leasing.

14      Q.  What happened to the proposal?

15      A.  I don't know.

16      Q.  Did South Sudan proceed, to your

17  knowledge?

18      A.  I don't know.

19      Q.  Has ALG attempted at any time after

20  January of 2018 to proceed with a proposal

21  involving South Sudan?

22      A.  Not that I know of.

Page 100

1      Q.   Is that viable today?

2      A.   Pardon me?

3      Q.   Is the proposal viable today with respect

4   to South Sudan?

5           MR. BEHRE:   Objection, vague, ambiguous,

6   lacks foundation.

7      A.   Is the proposal to South Sudan viable?   I

8   don't know.

9      Q.  Viable.

10     A.   I don't know if it's viable.

11     Q.   Are you aware of the political climate in

12   South Sudan?

13          MR. BEHRE:   Objection, relevance.

14          MR. ROSENTHAL:   Yes?

15     A.   I am.

16     Q.   And are you aware of the political

17   environment in 2018 through the present?

18          MR. BEHRE:   Calls for speculation, but you

19   can answer.

20     A.   I'm not -- I'm not aware.

21     Q.   Okay.   How would the political situation

22   that you are aware of have impacted the viability

1    of the proposal?

2              MR. BEHRE:  Objection, calls for

3    speculation, vague, ambiguous terms.

4         A.  Well, the proposal was in 2011.

5         Q.  And I'm asking you about the period from

6    2018 to the present.  To the extent you have an

7    understanding of the political situation, how would

8    that impact the viability of the proposal?

9         A.  It could have had an impact on the

10   proposal.

11        Q.  A negative impact that is, right?

12        A.  Yes.

13        Q.  Okay.  And that's because South Sudan's

14   been in turmoil?

15        A.  It has.

16        Q.  And revolution?

17             MR. BEHRE:  Objection, vague, ambiguous as

18   to "turmoil," "revolution," and any other terms.

19             MR. ROSENTHAL:  Is that correct?

20        A.  That's correct.

21        Q.  Okay.

22             If South Sudan picked up the phone and

Page 102

1     called you and said we want to proceed, would you

2     give them the same pricing?

3          A.   I don't know.

4          Q.   Would you have given them the same pricing

5     in 2018?

6               MR. BEHRE:  Objection, calls for

7     speculation, lack of foundation.

8          A.   It's doubtful.

9          Q.   Why is that?

10         A.   We would have factored in the risk.

11         Q.   And so the pricing would have been higher?

12         A.   Probably.

13         Q.   A lot higher?

14         A.   Probably.

15              MR. BEHRE:  Objection, calls for

16    speculation.  You have to slow down.

17         Q.   Has -- has any --

18              MR. BEHRE:   Before you answer you need to

19    just pause so I can interpose my objection.  Okay?

20              THE WITNESS:  Okay.

21    BY MR. ROSENTHAL:

22         Q.   Has anyone else, to your knowledge,

Page 103

1    attempted to start up an airline or a cargo

2    operation in South Sudan after 2011?

3            MR. BEHRE:  Objection, relevance.  If you

4    know.

5        A.  I'm not aware of it.

6            MR. ROSENTHAL:  Are we getting close to

7    your break time?  No?

8            THE REPORTER:  No.

9            MR. ROSENTHAL:  Okay.

10   BY MR. ROSENTHAL:

11       Q.  Focusing on the South Sudan proposal, are

12   you aware of any way in which ALG has been harmed

13   by the disclosure of that proposal on We Transfer

14   in 2018 or 2019?

15           MR. BEHRE:  You can answer.

16       A.  I believe ALG's been substantially harmed.

17       Q.  And I'm asking you specifically about the

18   South Sudan proposal.

19       A.  I believe ALG has been substantially

20   harmed by the publication of that information.

21       Q.  Okay.  And tell me how.

22       A.  It's our work product.