IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

FARHAD AZIMA,                          )
                                       ) Greensboro, North Carolina
     Plaintiff,                        ) January 23, 2025
     vs.                               ) 9:43 a.m.
                                       )
NICHOLAS DEL ROSSO AND                 )
VITAL MANAGEMENT SERVICES, INC.,       ) Case No. 1:20CV954
                                       )
     Defendant.                        )
_____)


                  TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:

**KIRBY D. BEHRE**                    **RIPLEY RAND**
**LAUREN E. BRIGGERMAN**              WOMBLE BOND DICKINSON (US) LLP
MILLER & CHEVALIER CHARTERED          555 FAYETTEVILLE STREET
900 16TH STREET, N.W.                 SUITE 1100
WASHINGTON, DC 20006                  RALEIGH, NC 27601


FOR THE DEFENDANTS:

**GEORGE G MAHFOOD**
**JUSTIN B. KAPLAN**
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 S. BISCAYNE BLVD., 21ST FL.
MIAMI, FL 33131

**SAMUEL ROSENTHAL**
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 CONSTITUTION AVE NW, SUITE 900
WASHINGTON, DC 20001

**BRANDON S. NEUMAN**
NELSON MULLINS RILEY AND SCARBOROUGH LLP
301 HILLSBOROUGH STREET, SUITE 1400
RALEIGH, NC 27603

APPEARANCES, Continued:

FOR NONPARTY DECHERT:

**KEARNS DAVIS**
**DANIEL D. ADAMS**
BROOKS PIERCE MCLENDON HUMPHREY & LEONARD
POB 26000
GREENSBORO, NC 27420-6000

FOR NONPARTY SWECKER:

**NANA AKONORBEA AFUA ASANTE-SMITH**
PARKER POE ADAMS & BERNSTEIN LLP
PNC PLAZA
301 FAYETTEVILLE ST., STE. 1400
RALEIGH, NC 27601

**RICHARD S. GLASER , JR.**
PARKER POE ADAMS & BERNSTEIN
THREE WELLS FARGO CTR.
401 S. TRYON ST., STE. 3000
CHARLOTTE, NC 28202

PROCEEDINGS

(At 9:43 a.m., proceedings commenced.)

THE COURT: All right. We are here this morning in Azima versus Del Rosso and Vital Management Services. It looks like everyone is here, both in the -- with respect to the substantive motions in the case as well as the third-party issues in the case. I'll explain how we're going to proceed in just a minute, but we'll start out with whoever is here on behalf of the parties, just for the record, stand up and state your name. We'll start with the Plaintiff Mr. Azima.

MR. BEHRE: Good morning, Your Honor, Kirby Behre, Lauren Briggerman and Ripley Rand on behalf of the plaintiff.

THE COURT: Thank you. All right. And for the defendants?

MR. MAHFOOD: Good morning, Your Honor, George Mahfood for the defendants along with Justin Kaplan, Martin Warf, Sam Rosenthal, and Brandon Neuman.

THE COURT: All right. Thank you. For Dechert?

MR. DAVIS: Good morning, Your Honor, Kearns Davis for Dechert.

THE COURT: All right. And for Swecker?

MS. ASANTE-SMITH: Good morning, Your Honor, Nana Asante-Smith and Rick Glaser on behalf of Mr. Swecker.

THE COURT: Thank you. Okay. So the notice was for all pending motions. There's still a lot of stuff that hasn't

been resolved by way of an order in the case. I had back in August a hearing on the objections to this -- or arguments on the objections to the Special Master's reports; that's Decisions One, Seven, and Nine. I heard the arguments and had intended to issue an order, but September and the fall kind of got away from me as well as my law clerk got away from me, so the order did not get issued.

I'm happy if the parties have anything they want to add briefly. I know the transcript that's been prepared from that hearing, and if anybody wants to add anything with respect to those objections to the Special Master, I'll allow you to briefly do that. We're not going to spend a lot of time on that, though. At the end of the hearing, I'll likely issue an oral order relating to those objections to the Special Master.

There's a number of motions to seal, partial motions that are pending. Quite frankly, I think overall, the parties have done a relatively good job to this point of redacting where possible and sealing where necessary, and at this point there haven't been any objections filed to those motions to seal. So I'm inclined just to grant the motions to seal that are now pending. That will include Document 396, Plaintiff's Motion to Seal Portions of the Response to Defendant's Motion for Summary Judgment; Document 408, Motion to Seal Exhibit 2 to Defendant's Reply; Document 412, that's Dechert's Motion to Seal Partial with respect to the appeal of the Special Master

Report; Document 417 is Plaintiff's Motion to Seal Exhibits 1 through 3 of the Response to Swecker's Motion for Costs and Fees.

Anybody want to be heard on any of those motions to seal?  No?  All right.  Well, I'll just go ahead and do that now.

So the standards are very clear in terms of the general right to inspect and copy public records and documents, including judicial records and documents, and for those records that are judicial in nature the right of public access is derived from the common law and the First Amendment.  The test with respect to both of those are clear in terms of when documents may be sealed.

I don't think there's any dispute, and certainly I haven't seen any question about whether or not the documents that have been filed are judicial documents in terms of the Court relying on those documents in making a decision.  But after consideration of the public interest in this case, as well as the parties' individual interest in maintaining the confidentiality of business records, confidential information, confidential communications, are both relevant to legal issues as well as business issues, those motions to seal, I find, should be granted.

I will note, relatedly, that they've been pending for an extended period of time, and no objections have been filed

to those motions to seal. And as I noted at the outset of this hearing, at least for the immediate past, I think the parties have done a relatively good job of redacting where possible and requesting sealing where redacting did not fully address the issues with respect to public disclosure of certain information.

So I will, therefore, find that Plaintiff's Motion to Seal Portions of its Response to Defendant's Motion for Summary Judgment (Document 396), Defendant's Motion to Seal Exhibit 2 to Defendant's Reply on the Defendant's Motion for Summary Judgment (Document 408), Dechert's Motion to Seal Plaintiff's Partial as to Plaintiff's Appeal of the Special Master Report (Document 412), Plaintiff's Motion to Seal Exhibits 1 through 3 and its Response to Swecker's Motion for Costs and Fees (Document 417), those motions are granted.

All right. Anybody have anything they want to briefly add with respect to the objections to the Special Master Reports Numbers One, Seven, and Nine? Anybody?

**MR. ROSENTHAL:** No, Your Honor.

**MR. MAHFOOD:** No, Your Honor. We have filed a correction to the record. I apologize. When we were here the last time, I didn't get the facts right, but we corrected it the next day.

**THE COURT:** All right. Anybody? No?

**MR. BEHRE:** Your Honor, I'd just add there's been no

change of circumstance, if you will. Since the August 15 hearing, we contacted RAK's counsel, invited him to be here or to just talk informally, and he declined.

**THE COURT:** All right. Thank you. Then at the end of this hearing, we'll go through those, and I'll issue my order.

So the big motions that remain are Swecker's motion for attorney's fees and costs, Defendant's motion for summary judgment, and Swecker's motions to quash. The order that we're going to proceed in with respect to those motions is we're going to deal with the motion for summary judgment first, then we'll move on to the attorney's fees and costs, and then we'll close out this morning, or whenever, with the motion to quash Wells Fargo.

So I think in terms of the process we're going to follow in terms of these motions, the moving party will have an opportunity for argument and rebuttal. The nonmoving party will have a response time. Those issues have been pretty thoroughly briefed by all sides as to all issues, and so I don't want to anticipate an extended argument is necessary.

What I do think would be helpful to me, if the parties want to do it, is 10 minutes -- no more than 10 minutes -- on an argument and a response and then a very short rebuttal as necessary. I find that helpful because often the reply, even without bringing up new arguments, does raise

issues in response to the nonmoving parties' arguments, and so it's sometimes helpful to hear a little bit more than just what's set out in the briefs. But we're going to go that route.

When you stand up to do your argument for that argument, response, and rebuttal -- so let's call that 25 minutes or so -- for the most part, I'm not going to interrupt. But I will forewarn you: once you've had a chance to make the points you want to make, interruptions or not, there are going to be some questions with respect to the arguments or the briefing, unless you happen to touch on those during that very -- what I'll call a very brief argument time frame.

So stand up, state for the record your name. It's not always clear anymore -- not anymore -- it's not always clear who's arguing, so just say "XYZ for Plaintiff, Defendant, or Movant," whatever, and then launch into your argument. I'll give you some time to say whatever you want to say, but hit the high points and the important points, and don't waste my time or anybody else's time with fluff and pointing fingers at the other side. Stick to the merits of the case, and then we'll come back and have question and answer session.

So I'm going to take a five-minute break, give you a chance to think about what points you think are most important that you can make very quickly and directly in the time allotted, and then we'll proceed. Any questions?

(No response.)

All right.  We'll be in recess for five minutes.

(At 9:54 a.m., break taken.)

(At 10:04 a.m., break concluded.)

**THE COURT:**  All right.  It's Defendant's motion for summary judgment.  Mr. Mahfood or whoever?

**MR. KAPLAN:**  Justin Kaplan from Nelson Mullins on behalf of the Defendants.  If it please the Court, as we noted in our moving papers, Judge, this case was filed for hacking.

**THE COURT:**  Filed what?

**MR. KAPLAN:**  For hacking.  It was an 11-count complaint.  Your Honor dismissed nine of them, you left two: North Carolina trade secret misappropriation and conspiracy. That was based on an allegation in the complaint that new data was published publicly for the first time in 2018 and 2019. After the benefit of discovery, it turns out not to be the case.

Let me state, Your Honor, it is Plaintiff's burden to establish that he files his claims within the limitations period, meaning that if there is an absence of evidence, he has not met his burden.

With regards to the continuing tort doctrine, I understand why the Court ruled what it did.  It was a wise decision based upon the allegations.  The cases discussing the continuing tort doctrine differentiate between misappropriation

by use and misappropriation by disclosure. So when the misappropriator takes a trade secret, keeps it confidential, but uses it, each time it's used the statute of limitations accrues again. However, and I'm quoting from *Bates v. Cook* cited in my papers:

"If the trade secrets are disclosed or published, then the misappropriator becomes liable to the trade secret owner upon disclosure or publication, and the tort is no longe continuing."

And that makes sense if you think about it, Judge. It's not a situation where like if Pepsi stole the formula for Coca-Cola Classic and put out a competing product, every time they sold the competing product, and somebody bought Pepsi besides Coke, it would cause additional harm. Where the alleged misappropriator is not using it, but is simply disclosing it, the harm is done. Once you fill a vessel up with water, you can pour all the water in the world into it, it's still the same water that's sitting there.

So even the Court, Your Honor, that -- even the case that Your Honor cited to in your order, Docket Entry 65, a Third Circuit decision, *Heraeus Medical versus Esschem*, says, quote:

"The statute of limitations for the tort of wrongful use begins to run at the time of the wrongful use and not at the time of the initial

misappropriation."

What -- when were Mr. Azima's alleged trade secrets first public? He's alleged that disclosure occurred in 2018 and 2019. However, he testified that his "entire world became public" and that's when he was harmed in 2016, "when his whole world became public", and, in fact, he also testified that by 2017 business had dried up due to the disclosure of his confidential information.

To corroborate the Plaintiff's testimony, in an earlier dispute, his own expert testified that "access to the data through ordinary Internet sites was established in January of 2017." That's obviously outside of the limitations period. Now, Mr. Azima's tried to walk back all of this by saying, well, my expert only meant that it was uploaded, and *uploaded* doesn't mean *disclosure*. That doesn't do anything to advance the Plaintiff's burden of establishing that disclosure first occurred in 2018 or 2019.

The Plaintiff's expert cannot state when the data was made publicly available. Mr. Azima previously testified in a proceeding in the United Kingdom that disclosure was in 2017. Defendant's expert has concluded -- or refuted that disclosure occurred in 2017, and there's documentary evidence to corroborate that.

If you look at when the websites were modified, you can see there was a modification in 2017. There were no

modifications between then and 2018 when Mr. Azima or his expert claimed to have first discovered it, meaning that if the websites weren't modified, but the information was there, it could only have been made public at the last date of modification, and that was in January of 2017.

Now, Mr. Azima does not hit this head on. He simply argues that, well, this is hotly contested, you know, and then he argues that it's undisputed that, quote -- this is from page 13 of the response, Your Honor -- "new links to the data were published in 2019." That may be, but he has absolutely no evidence, he's advanced no argument, and there's nothing in the record, Your Honor, to support what data was actually published in 2019, and he has not met his burden that his alleged trade secrets were, in fact, published in 2019. There was no proof whatsoever of any publication in 2018, and as such he has yet to meet his burden.

Your Honor, I just want to point out this FBI disclosure issue. We addressed it in our papers, but one thing for the Court to note is that the Plaintiff's own expert has stated in paragraph 30 of his report -- it's Exhibit E -- that to the extent it was disclosed to the FBI, that was done also in 2017.

You're probably going to hear about how it wasn't until 2018 that Mr. Azima first discovered publication of his documents, but the standard under statute number 66-157 is when

it reasonably should have been discovered, and in Docket Entry 65 -- that's when Your Honor finally resolved all the issues on dismissal -- Your Honor said, quote:

"The Court concludes that Plaintiff's factual allegations in the 2016 DC complaint that he had been hacked and his hacked confidential business data published online establish that by 2016 Plaintiff had discovered the conduct underlying the remaining counts" -- meaning those that we're here for today.

So no matter how you look at it, Your Honor already made a factual finding based upon Plaintiff's own allegations that he was aware in 2016. He has presented no evidence whatsoever that any of the trade secrets were published, whether republished, whether for the first time, after 2017. On that basis alone, Judge, summary judgment is appropriate.

There's also very strong substantive reasons why. This is not news --

**THE COURT:** Before you switch gears --

**MR. KAPLAN:** Yes, Your Honor.

**THE COURT:** So in terms of the continuing wrong doctrine, I'm not sure whether we're all reading my order the same way.

But, hypothetically speaking, let's say that there was a misappropriation here in 2014 by a taking. That's when the data was originally stolen or taken. And then it's

published that same year, 2014, and Azima is aware of the publication but takes no action. Then it is published again in 2018, and the statute extends not to just taking, but -- let me see. It says --

MR. KAPLAN: Your Honor, I can get you there quick. Do you want to put up slide 7? Your Honor, if you look at your screen, you should see a copy of the statute, which I think is probably what the Court's looking for.

THE COURT: No.

MR. KAPLAN: I'm sorry, that's the definition of a trade secret. I apologize --

THE COURT: It's the one that says it's the taking, publication, use, blah, blah, blah. It may not be in the statute; it may be in the cases.

MR. KAPLAN: It's disclosure, use, or taking. Those are the three.

THE COURT: Yes, disclosure, use, or taking.

MR. KAPLAN: Right.

THE COURT: So the taking and an initial disclosure take place in 2014, but then again there's a second disclosure, and we'll say we accept the argument that that second disclosure is again for the purpose of harming Azima.

The way I read -- or I think I read -- the continuing wrong doctrine is if you bring an action within that three years from the 2018 disclosure, that action can seek as damages

any injury caused by the 2018 disclosure, but it's not going to relate back to the 2014 disclosure.  Do you agree with that or disagree?

**MR. KAPLAN:**  I disagree with that, Your Honor, and if -- whether it's Your Honor or your clerk, when you go back and read the cases that have been cited, including the case that Your Honor cited from the Third Circuit in your order, what you will see is -- and I'm sure you remember this if you haven't studied the cases recently -- that the way that the continuing wrong doctrine in the context of trade secret has developed, there's an argument among jurists on whether trade secrets are property or not; right?

The use comes from the property view of trade secrets; right?  Never -- and the cases arose out of trespass, meaning every time you came onto my land, every time you trespass on my chattel, that was a brand new harm.  And I get it, and it makes sense.  But they differentiate between this property view and this other view, this confidentiality transactional view, of a trade secret.

And if you look at trade secret law, courts universally throughout the country that have adopted the Uniform Trade Secrets Act, they've said that the value -- the value of the trade secret is that it derives independent economic value by virtue of it having been secret.  And that's different than just being commercially valuable because lots of

things can be commercially valuable but not be trade secrets.

So if you think about it -- and it makes -- again, I keep saying this because I'm studying this, and it really does make sense, Judge. If I take your property, give it back, take it again, or if I use your property to harm you, that makes an awful lot of sense that every time I do that, the claim occurs anew.

But if you view a trade secret in the non-property context, the minute it loses its value by having not been publicly available -- that particular independent economic value that the Plaintiff must establish to prove the existence of a trade secret -- once that's gone, the harm is done.

So when you go back and look at the cases --

THE COURT: Okay. You're talking about "public" generally, though. What if there's a limitation? So the 2014 disclosure goes to A, B, and C, but the 2018 disclosure goes to D, E, and F. New disclosure, new people, new injury. Is that--

MR. KAPLAN: I think in that context -- I think that would be a very highly fact-specific inquiry because I think that --

THE COURT: It's all fact-specific in this context.

MR. KAPLAN: I agree, and I think that -- yes, let's take it offline. Let's talk about books; right? If the Plaintiff's information was in a pamphlet, and it was provided

to Company A, that'd be one harm. If it was only provided to Company A, and Company A kept it confidential, yes, they would be harmed by Company A getting it. And two years later it was disclosed to Company B by handing this to them, I would agree with the Court. But that's not what we have here.

What we have here is publication at large. So given that it's the Plaintiff's burden following the Court's scenario, I think that the way the cases read, the Plaintiff would need to establish -- would need to meet his burden either --

**THE COURT:** Your position is the wrong completely occurred in 2017 with the initial disclosure, and nothing new was added by anything that occurred in 2018?

**MR. KAPLAN:** There's no record evidence of anything new having been added, and it's his burden to do that; right? The bell has been rung. It's not as if they took the bell, brought it to another room, and rang it again for people that hadn't heard it the first time. There's no evidence of that. And that's why the cases distinguish -- they specifically say "use" when they talk about trade secrets of continuing wrong doctrine, and they don't apply the continuing wrong doctrine in cases where the allegations and evidence are solely related to disclosure.

**THE COURT:** All right.

**MR. KAPLAN:** On top of that, Judge, this is a highly,

highly unusual trade secrets case. This is an individual who is taking the position that he -- it's his trade secrets. It's not the Gatorade formula, it's not the Coca-Cola formula, it's not a transmission switch that GM created. It's everything he'd learned over the course of his doing business is a trade secret, and it's valuable. He has not at all, none, established, and there's no record evidence to show, that whatever information he claims is a trade secret is valuable solely because it's secret.

If you look at the evidence that was presented to the Court in opposition, it was, was this valuable? Objection. Yes. No evidence. Why no evidence showing that the disclosure harmed him? One would think if all this information was so valuable in the seven years since the alleged disclosure, somebody would have used it. Hasn't happened, even though it's become public.

The law is very clear, Your Honor -- did the Court have a question?

**THE COURT:** I'm going to let you run, and I'll come back.

**MR. KAPLAN:** Okay. I thought the Court was going to ask a question, and I -- I didn't want to interrupt.

So he has never been able to identify on a trade secret by trade secret basis. There's no record evidence to establish the value of each trade secret, and that is what's

required in order to establish value.

He said, "Well, my trade secrets are valuable, the information I've had over 40 or 50 years is valuable," and that just doesn't get there. He has to be able to show why each of the alleged 38 trade secrets derives value by not being known. The best example are these Rolodexes. It's his contacts list. It's not a specially curated contact list with pricing information or purchasing history, the types of things you normally see. It's his Amazon info, his own phone number. And he said, "Well, my whole life became public. That's what harmed me." And that's not quite where you establish a trade secret.

Beyond cursorily alleging that these trade secrets have value, Mr. Azima has not produced sufficient evidence at all of such value by virtue of being secret. There's nothing other than him and his right-hand man's self-serving opinion, which the Fourth Circuit has said cannot defeat summary judgment absent objective corroboration, and there is none.

On top of that, Mr. Azima disclosed every single one of these trade secrets, except for his Rolodexes, to third parties. All these different companies, all of them except for one, no longer exist, did not exist, or the trade secrets had become worthless at the time of disclosure. They involved movement of foodstuffs to troops in Afghanistan, which Mr. Azima admits had already been wound down by 2017. Some of them involved failed proposals for airlines in the country of

Georgia. Didn't go anywhere.

So things, you know, stay on this. We argue this in our motion, Judge. It's not a difficult concept. If you're claiming a trade secret, if your information that you gave to another company to create a spreadsheet about selling water in Azerbaijan, and that company's gone out of business prior to disclosure, clearly that information is no longer valuable by virtue of it being secret. These things change. They change on the ground all the time.

More importantly, Judge, aside from keeping his own trade secrets in his head or on a few computers with a password, virtually nothing was done to keep them secret. He gave them to all these different companies, most of which he only partially owned, one of which he owned indirectly with others, without requiring them whatsoever to maintain secrecy. He has testified that he thinks one of the companies -- this is ALG -- required some of the employees to have confidentiality agreements, but he never produced any, and he can't remember the name of a single person who was required to do that.

On top of that --

**THE COURT:** One minute.

**MR. KAPLAN:** Last thing I would point out, Your Honor, is RAK -- those 10 of the trade secrets -- he gave them to a company that he said he didn't trust, then sold them the company, and those trade secrets remained with that company.

That's pretty indicative of how he treated these alleged trade secrets.

Last thing I'll talk about is damages, Judge.  I get that Plaintiff essentially has conceded that they're not seeking economic damages, they want to do unjust enrichment. But given the order of limitations that they have to -- they're only entitled to establish liability for conduct occurring after 2017?  They need to say, okay, you were unjustly enriched specifically by this conduct at this time.

Their expert was told, which is fine, to assume that it was all together.  So they cannot establish -- and there's no record evidence with which to establish -- that the damages being sought or any quantifiable damages within any reasonable certainty were derived solely, as they must, from 2018 and 2019 disclosures.

The response, Judge, was, well -- well, these payments leading up to the 2018 and 2019 misappropriations are, at a minimum, recoverable as proceeds of the conspiracy. Leading up to when?  When do we set the line?  How much?  No evidence to that effect.  They have said -- and their expert has said -- "We get $35 million because you got $35 million if we can say that that was related to wrongful conduct."

When I asked in deposition their expert, I said, "Well, do you distinguish between money that was paid out of the 35 million for hacking in 2014, '15, '16, '17, whatever it

might be, and publication?" He said, "I can't do that." And I said, "Okay, can you distinguish between publication in 2016 or '17 and '18 and '19?" "I cannot do that."

So there's no evidence by which the Court can look at to establish -- and Plaintiff can't meet his burden to show -- that the unjust enrichment, which was derived from the alleged '18, '19 conduct, they cannot quantify within any reasonable certainty. On top of that, the law is very clear in this state and most of the states in the country: Gross revenue is not how you quantify unjust enrichment damages. It's profit. They haven't even tried to do that.

So on every single element that the Plaintiff needs to establish, he has failed. He has failed to establish trade secret. Even if he did, they were disclosed. He has failed to establish when they were disclosed, as he must, in order to get past a limitations defense. And on top of all of that, Judge, he absolutely cannot quantify damages arising from the limited conduct that he's permitted to within the standards required of them.

**THE COURT:** All right. Thank you. From the Plaintiff?

**MS. BRIGGERMAN:** Thank you, Your Honor. Lauren Briggerman on behalf of Plaintiff.

May it please the Court, first, Your Honor, I would like to address some preliminary issues, and first that is the

Plaintiff's position that summary judgment is premature at this time. Until big picture issues are resolved as to privilege, a ruling is premature.

Defendants have withheld at least a third of their responsive documents based on RAK's privilege, and, as the Court knows, there's currently a motion before the Court related to whether RAK has to appear here to assert privilege. So from our perspective, it's highly premature to be issuing a ruling that would grant summary judgment.

And I also agree with Mr. Kaplan. He's conceded today that this is a highly unusual case. This is a case where troves of our client's data was stolen and misappropriated.

THE COURT: Let me back up for just a second. How does the disclosure of -- I assume when you're talking about RAK's privilege, you're talking about Objection Number One in terms of the Special Master's findings? Nothing's happened in terms of disclosure since the objection was filed, correct?

MS. BRIGGERMAN: Correct, that's right. Numerous documents on Defendants' privilege log relate to NTi reports and other reports and documents that were provided to the FBI, and those documents show an ongoing disclosure or use of Mr. Azima's trade secrets by providing them to the FBI.

THE COURT: How does that affect, say, the statute of limitations issue?

MS. BRIGGERMAN: It's directly relevant to the

statute of limitations issue. And as Your Honor knows, the Court issued a ruling already on this issue in ECF Number 65, that because each act violates the law on its own, each act separately triggers its own limitations period. Now, these documents that were provided to the FBI that contain Mr. Azima's trade secrets were provided repeatedly and ongoing from at least 2017 to 2020.

THE COURT: Okay. Suppose I adopt the Defendants' position that there was a general public disclosure in January of 2017, and, therefore, if the trade secrets had any value or there was anything associated or of concern, we'll say, and more disclosures -- even if more disclosures occurred in '18 and '19 because of the 2017 disclosure took place, those are not actionable, because everybody had access to it in 2017.

MS. BRIGGERMAN: So Plaintiff's position is that any disclosure within this statute period would constitute a rewriting of the statute. In other words, harm would run anew from that point in time. It's undisputed that Mr. Azima learned that the publication of his trade secrets occurred in July of 2018, and so that's within the statute period. So any time from then on, he is enduring harm.

THE COURT: But if I should find that Mr. Azima -- there was a public disclosure of which Mr. Azima should have been aware in 2017, what does that do?

MS. BRIGGERMAN: Well, first I would say I think that

there is a material dispute of fact as to whether anything was published in 2017, and that is an issue that should go to the jury.

**THE COURT:** Okay. I'll let you make your arguments. I'm just trying to figure out how the discovery issues factor into the summary judgment analysis.

**MS. BRIGGERMAN:** I think the discovery issues are very relevant to statute of limitations. As I mentioned, the documents that show that Mr. Azima's trade secrets were provided to the FBI within the statute period absolutely blow away Defendants' argument that there is a statute of limitations affirmative defense here. And I should mention, they are the ones that have the burden here. It is an affirmative defense. The burden is not on Mr. Azima to prove statute of limitations.

And as I mentioned, it's undisputed that Mr. Azima learned of the publication in July of 2018. And to Mr. Kaplan's point, it was not reasonably possible for him to have learned of that disclosure prior to then, because the data just simply wasn't available.

And at a minimum, there is a dispute of material fact as to whether the trade secrets were publicly available in 2018, and that's an issue that should go to the jury and not be decided on summary judgment.

It's also undisputed that there were new links added

to Mr. Azima's data and published on anti-Azima blog sites in 2019. So, again, you have another publication online. Defendants argue that that is old data, that it's not a new publication, but that's not what the evidence shows. There's just no way to know what data was published. And, again, that's an issue that should go to the jury and not be decided on summary judgment.

There's also testimony that shows that the NTi reports prepared based on Mr. Azima's stolen data were provided to law enforcement until at least early 2020. You have testimony from FBI -- from NTi representative Mr. Garcia who admits that he had provided those NTi reports to the FBI throughout time, and FBI agent Mr. Zukas also testified that he received those documents within the statute period.

And Defendants argue that this Court has already found that Mr. Azima had discovered the conduct by 2016, and that's not accurate. He discovered that he had been hacked. He had not discovered that the data was publicly available. Again, there has been a material dispute of fact as to when that data did become publicly available, so it's not ripe for summary judgment.

**THE COURT:** So do you agree I made the finding, or do you disagree with that? Or you disagree with the finding?

**MS. BRIGGERMAN:** Disagree with the finding that he became aware of the data --

THE COURT: Let me ask it a little more clearly. Your argument was that they said I already made a finding that he was aware?

MS. BRIGGERMAN: No, I'm sorry. If I insinuated, that's not what I suggested. Defendants suggest that Mr. Azima has stated that he became aware of his data in 2016, and that's not accurate. He discovered that he was hacked.

THE COURT: This is what was said. Let me just make sure. "And Defendants argue that this Court has already found that Mr. Azima discovered the conduct by 2016?"

MS. BRIGGERMAN: Yes, I think they do make that argument in their brief, and that's just not an accurate portrayal.

THE COURT: You disagree that I made that finding at all at this point?

MS. BRIGGERMAN: Agreed, yes.

THE COURT: Okay.

MS. BRIGGERMAN: And if I may now jump to the trade secrets. As Mr. Kaplan said, this is a very unusual case. Troves of Mr. Azima's data was stolen and used and disclosed, which harmed him significantly.

Plaintiff has identified 38 trade secrets; and for the Court to issue summary judgment, the Court would have to find that there is no material dispute of fact as to any of those trade secrets. But there is deposition testimony both by

Mr. Azima and his financial advisor as to each of the trade secrets, that they were valuable, that he kept them confidential, that they were his, and that he took reasonable efforts to maintain the secrecy. And I -- I won't go through each one obviously in the interest of time; I'm happy to highlight a few of them if that would be helpful. But there was sufficient testimony --

**THE COURT:** Do what you want, but I'm going to be going through them one at a time.

**MS. BRIGGERMAN:** Okay. Well, I'm happy to highlight a few of them if that would be useful.

So Trade Secret One, as an example, is a detailed financial forecast for HeavyLift. Now, HeavyLift is a company that Mr. Azima owns 100 percent. It is a document that is marked "strictly confidential" showing that he intended to preserve the confidentiality of the document; and it was stored on his computer system protected by password with username and password protection; and it was only sent to individuals who understood that it was intended to be maintained confidential. It's also a trade secret in that it reflects internal assumptions, financial modeling, and financial information of Mr. Azima.

So that's just one example of a trade secret where there is significant testimony from Mr. Azima and Mr. Adams that Mr. Azima has met the elements of a trade secret here;

and, as a result, summary judgment would be inappropriate.  If anything, there's a dispute of fact as to whether it does constitute a trade secret, and that is something that should be left to the jury.

On the issue of causation and damages, contrary to Mr. Kaplan's position, Mr. Azima has shown that he has been harmed.  He is arguing a theory of disgorgement in this case, and the evidence shows, according to Defendants' own bank records, that they reaped $35 million in working on this project related to Mr. Azima.  The burden is on Defendants at this time.  They have the initial burden to point to undisputed evidence that they did not earn a profit, but they cannot do so; and part of the reason they cannot do so is that they have no bank records, and they have produced no records of their own that would show they earned no profit.  The reason we have bank records is we obtained them from third-party banks.

But Mr. Azima has suffered harm.  He has testified that he lost business deals and that banks closed his bank accounts.  We have provided in discovery copies of the bank closure letters, so that is all in the record at this time.

So based on all of this, given summary judgment is only warranted where there is no material dispute of fact, Mr. Azima argues that summary judgment is not warranted.  It's also premature at this time.

**THE COURT:**  Let me make it clear on what's going on

with these trade secrets. So I've got a thumb drive and then also have -- let's see. Okay. This would be -- all right. Let me have one lawyer from Plaintiff's side, one lawyer from Defendants' side step up here and take a look at what I'm looking at, whoever knows the ECF record the best. Who is that going to be?

**MR. KAPLAN:** I think we'll try.

**MS. BRIGGERMAN:** Yes.

**THE COURT:** Come on up, come behind me. So here is a motion. This is Defendants' Motion for Summary Judgment. These are -- down here are the sealed exhibits. So if I click on attachments Exhibit B1, which is Trade Secret Number One, I open that, this is what I get. A native Excel spreadsheet, blah, blah, blah. That's what I got. So, yeah. I then go the thumb drive. Where is it? This is what was in the thumb drive. Let's do it again if we can. This Excel spreadsheet, a chart of revenues, I don't see anything where it's marked -- let's see.

**MS. BRIGGERMAN:** Your Honor is looking for the confidential labeling? I think you may have to look at the PDF version or the print preview version of it.

**THE COURT:** All right. Hold on. Let me see if I can get back to my thumb drive. Joe, step up here and show me how to get to the thumb drive.

So there's the file stamp version. Same mess. Then

back -- so that's the Excel spreadsheet that I opened.

**MS. BRIGGERMAN:** Plaintiff also produced a set of the trade secrets that were initialed by Mr. Azima and Mr. Adams during their testimony, and those are attached to our opposition to the summary judgment motion. That may contain the PDF version. I can check.

**THE COURT:** That's what I was looking at. So your summary judgment --

**MR. KAPLAN:** Is 379, Your Honor.

**THE COURT:** But that's the unsealed, that 379. I didn't see it in there. These are the sealed exhibits. That says Exhibit B1, Trade Secret Number One, this is attached to your -- that's the motion for summary judgment. I couldn't find it.

**MR. KAPLAN:** Your Honor, I'll tell you the docket entry response. I think it may help. Your Honor, it's Docket No. 398.

**THE COURT:** 398, it's actually in 399. So I looked through all this. I didn't see anything with the actual trade secrets. They were -- they were submitted with the thumb drive. I mean, you're welcome to look through that and see what you can see, but I didn't see --

**MS. BRIGGERMAN:** They're on the thumb drive.

**THE COURT:** What I showed you, Excel spreadsheet plus the other three blanks, is what was on the thumb drive? At

this point, all I've seen -- you all can go back and have a seat, or go back.

So in terms of what I can find in the record, Trade Secret Number One being an example, is just the spreadsheet itself. I can't find -- or I can't connect the dots in terms of what you described there, so my -- I'm not going to rule on summary judgment today. We're going to talk more, but my suggestion is the parties get together and figure out how they can put together a hard copy of the trade secrets and submit those directly to chambers once you've agreed as to what constitutes the, quote, trade secrets at issue in the case, Numbers One -- I think it's One through Thirty-eight or One through Thirty-nine, whatever the number is.

**MS. BRIGGERMAN:** We're happy to do that, and we'll just double check. I'm pretty sure the "strictly confidential" labeling is somewhere in the document. When you print it out, it appears. Then there would be testimony, of course, that goes into how Mr. Azima deemed that trade secret to be valuable and what the purpose of it was.

**THE COURT:** Okay. All right. Anything else you wanted to address?

**MS. BRIGGERMAN:** No, Your Honor. Thank you.

**THE COURT:** All right. Thank you. Rebuttal?

**MR. KAPLAN:** Thank you, Your Honor. I want to -- Your Honor, if you forgive me, I want to read from Rule 56 to

address the first point, and it's on my computer, so I'll have to do that from here.

You've heard -- first thing that Ms. Briggerman said was, well, this is premature, and you can't rule yet because there's these outstanding issues. I would direct the Court to Rule 56(d), quote:

"If a non-movant shows by affidavit or declaration that for specific reasons it cannot present facts essential to justify its opposition, the Court may defer consideration of the motion or deny it, allow time to obtain affidavits or declarations or to take" --

THE COURT: I'm familiar with Rule 56(d).

MR. KAPLAN: Right. So they haven't met their burden at all on Rule 56, starting with the fact there's no declaration or affidavit. But more importantly, they haven't articulated whatsoever what information is extant that they need to defeat summary judgment, and I would offer to the Court that they don't.

And this brings into focus this issue about the FBI. You won't find the word "FBI" or any allegation regarding any disclosure other than by publication anywhere in the complaint. And as Your Honor well knows, given your ruling in *Rouse v. Duke University* at 869 F. Supp. 2d 674 all the way back in 2012, "The parties are bound by the allegations contained in

their complaint and cannot through the use of motion briefs amend the complaint." And that is exactly what they're doing. They got our brief. They got our evidence. They said, "Well, wait a second, we're not disclosing the FBI" to try to save themselves. Can't do that.

THE COURT: For a number of reasons I disagree with you on that. I'm well familiar with what I said in *Rouse*. Next argument?

MR. KAPLAN: Their own expert -- and you can find this in Exhibit E to the response at paragraph 30 -- states that record evidence establishes that Mr. Azima's confidential information was disclosed to the FBI in 2017, so we're back to the same place.

Let me talk about burden. You keep hearing Ms. Briggerman tell you how it's my client's burden because we're the movant. The reality, Judge, is that once we establish a prima facie case of our arguments, it's up to the Plaintiff to appear and forecast actual evidence to refute what the movant has established, and they have not done that. A lot of argument, but no actual evidence.

Let me just --

THE COURT: So just out of curiosity in terms of the statute of limitations, the question is whether knew or should have known, reasonably discovered. In terms of what occurred in January of 2017, what's the evidence Mr. Azima was aware of

that?

MR. KAPLAN: He has testified repeatedly that his whole world came crashing down in 2016 -- and we cited this in our papers -- in 2016, when his, quote, "whole world became public." Number two --

THE COURT: At that point clearly the 2017 information wasn't public, was it?

MR. KAPLAN: I don't know, but they have -- they have the burden, right?

THE COURT: Understood.

MR. KAPLAN: Well, here's what I would argue, Judge, and I'm going to use Ms. Briggerman's own arguments, because as she stated, and as Mr. Azima has taken this position, all of his information was stolen, everything, and everything was out there, and the trade secrets are a small subset of this massive amount of data that was out there. So his position is it's a subset, right? That's the starting point, okay.

So the question becomes what evidence is there of when the larger data was out there? And by his own testimony, it occurred -- his whole world came crashing down when his world became public in 2016. By 2017 -- and by the way, it's the same testimony about how he was harmed. His own testimony is "I was harmed by 2017." So --

THE COURT: By the set, not necessarily the subset. That's the tricky part. What happened with respect to each

one? Set aside credibility and weight for a minute. What he contends are trade secrets may have been disclosed in 2017, but in terms of the set -- yeah, I mean, apparently there was stuff going on 2014, '15, '16, all throughout, but this suit, at least -- or this complaint and this lawsuit, as I understand it, is only indirectly about the actual misappropriation and more directly about disclosure.

So in terms of this specific information -- I'm not saying it is or isn't trade secret -- there's something that happened in 2017. January of 2017 is when you all contend the information was disclosed, right?

**MR. KAPLAN:** If not earlier.

**THE COURT:** Okay. January 2017. The fact that Azima says his world came crashing down is meaningless. It may have come crashing down because of this, it may have come crashing down because he found out he'd been hacked, it may have come crashing down for something else. The question is what did this cause? Or what -- when was this disclosure used?

**MR. KAPLAN:** So I think -- I think the Court needs to -- and forgive me for emphasizing the wrong portion of his statements. What he said wasn't just that "my whole world came crashing down in 2016." What he said was "my whole world came crashing down when it all became public in 2016," and that by 2017 --

**THE COURT:** What was all? What was his answer to --

MR. KAPLAN: His data, the bigger picture data from which the subset is derived that are allegedly his trade secrets.

THE COURT: And what evidence have you put in to show the bigger picture data in 2016 included this subset that was publicly disclosed?

Stop nodding your head.

MR. KAPLAN: That's their entire case, Judge. Their entire case is -- if you look at the complaint, remember what this started for. They said: You hacked me, you hacked me, and things were disclosed, though maybe not publicly, in 2016, and then I discovered that in 2018.

It is Plaintiff's position -- and Ms. Briggerman argued to the Court not 10 minutes ago -- that the trade secrets are a subset of the data that was hacked. Our expert -- and this is unrefuted, Judge, unrefuted record evidence. He has established -- and we go through why -- he's established that the trade secrets are within the subset of data that was disclosed in January of 2017. Their own expert previously testified to that, Judge.

THE COURT: Your expert's Tarbell.

MR. KAPLAN: No, that's their expert, who, by the way, he also testified in another proceeding --

THE COURT: Your expert's Whitfield.

MR. KAPLAN: That's correct, Your Honor. So --

**THE COURT:** What he said was:

"Unfortunately, testing this specific piece of metadata is no longer possible as subsequent updates to the WordPress.com website and platform has since removed the modified time from the blog post. But it should be noted that this is a WordPress-hosted website, which means the users would have limited control over the hosting environment, and they would be able to edit."

There's a lot of uncertainty as to what happened in 2017.

**MR. KAPLAN:** Well, I would argue that there's not; and if the Court would indulge me, I think I could walk you through it because it is highly technical --

**THE COURT:** You had an opportunity to walk me through it in the briefing.

**MR. KAPLAN:** That's fair.

**THE COURT:** If I didn't get it from there, I'm not going to get it from here. Anything else?

**MR. KAPLAN:** I would simply say, Your Honor, that the offending blog sites were not modified after January of 2017. That is irrefutable, unrefuted evidence. If that is, in fact, the case, and Mr. Azima or Mr. Tarbell a year later went to the same websites that had not been modified and noticed his trade secrets, the only reasonable conclusion is that they became

public at the last time that the websites were modified, and that would have been January of 2017. There's no other conclusion.

THE COURT: Modified in 2018?

MR. KAPLAN: No.

THE COURT: What's Whitfield talking about in terms of he can't -- he can no longer --

MR. KAPLAN: That's 2019, Judge. And this is where the burden comes into play. He said -- there's no record evidence whatsoever of any publication occurring for the first time in 2018. The only evidence is that Mr. Tarbell went there and noticed that sometime before 2018 -- I guess it was June or October, forgive me -- but at some time before he went there, these websites were modified in order to include public disclosure of the alleged trade secrets.

THE COURT: Right.

MR. KAPLAN: Right? And the only other evidence of record in this Court is that the last time prior to when Mr. Tarbell noticed the information was there occurred in January of 2017. So they need to establish -- it's their burden to establish that, okay, fine, there's evidence of the last modification in 2017. Where is the evidence that it was modified to provide this information between January of 2017 and when they first noticed it in 2018? They cannot do that.

I do not dispute that there was a new link in 2019.

What nobody can prove -- and what is their burden to prove -- is what information was disclosed in 2019. And they cannot do that. They made an allegation; they have not supported it; and it's their burden to do so.

**THE COURT:** All right. Time's up. Thank you. We'll be in recess for five minutes.

(At 10:58 a.m., break taken.)

(At 11:07 a.m., break concluded.)

**THE COURT:** All right. I have some questions and comments.

All right. First of all, I don't know where we're going to head in terms of additional briefing; and certainly to some extent, the briefing has gotten better since I had the parties in here for a discussion about where things were going with discovery. But this is clearly a hotly contested case, and emotions are flying pretty high on both sides.

But if I get one more -- I'm going to call it an unhelpful subjective attack on briefing, I'm going to start striking briefs, and this is true for both sides. I'm going to give you an example that involves something in the Plaintiff's brief, but I'm really getting frustrated with some of the -- with the fact that some of the animosity or the emotions bleed over into the briefing, because it is not helpful at all.

So the Defendants' Brief in Support of the Motion -- the Motion for Summary Judgment. In terms of the brief itself,

admittedly shorter than I might have anticipated for this case. However, it did go straight to -- directly to the issues in the case without a lot of fluff, which is something that I appreciated.

In response, this is the preliminary statement in the Plaintiff's opposition brief: "Most summary judgment motions contain a lengthy statement of undisputed facts. Yet, Defendants muster fewer than three pages that boil down to two alleged undisputed facts: Azima's Rolodex trade secrets were created for this litigation, and Azima did not create and, therefore, does not own the rest of his trade secrets." That's citing the Motion for Summary Judgment at three.

Okay. So what's my problem with that? Number one, I've seen summary judgment motions boiled down to one disputed fact. So whether there's one, two, five, or 100 disputed or undisputed facts isn't dispositive.

Number two, here's a problem -- and, again, to be clear, I'm singling out this example, but if you want me to, I can sit here and pull it out from both sides' briefing, frankly.

Number two, when you make an attack like that on kind of the writing as opposed to the substance, what happens if you're wrong? What are you going to make a judge think if the judge looks at that and goes, "So what? I thought the brief was relatively well done. Why are they attacking the brief?"

It immediately triggers in the judge's mind, "What's going on here? Is this going to be a smoke and mirrors brief that I have to check everything on because the attack's on the length of the brief?"

And again, to be clear, that stuff just has got to stop, because it is not helpful to either side.

That's all I'm going to say today. You know, the rule that was given to me many years ago by another lawyer who's much smarter than I am says get all the adjectives and adverbs out of your briefs. Think about doing that because you want your analysis to be what explains the case to the Court, not the adjectives and adverbs. Because if you use them and you're wrong, you set yourself back.

Tip for the day. But I'm giving it as a tip for the day because I just -- I don't want to see that anymore. It doesn't do anything to help. And, quite frankly, the only thing it really does is continue to fuel the fire in terms of emotional responses from either side.

Now, this -- second, I'm going to pose some questions here because the Plaintiff bears the burden in terms of establishing the presence of a material issue of fact with respect to summary judgment. We're dealing with trade secrets here. And I will say this, and I'll give the Defendants a chance to respond later. If you look at this question of the statute of limitations, the statute says: "An action for

misappropriation must be commenced within three years after the misappropriation complained of is or reasonably should have been discovered."  "Is or reasonably should have been discovered."

So it's not just simply speaking in conclusory terms about when there has been a public disclosure.  We're talking about January of 2017, and then later in 2018 and again in 2019 there being these public disclosures on the Internet.

At this point in time, I'm not so sure a public disclosure on the Internet is akin to certain types of disclosures for which notice can be inferred.  For example, if disclosure occurs in a newspaper, does that mean the circulation of the newspaper is the measure of disclosure in looking at when the misappropriation is or should have been discovered?  Or is there something more?  Public notices in the newspapers, there's legal publications.

If somebody put on the Internet on Instagram, we'll say, a -- I've forgotten what you call the things on Instagram -- posted something on Instagram that said "Judge Osteen is corrupt and accepts bribes," if the statute of limitations goes -- that's clearly a public disclosure, assuming that it's not limited.  But if it's the discovery rule, when should I -- was I aware or should have been aware of that publication, that gets to be a tricky question, because I'm not an Instagram user, so I wouldn't have received notice of an Instagram

posting, even though it is, quote, unquote, public. Same if it was posted on Twitter, or X. I'm not on X. Don't know when I knew or should have known of that particular posting.

Here, we're dealing with a posting on the Internet; and even if I should find January of 2017 is public, how do I make the transition from the posting to the fact that Azima knew or should have known? I don't find it compelling at all that Azima makes a general statement in 2016 that "my world came crashing down because my data was stolen, and everybody knew everything about me." That's an emotional conclusory statement that doesn't provide any specifics as to when Azima knew or should have known.

So the argument, I think, is a fair one, but there's a real -- in terms of when did this statute of limitations start running with respect to the disclosed information, depending on what was posted in 2017 and who might have had access to it? But at this point in time, the standard is, as set forth, "is or reasonably should have been discovered." That's a tricky standard. So that's one thing that the Defendants can address now if they choose to.

Number two, this is difficult to do, because I don't know that I have clean accurate copies of Trade Secrets One through Thirty-eight or Thirty-nine, so it's awfully hard to know exactly what the circumstances are.

Well, before I move to that, Plaintiff contends that

Azima did not discover that his stolen data was posted on WeTransfer until July of 2018, and new links were published in 2019. I don't know -- I'm studying it now, but in terms of the admission from the related litigation, this is Exhibit L, page 29, paragraph 99:

"A large volume of data confidential to Mr. Azima was disseminated on WeTransfer sites. One dataset was made available on WeTransfer on 27 January 2017 and deleted on or around 9 May 2019. A further dataset was made available on WeTransfer on 3 June 2019 and remains available now. Mr. Pandey has admitted to Mr. Ray that CyberRoot made these data available on WeTransfer. It is inferred that CyberRoot did so on instructions from Del Rosso, Vital, or another agent of RAKIA."

It's -- that affidavit was signed by Azima. It's dated -- I don't how that's going to ultimately going to fit into the picture -- but "made available on WeTransfer" sounds like public, but how does that all fit together?

Number two, in terms of the trade secrets substantively, I'm sure all the lawyers here are familiar with individuals and corporations. The allegations here are that these trade secrets belong to Mr. Azima, and so in all candor things like Trade Secret Number Seven, an email forwarding pricing information, P responds that P provides -- this is the

Plaintiff's response -- provided input on financing and operations.

All right. So I don't know how the provision of input establishes the existence of a trade secret, and what I mean by that is this: I accept the general proposition put forward by Plaintiff that a number of individuals or companies can all possess a trade secret, and the trade secret can remain a trade secret under the law because the threshold question in terms of what is a trade secret is whether or not a formula, pattern, program, device, compilation of information, method, technique, or process that derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development. Not being generally known.

Related to that factor are things like: To what extent was the information known outside the business? To what extent was it protected? To what extent was it known to employees and others involved in the business? And the extent of measures taken to guard the secrecy of the information.

So the fact that Azima may have provided input to a proposal suggests -- assuming that somewhere someone might could find that that input was a trade secret with respect to Mr. Azima -- the important thing in evaluating whether or not there's been an improper disclosure, misappropriation and disclosure, is the question of whether or not it was protected

after the input was provided. And here, in all candor, I'm really struggling to see how Mr. Azima took reasonable steps to protect whatever he disclosed to a third party.

And it doesn't matter to me whether or not Mr. Azima -- at least at this point in time, it doesn't matter to me whether he was 100 percent owner or an indirect owner or something else. When he turned his information, assuming it was a trade secret to start, over to a business, a separate entity, another individual, a business that has its own independent entity, without any accompanying steps to protect it -- and I get the point in terms of a stamp at the top that might say "trade secret information" or "top secret information" or something like that. But I mean, as far as I know, I don't care what I stamp something with. If I hand it to somebody who's under no obligation to preserve secrecy as to that particular item, document, compilation of information, or whatever, then I don't think it's protected anymore, because the third party who received it without any corresponding obligation to protect it is free to disseminate that information wherever they choose to disseminate that information.

So those are two big picture issues that I have in terms of the briefing that I've seen so far. So I'm going to give the Plaintiff an opportunity to address Issue Number Two with respect to disclosure of information Azima contends is a

trade secret to a third party without any corresponding obligation of the third party to maintain confidentiality.

The same analysis applies if a third party should provide Mr. Azima with information that Mr. Azima then contends is his trade secret, well, it's not, because the third party -- as I see it -- because the third party has the authority to disclose it as they choose. And these are issues that it's not clear to me -- well, you can respond to that. In terms of the statute of limitations, the Defendant can respond to that. The Defendant respond first.

**MR. KAPLAN:** So, Your Honor, I think you -- I think the Court hit the nail on the head with Exhibit L, paragraph 99. This is sworn testimony, and there's no dispute -- I don't think -- there hasn't been a dispute that the 2019 --

**THE COURT:** When did he make that statement?

**MR. KAPLAN:** In the UK case prior --

**THE COURT:** Yeah, what was the date?

**MR. KAPLAN:** I'm sorry, Judge. I've got fat fingers. Forgive me. The sworn statement was made November 4, 2021.

**THE COURT:** Okay.

**MR. KAPLAN:** All right.

**THE COURT:** So by that point he knows. It's part of this case; it's part of other cases.

**MR. KAPLAN:** Right, and he said -- you know, we can

go back to -- you read it. I just left it, but it was disclosed in 2017 in January. He said, "I knew about this. It was out there."

**THE COURT:** Where does he say he knew about it?

**MR. KAPLAN:** He doesn't, you're right. I misspoke.

**THE COURT:** Why did --

**MR. KAPLAN:** I misspoke, Your Honor. I apologize.

**THE COURT:** These are the specifics that I'm talking about. These facts are important.

**MR. KAPLAN:** I agree with the Court, and I apologize for misspeaking. You caught it before I did coming out of my mouth, and I apologize to the Court.

Your Honor has to make a determination on what's reasonable, whether he should have known. And if you look at Mr. Azima's own words, he knew in 2016 or 2017 that his whole world had been public. He knew that he had been hacked --

**THE COURT:** Was that in 2016 or '17?

**MR. KAPLAN:** 2016 and that by 2017 he had -- or the harm had already occurred, right? And if you go through his transcript, he says repeatedly -- and this dovetails -- I know this is not a direct answer to the Court's question, but he repeatedly says, "Look, this isn't -- this isn't about each individual trade secret. The issue here is that my whole world by law became public. Everything --"

**THE COURT:** I don't care what he says.

MR. KAPLAN: But no --

THE COURT: The case is about the individual trade secret.

MR. KAPLAN: I agree, but the Court is asking about whether it was reasonable for him to know about disclosure. He knew in 2016 about the BitTorrent sites. He knew that his stuff was out there, okay. If you look at the Williams --

THE COURT: What stuff was out there, specifically with respect to Trade Secrets One through Thirty-eight or Nine?

MR. KAPLAN: He was aware that all of his information, all of his confidential information of which the trade secrets are a subset, had been hacked.

THE COURT: Right.

MR. KAPLAN: And the effects of that confidential information had been occurring, the harm since 2016.

THE COURT: How does he know Trade Secrets One -- what is it, is it One through Thirty-eight or One through Thirty-nine?

MS. BRIGGERMAN: Thirty-eight, Your Honor.

THE COURT: One through Thirty-eight have been public?

MR. KAPLAN: He doesn't need to know that. That's not the standard, and I want to point the Court to *Wilson versus C.R.* --

THE COURT: It's a two-prong standard: Is or should

have been.

MR. KAPLAN: Right --

THE COURT: So the question is should have been.

MR. KAPLAN: Correct.

THE COURT: How should he have been aware?

MR. KAPLAN: My argument, Judge, is -- and I'm basing this on *Wilson vs. C.R. Bard*, which they cite, all right. It was a negligence case involving bodily harm. The analogy I think the Court would be able to see. There -- this is a 2020 Eastern District case, North Carolina. It said that the question is "whether the plaintiff can convince a reasonable jury that her bodily harms had not become apparent to her and would not have become apparent to a reasonable person in her position."

And my argument, Judge, is that given all of Mr. Azima's prior testimony about everything that occurred to him, including knowledge of websites and the blog sites existing -- it is undisputed that he knew that the blog sites existed prior to 2018. So if Your Honor's looking at this reasonably, Mr. Azima's own position is: In 2016 I was hacked. I knew this. There were anti-Azima blog sites that were out there. It is very obvious that they were monitoring this stuff because why would you go back --

THE COURT: Did you ask him?

MR. KAPLAN: Ask him what, Your Honor?

THE COURT: If Azima was monitoring the blog sites.

MR. KAPLAN: I did not ask him that because --

THE COURT: Did you ask him if he looked at any of the blog sites?

MR. KAPLAN: I believe I did, Your Honor.

THE COURT: What did he say?

MR. KAPLAN: "Yes." And that's how they know -- that's how they know that in 2016, even though they were out there --

THE COURT: When did he look at those blog sites?

MR. KAPLAN: I do not have that readily available for the Court, but I'd be happy to answer it with further briefing.

THE COURT: Those are the kinds of questions that -- what's the reasonable person standard?

MR. KAPLAN: I would argue --

THE COURT: Take your case that you're citing now. Reasonably known. How do you -- what are the facts to support that he should reasonably have known --

MR. KAPLAN: He knew --

THE COURT: -- January of 2017 that this information was on this site?

MR. KAPLAN: I think that he reasonably should have known given the fact that he was aware that he was hacked, given the fact that he was aware that this BitTorrent stuff was out there but not publicly available and that there were

websites, and he kept getting information, hey, your information is out there, there are these anti-Azima websites, and he's looking at them; and if there were links that didn't necessarily work, I would think a reasonable person would go back. If they were so concerned about disclosure to the world at large, one would think that if you're being attacked -- and what is reasonable? The reasonable person, Judge, would look at these websites. He doesn't get to see -- he goes after -- after knowing what he knows, he doesn't get to put his head in the sand.

THE COURT: Did you ask him about these things?

MR. KAPLAN: Excuse me?

THE COURT: Did you ask him about these things?

MR. KAPLAN: I did not, Judge.

THE COURT: Okay. All right.

MR. KAPLAN: And the reason why, Judge, is because if you look at the totality of his testimony, no reasonable fact-finder can find that he wasn't since 2016 being vigilant about having been hacked and about these anti-Azima websites on which the information ultimately came to appear. It's not like a situation if you think -- if you take Mr. Azima's testimony at face value, because you can't judge credibility, he's the one who said, "Everything's crashing down around me. These guys are printing blog sites about me left and right."

You don't get to put your head and be -- it would be

unreasonable, Judge, with everything going on that Mr. Azima has complained about, which formed the basis for this lawsuit -- nine out of the eleven claims was that all occurred prior to 2017. It would be unreasonable to stick your head in the sand, pop it up and say, oh, great, forget statute of limitations, I get to sue you now. And the very fact that he attempted to assert claims that Your Honor found had accrued well before the statute of limitations, I think, is indicative of the fact that he knew what was going on. So at base, Judge, and you may not agree --

**THE COURT:** I don't find that to be helpful. Let me hear from the Plaintiff.

**MS. BRIGGERMAN:** Your Honor, may I respond briefly on the statute of limitations issue? So I think this discussion shows --

**THE COURT:** Let me hear from you on the other one.

**MS. BRIGGERMAN:** I'm sorry? I couldn't hear you.

**THE COURT:** The other question.

**MS. BRIGGERMAN:** The other question.

**THE COURT:** I'll give both sides a chance to do a brief rebuttal.

**MS. BRIGGERMAN:** Sure, on the confidentiality issue.

First, I just want to make clear the Court raised a question about Mr. Azima's ownership or involvement in some of these trade secrets given that they -- that he has an ownership

interest in some of these companies, and they appear to be trade secrets on behalf of the companies, and I just want to cite from the statute --

THE COURT: He can't assert a claim on behalf of a company, can he?

MS. BRIGGERMAN: : He's not asserting a claim on behalf of the company --

THE COURT: He's got to bring it individually.

MS. BRIGGERMAN: Correct, and the statute is clear on that. The statute says:

"The existence of a trade secret shall not be negated merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person or licensed to other persons."

THE COURT: I agree with that. The question is, did everybody protect it?

MS. BRIGGERMAN: Yes, and I can address that issue. First of all, the standard is whether or not Mr. Azima took efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets; and if you look at pages 18 and 19 of our opposition brief, and that's Document 398, it lays out the testimony where Mr. Azima established how he maintained the confidentiality of these trade secrets.

THE COURT: What happened to it when he gave it to

somebody else?

MS. BRIGGERMAN: Well, he had reasonable expectations that those parties --

THE COURT: I don't care about his reasonable expectations. The question is what, in fact, happened when he gave it to somebody else?

MS. BRIGGERMAN: So in certain circumstances, he had nondisclosure agreements. In certain circumstances, he had confidentiality labeling.

THE COURT: Where is that in the record?

MS. BRIGGERMAN: It's in his testimony.

THE COURT: So we don't know what those nondisclosure agreements entailed? He just testified that he had them?

MS. BRIGGERMAN: He has testified that he had them, and I would have to check to see if any have been produced. I don't have that right at the tip of my hands here.

THE COURT: That's important, isn't it?

MS. BRIGGERMAN: Yes, but he also maintained confidentiality in other ways. He had confidential labeling on a lot of the documents.

THE COURT: That's great. The fact that there's a label standing alone doesn't mean anything, does it?

MS. BRIGGERMAN: Well, I think the standard is what is reasonable under the circumstances at the time. He's not Coca-Cola or a corporation. He had a reasonable expectation of

privacy in providing these documents to business people who were within his circle of trust.  So he included confidentiality labeling.  He --

**THE COURT:**  So the standard is, so long as he trusted the person, that's enough to protect a trade secret?

**MS. BRIGGERMAN:**  As long as he took efforts that are reasonable under the circumstances.

**THE COURT:**  Okay.  So it's not just trust, it's efforts, so let's --

**MS. BRIGGERMAN:**  It is effort.

**THE COURT:**  Let's take, for example, Trade Secret Number One, HeavyLift.  It's got a stamp at the top that says "top secret."  He gives it to Heavy -- somebody in HeavyLift, right?

**MS. BRIGGERMAN:**  He owns HeavyLift 100 percent, so that is his company.

**THE COURT:**  Okay.  Is he an officer?

**MS. BRIGGERMAN:**  Yes.

**THE COURT:**  He's an officer.

**MS. BRIGGERMAN:**  It is solely owned by him.  It is his company.

**THE COURT:**  So who did he give it to in the company?

**MS. BRIGGERMAN:**  Well, he had some employees at the time.

**THE COURT:**  So what was their obligation to maintain

secrecy of that -- let's say after 2012?

**MS. BRIGGERMAN:** As employees of the company, they would have an obligation to maintain the confidentiality of a trade secret they're working with --

**THE COURT:** After 2012? Wasn't HeavyLift gone in 2012?

**MS. BRIGGERMAN:** I don't recall the exact year. I believe it was around longer than that, but I don't recall the exact year.

**THE COURT:** Let's see. HeavyLift ceased operations in 2012. That's what I have in my notes from the briefing.

**MS. BRIGGERMAN:** Okay.

**THE COURT:** So what's the employees' obligation to maintain confidentiality after 2012? Is there a contract? Is there a writing? Is there something? Anything?

**MS. BRIGGERMAN:** I don't believe there was a firm policy, but keep in mind what we're dealing with here is defendants who hacked our client's computer, got through password-protected emails, and hacked troves of his data and then published it online.

**THE COURT:** I understand -- I understand that part, but the question is: Was it a trade secret? That's the fundamental question.

**MS. BRIGGERMAN:** Right, and --

**THE COURT:** And if it was, to be a trade secret, it

has to be protected. And so let's say under your analysis that whatever his relationship was with his employees, whether it was in writing or whatever at the time, when he knew and could -- was reasonable to infer that it was protected when he provided the information to the employees, what is there to show that obligation continued after 2012? It's a little different issue. The Defendants didn't attack it quite this way, but they went through all of the criteria for a trade secret. But the basic fundamental question is: Was it protected?

And so to the extent it wasn't, whether at the time or later -- even if it was a trade secret when Azima had it, the question is what happened to it after it got away from Azima? Was it protected then?

**MS. BRIGGERMAN:** Just because a company comes to an end doesn't mean the trade secret is no longer confidential and that there are no --

**THE COURT:** No, I agree. But the question is what were the obligations of the people who'd been given that information at the time to maintain the secrecy of the trade secret when the company came to an end?

**MS. BRIGGERMAN:** Right. Well, it was still considered a trade secret at the time, and those obligations would be --

**THE COURT:** By Mr. Azima, I get that. But what about

the people who got it?

**MS. BRIGGERMAN:** Yes, if it's considered a trade secret, they would have an ongoing obligation, and it goes --

**THE COURT:** Based on what? Based on what? Great point. But based on what?

**MS. BRIGGERMAN:** Based on the fact that it is a trade secret, and it has value. So it would have value in the hands of a competitor, and that does not go away just because --

**THE COURT:** There are no competitors after 2012, the company is gone.

**MS. BRIGGERMAN:** Well, just because the company goes away doesn't mean there are potential competitors who wouldn't have value in that trade secret.

**THE COURT:** For what --

**MS. BRIGGERMAN:** Other companies in the aviation industry who would find that valuable, even if HeavyLift is gone, and that still harms -- that harms Mr. Azima independent of HeavyLift because his business has continued.

**THE COURT:** It may very well harm Mr. Azima. The question is: Did Mr. Azima take any steps to protect the information once he disclosed it to a third party, HeavyLift?

**MS. BRIGGERMAN:** Right. So the testimony is that in certain circumstances, he had confidential labeling, and that was understood based on the document that the third party was expected to keep it confidential, and he did not revoke that

confidentiality at any time. And I would just say with respect to HeavyLift, that is -- HeavyLift is essentially Mr. Azima. He wholly owns that company. So other than providing the documents to his employees, there's no one else who would have received them within HeavyLift.

THE COURT: You agree he may wholly own the company, but the company is a separate entity from Mr. Azima?

MS. BRIGGERMAN: Yes.

THE COURT: It's a third party.

MS. BRIGGERMAN: Yes, correct.

THE COURT: So is it fair to say then that the only thing that Mr. Azima can point to in terms of disclosure of whatever information he disclosed to HeavyLift that the only thing that protected the secrecy of that information is a stamp at the top of the document? Is that -- is that the record in the case?

MS. BRIGGERMAN: For that particular trade secret, Trade Secret Number One, there is the "highly confidential" labeling at the top. I would have to look at the testimony to see if he specifically addresses that. It was under password protection, of course, because it was in his email. Whether he had --

THE COURT: You had plenty of time to explain those protections in your briefing, didn't you?

MS. BRIGGERMAN: Yes, it's in the briefing.

**THE COURT:** Okay. I didn't --

**MS. BRIGGERMAN:** It's at page 19?

**THE COURT:** Page 19. What'd he say at page 19?

**MS. BRIGGERMAN:** And our brief does not go trade secret by trade secret just as Defendants' brief does not. So the testimony he gave in some instances was specific to trade secrets, but a lot of times was about his business habits and his customs.

**THE COURT:** Okay. So at page 19 --

**MS. BRIGGERMAN:** Correct, 18 and 19.

**THE COURT:** "Mr. Azima maintained his trade secrets on password-protected devices." Right?

**MS. BRIGGERMAN:** Correct.

**THE COURT:** "Mr. Azima used password-protected email accounts." Right?

**MS. BRIGGERMAN:** Correct.

**THE COURT:** "Mr. Azima protected his physical offices with locks, cameras, and alarms." Right?

"He only shared trade secrets with authorized third parties within his circle of trust."

"He marked those trade secrets as 'confidential,' see Trade Secret Number One."

"He transmitted those trade secrets in emails that include confidentiality labels based on confidentiality agreements."

So with respect to Trade Secret Number One, what does the confidentiality agreement say?

**MS. BRIGGERMAN:** I don't know that there was a confidentiality agreement with respect to Trade Secret One specifically.

**THE COURT:** See the issue with generalities as opposed to specifics?

**MS. BRIGGERMAN:** Yes, I understand, Your Honor, and I think --

**THE COURT:** In terms of the record that's before me now, the only evidence of a protection as to Trade Secret One is the stamp on the document.

**MS. BRIGGERMAN:** Right.

**THE COURT:** All right. Anything else on this point?

**MS. BRIGGERMAN:** No, Your Honor. Would you like me to address the statute of limitations issue?

**THE COURT:** I'm going to let them rebut, and then you can come back and address statute of limitations issue.

**MR. KAPLAN:** Judge, I'm going to answer your questions very succinctly.

First, let me correct the record. In 2009, Mr. Azima sold 49 percent of RAK -- of HeavyLift to RAKIA, and he testified that he never trusted RAKIA. He testified that after he sold them 49 percent that they had unfettered access to all of the documents containing his trade secrets. He further

testified that he then prior to 2012 sold the remaining interest in HeavyLift, meaning that by 2012 he was not a 100 percent owner, he was no longer an officer, and he also testified, Judge -- you can look at the bottom of pages 21 and 23, if you've still got your notes from our initial brief -- he testified that no HeavyLift employees were required to sign confidentiality or NDAs and that beginning in 2012 or before, RAK possessed 100 percent of HeavyLift's documents, and there were zero measures taken to ensure confidentiality by RAK at a time that he knew he didn't trust them.

So at the end -- so Trade Secrets One, Two, Twelve through Seventeen, Nineteen, and Thirty-four through Thirty-five were all given by Mr. Azima to HeavyLift, and then he said RAK could have it. So at the end of the day, there were no measures taken. There were also no measures taken whatsoever from any of the other companies, except maybe ALG, and ALG is the only company that is at issue that Mr. Azima wholly-owned, the only one.

And when I asked him, and this is in the record and this is in our briefing, I said, "Well, did you have any NDAs?" He said, "Yeah, yeah, with some." "Okay, well, with who?" Couldn't name a single person. There's never been an NDA produced. He thinks that there might have been some.

So Brownies Logistics, Smokehouse BBQ, he couldn't tell. He had no idea to whom his trade secrets -- once it got

into possession of Brownies Logistics or Smokehouse BBQ to whom his trade secrets were disclosed, and there were no confidentiality obligations as to either.

**THE COURT:** All right. Thank you. Do you want to be heard on the statute of limitations?

**MS. BRIGGERMAN:** Yes, Your Honor.

I think the discussion that Your Honor just had with Mr. Kaplan shows that there is a material dispute of fact as to when the trade secrets were first disclosed and when Mr. Azima reasonably should have been aware that they were publicly disclosed.

And one thing I want to correct is Mr. Kaplan's representation of Mr. Tarbell's testimony. Mr. Tarbell is our forensic expert. Mr. Tarbell clarified when he was deposed, his prior statement in another proceeding, in that when he was testifying about the January 2017 date -- and I'm just going to read directly from the quote.

He was asked: "So when you say uploaded (as to when the data was uploaded) you were distinguishing between when the data was uploaded and when it was available?"

And he says: "Correct."

So when the data was uploaded is different -- I'm sorry -- when the link was uploaded, when it was first created, is different from when the data was actually publicly

available, and there's a material dispute of fact as to when it was publicly available. But we do know that Mr. Azima has testified that he did not become aware that it was publicly available, and it was not available to his team, to Mr. Tarbell, until July 2018 when Mr. Tarbell found it on the Internet.

**THE COURT:** I wasn't really sure what to make of that statement by Mr. Tarbell because he also says in his affidavit that "my analysis indicates moreover that access to the data through ordinary Internet sites, i.e., the WeTransfer sites, which are not peer-to-peer or torrent sites, was subsequently established in January of 2017." If it wasn't public, what's he talking about access?

**MS. BRIGGERMAN:** And he does clarify that later. I believe it's in his rebuttal report as to what the word "access" means. It's not a -- candidly a great choice of words. But he later clarifies, as he did in his testimony, that "access" is -- when he used the word "access," he did not mean publicly available. And I believe his report concludes that --

**THE COURT:** Who was it accessible to in January of 2017 then?

**MS. BRIGGERMAN:** So I think he's referring to the link being available. Until the data is actually uploaded to the link, it is not publicly available.

THE COURT: So read what he said again.

MS. BRIGGERMAN: So the quote I have from his testimony is:

"So when you say uploaded (and he was referring to the previous use of the word "upload" in his testimony) you were distinguishing between when the data was uploaded and when it was available."

So uploading it to the link does not necessarily mean that it is publicly available.

THE COURT: Even though he says data through ordinary Internet sites was -- access to data was established in January of 2017?

MS. BRIGGERMAN: I would have to check that and compare it to his rebuttal report, because I do believe that he clarifies that in his rebuttal.

THE COURT: All right. Anything else?

MS. BRIGGERMAN: That's it, Your Honor. Thank you.

THE COURT: We're going to take a brief recess, 10 minutes. We'll come back, and I think I'll hear on attorneys' fees.

(At 11:50 a.m., break taken.)

(At 12:04 p.m., break concluded.)

THE COURT: All right. One second. Yes, sir?

MR. KAPLAN: Your Honor, if the Court will indulge, my colleague brought something to my attention that may be

helpful for the Court on the last point regarding HeavyLift.

THE COURT: All right.

MR. KAPLAN: I just want to point out to the Court that Trade Secret Number One as well as Two, Thirteen, Nineteen, and Twenty-four were specifically created to be disseminated to potential investors and, in fact, were without any evidence of any efforts taken to maintain their secrecy when it went out to those investors.

THE COURT: All right. Thank you.

Motion for attorneys' fees, Swecker & Swecker Enterprises?

MS. ASANTE-SMITH: Yes, Your Honor.

THE COURT: I don't think we need long on this.

MS. ASANTE-SMITH: We don't, your Honor, and I promise to be succinct.

Your Honor, as you are aware, we are seeking on behalf of Mr. Swecker approximately $210,000 in attorneys' fees and costs necessary for Mr. Swecker a third party's response to Plaintiff's various discovery requests.

Your Honor, as you will see in our motion, and even in our amended motion, Mr. Swecker's attorneys' fees are in the amount of approximately $155,000 and costs in the amount of approximately $55,000. And I want to point out, Your Honor, and outline for the Court what those fees are really kind of derived from.

First, we have a significant -- we have engaged in a significant and necessary document review and production process. I want to point out that in response to Plaintiff's subpoena, the initial scope of documents -- potentially relevant documents to be considered was 474,166 text messages and emails. That does not include the pages upon pages of Mr. Swecker's handwritten notes from several years ago that had to be deciphered, reconstructed, identified, and kind of diligently reviewed for the purposes of responding to Plaintiff's subpoena in good faith. I also want to point out --

**THE COURT:** Why did that have to happen? Why didn't he just give them to them?

**MS. ASANTE-SMITH:** Your Honor, because as we have mentioned in our various pleadings, including this one, Mr. Swecker very specifically and narrowly served Mr. Del Rosso in the capacity as his attorney, and those written notes derive from Mr. Swecker's legal work, and most, if not all, comprise work product and attorney-client privilege.

So this wasn't just a review of identifying potentially responsive information. Consistent with his duty per the North Carolina Rules of Professional Conduct and his role as an attorney, that information had to be deciphered to ensure that we were properly designating any information that did have to be produced and making the necessary designations

related to attorney-client privilege.

**THE COURT:** I mean, Mr. Swecker can't read his own handwriting?

**MS. ASANTE-SMITH:** Well, Your Honor, he did. But that did not negate the fact that, as his attorneys, even after he had engaged in that review, we had a duty and obligation to ensure that those documents -- again, not just the written documents -- were responsive and that we were not divulging any information written or otherwise protected by that privilege.

**THE COURT:** So why should the Plaintiff pay the bill to protect attorney-client privilege for Swecker's client?

**MS. ASANTE-SMITH:** Well, Your Honor, it's not -- it's not just about paying the bill to protect attorney-client privilege. I wanted to give the Court -- wanted to begin to give the Court a snapshot of what our work was comprised of, and that was an element of it.

**THE COURT:** Okay. So whether it was all or none, why should the Plaintiff pay to protect Swecker's client?

**MS. ASANTE-SMITH:** Well, it's not -- we would offer that it's not that the Plaintiff is paying to protect Mr. Swecker's client, it's that Mr. Swecker himself has an obligation and a duty against disclosure of that information.

**THE COURT:** Okay. I'll accept that as true. Why should they have to pay for him to figure out how to discharge his duty to his client? His client is the beneficiary of that

action, not the Plaintiff.

**MS. ASANTE-SMITH:** Yes, Your Honor. While his client is the beneficiary -- for example, the North Carolina State Bar imposes an obligation on Mr. Swecker as the attorney to ensure the unlawful disclosure of that information --

**THE COURT:** Understood. Why should they pay for that?

**MS. ASANTE-SMITH:** Well, because they were requesting the documents that were implicated, right? In that request, Mr. Swecker was doing his due diligence, considering all of the information within the scope of Plaintiff's subpoena; and in the course of that, in the course of specifically and distinctly responding to Plaintiff's request for information, that was one element of the necessary and essentially legally required review as an attorney that he had to go through in order to determine what to turn over.

**THE COURT:** Okay. What do you see as the standard for the transfer of fees from -- or expenses from the third party to the party issuing the subpoena? What's the standard?

**MS. ASANTE-SMITH:** Yes, Your Honor. The standard is, we would offer, Your Honor, is governed by Rule 45. Specifically, Rule 45(d)(2)(B)(ii) requires that costs be shifted from a non-party recipient of a subpoena, Mr. Swecker, to the party seeking discovery, Plaintiff, to avoid significant expense from compliance.

So when we have that as the standard, directly in response to your question, it implicates the cost-shifting provision. And the law is clear on the cost-shifting provision in that it provides that -- I'm sorry -- it provides that in order for the costs to be shifted, there has to be an analysis of what is considered a significant expense from compliance, and that's from the *Legal Voice v. Stormans* case. And in that the question is, once we've established that he is a non-party, which we have, and he is responding to a subpoena to be compliant, we have to assess the mandatory, significant expense-shifting under this rule.

And while there's no published Fourth Circuit authority addressing exactly how to do this, we have to turn to the practice in district courts within the Fourth Circuit. And at least one district court, Your Honor, in North Carolina has determined that the mandatory language of Rule 45(d)(2), quote, "eliminated the discretion that the courts previously had to require payment of compliance-related costs by the requesting party, and, therefore," I quote, "the main question the Court must answer is whether incurring a certain dollar amount in fees and costs to comply with the subpoena qualifies as significant." In that very case, the Court had no trouble concluding that more than $20,000 was, in fact, significant.

So between that case law --

**THE COURT:** Twenty as opposed to 200 or 150?

**MS. ASANTE-SMITH:** Yes, they had no trouble concluding --

**THE COURT:** So back to my question. So Swecker, he's an attorney.

**MS. ASANTE-SMITH:** Yes.

**THE COURT:** He was engaged in his capacity as an attorney.

**MS. ASANTE-SMITH:** Yes.

**THE COURT:** And so he knows from his own review what's attorney-client and what's not, right?

**MS. ASANTE-SMITH:** Well, yes, but --

**THE COURT:** That's his obligation under the State Bar rules.

**MS. ASANTE-SMITH:** Yes, Your Honor. But I think it's important for the Court to consider that when I -- when I provided the example of the handwritten notes, within that universe of 474,000 text and email numbers --

**THE COURT:** I'm not impressed with the numbers.

**MS. ASANTE-SMITH:** Yes, Your Honor. That represents just a limited scope, so that assessment.

**THE COURT:** That's fine.

**MS. ASANTE-SMITH:** Yes.

**THE COURT:** But he's entirely capable of looking at his own records that he accumulated while he was representing the client and recognizing what's attorney-client privilege and

what's not, right?

**MS. ASANTE-SMITH:** Yes, Your Honor, but --

**THE COURT:** So why does he have to go engage outside counsel to do a review on behalf -- which ultimately is on behalf of his client?

**MS. ASANTE-SMITH:** Your Honor, because he has interest to protect in his capacity --

**THE COURT:** That being what?

**MS. ASANTE-SMITH:** His interest as -- his duties to uphold as attorney for Mr. Del Rosso.

**THE COURT:** So he can look through, decide what he thinks is privileged, give that to his attorneys, say this is what I think is privileged, the rest is not.

**MS. ASANTE-SMITH:** Well, Your Honor, we also have a duty and obligation as retained counsel to not merely -- attorney or not -- to not merely accept what our client says or, you know, says, "Hey, this is what I have, that is privileged or not." We also have an obligation to make sure, as counsel of record, that we do our due diligence.

So that due diligence not only required that review; but as we've detailed in our briefing as well, as Your Honor I know can appreciate in this case, this is a multi-layered, multi-faceted case that includes but is not limited to entities like NTi that Mr. Swecker had to engage in his work as attorney for Mr. Del Rosso in that multi-layered and multi-faceted

process.

So a significant chunk of that review involved communications between these necessary parties and these essentially stakeholders who also had to be consulted.

THE COURT: So how am I supposed to tell from this what's what in my review?

MS. ASANTE-SMITH: Your Honor, I don't want to --

THE COURT: Do you know what this is?

MS. ASANTE-SMITH: I can assume, but I would like to --

THE COURT: Go ahead and assume. What's this?

MS. ASANTE-SMITH: The --

THE COURT: Heavily redacted billing.

MS. ASANTE-SMITH: Yes.

THE COURT: So how am I supposed to look and decide what's reasonable and what's not?

MS. ASANTE-SMITH: Well, Your Honor, I'll offer in response to at least one of the Special Master's inquiries where she provided guidance as to revisions that needed to be made, we did adjust and reproduce various kind of bills as appropriate in order to be responsive. Now --

THE COURT: To who?

MS. ASANTE-SMITH: -- in terms of -- I'm sorry?

THE COURT: Produce them to the Plaintiff? Who did you produce them to?

**MS. ASANTE-SMITH:** My apologies, Your Honor. Are those bills you're looking at our bills from Mr. Glaser, not --

**THE COURT:** Document 405.

**MS. ASANTE-SMITH:** Okay, yes. Okay, so those are our bills. And, Your Honor, if the Court -- if the Court decided or directed us to, you know, I guess, undo those redactions for the purpose of making those determinations, but --

**THE COURT:** Let me just ask you.

**MS. ASANTE-SMITH:** Yes, Your Honor.

**THE COURT:** How am I supposed to decide what's reasonable if the whole -- if 80 percent is redacted? How do I do that?

**MS. ASANTE-SMITH:** Well, Your Honor, we, as Mr. Swecker's attorneys, are representing and have detailed -- while not necessarily being able to review the time entries, we have detailed not in terms of conclusory statements, but with great specificity exactly what those time entries have been comprised of.

**THE COURT:** So you've given me general categories of work, right?

**MS. ASANTE-SMITH:** Your Honor, we would offer that they are much more specific than general categories of work.

**THE COURT:** Well, you can offer that, but I'm going to tell you it is general.

**MS. ASANTE-SMITH:** Yes, Your Honor.

THE COURT: Because I can't see anything. So back to my question. I mean, do you see any way to review the billing to see if it's reasonable if the billing is redacted like this?

MS. ASANTE-SMITH: Well, Your Honor, if Your Honor wished --

THE COURT: No, I'm asking.

MS. ASANTE-SMITH: I'm sorry.

THE COURT: It's a question. Do you see any way for me to review the billing to make a determination as to whether or not it's reasonable under the circumstances?

MS. ASANTE-SMITH: To review the billing, no. But we would offer that outside of the billing, including in our sworn pleadings and the representations being made in the arguments today, we provide with specificity, not conclusory statements, specificity the nature of that work --

THE COURT: Okay. Read me one that you contend is specific.

MS. ASANTE-SMITH: Yes, yes.

So, Your Honor, for example, in terms of -- let's say we use a diligent review as the broad topic. On page 8 of our amended motion for attorneys' fees, we specify that we had to develop distinct tagging fields according to a party or entity. So, for example, as I mentioned -- yes?

THE COURT: What was the hourly rate for that work?

MS. ASANTE-SMITH: Well, let me say this, Your Honor.

In terms of hourly rate, Mr. Glaser and I both have what some might consider pretty high hourly rates. I will say my hourly rate was cut in about half for this process and applied --

THE COURT: From the record, what is there for me to determine the hourly rate?

MS. ASANTE-SMITH: Your Honor, we provided in our initial filing the reduction -- the rate at which we were charging Mr. Swecker for our work.

THE COURT: Okay. So in your initial production, your rate was what?

MS. ASANTE-SMITH: It would have been -- and, Your Honor, the only reason I'm kind of pausing is between that time I know kind of the firm structure had changed. It was in the 200s. If I may have one moment, please. Your Honor, I want to make sure I'm not speaking out of turn in terms of the relevant time period. I can represent to the Court that it was in the 200 range, at least for me, as much as Mr. Glaser 300s --

THE COURT: I mean, it's a guess, because nobody can look at the record and see how much time or what the rate was charged at a particular time, right?

MS. ASANTE-SMITH: Yes, Your Honor. That's information that can be quickly and easily ascertained. I just want to make sure, given kind of the length of our engagement in this, I want to make sure that I'm representing properly, but I will say I know --

**THE COURT:** You could have done it in the invoices themselves, but you chose to redact them, so I can't see them.

**MS. ASANTE-SMITH:** Yes, Your Honor.

**THE COURT:** And as a result, is there -- I mean, what's your best case in terms of me conducting a review and making a determination as to what's a reasonable fee? What's the best way to do that based on what's been submitted?

**MS. ASANTE-SMITH:** Yes, Your Honor. We would offer that if the Court is willing to give us an opportunity --

**THE COURT:** No, based on what's submitted, how do I do that?

**MS. ASANTE-SMITH:** Your Honor, okay. If you are to do that now with the information that you have, we would point to our pleadings and our specific descriptions of the work that we've done and offer that --

**THE COURT:** Okay. You started with tagging.

**MS. ASANTE-SMITH:** Yes.

**THE COURT:** How much did you bill for tagging?

**MS. ASANTE-SMITH:** Your Honor, it's the same rate. It would be in about the 200 --

**THE COURT:** Not what would it be. In terms of the record, how much can I look and see how much you billed for tagging?

**MS. ASANTE-SMITH:** Your Honor, if you would allow me to, I can make that determination in a very short period of

time.

THE COURT: Based upon what? On the papers I have?

MS. ASANTE-SMITH: No, Your Honor.

THE COURT: Other records?

MS. ASANTE-SMITH: Yes, Your Honor, internal firm records.

THE COURT: At the end of the day, in terms of what's been submitted --

MS. ASANTE-SMITH: Yes, Your Honor.

THE COURT: -- by redacting the records as you have --

MS. ASANTE-SMITH: Yes.

THE COURT: -- you have deprived me of an opportunity to review the billing for reasonableness. Is that a fair statement?

MS. ASANTE-SMITH: I would say that we have -- we have in good faith --

THE COURT: I'm not talking about good faith, bad faith. Everybody makes a mistake. Just a straightforward question. If you redact your records the way these have been redacted --

MS. ASANTE-SMITH: Yes, Your Honor.

THE COURT: -- then a third party, specifically a court, really has no ability to conduct an effective review of whether or not what's been billed has been reasonable. Is that

a fair statement?

**MS. ASANTE-SMITH:** That is fair if the Court is limiting its review to our billing records.

**THE COURT:** No, take a look at everything, everything that you filed. Is it possible for me to review that and determine what a reasonable billing is? That's -- you can answer the question.

**MS. ASANTE-SMITH:** It's not.

**THE COURT:** Okay. That's important here, and I'll explain why. As -- I'm not the brightest bulb in the shed for sure, but this case -- people have chosen up sides. I don't know whether there's joint defense agreements, I don't know if interests are aligned, or I can't tell what. But this case has been a fight over everything that has happened in the case.

And so in terms of reviewing the record for reasonableness, we've got issues like, you know, Judge Webster issued a ruling. He narrowed down the time frame for the disclosure but otherwise ordered the disclosure to proceed. We've got all these pieces related. There are -- it's obvious that the adversary proceeding has gone on with respect to Dechert, Swecker, Del Rosso, Azima. Everybody's been fighting, which is fine.

But we're now moving into cost-shifting, and I have to make a determination as to what's reasonable in terms of the third-party cost as opposed to what may have been done in

relation to defending a client, or taking an adversary position in this proceeding consistent with Del Rosso's position as opposed to -- there's a lot of complexities in deciding what's reasonable.

It's not a question of whether the total bill to Swecker is reasonable, because I don't know everything that Swecker charged counsel with doing. I'm not into that. The question is specifically relating to the disclosure and the subpoena. That's what I have to make a determination as to, and I don't see any way that I can do it with what's been submitted as heavily redacted as it is.

Does the Plaintiff want to be heard on this at all at this point?

MR. RAND: Your Honor, you heard from Mr. Jones at the August hearing on this issue, and we have briefed it. I have a couple of points, but I'm happy if you're -- if you don't have any questions, I'm happy just to --

THE COURT: Here's what I think needs to happen. I think this motion needs to be denied without prejudice. You can resubmit it. But if I'm going to do it, I have to be able to look at the bills.

MS. ASANTE-SMITH: Yes, Your Honor.

THE COURT: I don't know that I've ever seen -- well, I take that back. I did have a case where counsel submitted the billing heavily redacted, and I couldn't tell anything. I

told them no fees; you can resubmit an unredacted version for my review. They did; I reviewed. But I think in reality the paying party needs an opportunity to review it as well because they may challenge the reasonableness of the billings. So there's a lot of things that go into this.

So I get it. I think under Rule 45, certainly as you point out, at least the case in Charlotte has recognized that there are rules about submitting. But in my mind if I'm going to review it for reasonableness, I need all the necessary information to do that.

**MS. ASANTE-SMITH:** Yes, Your Honor.

**THE COURT:** All right. Thank you.

**MS. ASANTE-SMITH:** Thank you, Your Honor.

**THE COURT:** All right. Let's see. What was the modified amended? Okay. So we have the motion was filed, that's Document 318 with memo, and then that was amended at Document 405. So just show those two are denied without prejudice to resubmission in light of the Court's comments.

All right. The last issue is the subpoena duces tecum. I'll defer to the parties. I think that one's been pretty well briefed. I think I'm pretty close. I don't know that I have any major questions, so I'd say if you have -- let's see. I'm going to make sure.

**MR. KAPLAN:** Your Honor, I'm getting a phone call from my daughter's school. I would like to be excused.

**THE COURT:** You can be excused.

**MR. KAPLAN:** Thank you.

**THE COURT:** All right. So we have the subpoena duces tecum to Wells Fargo and Company. There were two subpoenas issued, but they were -- I think they're pretty much the same. They were just amended as to the target of the subpoenas.

I think that one was pretty clearly briefed; but if the parties want to take five minutes and set forth anything additional, I'll hear from you. It's a motion to quash.

**MS. ASANTE-SMITH:** Your Honor, we have nothing further on that matter.

**THE COURT:** All right.

**MR. RAND:** Your Honor, I'm afraid I might make it worse, so I'll just stand now, and we appreciate the opportunity.

**THE COURT:** I understand. Let me offer this to the parties. The -- I will go ahead and say at the outset just to give you a forecast that I do -- I tend to agree. I don't think that Swecker has come forward with -- I think, number one, I do think the subpoenas need to be narrowed to the time frame consistent with what Judge Webster has previously -- or was previously entered as part of the discovery order, which was March 2015 through October 15, 2020.

I'm troubled by this one, even though I understand the law in terms of the bank is a third party, and, therefore,

it's questionable about standing. And so my preference would be -- well, I'll say this. I'll go back and look at this one more time; but even if I deny the motion to quash and say production needs to take place, it looks like there's the potential for a bunch of mess to come in, personal stuff that's really nobody's business.

I'd like for the parties to work out some way to review the material and not hang on to other clients' payment information or personal information that is clearly irrelevant to the case. So if you all can -- you all know that more than likely I'm going to deny it -- deny the motion to quash, but what I'm going to be looking for is some way to control the information that's provided and not be bogged down in Swecker's personal life or other business. If you all can find some way to narrow it on your own, that will take care of the problem. So I'll leave that with you all.

**MS. ASANTE-SMITH:** Yes, Your Honor.

**THE COURT:** So I'll leave that with you all. And I would say probably be at least a couple of weeks before an order comes out. Yes, sir?

**MR. RAND:** Your Honor, we've met and conferred on a number of issues, and we'll be happy to do that in the short term.

**THE COURT:** All right. I think it will probably end up better if you all take care of it rather than leaving it to

me, but, that's -- generally speaking, that's where things stand. So I'll give you at least two weeks, and you can let me know if the need for an order becomes moot, but I'll be happy to enter an order if I need to.

All right. I'm going to do a very brief cleanup. I'll decide later because I want you all to get out of here and figure out where you need to go from here.

In terms of the outstanding objections and appeals from the Special Master's report, the parties are familiar with the agreement that put the Special Master in place and the objections that could be lodged. It's a Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure. Ms. Richey issued a number of reports. Objections have been filed to parts of One and Seven -- I think I've got this right -- One and Seven and then the whole of Nine, which I think Nine was the one that was relatively short and related back to some findings that she had started in Finding Number Six, and there have been some status conferences and some other things, and then she closed that out with that Number Nine, special finding.

And for all three of those, the review -- the standard of review is the same. If there's a timely objection filed to a report and recommendation, then the standard of review is de novo, and it's de novo review as to any objections to any conclusions of law. And in this case that's complicated

-- not complicated, but we'll say my review is also subject to the rule that I will set aside the Special Master's rulings on procedural matters only for an abuse of discretion, and I have the authority to affirm, modify, or reverse, in whole or in part, or resubmit to the Master -- to the Special Master with instructions.

Number one is the big one obviously because that relates to an assertion of privilege by the Defendants with respect to the nonparty government of -- I don't know how to pronounce it, RAK, everybody in here knows who RAK is -- and there were two prongs to it: One, that Defendants were not authorized to assert the privilege, and, two, that Ms. Richey directed in her capacity as Special Master that RAK appear before the Court to assert any privileges. The Defendants contend that they can assert RAK's attorney-client privilege because the Defendants were engaged by Dechert, who was at that time counsel for RAK, to facilitate the representation and provision of legal advice to RAK, and, with RAK's express authorization, the Defendants withheld or otherwise redacted RAK's privileged information in response to Plaintiff's discovery request.

A number of factual matters have been raised. There's the Patterson Belknap affidavit that's been submitted as well as other affidavits from -- well, another affidavit from Ruzumna, an attorney for RAK. It talks about what

Defendants have in their possession and control, and it's really been kind of a two-pronged process. First, there was a general objection lodged by the Defendants with respect to the -- we'll call them the RAK documents, and that subsequently was fine-tuned a little bit with more input here from Patterson Belknap and Ruzumna and others getting more specific.

But there's still -- I talked about a lot of things that troubled me in the August hearing. There's still a number of things that trouble me about the assertion of privilege in this particular case. I've not had a case where the parties asserting privilege -- here it's Del Rosso asserting privilege. RAK has presented information to the Court, we'll say, through the affidavits that were provided, but RAK has not appeared, whether it's through Ms. Richey's direction or after Ms. Richey entered her opinion. RAK has stayed out. And, similarly, counsel for RAK, other than filing an affidavit, has not entered the proceeding. And I find that on several levels to be problematic.

Number one, as I've discovered really for the first time in my career, it makes it almost impossible to have a -- when the client and the attorney, both of whom engaged -- or, we'll say, responsible for engaging Del Rosso or engaging the Defendants and providing services of some description, without somebody appearing and being responsive to inquiries from both the Special Master and the Court, it does make it almost

impossible to conduct an appropriate review of the assertion of privilege in a case. I really haven't run into this before. Most of the time counsel is present and asserting privilege, or the client is present with new counsel asserting privilege, and that process -- that typical process, we'll call it -- allows the Court to address the issue.

In my mind, I think the Special Master's finding is correct, regardless of her -- I won't say regardless of anything. I think she properly determined -- number one, I think the Defendants have the power to tell the Court that they think these documents are protected by privilege, but I don't consider that to be an assertion of privilege, which is something different. And here there's no engagement letters, there's no specific information provided as between RAK and Dechert with respect to the scope of the representation, the scope of the employment of Del Rosso, those things, those processes that help define what is attorney-client and work product privilege material and what is not.

"Defendants were engaged by Dechert as counsel for RAK to facilitate the representation and provision of legal advice to RAK in connection with actual or contemplated litigation outside of the United States." But other than that, there's no further detail as to the nature and circumstances of the engagement beyond an assertion that Defendants were investigative consultants hired by RAK's counsel and, as a

result, are party to the attorney-client relationship.

And certainly at this point, I don't know of any reason to dispute that Defendants may have contributed information to Dechert's provision of legal services to RAK, but investigative consultant as opposed to an investigator, I mean, it's just too conclusory and too nebulous for me to find that the privilege should be recognized here as to those documents. Two things can be true at the same time: Del Rosso can be a party to the relationship between Dechert and RAK, but not necessarily falling within the scope of the attorney-client privilege; and, ultimately, RAK's authorization from Patterson Belknap, I don't find that to be persuasive or controlling for a number of different reasons.

Number one, if you carefully review the affidavit, who actually made the determination of what documents are privileged and what are not? It's not entirely clear to me as to whether Patterson Belknap simply accepted the review from a third party on behalf of RAK. I understand there's a lot of discussion about re-review and whether you review it under English law or whether you review it under American law, the analysis is still the same, and all -- which I understand and appreciate, but specifics are necessary in determining whether or not that attorney-client privilege should apply.

And so I agree with the Special Master that the Defendants had not carried their burden to demonstrate that the

investigative consultant services, number one, render them eligible to assert RAK's privilege as the attorney, the party, or anything else with respect to the attorney-client relationship.

And even if somehow they -- even if it's sufficient for an outside counsel -- when I say outside counsel, I mean who's not in this case specifically, has not intervened in the case specifically -- I really am not persuaded by what has been presented that the confidentiality of the records, be it under work product privilege or be it under attorney-client relationship, has been sufficiently established here.

And, finally, I am significantly troubled. I understand that an amended privilege log has ultimately been filed with the Court. I did review that, but ultimately the people making the determinations as to the privilege log are beyond the reach of the Court, and it's impossible for me to know what I can and can't rely on.

So for a lot of reasons, I think -- I don't think -- I am affirming the Special Master's decision based on that Decision Number One.

With respect to Decision Number Seven, same standard applies. There were a number of arguments made, and there's an initial question of whether or not that finding as to the attorney-client privilege affects the Special Master's findings with respect to Number Seven. And as I just described in

Number One, the Special Master determined Defendants could not assert RAK's privilege on its behalf because at most they were consultants working for Dechert in Dechert's capacity as attorneys for RAK, and so on and so forth. I won't go through that again.

But Dechert and Swecker stand in a different capacity. That report Number One dealt directly with Del Rosso asserting privilege, and so I don't find that that Report Number One, the decision that I've just affirmed, sweeps as broadly as Plaintiff argues in the case. I think it only relates to the Defendants as a third-party consultant and doesn't sweep as broadly as to Dechert and Swecker, who were retained and engaged as attorneys for RAK and the Defendants.

I agree with the Special Master in terms of the disclosure of the NTi reports to the FBI that that in and of itself is not a waiver of privilege. And to be clear, that issue was addressed more or less as a general rule with respect to the disclosure to the FBI, because it's not -- wasn't disclosed to an adversary. The NTi disclosures were not disclosed to an adversary. That's generally the -- I'll call that the reasoning behind the Special Master's opinion, and that's a much closer issue for me than might have appeared, because the FBI -- it appears to me on the facts presented at the particular time the NTi reports were disclosed, I agree. There's nothing -- FBI is investigating, but there's nothing to

demonstrate that the FBI at that point is an adversary to Azima sufficient to suggest that there's been some kind of waiver. But at least in my mind, and this is dicta, has nothing to do with the case, that status, "non-adversary," can switch over in a heartbeat. I just don't see that line was crossed in this case given the timing of the disclosure.

In terms of -- and I think the Zukas deposition where Zukas was aware there was litigation ongoing, but he testified "I wasn't aware, nor were we really concerned necessarily with who was filing the lawsuit. We were concerned with our investigation in chief."

So, ultimately, I'll just keep it simple and straightforward. I cannot conclude from the evidence presented that the FBI was adverse to Dechert, Swecker, or NTi such that their production of the NTi reports to the FBI waived any work product privilege over those reports, and, therefore, the Special Master's determination that there is nothing to suggest that the FBI was adverse or any of their clients or agents was appropriate given the evidence, and, therefore, I affirm that part -- certainly affirm that part of the Special Master's ruling and overrule the objection.

With respect to the crime fraud exception and the Window World of Baton Rouge and the In Re: Grand Jury Proceedings cases -- I'm trying to pare this down so you all don't have to stay here all afternoon -- it seems to me in

terms of the Special Master's resolution of the Plaintiff's crime fraud motion, the Special Master first determined that North Carolina law applies to the dispute, then applied Window World's preponderance of the evidence standard. I think that was a correct application of North Carolina law and affirm the Special Master as to that issue.

With respect to the hacking motion issues, I'm not persuaded that a subpoena seeking documents pertaining to any and all hacking allegations against Dechert, its attorneys, and its clients would even have a marginal benefit in litigating important issues and would not be unduly burdensome to Dechert, particularly where potential privilege issues are concerned and, therefore, affirm the Special Master's findings in that regard.

With respect to the procedural allegations, it seems -- with respect to deficiencies in the Special Master's approach to these issues, I find that the terms governing the procedure in this case control, and for that reason the objection can be overruled. And then finally I think the report is sufficiently thorough and demonstrates appropriate consideration of all the evidence presented to the Special Master.

To keep things short with respect to Number Nine of the objection -- so One and Seven, objections overruled, Special Master affirmed.

With respect to Number Nine, I think that I'm going to -- before I issue a ruling, I think I'm going to have to take a look at -- conduct an in-camera review of that before I can make a final call on what Ms. Richey did.

It seems to me that there's arguments about relevance and considering relevance for purposes of discovery, and the discovery relevance is different from the trial-level relevance and the contention that the Special Master confused those and applied the wrong standard in discussing relevance, I don't read her findings quite that way. I think she identified specifically for purposes of discovery what the relevant issue was with respect to the report, and then for purposes of discovery reviewed the report to see what in that report was consistent with her finding as to what was relevant from a discovery purpose. I think she made that pretty clear.

So with respect to Number Nine, at this point it's under advisement. But when I get the trade secrets specifically, I need that report so I can conduct an in-camera review, and all that can be sent to me directly.

Any questions about anything?

**MR. MAHFOOD:** Yes, Your Honor, George Mahfood. First, will the Court be entering written orders on these orders?

**THE COURT:** If I do, they'll be very short. They'll simply say for the reasons set forth on the record.

**MR. MAHFOOD:** Secondly, on behalf of Defendants, we would ask the Court for a stay of your Order Number One. We filed a motion to stay with our appeal, and we're reiterating a motion to stay because these are significant issues. I'm not even sure that you have ordered the documents to be produced.

**THE COURT:** What did Ms. Richey do in her order?

**MR. MAHFOOD:** She didn't say. That was my question, because we submitted that second -- the supplemental --

**THE COURT:** Let me be clear. They have to be disclosed.

**MR. MAHFOOD:** Okay. Then if that's the ruling, then I would request that the Court enter a stay of the order pending appellate review.

**THE COURT:** Do you want to be heard on that?

**MR. BEHRE:** Your Honor, yes. We object to that strongly. We're four years and three months into this case. This is an interlocutory request, and it shouldn't be granted.

**MR. MAHFOOD:** Your Honor, we think the risk of serious harm to RAK's privileges and to my client's obligations to RAK as a consultant -- and the Court seems to have acknowledged that, though you expressed some concern about it -- they're a consultant to a law firm in performing services. And in connection with that, they came into contact with privileged information. And this Court has now ordered what is at least asserted by one law firm -- two law firms in

this country to be privileged information to be disclosed.

THE COURT: Let me pose a question to you. So in making that determination, those two law firms, who actually -- according to the affidavit filed, who actually made the determination as to what's attorney-client privilege?

MR. MAHFOOD: Under Mr. Ruzumna's declaration, Patterson Belknap and Allen & Overy, an English law firm, in conjunction with RAK made the determination, and that is clear from Mr. Ruzumna's declaration.

THE COURT: Okay. So it was an English law firm and Patterson Belknap?

MR. MAHFOOD: Yes, and my law firm as well. You know, we started the process, and then they took it over.

THE COURT: Read me from the Patterson Belknap affidavit what you think is the strongest expression of that.

MR. MAHFOOD: This is the declaration of Daniel S. Ruzumna filed February 13, 2024. It's Document 320-2.

THE COURT: All right.

MR. MAHFOOD: And is the question who made the determination? That's the specific question, Your Honor?

THE COURT: Yes.

MR. MAHFOOD: I think there are two passages, Your Honor. But paragraph 20 at page 8 of the declaration, Mr. Ruzumna states:

"On August 22, 2023, we understand Defendants

made a supplemental production of 432 documents, previously had been withheld pending privilege review by RAK's counsel, and that RAK's counsel determined either required redaction only or were not covered by RAK's privilege. That same day Defendants served an amended privilege log as before. The first three pages of that amended log identified documents over which Defendants asserted their privileges -- the Defendants' specific privilege log.

The remaining 95 pages of the amended log identified documents over which Defendants had been expressly authorized and directed by RAK's counsel to assert RAK's privilege, the RAK-specific privilege log. At my direction, Defendants memorialized RAK's instructions with respect to each document withheld or redacted by including the following language at the top of each page of the RAK-specific privilege log."

And it goes on to quote what's on each page --

**THE COURT:** Let me stop you right there.

**MR. MAHFOOD:** Okay.

**THE COURT:** Who was RAK's counsel who did that review?

**MR. MAHFOOD:** RAK's counsel was Patterson Belknap and Allen & Overy.

**THE COURT:** How do you know that?

**MR. MAHFOOD:** Well, that's why I said you have to read two different paragraphs because paragraph 16, this deals with what they did following the July 25th order:

"Defendants reviewed and identified the corpus of respondent's documents to be produced in response to Plaintiff's first RFPs. Once identified, counsel for RAK, specifically, Patterson Belknap attorneys and A&O attorneys (that's Allen & Overy ) reviewed each responsive document to provide more particularized guidance to Defendants and to ensure any applicable privileges were asserted."

**THE COURT:** Okay.

**MR. MAHFOOD:** There's a footnote there, but I'll skip it for the moment.

"For each document reviewed and determined by RAK's counsel to be subject to RAK's privilege, RAK's counsel expressly authorized and directed Defendants to assert privilege over the particular document, withhold or redact the document from production, and include it in their privilege log."

**THE COURT:** Okay. So two attorneys. We have an affidavit from Patterson Belknap.

**MR. MAHFOOD:** Yes, Your Honor.

**THE COURT:** Have we got an affidavit from Overby?

**MR. MAHFOOD:** Allen & Overy, no.

**THE COURT:** So we don't know which of the two made the determinations, right? It says "they" did, but we don't know who did, right?

**MR. MAHFOOD:** No, Your Honor, I disagree.

**THE COURT:** Okay. Who did?

**MR. MAHFOOD:** I think they jointly decided.

**THE COURT:** You "think" they did.

**MR. MAHFOOD:** Based on the language of the declaration, they jointly decided.

**THE COURT:** And who did what under what standard?

**MR. MAHFOOD:** It says Patterson -- well, if you're asking which privilege standard, then the statements that have been included in our papers are that the English standard for attorney-client privilege, whatever they call it, and the North Carolina standard, the U.S. standard, are the same.

**THE COURT:** Understood. I understand that. But did Belknap review under the American standard and Overy, whatever his name is, review under the English standard? Did they both do both?

**MR. MAHFOOD:** Well, I think --

**THE COURT:** Where's Dechert? They are the ones that engaged Del Rosso. If you could get an affidavit from Patterson Belknap, what happened to the attorney that actually engaged the Defendants? Where are they? They're silent.

**MR. MAHFOOD:** Patterson Belknap was engaged to --

THE COURT: How does Patterson Belknap know what Dechert did in terms of the engagement? How?

MR. MAHFOOD: Patterson Belknap and Allen & Overy are more than capable of reviewing --

THE COURT: I know they are. But in the affidavit, what is in here to explain what Dechert engaged the Defendants to do? What explains that in here?

MR. MAHFOOD: One moment. Paragraph 6.

THE COURT: Okay.

MR. MAHFOOD: "Based on documents that I have reviewed, Defendants were engaged by RAK's former counsel, Dechert LLP, in connection with and to facilitate legal advice provided by Dechert to RAK relating to actual and contemplated litigation outside the United States."

THE COURT: Okay. Fair enough. What does that mean in terms of attorney-client work product privilege?

MR. MAHFOOD: I'm about to read on.

THE COURT: Okay. Read on.

MR. MAHFOOD: "Services provided by Defendants included asset tracing, background checks, and fraud examination."

THE COURT: We had this discussion last time. What's confidential about that information?

MR. MAHFOOD: Because it's directed by attorneys who

are using the information --

**THE COURT:** What did they do to get the information? Was it a Lexis search? Was it a public records search? What's confidential?

**MR. MAHFOOD:** Well, Your Honor, see, this is the problem with, I think, your rationale. I believe your rationale --

**THE COURT:** Let's hear it. Let me hear it.

**MR. MAHFOOD:** Your rationale is flawed in the sense that simply because some information may be publicly available, that renders it not subject to attorney-client privilege.

**THE COURT:** No, that is not my rationale. My rationale is that nobody knows specifically what was done because the relevant parties are not here. Dechert's not here, RAK is not here, and we've got third parties making judgments over what happened when these people were engaged. That's my problem.

**MR. MAHFOOD:** Your Honor, the privilege log that was --

**THE COURT:** That you didn't file when we had the hearing? That one?

**MR. MAHFOOD:** Well, Your Honor, privilege logs aren't generally filed. They're served. It was --

**THE COURT:** Why was the earlier one filed, and the later one wasn't?

**MR. MAHFOOD:** That was explained in this declaration. Because at the time of this appeal, the third one -- the third privilege log did not yet exist. It was prepared in response to the Special Master's order --

**THE COURT:** Right.

**MR. MAHFOOD:** -- and it was prepared in accordance with her instructions, and it was served. And it's interesting, Your Honor, that at no time since the service of that third privilege log directed by the Special Master has anyone -- has the Plaintiff or anyone else -- challenged the sufficiency of the information contained in that privilege log. No one.

**THE COURT:** That's great. But I'm back to my original question. Everything that has been presented has precluded any position from the actual parties to the transaction. It's all been reconstructed through later counsel.

**MR. MAHFOOD:** Well, my clients --

**THE COURT:** No, we're done. We're done.

**MR. MAHFOOD:** I'm sorry, Your Honor.

**THE COURT:** Your motion to stay is denied. You can go to the Fourth Circuit if you think there's an interlocutory appeal.

**MR. MAHFOOD:** Could you grant the motion to stay until you rule on the motion for summary judgment?

**THE COURT:** No. We'll be in recess.

(At 1:07 p.m., proceedings concluded.)

* * * * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Joseph B. Armstrong, FCRR
United States Court Reporter
324 W. Market Street
Greensboro, NC  27401

Date: 01/26/2025